## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNIÓN FENOSA GAS, S.A.
   Parque Empresarial Alvento
   Vía de los Poblados, 1
   28033 Madrid, Spain

                     Plaintiff,

        v.

                               **Civil Action No. 1:18-cv-02395**

ARAB REPUBLIC OF EGYPT
   The Egyptian State Lawsuits Authority
   (ESLA)
   42 Gameat El Dowal El Arabiya St.
   Mohandeseen, Giza, Cairo
   P.O. Box: 12311 Egypt

                Defendant.

## COMPLAINT

Plaintiff Unión Fenosa Gas, S.A. ("UFG" or "Plaintiff"), by and through its undersigned counsel, alleges as follows for its Complaint against Defendant the Arab Republic of Egypt ("Egypt"):

### Nature of the Action

1.    This is an action to recognize and enforce an arbitral award (the "ICSID Award")[1] issued on August 31, 2018 in ICSID Case No. ARB/14/4 in favor of UFG and against Egypt. The ICSID Award was issued by an arbitral tribunal (the "Tribunal") following arbitration

---

[1] A redacted version of a true and correct copy of the ICSID Award certified by the Secretary General of ICSID is attached hereto as Exhibit A. The ICSID Award appends a copy of the Dissenting Opinion issued by one of the arbitrators, and has been provided to the Court as part of Exhibit A, notwithstanding the fact that the Dissenting Opinion does not comprise a part of the ICSID Award, nor is it entitled to recognition under 22 U.S.C. § 1650a. A motion to file the unredacted ICSID Award and Dissenting Opinion under seal is being filed concurrently herewith.

proceedings conducted in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention").  Pursuant to Article 54 of the ICSID Convention[2] and 22 U.S.C. § 1650a, UFG requests that this Court (1) enter an order recognizing and enforcing the ICSID Award in the same manner as a final judgment issued by a court of one of the several states, (2) enter judgment in UFG's favor in the amounts and currency denominations specified in the ICSID Award, and (3) grant any other and further relief that the Court may deem appropriate.

## The Parties

2.      Plaintiff UFG is a corporation organized under the laws of Spain.

3.      Defendant Egypt is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1605(a)(6), as this case falls under the FSIA exception for cases brought to confirm arbitration awards that "are or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards," and 22 U.S.C. § 1650a.

5.      Personal jurisdiction over Egypt is expressly conferred by 28 U.S.C. § 1330(b), which provides that this Court may exercise personal jurisdiction over a foreign state in any action where service has been made in accordance with 28 U.S.C. § 1608 and over which the Court has subject matter jurisdiction.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

---

[2]  A true and correct copy of the ICSID Convention is attached hereto as Exhibit B.

**Factual Background**

**I.      Summary of the Dispute**

7.      UFG's business concerns the liquefaction, shipping, regasification and commercialization of natural gas.  The Parties' dispute arises out of Egypt's failure, through its own acts and omissions, and through the acts and omissions of its instrumentalities and organs, to afford UFG's investments in Egypt (namely, the Damietta natural gas liquefaction plant in northeast Egypt (the "Damietta Plant") and a long-term gas sale and purchase agreement) the protections set forth in the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, signed November 3, 1992 and entering into force on April 26, 1994 (the "Treaty").[3]  The Tribunal found that Egypt, on its own and through its instrumentalities and organs, breached its substantive obligations under the Treaty, namely, its obligations under the fair and equitable treatment standard in Article 4(1) of the Treaty.[4]

8.      The facts underlying UFG's investment in Egypt, and the Parties' dispute, are summarized as follows:

9.      On August 1, 2000, representatives from the Egyptian General Petroleum Corporation ("EGPC")[5] and Unión Fenosa Desarrollo y Acción Exterior, S.A. ("UFACEX"), entered into a Sale and Purchase Agreement ("SPA").[6]  The SPA was endorsed by the Egyptian

---

[3] A true and correct English version of the Treaty is attached hereto as Exhibit C.

[4] Ex. A, ¶ 13.7.

[5]  EGPC was created by the Egyptian State to regulate and manage the Egyptian hydrocarbons sector in 1976 (Ex. A., ¶ 5.16).

[6] Ex. A, ¶¶ 5.32, 5.15.

Minister of Petroleum[7] and ultimately approved by the Egyptian Council of Ministers and Egypt's Prime Minister.[8]

10.     Under the SPA, UFG[9] acquired the contractual right to receive from EGPC—and later, from the 100%-state-owned Egyptian Natural Gas Holding Company ("EGAS") after it succeeded to EGPC's rights and obligations under the SPA—a certain supply of natural gas at the Damietta Plant over a period of at least 25 years.[10]  Critically, the economic feasibility of the Damietta Plant was dependent on its receiving the contractually agreed quantities of natural gas from EGPC (later EGAS).[11]

11.     The SPA includes several guarantees including that "seller shall at all times keep a back up supply to meet an on stream (load) factor of 95% of the LNG Complex"; that "Seller is the sole responsible [party] for securing adequate supplies of N[atural] G[as] for performance of its obligations hereunder"; and that "Seller is aware that the supply of N[atural] G[as] to Buyer under this Agreement is a key element for the successful development of the Project and . . . Seller represents and warrants that its availability of NG will be sufficient."[12]

12.     The SPA also includes a *force majeure* clause, which expressly excludes changes in the market that affect the price or demand for gas or that result in the need to divert natural gas to other users from the scope of *force majeure* within the meaning of the SPA.[13]

---

[7]  Ex. A, ¶ 5.51.

[8]  Ex. A, ¶ 5.54.

[9]  While originally these rights were granted to UFACEX, on June 30, 2003 UFACEX assigned its rights and responsibilities under the SPA to UFG and EGAS granted this request (Ex. A, ¶ 5.59).

[10]  Ex. A, ¶ 5.60.

[11]  Ex. A, ¶ 5.60

[12]  Ex. A, ¶ 5.63.

[13]  Ex. A, ¶ 5.64.

13.     Moreover, the SPA includes an obligation for EGPC to "undertake[] to procure that the Egyptian authorities undertake not to interfere with the rights of [UFG] under this Agreement, and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer . . . even in the case of a N[atural] G[as] shortage in Egypt, save *Force Majeure* as defined in this Agreement."[14]

14.     In reliance upon Egypt's undertaking (as demonstrated by the Minister of Petroleum's endorsement of the SPA) not to interfere with or adversely affect the rights of UFG even in the case of a domestic natural gas shortage, UFG then spent approximately US$ 1.3 billion to build the Damietta Plant and its associated facilities, completing this project on time and within budget.[15]  The Damietta Plant was located about 60 kilometers west of Port Said and the Suez Canal.  At the time of its construction, it was the largest single-train liquefaction facility in operation in the world.[16]

15.     While Egypt was not a party to the SPA, the Tribunal found that "[g]iven the importance of the gas supply for the LNG Project, to be made by EGPC (later EGAS), this undertaking [of non-interference] by the Egyptian authorities was no formality."[17] In fact, this undertaking was of "great significance" as demonstrated by the Ministry of Petroleum's endorsement of the SPA.[18]

16.     In November 2004, the Damietta Plant began operating, and in May 2005, President Mubarak inaugurated the Damietta Plant.[19]  Over the following years, however, EGAS

---

[14] Ex. A, ¶ 5.65.
[15] Ex. A, ¶ 5.97.
[16] Ex. A, ¶ 5.97.
[17] Ex. A, ¶ 5.66.
[18] Ex. A, ¶¶ 5.66, 5.68.
[19] Ex. A, ¶ 5.139.

failed to comply with its supply obligations, and from October 2006-2012, it provided only lesser amounts of gas ranging from 84% to 61% of the contractually agreed supply.[20]   EGAS's failure to comply with its obligations continued, despite UFG's agreeing to pay EGAS an increased price for gas on November 13, 2006, a further increased price on December 12, 2007, and yet another increased price on July 11, 2008.[21]   Seeking to reach a mutually acceptable state of affairs, UFG also agreed, as of January 21, 2011 to accept not only another price increase but also delivery of amounts of gas below the contractually required level for a temporary period of 33 months so long as EGAS promised to restore full delivery of contractual amounts thereafter and would acknowledge that UFG remained entitled to all of the quantities of previously undelivered gas and that these amounts would be delivered in future years at a specified rate of increased deliveries.[22]

17.     From 2012, the gas supply to the Damietta Plant was repeatedly restricted and suspended by EGAS as a result of Egypt's decision to divert gas to other purchasers, including the domestic electricity sector.[23]   From 2012 through 2014, there was not enough gas to comprise even a single cargo.[24]

18.     The Tribunal found that the Egyptian State was ultimately responsible for the decisions to curtail and cut gas supply to the Damietta Plant.[25]   Moreover, the prioritization of

---

[20]  Ex. A, ¶¶ 5.143, 9.84.
[21]  *See* Ex. A, ¶¶ 5.149, 5.164, 5.170.
[22]  Ex. A, ¶ 5.202.
[23]  Ex. A, ¶¶ 5.219, 9.129, 9.134.
[24]  Ex. A, ¶ 9.84.
[25]  Ex. A, ¶ 9.138.

gas away from UFG and SEGAS was expressed by Egyptian officials including the Minister of Petroleum[26] as well as President Morsi.[27]

19.     In the interest of resolving their differences and to restart supply to the Damietta Plant, EGAS and UFG executed the Transient Agreement on October 29, 2013, which called for immediate resumption of gas deliveries at a reduced but steadily increasing level over a specified transient period until full, contractually required quantities would again be delivered as of the beginning of 2018.[28]   Thereafter, on November 12, 2013, SEGAS wrote to EGAS to request a beginning of feed-gas delivery to the Plant in order to resume LNG production under the Transient Agreement, pursuant to its terms.[29]   EGAS refused to comply with this request,[30] and on November 15, 2013 directed the shutdown of the Damietta Plant.[31]   Given EGAS' flagrant breach, UFG submitted a notice of intent to terminate the Transient Agreement, given that its terms were not met.[32]   The Damietta Plant did not receive any gas for export under the Transient Agreement.

20.     In sum, since December 2012, no LNG has been lifted from the Damietta Plant, and it remains idle.[33]   The Tribunal found that Egypt's acts and omissions, as well as those of EGAS, EGPC and their affiliates which were attributable to the Egyptian State, with regard to the Damietta Plant amounted to breaches of its obligations under the Treaty, effectively destroyed UFG's investment in the Damietta Plant, and resulted in substantial damages to

---

[26] Ex. A, ¶¶ 5.242, 5.244, 5.250.

[27] Ex. A, ¶ 5.243.

[28] Ex. A, ¶ 5.286.

[29] Ex. A, ¶ 5.291.

[30] Ex. A, ¶ 5.293.

[31] Ex. A, ¶¶ 5.297, 5.299.

[32] Ex. A, ¶ 5.308.

[33] Ex. A, ¶¶ 5.219, 9.84.

UFG.[34]  Seeking to vindicate its rights under international law and to obtain the compensation to which it is rightfully entitled as a result of Egypt's destruction of its investments, UFG commenced the arbitration underlying this proceeding on February 14, 2014.[35]

## II.    The Treaty

21.    The relationship and dispute between UFG and Egypt is governed by the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt.  The Treaty was signed on November 3, 1992, and entered into force on April 26, 1994.

22.    The substantive obligations of each Party to protect the investors of the other Party, as well as their investments, are set forth, in part, in Articles 3 and 4 of the Treaty.[36]

23.    Article 3 provides, *inter alia*, that "[e]ach Party shall protect in its territory the investments made in accordance with its laws and regulations, by investors of the other Party and shall not hamper, by means of unjustified or discriminatory measures, the management, maintenance, use, enjoyment, expansion, sale and if it is the case, the liquidation of such investments."[37]

24.    Article 4 provides, in relevant part, that:

"1. [e]ach Party shall guarantee in its territory fair and equitable treatment for the investments made by investors of the other Party.

2. This treatment shall not be less favorable than that which is extended by each Party to the investments made in its territory by investors of a third country.

[…]

---

[34]  Ex. A, ¶¶9.57, 9.66-9.67, 9.84, 9.126.

[35]   A true and correct copy of UFG's Request for Arbitration filed on February 14, 2014 is attached hereto as Exhibit D.

[36]  Ex. C, Arts. 3-4.

[37]  Ex. C, Art. 3.

5. In addition to the provisions of paragraph 2 of this article, each Party shall apply, under its own law, no less favourable treatment to the investments of investors of the other Party than which is that granted to its own investors.)."[38]

25.     Article 1 of the Treaty defines the term "investor" as: "(a) any individual who, in the case of Spanish investors, is resident in Spain under Spanish law and, in the case of investors of the other Party, possesses its nationality pursuant to the law of that Party; [or] (b) any legal entity, including companies, associations of companies, trading corporate entities and other organizations which is incorporated or, in any event, is properly organized under the law of that Party and is actually managed from the territory of that Party."[39]

26.     UFG is a Spanish company incorporated under the laws of Spain and managed from within Spanish territory.  Therefore, the Tribunal found that UFG is an investor for purposes of the Treaty.  Egypt did not dispute this fact.[40]

## III.    The Parties' Agreement to Arbitrate

27.     Article 11 of the Treaty, pertaining to Disputes between One Party and Investors of the Other Party, provides as follows:

1. Disputes between one of the Parties and one investor of the other Party shall be notified in writing, including a detailed information, by the investor to the host Party of the investment.  As far as possible the Parties shall endeavor to settle these differences by means of a friendly agreement.

2. If these disputes cannot be settled in this way within six months from the date of the written notification mentioned in paragraph 1, the conflict shall be submitted, at the choice of the investor, to:

   − a court of arbitration in accordance with the Rules of Procedure of the Arbitration of the Stockholm Chamber of Commerce;

---

[38] Ex. C, Art. 4.

[39] Ex. C, Art. 1.

[40] *See* Ex. A, at ¶ 6.3.

– the court of arbitration of the Paris International Chamber of Commerce;

– the ad hoc court of arbitration established under the Arbitration Rules of Procedure of the United Nations Commission for International Trade Law;

– the International Centre for Settlement of Investment Disputes (ICSID) set up by the "Convention on Settlement of Investment Disputes between States and Nationals of other States," in case both Parties become signatories of this Convention;

– Regional Centre for International Commercial arbitration in Cairo.

**3.** The arbitration shall be based on:

– the provisions of this agreement;

– the national law of the Party in whose territory the investment was made, including the rules relative to conflicts of law;

– the rules and the universally accepted principles of international law.

**4.** The arbitration decisions shall be final and binding for the parties in conflict. Each Party undertakes to execute the decisions in accordance with its national law.[41]

28.     Article 11 of the Treaty memorializes Spain's and Egypt's consent to arbitration of claims by an investor of a Party against the other Party.  Per the terms of the Treaty, when a dispute arises with respect to a Party's compliance with its obligations thereunder, "the conflict shall be submitted, at the choice of the investor, to . . . the International Centre for Settlement of Investment Disputes (ICSID) set up by the 'Convention on Settlement of Investment Disputes between States and Nationals of other States,' in case both Parties become signatories of this Convention."[42]

---

[41] Ex. C, Art. 11.
[42] Ex. C, Art. 11.

29.     By filing its Request for Arbitration on February 14, 2014, UFG submitted its claims to arbitration under the ICSID Convention (which both Spain and Egypt signed and ratified)[43] pursuant to Article 11 of the Treaty, in the following terms:

> Pursuant to both Article 11 of the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt (the "BIT") and Article 36 of the Convention on Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention"), Claimant Unión Fenosa Gas, S.A. ("UFG") hereby requests that the Secretary-General of the International Centre for Settlement of Investment Disputes ("ICSID") institute an arbitration proceeding against Respondent, the Arab Republic of Egypt ("Egypt" or "the Government").[44]

30.     In accordance with Article 11 of the Treaty, UFG's submission to arbitration coupled with Egypt's consent set forth in Article 11 constituted an agreement to arbitrate within the meaning of Chapter II of the ICSID Convention.

## IV.     The Arbitration

31.     On February 14, 2014, UFG commenced the arbitration by filing and serving a Request for Arbitration on Egypt.  The Request for Arbitration invoked Article 11 of the Treaty and Article 36 of the ICSID Convention.[45]   On February 27, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.[46]

32.     The arbitration was seated in Washington, D.C., and proceeded in accordance with the ICSID Convention and ICSID Arbitration Rules.  The selection of the Tribunal was completed on December 8, 2014.  The Tribunal selected by the Parties consisted of Mr. V. V.

---

[43] *See* https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx.

[44] Ex. D, ¶ 1.

[45] Ex. D, ¶ 1.

[46] Ex. A, ¶1.5.

Veeder (President), Dr. J. William Rowley, QC (appointed by UFG), and Mr. Mark Alan Clodfelter (appointed by Egypt).[47]

33.     Egypt was competently represented in the arbitration by attorneys from the Egyptian State Lawsuits Authority (ESLA) and attorneys from Cleary Gottlieb Steen & Hamilton LLP.[48]  Egypt participated in all aspects of the arbitration:  it submitted a Request for Bifurcation and a Reply Memorial on Bifurcation, a Counter-Memorial on the Merits and Memorial on Jurisdiction, as well as a Rejoinder on the Merits and Reply on Jurisdiction.[49]

34.     The Tribunal conducted the hearing (in which both parties participated and were represented by their respective outside counsel) on jurisdiction and liability at the ICSID facilities at the World Bank in Washington, D.C. from March 6 to March 11, 2017, during which the Tribunal heard testimony from both UFG's and Egypt's witnesses and experts.[50]   The Tribunal closed the proceedings on July 11, 2018 through Procedural Order No. 17.[51]

## V.     The Award

35.     The Tribunal issued the ICSID Award on August 31, 2018.

36.     With regard to jurisdiction, the Tribunal ruled that UFG was an "investor" under Article 1(1) of the Treaty, as a legal entity incorporated in Spain and as a member of the Unión Fenosa association of Spanish companies.[52]   The Tribunal also found that the SPA, its execution, amendments and performance by UFG, together with UFG's acquisition of shares in SEGAS, constituted an "Investment" under Article 1(2)[5] of the Treaty and Article 25(1) of the ICSID

---

[47]  Ex. A, ¶ 1.6-1.17.
[48]  Ex. A, ¶ 1.58.
[49]  Ex. A, ¶¶ 1.22-1.23, 1.26, 1.29, 1.38, 1.44.
[50]  Ex. A, ¶ 1.58.
[51]  Ex. A, ¶ 1.82.
[52]  Ex. A, ¶ 6.65.

Convention.[53]   The Tribunal also addressed two additional preliminary defenses regarding corruption and necessity.  After extensive briefing on these matters, the Tribunal rejected these defenses, concluding that no corruption had occurred[54] and rejecting Egypt's necessity defense.[55]

37.   On the merits of UFG's claims, the Tribunal "decide[d] that the Claimant established the liability of the Respondent for breach of its obligations under the ["fair and equitable treatment"] standard in Article 4(1) [of] the Treaty."[56]  The Tribunal found that Egypt exercised its sovereign authority and public powers by curtailing the gas supply to the Damietta Plant, including by directing EGAS to limit and eventually stop the supply of feed gas under the SPA.[57]  Further, the Tribunal found that the curtailment of gas by the Minister of Petroleum in aid of satisfying domestic gas demand was not justifiable under the concept of *force majeure*, and therefore amounted to discriminatory treatment by Egypt of UFG's investment.[58]  The Tribunal found that the decline in feed gas supply was reasonably foreseeable to Egypt (as a result of Egypt's own policies that overstimulated local demand for natural gas while simultaneously enacting pricing and other policies to restrict further development of Egypt's natural gas resources by local gas producers), but not to UFG.[59]

38.   As compensation for Egypt's breaches of the Treaty, the Tribunal awarded UFG US$ 2,013,071,000 (the "Principal Sum"), after tax but before interest.[60]  The Tribunal also awarded UFG two kinds of interest:  Pre-award interest on the Principal Sum, from January 1,

---

[53] Ex. A, ¶¶ 6.66, 6.67.

[54] Ex. A, ¶¶ 7.116-7.117.

[55] Ex. A, ¶ 8.62.

[56] Ex. A, ¶ 9.155. Given that it found Egypt liable under Article 4(1) of the Treaty, the Tribunal considered it unnecessary to address UFG's claims under Articles 3(1), 4(2), and 4(5) of the Treaty. *See* Ex. A, ¶ 9.158.

[57] Ex. A, ¶ 9.131.

[58] Ex. A, ¶¶ 9.139-9.144.

[59] Ex. A, ¶ 9.129.

[60] Ex. A, ¶ 10.143.

2016 to the date of the Award, at a rate of Three-Month LIBOR + 2.0%, compounded quarterly;[61] and Post-Award interest on the Principal Sum, from the date of the Award until payment, at a rate of Three-Month LIBOR + 2.0%, compounded quarterly.[62]  Additionally, the Tribunal awarded UFG its legal costs, and ordered Egypt to reimburse UFG for such costs in the amount of US$ 10,000,000.[63]  Lastly, the Tribunal awarded UFG the costs of the arbitration, subject to a set-off for any reimbursement of its advances by ICSID.[64]

39.     The ICSID Award remains unpaid.  By this action, UFG seeks recognition and enforcement of the ICSID Award by this Court.

**<u>Cause of Action – Recognition of the ICSID Award Pursuant to 22 U.S.C. § 1650a</u>**

40.     UFG repeats and realleges the allegations above as if set forth fully herein.

41.     The United States is a signatory to the ICSID Convention, which establishes a framework for the resolution of investment disputes between a foreign sovereign party to the Convention and a national of another State party to the Convention.  Awards issued pursuant to the ICSID Convention are subject to recognition and enforcement in the United States under Article 54 of the ICSID Convention and pursuant to 22 U.S.C. § 1650a.

42.     Egypt signed the ICSID Convention on February 11, 1972, and deposited its ratification on May 3, 1972.[65]  The ICSID Convention entered into force for Egypt on June 2, 1972.  As the Tribunal found, UFG is a national of Spain, which became a State party to the ICSID Convention on September 17, 1994.[66]

---

[61] Ex. A, ¶ 10.144.

[62] Ex. A, ¶ 10.145.

[63] Ex. A, ¶ 12.17.

[64] Ex. A, ¶ 12.20.

[65] *See* https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx.

[66] *Id.*

43.     Article 53 of the ICSID Convention provides that an award rendered by an ICSID tribunal "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.  Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."  There is no stay of enforcement currently in place.  Thus, pursuant to Article 53 of the ICSID Convention, Egypt is obligated to abide by and comply with the terms of the ICSID Award without any further action by UFG.

44.     Article 54(1) of the ICSID Convention provides that "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."

45.     The United States has been a party to the ICSID Convention since October 14, 1966,[67] when the Convention entered into force and Congress enacted enabling legislation in the form of 22 U.S.C. § 1650a, which provides as follows:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

46.     The ICSID Award was rendered by an arbitral tribunal pursuant to Chapter IV of the ICSID Convention.

---

[67] *Id.*

47.     The pecuniary obligations under the ICSID Award consist of the Principal Sum in the amount of US$2,013,071,000 plus Pre-Award and Post-Award interest at a rate of Three-Month LIBOR + 2.0%, compounded quarterly, and legal costs in the amount of US$10,000,000.[68]  The tribunal also taxed the costs of the arbitration to Egypt; those costs will be determined by ICSID by October 30, 2018.

48.     Egypt has not paid any part of this outstanding pecuniary obligation.

49.     Pursuant to 22 U.S.C. § 1650a and Article 54 of the ICSID Convention, the ICSID Award must be recognized and the pecuniary obligations therein must be enforced as if the ICSID Award were "a final judgment of a court of general jurisdiction of one of the several States."

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

(a)     Recognizing the ICSID Award and enforcing the pecuniary obligations imposed by the ICSID Award as if the ICSID Award were a final judgment of a court of general jurisdiction of one of the several States;

(b)     Entering judgment in Plaintiff's favor in the amounts specified in the Award, including the principal amount of US$2,013,071,000, legal costs, arbitration costs, and pre-award and post-award interest as granted by the Tribunal; and

(c)     Awarding such other and further relief as may be proper.

---

[68]  Including pre-award and post-award interest as of September 30, 2018, the ICSID Award requires Egypt to pay US $2,211,409,456.

Dated: October 17, 2018

Respectfully submitted,

/s/ *Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz (D.C. Bar 452385)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, D.C. 20006
Tel: (202) 737-0500
Fax: (202) 626-3737
jbucholtz@kslaw.com

Edward G. Kehoe (*pro hac vice* application forthcoming)
Charlene C. Sun (D.C. Bar 1027854)
Enrique J. Molina (*pro hac vice* application forthcoming)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: (212) 556-2200
Fax: (212) 556-2222
ekehoe@kslaw.com
csun@kslaw.com
emolina@kslaw.com

*Attorneys for Plaintiff Unión Fenosa Gas, S.A.*