# Exhibit A



INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE (202) 458 1534  |  FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

By courier *(advance copy by email)*                                                      August 31, 2018

| | |
|---|---|
| Unión Fenosa Gas, S.A.<br>c/o Mr. R. Doak Bishop<br>Ms. Anisha Sud<br>Ms. Ginny Castelan<br>Mr. David Weiss<br>Ms. Sarah L. McBrearty<br>King & Spalding LLP<br>1100 Louisiana Street, Suite 4000<br>Houston, Texas 77002<br>United States of America<br> and<br>Mr. Edward G. Kehoe<br>Ms. Isabel Fernández de la Cuesta<br>Mr. Aloysius Llamzon<br>Mr. Timothy M. McKenzie<br>King & Spalding LLP<br>1185 Avenue of the Americas<br>New York, New York 10036<br>United States of America<br> and<br>Ms. Sara Burns<br>King & Spalding LLP<br>1180 Peachtree Street, NE<br>Atlanta, GA 30309-3521<br>U.S.A.<br> and<br>Mr. James E. Castello<br>Mr. Rami Chahine<br>King & Spalding International LLP<br>12, cours Albert 1er<br>75008 Paris<br>France | Arab Republic of Egypt<br>c/o H.E. Couns. Hussein Khalil Hamza<br>Couns. Abdel Hameed Nagashy<br>Couns. Mohamed Khalaf<br>Couns. Amr Arafa Hassan<br>Couns. Fatma Khalifa<br>Couns. Lela Kassem<br>Couns. Yousria Elgamal<br>Egyptian State Lawsuits Authority (ESLA)<br>42 Gameat El Dowal El Arabiya St.<br>Mohandeseen, Giza, Cairo<br>P.O. Box: 12311<br>Egypt<br> and<br>c/o Ms. Claudia Annacker<br>Mr. Robert T. Greig<br>Mr. J. Cameron Murphy<br>Ms. Laurie Achtouk-Spivak<br>Ms. Ariella Rosenberg; and<br>Mr. Larry Work-Dembowski<br>Cleary Gottlieb Steen & Hamilton LLP<br>12, rue de Tilsitt<br>75008 Paris<br>France |

**Re:**   **Unión Fenosa Gas, S.A. v. Arab Republic of Egypt**
(ICSID Case No. ARB/14/4)

Dear Mesdames and Sirs,

        Please find enclosed certified copies of the Tribunal's Award dated August 31, 2018 and Mr. Mark Clodfelter's Dissenting Opinion.

        Pursuant to Arbitration Rule 48, I have authenticated the original texts of the Award and Opinion and deposited them in ICSID's archives. In accordance with Arbitration Rule 48, the

Award is deemed to have been rendered on the date of dispatch, which is indicated on the original texts of the Award and on all copies.

      In accordance with Section 23.1 of Procedural Order No. 1, no award or decision in this case shall be published by ICSID without the consent of both parties. I would be grateful if the parties could inform us whether they consent to the publication of the Award and Opinion on the ICSID website.

Yours sincerely,

Meg Kinnear
Secretary-General

Enclosure

cc (with enclosure): Members of the Tribunal

 **ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE (202) 458 1534  |  FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

## C E R T I F I C A T E

### UNIÓN FENOSA GAS, S.A.

v.

### ARAB REPUBLIC OF EGYPT

### (ICSID CASE NO. ARB/14/4)

 

I hereby certify that the attached documents are true copies of the Tribunal's Award dated August 31, 2018 and the Dissenting Opinion of Mr. Mark Clodfelter.

Meg Kinnear
Secretary-General

Washington, D.C., August 31, 2018

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**UNIÓN FENOSA GAS, S.A.**

*Claimant*

and

**ARAB REPUBLIC OF EGYPT**

*Respondent*

**ICSID Case No. ARB/14/4**

---

## AWARD

---

***The Tribunal:***

V.V. Veeder, President
J. William Rowley, Arbitrator
Mark Clodfelter, Arbitrator

***Secretary of the Tribunal***
Milanka Kostadinova

*Date of Dispatch to the Parties:* 31 August 2018

# REPRESENTATION OF THE PARTIES

*Representing Unión Fenosa Gas, S.A.*:

Mr R. Doak Bishop
Mr David H. Weiss
Ms Anisha Sud
Ms Sara L. McBrearty
Ms Ginny Castelan
King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
United States of America

and

Mr Edward G. Kehoe
Ms Isabel Fernández de la Cuesta
Mr Aloysius Llamzon
Mr Timothy M. McKenzie
King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
United States of America

and

Mr James E. Castello
Mr Rami Chahine
King & Spalding International LLP
12, cours Albert 1$^{er}$
75008 Paris
France

and

Ms Sara Burns
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309-3521
United States of America

*Representing the Arab Republic of Egypt*:

H.E. Counsellor Hussein Khalil Hamza
Counsellor Abdel Hameed Nagashy
Counsellor Mohamed Khalaf
Counsellor Amr Arafa Hassan
Counsellor Fatma Khalifa
Counsellor Yousria El Gamal
Counsellor Lela Kassem
Egyptian State Lawsuits Authority (ESLA)
42 Gameat El Dowal El Arabiya St.
Mohandeseen, Giza, Cairo
P.O. Box: 12311
Egypt

and

(since 17 March 2015)

Dr Claudia Annacker
Mr Robert T. Greig
Mr J. Cameron Murphy
Ms Laurie Achtouk-Spivak
Mr Larry Work-Dembowski
Ms Ariella Rosenberg
Ms Ellie Norton
Cleary Gottlieb Steen & Hamilton LLP
12, rue de Tilsitt
75008 Paris
France

## *TABLE OF CONTENTS*

**I.      THE ARBITRATION**                                           **I.001**

    **(1) THE PARTIES**                                      **I.001**
    **(2) THE ARBITRATION'S PROCEDURE**                      **I.001**

**II.      THE PARTIES' DISPUTE**                                      **II.001**

    **(1) INTRODUCTION**                                     **II.001**
    **(2) THE CLAIMANT'S CASE**                              **II.001**
    **(3) THE RESPONDENT'S OBJECTIONS, RESPONSES ETC**       **II.002**
    **(4) THE PARTIES' RESPECTIVE PRAYERS FOR RELIEF**       **II.004**

**III.      THE PRINCIPAL TEXTS**                                      **III.001**

    **(1) INTRODUCTION**                                     **III.001**
    **(2) THE TREATY**                                       **III.001**
    **(3) THE SPA**                                          **III.003**
    **(4) THE EGAS TOLLING CONTRACT**                        **III.009**
    **(5) THE ICSID CONVENTION**                             **III.009**
    **(6) THE ILC ARTICLES ON STATE RESPONSIBILITY**         **III.010**

**IV.      THE PRINCIPAL ISSUES**                                      **IV.001**

    **(1) INTRODUCTION**                                     **IV.001**
    **(2) THE PRINCIPAL ISSUES**                             **IV.001**

**V.      THE PRINCIPAL FACTS**                                        **V.001**

    **(1) INTRODUCTION**                                     **V.001**
    **(2) DRAMATIS PERSONAE**                                **V.001**
    **(3) SELECTED FACTUAL CHRNONOLOGY**                     **V.004**
       **1980-1982**                             **V.005**
       **1993**                                  **V.005**
       **1994**                                  **V.005**
       **1997**                                  **V.005**
       **1999**                                  **V.006**
       **2000**                                  **V.006**
       **2001**                                  **V.023**
       **2002**                                  **V.030**
       **2003**                                  **V.038**
       **2004**                                  **V.040**
       **2005**                                  **V.042**
       **2006**                                  **V.043**
       **2007**                                  **V.046**
       **2008**                                  **V.051**

|  |  |
|---|---|
| **2009** | **V.054** |
| **2010** | **V.055** |
| **2011** | **V.058** |
| **2012** | **V.065** |
| **2013** | **V.082** |
| **2014** | **V.096** |
| **2015** | **V.099** |
| **2016** | **V.101** |
| **2017-2018** | **V.102** |
| **VI.  THE JURISDICTION ISSUES** | **VI.001** |
| (1) INTRODUCTION | **VI.001** |
| (2) THE RESPONDENT'S CASE | **VI.003** |
| (3) THE CLAIMANT'S CASE | **VI.011** |
| (4) THE TRIBUNAL'S ANALYSES AND DECISIONS | **VI.018** |
| (5) SUMMARY OF DECISIONS | **VI.024** |
| **VII.  THE CORRUPTION ISSUES** | **VII.001** |
| (1) INTRODUCTION | **VII.001** |
| (2) THE RESPONDENT'S CASE | **VII.001** |
| (3) THE CLAIMANT'S CASE | **VII.007** |
| (4) THE TRIBUNAL'S ANALYSES AND DECISIONS | **VII.014** |
| (5) SUMMARY OF DECISIONS | **VII.031** |
| **VIII.  THE NECESSITY ISSUES** | **VIII.001** |
| (1) INTRODUCTION | **VIII.001** |
| (2) THE RESPONDENT'S CASE | **VIII.002** |
| (3) THE CLAIMANT'S CASE | **VIII.006** |
| (4) THE TRIBUNAL'S ANALYSES AND DECISIONS | **VIII.011** |
| (5) SUMMARY OF DECISIONS | **VIII.016** |
| **IX .  THE MERITS ISSUES** | **IX.001** |
| (1) INTRODUCTION | **IX.001** |
| (2) THE CLAIMANT'S CASE | **IX.001** |
| (3) THE RESPONDENT'S CASE | **IX.010** |
| (4) THE TRIBUNAL'S ANALYSES AND DECISIONS | **IX.018** |
| (5) SUMMARY OF DECISIONS | **IX.046** |
| **X.  THE COMPENSATION ISSUES** | **X.001** |
| (1) INTRODUCTION | **X.001** |
| (2) THE CLAIMANT'S CASE | **X.003** |
| (3) THE RESPONDENT'S CASE | **X.015** |
| (4) THE TRIBUNAL'S ANALYSES AND DECISIONS | **X.022** |
| (5) INTEREST | **X.031** |
| (6) SUMMARY OF DECISIONS | **X.032** |

**XI.   THE STAY/SUSPENSION ISSUES**                                   **X1.001**

       **(1)** INTRODUCTION                                **XI.001**
       **(2)** THE RESPONDENT'S CASE                       **XI.001**
       **(3)** THE CLAIMANT'S CASE                         **XI.004**
       **(4)** THE TRIBUNAL'S ANALYSES AND DECISIONS       **XI.007**
       **(5)** SUMMARY OF DECISIONS                        **XI.008**

**XII.  THE COSTS ISSUES**                                            **XII.001**

       **(1)** INTRODUCTION                                **XII.001**
       **(2)** THE CLAIMANT'S CASE                         **XII.001**
       **(3)** THE RESPONDENT'S CASE                       **XII.003**
       **(4)** THE TRIBUNAL'S ANALYSES AND DECISIONS       **XII.007**

**XIII. THE OPERATIVE PART**                                          **XIII.001**

## A: SELECTED ABBREVIATIONS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings (2006) |
| BIT or Treaty | Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, signed on 3 November 1992 and entered into force on 26 April 1994 |
| BCM or bcm | Billion cubic meters |
| Bcma or bcma | Billion cubic meters per annum |
| C-[#] | Claimant's Exhibit |
| CL-[#] | Claimant's Legal Authority |
| Cl Mem Merits | Claimant's Memorial on the Merits dated 7 August 2015 |
| Cl CM Jur | Claimant's Counter-Memorial on Jurisdiction dated 13 June 2016 |
| Cl Obj Bif | Claimant's Objection to Bifurcation dated 22 December 2015 |
| Cl Rej Bif | Claimant's Rejoinder on Bifurcation dated 5 February 2016 |
| Cl Rep Merits | Claimant's Reply Memorial on the Merits dated 7 October 2016 |
| Cl Rej Jur | Claimant's Rejoinder on Jurisdiction and Admissibility dated 16 January 2017 |
| Cl SoC | Claimant's Statement of Costs dated 17 May 2017 |
| COS | Claimant's Opening Statement |
| Damietta Plant | The gas liquefaction plant in Damietta, Egypt |
| EATCO | Egyptian Arab Trading Company |
| EGAS | Egyptian Natural Gas Holding Company |

| EGPC | Egyptian General Petroleum Corporation |
|---|---|
| ENI | Eni S.p.A. |
| ENPPI | Engineering for the Petroleum & Process Industries |
| ER# | First, Second, etc. Expert Report |
| GASCO | Egyptian Natural Gas Company |
| GNF | Gas Natural Fenosa |
| Hearing | Hearing on Jurisdiction and the Merits held on 6 to 11 March 2017 |
| IBA Rules | The IBA Rules on Taking of Evidence in International Arbitration (29 May 2010) |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ILC Articles | Articles on Responsibility of States for International Wrongful Acts of the International Law Commission |
| ██ | ████████████████ |
| LNG | Liquefied Natural Gas |
| NG | Natural Gas |
| MBtu or MMBtu or MMBTU | Million British Thermal Units |
| R-[#] | Respondent's Exhibit |
| RL-[#] | Respondent's Legal Authority |
| Resp CM Merits | Respondent's Counter-Memorial on the Merits dated 13 June 2016 |
| Resp Obj Jur & Req for Bif | Respondent's Memorial on Objections to Jurisdiction and Request for Bifurcation dated 25 November 2015 |
| Resp Rej Merits | Respondent's Rejoinder on the Merits dated 16 January 2017 |

| Resp Rep Bif | Respondent's Reply Memorial on Bifurcation dated 18 January 2016 |
|---|---|
| Resp Rep Jur | Respondent's Reply Memorial on Objection to Jurisdiction and Admissibility dated 7 October 2016 |
| Resp SoC | Respondent Statement of Costs dated 17 May 2017 |
| RfA | Request for arbitration dated 14 February 2014 |
| ROS | Respondent's Opening Statement |
| SEGAS | Spanish-Egyptian Gas Company S.A.E. |
| SPA | Natural Gas Sale and Purchase Agreement between Egyptian General Petroleum Corporation, as "Seller", and Unión Fenosa Desarrollo y Acción Exterior, S.A., as "Buyer", dated 1 August 2000 |
| Tr. Day [#] [page] | Transcript of the Hearing – day and page |
| Tribunal | The Arbitral Tribunal constituted on 8 December 2014 |
| Unión Fenosa | Unión Fenosa, S.A. |
| UFACEX | Unión Fenosa Desarrollo y Acción Exterior, S.A. |
| UFG or UFGas | Unión Fenosa Gas, S.A. |
| UFGC | Unión Fenosa Gas Comercializadora, S.A. |
| UFI (previously UFACEX) | Unión Fenosa Internacional, S.A. |
| WS# | First, Second, etc. Witness Statement |

## *B: SELECTED LEGAL MATERIALS*

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *AAPL v. Sri Lanka* | *Asian Agricultural Products Limited v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3), Award, 27 June 1990 | CL-0098 |
| *Accession v. Hungary* | *Accession Mezzanine Capital L.P. and Danubius Kereskedohaz Vagyonkezelo Zrt. v. Hungary,* ICSID Case No. ARB/12/3, Decision on Respondent's Notice of Jurisdictional Objections and Request for Bifurcation, 8 August 2013 | RL-0052 |
| *ADC v. Hungary* | *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 | CL-0095 |
| *Alex Genin v. Estonia* | *Alex Genin, E. Credit Limited, Inc. and A.S Baltoil v. The Republic of Estonia*, ICSID Case No. ARB/99/2, Award, 25 June 2001 | CL-0151 |
| *Alpha v. Ukraine* | *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010 | CL-0061 |
| *Alps Finance and Trade v. Slovak Republic* | *Alps Finance and Trade AG v. The Slovak Republic,* UNCITRAL, Award, 5 March 2011 | RL-0140 |
| *Amco v. Indonesia* | *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1 (resubmitted case), Decision on Jurisdiction, 10 May 1988 | RL-0048 |
| *Amco v. Indonesia* | *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on Jurisdiction, 25 September 1983 | CL-0131 |
| *Amoco v. Iran* | *Amoco International Finance Corporation v. The Government of the Islamic Republic of Iran National Iranian Oil Company, National Petrochemical Company and Kharg Chemical Company Limited,* Case No. 56, Partial Award No. 310-56-3, 14 July 1987 | CL-0097 |
| *Ampal v. Egypt* | *Ampal-American Israel Corp. v. Arab Republic of Egypt, (ICSID Case No. ARB/12/11),* Decision on Liability and Heads of Loss, 21 February 2017 | CL-0273 |
| *Anatolie Stati v. Kazakhstan* | *Anatolie Stati et al. v. Republic of Kazakhstan,* SCC Arbitration No. 116/2010, Award, 19 December 2013 | CL-007 |
| *Apotex v. United States* | *Apotex Holdings, Inc. and Apotec Inc. v. United States of America,* ICSID Case No. ARB(AF)/12/1, Procedural Order Deciding Bifurcation and Non-Bifurcation, 25 January 2013 | CL-0112 |
| *Apotex v. United States* | *Apotex Holdings, Inc. and Apotex Inc. v. United States of America*, ICSID Case No. ARB(AF)/12/1, Award, 25 August 2014 | RL-0047 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Arif v. Moldova* | *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 | CL-0129 |
| *AWG v. Argentina* | *AWG v. Argentina*, UNCITRAL, Decision on Liability, 30 July 2010 | CL-0200 |
| *Azurix v. Argentina* | *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003 | CL-0133 |
| *Azurix v. Argentina* | *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 | CL-0010 |
| *Azurix v. Argentina* | *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 September 2009 | CL-0099 |
| *Bayindir v. Pakistan* | *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005 | CL-0161 RL-0072 |
| *Bayindir v. Pakistan* | *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009 | CL-0086 |
| *Bernardus Henricus v. Zimbabwe* | *Bernardus Henricus Funnekotter and others v. Republic of Zimbabwe*, ICSID Case No. ARB/05/6, Award, 22 April 2009 | CL-0104 |
| *BG Group v. Argentina* | *BG Group Plc v. The Republic of Argentina*, UNCITRAL, Award, 24 December 2007 | CL-0036 |
| *Biwater v. Tanzania* | *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 | CL-0014 |
| *Bogdanov v. Moldova* | *Iurii Bogdanov et al. v. Republic of Moldova*, SCC Case Award, 22 September 2005 | CL-0035 |
| *Bogdanov v. Moldova* | *Yuri Bogdanov and Yulia Bogdanov v. The Republic of Moldova*, SCC Case No. V091/2012, Final Award, 16 April 2013 | CL-0088 |
| *Bosnian Genocide Case* | *Case Concerning Application Of The Convention On The Prevention And Punishment Of The Crime Of Genocide (Bosnia And Herzegovina v. Serbia And Montenegro), Judgment, I.C.J. Reports 2007, p.43* | RL-0049 |
| *Bureau Veritas v. Paraguay* | *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC B.V. v. The Republic of Paraguay*, ICSID Case No. ARB/07/9, Further Decision on Objections to Jurisdiction, 9 October 2012 | RL-0043 |
| *Burlington v. Ecuador* | *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010 | CL-0058 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Burimi v. Albania* | *Burimi S.R.L. and Eagle Games SH.A. v. Republic of Albania*, ICSID Case No. ARB/11/18, Procedural Order No. 1 and Decision on Bifurcation, 18 April 2012 | CL-0119 |
| *BCB v. Belize* | *British Caribbean Bank Limited (Turks & Caicos) v. Belize*, PCA Case No. 2010-18/BCB-BZ, UNCITRAL, Award, 19 December 2014 | CL-0236 |
| *Camuzzi v. Argentina* | *Camuzzi International S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/2, Decision on Objections to Jurisdiction, 11 May 2005 | CL-0162 |
| *Caratube v. Kazakhstan* | *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Award, 5 June 2012 | RL-0063 |
| *Cargill v. Mexico* | *Cargill, Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)/05/2, Procedural Order No. 3, 18 July 2007 | CL-0118 |
| *Cementownia v. Turkey* | *Cementownia "Nowa Huta" S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)/06/2, Award, 11 September 2009 | RL-0023 |
| *Champion Trading v. Egypt* | *Champion Trading Company and Ameritrade International, Inc. v. Arab Republic of Egypt*, ICSID Case No. ARB/02/9, Decision on Jurisdiction, 21 October 2003 | CL-0240 |
| *Chevron v. Ecuador* | *Chevron Corp. and Texaco Petrol. Corp. v. Ecuador*, PCA Case No. AA277, Interim Award, 1 December 2008, Paragraphs 86, 163-4 | CL-171 |
| *CSOB v. Slovakia* | *Ceskoslovenska Obchodini Banka, A.S. v. The Slovak Republic*, ICSID Case No. ARB/97/4; Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999 | CL-0002 CL-0174 |
| *CME v. Czech Republic* | *CME Czech Republic B.V. v. The Czech Republic*, Partial Award, 13 September 2001 | CL-0029 |
| *CMS v. Argentina* | *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 | CL-0076 |
| *CMS v. Argentina* | *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003 | CL-0152 RL-0071 |
| *CMS v. Argentina* | *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 25 September 2007 | RL-0162 |
| *Compañía de Aguas v. Argentina* | *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 | CL-0021 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Compañía de Aguas v. Argentina* | *Compañía de Aguas del Aconquija SA and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002 | RL-0032 |
| *Compañía del Desarrollo v. Costa Rica* | *Compañía del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000 | CL-0100 |
| *Continental Casualty v. Argentina* | *Continental Casualty Company v. The Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008 | CL-0049 CL-0103 |
| *Corn Products v. Mexico* | *Corn Products International, Inc. v. The United Mexican States*, ICSID Case No. ARB(AF)/04/01, Decision on Responsibility, 15 January 2008 | CL-0078 |
| *Deutsche Bank v. Sri Lanka* | *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award, 31 October 2012 | CL-0074 |
| *Duke Energy v. Ecuador* | *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008 | CL-0018 |
| *Dow Chemical France* | *Dow Chemical France, the Dow Chemical Company and others v. ISOVER Saint Gobain*, ICC Case No. 4131, Interim Award, 23 September 1982, Paragraph 136 | CL-0210 |
| *Maffezini v. Spain* | *Emilio Agustín Maffezini v. The Kingdom of Spain, ICSID Case No. ARB/97/7*, Decision on Jurisdiction, 25 January 2000 | CL-0066 |
| *Maffezini v. Spain* | *Emilio Agustín Maffezini v. The Kingdom of Spain, ICSID Case No. ARB/97/7*, Award, 13 November 2000 | CL-0070 |
| *Eastern Sugar v. Czech Republic* | *Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 | CL-0090 |
| *EDF International v. Argentina* | *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Award, 11 June 2012 | CL-0158 |
| *EDF (Services) v. Romania* | *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 | CL-0038 |
| *El Paso v. Argentina* | *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 | CL-0075 |
| *Emmis v. Hungary* | *Emmis International Holding, B.V, Emmis Radio Operating, B.V, MEM Magyar Operating Media Kereskeldemi Es Szolgaltato Kft v. Hungary*, ICSID Case No. ARB/12/2, Decision on Respondent's Application for Bifurcation, 13 June 2013 | RL-0051 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Encana Corp. v. Ecuador* | *EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN 3481, Award, 3 February 2006 | CL-0015 |
| *Enron v. Argentina* | *Enron Corp. & Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007 | CL-0079 |
| *Eureko v. Poland* | *Eureko v. Poland*, Ad hoc Arbitration, Partial Award, 19 August 2005 | CL-0031 |
| *Europe Cement v. Turkey* | *Europe Cement Investment & Trade S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)/07/2, Award, 13 August 2009 | RL-0065 |
| *Fedax v. Venezuela* | *Fedax N.V. v. The Republic of Venezuela*, ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction, 11 July 1997 | CL-0001 |
| *Feldman v Mexico* | *Marvin Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002 | CL-0089 |
| *Flughafen v. Venezuela* | *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, 18 November 2014 | RL-0006 |
| *Fraport v. Philippines* | *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Award and Dissenting Opinion of Prof. Bernardo Cremades, 16 August 2007 | CL-0126 |
| *Fraport v. Philippines* | *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/11/12, Award, 10 December 2014 | RL-0003 |
| *GEA v. Ukraine* | *GEA v. Ukraine*, ICSID Case No. ARB/08/16, Award, 31 March 2011 | RL-0139 |
| *Gemplus v. Mexico* | *Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010 | CL-0135 |
| *Generation Ukraine v. Ukraine* | *Generation Ukraine Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003 | CL-0120 |
| *Glamis Gold v. United States* | *Glamis Gold, Limited v. The United States of America, NAFTA, UNCITRAL*, Procedural Order No. 2, 31 May 2005 | RL-0057 |
| *Global Trading v. Ukraine* | *Global Trading Resource Corp. and Globex International, Inc. v. Ukraine*, ICSID Case No. ARB/09/11, Award, 1 December 2010 | RL-0068 |
| *Gold Reserve v. Venezuela* | *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014 | CL-0040 |
| *Grand River v. United States* | *Grand River Enterprises Six Nations, Limited, et al. v. United States of America, UNCITRAL*, Award, 12 January 2011 | CL-0069 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Grynberg v. Grenada* | Rachel S. Grynberg, Stephen M. Grynberg, Miriam Z. Grynberg, and RSM Production Corporation v. Grenada, ICSID Case No. ARB/10/6, Award, 10 December 2010 | RL-0053 |
| *Hamester v. Ghana* | *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010 | RL-0009 |
| *Helnan v. Egypt* | *Helnan International Hotels AS v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Award, 3 July 2008 | RL-0025 |
| *H&H v. Egypt* | *H&H Enterprises Investments Inc. v. Arab Republic of Egypt*, ICSID Case No. ARB/09/15, Award, 6 May 2014 | RL-0026 |
| *Hochtief v. Argentina* | Hochtief AG v. Argentina, ICSID Case No. ARB/07/31, Decision on Liability, 29 December 2014 | CL-0247 |
| *Impregilo v. Pakistan* | *Impregilo S.p.A. v. Islamic Republic of Pakistan,* ICSID Case No. ARB/03/3, Decision on Jurisdiction, 22 April 2005 | CL-0057 |
| *Inceysa v. El Salvador* | *Inceysa Vallisoletana S.L. v. Republic of El Salvado*r, ICSID Case No. ARB/03/26, Award, 2 August 2006 | RL-0001 |
| *Inmaris Perestroika v. Ukraine* | *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 30 April 2010 | CL-0003 RL-0067 |
| *Invesmart v. Czech Republic* | *Invesmart B.V. v. Czech Republic,* UNCITRAL, Award, 26 June 2009 | CL-0048 |
| *Ioan Micula v. Romania* | *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 | CL-0041 |
| *Jan de Nul v. Egypt* | *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008 | CL-0022 |
| *Jan Oostergetel v. Slovak Republic* | *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Final Award, 23 April 2012 | CL-0023 |
| *Joy Mining v. Egypt* | *Joy Mining Machinery Limited v. The Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004 | CL-0059 |
| *Kardassopoulos v. Georgia* | *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007 | RL-0135 |
| *Kardassopoulos and Fuchs v. Georgia* | *Ioannis Kardassopoulos and Ron Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010 | CL-0208 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Klöckner v. Cameroon* | *Klöckner Industrie-Anlagen GmbH v. Cameroon*, ICSID Case No. ARB/81/2, Award, 21 October 1983 | CL-0176 |
| *KT Asia v. Kazakhstan* | *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013 | RL-0141 |
| *Lanco v. Argentina* | *Lanco International, Inc. v. The Argentine Republic,* ICSID Case No. ARB/97/6, Preliminary Decision: Jurisdiction of the Arbitral Tribunal, 8 December 1998 | CL-0154 |
| *Lesi v. Algeria* | *LESI, S.p.A. and Astaldi, S.p.A. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/05/3, Award, 12 November 2008 | CL-0072 |
| *LG&E v. Argentina* | *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 | CL-0016 |
| *Libananco v. Turkey* | *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Award, 2 September 2011 | RL-0054 |
| *Loewen v. United States* | *The Loewen Group, Inc. and Raymond L. Loewen v. The United States of America,* Award, 26 June 2003 | CL-0068 |
| *Malicorp v. Egypt* | *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Award, 7 February 2011 | RL-0029 |
| *Merrill v. Canada* | *Merrill & Ring Forestry L.P. v. The Government of Canada,* NAFTA, UNCITRAL, Award, 31 March 2010 | RL-0070 |
| *Mesa Power v. Canada* | *Mesa Power Group, LLC v. Government of Canada,* PCA Case No. 2012-17, Procedural Order No. 2, 18 January 2013 | RL-0058 |
| *Mesa Power v. Canada* | *Mesa Power Group, LLC v. Government of Canada,* PCA Case No. 2012-17, Procedural Order No. 3, 28 March 2013 | CL-0134 |
| *Malaysian Historical Salvors v. Malasia* | *Malaysian Historical Salvors v. Malaysia,* ICSID Case No. ARB/05/10, Decision on the Application for Annulment, 16 April 2009 | RL-0069 |
| *Mohamed Al-Bahloul v. Tajikistan* | *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan,* SCC Case No. V(064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009 | CL-0044 |
| *Mohamed Al-Bahloul v. Tajikistan* | *Mohammad Ammar Al-Bahloul v. Rep. of Tajikistan,* SCC Case No. V 064/2008, Final Award, 8 June 2010 | CL-0147 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Metalclad v. Mexico* | *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 | CL-0071 |
| *Metal-Tech v. Uzbekistan* | *Metal-Tech Limited v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013 | RL-0002 |
| *Middle East Cement v. Egypt* | *Middle East Cement Shipping and Handling Co. S.A. v. Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002 | CL-0102 |
| *Nicaragua v. USA* | *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. USA), Merits, Judgement, I.C.J. Reports 1986*, p. 14 | N/A |
| *Mobil v. Canada* | *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Canada*, ICSID Case No. ARB(AF)/07/4, Decision on Liability and on Principles of Quantum, 22 May 2012 | CL-0043 |
| *Mondev v. United States* | *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Final Award, 11 October 2002 | CL-0053 |
| *MTD v. Chile* | *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 | CL-0011 |
| *MTD v. Chile* | *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 | N/A |
| *Mytilineos v. Montenegro and Serbia* | *Mytilineos Holdings SA v. Serbia and Montenegro and Serbia*, UNCITRAL, Partial Award on Jurisdiction, 8 September 2008 | CL-0172 |
| *National Grid v. Argentina* | *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008 | CL-0008 |
| *Niko Resources v. Bangladesh* | *Niko Resources v. People's Republic of Bangladesh et al.*, ICSID Case No. ARB/10/11 and ARB/10/18, Decision on Jurisdiction, 19 August 2013 | CL-0128 |
| *Nordzucker v. Poland* | *Nordzucker AG v. The Republic of Poland*, UNCITRAL, Second Partial Award (Merits), 28 January 2009 | CL-0080 |
| *Northern Cameroons Case* | *Case Concerning the Northern Cameroons (Cameroon v. United Kingdom)*, Preliminary Objections Judgment of 2 December 1963, *I.C.J. Reports 1963, p.15* | RL-0034 |
| *Nova Scotia v. Venezuela* | *Nova Scotia Power Incorporated (Canada) v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/1, Award, 30 April 2014 | RL-0066 |
| *Nuclear Tests Case* | *Nuclear Tests (New Zealand v. France), Judgment, 20 December 1974, I.C.J Reports 1974, p.457* | RL-0035 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Occidental v. Ecuador* | *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012 | CL-0017 |
| *Occidental v. Ecuador* | *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment, 2 November 2015 | RL-0024 |
| *Occidental Exploration v. Ecuador* | *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004 | CL-0087 |
| *OI European Group v. Venezuela* | *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, 10 March 2015 | RL-0136 |
| *Pan American Energy v. Argentina* | *Pan American Energy LLC and BP Argentina Exploration Company v. Argentine Republic*, ICSID Case No. ARB/03/13, Decision on Preliminary Objections, 27 July 2006 | RL-0073 |
| *Pantechniki v. Albania* | *Pantechniki S.A. Contractors & Engineers (Greece) v. Republic of Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009 | RL-0028 |
| *Parkerings v. Lithuania* | *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007 | CL-0045 |
| *Patrick Mitchell v. Congo* | *Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006 | RL-0133 |
| *Perenco v. Ecuador* | *Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Decision on the Remaining Issues of Jurisdiction and on Liability, 12 September 2014 | CL-0047 |
| *Petrobart v. Kyrgyz Republic* | *Petrobart Limited v. The Kyrgyz Republic*, SCC Case No. 126/2003, Arbitral Award, 29 March 2005 | CL-0024 |
| *Pey Casado v. Chile* | *Pey Casado and "President Allende" Foundation v. Republic of Chile*, ICSID Case No ARB/98/2, Award, 8 May 2008 | CL-0105 |
| *Philip Morris v. Australia* | *Philip Morris Asia Limited v. The Commonwealth of Australia*, UNCITRAL, PCA No. Case 2012-12, Procedural Order No. 8 Regarding Bifurcation of the Procedure, 14 April 2014 | CL-0059 |
| *Phoenix v. Czech Republic* | *Phoenix Action Limited v. The Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009 | RL-0004 |
| *Plama v. Bulgaria* | *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 | RL-0007 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *PSEG v. Turkey* | *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 | CL-0030 |
| *Quasar de Valores v. Russia* | *Quasar de Valores SICAV S.A., et al. v. The Russian Federation*, SCC, Award, 20 July 2012 | CL-0244 |
| *Railroad v. Guatemala* | *Railroad Development Corporation v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Second Decision on Objections to Jurisdiction, 18 May 2010 | CL-0130 |
| *Renée Rose v. Peru* | *Renée Rose Levy de Levi v. Republic of Peru*, ICSID Case No. ARB/10/17, Award, 26 February 2014 | CL-0085 |
| *Robert Azinian v. Mexico* | *Robert Azinian, Kenneth Davitian, & Ellen Baca v. The United Mexican States*, ICSID Case No. ARB (AF)/97/2, Award, 1 November 1999 | RL-0027 |
| *Rompetrol v. Romania* | *The Rompetrol Group. N.V. v. Romania*, ICSID Case No. ARB/06/3, Award, 6 May 2013 | CL-0146 |
| *Ronald Lauder v. Czech Republic* | *Ronald S. Lauder v. The Czech Republic*, UNCITRAL, Award, 3 September 2001 | CL-0092 |
| *Romak v. Uzbekistan* | *Romak S.A. (Switzerland) v. The Republic of Uzbekistan, UNCITRAL, PCA Case No. AA280, Award, 26 November 2009* | RL-0138 |
| *Rumeli v. Kazakhstan* | *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v, Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008 | CL-0020 |
| *Saghi v. Iran* | *James M. Saghi, Michael R. Saghi and Allan J. Saghi v. Islamic Republic of Iran,* Iran-United States Claims Tribunal, Award, 22 January 1993 | CL-0140 |
| *Salini v. Morocco* | *Salini Costruttori S.p.A and Italstrade S.p.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001 | CL-0143 |
| *Salini v. Jordan* | *Salini Costruttori S.p.A and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/02/13, Decision on Jurisdiction, 29 November 2004 | CL-0060 |
| *Salini v. Morocco* | *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001 | CL-0006 |
| *Saluka v. Czech Republic* | *Saluka Investments BV (The Netherlands) v. The Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 | CL-0067 |
| *SAUR v. Argentina* | *SAUR International v. Argentine Republic*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012 | RL-0005 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *S.D. Myers v. Canada* | *S.D., Myers, Inc. v. Government of Canada*, First Partial Award, 13 November 2000 | CL-0077 |
| *Sempra v. Argentina* | *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007 | CL-0032 |
| *SGS v. Philippines* | *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003 | CL-0062 |
| *SGS v. Philippines* | *SGS Société Générale de Surveillance v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004 | RL-0030 |
| *SGS v. Philippines* | *SGS Société Générale de Surveillance S.A. v. The Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010 | CL-0004 |
| *Siag v. Egypt* | *Wauih Elie George Siag et Clorida Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 | CL-0013 |
| *Siemens v. Argentina* | *Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004 | CL-0132 |
| *Siemens v. Argentina* | *Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007 | CL-0009 |
| *Sistem v. Kyrgyzstan* | *Sistem Muhendislik Insaat Sanayi ve Ticaret A.S. v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, 9 September 2009 | N/A |
| *SOABI v. Senegal* | *Société Ouest Africaine des Bétons Industriels (SOABI) v. Senegal*, ICSID Case No. ARB/82/1, Award, 25 February 1988 | CL-0175 |
| *Southern Bluefin Tuna Case* | *Southern Bluefin Tuna Case between Australia and Japan and between New Zealand and Japan*, Award on Jurisdiction and Admissibility, 4 August 2000 | RL-0033 |
| *Southern Pacific Railroad v. United States* | *Southern Pacific Railroad Company v. United States*, US Supreme Court, Judgment, argued 2 and 3 December 1896, decided 18 October 1897 | RL-0046 |
| *Spanish Egyptian Gas Company v. Egyptian Natural Gas Holding Company* | *Spanish Egyptian Gas Company, S.A.E. (Egypt) v. Egyptian Natural Gas Holding Company (Egypt)*, ICC Case No. 19392/MD/TO, Second Partial Final Award, 24 May 2016 | R-0323 |
| *SPP v. Egypt* | *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Decision on Jurisdiction, 27 November 1985 | RL-0042 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *SPP v. Egypt* | *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award on the Merits, 20 May 1992 | CL-0122 |
| *Spyridon Roussalis v. Romania* | *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award, 7 December 2011 | CL-0093 |
| *ST-AD GmbH v. Bulgaria* | *ST-AD GmbH (Germany) v. The Republic of Bulgaria*, UNCITRAL, PCA No. 2011-06, Award on Jurisdiction, 18 July 2013 | RL-0022 |
| *Suez v. Argentina* | *Suez, Sociedad General de Aguas de Barcelona S.A. and Interagua Servicios Integrales de Agua S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010 | CL-0037 |
| *Swisslion v. FYR Macedonia* | *Swisslion DOO Skopje v. The Former Yugoslav Republic of Macedonia*, ICSID Case No. ARB/09/16, Award, 6 July 2012 | CL-0012 |
| *Técnicas v. Mexico* | *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 | CL-0019 |
| *The Mox Plant Case* | *The Mox Plant Case (Ireland v. United Kingdom)*, PCA Case, Order No. 3, 24 June 2003 | RL-0041 |
| *Thunderbird v. Mexico* | *International Thunderbird Gaming Corporation v. The United Mexican States,* NAFTA, UNCITRAL, Separate Opinion of Thomas Wälde, December 2005 | CL-0121 |
| *Thunderbird v. Mexico* | *International Thunderbird Gaming Corporation v. The United Mexican States,* UNCITRAL, Final Award, 26 January 2006 | CL-0039 |
| *Total v. Argentina* | *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010 | CL-0042 |
| *Toto v. Lebanon* | *Toto Costruzioni Generali S.P.A v. Republic of Lebanon*, ICSID Case No. ARB/07112, Decision on Jurisdiction, 11 September 2009 | CL-0150 |
| *Toto v. Lebanon* | *Toto Costruzioni Generali S.P.A v. Republic of Lebanon*, ICSID Case No. ARB/07112, Award, 7 June 2012 | CL-0046 |
| *Tokios Tokelés v. Ukraine* | *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction, 29 April 2004 | RL-0055 |
| *TSA v. Argentina* | *TSA Spectrum de Argentina S.A. v. Argentine Republic*, ICSID Case No. ARB/05/5, Award, 19 December 2008 | RL-0137 |

| Short Name | Full Name | Exhibit Number |
|---|---|---|
| *Tulip v. Turkey* | *Tulip Real Estate Investment and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on the Respondent's Request for Bifurcation under Article 41(2) of the ICSID Convention, 2 November 2012 | RL-0053 |
| *Tulip v. Turkey* | *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award, 10 March 2014 | CL-0073 |
| *Ulysseas v. Ecuador* | *Ulysseas, Inc v. The Republic of Ecuador*, UNCITRAL, Final Award, 12 June 2012 | RL-0079 |
| *Vigotop v. Hungary* | *Vigotop Limited v. Hungary*, ICSID Case No. ARB/11/22, Award, 1 October 2014 | CL-0063 |
| *Vito Gallo v. Canada* | *Vito G. Gallo v. The Government of Canada*, NAFTA - UNCITRAL, PCA Case No. 55798, Award, 15 September 2011 | RL-0021 |
| *Walter Bau v. Thailand* | *Walter Bau AG (In Liquidation) v. The Kingdom of Thailand*, UNCITRAL, Award, 1 July 2009 | CL-0050 |
| *Waste Mangement v. Mexico II* | *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 | CL-0033 |
| *WDF v. Kenya* | *World Duty Free Company Limited v. The Republic of Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006 | RL-0020 |
| *Wena v. Egypt* | *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000 | CL-0101 |
| *Wintershall v. Qatar* | *Wintershall A.G.. et al. v. Government of Qatar*, Final Award, 5 February 1988 and 31 May 1988 | CL-0188 |

*C: LIST OF PROCEDURAL ORDERS*

| Procedural Orders | Date |
|---|---|
| Procedural Order No. 1 | 3 August 2015 |
| Procedural Order No. 2 | 3 August 2015 |
| Procedural Order No. 3 | 28 September 2015 |
| Procedural Order No. 4 | 22 December 2015 |
| Procedural Order No. 5 | 4 March 2016 |
| Procedural Order No. 6 | 8 April 2016 |
| Procedural Order No. 7 | 22 August 2016 |
| Procedural Order No. 8 | 12 December 2016 |
| Procedural Order No. 9 | 31 January 2017 |
| Procedural Order No. 10 | 6 February 2017 |
| Procedural Order No. 11 | 1 March 2017 |
| Procedural Order No. 12 | 2 March 2017 |
| Procedural Order No. 13 | 4 September 2017 |
| Procedural Order No. 14 | 12 December 2017 |
| Procedural Order No. 15 | 9 January 2018 |
| Procedural Order No. 16 | 2 February 2018 |
| Procedural Order No. 17 | 11 July 2018 |

### PART I: THE ARBITRATION

#### (1) The Parties

1.1     The Claimant is Unión Fenosa Gas, S.A. (hereinafter referred to as "UFG", "Unión Fenosa" or the "Claimant"). UFG is a company organized under the laws of the Kingdom of Spain in 1998 as a gas subsidiary of the Spanish electricity utility company, Unión Fenosa S.A., which has its headquarters in Madrid, Spain.

1.2     The Respondent is the Arab Republic of Egypt and is hereinafter referred to as "Egypt" or the "Respondent."

1.3     The Claimant and Respondent are hereinafter collectively referred to as the "Parties." The Parties' respective representatives and their addresses are listed above on page (i).

#### (2) The Arbitration's Procedure

1.4     On 14 February 2014, the Claimant filed with ICSID a request for arbitration against the Respondent (the "Request" or "RfA").

1.5     On 27 February 2014, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In her Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

1.6     On 28 February 2014, the Claimant appointed Mr J. William Rowley, QC, a national of Canada and the United Kingdom, as its party-appointed arbitrator, pursuant to Article 37(2)(b) of the ICSID Convention. By letter of the same date, ICSID informed the Parties that, as provided in ICSID Arbitration Rule 2(3), either of the Parties might choose the formula of Article 37(2)(b) at any time 60 days after the registration of the Request for Arbitration, if no agreement had been reached on another procedure for constituting the Tribunal within that period.  ICSID noted that the Parties had not yet informed ICSID of any agreement on the number of arbitrators and the method of their appointment.  ICSID also invited the Respondent to respond regarding the Claimant's proposed method of constitution of the Tribunal.

1.7    By letter of 30 May 2014, the Claimant invoked the formula contained in Article 37(2)(b) of the ICSID Convention and confirmed its previous appointment of Mr Rowley as its party-appointed arbitrator.

1.8    By letter of 30 May 2014, ICSID acknowledged that the Claimant had invoked Article 37(2)(b) of the ICSID Convention, according to which the tribunal would consist of three arbitrators, one arbitrator appointed by each Party and the president of the tribunal appointed by agreement of the Parties.   By the same letter, ICSID acknowledged the Claimant's appointment of Mr Rowley as a co-arbitrator. ICSID also invited the Claimant to propose a name of a person to serve as president of the tribunal and to invite the Respondent to concur with such a proposal, as provided in ICSID Arbitration Rule 3(1)(a)(i).

1.9    By letter of 1 June 2014, the Respondent appointed Mr J. Christopher Thomas, a national of Canada, as arbitrator in this case pursuant to Article 37(2)(b) of the ICSID Convention.

1.10   On 3 June 2014, ICSID informed the Parties that Mr Rowley had accepted his appointment as a co-arbitrator.

1.11   On 4 June 2014, ICSID informed the Parties that Mr J. Christopher Thomas had accepted his appointment as a co-arbitrator. On the same date, ICSID invited the Parties to proceed with the appointment of a third arbitrator to serve as president of the tribunal.

1.12   On 3 November 2014, Mr Thomas voluntarily withdrew his acceptance of his appointment. By letter of the same date, ICSID invited the Respondent to appoint another arbitrator in place of Mr Thomas.

1.13   On 7 November 2014, the Claimant requested the Chairman of the ICSID Administrative Council to appoint the arbitrator not yet appointed by the Respondent, pursuant to Article 38 of the ICSID Convention.

1.14   On 8 November 2014, the Respondent appointed Mr Mark Alan Clodfelter, a national of the United States of America, as arbitrator pursuant to Article 37(2)(b) of the ICSID Convention.

1.15    On 13 November 2014, M. Clodfelter accepted his appointment as a party-appointed arbitrator.

1.16    By letter of 25 November 2014, ICSID acknowledged the Parties' mutual agreement to appoint Mr V.V. Veeder as president of the tribunal. Mr Veeder accepted his appointment on 7 December 2014.

1.17    On 8 December 2014, the Secretary-General, in accordance with Rule 6(1) of the ICSID Arbitration Rules, notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed constituted on that date. Ms Milanka Kostadinova, ICSID Senior Counsel, was designated to serve as Secretary of the Tribunal.

1.18    By agreement between the Tribunal and the Parties, the first session was held on 25 February 2015 by telephone conference.  The Parties confirmed that the Tribunal was properly constituted and that no Party had any objection to the appointment of any Member of the Tribunal. They agreed, *inter alia*, that the applicable Arbitration Rules would be the ICSID Arbitration Rules in effect from 10 April 2006, that the procedural language would be English, and that hearings should take the place at ICSID in Washington, D.C., "unless the Parties agree otherwise."[1]

1.19    The agreement of the Parties and the Tribunal's decisions were embodied in Procedural Order No. 1 ("PO1"), which was signed by the President and circulated to the Parties by the Secretary on 3 August 2015. On the same date, the Tribunal also issued Procedural Order No. 2 ("PO2"), by which it granted to the Parties permission to file written submissions concerning the procedural timetable after 7 August 2015.

1.20    In accordance with the Parties' partial consensus on the procedural timetable reached at the first session, the Claimant filed its Memorial on the Merits on 7 August 2015, along with supporting documentation.

1.21    By letter of 24 August 2015, the Respondent filed an application to the Tribunal for permission to submit a Memorial on Objections to Jurisdiction, together with a request for bifurcation, by 15 December 2015 (as opposed to a deadline of 16 November 2015, as determined earlier). The Claimant opposed the application by

---

[1] PO1, Paragraph 10.2.

letter of 31 August 2015.  The Respondent replied to such objections by letters of 4 and 15 September 2015; and the Claimant responded by letters of 17 and 23 September 2015, respectively.

1.22    On 28 September 2015, having considered the Parties' written submissions, the Tribunal issued Procedural Order No. 3 ("PO3"), fixing a deadline of 25 November 2015 for the filing the of Respondent's Memorial of Objections to Jurisdiction, together with any request for bifurcation.

1.23    On 25 November 2015, the Respondent filed a Memorial on Objections to Jurisdiction and Request for Bifurcation, along with supporting documentation.

1.24    On 2 December 2015, the Tribunal held a procedural meeting by telephone conference call with the Parties to address outstanding issues regarding the procedural timetable for the entire case, including for the Parties' respective submissions on Respondent's request for bifurcation and its application for a stay, or suspension, of the arbitration.

1.25    Pursuant to the Tribunal's directions given during the procedural conference call on 2 December 2015, on 9 December 2015 the Parties submitted by letter their respective proposals for procedural calendars on both bifurcated and non-bifurcated scenarios. The Respondent also submitted its proposed procedural calendar if the Tribunal were to order a stay or suspension of this arbitration pending the resolution of three other arbitrations pending before the Cairo Regional Centre for International Commercial Arbitration ("CRCICA") and the International Chamber of Commerce ("ICC").

1.26    On 22 December 2015, the Tribunal issued Procedural Order No. 4 ("PO4"), setting out a procedural timetable for the filing of the Claimant's Counter-Memorial in Opposition to the Respondent's Request for Bifurcation, the Respondent's Reply to such Counter-Memorial and the Claimant's Rejoinder Memorial.  The Tribunal reserved, for the time being, its decision regarding Respondent's request for a stay or suspension of this arbitration.

1.27    On 22 December 2015, the Claimant filed its Objection to Respondent's Request for Bifurcation.

1.28    On 30 December 2015, the Respondent requested an adjustment of dates as proposed in a schedule.  On the invitation by the Tribunal, on 11 January 2016, the Claimant submitted its response to the Respondent's letter of 30 December 2015, objecting to any date adjustments.

1.29    On 18 January 2016, the Respondent filed its Reply Memorial on Bifurcation.

1.30    On 5 February 2016, the Claimant filed its Rejoinder on Bifurcation.

1.31    On 4 March 2016, the Tribunal issued Procedural Order No. 5 ("PO5") concerning the two procedural issues of bifurcation and stay/suspension raised by the Respondent on 25 November 2015. The Tribunal decided to join the Respondent's objections to jurisdiction to the merits of the dispute. With regard to the Respondent's application for a stay/suspension, the Tribunal requested that it "continue to be informed on a regular basis by the Parties of the progress made in the CRICCA and ICC arbitrations (insofar as it may be permissible for each of them to do so)."[2] The Tribunal made no order for a stay or suspension of this arbitration.

1.32    On 8 April 2016, the Tribunal issued Procedural Order No. 6 ("PO6"), by which it addressed certain unresolved differences between the Parties over the procedural timetable.  The Tribunal fixed a procedural calendar for the filing of further written pleadings and requests for document production.  The Tribunal also proposed dates for the oral hearing, which both Parties subsequently confirmed as beginning on 6 March 2017.

1.33    On 13 June 2016, the Claimant filed its Counter-Memorial on Jurisdiction and Admissibility; and the Respondent filed its Counter-Memorial on the Merits.

1.34    Following the completion of their first round of written pleadings on the merits, pursuant to the Tribunal's PO1 and PO6, on 29 July 2016 the Parties submitted their respective Schedules of Requests for Document Production.

1.35    On 22 August 2016, the Tribunal issued Procedural Order No. 7 ("PO7") addressing the production of documents disputed by the Parties.

---

[2] PO5, Paragraph 3.11.

1.36    By letter of 12 September 2016, the Claimant informed the Tribunal that the Parties had been unable to complete the work necessary to carry out the Tribunal's directions relating to document production by the deadline of 31 August 2016, as required by PO7.  As a result, the Claimant had agreed with the Respondent upon an extension of the deadlines for the remaining two rounds of written pleadings. The Tribunal approved the Parties' agreed extension on 13 September 2016.

1.37    On 22 September 2016, the Claimant and the Respondent submitted their respective privilege logs.

1.38    In accordance with the adjusted timetable, on 7 October 2016, the Respondent filed its Reply Memorial on Objections to Jurisdiction and Admissibility; and the Claimant filed its Reply on the Merits.

1.39    On 26 October 2016, the Claimant requested an order from the Tribunal directing the Respondent to produce the five documents listed in the Respondent's Privilege Log, subject to any confidentiality undertakings considered appropriate by the Tribunal, and to produce documents responsive to the Claimant's Request No. 1 ordered under the Tribunal's PO7.[3]

1.40    On 28 October 2016, the Tribunal invited the Respondent to reply by 7 November 2016.

1.41    On 7 November 2016, the Respondent filed observations disputing the Claimant's application of 26 October 2016, and asked the Tribunal to reject the Claimant's request that the five documents listed in the Respondent's Privilege Log be produced. The Respondent further stated that, following a diligent search, it had not identified any documents responsive to the Claimant's Request No. 1; namely, for the 1999 Gas Master Plan for Egypt issued by the Government of Egypt and/or its State-owned companies (the "Master Plan").

1.42    On 12 December 2016, the Tribunal issued Procedural Order No. 8 ("PO8") concerning production of documents and procedural matters. The Tribunal made no order for the production of the five documents listed in the Respondent's Privilege Log. The Tribunal stated that that it "will […] keep the matter under consideration in

---

[3] PO7, Paragraph 30.

the light of any further relevant circumstances, including the Hearing."[4] The Tribunal asked the Respondent to clarify its position concerning its knowledge of any version of the Master Plan held by any third person or organization; whether it had made any attempt to procure such a version from any such third party; and to describe such attempt or attempts.  The Tribunal also invited the Parties to inform the Tribunal concerning the status of their travel and visa arrangements for the March 2017 Hearing.

1.43   By letter of 28 December 2016, the Respondent replied that it was unable to locate or procure the particular document.

1.44   On 16 January 2017, the Respondent filed its Rejoinder on the Merits and the Claimant filed its Rejoinder on Jurisdiction.

1.45   On 31 January 2017, the Tribunal issued Procedural Order No. 9 concerning procedural matters.

1.46   On 6 February 2017, the President of the Tribunal held a pre-hearing organisational meeting by telephone conference with the Parties. By letter of 6 February 2017, ICSID transmitted to the Parties the Tribunal's decision to maintain the scheduled date and venue of the Hearing.  The Parties were asked to inform the Tribunal promptly of any material event jeopardizing the March 2017 Hearing in Washington, D.C. resulting from political developments in the USA's new administration.

1.47   The Tribunal also approved the Parties' agreed positions concerning the organisation of the Hearing, as communicated to the Tribunal on 3 February 2017. These included the hearing schedule and allocation of time, the preparation of an indicative complete hearing schedule, the order in which fact witnesses would be called for examination, the presentation of hearing bundles and other materials, the submission of post-hearing briefs and statements of costs, and main logistical matters.

1.48   On 6 February 2017, the Tribunal issued Procedural Order No. 10 ("PO10"), by which it confirmed that the March 2017 Hearing on Jurisdiction and the Merits will be held in Washington, D.C.

---

[4] PO8, Paragraph 5.

1.49   By email of 8 February 2017, both Parties submitted their lists of fact witnesses and experts for cross-examination at the Hearing.

1.50   By letter of 22 February 2017, the Respondent requested that the Claimant withdraw from the record certain documents filed with the Claimant's Rejoinder Memorial on Jurisdiction and Admissibility (namely Exhibits C-0456 and C-0458 through C-0463) or, in the alternative, that the Tribunal find these documents inadmissible and strike them from the record of the arbitration. The Respondent argued that these documents constituted confidential state secrets not subject to disclosure under Egyptian law.

1.51   On 24 February 2017, the Claimant applied to the Tribunal for leave to introduce additional documents into the record, including twelve Exhibits (C-0476 through C-0487) (the "New Documents") and seven Legal Authorities (CL-0250 through CL-0256).

1.52   By letter of 28 February 2017, responding to the Respondent's letter of 22 February 2017, the Claimant declined to withdraw any of the documents and opposed the Respondent's request that the Tribunal strike these documents from the record. The Claimant's letter was accompanied by one new Exhibit (C-0488)[5] and sixteen additional Legal Authorities (CL-0257 through CL-0272).

1.53   On 1 March 2017, the Tribunal issued Procedural Order No. 11 ("PO11"), concerning the examination of expert witnesses.

1.54   On the same date, the Claimant requested leave from the Tribunal to introduce into the record a new Legal Authority.[6] By email of 5 March 2017, the Respondent indicated that it did not object to the Claimant's request. The new Legal Authority was admitted into the record of the arbitration by the Tribunal on 6 March 2017.[7]

1.55   On 2 March 2017, responding to the Claimant's application of 24 February 2017, the Respondent stated that it did not oppose the admission of two of the New Documents (namely Exhibits C-0482 (Transcripts of the CRCICA case 896 Hearings of 30

---

[5] Dockets of Exhibits submitted on behalf of Mr. Sameh Fahmy in Case No. 41 of 2011, [C-0488].
[6] *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273].
[7] Tr. D1 10:16-22.

January and 3 February 2017) and C-0487 (English translation of Exhibit NAV-175)), but raised arguments as to why the remainder should not be admitted into evidence.

1.56   On 2 March 2017, the Tribunal issued Procedural Order No. 12 ("PO12") directing the Respondent to reply in writing to the Claimant's letter of 28 February 2017. The Tribunal indicated that it wished to decide the procedural issue before the commencement of the Hearing on 6 March 2017.

1.57   By letter of 5 March 2017, responding to the Claimant's letter of 28 February 2017, the Respondent reiterated its request that the Tribunal exclude from the record of the arbitration Claimant's Exhibits C-0456 and C-0458 through C-0463, pursuant to Article 9(2)(f) of the IBA Rules.

1.58   The Hearing was held at ICSID in Washington D.C., USA, from 6 to 11 March 2017. In addition to the Members of the Tribunal, the Secretary of the Tribunal, court reports and interpreters, the following persons were present at the Hearing:

*On behalf of the Claimant:*

*Counsel*:

| | |
|---|---|
| Mr Doak Bishop | King & Spalding |
| Mr James Castello | King & Spalding |
| Mr Ed Kehoe | King & Spalding |
| Ms Isabel Fernandez de la Cuesta | King & Spalding |
| Ms Nilufar Hossain | King & Spalding |
| Mr Rami Chahine | King & Spalding |
| Ms Sara Burns | King & Spalding |
| Ms Sara McBrearty | King & Spalding |
| Mr David Weiss | King & Spalding |
| Ms Virginia Castelan | King & Spalding |
| Mr Timothy McKenzie | King & Spalding |
| Ms Zhennia Silverman | King & Spalding |
| Ms Carol Tamez | King & Spalding |

*The Claimant*

| | |
|---|---|
| Mr Javier Gerboles De Galdiz | Unión Fenosa Gas, S.A. |
| Ms Wendy Valentina Quintero | Unión Fenosa Gas, S.A. |
| Ms Elena Feliu Vera | Unión Fenosa Gas, S.A. |
| Mr. Ignacio de la Pena | Unión Fenosa Gas, S.A. |

*On behalf of the Respondent*

*Counsel:*

| | |
|---|---|
| Ms Claudia Annacker | Cleary Gottlieb Steen & Hamilton LLP |
| Mr Robert T. Greig | Cleary Gottlieb Steen & Hamilton LLP |
| Mr J. Cameron Murphy | Cleary Gottlieb Steen & Hamilton LLP |
| Ms Laurie Achtouk-Spivak | Cleary Gottlieb Steen & Hamilton LLP |
| Mr Larry Work-Dembowski | Cleary Gottlieb Steen & Hamilton LLP |
| Ms Ariella Rosenberg | Cleary Gottlieb Steen & Hamilton LLP |
| Ms S. Ellie Norton | Cleary Gottlieb Steen & Hamilton LLP |
| Mr Pablo Mateos Rodríguez | Cleary Gottlieb Steen & Hamilton LLP |
| Ms Sarah Moy | Cleary Gottlieb Steen & Hamilton LLP |
| Ms Emilie Mills | Cleary Gottlieb Steen & Hamilton LLP |

*The Respondent:*

| | |
|---|---|
| Counsellor/ Mahmoud El Khrashy | Egyptian State Lawsuits Authority (ESLA) |
| Counsellor/ Amr Arafa | Egyptian State Lawsuits Authority (ESLA) |
| Counsellor/ Yousria El Gamal | Egyptian State Lawsuits Authority (ESLA) |
| Counsellor/ Yasmine Shamekh | Egyptian State Lawsuits Authority (ESLA) |
| Counsellor/ Nada Elzahar | Egyptian State Lawsuits Authority (ESLA) |

1.59   The following persons testified in writing in written witness statements and expert reports before the Hearing:

*On behalf of the Claimant:*

Mr José Javier Fernández Martínez
Mr José María Egea Krauel
Mr Javier Sáez Ramírez
Mr Paolo Conti
Mr José Luis de Lara Alonso-Burón
Mr Christopher John Goncalves
Mr Kenneth B. Medlock III
Mr Kiran P. Sequiera
Mr Gardner William Walkup Jr.

*On behalf of the Respondent:*

Mr Hassan El Mahdy
Mr Mahmoud Abdel Hameed

Mr Ahmed Shaaban
Dr Antón García
Mr Ian Davison
Dr Mohsin Khan
Mr Gervase MacGregor


1.60    During the Hearing, the following persons testified orally before the Tribunal as factual and expert witnesses:

*On behalf of the Claimant:*

| | |
|---|---|
| Mr Javier Sáez Ramírez | Unión Fenosa Gas, S.A. |
| Mr José María Egea Krauel | Unión Fenosa Gas, S.A. |
| Mr José Javier Fernández Martínez | Unión Fenosa Gas, S.A. |
| Mr José de Lara Alonso-Burón | Unión Fenosa Gas, S.A. |
| Mr Christopher John Goncalves | BRG |
| Mr Gardner William Walkup Jr. | BRG |
| Mr Kenneth B. Medlock III | Center for Energy Studies, Baker Institute for Public Policy, Houston, TX |
| Mr Kiran Sequeira | Navigant |

*On behalf of the Respondent:*

| | |
|---|---|
| Mr Ahmed Shaaban | Egyptian Natural Gas Company (GASCO) |
| Mr Hassan El Mahdy | Egyptian Natural Gas Holding Company (EGAS) |
| Mr Mahmoud Abdel Hameed | Egyptian Natural Gas Holding Company (EGAS) |
| Mr Gervase MacGregor | BDO LLP |
| Mr Ian Davison | RPS Energy Consultants Limited |
| Dr Antón García | Compass Lexecon |


1.61    On the first day of the Hearing, the Tribunal heard each side's oral arguments on the outstanding procedural issues, including (i) the Respondent's application of 22 February 2017 to exclude certain documents from the record of the arbitration; and (ii) the Claimant's application of 24 February 2017 to admit into the record the nineteen documents, including seven Legal Authorities and twelve Exhibits, of which two were no longer an issue.[8]  Having deliberated on the two disputed applications, the Tribunal decided regarding the Respondent's application of 22 February 2017 to admit Exhibits C-0456, C-0458 through C-0463, and C-0488 *de bene esse*.[9] Regarding the Claimant's application of 24 February 2017, the Tribunal decided to admit the new Legal Authorities. The Claimant's new factual Exhibits were admitted

---

[8] Tr. D1 11-58.
[9] Tr. D1 56.

*de bene esse*.[10]   The Tribunal announced its decision without reasons, but indicated that it might wish to revisit the decision later.[11]

1.62    As directed by the Tribunal on the final day of the Hearing,[12] by letter of 15 March 2017 the Claimant confirmed that, having performed a comprehensive review of the hearing record, it had determined that, from the disputed ten New Documents. one was referred to during the Hearing (Exhibit C-0486).  The Claimant maintained that the admission of the New Documents was warranted; and it requested that the Tribunal confirm the admission of all documents labeled C-0476 through C-0486.

1.63    The Tribunal addresses below the admission of these several "*de bene esse*" materials.

1.64    On 19 April 2017, the Parties agreed on transcript corrections. The finalized transcripts were sent to the Tribunal on 1 May 2017.

1.65    During the Pre-Hearing conference-call on 6 February 2017 and again at the Hearing,[13] the Tribunal requested the Parties to try to complete and provide an agreed chronology. On 21 April 2017, the Claimant sent to the Respondent a draft chronology for comments.  On 22 April 2017, the Respondent objected to the draft prepared by the Claimant. On the same date, the Claimant transmitted its draft chronology to the Tribunal.

1.66    On 23 April 2017, the Tribunal inquired when the Respondent would be in a position to submit its own draft chronology and/or comment on the Claimant's draft chronology. On 28 April 2017, the Respondent replied that it would provide comments within 2-3 weeks.

1.67    On 17 May 2017, each Party filed a statement of costs.

1.68    On 22 May 2017, the Respondent sent a redline PDF reflecting Respondent's comments on the draft chronology prepared by the Claimant to the Tribunal. A clean Word version of the revised document was also attached.

---

[10] Tr. D1 57.
[11] Tr. D1 56.
[12] Tr. D6 1795.
[13] Tr. D6 1708-1709.

1.69 *The "de bene esse" Materials*: As to C-0456 and C-0458 to C-0463, these materials were submitted as exhibits to the Claimant's Memorial on Jurisdiction and Admissibility. The Respondent requested that the Claimant withdraw them or, alternatively, that the Tribunal strike them from the record pursuant to Article 9(2)(f) of the IBA Rules.  The Claimant refused to withdraw them. The Tribunal ruled on the first day of the Hearing that it should retain and inspect these documents *de bene esse*.

1.70 As to Exhibits C-0476 to C-0488, the Claimant submitted these materials on 24 February (C-0476 through C-0487) and 28 February 2017 (C-0488).  The Respondent did not oppose the admission of two of these documents, namely: C-0482 and C-0487. The Tribunal decided on the first day of the Hearing that these other materials would be inspected by the Tribunal *de bene esse* and ruled upon their admission later

1.71  The Tribunal has decided this procedural issue as follows: Only one of these documents was referred to by the Claimant during the Hearing, namely C-0486 (see the Claimant's letter of 15 March 2017). In that letter, however, the Claimant asked the Tribunal to confirm the admission of all its materials. In the circumstances, in the absence of any material prejudice to the Respondent, the Tribunal has decided to admit all such materials into the evidential file.

1.72 *The Six (Seven Documents):* On 21 June 2017, the Respondent filed an application for the production of six additional documents produced by the Claimant in CRCICA Arbitration No. 896/2013. The Claimant objected to their production by letter of 30 June 2017.  The Respondent replied by letter of 8 August 2017.

1.73 On 4 September 2017, the Tribunal issued Procedural Order No. 13 ("PO13").  The Tribunal ordered the Claimant to produce to the Tribunal and the Respondent true copies of the requested documents *de bene esse*.  The Tribunal made the production of these documents subject to the Parties' entering into a suitable confidentiality agreement given that four of the documents were said to be confidential as regards other interested parties.

1.74 On 20 September 2017, following the execution by the Respondent of a confidentiality undertaking, the Claimant produced the six documents ordered by the Tribunal. The Claimant also produced an additional seventh contemporaneous

document, a Termination Agreement dated 27 November 2003 (not covered by PO13).

1.75    By letter of 23 November 2017, the Respondent asserted that the six documents produced were highly relevant and material to the issues of corruption, reiterated its request that the Six Documents be admitted into evidence, and sought permission from the Tribunal to file a short submission on these documents to assist the Tribunal. By letters of 30 November 2017 and 8 December 2017, the Claimant objected to the application and requested that the Tribunal reject the Respondent's proposal for a written submission supporting admission of the six documents.

1.76    On 12 December 2017, the Tribunal issued Procedural Order No. 14 ("PO14"). The Tribunal granted permission to the Respondent to submit, in writing, short observations not exceeding five pages on "the six documents." Further, the Tribunal requested the Respondent to comment, in writing, upon the other matters raised in the Claimant's letter dated 8 December 2017.

1.77    By its letter dated 8 December 2017, the Claimant informed the Tribunal (*inter alia*) of developments in the CRICA Arbitration (896) between UFG and EGAS:

> *Earlier this week, on December 5, 2017, EGAS sought leave from the Tribunal in CRCICA Case 896 to disclose to Egypt the pleadings filed by UFG and EGAS on EGAS' corruption defense in that case. EGAS explained to the Tribunal that it sought such leave because Egypt intends to submit these Case 896 pleadings in this arbitration. Specifically, EGAS stated: 'We understand that the Arab Republic of Egypt would seek to place these submissions before the tribunal in Unión Fenosa Gas, S.A. v. Arab Republic of Egypt (ICSID Case No. ARB/14/4).' Egypt's determination to use these materials must be quite strong since EGAS made its request notwithstanding that the Case 896 Tribunal had already closed that proceeding and admonished the parties not to submit further requests […] As we have previously noted, EGAS has entered into a joint defense agreement with Egypt and is therefore doubtless well informed of Egypt's intentions in this arbitration […].*

1.78    Pursuant to PO14, the Respondent made its written submissions on the "six documents" and other matters by letter dated 21 December 2017. At the Tribunal's request of 23 December 2017 under PO14, the Claimant submitted its response by letter dated 3 January 2018.

1.79    Pursuant to the Tribunal's Procedural Order No. 15, the Respondent made further submissions by letter dated 22 January 2018; and the Claimant made further submissions by letter also dated 22 January 2018.

1.80    In its Procedural Order No. 16 dated 2 February 2018, the Tribunal decided as follows:

> *1. The Tribunal refers to the Respondent's application to the Tribunal for an order admitting new documents into this arbitration's evidential file and to the Claimant's opposition to the Respondent's application. The Respondent's application addressed originally only six documents. The Claimant thereafter produced a seventh document. The Tribunal considers that all seven documents should be read together for the purpose of this Procedural Order.*

> *2. The Tribunal refers to its Procedural Orders Nos 13, 14 and 15 and the Parties' respective letters (or email messages) dated 22 January 2018 (two), 3 January 2018, 21 December 2017, 8 December 2017, 30 November 2017, 23 November 2017, 20 September 2017 (email), 19 September 2017 (email), 8 August 2017, 30 June 2017 and 21 June 2017.*

> *3. Notwithstanding the Respondent's application made at a late stage of this arbitration, the Tribunal considers that these six new documents are relevant to issues raised by the Parties' dispute, as also the seventh document. Accordingly, the Tribunal has decided to admit these seven new documents into the evidential file, together with the Parties' several submissions regarding these documents made in their respective correspondence listed above.*

> *4. This Procedural Order is strictly limited to the admission of the seven new documents into the evidential file. The arbitration's evidential file is closed to the Parties. Nonetheless, the Tribunal reserves its right to request any further written explanations from the Parties.*

1.81    *The "Parallel Arbitrations":* By letter dated 8 June 2018, the Respondent informed the Tribunal of developments in certain "parallel arbitrations." By letter dated 8 June 2018, the Claimant responded to the Respondent's said letter. By its Procedural Order No. 17 of 11 July 2018 (see also below), the Tribunal decided to retain these two letters on the file for information and not evidential purposes; and, in the circumstances, it rejected the Claimant's application to respond further to the Respondent's letter.

1.82   *Closure:* By its Procedural Order No. 17, the Tribunal closed the proceeding on 11 July 2018, pursuant to ICSID Arbitration Rule 38(1).   The Tribunal's Order was dispatched to the Parties by email on the same date.

### PART II: THE PARTIES' DISPUTE

#### (1) Introduction

2.1    A dispute exists under the Treaty between the Claimant, UFG, and the Respondent, the Arab Republic of Egypt, in regard to UFG's alleged investments in Egypt regarding the Damietta natural gas liquefaction plant located in the northeast of Egypt (the "Damietta Plant") and associated legal and contractual rights. In general terms, UFG's business concerns the liquefaction, shipping, regasification and commercialisation of natural gas. The Respondent, a sovereign State, advances objections as to jurisdiction and admissibility in regard to the Claimant's claims. Alternatively, the Respondent requests the Tribunal to suspend this arbitration pending the resolution of similar disputes in other arbitrations. In the further alternative, the Respondent denies any liability to the Claimant and, if liable, disputes the amounts of compensation claimed by the Claimant.

#### (2) The Claimant's Claims

2.2    In summary, UFG contends that the Respondent has failed, through its own acts and omissions and through the acts and omissions of its State instrumentalities and organs for which the Respondent bears international responsibility (EGPC and EGAS), to afford to UFG's investments in Egypt the protections granted by the Treaty.[1] UFG contends that its investments have suffered and continue to suffer significant harm as a result of the decisions attributable to the Respondent to curtail and cut the supply of natural gas to the Damietta Plant, which eventually resulted in the Damietta Plant's complete shut-down for lack of the necessary gas supply.[2]

2.3    UFG contends that the Respondent, through its own actions and omissions and by the acts and omissions of EGAS, EGPC and their affiliates, has breached its substantive obligations under the Treaty; namely:[3] (i) the obligation to grant fair and equitable treatment to UFG's investments under Article 4(1); (ii) the obligation not to hamper by means of unjustified or discriminatory measures the management, maintenance, use, enjoyment, expansion or disposal of UFG's investment under Article 3(1); (iii) the obligation to protect UFG's investment under Article 3(1); and (iv) the obligation

---

[1] RfA, Paragraph 2.
[2] RfA, Paragraph 3.
[3] RfA, Paragraphs 26-29.

to provide UFG's investment with treatment not less favourable than that accorded to investments made by its own nationals or investors of a third country under Articles 4(5) and 4(2) of the Treaty.

*(3) The Respondent's Objections, Responses and Defences*

2.4    In summary, as to jurisdiction and admissibility, the Respondent first contends that the Damietta project was "riddled with corruption": UFG selected Halliburton, whose bid was US$ 50 million higher than that of the next competitor, as its subcontractor; and Halliburton's CEO pleaded guilty in the USA to violations of the US Foreign Corrupt Practices Act, including bribes and kickbacks in connection with the Damietta Project.[4]

2.5    In addition, the Respondent contends that UFG's procurement of the Project is replete with "red flags." As explained later in Part VII of this Award, these red flags include the following, based particularly on the "Six Documents" ██████████████:

    (i)    the Project takes place in a country known for corrupt payments, namely Egypt at the time of the events in question;

    (ii)    ████████████████████████████████████████████████████
████████████████████████

    (iii)    There is no substantial time lag between ████████████████████████
and the date when the main contract is awarded to the principal (████████ to 1 August 2000);

    (iv)    The subject matter of the ██████████ is not tangible (for example, ████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

    (v)    The agent has a close personal or family relationship, or business relationship, with a public official or relative of an official (such as that between Mr El Komy and the Respondent's Minister Mr Fahmy), which is the only qualification the agent brings to the venture;

---

[4] Resp Obj Jur & Req for Bif, Paragraph 5.

(vi)   The agent is a shell company or has some other non-transparent corporate structure (EATCO is a shell entity owned by members of Mr El Komy's family);

(vii)   

(viii)

2.6   The Respondent submits, therefore, that the Tribunal lacks jurisdiction or should not exercise its jurisdiction because the Claimant procured its alleged investments through corrupt and illegal means in violation of Egyptian law and international public policy.[5]

2.7   The Respondent next contends that the Claimant has failed to establish that its alleged investments were investments of a Spanish investor at the time that the acts and omissions occurred that the Claimant alleges to constitute violations of the Treaty. The Respondent submits that, in July 2007, SEGAS assigned to HSBC UK all of its rights under the Tolling Agreements in the context of a refinancing transaction that led UFG to pledge to HSBC Egypt its shares in SEGAS, and associated rights to the Damietta Plant, as security. Accordingly, the Respondent submits that the Claimant has failed to establish any investment under the Treaty.[6]

2.8   The Respondent next contends that this dispute is essentially contractual in nature[7] and has been submitted to contractual arbitrations.[8] Accordingly, the Respondent submits that the Tribunal has no jurisdiction or should not exercise its jurisdiction over this dispute.

---

[5] Resp Obj Jur & Req for Bif, Paragraph 7; Resp Rep Jur, Paragraph 8.
[6] Resp Obj Jur & Req for Bif, Paragraphs 44- 45 and 50; Resp Rep Jur, Paragraph 48.
[7] Resp Obj Jur & Req for Bif, Paragraph 51.
[8] Resp Rep Jur, Paragraph 73.

2.9    As to the suspension of this arbitration, the Respondent requests that this Tribunal suspend or stay this arbitration until the resolution of the contractual claims in the contractual arbitrations by the ICC and CRCICA tribunals.[9]

2.10   As to the merits, the Respondent contends that the conduct of which UFG complains is not attributable to the Respondent;[10] nor is the conduct an exercise of sovereign powers that could engage the Respondent's international responsibility under the Treaty;[11] there is, in any event, no breach of the FET standard of the Treaty;[12] the Respondent did not fail to accord protection to UFG's investment;[13] the Respondent did not impair the management, maintenance, use, enjoyment or expansion of UFG's investment by unjustified or discriminatory measures;[14] the Respondent did not fail to accord to UFG National or MFN Treatment;[15] and, in any event, any wrongful conduct complained of would be precluded by state of necessity, if, *quod non*, such conduct were attributable to the Respondent, involved an exercise of governmental authority and was not in conformity with the obligations under the Treaty.[16] Further, the Respondent contends that no recoverable damages have been proven by UFG.[17]

### *(4) The Parties' Prayers for Relief*

2.11   *Jurisdiction/Admissibility - The Respondent's Claim for Relief*: The Respondent requests the Tribunal in Paragraph 110 of its Memorial on Objections to Jurisdiction and Request for Bifurcation, in material part:

> *(b) Dismiss Claimant's claims for lack of jurisdiction;*
>
> *(c) In eventu, decline to exercise jurisdiction over Claimant's claims;*
>
> *[…]*
>
> *(e) Order Claimant to pay to Respondent the full costs of this arbitration, including, without limitation, arbitrators' fees and expenses, administrative costs, counsel fees, expenses and any other costs associated with this arbitration;*

---

[9] Resp Obj Jur & Req for Bif, Paragraphs 90 to 92.
[10] Resp CM Merits, Paragraph 181.
[11] Resp CM Merits, Paragraph 213.
[12] Resp CM Merits, Paragraph 220.
[13] Resp CM Merits, Paragraph 288.
[14] Resp CM Merits, Paragraph 288.
[15] Resp CM Merits, Paragraph 314.
[16] Resp CM Merits, Paragraph 331.
[17] Resp CM Merits, Paragraph 367.

*(f) Order Claimant to pay to Respondent interest on the amounts awarded under (e) above until the date of full payment;*

*(g) Grant any further relief to Respondent as it may deem appropriate.*

2.12    *Jurisdiction/Admissibility - The Claimant's Claim for Relief*: The Claimant requests the Tribunal, in Paragraph 89 of its Counter-Memorial on Jurisdiction, to order the following relief:

*(a) Reject Egypt's jurisdictional objections in their entirety and confirm its jurisdiction over the dispute;*

*(b) Order Egypt to pay all costs and expenses of the jurisdictional phase of this arbitration, including the fees and expenses of UFG's legal representatives in respect of this phase and any other costs; and*

*[(c)] Order any further relief that the tribunal deems just and appropriate.*

2.13    *Stay/Suspension - The Respondent's Claim for Relief*: The Respondent requests the Tribunal in Paragraph 110 of its Memorial on Objections to Jurisdiction and Request for Bifurcation, in material part, to:

*(d) In eventu, suspend the proceedings pending the resolution of the Contractual Arbitrations* [described as the ICC arbitration between SEGAS and EGAS under the Tolling Agreement; the CRCICA arbitration between UFG and EGAS under the SPA; and the CRCICA arbitration between UFG and EGAS under the SPA).

2.14    *Stay/Suspension - The Claimant's Claim for Relief*: The Claimants requests the Tribunal in Paragraph 212 of its Rejoinder Memorial on Jurisdiction and Admissibility, in material part to:

*(c) Deny Egypt's request that these proceedings be suspended pending resolution of the CRCICA and ICC arbitrations* […]

2.15    *Merits: The Claimant's Claim for Relief*: The Claimant requests the Tribunal, in Paragraph 638 of its Memorial on the Merits,[18] to order the following relief:

*a. Declare that Egypt has violated the BIT in connection with its treatment of UFG and UFG's investment;*

*b. Award Claimant compensation for the full amount of damages it suffered due to Egypt's breaches of its BIT obligations, in the amounts set forth in this Memorial;*

---

[18] *See also* the Claimant's request in the Reply on the Merits, Paragraph 473.

*c. Award Claimant pre-award and post-award interest on any compensatory amounts until the date of full satisfaction of the award, at a rate to be determined by the Tribunal in accordance with the BIT;*

*d. Order Egypt to pay all costs and expenses of this arbitration, including ICSID's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of UFG's legal representatives in respect of this arbitration and any other costs of this arbitration; and*

*e. Grant any other and further relief that it deems just and proper.*

2.16    *Merits: The Respondent's Claim for Relief:* The Respondent requests the Tribunal, in Paragraph 389 of its Counter-Memorial on the Merits,[19] to order the following relief:

*(a) Dismiss the Claimant's claims in their entirety for lack of jurisdiction and/or as inadmissible;*

*(b) In eventu, stay the proceeding pending the resolution of the contractual arbitrations;*

*(c) Alternatively, dismiss Claimant's claims on the merits in their entirety;*

*(d) In the further alternative, declare that Claimant is not entitled to the damages it seeks, or to any damages;*

*(e) In any event, order Claimant to pay all the costs of this arbitration as well as the Respondent's legal costs and expenses in connection with this arbitration, including but not limited to its attorney's fees and expenses and the fees and expenses of its experts; and*

*(f) grant such further relief against Claimant as the Tribunal deems fit and proper.*

---

[19] *See also* the Respondent's request in the Rejoinder on the Merits, Paragraph 465.

## PART III: THE PRINCIPAL TEXTS

### (1) Introduction

3.1.   The Tribunal here describes and recites, for later ease of reference, the principal legal texts to which it refers later in this Award.

### (2) The Treaty [C-0001]

3.2.   The Treaty was signed between Spain and Egypt on 3 November 1992; and it entered into force on 26 April 1994.

3.3.   Article 1 of the Treaty, "Definitions," provides in material part (to which the Tribunal has here added square brackets for ease of reference below):

> *For the purposes of the present Agreement,*
>
> *1. The term 'Investor' means:*
>
> *a) any individual who, in the case of Spanish investors, is resident in Spain under Spanish law and, in the case of investors of the other Party, possesses its nationality pursuant to the law of that Party;*
>
> *b) any legal entity, including companies, associations of companies, trading corporate entities and other organizations which is incorporated or, in any event, is properly organized under the law of that Party and is actually managed from the territory of that Party.*
>
> *2. The term 'Investment' means any kind of assets, such as goods and rights of all sorts, acquired under the law of the host country of the investment and in particular, although not exclusively, the following:*
>
> *- [1] shares and other forms of participation in companies;*
>
> *- [2] rights arising from all types of contributions made for the purpose of creating economic value, including every loan granted for this purpose, whether capitalized or not;*
>
> *- [3] movable and immovable property and any other property rights such as mortgages, loans or pledges;*
>
> *- [4] any rights in the field of intellectual property, including patents and trademarks, as well as manufacturing licences and know-how;*
>
> *- [5] rights to engage in economic and commercial activities authorized by law or by virtue of a contract, particularly those rights to search for, cultivate, extract or exploit natural resources, in accordance with existing laws and regulations.*

*3. The term 'returns' refers to income deriving from an investment in accordance with the definition contained above, and includes, in particular, profits, dividends and interests.*

*4. The term 'territory' designates the land territory and territorial waters of each of the Parties, as well as the exclusive economic zone and the continental shelf that extends outside the limits of the territorial waters of each of the Parties, over which they have or may have jurisdiction and sovereign rights for the purposes of prospectioning* [sic]*, exploration and conservation of natural resources, pursuant to international law.*

3.4.    Article 3 of the Treaty, "Protection," provides in material part:

*1. Each Party shall protect in its territory the investments made in accordance with its laws and regulations, by investors of the other Party and shall not hamper, by means of unjustified or discriminatory measures, the management, maintenance use, enjoyment, expansion, sale and if it is the case, the liquidation of such investments.*

3.5.    Article 4 of the Treaty, "Treatment," provides in material part:

*1. Each Party shall guarantee in its territory fair and equitable treatment for the investments made by investors of the other Party.*

*2. This treatment shall not be less favorable than that which is extended by each Party to the investments made in its territory by investors of a third country.*

[…]

*5. In addition to the provisions of paragraph 2 of this article, each Party shall apply, under its own law, no less favourable treatment to the investments of investors of the other Party than which is that granted to its own investors.*

3.6.    Article 6 of the Treaty, "Nationalization and Expropriation," provides in material part:

*The nationalization, expropriation or any other measure of similar characteristics or effects that may be applied by the authorities of one Party against the investments in its own territory of investors of the other Party must be applied exclusively for reasons of public interest pursuant to the law, and shall in no case be discriminatory. The Party adopting such measures shall pay to the investor or his legal beneficiary an adequate indemnity in convertible currency without unjustified delay.*

3.7.    Article 11 of the Treaty, "Disputes between One Party and Investors of the Other Party", provides in material part (the "Arbitration Agreement," to which the Tribunal has here added square brackets for ease of reference below):

*1. Disputes between one of the Parties and one investor of the other Party shall be notified in writing, including a detailed information, by the investor to the host Party of the investment. As far as possible the Parties shall endeavour to settle these differences by means of a friendly agreement.*

*2. If these disputes cannot be settled in this way within six months from the date of the written notification mentioned in paragraph 1, the conflict shall be submitted, at the choice of the investor, to:*

*- [1] a court of arbitration in accordance with the Rules of Procedure of the Arbitration Institute of the Stockholm Chamber of Commerce.*

*- [2] the court of arbitration of the Paris International Chamber of Commerce.*

*- [3] the ad hoc court of arbitration established under the Arbitration Rules of Procedure of the United Nations Commission for International Trade Law.*

*- [4] the International Center for Settlement of Investment Disputes (ICSID) set up by the 'Convention on Settlement of Investment Disputes between States and Nationals of other States', in case both Parties become signatories of this Convention.*

*- [5] Regional Center for International Commercial Arbitration in Cairo.*

*3. The arbitration shall be based on:*

*- [1] the provisions of this agreement;*

*- [2] the national law of the Party in whose territory the investment was made, including the rules relative to conflicts of law;*

*- [3] the rules and the universally accepted principles of international law.*

*4. The arbitration decisions shall be final and binding for the parties in conflict. Each Party undertakes to execute the decisions in accordance with its national law.*

### *(3) The SPA* [C-0002]

3.8.    The Sale and Purchase Agreement dated 1 August 2000 between UFACEX as Buyer (later "assigned" to UFG) and EGPC as Seller (later "assigned" to EGAS) (the "SPA") provides in material part, as follows:

3.9.    ***Article 5.1 of the SPA***: *"Seller's Obligations"*

*[1] Given that the capacity of the Complex shall be known once the EPC Contract is executed, Buyer shall notify Seller the nominal capacity of the Complex as prompt* [sic] *as possible after signature of the EPC Contract,*

*and Seller commits to sell and deliver to the Buyer at the Delivery Point up to the maximum of the amount of NG needed for the nominal capacity of the Complex, according to the terms of this Agreement and the nomination procedure to be included in the Coordination, Operating and Measurement Agreement.*

*[2] In the event that new natural gas liquefaction trains are constructed by Buyer, then Buyer shall notify Seller of the nominal capacity of the new train/s as prompt* [sic] *as possible and Seller undertakes to sell and deliver to Buyer at the Delivery Point up to the maximum of the amount of NG and daily quantities of NG needed for such capacity.*

*[3] Seller shall also sell and deliver to the Buyer at the Delivery Point the NG that Buyer requests for the execution of the commissioning, start-up and testing, and any other action needed for the commercial operation of the Complex, at the price set forth in Article 13, and with the specific delivery conditions set forth under the Coordination, Operating and Measurement Agreement.*

*[4] Seller shall be the exclusive responsible* [sic] *for the transportation, supply and delivery of NG to the Delivery Point specified in Article 12.*

*[5] Seller shall at all times keep a back up supply to meet an on stream (load) factor of 95% of the LNG Complex.*

3.10.   ***Article 6.1 of the SPA****: "Take or Pay*"

*During each Contract Year, Buyer will be obligated to purchase, take and pay for, or pay for if not taken a minimum of ninety per cent (90%) of the ACQ applicable for such Contract Year, less any amount of NG to be deducted from the ACQ (or from the quantity applicable for each Contract Year of the Build-up period, as the case may be) due to the occurrence of (i) Force Majeure events, (ii) Seller's failure to supply the NG, and/or (iii) scheduled maintenance of the Complex ('Adjusted ACQ').*

*If for any reason whatsoever, the capacity of the Complex is increased (due to the increase in capacity of the first train up to a maximum of 10% of the then existing ACQ or due to the construction of new train/s), Seller shall be obligated to sell and deliver to Buyer the NG necessary for that increase in capacity. The take or pay obligations of the Buyer for the first train shall not be altered and therefore they shall be 90% of the ACQ as defined in 4.1, less the amounts and concepts mentioned in (i), (ii) and (iii) of this Section 6.1.*

3.11.   ***Article 8.1 of the SPA****: "Failure to Supply NG"*

*[1] If Seller, for reasons other than Force Majeure or Buyer's failure to take, fails to deliver at the Delivery Point a quantity of NG nominated by Buyer according to this Agreement, Seller shall be liable to Buyer for any damages, costs and/or expenses (to the extent permissible under Egyptian laws, but excluding consequential damages and loss of profits) arising*

*from Seller's failure to supply, including (i) third party's claims and penalties against Buyer, (ii) costs, extra-costs, damages and expenses caused to the Complex arising from Seller's failure to supply, including operation and maintenance costs (expressed in USD per MMBTU), and capital investment costs (expressed in USD per MMBTU)."*

*[2] Seller's liability vis-a-vis Buyer as a result of this Section 8.1 shall not exceed an amount equivalent to ninety per cent (90%) of the Price applicable to the NG not delivered by Seller.*

3.12.  ***Article 9.1 of the SPA: "NG Specifications"***

*The quality specification of the NG to be supplied to Buyer, shall be in accordance with the Specifications contained in Annex 2 ('<u>NG Specifications</u>') of this Agreement, which shall include the typical values for such NG and the limits of such values which are acceptable for Buyer. The procedures for measurement of quality and tests shall be developed in the Coordination, Operating and Measurement Agreement referred to in Article 19.*

3.13.  ***Article 11.1 of the SPA: "Scheduling"***

*The provisions regarding the nominations, procedures, deviations from nominations, commissioning and tests, and maintenance, among others, shall be developed by the Parties in the Coordination, Operating and Measurement Agreement referred to in Article 19.*

3.14.  ***Article 15.1 of the SPA: "Definition of Force Majeure"***

*For the purposes of this agreement 'Force Majeure' means an event or circumstance which is beyond the reasonable control of a Party or Parties (acting and having acted with reasonable level of due diligence) resulting in or causing failure by the Party concerned to perform any of its obligations hereunder.*

3.15.  ***Article 15.2 of the SPA: "Suspension of Obligations"***

*The Parties shall be relieved from liability under this Agreement for so long as and to the extent that due to Force Majeure, and without limiting the generality of the foregoing Section 15.1, any of the following events or circumstances, (each of which shall constitute a Force Majeure event only to the extent that it satisfies the requirements of Section 15.1) occurs:*

*Any act of war, invasion, armed forces conflict or act of foreign enemy, blockade, embargo or revolution.*

*Any riot, insurrection, civil commotion, act or campaign of terrorism or sabotage that is part of religious or ethnic unrest or commotion that is widespread or nationwide, such as, by way of example and not limitation, actions associated with or directed against the Buyer (or its contractors)*

*as a part of a broader pattern of actions against companies or facilities with foreign ownership or management.*

[…]

*(iv) Strikes, works to rule, labor unrest or go-slows that are widespread or nationwide or that are of a political nature, (but not where the same is related to the Seller or any of their assignees, affiliates, joints ventures* [sic]*, contractors and subcontractors or successors in title) such as, by way of example and not limitation, labor actions directed against the Buyer (or of its contractors and subcontractors) as a part of a broader pattern or labor actions against companies or facilities with foreign ownership or management.*

[…]

*The parties shall further be relieved from liability under this Agreement as follows:*

*(A) In the case of Seller:*

  *(1) For so long and to the extent that due to Force Majeure and/or*

  *(2) For so long as and to the extent that owing to the failure due to Force Majeure by a third party, acting with a reasonable level of due diligence of its obligations to Seller to produce, transport, process, or handle NG to be made available to Buyer hereunder provided that in respect of such failure by a third party, the reasons giving rise to such failure would constitute a Force Majeure event as defined in this Agreement affecting to such third party, Seller is unable to make available the properly nominated quantity of NG in accordance with this Agreement* […]*.*

  *Where Force Majeure partially affects Seller's obligation to supply NG to Buyer and to any other purchaser/s, Seller shall treat Buyer no worse than any other present or future purchaser/s of NG. This right shall be binding upon the Parties at all times, including the event of shortage of NG* […]

3.16. ***Article 15(3)(b)****: "Failure of Market"*

  *In the case of the Seller, Force Majeure shall not include changes in market conditions including, without limitation, changes that:*

  *(i) Directly or indirectly affect the demand for or price of NG.*

  *(ii) Result in the diversion of NG to other users,*

  *(iii) Are due to the inability of the transportation system and/or pipeline (whether for reasons of maintenance, repairs or lack of capacity or otherwise) to meet consumer demand and/or Buyer demand.*

3.17.  **Article 16.1 of the SPA:** *"Governing Law"*

> *This Agreement shall be governed and interpreted in accordance with the provisions hereof and, where not expressly provided, it shall be governed by Egyptian laws.*

3.18.  **Article 16.4 of the SPA**: [CRCICA Arbitration]

> *(a) Any dispute, controversy or claim arising out of or in connection with this Agreement, or breach, termination or invalidity thereof between the Parties, shall be settled by arbitration in accordance with the Arbitration Rules of the Cairo Regional Center for International Commercial Arbitration (the 'Cairo Center') in effect on the date of execution of this Agreement.*

> *[…]*

> *(f) The award of the arbitrators shall be final and binding upon the Parties and the arbitral award rendered shall be final and conclusive.*

3.19.  **Article 20 of the SPA:** *"Sovereign Immunity"*

> *To the extent that any of the Parties may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution, before judgement or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), such Party hereby irrevocably waives such immunity to the full extent permitted by the laws of such jurisdiction.*

> *Buyer and Seller represent and warrant to each other that neither of them nor any of their respective shareholders have any legal privileges or special rights that could render this Agreement or the arbitral awards granted pursuant to Section 16.4 totally or partially unenforceable against them.*

3.20.  **Article 21.1 of the SPA**: *"EGPC's support to the Project"*

> *EGPC undertakes to procure that the Egyptian authorities undertake not to interfere with the rights of Buyer under this Agreement, and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer under this Agreement, or affect the capacity of Buyer to perform its obligations under this Agreement, even in the case of a NG shortage in Egypt, save for Force Majeure situations as defined in this Agreement.*

> *EGPC shall also assist and actively collaborate with Buyer to obtain any authorization and/or legal, administrative or governmental benefit to Buyer for the Project and/or construction of the Complex.*

3.21.   *Article 23.2 of the SPA:* *"Adequacy of Supply"*

> *Seller is the sole responsible* [sic] *for securing adequate supplies of NG for performance of its obligations hereunder. Seller shall, throughout the Term, provide Buyer or Lenders with such further assurances as Buyer or Lenders may reasonably request from time to time regarding the continued adequacy of NG supply sources relied upon by Seller to perform hereunder. In no case this shall represent for Seller additional obligations to those set forth in this Agreement.*

3.22.   *Article 24.1 of the SPA*: *"Mutual Representations"*

> *Each Party represents and warrants to the other Party that (a) it possesses all power, authority, and applicable approvals (if any) necessary for it to enter into this Agreement, (b) this Agreement constitutes the valid and binding obligation of such Party enforceable against it in accordance with the terms thereof, (c) the execution, delivery, and performance hereof will not cause such Party t be in violation of any other agreement or law, regulation, order, or court process or decision to which it is a party or by which it or its properties are bound or affected, (d) it has and will maintain all regulatory authorizations, certificates, and documentation as may be necessary and legally required for it to transport, buy, sell or make sales for resale of NG sold or purchased under this Agreement; (e) it is a producer, processor, or commercial user of, or a merchant handling, of* [sic] *NG and has entered into this Agreement solely for purposes related to its business as such, (f) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions (including decisions regarding the suitability of this Agreement) based upon its own judgement and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other Party, (g) it understands the terms, conditions, and risks of this Agreement and is capable of assuming and willing to assume (financially and otherwise) those risks, (h) it is acting as principal, and not as agent, fiduciary, or any other capacity, and (i) the other Party is not acting as a fiduciary or financial, investment, or commodity trading advisor for it.*

3.23.   *Article 24.3 of the SPA*: *"Adequacy of Supply of NG"*

> *Seller is aware that the supply of NG to Buyer under this Agreement is a key element for the successful development of the Project, and therefore Seller represents and warrants that its availability of NG will be sufficient to feed the Complex under the terms and conditions of this Agreement. Also, Seller represents and warrants that it has, and will have during the Term, all the legal, administrative and corporate rights, licenses and authorizations to deliver the NG at the Delivery Point and to comply with all its obligations under this Agreement.*

*(4) The EGAS Tolling Contract* [C-0003]

3.24.    The Tolling Contract dated 30 June 2003 between EGAS (as Toller) and SEGAS (as Owner) (the "EGAS Tolling Contract") provided in material part, as follows:

3.25.    **Article 11.1:** *"Governing Law"*

> *This Contract shall be governed by and interpreted in accordance with the provisions hereof and by English law. English law shall govern the procedure of any arbitration under Article 11.3 (Arbitration).*

3.26.    **Article 11.3:** [ICC Arbitration, Paris]

> *Any Dispute arising in connection with this Contract and that is not solved through Article 11.2 (Referral of Disputes to Senior Management) shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce. In relation to an arbitration:*
>
> *(a) the language of the arbitration shall be English;*
>
> *(b) the place of arbitration shall be Paris; and*
>
> *(c) there shall be three arbitrators, the first being appointed by the Owner, the second being appointed by the Toller and the third being appointed by the Owner and the Toller or, if either the Owner or the Toller has failed lo appoint an arbiter or both have failed to agree upon the appointment of the third arbiter within thirty (30) days of the date the Parties determined to submit the dispute to arbitration, being appointed in accordance with the said Rules.*

3.27.    **Article 13(a):** *"Representations and Warranties"*

> *Each Party represents and warrants to the other Party that (a) it possesses all power, authority, and applicable approvals (if any) necessary for it to enter into this Contract and the Co-ordination Agreement,* […].

*(5) The ICSID Convention* [CL-0096]

3.28.    **Article 25(1) of the ICSID Convention:**

> *The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*

*(6) The ILC Articles on State Responsibility* [CL-0064]

3.29.  ***Article 4 of the ILC Articles:*** *"Conduct of organs of a State"*

> *(1) The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.*

> *(2) An organ includes any person or entity which has that status in accordance with the internal law of the State.*

3.30.  ***Article 5 of the ILC Articles***: *"Conduct of persons or entities exercising elements of governmental authority"*

> *The conduct of a person or entity which is not an organ of the State under Article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.*

3.31.  ***Article 8 of the ILC Articles:*** *"Conduct directed or controlled by a State"*

> *The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.*

3.32.  ***Article 11 of the ILC Articles***: *"Conduct acknowledged and adopted by a State as its own"*

> *Conduct which is not attributable to a State under the preceding articles shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.*

3.33.  ***Article 25 of the ILC Articles:*** *"Necessity"*

> *1. Necessity may not be invoked by a State as a ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act:*

> *(a) is the only way for the State to safeguard an essential interest against a grave and imminent peril; and*

> *(b) does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.*

*2. In any case, necessity may not be invoked by a State as a ground for precluding wrongfulness if:*

*(a) the international obligation in question excludes the possibility of invoking necessity; or*

*(b) the State has contributed to the situation of necessity.*

3.34. ***Article 36 of the ILC Articles:*** *"Compensation"*

*1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.*

*2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established.*

## PART IV: THE PRINCIPAL ISSUES

### (1) Introduction

4.1     The Tribunal divides the principal matters and issues arising from the Parties' dispute into the following categories, as here numbered by reference to the Parts of the Award that follow.

### (2) Principal Issues

4.2     *(V) Principal Facts:* In Part V of the Award, the Tribunal describes the relevant persons and events. The latter takes the form of a chronology, limited to the facts found necessary by the Tribunal for the purposes of this Award.

4.3     *(VI) Jurisdiction (with Admissibility) Issues:* In Part VI of the Award, the Tribunal addresses the Respondent's jurisdictional objections; namely (as alleged by the Respondent): (i) the absence of any protected investments within the meaning of Article 1 of the Treaty and Article 25(1) of the ICSID Convention; (ii) the "claim-splitting" tactics employed by the Claimant and SEGAS in their disputes and several arbitrations with the Respondent and EGAS; and (iii) the contractual nature of the Claimant's claims.

4.4     *(VII) Corruption Issues:* In Part VII of the Award, the Tribunal addresses the Respondent's other objection to jurisdiction and admissibility based on "corruption," namely the several alleged acts of corruption by the Claimant (including its predecessor UFACEX) in procuring the SPA made with EGPC (succeeded by EGAS).

4.5     *(VIII) Necessity Issues:* In Part VIII of the Award, the Tribunal addresses the defence of necessity under customary international law pleaded by the Respondent to preclude its international responsibility for the alleged international wrongs under the Treaty towards the Claimant. (The Treaty does not contain any specific provision on the defence of necessity).

4.6     *(IX) Merits Issues:* In Part IX of the Award, the Tribunal addresses the merits of the Claimant's claims and the Respondent's defences under the Treaty.

4.7    *(X) Compensation Issues;* In Part X of the Award, the Tribunal addresses the Parties' respective submissions on compensation, applying the legal principles applicable under the Treaty and international law.

4.8    *(XI) Stay/Suspension Issues:* In Part XI of the Award, the Tribunal addresses the Respondent's contention (opposed by the Claimant) that the Tribunal should decline to exercise its jurisdiction, or order a stay (or suspension) of this arbitration pending the resolution of CRCICA and ICC arbitrations.

4.9    *(XII) Costs Issues:* In Part XII of the Award, the Tribunal addresses the Parties' respective claims for legal and arbitration costs under Article 61(2) of the ICSID Convention (namely, the expenses incurred by the Parties in connection with this arbitration, the fees and expenses of the members of the Tribunal and the charges for the use of ICSID's facilities).

4.10   The list and description of these principal issues is not exhaustive. Moreover, the Tribunal has not found it necessary or appropriate to decide in this Award all issues forming part of the Parties' overall dispute.

## PART V: THE PRINCIPAL FACTS

### (1) Introduction

5.1     The following description of persons and events is not exhaustive, albeit lengthy.
Moreover, the events are mostly confined to evidential references to contemporary
documentation in the form of a documentary chronology. The chronology is largely
drawn from the Parties' own chronologies submitted at the request of the Tribunal.
These rival chronologies were not agreed between the Parties; and, further, it should
not be assumed that any Party agrees with the Tribunal's chronology below, recording
the more limited facts found necessary by the Tribunal for the purpose of this Award.

### (2) Dramatis Personae

5.2     The project for the Damietta Plant included several legal and other persons, at
different times.

5.3     *UFG:* UFG is the Claimant. It is a company incorporated under the laws of Spain, and
(by "assignment") a contractual party to the SPA. It also owns just under 80% of
SEGAS' shares. Mr J.M. Egea Krauel was UFG's Chairman from December 2009
onwards. In March 2010, Mr J. Sáez Ramírez was appointed UFG's Executive Vice-
President for Supply and Operations. Both testified as factual witnesses in this
arbitration.[1]

5.4     *UFACEX*: UFG's predecessor-in-interest in regard to the SPA and the Damietta Plant
was Unión Fenosa Desarrollo y Acción Exterior S.A. ("UFACEX"). It was a wholly
owned subsidiary of Unión Fenosa, which later merged with another company to
become Gas Natural Fenosa SDG, S.A., and which holds 50% of the shares in UFG.

5.5     *UFGC:* UFG owns 99.99% of UFGC. UFGC bought gas from UFG, and sold it on to
other customers outside Egypt.

5.6     *SEGAS:* SEGAS, the owner and operator of the Damietta Plant, is owned as to just
under 80% by UFG. UFG established SEGAS in 2000, as an Egyptian joint stock
company majority-owned by UFG, to develop and operate the Damietta Plant. At the
time of the SPA, the Damietta Free Zone was operative, having been established in

---

[1] Egea Krauel WS; Tr. D2 482-552; Sáez Ramírez WS1 and WS2; Tr. D2 401-477.

1993.[2] As intended by UFG, SEGAS was granted tax-free status under Egyptian tax laws by GAFI (the Respondent's General Authority for Foreign Investment and Free Zones).[3] That tax status was changed by the Respondent in 2008. That change forms part of UFG's claims in this arbitration.

5.7     Of SEGAS' directors from 2000 to 2009, Mr Fernández Martínez testified as a factual witness in this arbitration. Another former director and shareholder was Mr Yehia El Komy (who was not called as a witness in this arbitration). Mr J.L. de Lara Alonso-Burón was an engineer employed by SEGAS at the Damietta Plant from April 2005 to December 2012 (excepting a period of convalescence in Spain from December 2006 to November 2007). He testified as a factual witness in this arbitration.[4]

5.8     As Mr Fernández Martínez testified:

> *Unión Fenosa decided from the beginning to create a local corporate vehicle, SEGAS, for the sole purpose of building, owning and operating the Damietta Plant. SEGAS was incorporated in Egypt in 2000. SEGAS does not itself own, purchase, or export gas but instead provides liquefaction services in exchange for the payment of a tolling fee. The fee is to be paid by UFG and EGAS as tollers (companies who own natural gas that is liquefied at the LNG plant) under two separate Tolling Contracts and is prorated on the basis of the gas quantities they have contracted to toll through the Plant. EGPC and EGAS each obtained 10% ownership of SEGAS; and EGAS obtained 51.98% of the Plant's production capacity for an initial four-year period and thereafter only up to 41.80% for the remaining contract years.[5]*

5.9     *Gas Natural Fenosa*: In 2009, Unión Fenosa merged with Gas Natural SDG, S.A., becoming "Gas Natural Fenosa."  As a result, Gas Natural Fenosa owns 50% of UFG, which in turn owns 79.99870% of SEGAS.  The remaining shares in SEGAS are owned by EGAS (10%), EGPC (10%) and a subsidiary of Gas Natural Fenosa (0.00087%).

5.10    *ENI*: In 2003, Unión Fenosa sold 50% of its interest in UFG to ENI Spa. ("ENI").

---

[2] Cl Mem Merits, Paragraph 43.
[3] Decision of the Director of GAFI No. 3336 of 2001 regarding a License for the Spanish Egyptian Gas Company (SEGAS) to Carry out its Activities in accordance with the Private Free Zone Regime, [R-0075].
[4] De Lara Alonso-Burón WS; Tr. D2 636-670.
[5] Fernández Martínez WS, Paragraph 17.

5.11    For ease of reference below, save where the context requires otherwise, these different entities are described as "Unión Fenosa," "Gas Natural Fenosa," "SEGAS," "UFACEX" and "UFG" (as the sole Claimant in this arbitration).

5.12    *EATCO*: The Egyptian Arab Trading Company ("EATCO") is an Egyptian company, operated and controlled by Mr Yehia El Komy, a national of Egypt. From the early days of the Project, EATCO and Mr El Komy had a relationship with Unión Fenosa. Mr El Komy was not a witness in this arbitration.

5.13    In brief, this relationship included the following: EATCO and UFACEX entered into an agreement on 9 March 2000,[6] under which the parties were to undertake a pre-feasibility study into the Damietta Plant, and EATCO was to provide logistical and technical support to UFACEX. UFACEX ████████████████████████████ ████████████████████████ ██ ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ █ ████████████████████ ████████████████████████████████████████████ ████████████ █ ████████████████████████████████ ██████████████████

5.14    *Mr El Komy:* As already indicated, Mr Yehia El Komy was an Egyptian businessman, operating EATCO, of which he was the Chairman and Managing Director. His role in the Project is controversial and strongly disputed between the Parties. As pleaded in the Claimant's Rejoinder on Jurisdiction and Admissibility, the Claimant contended that Mr El Komy was the originator of the Project, a partner of UFACEX and that the fees he received were relatively modest in the light of his contributions to the Project, beginning with events leading up to the SPA.[10]

---

[6] Agreement between UFACEX and EATCO, 9 March 2000, [C-0439].

█ ████████████████████████████████████████████████████████████ █ ████████████████████████████████████████████████████████████

[10] Cl Rej Jur, Paragraphs 8 and 54.

5.15    The Respondent contends that Mr El Komy's role was much more significant, as part of a corrupt conspiracy involving (*inter alia*) EATCO, UFACEX and UFG. The Respondent refers, in particular, to contemporary documents, all of which are addressed in the chronology below under the heading "Six Documents" (there are, in fact, seven such documents).[11]

5.16    *EGPC:* The Respondent created EGPC (the Egyptian General Petroleum Corporation) by law in 1976 to regulate and manage the Egyptian hydrocarbons sector.[12]

5.17    *EGAS:* EGAS is wholly owned by EGPC. It succeeded, by way of "assignment" to EGPC's rights and obligations under the SPA. It was created by Decree of the Egyptian Minister of Petroleum in August 2001 to regulate, organise, and exploit the Respondent's natural gas resources.[13] From 2004 to December 2009, Mr Hassan El Mahdy was EGAS' assistant vice-chairman for operations; and from June 2010 to December 2011, he was EGAS' vice-chairman for operations. Mr El Mahdy testified as a factual witness in this arbitration.[14]

5.18    According to the Claimant, the Respondent created EGAS and EGPC to allow it to exercise control over the hydrocarbons and energy sectors in Egypt; and the Respondent used and continues to use these companies and their affiliates to exercise governmental authority and to dominate all aspects of natural gas exploration, development, production, liquefaction and sale in Egypt.

5.19    *The EPC Contractor*: In 2001 SEGAS awarded a contract for the engineering, procurement and construction of the Damietta Plant (the "EPC Contract") to a joint venture consortium[15] comprised of three international companies, one of which was Halliburton KBR ("Halliburton").

### (3) Selected Factual Chronology

5.20    The Tribunal sets out below its selected factual chronology, with annotations.  As already indicated, it is based largely on the rival chronologies prepared by the Parties.

---

[11] The Tribunal has taken the Respondent's case on these Six Documents largely from Annex I to its letter dated 21 December 2017.
[12] Law No. 20 of 1976 regarding the Egyptian Petroleum Corporation, 17 March 1976, [R-0002].
[13] Prime Ministerial Decree No. 1009 of 2001 concerning the Establishment of the Egyptian Holding Company for Natural Gases, [C-0132 / R-0001].
[14] El Mahdy WS1; Tr. D3 709-831.
[15] Fernández Martínez WS, Paragraph 19.

Those were not agreed documents as between the Parties; and the compilation below has been selected, edited and supplemented by the Tribunal.

***1980-1982***

5.21    *1980-1982*: The Prime Minister of Egypt issues decrees concerning the Petroleum Sector.

> *The Supreme Council of the Petroleum Sector shall be constituted with the presidency of the Minister of Petroleum and the membership of:*
>
> *The Chairman of the Board of Directors of the Egyptian General Petroleum Corporation;*
>
> *The Chairman of the Board of Directors of the Public Petroleum Company*
>
> *[…];*
>
> *The Chairman of the Board of Directors of the Petroleum Gases Company*[16]

***1993***

5.22    *1993*: The Minister of Petroleum issues Decree No. 1020/1993, addressing the provision of medical services to workers in the Petroleum Sector. The term "Petroleum Sector" is there defined as follows:

> *The Petroleum Sector, in the application of this Decree, shall mean the following entities:*
>
> *The Ministry of Petroleum, the Egyptian General Petroleum Corporation, and the petroleum public sector and common sector companies.*[17]

***1994***

5.23    *26 April 1994*: The Treaty enters into force.[18]

***1997***

5.24    *8 September 1997*: Egypt enacts the Investment Guarantees and Incentives Law No. 8 of 1997. The Law creates investment incentives for investing in Egypt's Free Zones.[19]

---

[16] Prime Minister's Decree No. 356 of Year 1980, Article 1, [C-0352]; Prime Minister's Decree No. 321 of Year 1982, [C-0353].
[17] Minister of Petroleum's Decree No. 1020 of the Year 1993, Article 4, [C-0355].
[18] Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, [C-0001].

*1999*

5.25    *1999*: The Minister of Petroleum (Mr Sameh Fahmy) produces an Integrated Gas Strategy (1999) for the natural gas industry of Egypt to 2017 (the "Master Plan"):

> *In 1999, the Egyptian government declared that domestic demand had been met and encouraged the search for export markets.*
>
> *In conjunction with that search, the Integrated Gas Strategy (1999) in Egypt was penned by Mr Sameh Fahmi, Petroleum Minister.  It featured the creation of a 'Master Plan' which should remain valid through 2017. The Master Plan involves price optimization to attract investors, increased gas exports, and infrastructure development, qualified by six considerations:*
>
> *1. An export ceiling – 25% of total production;*
>
> *2. No foreign or domestic gas operator may export gas from Egypt prior to investing in Egypt's domestic gas market;*
>
> *3. Special incentives were established to encourage foreign and Egyptian Exploration & Production (E&P) companies to establish marketing franchises, in order to promote gas-based business within Egypt;*
>
> *4. Incentives were also established to encourage diversification within the gas industry;*
>
> *5. Exploration & Production (E&P) incentives were aimed to maintain a higher level of attractiveness, when compared with neighboring countries;*
>
> *6. All businesses within Egypt – whether state-controlled, private, or mixed – were encouraged to convert to natural gas for energy needs.*[20]

*2000*

5.26    *21 January 2000 - The Six Documents:* The Respondent refers to the first of the Six Documents: a fax message of 21 January 2000 from Messrs Ortega and El Maatawy to Mr Elías Velasco García of Unión Fenosa, with an attached fax of 20 January 2000 from Mr El Komy ("UFGTREATY 0047965").

5.27    The fax of 21 January 2000 states (*inter alia*):

> *Further to our conversations, I enclose a copy of the fax received from MR YEHIA A. ELKOMI, Chairman and Managing Director of EATCO, setting out the reality and viability of our expectations.*

---

[19] Investment Guarantees and Incentives Law No. 8 of 1997, [C-0109].
[20] Mary E. Stonaker, "Energy Infrastructure as a Diplomatic Tool: The Arab Gas Pipeline," *J. Energy Security* (14 December 2010), [C-0122], Page 2.

5.28    The fax of 20 January 2000 from Mr El Komy states (*inter alia*) in relation to the Project: "we would like to inform you that we have obtained the initial approval from the Egyptian government to construct such a project." It is cited more fully below:

> *Reference to our telephone conversation at this week and with regard to the meeting held on Jan 10, 2000 with Mr Omar El-Koumy, ADGAS-U.A.E. regarding the Spanish company interest to construct LNG and Electrical Power Plant of 500 MW using local Egyptian natural gas, we would like to inform you that we have obtained the initial approval from the Egyptian government to* [construct] *such Project.*
>
> *The power plant of 500 MW will be able to supply the LNG plant with the required electricity and the remaining capacity will be tied to the local national grid with mutual agreement on the prices of natural gas and supply of electricity to the national grid per KW.*
>
> *We also can obtain long term supply of natural gas with a contract of 25 years renewable for another 25 years and so on. The price formula will be mutually agreed between the Egyptian government and the new company to be established to construct such project.*
>
> *EATCO will secure all local land for the project and all local license for the project and also EATCO will be the local partner in this project.*
>
> *I'm going to meet the minister of petroleum of Egypt on 23.1.2000 for arranging the meetings required with you and the Spanish company in this regard. We understand that the Spanish company will fund the project completely and will be able to utilize all LNG produced by this plant. We understand that the capacity of LNG will be in the range of 2.5 million metric tons per year.*
>
> *The official gas price will be US50.041 per m$^3$ of natural gas supplied to the battery limit of LNG* […]

5.29    It also sets out a work plan with meetings in Egypt to be attended by Unión Fenosa, including a meeting with the "Oil Minister" to explain the Project and "to confirm the approval of the Egyptian government to the Project."

5.30    According to the Respondent, this first document directly contradicts the Claimant's contention that "the SPA was the result of genuine arm's length negotiations between the parties involved."[21]   In fact, again according to the Respondent, this document shows that, even before UFACEX had even met with the Minister of Petroleum (Mr Sameh Fahmy), or submitted a proposal for the SPA, or ███████████████ ██████████████████████████████████████  Mr El Komy represented that he

---

[21] The Respondent cites from the letter dated 30 June 2017 from the Claimant to the Tribunal, Page 4.

had already secured "the initial approval" for the Damietta Project (in only ten days). As the cover letter addressed to Unión Fenosa states, so the Respondent submits, Mr El Komy's representation confirmed the "reality and viability" of the expectations shared by Unión Fenosa, apparently to obtain the Project by any means. It did so in a contract of the same duration, substantially the same quantity and (███████████ ██████████████████████) a more favourable price than this initial proposal.[22]

5.31    *26-30 January 2000*: A delegation from UFACEX attends a meeting with the Minister of Petroleum (Mr Sameh Fahmy) in Egypt. A contemporaneous memorandum prepared by a member of the UFACEX delegation describes the meeting as follows:

> *Between January 26 and 30, a UNIÓN FENOSA delegation held a series of meetings for the purpose of gathering information and obtaining a clearer perception of the potential LNG project that had been presented to the management of UNIÓN FENOSA [...] we had a meeting with the Minister of Petroleum, Sameh Fahmy, who has openly confirmed the support of the Government of Egypt for this Project. The Minister mentioned during the meeting that other international groups had expressed an interest in the Project, and encouraged UNIÓN FENOSA to submit a proposal for negotiation (in case UNIÓN FENOSA was interested in the Project) shortly. Thus, in relation to this meeting with the Minister, we have summarized our impressions of him and our/the Minister's commitments:*
>
> - *A young, active and ambitious Minister.*
>
> - *He is very familiar with the gas business.*
>
> - *Although he has been Minister for only a short time, he is eager to do a 'well-known' project in a short period of time.*
>
> - *He has a personal interest in the project and entering the Spanish market.*
>
> - *We have his support for the project and his commitment to provide the gas with a long-term contract of 20 to 25 years at a competitive price [...]*[23]

5.32    This meeting is the beginning of the negotiations leading to the execution of the SPA on 1 August 2000. These negotiations are conducted for EGPC by a committee comprised of the EGPC Chairman (Mr Mohamed Tawila), the EGPC Vice-Chairman for production (Mr Hassan Akl), the EGPC Vice-Chairman for natural gas

---

[22] The Respondent refers to UFGTREATY 0047965 and the Natural Gas Sale and Purchase Agreement, [C-0002].
[23] UFACEX Memorandum to Elías Velasco and Santiago Roura of 23 January 2000 re "LNG – Egypt," 28 January 2000, [C-0344].

(Mr Mohamed Latef), the Assistant General Manager of GASCO's Natural Gas Management Division (Mr Ahmed Shaaban) and the legal counsellor for Engineering for the Petroleum and Process Industries (ENPP) (Mr Ahmed Taha). Mr Shaaban testified as a factual witness in this arbitration.[24]

5.33    Mr Shaaban's witness statement described the negotiations of the SPA as follows:

> *During the negotiations with UFACEX, which lasted for several months, no representatives from the Ministry of Petroleum or Government were present. EGPC was negotiating in its own name and independently, and all instructions to Committee members were made by EGPC representatives. I am not aware of any instructions given by the Ministry to the members of the Committee on the terms we negotiated with UFACEX, and as far as I know, the Ministry was not involved in these negotiations, nor was EGPC required to seek or obtain any approvals from the Ministry regarding these terms.* [25]

5.34    *2 March 2000 - The Six Documents:* The Respondent next refers, as the second of these documents, to the minutes of 2 March 2000 of a UFACEX internal meeting ("UFGTREATY 0047964").

5.35    These minutes, headed "Re: Natural Gas Liquefaction Project in Egypt," record the attendees of this meeting as follows: Mr Eloy Álvarez Pelegry, Mr Juan Manuel Álvarez González, Mr Jorge Porras, Mr Antonio Hernando Villaroya, Mr José María Suárez and Mr Arturo Torrego.

5.36    The "matters discussed" at the meeting include the following:

> *Mr Antonio Hernando produced the draft letter to EATCO, for signature by Mr Eloy Álvarez, in which the request for additional information and for a possible meeting date of March 7 is repeated.*
>
> *He also produced the draft MoU with EATCO which, with slight changes (postponement of the date of commitment to a pre-feasibility study and a fuller description of the tasks that EATCO undertakes to carry out in this first phase) will be used at the next meeting. He also produced a form Confidentiality Agreement between EATCO and UFACEX, which may be used as a model for work with engineers/consultants, who will be mentioned below.*
>
> *The MoU with the Egyptian Authority is being drawn up as a draft in two different versions: depending on whether EATCO is simply an agent*

---

[24] Shaaban WS1, Paragraph 5; Tr. D3 687-688.
[25] Shaaban WS1, Paragraph 7.

> *activating the project or more of an investor partner. This document may*
> *not be finalized until such time as these and other points of the agreements*
> *with EATCO have been defined […]*

5.37    According to the Respondent, these minutes, some two months prior to the MOU for
the Project, show that UFACEX deliberated on preparing two different versions of the
MOU, one portraying Mr El Komy's company EATCO as "simply an agent activating
the project"; and the other as "investor partner." As alleged by the Respondent,
despite the Claimant's contention that Mr El Komy played a leading role in the
Project ████████████████████████████, in May 2000 UFACEX
adopted a version of the MOU that did not disclose EATCO's stake in the Project (or
refer to it at all), thereby demonstrating a concern within UFACEX about disclosing
Mr El Komy's role in procuring the Project.[26]

5.38    *09 March 2000:* UFACEX and EATCO execute a Preliminary Agreement. It
provides, in material part:

> *WHEREAS*
>
> *1. UFACEX is a Spanish Company working in the field of electricity*
> *and gas.*
>
> *2. UFACEX is interested in entering in the market of* [...] *Egypt by means*
> *of* […] *developing, constructing and operating a single train of Liquefied*
> *Natural Gas Project (LNG Project) in Egypt.*
>
> *3. EATCO has been rendering advisory and assistance services in Egypt*
> *for many years, EATCO is also investing in several projects in oil and*
> *petrochemical sector, and is interested in co-operating with UFACEX, in*
> *the above-mentioned LNG Project.*
>
> *Both parties have met in Cairo on 26th-28th January 2000 and in Madrid*
> *on 8th-9th March 2000 and have agreed to study and analyse co-operating*
> *in the LNG Project.  Both Parties agree to the following* […][27]

5.39    *21 March 2000*: UFACEX and the Minister of Petroleum meet to negotiate the LNG
project in Egypt. A letter from UFACEX to the Minister following the meeting
records UFACEX's understanding of the outcome:

> *First of all, we would like to thank your Excellency for the opportunities*
> *we had to meet with you to discuss the LNG Project in Egypt.  Since our*
> *last meeting on the 21st of March, and in accordance with your*

---

[26] Memorandum of Understanding between EGPC and UFACEX [for the] Development of a Natural Gas
Liquefaction Facility, 17 May 2000, [C-0168].
[27] Agreement between UFACEX and EATCO, 9 March 2000, [C-0439].

> *suggestions, we have moved forward, in co-operation with our Egyptian partner EATCO, in the development of this interesting project. [...] [O]ur understanding is that the support of the Egyptian Authorities and the commitments of our Companies could be established in terms of a Protocol or a Memorandum of Understanding (MOU) […]*[28]

5.40   *09 May 2000*: Mr Yehia El Komy, Mr Omar El-Komy, and Mr Hamed El-Maatawy execute an agreement identifying their respective roles in connection with the Project.

> *The First Party* [Mr Yehia El Komy] *provided the required services for the establishment of this project.  It introduced the Spanish Companies to the Egyptian Government through meetings with the Minister of Petroleum and other officials in the Egyptian Government.  The First Party also played a main role in obtaining the required official approvals for the establishment of the projects, in addition to the raw natural gas supply approvals, the land allocation, and the coordination with official and financial entities for the establishment of the project.*[29]

5.41   *17 May 2000*: EGPC and UFACEX execute a Memorandum of Understanding (the "MOU"). It states:

> *ARTICLE 2        PURPOSE AND SCOPE OF THIS MOU.*
>
> *The purpose of this MOU is to determine the general framework of the Natural Gas Sale and Purchase Agreement and the responsibilities and commitments to be assumed by each Party with the aim to support the development of the Project.  The Parties will cooperate and act in good faith and diligently to pursue the development of the Project.*[30]

5.42   *31 May 2000*: UFACEX and the Minister of Petroleum continue to consider the LNG project in Egypt. A memorandum written on the same day by a member of the UFACEX delegation records:

> *In successive visits to Egypt, we have completed a set of tasks aimed at establishing a framework of information upon which decisions can be made with respect to the LNG Project. […] The long-term supply of Natural Gas for the LNG Plant will come from the Government of Egypt's share [of gas] in the production of international operators through a long-term purchase contract (25 years extendable by another period of identical duration) with EGPC. [...] [I]n recent conversations with the Minister of Petroleum, the Minister stated that the interests of the Government of*

---

[28] Letter from UFACEX to Sameh Fahmy, Minister of Petroleum of Egypt, 2 April 2000, [R-0007].
[29] Agreement between Yehia El Komy, Omar El-Komy and Hamed El- Maatawy, [C-0438].
[30] Memorandum of Understanding between EGPC and UFACEX [for the] Development of a Natural Gas Liquefaction Facility, 17 May 2000, [C-0168].

> *Egypt in relation to the export of gas are 12 bcm, out of which 4 of them would be exported through 'Pipeline' and the rest as LNG.*[31]

5.43    *June 2000*: It appears that EATCO engages in a search for suitable sites on Egypt's north coast and provides Unión Fenosa with reports on the potential location for the LNG project. This is proposed in an undated fax sent by Mr Antonio Hernando of UFACEX to Mr Ricardo Villanueva;[32] and it is evidenced by a meeting of the Management Committee on 14 June 2000:

> *'LNG Facility' Area: 1. The Management Committee is informed of the activities carried out over the last week by the Group responsible for Site analysis […]*[33]

5.44



5.45

---

[31] UFACEX Memorandum, *LNG – Egipto*, [C-0358].
[32] Fax from A. Hernando to R. Villanueva (undated), [C-0445].
[33] Minutes of Meeting sent by Antonio Hernando to Elías Velasco *et al.*, 14 June 2000, [C-0444], Page 2.
[34]



5.46   The Claimant emphasises ███████████████████████
███████████████████████████████████████████████████
████████████████████

5.47   The Tribunal notes ████████████████████████████████████.
Under the laws of the USA, this legislation makes it a criminal offence for a US
company and also certain foreign companies to bribe an official of a foreign State.

5.48   According to the Claimant, this language demonstrates ████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

───────────────────────

█ ████████████████████████████████
[36] Cl Rej Jur, Paragraph 7.

5.49   *May-July 2000*: The EGPC Chairman asks the EGPC Board of Directors to review and approve the proposed SPA. His memorandum records:

> *Based on the request of the Spanish Unión Fenosa company to purchase the gas needed to produce about 4 million tons per annum; with the company to cover the costs of setting up the liquefaction and storage facilities and the shipping pier and to secure the necessary financing for this purpose; and with the company to also take care of the operations to transfer the liquefied natural gas to Spain; and with the responsibility of the Egyptian side being restricted to supplying gas in the quantities and specifications until liquefaction.*[37]

5.50   *15 July 2000:* A memorandum of understanding, in principle, is signed between EGPC and UFG. Later, the EGPC Chairman's own note summarises the effect of the memorandum of understanding:

> *Agreement is to be reached on a sale price for the gas upon signing the final contract.* [...]
>
> *At the end of the negotiations, agreement was reached between the two parties to implement the prices. This is considered to be a success for the petroleum sector in the field of pricing gas for export,* [...] *This contract has been signed in principle between the Egyptian General Petroleum Commission and the Unión Fenosa company on 15 July 2000, on condition that the competent authorities approve the agreements that have been made regarding the price of the gas, given the potential for this to contribute to the dollar currency returns earned by the petroleum sector* […] *This will increase with the average export ratios.* […] *[T]he matter is being submitted to the Board of Directors so that they may review and approve the draft agreement to sell gas to the Unión Fenosa company and begin the implementation procedures thereof.*
>
> *Chairman of the Board of Directors.* [Signature]. *Engr. Mohammed Ibrahim Tawilah.*[38]

5.51   *24 July 2000*: The EGPC Board authorises the EGPC to execute the SPA; and the Minister of Petroleum "endorses" the decision that EGPC is to execute the SPA.

> *Decision: after discussion, the board of directors of the Egyptian General Petroleum Commission reached the following decision:*
>
> *1. To approve the contents of the memorandum* [concerning the SPA and gas prices].

---

[37] Memorandum Number 56, from the agenda of the XIIIth Meeting of the Board of Directors of EGPC convened on 20 July 2000, [C-0359].
[38] Draft Memorandum Number 56, 2000, [C-0360].

*2. The Engr. / chairman of the Board of Directors of the* [EGPC]*, and the Engr. / deputy chairman of the Board of Directors of the* [EGPC] *are to be authorized to conclude the contractual procedures as required.*

[…]

*Endorsed, Minister of Petroleum.* [Signature] *24 July 2000. Engr. Sameh Fahmi.*[39]

5.52    *25 July 2000*: The Minister of Petroleum proposes to the Respondent's Council of Ministers for its session on 25 July 2000 that a memorandum of understanding should be entered into with UFACEX.[40] This is followed by a letter from the Minister dated 27 July 2000 to the Prime Minister, Dr Atef Ebeid, on the SPA's pricing terms.[41] Also in July 2000, the Minister sends a separate memorandum to the Council of Ministers, summarising the then-draft SPA and the Project as a whole, and seeking the Council's approval for "signing a contract with the Spanish Company Unión Fenosa."[42] This memorandum clearly preceded the SPA's signing ceremony on 1 August 2000.

5.53    The Minister of Petroleum's memorandum to the Council of Ministers for its session on 25 July 2000, seeking its approval for the SPA, acknowledges that the SPA prices fall within the range with accepted international prices:[43]

*In April 2000, Unión Fenosa* […] *requested to sign a contract on purchasing the Egyptian natural gas to manufacture, liquefy and export, and market it in Spain. In this framework, an understanding memorandum was* [executed] *between the Egyptian General Petroleum Corporation (EGPC) and Unión Fenosa in May* […] *During the landmark visit which was paid by His Excellency President Mohamed Hosni Mubarak to Spain and which supported the project within the framework of encouraging economic cooperation between the two countries, and after signing the above mentioned memorandum, intensive negotiations were carried out between the two parties. The negotiations lasted till after the termination of the visit and they aimed to sign the gas sales agreement and implement the first project for natural gas liquefaction and export in the history of Egypt.* […]

---

[39] Memorandum Number 56, from the agenda of the XIIIth Meeting of the Board of Directors of EGPC, convened on 20 July 2000, [C-0359].

[40] Minutes of the 18th meeting of the Council of Ministers, 25 July 2000, [C-0456].

[41] Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr Atef Ebeid (Prime Minister), 27 July 2000, [C-0461].

[42] Memorandum from the Minister of Petroleum (Sameh Fahmy) to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458].

[43] Memorandum Number 56, from the agenda of the XIIIth meeting of the Board of Directors of EGPC convened on 20 July 2000, [C-0359].

*The above mentioned table shows that the agreed upon prices for the sale of natural gas to Unión Fenosa company are in the range of international prices.*

*In light of the foregoing, the matter is submitted before the Council of Ministers to kindly approve the following:*

- *signing a contract with the Spanish Company Unión Fenosa to purchase a quantity of natural gas estimated to be about 4 billion cubic meters per year for 25 years of a total quantity estimated to be about 3.5 trillion cubic feet of gas […] according to the conditions and prices mentioned in the memorandum to be paid in dollars.*[44]

5.54    *25 July 2000*: The Council of Ministers and the Prime Minister discuss and approve the SPA.

*Approval […]*

*Signing a*[n agreement] *with Unión Fenosa Company to develop a project for the liquefaction of natural gas for export to Spain […] Thus, H.E the Prime Minister wrapped up the meeting at 3:30 p.m. He thanked the members of the Cabinet and wishes them continued success.*[45]

5.55    *27 July 2000*: The Minister of Petroleum sends a letter to the Prime Minister regarding success in negotiating higher gas prices with UFACEX under the SPA:

*I have the honor to inform you that we have negotiated with the Spanish company after the Cabinet meeting in a final attempt to improve the maximum price as per the proposed equation for the sale of Egyptian gas and in light of the desire of the Spanish company to closely cooperate with the Egyptian government, the negotiations succeeded and the company agreed to improve the maximum price to be increased by 25% […] The Egyptian General Petroleum Corporation has signed the contract with the Spanish Company Unión Fenosa S.A. according to the above mentioned and the main conditions which were stated in the memorandum submitted to the Cabinet. I take this opportunity to congratulate His Excellency President Hosni Mubarak and you for signing the first contract in Egypt's history to export the Egyptian gas.*[46]

5.56    *27 July 2000*: At a meeting, Mr El Komy introduces the Japanese contractor Chiyoda to Unión Fenosa.[47]

---

[44] Memorandum from the Minister of Petroleum (Sameh Fahmy) to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458].

[45] Minutes of the 18th Meeting of the Council of Ministers, 25 July 2000, [C-0456]; *see also* Memorandum from the Minister of Petroleum (Sameh Fahmy) to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458].

[46] Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr Atef Ebeid (Prime Minister), 27 July 2000, [C-0461].

[47] Fax from Ricardo Villanueva to Yehia El Komy, undated, probably July 2000, [C-0467].

> *I would like to present to you a summary of the meeting held with the CHIYODA company (Mr Nagata and Mr Kenzo Ukibe) on the preliminary UFG assessment of potential sites for an LNG plant in Egypt.*[48]

5.57   *29 July 2000*: The Ministry of Petroleum (Technical Affairs Division) acknowledges approval of the draft SPA by EGPC Board and approval by Council of Ministers prior to the execution of the SPA. In that acknowledgment, the following is recorded:

> *The role of the Egyptian Petroleum sector: Sale and supply of gas in the quantities and specifications required to the liquefaction facilities at the project's site in northern Egypt, at a price paid in hard currency and ranging from 0.75-1.25 USD MMBTU [...] Attached is a table [that] indicates the sale prices of natural gas which is distributed [...] in some countries competing with Egypt.  The prices are almost identical to the price of selling gas to liquefaction units [...]*

> *The Project was submitted to the Economic Commission of the Board of Directors of the Egyptian General Petroleum Corporation and approved on 20/7/2000.  The Economic Commission recommended consulting the board of the Egyptian General Petroleum Corporation in this regard and the board approved the project in its 12th session on 20/7/2000. The Project was also submitted to the Council of Ministers and the council approved the project on 25/7/2000.*[49]

5.58   *1 August 2000*: UFACEX and EGPC execute the Natural Gas Sale and Purchase Agreement (the "SPA").[50] Article 16.4 of the SPA contains a CRCICA arbitration clause. Article 24.1 of the SPA provides that each Party to the SPA represented that it acted "as principal and not as agent, fiduciary, or any other capacity." Mr Shabaan testified at the Hearing that EGPC was negotiating the SPA in its own name.[51]

5.59   Later, on 17 October 2002, EGPC gave notice that it had novated its rights and responsibilities under the SPA to EGAS, effective as of August 2000.[52] On 30 June 2003, UFACEX sought permission to novate its rights and responsibilities under the SPA to UFG, which EGAS granted.[53]

5.60   In brief, under the SPA (as later amended), UFG acquired the contractual right to receive from EGAS a certain supply of natural gas at the Damietta Plant over a period

---

[48] Email from Ricardo Villanueva, 17 July 2000, [C-0447].
[49] Memorandum from the Technical Affairs Office of the Ministry of Petroleum, 29 July 2000, [C-0459].
[50] Natural Gas Sale and Purchase Agreement, [C-0002].
[51] Shabaan WS, Paragraph 7; Tr. D3 693-694.
[52] Letter from EGPC (Ibrahim Saleh) and EGAS (Mohamed Tawila) to Unión Fenosa, S.A. (Elías Velasco), 17 October 2002, [C-0170].
[53] Letter from Unión Fenosa Internacional, S.A. and UFG (Elías Velasco) to EGAS (Mohamed Tawila), 30 June 2003, [C-0171].

of at least 25 years. EGAS was to supply up to the maximum amount of natural gas needed for the nominal capacity of the Plant, which resulted in a gas quantity of 7.56 billion cubic meters per annum ("bcma"). The economics of the Damietta Plant were dependent upon its receiving the contractually agreed quantities of natural gas from EGPC (later EGAS).

5.61   Later, the Ministry of Petroleum produces a number of memoranda on the SPA for the Council of Ministers or the Minister for Petroleum, after the SPA had been signed on 1 August 2000: an undated memorandum;[54] a memorandum dated 14 November 2006 outlining amendments to the SPA's pricing mechanism, which had been negotiated with UFG;[55] and two memoranda dated 27 August 2007[56] and January 2008[57] concerning further proposed amendments to the pricing mechanism in the SPA. The Tribunal concludes the Respondent, by its Ministry of Petroleum and Council of Ministers, was and remained familiar with the terms of the SPA.

5.62   The recitals to the SPA set out its purpose:

> *WHEREAS, Buyer intends to contract with Seller for the firm supply and transportation by Seller of NG to the Complex, in which the NG will be liquefied and transformed into liquefied natural gas ('LNG'), to be exported for sale to Spain and other territories.*

5.63   The SPA contains several guarantees of supply of natural gas to the Damietta Project, including:

> *Section 5.1. Seller shall at all times keep a back up supply to meet an on stream (load) factor of 95% of the LNG Complex.*
>
> *Section 23.2. Adequacy of Supply. Seller is the sole responsible [party] for securing adequate supplies of N[atural] G[as] for performance of its obligations hereunder. Seller shall, throughout the Term, provide Buyer or Lenders with such further assurances as Buyer or Lenders may reasonably request from time to time regarding the continued adequacy of N[atural] G[as] supply sources relied upon by Seller to perform hereunder.*

---

[54] Memorandum from the Technical Affairs Office of the Ministry of Petroleum, 29 July 2000, [C-0459].
[55] Memorandum to be submitted to Eng. Sameh Fahmy, Minister of Petroleum on contracting with Unión Fenosa on adjusting the prices of Natural Gas supplied to the company in Damietta liquefaction Plant, 14 November 2006, [C-0462].
[56] Memorandum on Contracting with Unión Fenosa Gas on Natural Gas Sale and Purchase to Establish Natural Gas Liquefaction and Export Plant, signed by Sherif Ismail and Ismail Karara , 27 August 2007, [C-0460].
[57] Memorandum to be submitted to Eng. Sameh Fahmy, Minister of Petroleum on contracting with Unión Fenosa on amending the prices of Natural Gas supplied to the company in Damietta liquefaction Plant, January 2008, [C-0463].

*Section 24.3. Adequacy of Supply of N*[atural] *G*[as]. *Seller is aware that the supply of N*[atural] *G*[as] *to Buyer under this Agreement is a key element for the successful development of the Project, and therefore Seller represents and warrants that its availability of NG will be sufficient to feed the Complex under the terms and conditions of this Agreement. Also Seller represents and warrants that it has, and will have during the Term, all the legal, administrative and corporate rights, licenses and authorizations to deliver the N*[atural] *G*[as] *at the Delivery Point and to comply with all its obligations under this Agreement.*

5.64   It also contains a *force majeure* provision that carves out "changes in market conditions" from *force majeure*.

*15.3 Failure of Market.*

*(b) In the case of the Seller, Force Majeure shall not include changes in market conditions including, without limitation, changes that:*

*(i) Directly o*[r] *indirectly affect the demand for or price of N*[atural] *G*[as].

*(ii) Result in the diversion of N*[atural] *G*[as] *to other users.*

*(iii) Are due to the inability of the transportation system and/or pipeline (whether for reasons of maintenance, repairs or lack of capacity or otherwise) to meet consumer demand and/or Buyer demand.*

5.65   EGPC undertakes in the SPA to obtain from Egyptian authorities an undertaking not to interfere with UFACEX's rights under the SPA:

*Section 21.1. EGPC's support to the Project. EGPC undertakes to procure that the Egyptian authorities undertake not to interfere with the rights of Buyer under this Agreement, and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer under this Agreement, or affect the capacity of Buyer* [sic] *to perform its obligations under this Agreement, even in the case of a N*[atural] *G*[as] *shortage in Egypt, save for Force Majeure as defined in this Agreement.*

*EGPC shall also assist and actively collaborate with Buyer to obtain any authorization and/or legal, administrative or governmental benefit to Buyer for the Project and/or the construction of the Complex.*[58]

5.66   Given the importance of the gas supply for the LNG Project, to be made by EGPC (later EGAS), this undertaking by the Egyptian authorities was no formality. It was a contractual requirement of great significance. It was made in the form of the letter dated 5 August 2000 from the Ministry of Petroleum, cited below.

---

[58] Natural Gas Sale and Purchase Agreement, [C-0002].

5.67    *03 August 2000*: Egyptian Counsel for UFACEX confirms that the negotiation and signature of the SPA were proper and comply with all applicable Egyptian regulations:

> *According to the relevant laws applicable in the Arab Republic of Egypt, the Egyptian Petroleum Corporation is entitled to execute the* [SPA] [...]
>
> *No law, ordinance, statutes or regulations of the Arab Republic of Egypt or of any local authority applicable to or binding on EGPC or by which EGPC will become bound* [...] *will be violated by the execution and delivery of the* [SPA].[59]

5.68    *05 August 2000*: By letter dated 5 August 2000 to Unión Fenosa, the First Under-Secretary of the Ministry of Petroleum writes, in English:

> *On behalf of the Ministry of Petroleum I have the pleasure to inform you that the Egyptian Government official* [sic: officially] *endorsed the natural gas Sales and Purchase Agreement signed on August 1ˢᵗ, 2000 between UFACEX and EGPC* [...][60]

5.69    *08 August 2000*: UFACEX executes an agreement with the Damietta Port Authority. The agreement's purpose is:

> *Preamble.*
>
> *I. UFACEX is exploring the commercial feasibility of building, owning and operating a natural gas liquefaction facility within the area of and adjacent to the Damietta Port, such complex to comprise special facilities for the transmission, processing, storing, loading and shipping of supplies of natural gas and exports of liquefied natural gas within the Damietta Port site.*
>
> *II. To this effect, UFACEX, subsequent to the execution of a Memorandum of Understanding of May 17 2000, with the EGYPTIAN GENERAL PETROLEUM CORPORATION (EGPC), have executed on August 1 2000, a Natural Gas Sale and Purchase Agreement with the EGPC for an initial period of 25 years to be extended under mutual agreement to an additional period of 25 years.*
>
> *This liquefaction complex may also include power generation facilities.*
>
> *According to such Agreement, the commencement of supply on natural gas shall take place on the second half of year 2004.*[61]

---

[59] Legal Opinion from Zaki Hashem & Partners, 3 August 2000, [C-0455].
[60] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 August 2000, [C-0169].
[61] Agreement with the Damietta Port Authority, 8 August 2000, [C-0448].

5.70 

5.71 *18 October 2000*: SEGAS executes an agreement with the Damietta Port Authority. The agreement records:

> *Article 1 – Subject of the Agreement:*
>
> *The First Party hereby undertakes and agrees to grant the right to use to the Second Party, which accepts to acquire it, regarding an area located at Damietta Port, Egypt. This area shall be defined by reference to: (I) The area offered by the First Party as described in the map attached as Exhibit 4 to this Agreement and (II) that area marked with horizontal stripes as UF process area within the northern boundaries defined by points A, D, E, F, and G in Exhibit 5 to this Agreement. Both Exhibits 4 and 5 shall describe the area of this Agreement (The Area). The Area shall be surrounded by a wall made of bricks, similar to those available inside the Port.*
>
> *Article 2 – Object:*
>
> *The Second Party shall have the right to use the Area to build, own and operate a natural gas liquefaction facility (Complex), for the purpose of transmitting, processing, storing, loading and shipping supplies of natural gas and exports of liquefied natural gas by the Second Party. Such Complex shall also include other facilities such as jetty, a flue gas flare, power generation facilities, and others that might be convenient.[63]*

5.72 *18-31 October 2000*: EATCO participates in initial technical meetings with EGPC and UFACEX. This is recorded in a fax from Mr Villanueva of UFACEX to EGPC, following up on questions arising out of that meeting:

> *In a new meeting held in Cairo (October 18th, 2000) between EGPC (Mahmoud Latif Amer), GASCO (TBA), Mr Yehya El Komi and other member[s] of our company, [it] was said [to] us that [...][technical details regarding the gas supply].[64]*

---

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
[63] Agreement with the Damietta Port Authority, 18 October 2000, [C-0449].
[64] Fax from Ricardo Villanueva to EGPC (cc. Y. El Komy), 27 October 2000, [C-0453].

In a letter to EGPC, Unión Fenosa requests further meetings to resolve technical details about the gas to be supplied, saying:

> [W]e would like to have a meeting next Tuesday October 31 – 2000 at 10.00 a.m. hour between EGPC, GASCO, EATCO, UFACEX and our CONTRACTOR (CHIYODA Corp.). [...]
>
> Mr Yehya El Komi shall be in contact with you or Mr Hassan Akl to confirm and prepare this meeting."[65]

5.73   *28 October 2000*: Unión Fenosa sends a letter to EGPC with an update on the Damietta Project, requesting information concerning approvals from Egyptian authorities to build the LNG Plant.

> [I]n order to progress with our project we will thank you if you could officially inform us about the steps to be done in order to obtain the necessary approvals in front of the Egyptian Authorities to construct our LNG plant in Damietta site (what kind of documents have to be done and the Egyptian Authorities to present these).[66]

5.74   *11 November 2000*: Egypt's General Authority for Investment (GAFI) approves the establishment of the "SEGAS Project."[67] It records SEGAS status in accordance with Investment Law No. 8 of 1997, as an Egyptian Joint Stock Company established under the Private Free Zone System. [68]

5.75   *16 December 2000*: The Damietta Port Authority issues a license to SEGAS, following the approval of Cabinet of Ministers, to construct and operate a liquefied natural gas plant and port:

> With reference to The Cabinet's approval in its session [...] that [SEGAS)] [...] subject to the provision of the Free Zone regime (under formation) to construct, operate and transfer A Specialized Petroleum' Jetty in accordance with (BOT) system for handling, loading, unloading and export liquefied Natural Gas and petroleum products according to (BOT) system in compliance with the provisions of the Law No. 22 of 1998 which amended Law No. 1 of 1996 issued regarding specialized ports in order to serve the project of establish, owns and operate a complex for Natural Gas liquefactions and export thereof […][69]

---

[65] Letter from Unión Fenosa to EGPC, 28 October 2000, [C-0454].
[66] Letter from Unión Fenosa to EGPC, 28 October 2000, [R-0337].
[67] Decision of the Director of GAFI No. 3035 of 2000 regarding the Approval to the Establishment of SEGAS Project in accordance to the Free Zone Regime, [R-0074].
[68] Contract of Incorporation of SEGAS, 11 November 2000, [R-0008].
[69] Damietta Port Authority License, 16 December 2000, [C-0328].

*2001*

5.76    *February 2001*: The Prime Minister of Spain visits Egypt in February 2001; and the Prime Minister of Egypt visits Damietta in October 2001. Later, on 1 February 2002, Unión Fenosa writes to the Egyptian Ministry of Defence about the removal of military housing that was an obstacle to the Damietta Project, and refers to both visits).[70]

5.77    *06 February 2001*: The Egyptian Cabinet provides its preliminary approval of the construction of the LNG Plant in Damietta. This is referred to in a letter from UFACEX to the Damietta Port Authority:

> *Based on the License Basis signed between Damietta Port Authority and [SEGAS], as an affiliate of UFACEX, on December 6, 2000 for the building, ownership, operating and transfer of a specialized petroleum Jetty ... and to build, operate and own a natural gas liquefaction plant, in an area of land owned and administered by Damietta Port Authority.*
>
> *And with regard to the above and the preliminary approval by the Egyptian Cabinet to such project, issued on February 6, 2001 and the final one signed by the Cabinet on March 17, 2001.*[71]

5.78    *13 February 2001:* UFACEX is aware that there may be supply shortfalls in the Damietta area: see the email from UFACEX to the New Project Management of 13 February 2001.[72]

5.79    ████████████████████████████████████████████████████
        ████████████████████████████████████████████████████
        ████████████████████████████████████████

5.80    ████████████████████████████████████████████████████
        ████████████████████

        ████████████████████████████████████████████████████
        ████████████████████████████████████████████████████
        ████████████████████████████████████████████████████
        ████████████████████████████████████████████████████
        ████████████████████████████████████████████████████

---

[70] Letter from Unión Fenosa (Elías Velasco) to Minister of Defence (El Moushir Tantawi), 1 February 2002, [C-0181].

[71] Letter from SEGAS to the Damietta Port Authority, 21 March 2001, [C-0329].

[72] Email from UFACEX to New Project and Infrastructure Manager, 13 February 2001, [R-0340].



5.81      It was also described by the Claimant when it acknowledged that part of Mr El Komy's US$ 6.88 million contribution to SEGAS capitalization was ████████████████ ████████████████████████████████

5.82      *28 February 2001*: Unión Fenosa sends a letter to EGPC with an update on the Damietta Project and requesting information concerning approvals from the Egyptian authorities. The letter says:

> [I]*n order to go ahead with our project we will thank you if you could officially inform us about the steps to be done in order to obtain the necessary approvals in front of the Egyptian Authorities to construct the*

---

[73] ██████████████████████████████████
[74] Cl Rej Jur, Paragraph 60, Footnote 85.

> *LNG plant in Damietta site (what kind of documents have to be done and the Egyptian Authorities to present these).*[75]

5.83    *17 March 2001*: Egypt's Prime Minister issues a Decree granting SEGAS a license to "build, own[] and operate a Natural Gas Liqu[e]faction Complex and export LNG," as well as "build, [o]perate and [t]ransfer a specialized Petroleum Jetty" in the Damietta Free Zone. The Prime Minister's Decree recognises that SEGAS operates as a private Free Zone Company under Law No 8 of 1997 and (as also cited above) that SEGAS would be regulated by Law No. 1 of 1996 as regards specialised ports. The Prime Minister's Decree records that the Decree had been approved by the Cabinet; and it called upon the Minister of Transportation to execute the Decree.[76]

5.84    The Claimant contends that the licence was "based on the approval of the [Egyptian] cabinet."[77] This is supported by a letter from UFACEX to the Damietta Port Authority, quoted above:

> *And with regard to the above and the preliminary approval by the Egyptian Cabinet to such project, issued on February 6, 2001 and the final one signed by the Cabinet on March 17, 2001.*[78]

5.85    *04 April 2001*: Mr El Komy and other representatives of SEGAS attend a site handover meeting with the Damietta Port Authority. A few days earlier, on 29 March 2001, UFACEX had issued a Statement of Requirements for the Damietta Plant.[79] A report into the handover, prepared by the Damietta Port Authority, records:

> *Firstly: The committee ha[s] examined the following documents:*
>
> *1. The resolution of committee formation No. 116 of 2001.*
>
> *2. Hand-over report of the land from the New Communities Authority dated 25/3/2001.  (Annex no. 1)*
>
> *3. Cabinet Decree No. 335 of 2001 granting license for concession to construct a specialized jetty and approving the project.*
>
> *4. License issued by Damietta Port Authority and the annexes thereof regarding the landplot for the project.*
>
> *5. The attached map signed by DPA and SEGAS, which specifies the boundaries.*

---

[75] Letter from Unión Fenosa (Elías Velasco) to EGPC (Mohamed Tawila), 28 February 2001, [R-0338].
[76] Prime Minister Decree No. 335 of 2001, 17 March 2001, [C-0116], Preamble and Articles 1-2.
[77] Cl Mem Merits, Paragraph 160.
[78] Letter from SEGAS to the Damietta Port Authority, 21 March 2001, [C-0329].
[79] Unión Fenosa, Egypt LNG Feed Work Statement of Requirements, 2, Sections 3.1, 5.9, [R-0341].

> *6. And according to the minutes of meetings held between the two parties regarding hand-over of the landplot and evacuation thereof from occupations, relocation and construction of the fence and the documents relating to all such matters and other related matters.*[80]

5.86    *07 May 2001*: SEGAS is formally registered in the commercial registry of Egypt. This is evident from a covering letter by UFACEX regarding various documents, including:

> *Please find attached hereto the following documents [...] A photocopy of the Business Registry document (provided by Yehia El Komi)* [...][81]

5.87    *08 July 2001*: EGPC and UFG discuss gas supply and EGPC's participation in the Damietta Plant as the sole Egyptian shareholder (in SEGAS), as described in EGPC's letter to UFG:

> *Reference to your Fax [...] concerning the agenda of the proposed meeting in Cairo next week, we would like to emphasize the following:*
>
> *1. Gas supply to the first train will be 450 MMSCFD equivalent to 4 bcm as per article 4 of the contract which may have been repeatedly communicated with you in several occasions.*
>
> *2. EGPC participation of 10% in Damietta LNG plant is based on the concept that EGPC will be the only Egyptian shareholder in this project.*

Mr Fernández Martínez testified:

> *During the EPC Bid Process in 2001, the two consortiums that we considered recommended increasing the capacity of the LNG train to 7.56 Bcm instead of 4.4 Bcm as originally agreed. This would allow a large increase in capacity with almost the same initial investment and equivalent operating costs because of significant economies of scale. We proposed the increase in the size of the project and the Ministry of Petroleum agreed, repeatedly assuring UFG that Egypt had ample gas supply to accommodate expanded capacity and approved the expansion. Later, in 2002, UFG offered Egypt the opportunity to participate directly in the Damietta Project and thus monetize Egypt's natural gas resources by selling LNG directly on the international market. The Government expressed its interest in having EGAS and EGPC buy this increased capacity.*[82]

5.88    *19 July 2001*: The Prime Minister issues a Decree establishing EGAS:

---

[80] Plot Handover Minutes, 1 April 2001, [C-0451].
[81] Letter from UFG (Gonzalo Fernandez) to Jaime Portero, 7 May 2001, [C-0452].
[82] Letter from EGPC (Mohamed Tawila) to UFG (Elías Velasco), [C-0443]; *See also* Fernández Martínez WS, Paragraph 20.

*Article 2: The said company shall be vested with the status of juridical [legal] personality and shall be considered a [private] person of the Special Law.*

*Article 3: The Minister of Petroleum shall be the minister concerned with applying the provisions of [...] Law No. 203 of the year 1991 concerning this company and the affiliated companies [...]*

*Article 4: The Company's purpose shall be to operate in all activities of natural gas, and it shall in particular have power to:*

*(1) Promote and merchandise gas activities investments;*

*(2) Propose the plans for natural gas industries and projects;*

*[...]*

*(5) Assume the management and supervision work on gas activity as shall be determined by the Minister of Petroleum; [...]*

*Article 5: The Company shall be powered to invest its property and funds by itself or through its affiliated companies. [...]*

*Article 6: The management of the company shall be assumed by a board of directors to be formed [...] upon the proposition of the Minister of Petroleum [...]*

*Article 7: The Board of Directors is the higher authority controlling the company's affairs and disposal of its matters. It may adopt whatever decisions it deems necessary toward realizing the purpose for which the company is established and within the context of the targets, plans and general policies of the State.*

*Article 8: The Company's general assembly shall be formed under the chairmanship of the Minister of Petroleum [...] to be selected by virtue of a decree of the Prime Minister upon the proposition of the Minister of Petroleum [...]*

*Article 11: The Company's property shall be considered privately owned state-property. The company shall settle the annual profits [...] to the Ministry of Finance.*

*Article 12: The Company's articles of association shall determine its duration. This shall be issued by virtue of a decree of the Minister of Petroleum […]*[83]

5.89    *28 August 2001:* UFACEX and the intended Contractor discuss turndown issues relation to the Damietta Plant. These may give rise to re-design and additional costs.[84]

---

[83] Prime Ministerial Decree No. 1009 of 2001 concerning the Establishment of the Egyptian Holding Company for Natural Gases, [C-0132].

[84] Kellogg – Post Bid Correspondence, [R-0342].

5.90   *08 October 2001*: UFG meets with the Ministry of Petroleum, seeking assistance in relocating the military base as part of the construction of the Damietta Plant. UFG also sends letters following the meeting, repeating the request:

> *According with our meeting held on September 4th, in which we commented about the evacuation of the Military Base that occupies [...] the Damietta site which also coincide with the location of the LNG Storage Tank No. 1.*
>
> *Up to date we have not received any response from the militaries after the meeting held on September 4th in Damietta, I beg your best efforts in order to cause the evacuation of the base and not take any longer concerning the construction of the LNG plant.*[85]

5.91   *16 October 2001*: UFG meets the Minister of Petroleum, requesting assistance in relocating the military base to facilitate the construction of the Damietta Plant.

> *His Excellency,*
>
> *After our meeting held on October 16, 2001, I would like to mention again that the military housing that occupies one part of the site over which the Plant is being built has not been removed ... we kindly ask for your best efforts in order to solve this matter as soon as possible.*[86]

5.92   *23 October 2001*: EGAS and UFG meet to discuss a technical evaluation of the offers for the engineering, procurement and construction ("EPC") contract. The results of this meeting are recorded in a letter from EGAS to UFG:

> *We would like to thank you for your brief technical presentation [...] concerning Unión Fenosa technical evaluation of the EPC contract offers [...] [W]e [are] still waiting for more information and or clarifications to enable us [to] draw a conclusion regarding your recommendation to award the EPC contract.*[87]

5.93   *31 October 2001*: By this date, EATCO had been authorised to operate in the Egyptian gas sector.[88] On 31 October 2001, the Egyptian Prime Minister visits the SEGAS construction site in Damietta Free Zone. Later, again, UFG seeks the Prime Minister's assistance in relocating military housing to facilitate construction of the Damietta Plant:

---

[85] Letter from UFG (Javier Martínez) to Ministry of Petroleum (Shemel Hamdy), [C-0185].
[86] Letter from Unión Fenosa (Elías Velasco) to Minister of Petroleum (Sameh Fahmy), 17 January 2002, [C-0182].
[87] Letter from EGAS (Ismail Karara) to UFG (Gonzalo Fernandez), 11 November 2001, [C-0118].
[88] Summary of the amendment of the Limited Partnership Contract of the Egyptian Arab Trading Company, 22 September 2001, [R-0330]; Excerpt of the Commercial Registry of the Egyptian Arab Trading Company, 18 December 2016, [R-0327].

> [I]*n view of the interest that you showed when you visited our GNL Plant at Damietta Port on October 31, 2001, I feel bound to advise you that the military housing occupying part of the land on which the Plant is being built has not yet been removed. [...] We therefore beg your cooperation in solving this problem as soon as possible.  There is no disagreement as to the terms of evacuation; all that is required is an order to carry it out.*[89]

5.94    *31 October 2001*: UFG meets the Minister of Transport, requesting his assistance in relocating the military base to facilitate construction of the Damietta Plant. This meeting is referred to in a later letter from UFG:

> *His Excellency,*
>
> *In regard of our meeting held on October 31, 2001 at Damiet*[t]*a, I would like to mention again that the military housing that occupies one part of the land over which the GNL plant* [is] *being built has not been removed ... As you know, the Port Authorities have provided a new site for the Military housing* [...] *and* [...] *we kindly ask for your best efforts in order to solve this matter as soon as possible.*[90]

5.95    *09 December 2001*: The General Authority for Foreign Investment and Free Zones ("GAFI") issues a tax-free status license to SEGAS:

> *The Spanish Egyptian Gas Company (SEGAS) is licensed to carry out its activities in the Private Free Zone* [...] *The duration of this license is 25 years, could be extended after the approval of GAFI.* [...]
>
> *The Company shall be bound by the rules of the Investment Law No. 8 of 1997 and its executive regulations, as well as all the current and future decisions regulating Free Zones* [...]*"*[91]

5.96    *19 December 2001*: The Signing Ceremony takes place for the engineering, procurement and construction ("EPC") contract between SEGAS and the Halliburton Consortium. The minutes of a SEGAS Board meeting, held on 20 February 2002, note with respect to this contract that:

> *It is important to emphasize the reference that is made about the official signing ceremony of the EPC Contract, awarded to the consortium formed by Hallibu*[rt]*on KBR (formerly Kellogg Brown & Root), Japan Gasoline Compa*[n]*y Co. and Técnicas Reunidas S.A., as per the unanimous*

[89] Letter from UFG (Elías Velasco) to Prime Minister of Egypt (H.E. Dr Atef Ebeid), 29 January 2002, [C-0317].
[90] Letter from UFG (Elías Velasco) to Minister of Transport (Ibrahim El Demeiri), 17 January 2002, [C-0183].
[91] Decision of the Director of GAFI No. 3336 of 2001 regarding a License for the Spanish Egyptian Gas Company (SEGAS) to Carry out its Activities in accordance to the Private Free Zone Regime, 9 December 2001, [R-0075].

> *agreement of SEGAS Board of Directors held on September 20, 2001.  The signing ceremony took place on December 19, 2001.*[92]

5.97   UFG was to expend an amount of about US$ 1.3 billion to build the Damietta Plant and associated facilities in Egypt. The Damietta Plant was built as an integrated single-train facility for the production of liquefied natural gas ("LNG"). It was located in the Damietta Port Private Free Zone about 60 kilometres west of Port Said and the Suez Canal.  At the time of its construction, the Damietta Plant was the largest natural gas liquefaction train operating in the world. It was completed on time and within budget.

*2002*

5.98   *1 February 2002*: UFG asks the Minister of Defence for assistance in relocating the military base so as to facilitate the construction of the Damietta Plant:

> *Through*[] *the Damietta's Port Authority we have maintained several meetings, some of them, being attended by Militaries in Charge, reaching an agreement in which we would take care of the expenses that this military housing re-location may originate, and the Port Authorities would provide them a new site inside the Damietta's Port.* [...]
>
> [O]*ur situation right now is critical and if this relocation does not occur on an immediate date, there would be a delay on the starting up of the plant with the consequent detriment for both countries, Spain and Egypt, and will entail a loss of income from the GNL sale*. […] [O]*n the practice of your responsibilities as Minister of Defence of the Government of the Arab Republic of Egypt, I kindly ask for your intervention, [i]n the knowledge that in your hands is the solution to this issue, that although small for your responsibilities, is of great significance for the well being of the project that we consider of great interest and importance for both countries.*[93]

5.99   *20 February 2002*: The SEGAS Board meets to discuss (*inter alia*) the shareholders' payments to EGAS' capital, actions to be taken in respect to defaulting shareholders, an increase of the issued capital to US$ 300,000,000 and obtaining commercial loans by SEGAS management pending the increase in the share capital.[94] With respect to

---

[92] Minutes of Fourth Board Meeting Spanish Egyptian Gas Company (SEGAS) held on 20 February 2002, [C-0442], Page 5.
[93] Letter from Unión Fenosa (Elías Velasco) to Minister of Defence (El Moushir Tantawi), 1 February 2002. [C-0181].
[94] Minutes of Fourth Board Meeting Spanish Egyptian Gas Company (SEGAS), held on 20 February 2002, [C-0442].

EATCO's 40% shareholding of SEGAS, the Minutes of the Board meeting indicate EATCO's default on a requested payment for up to 25% of the issued capital:

> *EATCO, however, have only offset credits to SEGAS [...] in the amount of 651,033 US $, and has made a direct disbursement of 548,967 US$ which represent a total amount of 1,200,000 US$. EATCO, therefore, still remains liable to the Company in the amount of 3,120,000 US$. [...] Accordingly, EATCO is required by the Board to fund the amount of 3,120,000 US Dollars immediately.[95]*

5.100   Item No. 3 of the Minutes further indicates that "EATCO is in default [of] its relevant obligations in the amount of 30,000,000 US dollars," based on a decision of SEGAS' Board of Directors of 16 October 2001, resolving that the entirety of SEGAS' issued share capital had to be paid before 31 January 2002.[96]

5.101   According to the Claimant, EATCO was required to pay this US$ 30 million out of its own resources, even if it had used ███████████████████ to finance its participation in SEGAS.[97]

5.102   The Tribunal notes that EATCO's default in the sum of US$ 30 million was a small fraction of the total cost of the Damietta Plant. Its own cash contribution to SEGAS' capital at this date was limited to US$ 548,967, less than 0.00043% of the total cost incurred by SEGAS.

5.103   

5.104

[95] Minutes of Fourth Board Meeting Spanish Egyptian Gas Company (SEGAS), held on 20 February 2002, [C-0442], Item No. 2, Page 3.
[96] Minutes of Fourth Board Meeting Spanish Egyptian Gas Company (SEGAS), held on 20 February 2002, [C-0442], Item No. 3, Page 4; Cl Rej Jur, Paragraph 59.
[97] Cl Rej Jur, Paragraphs 59-60.





5.105

5.106

5.107

5.108



5.109  *24 April 2002*: UFG thanks the Minister of Petroleum for his assistance in relocating the military base to facilitate the construction of the Damietta Plant:

> *His Excellency,*
>
> [W]*e have received the confirmation of the evacuation of the military base, located on our site at the Port of Damietta* [...] *I want to thank you in a very special way,* [for] *the effort carried out and the interest shown to this matter, in order to achieve finally that the site is totally free to begin the construction* [...]
>
> *I would like to emphasize the relevance of this event due to the fact that it avoids any interference for the development of this important project for both, Egypt and Spain.*[102]

5.110  *24 April 2002*: UFG thanks the Ministry of Maritime Transport Sector for its assistance in relocating the military base to facilitate the construction of the Damietta Plant:

> *Once on receipt of the confirmation of the military base evacuation from our site at the Port of Damietta, and being aware of your continuous dedication, efforts and personal intervention in order to make possible the beginning our LNG tank nº 1 construction, I want to show you my most sincere gratitude.*
>
> *I would like to emphasize the relevance of this event that prevents us from any interference on the development of this important project for both, Egypt and Spain.*[103]

5.111  

---

[101]

[102] Letter from UFG (Elías Velasco) to Minister of Petroleum (Sameh Fahmy), 24 April 2002, [C-0179].

[103] Letter from Unión Fenosa (Elías Velasco) to the Ministry of Maritime Transport (Essam El Din Badawy), 24 April 2002, [C-0180].

5.112 ███████████████████████████████████
██████████████████████████████████████
███████████████████████

████████████
█ ████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
██████████████

█ ████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
██████████████████████████████████

█ ████████████████████████████████████
██████████████

5.113 ███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████ █ ████████
██████████████████████████████████████
████████████████████████

5.114 ███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████ █ ██████████
██████████████████████████████████████

---

[104] ████████████████████████████████████████████
██████████████████████████████████████████████
[105] ██████████████████████████████



5.115  Mr Fernández Martínez also signed the Sale and Purchase Agreement as a proxy for EATCO. The Respondent contends that Mr Martínez was intimately involved in Mr El Komy's buyout and continued payment by UFG and SEGAS. Yet, as a witness before this Tribunal, he never once mentioned Mr El Komy in his witness statement; nor did he reveal any of this information during his oral testimony at the Hearing.[107]





5.119

5.120   *17 October 2002*: EGPC "assigns" (novates) its interests in the SPA to EGAS (with such assignment retroactive to August 2001):

> [B]*y means of this letter*[,] *we hereby notify you that effective as of August 2001, of the following:*

---



[111] *See* "Court Sentences Former Housing Minister, Alaa Mubarak's Father-in-Law to Prison," *Egypt Independent* (29 March 2012), [R-0016]; "Businessman Yehia el Komy sentenced to 3 years in prison," *Mada Al Balad* (27 December 2011), [R-0335].

> *1. The Egyptian Natural Gas Holding Company (EGAS) a Petroleum entity incorporated by law No. 203 of 1991 has been fully assigned by EGPC, in executing the SPA [...]*[112]

**2003**

5.121   *30 June 2003*: UFACEX "assigns" (novates) its interests in the SPA to UFG.

> *[W]e hereby notify you* [of] *UFI's intention to assign the SPA* [...] *to UFGas and we request from you ...your written permission for such assignment of the SPA, and of all [of] UFI's rights and obligations under the SPA, to UF Gas [...]*[113]

5.122   *30 June 2003*: EGAS and UFG execute a Framework Agreement (the "Framework Agreement"). The Agreement modifies "[t]he total quantities of natural gas to be supplied by EGAS to [UFG] under the SPA during the build-up period." The Framework Agreement locked in supply to UFG at 4.4 bcm per year from the fifth contract year (and 3.63 bcm per year for the first four contract years).[114]

5.123   *30 June 2003*: EGPC, EGAS and UFG execute the Participation Agreement (the "Participation Agreement"), making EGAS and EGPC each 10 per cent shareholders of SEGAS.

> *The purpose and effect of this Agreement is to set forth the terms and conditions that will govern the participation by EGPC and EGAS in SEGAS and the collaboration between the Parties in the development of the Plant.*[115]

5.124   *30 June 2003*: EGAS (as "Toller") and SEGAS (as "Owner") execute a Contract (the "EGAS Tolling Contract");[116] and UFG and SEGAS also execute a Tolling Contract (the "UFG Tolling Contract").[117] A condition for the Parties' rights in relation to the EGAS Tolling Contracts is "the acquisition by EGPC and EGAS of a participation in the share capital of [SEGAS] as contemplated in the Participation Agreement."[118]

---

[112] Letter from EGPC (Ibrahim Saleh) and EGAS Mohamed Tawila) to Unión Fenosa, S.A. (Elías Velasco), 17 October 2002, [C-0170].
[113] Letter from Unión Fenosa Internacional, S.A. and UFG (Elías Velasco) to EGAS (Mohamed Tawila), 30 June 2003, [C-0171].
[114] Framework Agreement between EGAS and UFG, [C-0167].
[115] Participation Agreement between EGPC and EGAS and UFG, [C-0172].
[116] Tolling Contract between EGAS and SEGAS, 30 June 2003, [C-0003].
[117] Tolling Contract between UFG and SEGAS, 30 June 2003, [C-0188]
[118] Tolling Contract between EGAS and SEGAS, 30 June 2003, [C-0003], Article 7.

5.125   Under these Tolling Contracts, SEGAS would receive feedgas from EGAS to produce LNG for itself as well as for UFG. The EGAS and UFG Tolling Contracts require both UFG and EGAS to pay certain tolling fees.

5.126   *2 September 2003*: The Prime Minister of Egypt meets with the Chairman of UFG in Cairo. This meeting is scheduled by fax:

> *Reference is made to the letter of Mr Antonio Basagoiti addressed to H.E. Sameh Fahmy Minister of Petroleum, concerning his proposed institutional visit to Egypt. In this regard, I have the pleasure to inform you that Mr Basagoiti's appointment with H.E. the Prime Minister has been scheduled on Tuesday, Sep[t]. 2nd, 2003.*[119]

The visit is confirmed by return fax from UFG:

> *I would like to reconfirm the visit of our Chairman, Mr Antonio Basagoiti, to H.E. the Prime Minister next Tuesday 2nd of September in Cairo.*

> *If possible, we would like to take this opportunity to meet also H.E. Sameh Fahmy, Minister of Petroleum on Tuesday 2nd of September.*

> *I would like to inform you as well, that Mr Basagoiti will visit the installations under [...] construction of the GNL plant in Damietta on Wednesday 3rd of September.*[120]

5.127   *23 November 2003 - The Six Documents:* The Respondent refers, as the seventh document, to the Agreement of 23 November 2003 between Unión Fenosa Soluzìona, S.A., EATCO, and Mr El Komy (the "Termination of Services Agreement") ("UFGTREATY 0047968").

5.128   This document was ostensibly made in Madrid and is comprised of five pages. It is signed by Mr El Komy as a contractual party and for EATCO. Its preamble provides:



5.129   According to the Respondent, the Claimant produced this document (not being one of the Six Documents the Claimant was ordered to produce pursuant to Procedural Order

---

[119] Fax from the Ministry of Petroleum to SEGAS (Gonzalo Fernandez Viejo), 24 August 2003, [C-0177].
[120] Fax and letter from UFG (Elías Velasco) to the Ministry of Petroleum (Shamel Hamdy), 26 August 2003, [C-0176].

No. 13) in an attempt to show that ██████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ The Respondent states that it is

unclear why this arrangement was terminated at the end of 2003, but contends that it

nonetheless demonstrates that the Claimant maintained its relationship with Mr El

Komy. Moreover, ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

5.130 ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████

**2004**

5.131  *24 February 2004*: UFG requests EGAS to help obtain the execution of the
Participation Agreement and the EGAS Tolling Contract, so that they enter into full
force the following month. UFG writes:

> *Once again in Madrid after the visit to Damietta, I would like to thank you
> for the opportunity to show you our LNG Plant, where you could
> appreciate the magnitude of the Project and the progress of the
> construction works [...] As you can understand, dear Mohamed, now it is
> extremely important, as I had the opportunity to comment with you and
> with H.E. the Minister last Thursday in Damietta, to make a final effort in
> order to achieve that the Participation Agreement and the Tolling
> Contract enter in full force before the end of March, as it is agreed.*[121]

5.132  *31 March 2004*: SEGAS, UFG and EGAS execute the Coordination Agreement
("COMAT"), with SEGAS as "Owner" and EGAS and UFG as "Tollers." COMAT

---

[121] Letter from SEGAS (Elías Velasco) to EGAS (Mohamed Tawila), 24 February 2004, [C-0119].

addresses the natural gas to be tolled and the LNG to be lifted from the Damietta Plant by both Tollers.[122]

5.133   *31 March 2004*: EGAS (as "Seller") and UFG (as "Buyer") execute the Coordination, Operating and Measurement Agreement ("COMAS"). COMAS addresses EGAS' delivery and sale of gas to UFG.[123]

5.134   *31 March 2004*: UFG and SEGAS amend their UFG Tolling Contract, to ensure dividends from SEGAS operations are at a rate reflecting an 11% return on equity, reducing expected dividends by removing "Premium ROE" (designating a 15% return on equity):

> *2.15. The Parties agree to remove from the UFGas Tolling Contract the definition of 'Premium ROE' and, accordingly, all references to such term (as defined in the UFGas Tolling Contract) shall be removed from the UFGas Tolling Contract.*
>
> *2.16. The definition of the term 'Basic ROE' as provided for in Article 1 (Definitions and Interpretation) of the UFGas Tolling Contract is amended and restated to read as follows:*
>
> *'Basic ROE means 11%'*[124]

EGAS and SEGAS make the same amendments to their Tolling Contract:

> *2.17. The Parties agree to remove from the EGAS Tolling Contract the definition of 'Premium ROE' and, accordingly, all references to such term (as defined in the EGAS Tolling Contract) shall be removed from the EGAS Tolling Contract.*
>
> *2.18. The definition of the term 'Basic ROE' as provided for in Article 1 (Definitions and Interpretation) of the EGAS Tolling Contract is amended and restated to read as follows:*
>
> *'Basic ROE means 11%'*[125]

5.135   *July-August 2004*: EGAS and EGPC seek to become official SEGAS shareholders, which requires obtaining an official GAFI decree. UFG writes to EGAS:

> *On the basis of the Board of Directors and the Extraordinary General Assembly resolutions we will then obtain the relevant GAFI Decree and*

---

[122] Coordination Agreement among SEGAS as Owner, and EGAS and UFG, as Tollers (COMAT), [C-0189].
[123] Coordination, Operating and Measurement Agreement (COMAS) between EGAS as Seller and UFG as Buyer, [C-0190].
[124] Amendment No. 3 to the Tolling Contract between UFG and SEGAS, [C-0173], Articles 2.15 - 2.16.
[125] Amendment No. 3 to the Tolling Contract between EGAS and SEGAS, [C-0174], Articles 2.17-2.18.

> *Commercial Registration, after which EGAS and EGPC will become officially shareholders of SEGAS and their representatives will be formally appointed as Board Members.*[126]

And later:

> *The required documents, according with the Laws and Regulations of Egypt, were presented to GAFI in order to obtain the approval of the increase of capital issue. As soon as we will obtain this approval from GAFI, we will immediately present the documentation to the Commercial Register, in order to register the modification of the Articles of Incorporation.*
>
> *We are doing our best efforts to finalise the participation process in accordance with the Egyptian Laws and Regulations as soon as possible.*[127]

5.136   *November 2004*: The Damietta Plant's production operations begin. UFG's website notes:

> *Construction of the plant began in March 2002, with production starting in late November 2004.*[128]

**2005**

5.137   *23 January 2005*: UFG exports the first LNG cargo to Spain from the Damietta Plant. A news article at the time reports:

> *Egypt's first shipment of liquefied natural gas (LNG) left the port of Damietta for Spain yesterday, opening up a new export sector crucial to the country's economic future.*[129]

5.138   *20 April 2005*: EGAS, UFG and SEGAS reach agreement regarding the commercial start date of the Damietta Plant.

> *As you are aware of, pursuant to the Agreement dated 20 April 2005, SEGAS, EGAS and UFGas have agreed that the Commercial Start Date of the Damietta LNG Plant shall take place after the date of signature of such Agreement (this is, after 20 April 2005).*[130]

5.139   *30 May 2005*: President Mubarak inaugurates the Damietta Plant, as Egypt's first LNG facility. EGAS publishes a press release that says:

---

[126] Letter from UFG (Elías Velasco) to EGAS (Mohamed Tawila), 29 July 2004, [C-0388].
[127] Letter from UFG (Elías Velasco) to EGAS (Mohamed Tawila), 23 August 2004, [C-0387].
[128] UFG, Our Business: Liquefaction - UFG participates in liquefaction plants at Damietta and Qalhat, [C-0157].
[129] "Egypt export LNG to Spain," *Gulf Daily News* (24 January 2005), [C-0155].
[130] Letter from SEGAS to EGAS and UFG, 11 July 2005, [BRG-272].

> *President Hosni Mubarak, accompanied by Dr Ahmed Nazif, the Prime*
> *Minister and Eng. Sameh Fahmy Minister of Petroleum, inaugurated on*
> *Monday 30 May, 2005 the first LNG facility in Egypt located in Damietta*
> *in Mubarak Complex for Natural Gas and Petrochemicals.*[131]

5.140   *11 July 2005:* By notice to EGAS and UFG, SEGAS declares *force majeure* under the
EGAS and UFG Tolling Contracts.[132] SEGAS lifts *force majeure* by notice of 28
August 2006: see below.

5.141   *14 July 2005*: EGPC represents in an offering memorandum to investors that EGPC
operates under the supervision of the Ministry of Petroleum:

> *EGPC reports directly to the Egyptian Minister of Petroleum, which has*
> *ultimate responsibility for exploitation of all mineral resources of the Arab*
> *Republic of Egypt.  All decisions of the Board of Directors are required to*
> *be notified to the Minister of Petroleum for approval* […][133]

5.142   *15 October 2005*: EGAS reminds UFG of the priority it gives to local demand for
natural gas.[134]

## 2006

5.143   Following the Damietta Plant's entry into service, from October 2006 to 2012 (so
UFG contends) EGAS did not comply with its supply obligations under the SPA; and
annual gas supply to UFG ranged between 84% and 61% of the contractually agreed
supply.[135]

5.144   *18 June 2006:*  On 18 June 2006, a framework agreement for the Damietta Plant's
second train is made between EGAS, UFG, SEGAS, ENI and BP Egypt LNG
Limited. [136] This agreement was not further pursued; and no second train was
constructed at the Plant.

5.145   *20 June 2006*: Unión Fenosa, UFG and ENI reiterate to the Minister of Petroleum
their willingness to share their technical expertise to improve electricity generation
efficiency in Egypt:

---

[131] "President Mubarak inaugurated First LNG Facility in Egypt," EGAS Press Release, 30 May 2005, [C-0175].
[132] *see* Letter from SEGAS (Elías Velasco) to EGAS (Sherif Ismail) and UFG (Angelo D'Abundo), 28 August 2006, [C-0367].
[133] Offering Memorandum for Petroleum Export Limited, 14 July 2005, [C-0125].
[134] Letter of EGAS to UFG, 16 October 2005, [R-0364].
[135] Cl Mem Merits, Paragraphs 20 and 254-255.
[136] Second Train Framework Agreement, 18 June 2006, [R-0091].

*Following the recent conversations held in Cairo, our companies are ready to carry on a deep analysis and to significantly contribute to the further implementation of an energy saving programme in the power generation and industrial sector in Egypt. [...]*

*His Excellency, our companies have significant know-how in CCGT power stations, in the repowering of existing facilities and in energy saving programme. We are ready to make available this know how and to co-operate with Your staff as well as all the concerned Egyptian Authorities and related Companies for the implementation of the programme. [...]*

*His Excellency we are ready to arrange for a meeting with Your experts and representatives at Your earliest convenience in order to start the proposed activities* […][137]

5.146   *28 August 2006*: SEGAS confirms the end of its declaration of *force majeure* under the Tolling Contracts and announces the Commercial Start Date of 1 September 2006 under the Tolling Contracts with EGAS and UFG:

*As you are aware of, a Force Majeure event was notified to you under the Tolling Contracts on July 11, 2005. In this respect, as anticipated in the last BoD of SEGAS we are glad to formally notify you that the Force Majeure event has been removed. Therefore the Commercial Start Date of the plant will be at 00:00 of September 1, 2006, as agreed in the last BoD of SEGAS.*[138]

5.147   *11 October 2006*: Mr Sherif Ismail (then Chairman of EGAS) seeks meetings in Madrid with UFG:

*I refer to our discussions that took place regarding holding a meeting to discuss terms and conditions of the Sale and Purchase Agreement for Damietta Train 1.*

*In this respect, please advise your availability during 30th and 31st October 2006, if required 31st October, to hold said meetings in Madrid, Spain* […][139]

5.148   *15 October 2006*: The "Commercial Operation Date" of the Damietta Plant occurs on 15 October 2006. Later documentation confirms this:

*Tolling Contracts provide that, as from the Commercial Operation Date (COD), and not before, the Annual Delivery Program (ADP) shall be set, according to* [which] *the production amounts corresponding to each*

---

[137] Letter from Unión Fenosa (Elías Velasco), UFG and ENI SpA to Minister of Petroleum, 20 June 2006, [C-0224].
[138] Letter from SEGAS (Elías Velasco) to EGAS (Sherif Ismail) and UFG (Angelo D'Abundo), 28 August 2006, [C-0367].
[139] Letter from EGAS (Sherif Ismail) to UFG (Elías Velasco), 11 October 2006, [C-0389].

> *Toller out of the production capacity of the Plant and their respective contracted capacity under each TC are determined.*
>
> *COD has been set on the 15th of October 2006, according to the letter sent by SEGAS to the Tollers on the 21st of September 2006.*[140]

5.149   *13 November 2006*: UFG agrees with EGAS to pay an increased price for gas, through a Side Letter amending the SPA.

> *An[n]ex 1. Summary Table:*
>
> *From 01-01-2007 to 01-07-2007:*
>
> *If Brent >= 33 USD/Bbl → 0,25 USD/MMBtu,*
>
> *From 01-07-2007 to Commercial Start Date of Train 2, or 1 January 2012, whichever comes earlier:*
>
> *If Brent >= 33 USD/Bbl → 0,25 USD/MMBtu, or*
>
> *If Brent >= 38 USD/Bbl → 0,375 USD/MMBtu, or*
>
> *If Brent >= 43 USD/Bbl → 0,50 USD/MMBtu,*
>
> *From to Commercial Start Date of Train 2, or 1 January 2012, whichever comes earlier:*
>
> *If Brent >= 33 USD/Bbl → 0,25 USD/MMBtu, or*
>
> *If Brent >= 38 USD/Bbl → 0,375 USD/MMBtu, or*
>
> *If Brent >= 43 USD/Bbl → 0,50 USD/MMBtu, or*
>
> *If Brent >= 48 USD/Bbl → 0,60 USD/MMBtu, or*
>
> *If Brent >= 53 USD/Bbl → 0,70 USD/MMBtu.*[141]

5.150   *14 November 2006*: EGAS' Chairman Mr Sherif Ismail and the Ministry of Petroleum Undersecretaries send a memorandum to the Minister of Petroleum, concerning SPA price amendments. It acknowledges the Minister's involvement in SPA negotiations in 2000; the Minister's instructions to renegotiate gas prices after 2000; and the involvement of the Ministry of Petroleum and EGAS in an official visit to Spain to renegotiate gas prices in 2006:

> *In mid 2000 and before signing the contract with Unión Fenosa and through the final negotiations carried out with His Excellency Eng. the Minister of Petroleum, the first adjustment to the price equation was made*

---

[140] Toll or Pay Counterproposal by EGAS, 3 September 2007, [NAV-119]; Letter from SEGAS (Elías Velasco) to EGAS (Sheriff Ismail) and UFG (Angelo D'Abundo), [C-0367].
[141] Side Letter between EGAS and UFG, 13 November 2006, [C-0091].

*with an increase to the maximum limit to reach 1.25 USD in case the price of Brent crude is more than 24 dollar/barrel [...] In addition to the above mentioned and within the framework of the instructions of Eng./ Minister of Petroleum to improve the terms of the contract signed with Unión Fenosa, a contract was signed with the company to increase the energy of the liquefaction plant to reach approximately 7 BCM annually [...] In the framework of the efforts which you have exerted in this regard based on your instructions to continue the negotiations with Unión Fenosa to introduce a new adjustment on the price equation of national gas (second adjustment) which is supplied to the company to be liquefied in favor of its interest in Damietta liquefaction plant in light of the current increase in the international prices of energy.*

*Eng. Hani Suleiman, the First Under-Secretary of the Ministry of Petroleum, and Eng. Sherif Ismail, Chairman of Egyptian Natural Gas Holding Company (EGAS) made an official visit to Spain during the period from 29-31st October, 2006. Several meetings were held with the officials of Unión Fenosa Company and after extensive discussions and negotiations for the adjustment of the maximum price which was determined by 1,25 USD\MMBTU in the original contract signed in August 2000, the negotiations were recently resumed [...]*[142]

**2007**

5.151  *26 January 2007*: UFG requests EGAS to meet its gas supply commitments.

> *The loss of production that we have experienced in the last months, due to lack of feed gas, is causing Unión Fenosa Gas a significant impact that gets worse during the months when the demand increases due to low temperatures in the winter season, and this prevents us from meeting the committed supplies with our clients in the Spanish market. [...]*
>
> *Understanding and appreciating the continuous efforts of EGAS to improve the feed gas to Damietta, once again, I would like to ask you for a new effort in order to increase the feed gas to Damietta [...]*[143]

5.152  *13 February 2007*: In connection with SEGAS' refinancing of its debt, EGAS and the Royal Bank of Scotland PLC, on behalf of the lenders, engage Wood Mackenzie (as an independent consultant) to confirm "the reasonableness of contracted gas supply to Damietta" and gas supply and demand forecast to 2030.[144]

5.153  *14 February 2007*: EGAS represents to UFG that it will use its best endeavours to improve feedgas supply, attaching forecasts for the year.

---

[142] Memorandum to be submitted to Eng. Sameh Fahmy, Minister of Petroleum on contracting with Unión Fenosa on adjusting the prices of Natural Gas supplied to the company in Damietta liquefaction Plant, 14 November 2006, [C-0462].

[143] Letter from Unión Fenosa (Elías Velasco) to EGAS (Sherif Ismail), 26 January 2007, [C-0379].

[144] Letter of Engagement between SEGAS and Wood Mackenzie, 13 February 2007, Annex B, [R-0092].

> *Reference is made to your letter dated January 26th, 2007, concerning the feed gas to Damietta LNG Plant and your analysis for the production profile for 2006 and the production plan for 2007, please be informed that EGAS exert[s] its best endeavor[s] to improve the feed gas supply to Damietta LNG Plant* […][145]

5.154  *31 March 2007*: The Ministry of Petroleum writes to UFG's Chairman, Mr Elias Velasco, concerning future mutual cooperation.

> *Dear Elias* [Velasco, UFG's Chairman] [...] *Looking for further mutual cooperation in the future.*[146]

5.155  *24 May 2007*: President Mubarak issues a Decree declaring that the Board of Directors of EGPC will be chaired by the Minister of Petroleum.

> *Article One – The board of directors of the Egyptian General Petroleum Corporation shall be presided by the Minister of Petroleum and the membership of: - Minister of Finance; Minister of Electricity and Energy; Minister of Investment; Minister of Trade and Industry; Minister of State for Local Development* [...] *Three [members] with expertise in the main activities of the Corporation from the employees of the Ministry of Petroleum and its affiliated authorities to be appointed under a resolution by the board of directors upon the proposal of the Minister of Petroleum.*[147]

5.156  *28 May 2007*: Wood Mackenzie issues its report on SEGAS Damietta Financing.[148] The report concludes that the amount of new LNG fields that would need to be discovered and brought on-stream, to ensure uninterrupted supply to the Damietta Plant until 2022, is achievable, if the then current rate of export activity was maintained at its current level and upstream gas sales discovery agreements were made swiftly following any new gas discovery.[149]

5.157  Wood Mackenzie advise that Egypt needs to sign additional gas production contracts quickly or risk creating a supply/demand gap. It concludes:

> *A gas supply‑demand gap emerges in the short‑term (in 2009/2010) and therefore it is very important that progress is made on signing upstream GSAs and sanctioning new development projects this year.   There is*

---

[145] Letter from EGAS (Sherif Ismail) to UFG (Elías Velasco), 14 February 2007, [C-0380].
[146] Letter from Ministry of Petroleum (Hany Soliman) to UFG (Elías Velasco), 31 March 2007, [C-0390].
[147] Presidential Decree No. 164 for year 2007, [C-0310].
[148] Wood Mackenzie, SEGAS: Damietta LNG Refinancing – Gas Consultant Report, 28 May 2007, [R-0084].
[149] Wood Mackenzie, SEGAS: Damietta LNG Refinancing – Gas Consultant Report, 28 May 2007, [R-0084], Page 7.

*enough discovered gas to be developed until 2017/2018, after which point yet-to-find (undiscovered) reserves will need to be produced. [...]*

*In order to ensure supply to the LNG plant to the end of the loan tenor in 2022, some 26 tcf reserves need to be discovered and developed by 2016/2017, assuming that no further LNG exports are sanctioned. This is equivalent to an average annual discovery rate of 2.6 tcf/year over the next 10 years, which is lower than the average discovery rate of 4 tcf/year seen over the last 5 years. [...]*

*Wood Mackenzie has not performed any geological studies to establish if this level of reserves can reasonably be found in the timeframes required for the SEGAS Project but if exploration drilling and success rates are maintained at previous levels and new fields are developed in a timely manner then Wood Mackenzie believes that this target can be met.[150] [...] Wood Mackenzie has reviewed EGAS' data and in light of its experience in analysing Egypt's energy market and forecasting gas demand worldwide, we believe EGAS' gas forecast to be reasonable.[151]*

5.158   *29 May 2007*: UFG requests EGAS to meet its gas supply commitments:

*I would like to analyse again with you the situation concerning the feed gas supply to Damietta, that we have been experiencing during the first part of the current year 2007 and that will become even worse during the rest of the year 2007, according to the fax received from EGAS informing SEGAS about the forecasted gas supplies for the next months (June to August) [...]*

*Understanding the continuous efforts of EGAS to improve the feed gas to Damietta, once again, I kindly ask you a further effort in order to increase the feed gas supply to Damietta, thus, allowing Unión Fenosa Gas to meet its commitments with the customers, recovering at the same time the production lost and fulfilling the Annual Delivery Program of 78 ships established for year 2007.[152]*

5.159   *27 July 2007*: SEGAS refinances its debt to replace the original corporate funding and guarantees provided by Unión Fenosa and ENI (through UFG) with non-recourse project finance. SEGAS, the Royal Bank of Scotland and HSBC Bank PLC make the Offshore Account Agreement and SEGAS and HSBC Bank make the Offshore Security Agreement (the "Offshore Security Agreement").[153] On the same date, UFG, SEGAS and HSBC Egypt concluded a Share Pledge Agreement (the "Share Pledge

---

[150] Wood Mackenzie, SEGAS: Damietta LNG Refinancing – Gas Consultant Report, 28 May 2007, [R-0084], Page 11.
[151] Wood Mackenzie, SEGAS: Damietta LNG Refinancing – Gas Consultant Report, 28 May 2007, [R-0084], Page 48.
[152] Letter from Unión Fenosa (Elías Velasco) to EGAS (Sherif Ismail, Chairman), 29 May 2007, [C-0294].
[153] Offshore Account Agreement between SEGAS, the Royal Bank of Scotland PLC and HSBC Bank Plc, 27 July 2007, [C-0342]; Offshore Security Agreement between SEGAS and HSBC Bank Plc, 27 July 2007, [C-0343/R-0038].

Agreement"); [154]   and UFG, SEGAS, EGAS and HSBC concluded a Direct Agreement. [155]

5.160   Together, these agreements allow SEGAS to refinance its debt funding for the Damietta Plant. In brief, HSBC provide loans to cover the funds that had been used for the Damietta Plant's construction, using the Damietta Plant as security; and UFG pledges its shares in SEGAS, as the owner of the Damietta Plant, to HSBC Egypt as collateral against a possible default in repayment of the loan by SEGAS.

5.161   *July 2007*: Egypt promotes natural gas investments in its territory, including the Damietta Plant, to other international investors. A letter from the Ministry of Petroleum to UFG, requesting that UFG co-operate in this promotion effort, states:

> [K]*indly be informed that Quality Communications Productions (QCP) is currently preparing a report for the Economist magazine entitled 'The Gateway to Opportunity'.   The objective of this report is to inform on the latest developments and opportunities in the Oil & Gas sector, communicating our position to the world, marketing our competitive advantages to the international community, while at the same time reinforcing the idea of Egypt as an ideal investments venue.*
>
> *This report will feature, through professional and top quality in terms of both content and design, not only the government and state holding companies, but also the private sector companies, both Egyptian and multinational, who are behind the success of Egypt's Oil, Gas & Petrochemicals industry.*
>
> *The Editor-in-Chief* [...][and] *the Project Director* [...] *are now working on the report.   They will contact you to further explain technical & commercial advantages of participating in this report.   [We]* would appreciate it if you could spare some time for this important issue. [156]

UFG agrees to co-operate. [157]

5.162   *27 August 2007*: EGAS and EGPC send a memorandum to the Minister of Petroleum. It records that the Minister of Petroleum was involved in SPA negotiations in 2000, prompted the negotiation of the Tolling Contract between EGAS and SEGAS and

---

[154] Share Pledge Agreement between UFG, SEGAS and HSBC Bank Egypt S.A.E, 27 July 2007, [C-0325].
[155] Direct Agreement between EGAS, UFG, SEGAS and HSBC Bank Plc, 27 July 2007, [C-0326].
[156] Fax from Ministry of Petroleum (Shamel Hamdy) to Chairman of Unión Fenosa (SEGAS), 4 July 2007, [C-0158].
[157] Letter from Unión Fenosa (Elías Velasco) to Ministry of Petroleum (Eng. Shamel Hamdy), 13 July 2007, [C-0159].

ordered subsequent gas price improvements after 2000. EGAS and EGPC also acknowledge that the value of the Damietta Project is US$ 2.3 billion.

> *In mid-2000, before signing the contract with Unión Fenosa and through the final negotiations carried out with His Excellency the Engineer Egyptian Petroleum Minister, the price equation was first adjusted as the maximum increased to 1.25 USD in case the price of Brent crude is more than 24 USD/barrel [...]*

> *In light of the instructions of the Eng/the Minister of Petroleum to improve the terms of the Contract with Unión Fenosa, it was agreed with the Company in June 2003 on the exploitation of the surplus capacity of the liquefaction factory in order for the Petroleum Sector to benefit from a percentage up to 50% from the total capacity of the factory which decreases gradually to reach 42% during the initial five years of operation [...]*

> *In light of this agreement, which allows the Petroleum Sector to liquefy the gas owned by the State and sell same according to international prices maximizing the revenues for Egypt, the average price of exporting the Egyptian share of the liquefied gas from the liquefaction factory in Damietta during 2005/2006 has reached around 5.7 USD/MMBTU. [...] Moreover, such investments exist in Egyptian territories, and the replacement value is estimated by approximately 2.3 billion dollars in addition to what the establishment of the plant in the free zone area in Damietta represents of economic and social development and employing of Egyptian labour and operating ancillary and assisting activities to the project in the governorate, all of which represent direct and indirect economic returns to the Egyptian economy. This matter is submitted for your consideration and guidance […]*[158]

5.163   *10 December 2007*: Egypt's Minister of Trade and Industry states that demand for natural gas is growing rapidly, as reported by the Financial Times:

> *Rachid Mohamed Rachid, minister of trade and industry, says he and his colleagues are not projecting a gas shortage and the government has moved to curb energy demand by raising prices for industrial purchasers or off-takers. But he concedes demand is growing very fast.*

> *'We are not expecting gas shortages in the short term. We have laid out the energy policy and the pricing strategy for the next 15 years. The reality is that we are growing much faster than we expected. The increase in energy consumption is growing at double-digits,' Mr Rachid said.*[159]

5.164   *12 December 2007*: UFG agrees to pay to EGAS increased an increased price for gas, through a Side Letter amending the SPA.

---

[158] Memorandum on Contracting with Unión Fenosa Gas on Natural Gas Sale and Purchase to Establish Natural Gas Liquefaction and Export Plant, signed by Sherif Ismail and Ismail Karara , 27 August 2007, [C-0460].
[159] "Cairo Toes Pragmatic Line with the IOCs," *Financial Times* (10 December 2007), [C-0200].

> *EGAS [...] commits to [...] (b) supply to UFGas the under-supplied quantities, which the Seller failed to deliver to UFGas in 2006 and 2007 […]*[160]

**2008**

5.165   *January 2008*: Ministry of Petroleum Undersecretaries send a memorandum to the Minister of Petroleum concerning SPA price amendments. It records: the Minister's involvement in SPA negotiations in 2000; the Minister's instructions to renegotiate SPA gas prices after 2000; the Minister's prompting of the negotiation of the EGAS Tolling Contract (whereby EGAS was allocated a proportion of the LNG produced at the Plant); and the participation of the Ministry of Petroleum and EGAS in the official visit to Spain to renegotiate gas prices in 2006:

> *In mid-2000, before signing the contract with Unión Fenosa Gas and through the final negotiations carried out with His Excellency Engineer the Egyptian Petroleum Minister, the price quotation was first adjusted as the maximum increased to 1.25 USD in case the price of Brent crude is more than 24 USD/barrel [...]*

> *In addition to the above mentioned and in the framework of the instructions of the Minister of Petroleum to improve the terms and conditions of the contract signed with Unión Fenosa Company, a contract was signed with the company to increase the capacity of the liquefaction plant with annual energy estimated by 7 BCM/annum. Petroleum sector benefits of that by a proportion up to 50% although the contribution of the sector whose investment was estimated by 1.3 billion USD in the project has been limited to only 20% [...]*

> *In the framework of the efforts which you have exerted in this regard and based on your instructions to complete negotiations with Unión Fenosa Company to introduce new amendment on the price equation of natural gas (second amendment) which is supplied to the company to be liquefied in favor of Damietta liquefaction plant in light of the current increase in the international prices of energy.*

> *Eng. Hani Suleiman, the First Under-Secretary of the Ministry of Petroleum, and Eng. Sherif Ismail, Chairman of Egyptian Natural Gas. Holding Company (EGAS) made an official visit to Spain during the period from 29-31st October 2006. They held several meetings with the officials in Unión Fenosa Company and after extensive discussions and negotiations in order to adjust the maximum price which was determined*

---

[160] Side Letter between EGAS and UFG, 12 December 2007, [C-0092].

*by 1.25 USD\MMBTU in the original contract signed in August 2000, negotiations have recently resumed* […][161]

5.166  *21 January 2008*: SEGAS, EGAS and UFG execute a Side Letter to the Tolling Contracts, regarding payment of Tolling Fees. This follows EGAS' failure to meet its obligations under the Tolling Contracts, and is an agreement to facilitate payments from EGAS.[162]

5.167  In response to rising costs of food and low wages, the Egyptian Government seeks to increase salaries of government employees.[163]

5.168  *5 May 2008*: Egypt enacts Law No. 114 under which SEGAS' Free Zone status is revoked, thereby subjecting SEGAS to Egyptian taxes (as with other companies operating in the natural gas manufacturing and liquefaction sectors). The Law cancels all Free Zone licenses granted to companies operating in the natural gas manufacturing and liquefaction sectors.[164]

5.169  *June 2008*: EGAS Annual Report discusses the Ministry of Petroleum's strategy to increase domestic dependence on natural gas:

> *First: Natural Gas Local Consumption:   Strategy of the ministry of petroleum aims at expanding the depend*[e]*nce on Natural Gas utilization* […][165]

5.170  *11 July 2008*: UFG and EGAS initial a draft Side Letter to amend the SPA, seeking to resolve problems with EGAS undersupply of gas. The Draft Side Letter provides for an increased price to be paid by UFG for gas delivered by EGAS:

> *EGAS* [...] *commits to supply the under-supplied quantities which the Seller* [EGAS] *failed or will fail to deliver to UFGas in relation to the full entitlement of UFGas of Contract Year 2008* [...] *according to an annual recovery program in such a manner that UFGas shall recover all such quantities, starting in the year 2009 and ending before December 31, 2012.*[166]

---

[161] Memorandum to be submitted to Engineer Minister of Petroleum, on Contracting with Unión Fenosa Company on amending the prices of Natural Gas Supplied to the Company at Damietta Liquefaction Plant, January 2008, [C-0463].
[162] Side Letter between SEGAS, EGAS, and UFG, 21 January 2008, [C-0330].
[163] "Clashes in Egypt strike stand-off," *BBC News* (6 April 2008), [R-0076].
[164] Law No. 114 of 2008, regarding the Opening of Two Additional Funds in the General Budget of the Financial Year 2007/2008, [R-0080], Article 11; Cl Mem Merits, Paragraph 504.
[165] EGAS Annual Report 2007-2008, [C-0347], Page 47.
[166] Side Letter between EGAS and UFG, 11 July 2008, [C-0093].

5.171 *06 August 2008*: EGAS confirms approval by the Egyptian Authorities of the draft Side Letter of 11 July 2008, and requests activation of the new gas prices:

> *Following the principles of agreement reached during the last visit to Madrid and the side letter (SPA) signed on July 11th, 2008.  Please be informed that, based on the concerned authorities' approval pertaining the concept of the above mentioned documents, UFGas is kindly requested to activate the new applied gas prices effective of July 1st, 2008 […]*[167]

5.172 *26 August 2008*: UFG asks EGAS to meet its gas supply commitments:

> *UFGas is specially affected by this situation* [falling feedgas supply] *in such a manner that UFGas' gas reserves have been reduced dramatically and cannot face its customers' firm contractual commitments, and more than that is not able to satisfy the Spanish Regulator provisions.  This will negatively impact on the image of UFGas in the Spanish gas market as well as on the image of Egypt as a gas supplier country to the Spanish market.*
>
> *We would also like to remind you of the recent agreement reached between UFGas and EGAS in July 2008 by means of which EGAS is bound to supply at least 15 LNG cargoes in the 2nd half of year 2008.*[168]

5.173 *16 October 2008*: UFG meets the Minister of Petroleum. They discuss gas supply and gas prices, as well as the Minister's continued support for the Damietta Project. This is referred to in a later letter from Unión Fenosa to the Minister:

> *First of all I would like to thank you very much for the valuable time you gave to me and to my colleagues on October 16th in your office.  I am so pleased with the very open and candid discussion we had and your consistent support of our joint successful SEGAS LNG project.  In the past, with your great vision, we managed to build together the first LNG project in Egypt and to penetrate the first European LNG market for the Egyptian gas.  Today you made us comfortable that SEGAS project will continue its success with your extended support and our mutual cooperation to maintain a satisfactory agreement for both countries, Egypt and Spain […]*[169]

5.174 *10 November 2008*: UFG and EGAS continue to negotiate the draft Side Letter of July 2008, following a meeting with the Minister of Petroleum. This draft Side addresses prior gas undersupply by EGAS and pricing concessions to be made to EGAS. These negotiations are recorded in a letter from Unión Fenosa to EGAS:

---

[167] Letter from EGAS (Khalid Abdel Badie) to UFG (Javier Fernandez), 6 August 2008, [C-0392].

[168] Letter from Unión Fenosa (Elías Velasco) to EGAS (Mahmoud Latif), 26 August 2008, [C-0298].

[169] Letter from Unión Fenosa (Elías Velasco) to Minister of Petroleum (Sameh Fahmy), 10 November 2008, [C-0319].

> *Regarding the miss-supply of gas to UFG due to shutdown of Burullus gas fields from November 21st to December 2nd, and taking into consideration the total gas volumes received by UFG at the end of the year 2008, we are willing to meet* [to] *try* [...] *to reach a satisfactory agreement for the Parties, including all the pending issues that we have still on the table. To this purpose, and in line with the general principles commented in the meetings held on October 16th with H.E. the Minister of Petroleum, and on October 15th with you, I would like to propose the following wording for* [...] *the Side Letter in order to close it:*

> *'Every month, starting from April 1st 2009, if the average of the six preceding month of the monthly quotations of Brent exceed 15$/bbl or fall below 98$/bbl, the Parties shall meet and review this scheme set forth hereby.'*[170]

5.175  *18 November 2008*: an Egyptian court freezes gas exports to Israel. A report from Al Arabiya noted:

> *A Cairo court on Tuesday overruled the Egyptian government's decision to allow exports of natural gas to Israel and said the constitution gave parliament the right to decide on sales of natural resources.*[171]

5.176  In late 2008, the Global Financial Crisis began. Its effects were felt for a number of years thereafter. The Global Financial Crisis caused economic slowdowns in Egypt in 2009, affecting especially its balance of payments, specifically exports, remittances, tourism and capital inflows. Foreign direct investment and domestic investment both dropped in 2008 to 2010.[172] The Respondent's witness Mr El Mahdy, formerly the Chairman of EGAS, explained:

> *The global financial crisis that began in 2008 made investors unwilling to start new natural gas exploration projects. In light of global economic uncertainty and the high cost of development, many investors postponed exploration and development activities, particularly offshore, which accounts for about 80% of Egypt's gas production.*[173]

*2009*

5.177  *June 2009*: The Chairman of EGAS outlines the strategy of the Egyptian Petroleum Sector, in EGAS' Annual Report, as:

> *The petroleum sector pursues a balanced policy by allocating one-third of the natural gas reserves for domestic consumption and a maximum*

---

[170] Letter from Unión Fenosa (José Javier Martínez) to EGAS (Mahmoud Latif), 10 November 2008, [C-0320].
[171] "Egypt court freezes gas exports to Israel," *Al Arabiya News Channel* (18 November 2008), [C-0402].
[172] Khan ER, Paragraphs 38-42.
[173] El Mahdy WS, Paragraph 5.

> *one-third for export while keeping the remaining reserves for future generations.*[174]

5.178   *02 September 2009*: SEGAS, EGAS and UFG execute a Side Letter to the Tolling Contracts, regarding payment of Tolling Fees. The Side Letter is executed due to EGAS' continued failure to meet its payment obligations under the Tolling Contract with SEGAS.[175]

## 2010

5.179   *13 January 2010*: UFG continues to discuss a potential recovery plan with EGAS. UFG writes in a letter to EGAS:

> *I think that it would be convenient [...] to define as well an annual recovery program for the under-supplied quantities relevant to the period from 2006 to 2009.*[176]

5.180   *26 January 2010*: SEGAS informs EGAS of operational instability caused by a shortfall of gas supply:

> *We feel it is necessary to draw your immediate attention to the operational requirements and associated risks that the shortfall of gas supply is generating in SEGAS LNG Plant. Recent circumstances of availability of gas to SEGAS have reached to a point where Owner must notify the impossibility to maintain the stable operation of the Plant if this situation is repeated and comes to stay for a continuous period.*[177]

5.181   *29 January 2010*: UFG requests an urgent meeting with EGAS to discuss the imminent risk of the shutdown of the Damietta Plant.

> *The situation of the gas supply to Damietta LNG plant is dramatically worsening day by day, facing the risk of a shutdown of the plant due to a gas supply below the minimum flow threshold. This fact will cause, inter alia, a very negative impact at international level on the reputation in terms of reliability of all the Parties involved in the Project. Therefore I suggest arranging a meeting in Cairo at your earliest convenience to agree an action plan in order to overcome the present problems.*[178]

5.182   *2 February 2010*: EGAS informs SEGAS of the efforts it undertook to mitigate delays in upstream development caused by the Global Financial Crisis:

---

[174] EGAS Annual Report 2008-2009, Chairman's Message, [C-0348].
[175] Side Letter among SEGAS, EGAS, and UFG, 2 September 2009, [C-0331].
[176] Letter from UFG (Alessandro Della Zoppa) to EGAS (Mahmoud Latif), 13 January 2010, [C-0301].
[177] Letter from SEGAS (Jose Luis Torre) to EGAS (Mahmoud Latif) and UFG (Alessandro Della Zoppa), 26 January 2010, [C-0302].
[178] Letter from UFG (José María Egea Krauel) to EGAS (Mahmoud Latif), 29 January 2010, [C-0303].

> *In the same time and considering the difficulties caused by the big delays in the upstream development plans associated with the international economic crisis, EGAS has thoroughly discussed this serious issue with the upstream parties in the way to accelerate those development plans in order to add valuable gas quantities to the present system which is the key solution for all problems caused by lack of gas supply for SEGAS and all other consumers as well.[179]*

5.183   *16 February 2010*: UFG asks EGAS to meet its gas supply commitments. It delivers a presentation to EGAS regarding reduced gas supply to the Damietta Plant. The letter to which the presentation is attached concludes:

> *As shown in our presentation [...] the feed gas shortfall has been increasing during the last months, with a mere 50 % compliance of the ADP in January 2010, and is having a huge impact on UFGas' cost structure.*

The attached presentation notes:

> *Reputable international sources suggest a relevant increase in Egyptian gas exports, whilst the supply to Damietta LNG Plant has been dramatically reduced.[180]*

5.184   *27 February 2010*: Egypt's Conseil d'État rules that the Government's decision to export gas to Israel was a sovereign decision, not subject to review by Egypt's administrative courts.[181] Press reports announce:

> *A Cairo court on Saturday gave the Egyptian government legal clearance to allow natural gas exports to Israel, cancelling a lower court's verdict to stop exports.*
>
> *The Higher Administrative Court, an appeals court for cases involving the state, also ruled Egypt should monitor the price and quantity of its exports and ensure it met local energy needs before exporting.*
>
> *[…] 'It is not within the jurisdiction of the courts to hear appeals against the government's decision to export gas to eastern Mediterranean markets, including Israel,' said Mohamed Husseini, who chaired the court's meeting.*
>
> *The state's decision to export gas to Israel was 'sovereign,' he said.[182]*

---

[179] Letter from EGAS (Khaled Abdel Badie) to SEGAS (Jose Luis Torre), 2 February 2010, [R-0104].
[180] UFG Presentation, "Current Situation in Egypt" attached to the letter of 24 February 2010 from UFG (José María Egea Krauel) to EGAS (Mahmoud Latif), [C-0087].
[181] High Administrative Court (First Circuit) Decisions, Appeal Cases Nos. 5546, 6013 and 7975 of High Judicial Year 55, Hearing of 27 February 2010, [C-0400 / R-0367].
[182] "Egypt Court okays gas exports to Israel," *Reuters* (27 February 2010), [C-0403]; *see also* "Egypt lifts ban on gas to Israel," *BBC News* (27 February 2010), [C-0404].

5.185   *16 March 2010*: UFG meets EGAS to discuss gas supply issues. EGAS delivers a presentation on feedgas forecasts. It indicates that UFG will receive 100% of the required quantities by 2013.[183]

5.186   *15 April 2010*: UFG meets EGAS concerning cargo recovery plans and linking price to deliveries. Following the meeting, UFG writes in a letter to EGAS:

> *As agreed during the meeting I am sending to you a copy of our presentation that summarises the main subjects under discussion, i.e. current gas supply, recovery plan and pricing issues, as better detailed here below.*
>
> *In respect of the gas supply, UFGas appreciates EGAS' effort to improve feed gas supply from the 1Q levels to around 500 mmscfd (67% of the ADP) during the first days of April 2010, as well as EGAS' commitment to ramp up supply in the coming years and to achieve supply up to nominal plant capacity in 2013 and onwards.*[184]

5.187   *6 May 2010*: EGAS agrees to grant priority to UFG for undelivered cargoes, by letter to UFG:

> *EGAS has planned this Recovery Program by assigning to UFGas all potentially expected excess production starting from 2014 to last till the full recovery achieved.  Additionally, the priority will be given to UFGas in any capacity not being exploited by the third party gas entitled to EGAS capacity after BG/Petronas contracts' expiry.*[185]

5.188   *10 May 2010*: SEGAS, EGAS and UFG execute a Side Letter to the Tolling Contracts, regarding the payment of Tolling Fees.

> *The Parties execute this additional Side Letter due to EGAS' continued failure to meet its payment obligations under the EGAS Tolling Contract with SEGAS.*[186]

5.189   *5 August 2010*: EGAS requests the immediate stoppage of production at the Damietta LGN Plant.

> *At 15:00 hr today SEGAS Operations got a phone call from EGAS [Toller Representative at SEGAS LNG Plant in Damietta] requesting to immediately proceed cutting the feed gas, stopping the production and*

---

[183] EGAS Presentation to UFG, 16 March 2010. [C-0007].
[184] Letter from UFG (José María Egea Krauel) to EGAS (Mohamed Latif Amer), 27 April 2010, attaching UFG presentation to EGAS, [C-0008].
[185] Letter from EGAS (Mohamed Latif Amer) to UFG (José María Egea Krauel), 6 May 2010, copying First Undersecretary for Gas Affairs of the Ministry of Petroleum (Eng Tarek El Hadidy), [C-0009].
[186] Side Letter between SEGAS, EGAS and UFG, 10 May 2010, [C-0006 / C-0332].

*maintaining the Plant in total recirculation under the threat of grid operator closing the feed gas valve if not done in 10 – 15 minutes.  SEGAS complied with the instruction [...]*[187]

5.190   *06 August 2010*: UFG writes to EGAS, attributing the issues caused by feedgas suspension to EGAS:

> *We hereby want to record that the sudden suspension of the supply constitutes an unacceptable breach of your obligations to supply natural gas to the LNG plant in accordance with the terms and conditions of the gas supply agreement dated 1st August 2000.  […]  We consider all this directly attributable to EGAS and we reserve our rights with respect to the subject matter under the Contract or elsewhere to protect our interests and recover any damages suffered.*[188]

5.191   *3 December 2010*: UFG sends a letter to EGAS summarising a recent telephone conference-call concerning gas supply shortfalls.

> *As for the committed volumes during the transient period of shortfalls, the positions are aligned with the exception of the first quarter of year 2011. We have made the effort to adjust the quantities as per Egas' indications and we appreciate Egas' position to commit to such minimum volumes as they are of extreme importance to guarantee a minimum throughput in Damietta LNG Plant and a minimum level supply to markets.*[189]

***2011***

5.192   *25-28 January 2011*: The Egyptian revolution begins with protests in Cairo, leading to the resignation of President Mubarak and an extended period of protests and changes to the composition of the Egyptian Government.  The resulting political turmoil, social unrest and deteriorating security situation creates uncertainty over Egypt's economic prospects for both domestic and foreign investors. Along with the continuing Global Financial Crisis and the subsequent Eurozone crisis, this leads to a sharp fall in foreign direct and financial investments in 2011 and 2012,[190] especially into the petroleum sector.[191] In 2013 and 2014, economic growth and foreign direct

---

[187] Fax from SEGAS (Yeo Yee Ngee) to GASCO (National Gas Control Centre General Manager), 5 August 2010, [C-0299].
[188] Letter from UFG (Javier Sáez) to EGAS (Hassan El-Mahdy), 6 August 2010, [C-0300].
[189] Letter from UFG (José María Egea Krauel) to EGAS (Mohamed Latif Amer), 3 December 2010, [C-0011].
[190] Khan ER, Paragraph 47.
[191] Khan ER, Paragraphs 51-52.

investment remains poor.[192] As of these dates, the Government of Egypt expects the country to emerge from its economic crisis only in the coming two to three years.[193]

5.193   Mr De Lara Alonso-Burón testified that:

> *Street protests in Egypt intensified on 25 January 2011.  I remember hearing that there were calls for people to join the demonstrations in the press that week.  The press was saying that big demonstrations would take place on 28 January 2011, after Friday noon prayers.*[194]

5.194   The Respondent's expert witness, Dr Khan testified:

> *At the same time, Egypt was also suffering from an unfolding energy crisis that manifested itself in country-wide electricity shortages and daily power cuts.  In addition to the inconvenience and hardships this caused households, energy shortages also had a negative impact on industry, which in many cases, such as heavy industries like cement production, were operating at 50-60 per cent capacity. This energy crisis had a strong negative impact on the economy, with significant reductions in industrial production and employment.*[195]

5.195   Mr El Mahdy testified to similar effect:

> *The Global Financial Crisis and the 2011 revolution caused instability and security concerns that* made *investors reluctant to invest.*[196]
>
> *In consequence, investment fell for both exploration for new fields, and development of existing* fields *with existing infrastructure in order to maintain or increase capacity. The latter, in particular, caused a rapid decline in the levels of gas production.*[197]

5.196   This national shortage of gas production, as compared to supply, began in 2002-2003, with a net shortage across all natural gas consumers of 0.1 bcma. This steadily increases to a shortage of 7.0 bcma in 2009-2010. In 2010-2011 the shortage increases further to 10.9 bcma, and thereafter increases sharply to 20.5 bcma in 2012-2013.[198]

5.197   In response to the gas shortages and the risk of blackouts across the country, EGAS prioritised distribution of gas to the domestic market in order to maintain power

---

[192] Khan ER, Paragraphs 53-55.
[193] Khan ER, Paragraph 66.
[194] De Lara Alonso-Burón WS, Paragraph 16.
[195] Khan ER, Paragraph 48.
[196] Tr. D3 725.
[197] Tr. D3 819-820.
[198] BRG ER1, Annex B-16.

generation.[199] As a result, the supply of gas to plants that exported gas was either minimised, or stopped completely.[200]

5.198   A later report of the Managing Director of UFG to the Board of Directors, of 20 March 2013, outlined the economic effects of the 2011 revolution in Egypt. The report referred to permanent riots in Cairo, Port Said, Alexandria and Suez, and a "permanent state of insurrection and civil commotion" since 2011.[201] The recurrent political instability was the main factor behind deterioration in investments, a rise in the unemployment rate, and a decline in industrial production.[202] According to the report, "[f]oreign direct investment came to a virtual standstill following the revolution", and would not likely return "[u]ntil security and stability return to the country and greater clarity is achieved in the political transition."[203] In the claim before the Commercial Court of Madrid brought against UFG and some of its directors, by some of its other directors, the claimant directors referred to a proposal by UFG's Head Office on 20 March 2013 to issue force majeure notices to its customers as a result of the Egyptian revolution, and the slowdown of foreign direct investment and consequent deterioration in gas extraction and production capacity that resulted.[204]

5.199   *11 February 2011*: President Mubarak resigns and political power is entrusted to the Supreme Council of the Armed Forces ("SCAF").[205]

5.200   *23 February 2011*: EGAS' Chairman Mr Mahmoud Latif is appointed the new Minister of Petroleum. As reported in the press:

> *Egypt's military rulers swore in a new Cabinet on Tuesday.  Energy veteran Eng. Mahmoud Latif, formerly known as the head of the Egyptian Natural Gas Holding Company (EGAS), became the new Petroleum Minister […]*

---

[199] El Mahdy WS1, Paragraph 16; Hameed WS, Paragraph 24.
[200] Hameed WS, Paragraph 24.
[201] Report of the Managing Director to the Board of Directors Meeting, "Gas S&P Contracts. Analysis of Current Stand and Proposal of Improvement Measures," 20 March 2013, [R-0379], Page 5.
[202] Report of the Managing Director to the Board of Directors Meeting, "Gas S&P Contracts. Analysis of Current Stand and Proposal of Improvement Measures," 20 March 2013, [R-0379], Page 5.
[203] Report of the Managing Director to the Board of Directors Meeting, "Gas S&P Contracts. Analysis of Current Stand and Proposal of Improvement Measures," 20 March 2013, [R-0379], Page 6.
[204] *Rinaudo, et al. v. Unión Fenosa Gas, S.A., et al.*, ENI Directors' Statement of Claim [R-0354], Page 3.
[205] "18 days of protests culminate in Mubarak's ouster," *CNN* (12 February 2011), [R-0124].

> *Latif was a key figure in implementing Egypt's integrated gas strategy and was the head of many petroleum companies including the Egyptian Natural Gas Company (GASCO), the General Petroleum Company (GPC) and Badre El Din Company (BAPETCO).  In a later stage, Latif was appointed as the chairman of the state-owned Egypt Natural Gas Holding Co (EGAS).* [206]

5.201   The new Minister announces that the petroleum sector will give priority to the domestic market for (*inter alia*) natural gas:

> *Eng. Mahmoud Latif the New Petroleum Minister said* [t]*hat, petroleum sector will give priority to domestic market in the provision of petroleum products and natural gas.* [207]

5.202   *23 February 2011*: UFG and EGAS initial Heads of Agreement as a temporary two-year agreement (the "HOA").[208] Under Article 2 of this draft Agreement, UFG agrees to accept lower levels of gas than the minimum quantities specified in the SPA. By Article 3, EGAS acknowledges that there were quantities of gas that UFG was entitled to receive under the SPA and which had not been delivered, but which would be delivered in future.

5.203   EGAS states that it will submit the draft HOA to the Government for approval. Mr Egea Krauel describes what happened:

> *We negotiated and initialed a draft Heads of Agreement (the 'HOA') with EGAS during that meeting, which covered the three points mentioned.  We agreed that EGAS would submit the initialed draft HOA to the Government for approval.*[209]

5.204   It was nine months later that the HOA was signed by the parties. According to Mr Sáez Ramírez (of UFG), the reason for the delay was that EGAS and EGPC were still waiting for approval by the "competent authorities" in the Egyptian Government, which was only granted in November 2011.[210] Mr Egea Krauel likewise referred to the need to submit the initialled draft to the Government for approval. [211] Mr Soliman's email of 4 July 2011 to Mr Sáez Ramírez, forwarding Mr Ismail's

---

[206] "Eng. Mahmoud Latif new Oil Minister," *Egypt Oil & Gas* (23 February 2011), [C-0138]; "Eng. Mahmoud Latif new Oil Minister," *Egypt Oil & Gas* (23 February 2011), [C-0410]; "New Petroleum Minister: creating products for the domestic market priority," *Oil News* (24 February 2011), [C-0414].
[207] "New Petroleum Minister: creating products for the domestic market priority," *Oil News* (24 February 2011), [C-0414].
[208] Initialled Heads of Agreement between EGAS and UFG, 23 February 2011, [C-0430].
[209] Egea Krauel WS, Paragraph 13.
[210] Sáez Ramírez WS1, Paragraphs 11-13.
[211] Egea Krauel WS, Paragraph 13.

"unofficial" proposal for price increases, noted that if UFG agreed to the proposal then "I understand that they will act immediately […] to get the competent authorities approval."[212]

5.205   *7 March 2011*: The President of EGPC, Mr Ghorab, is appointed the new Minister of Petroleum. A news article records:

> *Eng. Abdallah Ghorab, the President of the Egyptian General Petroleum Corporation is announced as* [n]*ew Petroleum and mineral resources Minister, He replaces Eng. Mahmoud Latif* […][213]

5.206   *May-June 2011*: UFG delivers presentations to EGAS and the Ministry of Petroleum discussing (*inter alia*), the initialled HOA and pending Governmental approvals. One such presentation notes:

> *New Heads of Agreement initialized on 23.02.2011 and subject to ratification by March 31st.*
>
> *The agreement was approved by the Board of Directors of UFGAS 29th March 2011.*
>
> *UFGas understands it was also approved by EGAS and currently is pending on EGPC and other Egyptian Authorities approvals.* [214]

5.207   Mr Sáez Ramírez (of UFG) testified at the Hearing:

> *After that meeting, there was silence on the Egyptian side for a while. In May of 2011, EGAS informed us that some of the provisions were 'not acceptable' to the Government, who wanted a higher price for the gas sold to UFG.*[215]

5.208   *June 2011*: The Chairman of EGAS discusses the strategy of the Egyptian petroleum sector in its Annual Report, stating:

> [T]*he strategy of the Egyptian petroleum sector focuses on the local market demand and gives it absolute priority.*[216]

---

[212] Email from Hany Hakky to UFG (Javier Sáez Ramírez), 4 July 2011, [C-0014].
[213] "Eng. Abdallah Ghorab, the President of (EGPC) Petroleum Minister in the new Cabinet," *Oil News* (7 March 2011), [C-0139]; "Eng. Abdallah Ghorab, the President of (EGPC) Petroleum Minister in the New Cabinet," *Oil News* (7 March 2011), [C-0411].
[214] UFG Presentation to EGAS, May 2011, [C-0012]; UFG Presentation to EGPC, June 2011, [C-0013].
[215] Sáez Ramírez WS1, Paragraph 12.
[216] EGAS Annual Report 2010-2011, Chairman Message, [C-0350].

5.209   *16 June 2011*: SEGAS, EGAS and UFG execute a Side Letter to the Tolling Contracts, regarding payment of Tolling Fees, due to EGAS' continued failure to meet its payment obligations under the EGAS Tolling Contract with SEGAS.[217]

5.210   *4 July 2011*: UFG reviews a price proposal from EGAS in relation to the HOA. The proposal states that finalising the HOA will require the approval of the "competent authorities":

> *The attachments [...] include the proposal (unofficial) from S. Ismail as we discussed before, for your evaluation and we can discuss after your evaluation and internal coordination, to plan for the next step, I understand that they will act immediately after they receive U.F.Gas verbal agreement to get the competent authorities* [sic] *approval.*[218]

5.211   *13 August 2011*: UFG expresses concern to EGAS over feedgas supply:

> *I am writing you further to my previous email and with reference to the subject matter. First, I would like to acknowledge your support to restart Damietta LNG production. However, I would like to express my strong concern due to the low feedgas supplied to the LNG Plant. As you are well aware, to operate the Plant on steady mode requires a minimum feedgas quantity and the currently supplied quantities are below such threshold [...]*[219]

5.212   *02 November 2011*: EGAS informs UFG that the gas price modification provided for in the HOA is awaiting approval by the Minister of Petroleum and the Egyptian Cabinet.

> *Regarding the gas price modification to Unión Fenosa, the subject is just approved yesterday 1st November 2011 by EGPC board members and it's in* [on] *its way for Petroleum Minister and cabinet of ministries approval and we are doing our best to finalize this issue before the elections.*[220]

5.213   *04 November 2011*: UFG expresses concern to EGAS over EGAS' gas supply to the Damietta Plant.

> *We write to you [...] in relation to EGAS' continuous Default in the supply of the contracted feedgas quantities to the Damietta LNG Plant; To this respect we reserve our rights under the Supply Contract and the applicable Laws.*

---

[217] Side Letter among SEGAS, EGAS, and UFG, 16 June 2011, [C-0333].
[218] Email from Hany Hakky to UFG (Javier Sáez Ramírez), 4 July 2011, [C-0014].
[219] Email from UFG to EGAS, 13 August 2011, [R-0300].
[220] Email from EGAS (Vice Chairman Raafat El Beltagy) to UFG (José María Egea Krauel), 2 November 2011, [C-0485].

> *In the process of the negotiations [...] in connection with EGAS' request to increase the price of the gas supplied to UFG, EGAS committed with UFG to supply the Damietta LNG Plant with certain Minimum Committed Feed Gas Quantities during the transient period of shortages until 2013 [...] EGAS has requested twice to stop LNG production on October 26th and November 2nd. Further, the feedgas supply has been extremely erratic [...] [W]e hereby request you to respect the Minimum Committed Feedgas Quantities in the supply to the Damietta LNG Plant to allow UFG Management to support the approval of the Heads of Agreement.*[221]

5.214   *11 November 2011:* After violent protests in Cairo and elsewhere, the Egyptian Prime Minister and Council of Ministers resign.[222]

5.215   *21 November 2011:* The Muslim Brotherhood with other opposition parties win a parliamentary election and form a new Government.[223]

5.216   *23 November 2011*: UFG, EGAS and EGPC execute the HOA. Article 1 addresses new gas pricing. Article 2 addresses "Feed Gas Supply." It provides (*inter alia*):

> *"Throughout the Period* [of the HOA]*, EGAS hereby commits to deliver a continuous supply of natural gas to the LNG Plant of no less than a minimum average daily feed gas quantities expressed in million standard cubic feet per day (mmscfd) (hereinafter the 'Minimum Feedgas Commitment'). The Mininum Feed Gas Commitment shall be as provided in the following quarterly schedule; […]; resulting in an average Mininum Feedgas Commitment for the year 2011 equal to 487 mmscfd. Year 2012: 560 mmscfd; Year 2013: 600 mmscfd* [224]

5.217   The Claimant's Memorial on the Merits describe the HOA's purpose as follows:

> [T]*he* [HOA]*, was an exceptional measure taken by UFG to accept lower deliveries of gas for a transitory period and provide for a recovery plan by which all 'lost' volumes (i.e., volumes not delivered to UFG when due under the SPA) would be 'recovered' by delivery in subsequent years.*[225]

5.218   Mr Sherif Ismail participated in a number of meetings between UFG, EGAS and the Ministry of Petroleum in which the terms of the Heads of Agreement were negotiated by the Parties.[226] Over the course of 2011, Mr Ismail also communicated by email and

---

[221] Letter from UFG (José María Egea Krauel) to EGAS (Hassan El-Mahdy), 4 November 2011, [C-0304].
[222] D.D. Kirkpatrick, "Egypt's Cabinet Offers to Resign as Protest Rage," *New York Times* (21 November 2011), [R-0141]; S. Fayed, M. Awad, "Egyptian police battle protestors, 33 dead," *Reuters* (21 November 2011), [R-0147].
[223] S. Tarek, "Islamists win 70% of Egypt People's Assembly party list seats," *Ahram Online* (21 January 2012), [R-0142]; Z. Laub, "Egypt's Muslim Brotherhood," *Council on Foreign Relations* (15 January 2014), [R-0143].
[224] Heads of Agreement between EGAS and UFG, 23 November 2011, [C-0010].
[225] Cl Mem Merits, Paragraph 286.
[226] Cl Rep Merits, Paragraphs 190 and 204; Resp Rej Merits, Paragraph 141.

telephone with UFG's representatives, requesting price increases in the Heads of Agreement.[227] On 4 July 2011, an email was sent on behalf of Mr Ismail to Mr Hani Soliman, a former Undersecretary of the Ministry of Petroleum, which was forwarded by Mr Soliman to Mr Sáez Ramírez of UFG.[228] Mr Ismail's email attached an "unofficial" proposal for price calculations, to be evaluated by UFG. At this time, Mr Sherif Ismail was the Chairman of Ganoub El Wadi ("Ganope"), a State-owned oil and gas company. Later, he became the Minister of Petroleum and, later still, the Prime Minister of Egypt.

*2012*

5.219   From 2012, the gas supply to the Damietta Plant deteriorates with EGAS restricting and suspending gas supply. According to UFG, this situation resulted from the Respondent's decision to block deliveries of contractually agreed gas supply to the Damietta Plant whilst diverting gas supplies to other purchasers, most notably to the domestic electricity generation sector. As a result of these actions, so UFG contends, UFG was able to lift only two full cargoes of LNG from the Plant after July 2012, instead of the 39 cargoes originally planned and agreed for this period.[229] Since December 2012, no LNG has been lifted from the Damietta Plant, which has remained idle.

5.220   *31 January 2012*: EGAS sends *force majeure* notices to UFG and SEGAS under Article 15.4 of the SPA and Clause 17 of the EGAS Tolling Contract regarding a shutdown at the facility of one of the main upstream suppliers (Burullus).[230] The Burullus facility had shut down for technical reasons, owing to emulsion.

5.221   *1 February 2012:* One day later, UFG rejects the *force majeure* notice sent by EGAS under the SPA:

> *First of all we would like to thank you for the information provided to us with regard to the shutdown in Burullus facilities and we really regret the consequences of this event.*

---

[227] Egea Krauel WS, Paragraph 14; Sáez Ramírez WS1, Paragraph 13.
[228] Email from Hany Hakky to UFG (Javier Sáez Ramírez), 4 July 2011, [C-0014].
[229] *See* Sáez Ramírez WS1, Paragraph 25; Egea Krauel WS, Paragraph 23.
[230] Letter from EGAS (Ashraf Zaki) to UFG (José María Egea Krauel), 31 January 2012, [C-0015]; Letter from EGAS (Ashraf Zaki) to SEGAS (José Luis Torre), 31 January 2012, [C-0016]

> *Notwithstanding the aforementioned, taking into consideration the Sale and Purchase Agreement [...] nowadays UFG cannot accept this letter as a Force Majeure notification based on the following contractual considerations [...]*
>
> *Consequently, please kindly consider the present letter as an official UFG's rejection of the FM notification mentioned above and eventual suspension of EGAS' obligations under the SPA.*[231]

5.222   *6 February 2012*: SEGAS also rejects the *force majeure* notice sent by EGAS under the EGAS Tolling Contract.

> *We understand that the Burullus facility has resumed its operations [...] As we have not timely received full particulars of the event as detailed here above and until we receive and analyze them, we are not in a position to accept your Force Majeure Notification and reserve our rights under Article 17 of the Tolling Contract to reject such notification.*[232]

(EGAS does not follow up on its *force majeure* notices).

5.223   *22 February 2012*: EGAS and UFG representatives meet in Cairo concerning issues over EGAS' feedgas supply. UFG requests proportional curtailments of other industries to ensure compliance with the HOA's Minimum Feedgas Commitment; and UFG reiterates its cooperation with EGAS and the Egyptian authorities, including price renegotiations for gas sales:

> *[W]e are seriously concerned by your description of the current situation, which led to EGAS' default on the feedgas supplies to the Damietta LNG Plant and would cause the feedgas supply to Damietta LNG Plant [...] to be significantly below the Minimum Feedgas Commitment agreed in the Heads of Agreement [...] [T]his will have direct consequences over us, such as damages, costs and/or additional expenses [...]*
>
> *[O]ur view is that EGAS must and can act promptly to supply Damietta LNG Plant at the minimum committed level under the HoA (560 mmscfd, on average). The current shortfall stands at around 175 mmscfd, and we see different alternatives that EGAS can implement to comply with its Minimum Feedgas Commitment during 2012. These include a limited prorata reduction of Industry and Other consumers, a limited increase of mazout as primary energy for electricity generation and certain industrial consumers or a combination of both. Such measures are directly under your control and will have as a consequence the avoidance of the Default in the supply to Damietta LNG Plant under the HoA (not to mention those under the SPA).*

---

[231] Letter from UFG (Javier Sáez Ramírez) to EGAS (Ashraf Zaki), 1 February 2012, [C-0017].
[232] Letter from SEGAS (José Luis Torre, Managing Director Operations) to EGAS (Ashraf Zaki, Vice Chairman for Operations), 6 February 2012, [C-0018].

*As the Country faces difficult supply/demand scenarios through the Transient Period 2011-2013, UFG has shown its strong commitment with EGAS, in particular, but also with Egyptian Authorities in general, by recently agreeing a natural gas price increase and a reduction (even temporarily and to be recovered in the future) of the volumes down from the contractual volume to a minimum committed quantity. Now we strongly request that EGAS takes the necessary steps to guarantee the supply of natural gas to the Damietta LNG Plant within the agreed level.*

*We trust EGAS will support the compliance of our agreement in place, and we are sure that this will strengthen the continued development of our partnership, but also it will strengthen EGAS and the Egyptian Petroleum Sector as a whole, since the opposite (i.e., the continued default under the agreement) will not help UFG to continue supporting EGAS and will surely have as a consequence, apart from the economic losses, deficit in the sector, delay in projects, lack of new investments and finally additional shortfalls affecting both exporters and domestic consumers.[233]*

5.224 *13 March 2012*: Mr Paolo Conti, SEGAS' Managing Director of Administration and Control, informs the SEGAS Board of Directors (including representatives of EGAS) that:

*Among the highlights for year 2011 Mr Conti refers to the production of the plant not being adversely affected by the revolution that has taken place in the country during this year adding nevertheless that the final production was significantly under the budget expectations.[234]*

5.225 *15 March 2012*: UFG rejects EGAS' stated reasons for the reduced supply; and UFG alleges that EGAS discriminates against UFG:

*Reference is made to yesterday's communication received by SEGAS in which a supply to Damietta LNG Plant of only 150 mmscfd was announced due to gas production reduction in certain limited gas fields. As a direct consequence of such nomination, well below the minimum turn down ratio of the Damietta LNG Plant, SEGAS has been forced to stop production for the third time in year 2012.*

*Contractually, supply of NG to Damietta LNG Plant is not supported by any particular field and EGAS is 'the exclusive responsible for the transportation, supply and delivery of NG' [...] keeping at all times a 'back-up supply to meet an on stream (load) factor of 95%' in the Plant, regardless of the origin of the gas.*

*Consequently any eventual reduction of gas availabilities in a field cannot be used by EGAS as a contractual reason to reduce the feed gas to*

---

[233] Letter from UFG (José María Egea Krauel and Alessandro Della Zoppa) to EGAS (Mohamed Shoeib), 27 February 2012, [C-0019].
[234] SEGAS Board of Directors Meeting Minutes, 13 March 2012, [R-0356].

*Damietta LNG Plant, as still remains a sufficient amount of gas in the grid to fill the plant according to EGAS contractual obligations.*

*As per the contracts in force, Damietta LNG Plant has to be treated in a non-discriminatory manner in comparison with other NG customers which means that an eventual reduction of NG in the grid has to be shared on a pro-rata basis between all customers. We consider that EGAS has discriminated UFG by curtailing feedgas Damietta LNG Plant to a higher exten[t] than other NG customers and we hold EGAS responsible of the consequences of such breach.*[235]

5.226 *8 May 2012*: UFG sends a letter to EGAS requesting that EGAS meet its gas supply commitments:

*[S]ince the beginning of commercial operation of the Damietta LNG Plant in year 2006 the supply of natural gas from EGAS to UFG under the Sale and Purchase Agreement between our Companies (the "SPA") has been at substantially all times below UFG' contractual rights (and corresponding EGAS' delivery commitments) under the SPA and, more recently, under the HoA.*[236]

5.227 *12 May 2012*: The Egyptian Natural Gas Co. ("GASCO") notifies SEGAS of increased gas availability:

*Please be informed that you can increase the gas quantity for SEGAS Plant gradually till 300 MMSCFD at 6am tomorrow 13-5-2012.*[237]

5.228 *16 May 2012*: GASCO requests SEGAS to operate the Damietta Plant in recycle mode:

*Apart of any commitments and agreements We are now in critical condition regarding the grid pressure, any action taken by gasco is based on actual grid condition targeting to maintain the grid min operable pressure in order to secure the power stations and all other consumers.*

*Taking into consideration that in normal operation mode we were strongly abide with all the commitments and agreements and did all our best endeavors to satisfy Segas requirements as agreed.*

*Gent[le]men, if we didn't cooperate in encountered emergency situations we will all loose.*[238]

---

[235] Letter from UFG (José María Egea Krauel and Alessandro Della Zoppa) to EGAS (Mohamed Shoeib), 15 March 2012, [C-0020 / R-0293].
[236] Letter from UFG (José María Egea Krauel and Alessandro Della Zoppa) to EGAS (Mohamed Shoeib), 8 May 2012, [C-0029].
[237] Fax from GASCO (National Gas Control Center General Manager) to SEGAS (Plant Shift Leader), 12 May 2012 (18:53), [C-0023].
[238] Email from GASCO (Khaled Abel Badie) to SEGAS (José Luis Torre), 16 May 2012, [C-0025].

5.229 *16 May 2012*: GASCO requests SEGAS to prepare for a safe shut down of the Damietta Plant:

> *Ref to your fax received now concerning non-response to your request to decrease SEGAS plant consumption rate to 200 MMSCD, and as a result of severe falling in gas pressures all over the National Gas Grid reaching to a critical situation; A case that requires an immediate action to maintain National Gas Grid Balance, as well as, to ensure safely operation for Power Stations. The matter that forcing our company* [sic] *to stop feeding some customers with natural gas including SEGAS plant for a period of 36 hours starting from 11 pm today, so prepare your plant for normal safe stop.*[239]

5.230 *22-29 May 2012*: UFG expresses concern over the frequency of shutdowns ordered by GASCO; and it accuses EGAS of wilfully discriminatory treatment of SEGAS:

> *Further to your request, and before Suspending feedgas to SEGAS, please note as follows.*
>
> *EGAS/GASCO have requested already 5 times to stop production to SEGAS throughout May 2012. Other consumers have not been curtailed in similar quantities, therefore EGAS is wilfully discriminating* [against] *SEGAS* […][240]

EGAS informs SEGAS that is not the only consumer affected by the situation.[241]

5.231 *31 May 2012*: GASCO requests SEGAS to operate the Damietta Plant in recycle mode:

> [B]*ecause of sudden outage of El-Burullus gas field* […] *please be advised that, we are forced to begin reducing gas quantities delivered to your plant gradually, similar to the procedures taken with other major consumers* […][242]

5.232 *2 June 2012*: GASCO requests SEGAS to operate the Damietta Plant in recycle mode:

> *Due to the falling in gas pressure within the whole gas grid as well as the high consumption rate of the power stations resulted from increasing of ambient temperature, kindly take your necessary actions to adapt the plant*

---

[239] Fax from GASCO (National Gas Control Center Shift) to SEGAS (Plant Shift Leader), 16 May 2012 (21:06), [C-0246].
[240] Email from UFG (Javier Sáez Ramírez) to EGAS (Ashraf Zaki), 22 May 2012, [C-0026].
[241] Email from UFG (Javier Sáez Ramírez) to EGAS (Ashraf Zaki), 22 May 2012, [C-0026].
[242] Fax from GASCO (Gas Control Center General Manager) to SEGAS (José Luis Torre), 31 May 2012 (15:17), [C-0028].

> *to Recycle Mode Operation starting from 2:30 pm dated 2/6/2012 until today midnight.*243

5.233   *6 June 2012*: GASCO requests SEGAS to operate the Damietta Plant in recycle mode.

> *Due to Gas Grid pressure falling, as well as, El-Burullus Gas field expected mainten*[a]*nce shutdown on Fri. 8/6/2012, please be informed that it is requested to adapt your plant on Recycle Mode Operation starting from now at 10:00 am.*244

5.234   *11 June 2012*: UFG sends a letter to EGAS expressing concern over feedgas suspension to the Damietta Plant:

> *We write you today to show our deep concern raised by the sequence of events that affected SEGAS and UFG on June 6th, 2012 which leaded to the unilateral total suspension of the feedgas flow to the LNG Plant for the 10th time since the beginning of May 2012* [...]

> *EGAS, through the intervention of GASCO, has forced several times to reduce and/or suspend the feedgas to SEGAS, as of the commencement of May 2012. We strongly oppose each and every one of such unilateral suspensions of your obligation to deliver without any contractual grounds; however, we regard with special concern the events occurred on June 6th.*

> *In this occasion, the facts as they are known to us have been: (i) we have received EGAS assurance that the plant would be operated on continuous basis above its Minimum Turndown Ratio; (ii) as of the time of the GASCO communications, the grid was stable and pressure was building up; (iii) no hiccups to production happened in such time frame; (iv) SEGAS requested clarification as to the rationale to such instruction and as a response it received a* [threat] *to shut down the inlet gas valve, i.e., a menace to blackout the plant; (v) GASCO proceeded to shutdown the valve forcing SEGAS' stoppage.*245

5.235   *14 June 2012:* The Supreme Court calls for the dissolution of Parliament.246

5.236   *24 June 2012*: Mr Mohamed Morsi is appointed the President of Egypt.247

5.237   *28 June 2012*: By letter of 28 June 2012, UFG urges the Minister of Petroleum to assure the immediate restoration of gas supply to the Damietta Plant.

---

243 Fax from GASCO (National Gas Control Center) to SEGAS (Plant Shift Leader), 2 June 2012 (14:19), [C-0030 / C-0245].
244 Fax from GASCO (Mahmoud Tawfik) to SEGAS (José Luis Torre), 6 June 2012 (10:02) [C-0031].
245 Letter from UFG (José María Egea Krauel and Alessandro della Zoppa) to EGAS (Mohamed Shoeib) (undated), [C-0033] (emphasis omitted).
246 "Egypt Supreme Court calls for Parliament to be dissolved," *BBC News* (June 14, 2012), [R-0150].
247 "D.D. Kirkpatrick, Named Egypt's Winner, Islamist Makes History," *New York Times* (24 June 2012), [R-0145].

*Your Excellency,*

*This letter is aimed to share with you our concern raised as a consequence of the deterioration of the feed gas supply to the Damietta LNG Plant throughout the recent months and particularly our deep concern due to the unilateral complete suspension by Egypt of the Natural Gas supply to the Damietta LNG Plant and to Unión Fenosa Gas since 17 June 2012, without further notice. [...] I would like to request your support to assure the immediate restoration of the feedgas supply to SEGAS and Unión Fenosa Gas and its operation on continuous basis. Subject to this, Unión Fenosa Gas will continue to cooperate with Egypt as we have always done.*[248]

5.238   *15 July 2012*: GASCO orders SEGAS to operate the Damietta Plant in recycle mode, citing priority in supply for the electricity sector.

*Due to the high consumption rates of electricity sector and high degrees of temperatures, as well as, the continuous decreasing in gas pressures over the whole Grid, and in the light of what was agreed upon with EGAS, please be informed to reaching* [sic] *SEGAS plant operation on Recycle Mode by today at 12:00 pm (noon) until 12:00 am (midnight).*[249]

5.239   *15 July 2012*: SEGAS expresses concerns to GASCO over EGAS/GASCO's actions.

*Reference is made to GASCO fax 'SEGAS Plant Operation on Recycle Mode', sent to SEGAS on 15th July 2012 at 10:00 hours, and to which EGAS has received copy.*

*In such respect, we wish to state clearly that:*

*l. There is no other existing agreement with EGAS other than complying with nominated quantities provided that they are within the safe operating range of the LNG Plant.  This agreement does not contemplate that SEGAS LNG Plant shall balance the gas grid in the conditions stated in GASCO fax.*

*2. Therefore, the decision to force SEGAS to adapt its operation to balance the gas grid for safeguarding other consumers is made unilaterally by EGAS/GASCO and in no manner it is framed within any agreement between EGAS and SEGAS.*

*We find it is not appropriate to introduce these misleading statements in the operating communications received from GASCO.*[250]

---

[248] Letter from UFG (Jose María Egea Krauel and Alessandro della Zoppa) to Minister of Petroleum (Abdullah Ghorab), 28 June 2012, [C-0393].

[249] Fax from GASCO (National Gas Control Center General Manager) to SEGAS (Plant Shift Leader), 15 July 2012 (10:00), [C-0036].

[250] Fax from SEGAS (Plant Shift Leader) to GASCO (National Gas Control Center General Manager), 15 July 2012, [C-0037].

5.240   *19 July 2012*: The Ministry of Petroleum announces reduction of gas exports in favour of the domestic market. The news media reports:

> *Egypt will decrease the amount of natural gas it exports in order to meet urgent domestic needs, a move that may result in a massive loss of revenues, said a Petroleum Ministry senior official on Thursday.* [251]

5.241   *25 July 2012*: UFG expresses continued concern to EGAS over EGAS' gas supply.

> *We write to you to express our deep concern about feed gas supply to the Damietta LNG Plant.  As you are aware of, since the beginning of commercial operation of the Damietta LNG Plant in year 2006 the supply of natural gas from EGAS to UFG under the SPA has been substantially at all times below UFG's contractual rights (and corresponding EGAS' delivery commitments) under the SPA and, since its date of signature, under the HoA. The situation has significantly deteriorated from 2011 onwards […]* [252]

5.242   *1 August 2012*: Mr Osama Kamal is announced as the new Minister of Petroleum, as reported in Reuters:

> *Osama Kamal, who served as the chairman of the Egyptian Petrochemicals Holding Company, said on Wednesday he was appointed as the minister of petroleum and mineral resources in a cabinet being formed by Prime Minister Hisham Kandil.* [253]

5.243   *04 August 2012*: President Morsi apologizes to the public for the widespread electricity blackouts across Egypt. [254] EGAS suspends all gas deliveries to UFG. This is described by Mr Egea Krauel (of UFG) in his written testimony:

> *In May and June 2012, a series of unexpected gas stoppages (situations where EGAS abruptly stops delivering natural gas) affected production at the Damietta LNG Plant and, by July, it had become clear that we would not get gas for the remainder of the summer.* [255]

5.244   *06 August 2012*: The Minister of Petroleum announces that the gas needs of citizens are the Ministry's top priorities. As reported in the media:

> *Minister of Petroleum [...] Osama Mohamed Kamal [...] stressed that the needs of the Egyptian citizens come on top of the list of his ministry's priorities and concerns.  The Minister pointed out that the vision that had*

---

[251] "Petroleum Ministry reduces gas exports to meet local needs," *Egypt Independent* (19 July 2012), [C-0305].
[252] Letter from UFG (Javier Sáez Ramírez) to EGAS (Ashraf Zaki), 25 July 2012, [C-0038].
[253] "Egypt's Osama Kamal says to head energy ministry," *Reuters* (1 August 2012), [C-0394].
[254] H. El-Behary, M. M. Hussein, "Popular anger rises against chronic blackouts across Egypt," *Ahram Online* (4 August 2012), [R-0288].
[255] Egea Krauel WS, Paragraph 20.

*been developed for the petroleum sector and presented to Prime Minister Dr Hesham Kandil includes several key points, topped by the importance of providing petroleum products [...] and coordination with the ministries of supply and electricity to meet needs of citizens.  He stressed that the vision also paid attention to all mineral resources projects, especially as this sector enjoys tremendous investment opportunities in all Egyptian governorates.*[256]

5.245   *23 August 2012*: GASCO requests SEGAS to stop Damietta Plant start-up operations, citing demand in the electricity sector.

> *Due to Electricity Power Stations returning back to up-raise gas consumption rates to normal loads, please be informed to stop your plant starting from now and until further notification.*
>
> *Thanks for your cooperation.*[257]

5.246   *26 August 2012*: UFG requests an urgent meeting with the Minister of Petroleum to discuss the gas supply to the Damietta Plant:

> *On behalf of Unión Fenosa Gas, we would like to congratulate you sincerely for your appointment as Minister of Petroleum [...] We look forward to the prospect of continuing the work with the Petroleum Sector and especially with our counterpart Egyptian Natural Gas Holding Company, strengthening our close cooperation with them.*
>
> *As you probably know, Unión Fenosa Gas is one of the main investors in the Gas Sector in Egypt, being Damietta LNG Plant the first export project developed in Egypt providing the opportunity to Egyptian Partners to access international markets and constituting the foundation of a fruitful partnership between Egypt and Spain.*
>
> *However, this strategic joint project is suffering from the lack of supply of continuous feedgas to the Damietta LNG Plant at operational levels, which de facto has been suspended throughout the summer.*
>
> *In line with the continued cooperation between the Egyptian Authorities and Unión Fenosa Gas, we would like to kindly ask you for an urgent meeting at your earliest convenience […]*[258]

5.247   *16 September 2012*: UFG meets the Minister of Petroleum. The meeting is recorded in letters from EGAS:

---

[256] "Egypt: Petroleum Minister – Needs of Citizens Come on Top of Ministry's Priorities," *Oil News* (6 August 2012), [C-0318].

[257] Fax from GASCO (National Gas Control Center General Manager) to SEGAS (Plant Shift Leader), 23 August 2013 (10:33), [C-0242].

[258] Letter from UFG (José María Egea Krauel) to Minister of Petroleum (Osama Kamal), 26 August 2012, [C-0044].

> *We have the pleasure to confirm the meeting to be held on Sunday 16th September 2012 [...] at the Ministry of Petroleum premises to review and discuss all issues as proposed in your aforementioned letter.*[259]

and from UFG:

> *We acknowledge receipt of your letter […] confirming the date for the meeting with H.E. Minister of Petroleum […] next 16th of September 2012 […]*[260]

The content of discussions at the meeting is described in Mr Egea Krauel's written testimony:

> *During that September meeting, Minister Kamal stated that he was conscious of UFG's problem and that he was in the process of reviewing the situation of every exporter (including UFG) and major domestic customer.  He stated that he was analyzing the contractual frameworks and the legal conditions for stopping gas deliveries to one consumer in order to improve supply to other gas users.  He expected to get the results of this study within a month. The Minister never got back to us with the results of this analysis.  We realized that UFG had been singled out as the offtaker of gas from the grid whose supply would be indefinitely interrupted.  UFG had been one of the largest consumers of natural gas in Egypt and was no longer receiving any gas.*[261]

Mr Sáez Ramírez's testimony describes this meeting:

> *In August 2012, Osama Kamal was appointed Minister of Petroleum. Messrs Egea, […] Cuniberto […] and I visited him in September. During our meeting, he confirmed his intention to study the gas supply situation and make a decision.*[262]

In its letter to the Minister following the meeting, UFG writes:

> *Thank you very much for the time you have spent with us during our meeting held on September 16th and for reiterating your continuous support to our Damietta LNG joint project [...]*

> *[T]he shutdown of the LNG Plant that brought production to a complete standstill since July has placed our Company in a very critical situation. We would like to express our special appreciation to Your Excellency for the support to our Company request to restart the production of the Plant[...] We would like to make it clear from our side that Unión Fenosa*

[259] Letter from EGAS (Mohamed Shoeib) to UFG (Jose María Egea Krauel and Cesare Cuniberto), 2 September 2012, [C-0045].
[260] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to EGAS (Mohamed Shoeib), 3 September 2012, [C-0047]; *see also* Presentation by Jose María Egea and Cesare Cuniberto to Osama Kamal at a Meeting with H.E. Ministry of Petroleum, 16 September 2012, [C-0089].
[261] Egea Krauel WS, Paragraph 22.
[262] Sáez Ramírez WS1, Paragraph 25.

> *Gas is fully committed to this project; hence we will continue to provide*
> *our cooperation to ensure that this project would continue to be successful*
> *and beneficial to all parties and economic sectors involved directly and/or*
> *indirectly.*[263]

5.248 *09 October 2012*: UFG expresses concerns to EGAS about EGAS' discriminatory treatment of UFG in the supply of gas to the Damietta Plant:

> *As we had the opportunity to discuss in such meetings, UFG is deeply*
> *worried because of the current situation of the feed gas supply to Damietta*
> *LNG Plant since, despite of our constant spirit of cooperation, the actual*
> *level of supply in the past few months has been considerably lower than*
> *EGAS commitments in previous meetings and tremendously below the*
> *contractual volumes under the SPA and the agreed Minimum Feed Gas*
> *Commitment for the period. Far from improving, the situation has further*
> *deteriorated to the point that no supply of gas has been delivered to the*
> *Damietta LNG Plant since 16 July 2012, as explained in more detail below.*
> *Furthermore, this shortage of supply represents a clear discriminatory*
> *measure against UFG by EGAS and the Egyptian authorities, as evidenced*
> *by the fact that the supply of gas has not been interrupted to other*
> *consumers (such as, for example, the liquefaction plant in Idku).*[264]

5.249 *15 October 2012*: The Minister of Petroleum informs the Egyptian Parliament that Egypt has stopped exporting gas to Spain due to increasing domestic gas consumption. This announcement is publicly reported as follows:

> *Petroleum Minister Osama Kamal said that Egypt has stopped exporting*
> *gas to Jordan and Spain because of increasing gas consumption on the*
> *domestic market.*
>
> *The two countries understand why Egypt made this decision, he added.*[265]

5.250 *17 October 2012*: UFG writes to the Minister of Petroleum objecting to press reports that UFG had approved the suspension of gas to the Damietta Plant:

> *[W]e also would like to address the news recently published in the*
> *Egyptian press referring to the unilateral suspension by the Egyptian*
> *Party of the feedgas supply under our Sale and Purchase Agreement.*
>
> *To this regard we regret to say that· we are disappointed because such*
> *news inform that sources from the Ministry of Petroleum and the Minister*
> *have stated that Spain approves such suspension. These kind of public*
> *messages do not represent the position of Unión Fenosa Gas, are not*

---

[263] Letter from UFG (Jose María Egea Krauel and Cesare Cuniberto) to Minster of Petroleum (Osama Kamal), 21 September 2012, [C-0048].

[264] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to EGAS (Mohamed Shoeib), 9 October 2012, [C-0049].

[265] "Petroleum Minister: Gas exports to Jordan, Spain halted," *Egypt Independent*, [C-0286].

*accurate and may cause additional damages to SEGAS, UFG, and its shareholders,*

*In view of all the above and under the firm conviction that Your Excellency shall support an urgent action to resume Damietta LNG feed gas, we would like to request an urgent meeting with Your Excellency at the earliest convenience to address this matter.*[266]

5.251  *17 October 2012*: UFG again requests an urgent meeting with the Prime Minister of Egypt to discuss gas supply to the Damietta Plant.

*We are aware about the challenging current situation for the Petroleum and Electricity sector, but Damietta LNG Plant is one of the main consumers suffering curtailments, in opposition to other LNG export projects in Egypt which remain in continuous operation. This is despite of our continuous spirit of cooperation with the authorities of the Ministry of Petroleum, materialized in an agreement executed in November 2011, accepting a transient reduction of supply plus a significant increase in prices versus a commitment by Egas to receive a minimum feed gas volume on stable basis.*[267]

5.252  *27 October 2012*: GASCO orders SEGAS to stop consumption at the Damietta Plant:

*Reference to your received fax today [...] on the reasons to stop SEGAS plant gas consumption rate [...]*

*1. According to EGAS instructions.*

*2. Returning the electricity power stations and industrial consumers to their normal loads after the end of feast holiday period.*[268]

5.253  *1 November 2012*: EGAS writes to UFG denying any suggested discriminating conduct against UFG:

*I am grateful for the ongoing spirit of cooperation Unión Fenosa Gas and SEGAS have shown through their willingness to make accommodations in view of the unexpected and unavoidable circumstances EGAS continues to face. […] Additionally, your suggestion that EGAS has discriminated against Unión Fenosa Gas vis-à-vis its other industrial customers is misinformed, as numerous domestic and export-oriented customers of EGAS are also affected by the same difficulties. The Idku gas liquefaction*

---

[266] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Osama Kamal), 17 October 2012, [C-0050].
[267] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Prime Minister (Hesham Qandil), 17 October 2012, [C-0051].
[268] Fax from GASCO (Ahmed Sabry) to SEGAS (Plant Shift Leader), 27 October 2012 (23:45), [C-0247].

> *plant to which you refer is directly linked to a dedicated gas field and is therefore not in a comparable situation to the Damietta LNG Plant.*[269]

5.254  *6 November 2012*: UFG writes to EGAS, requesting a resumption of the feedgas supply to the Damietta Plant and reiterating its position that the Damietta Plant was being discriminated against:

> *We do appreciate the spirit of cooperation, and especially EGAS endeavor to maintain the supply to Damietta LNG Plant once the production was resumed on the 22nd of October. Unfortunately, SEGAS has received a request to stop production and operate the Plant in recycle mode, which cannot be sustained for long periods. Consequently, we shall appreciate Egas action to resume feedgas supply to Damietta LNG Plant soonest.*
>
> *Finally, we respectfully dispute your view that SEGAS/UFG is not being discriminated in comparison with other consumers, based on the longstanding reduction/suspension of our contractual supplies. We will have the opportunity to further explain our position to you in our forthcoming meeting.*[270]

5.255  *13 November 2012*: UFG meets with EGAS to discuss the resumption of gas supply to the Damietta Plant. At the meeting, UFG gives a presentation setting out the effect on its operations of the gas supply disruptions.[271]

5.256  *14 November 2012*: UFG meets with the Minister of Investment regarding the supply of gas to the Damietta Plant. In a later letter to the Minister, UFG describes the meeting:

> *During this meeting we had the opportunity to call your attention with regards to the current difficulties and extraordinary circumstances that our billionaire investment in Egypt [...] is facing due to shortage of gas and continuous and prolonged interruption of the supply.*[272]

5.257  *15 November 2012*: UFG notifies the Minister of Petroleum of EGAS' discriminatory treatment of UFG in the supply of gas to the Damietta Plant:

> *[W]e hereby call to your attention for the discriminatory treatment that the Egyptian Part is imposing on Damietta LNG Plant, which SEGAS is suffering in comparison with other gas consumers in Egypt, including both*

---

[269] Letter from EGAS (Sherif Sousa) to UFG (José Maria Egea and Cesare Cuniberto), 1 November 2012, [R-0315].
[270] Email from UFG (José María Egea Krauel) to EGAS (Sherif Sousa), 6 November 2012, [C-0053].
[271] UFG Presentation to EGAS, "UFG Project in Egypt: Meeting with EGAS Chairman," 13 November 2012, [C-0088].
[272] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Investment (Osama Saleh), 5 December 2012, [C-0052].

*domestic consumers and export projects. EGAS firm supply obligation has not being fulfilled while other customers are receiving gas* [...]

*It is needed to remind that this policy to favor ones in detriment of others is not only unfair but against the contractual framework and other international laws.*

*For the benefit of all parties we request for your active action to revert the current situation by clearly instructing EGAS to resume Damietta feed gas, attend SEGAS request in terms of cash needs and to order a pro-rata sharing of gas availabilities, all of it according to EGAS' contractual commitments.* […]

*[W]e stress our willingness to keep on cooperating with the Egyptian Authorities to overcome the current challenging situation looking for the long-term sustainability of our common project and we remain our offer to jointly prospect new solutions for the Petroleum Sector and help you in defining new strategies and measures to be implemented in connected sectors as electricity.* […]

*[Y]ou will be aware about the extreme urgency of the situation and the necessity of your prompt action and looking forward to meeting you soon.*[273]

5.258   *18 November 2012*: UFG expresses concerns to EGAS over EGAS' failure to supply gas at the Damietta Plant's minimum turn-down ratio, and its refusal to commit to doing so:

*I acknowledge receipt of your letter, however I must stress that the operational conditions imposed to the feedgas that I read in your letter are not compatible with stable continuous operation of the LNG plant* […]

*We received assurance from Egas that commencing mid November the plant will be fed with 350 mmscfd on continuous basis. We will co[m]mence the cooldown tomorrow, but we need to ramp up feedgas above to stable continuous operational threshold asap, and I request your support and understanding to achieve this.*[274]

5.259   *26 November 2012*: Reports concerning "delivered output" provided by SEGAS Services Operations Department show that the final shipment of LNG from the Damietta Plant occurred on 26 November 2012.[275]

---

[273] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Osama Kamal), 15 November 2012, [C-0054].

[274] Emails between UFG (Javier Sáez Ramirez) and EGAS (Ibrahim Abdel-Salam), 18 November 2012 [C-0039]; Email from UFG (Javier Sáez Ramirez) to (EGAS) Ibrahim Abdel-Salam, 18 November 2012, [C-0041]; attached Letter from EGAS (Ibrahim S. Abdel-Salam) to SEGAS (José Luis Torre), 18 November 2012, [C-0040].

[275] Liftings from Damietta, [NAV-048].

5.260   *27 November 2012*: UFG meets the Minister of Petroleum regarding gas shortages and prolonged supply interruptions to the Damietta Plant. This meeting is described in a later letter of 5 December 2012 from UFG to the Minister:

> *First of all let us express our sincere appreciation for your availability to meet us in Cairo, last 27th of November 2012 where we had the opportunity to call your attention with regard to the current difficulties and extraordinary circumstances that our investment in Damietta LNG Plant is facing due to the shortage of gas and prolonged interruption of the supply.* [276]

5.261   *1 December 2012*: GASCO orders SEGAS to operate the Damietta Plant in recycle mode, citing priority in supply for the electricity sector.

> *In addition, due to the low pressure within the national gas grid and to maintain supplying electricity power stations with natural gas, please be informed to adopt SEGAS plant on the recycle mode operation for four hours period starting from now 17:05.* [277]

5.262   *8 December 2012*: EGAS stops providing gas to the Damietta Plant. The Damietta Plant suspends LNG production due to EGAS' failure to deliver gas. Mr Sáez Ramírez (of UFG) testified that:

> *We visited* [Osama Kamal, Minister of Petroleum] *again on November 27, 2012, after meeting with the Ministry of Investment on November 14. At that time, the Plant had been running again for a few weeks, even if at very low capacity and in a very unstable mode. Unfortunately, supply stopped again completely a few days later, and by late November 2012 production at the Plant had to be suspended again. We were able to deliver only two LNG cargoes in November and December 2012, but soon thereafter EGAS requested that the Plant be shut down again. In December 2012 and January 2013, with the Plant completely stopped, EGAS stopped responding to UFG's inquiries and requests for gas.* [278]

5.263   *08 December 2012:* Mass public protests take place at the Presidential Palace in Cairo, demanding the resignation of President Morsi. [279]

5.264   *10 December 2012*: UFG writes to Minister of Petroleum to follow up on EGAS' interruption of the feedgas supply to the Damietta Plant:

---

[276] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Osama Kamal), 5 December 2012, [C-0046].
[277] Fax from GASCO (Ahmed Sabry) to SEGAS (Plant Shift Leader), 1 December 2012 (17:09), [C-0056].
[278] Sáez Ramírez WS1, Paragraphs 25-26.
[279] R. Abdellatif, "Egypt protestors demand that Mohamed Morsi step down," *Los Angeles Times* (8 December 2012), [R-0158].

*I write you further to our letter dated 5th of December to underline the critical situation that our joint company SEGAS is facing as a consequence of the lack of feedgas supply to Damietta LNG Plant.*

*As we have extensively discussed in our last meeting, we have the urgent need to (i) assure a minimum number of cargoes produced by the LNG Plant during the coming months and (ii) implement a remedy plan to assure the compliance with financial commitments of the Company and to be submitted to the Lenders for approval before the end of December 2012, in order to avoid a Default under SEGAS Financial Agreements.*

*We also informed Your Excellency about the status of the conversations with EGAS/EGPC, including the outcome of SEGAS General Assembly held on 28th November to propose a remedy plan. [...]*

*As Your Excellency knows, feed gas to Damietta LNG Plant is currently interrupted by EGAS/EGPC and we have not received any feed back in reference to the planned resumption of supply. […]*

*We have further received strong pressure by the Lenders urging SEGAS to update them with respect to the progress of the Remedy Plan, and at the same time we have tried without success to contact EGAS' representatives to understand the status of the matters under discussion.*

*In view of the critical situation SEGAS is facing, we gently reiterate the urgent need in solving this matter [...] and we request your prompt action and support to achieve these goals.*[280]

5.265   *12 December 2012*: UFG expresses concerns to EGAS over SEGAS' operations and discrimination, and about payments to lenders due to suspension of feedgas.

*As you know, feed gas to Damietta LNG Plant was suspended by EGAS/EGPC from July to the end of October and, despite EGAS commitment to supply 350 mmscfd from mid November of 2012 until April 2013 [...] SEGAS has not been able to resume stable production due to shortage of gas and we have received several petitions from GASCO and EGAS to operate in recycle mode and finally to stop production.*

*I would like to take this opportunity to stress how UFG and SEGAS operations are being jeopardized by EGAS and EGPC due to shortfall of gas, the damages that we are suffering due to the suspension of feedgas supply, the financial risks that SEGAS is undertaking and the urgency to restore the feedgas supply to allow to continue operations and avoid any eventual default in front of Lenders and its dramatic consequences for all parties involved.*

*Moreover, we understand from different sources that other Egyptian LNG facilities are currently producing at higher rates than SEGAS in 2012 and other pipeline export project is currently receiving feedgas [...] Finally, in*

---

[280] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Osama Kamal), 10 December 2012, [C-0061].

> *order to minimize the damages we are sustaining, we would like to request*
> *your cooperation to restart Damietta LNG plant production, assuring*
> *that EGPC/EGAS available gas is shared equitably between the*
> *different consumers.*[281]

5.266  *12 December 2012*: UFG expresses concerns to EGAS and EPC over the gas supply situation and demands of EGPC and EGAS that there be a Shareholders' Meeting for SEGAS.

> [L]*et us remind you of the extremely severe situation in which SEGAS is*
> *currently in and the need to agree on a Remedy Plan on an urgent basis.*
> *As you may recall, the submission of the Remedy Plan before 31 December*
> *2012 is one of the obligations assumed by SEGAS before the Lenders*
> *under the waiver negotiated during the last weeks.  In addition to this, the*
> *Remedy Plan is also a condition to avoid a default under the finance*
> *contracts and the multiple consequences that such default would carry for*
> *SEGAS, EGAS and UFG as well as for Egypt and its reputation towards*
> *international banks* [...]
>
> [P]*lease revert on an urgent basis with a proposed date for holding*
> *SEGAS Shareholders' Meeting.*[282]

5.267  *13 December 2012*: GASCO requests that SEGAS stop the use of natural gas at the Damietta Plant so as to ensure the safety of the Plant and electricity power stations, until further notification:

> *Reference to our last fax* [...] *requesting to stop SEGAS plant completely*
> *from using natural gas owing to Gas Grid low-pressures, please be*
> *informed that till the moment SEGAS plant is still taking natural gas.  Thus,*
> *we argue your cooperation and understanding to the situation of non-*
> *taking any gas quantities at all even though as fuel, to ensure safety to*
> *your plant and electricity power stations until further notification of using*
> *natural gas.*[283]

5.268  *December 2012*: EGAS stops paying SEGAS accrued Toll-or-Pay fees under the EGAS Tolling Contract:

> *As of January 2013, we understand that US$ 22.6 million of the 2011 Toll-*
> *or-Pay amounts remained to be collected as did the entire 2012 amounts.*
> *An additional US$ 9 million was invoiced in 2013, but we understand that*

---

[281] Letter from UFG (Javier Sáez Ramírez) to EGAS (Ibrahim Qenawy), 12 December 2012, [C-0062].
[282] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to EGPC (Hany Dahy) and EGAS (Sherif Sousa), 12 December 2012, [C-0063].
[283] Fax from GASCO (National Gas Control Center General Manager) to SEGAS (Plant Shift Leader), 13 December 2012 (13:57), [C-0060].

> *EGAS has continued to withhold payment. As of June 2015 EGAS has not paid any additional Toll-or-Pay amounts.*[284]

**2013**

5.269 *27 January 2013:* President Morsi declares a state of emergency in Port Said, Suez and Ismailia after violent clashes leaving many dead and injured.[285]

5.270 *29 January 2013*: UFG issues its notice of an investment dispute under the Treaty to the Respondent. It provides (*inter alia*) as follows:

> *UFG directly and indirectly owns and controls significant investments in the gas industry in Egypt, relating to the Damietta natural gas liquefaction plant [...] UFG's investments in Egypt are suffering significant harm as a result of the Republic's decision to cut the supply of natural gas to the Damietta LNG Plant, which has resulted in substantial reductions in operations and in the Plant's shut-down for lack of the necessary gas supply. UFG is hopeful that this dispute can be promptly resolved through amicable negotiations, but it reserves all legal rights, including those under the Treaty.*

> *UFG has already made substantial efforts to negotiate in good faith with the Government, the Ministry of Petroleum, and [...] EGAS and [...] EGPC, Egypt's State-owned entities, in order to resolve the problem of the gas supply to the Damietta LNG Plant. UFG's willingness to solve the dispute is amply evidenced, for instance, by the numerous agreements reached with the State-owned entities, addressing,* inter alia, *repeated natural gas price increases that EGAS and EGPC requested beyond the originally-agreed contractual terms [...] UFG has constantly accommodated EGAS and EGPC's requests with a view to continuing its now more-than-a-decade-long relationship with Egypt.*[286]

5.271 *4 February 2013*: EGAS asserts that the Egyptian revolution and the Global Financial Crisis constitute a situation of *force majeure*:

> *As you are well aware, however, several extraneous factors such as the continuing social and political instability in Egypt as well as the ensuing economic crisis have led to operational difficulties and an unforeseeable decrease in the supply of available natural gas. In fact, such is the extent of these circumstances that they have, for some time, affected our ability to perform our different gas sales agreements, including the SPA, and fall*

---

[284] Expert Report of Brent C. Kaczmarek and Kiran P Sequeira, Paragraph 86, Footnote 102; citing SEGAS statement of EGAS Tolling Fees and Reconciliation, 2012-2015, [NAV-115].

[285] A. Haublohner, "Egypt's Morsi declares state of emergency, curfew after deadly clashes," *The Washington Post* (27 January 2013), [R-0164].

[286] Notice of Dispute sent by UFG (José María Egea Krauel and Cesare Cuniberto) to the Government of Egypt (President Mohamed Morsi), 29 January 2013, [C-0005].

*within the meaning of the force majeure provision provided for in Article 15 thereof.*[287]

5.272   *24 February 2013*: EGAS sends to UFG a notice of *force majeure* under the SPA:

> *We write [...] regarding the continued situation of force majeure which EGAS has been facing.  We note that UFG (i) claims to be* 'surprised' *that the current situation in Egypt has disrupted EGAS's ability to perform the SPA.  We further note that UFG alleges that EGAS (ii) has chosen to divert gas away from UFG as a result of a 'change in market conditions', (iii) discriminated against UFG and (iv) did not provide a valid notice of force majeure.  We reject all these allegations […]*[288]

5.273   *20 March 2013*: Unión Fenosa's Board holds a meeting to discuss the situation in Egypt.[289]

5.274   *27 March 2013*: The Minister of Petroleum announces an increased gas supply to electricity generating power plants. This is reported in the news media:

> *Eng. Osama Kamal, Petroleum minister, announced that it has decided to increase equivalent natural gas supplies to power plants by 10% during the next two months to face electrical load.*[290]

5.275   *9 April 2013*: The Ministry of Petroleum announces a meeting between UFG and EGAS officials to discuss the non-supply of gas to Damietta Plant. The media reports:

> *Petroleum ministry sources confirmed that EGAS officials will hold a meeting with officials at the Spanish Unión Fenosa next Wednesday in order to discuss the current situation after halting natural gas supplies to UFG, the theme that drove UFG to allude to file international arbitration against Egypt.  The source excluded UFG's resorting to international arbitration over the strong ties between* [the] *petroleum sector and UFG.*[291]

5.276   *11 April 2013*: SEGAS files a Request for Arbitration against EGAS under the EGAS Tolling Contract. (This is to become the ICC Arbitration ICC 19382/MD/TO).

> *This dispute arises out of EGAS' failure to pay amounts due under the EGAS Tolling Contract.  […]  Under the EGAS Tolling Contract, SEGAS agreed to make liquefaction capacity available at the Plant and EGAS*

---

[287] Letter from EGAS (Sherif Sousa) to UFG (Javier Sáez Ramírez), 4 February 2013, [C-0429].
[288] Letter from EGAS (Sherif Sousa) to UFG (José María Egea Krauel and Cesare Cuniberto), 24 February 2013, [R-0365].
[289] Minutes of the Meeting of the Board of Directors of the company Unión Fenosa, S.A, 20 March 2013, [R-0353].
[290] "Gas supplies to power plants increased by 10%,"*Al Wafd* (27 March 2013), [C-0253].
[291] "EGAS holds a meeting with Unión Fenosa to convince UFG not to resort to international arbitration," *Daily Press Report* (undated), [C-0295].

*agreed to use that capacity by supplying natural gas ('Gas') to the Plant for liquefaction and taking the LNG produced pursuant to a tolling scheme. […] Throughout the term of the Tolling Contract, EGAS has failed consistently to comply with its obligations to supply Gas in such quantities corresponding to its liquefaction rights. […] EGAS has [also] failed to pay in full the 2010/2011 [Toll or Pay] Amount […] the 2012 [Toll or Pay Amount] […] [and] Tolling Fees for liquefaction services provided in November 2012.*[292]

5.277   *19 April 2013*: ENI-appointed UFG board members file a claim against other board members before the Commercial Court of Madrid:

*As a result of the situation of acute civil strife in Egypt since January 2011 due to the sudden emergence of the 'Arab Spring' in that country, which eventually led to the ouster of President Mubarak, the economic crisis has worsened unrelentingly and this has led to, among other things, a slowdown of foreign direct investment in Egypt's energy sector with the consequent deterioration in gas extraction and production capacity. […] The infringement by the defendant Directors of the rules in matters of conflict of interest is far from an insignificant or purely theoretical issue, because the harm which this involves for UFG to maintain the current situation is extremely serious.*[293]

5.278   *17 May 2013*: UFG files a Notice of Arbitration with the Cairo Regional Centre for International Commercial Arbitration. (This is to become the CRCICA Arbitration Case 896). The Notice of Arbitration provides a summary of the dispute:

*This dispute concerns EGAS' contractual breach by failing to follow a price adjustment procedure with respect to gas delivered to UFG under the SPA. The Parties adopted the price adjustment procedure when they entered into a Heads of Agreement (the 'HOA') dated November 23, 2011, which amended – for a temporary period – certain of their obligations under the SPA. The SPA requires EGAS to deliver, and UFG to receive and pay for, certain volumes of natural gas at the Damietta LNG Plant in Damietta, Egypt (the 'Plant'), for processing and conversion into liquefied natural gas ('LNG'). The HOA sets forth, inter alia, a revised pricing formula for natural gas delivered by EGAS to UFG during a certain period ('the transient period'), extending from January 1, 2011, until September 30, 2013 (with the possibility of extension thereafter).*[294]

5.279   *30 May 2013*: UFG files a second Notice of Arbitration with the Cairo Regional Centre for International Commercial Arbitration. (This is to become the CRCICA Arbitration Case 899). The dispute is summarised in this Notice as follows:

---

[292] *Spanish Egyptian Gas Company, S.A.E. v. Egyptian Natural Gas Holding Company*, ICC Case No. 19392/MD/TO, Request for Arbitration, [R-0046].

[293] *Rinaudo, et al. v. Unión Fenosa Gas, S.A., et al.*, ENI Directors' Statement of Claim, [R-0354].

[294] *Unión Fenosa Gas, S.A. v. Egyptian Natural Gas Holding Company*, CRCICA No. 896/2013, Notice of Arbitration, [R-0045], Paragraph 2.

> *This dispute concerns EGAS' breach of the SPA by failing to deliver natural gas to UFG under that Contract.   The SPA requires EGAS to deliver, and UFG to receive and pay for, certain contractually agreed volumes of natural gas at the Damietta LNG Plant in Damietta, Egypt (the 'Plant'), for processing and conversion into liquefied natural gas ('LNG'), which UFG subsequently lifts. Under the SPA, EGAS committed to supply up to the maximum amount of natural gas needed for the nominal capacity of the Plant.*[295]

5.280   *June 2013*: EGAS' Chairman discusses a "strategy" of prioritising the domestic market in its Annual Report:

> *The strategy of Egyptian petroleum sector focuses on the local market demand and gives it absolute priority.*[296]

5.281   *03 July 2013:* President Morsi is deposed by Egyptian military forces and placed under house arrest; and the Constitution is suspended.[297]

5.282   *16 July 2013:* General El-Sisi becomes Deputy Prime Minister and Minister of Defence.[298]

5.283   *14 August 2013*: Egypt declares nationwide state of emergency:

> *The state of emergency and curfew had been due to last a month from August 14, but the government extended it for two more months on September 12.*
>
> *Some 250 members of the security forces have been killed since* [July 3]*.*[299]

5.284   *August 2013*: Egypt's energy policy is characterised by industry commentators as "political":

> *Surging domestic energy consumption has meant the government has been forced to divert a growing share of its natural gas production to the domestic market, where low domestic, rather than high international prices are paid.*
>
> *While rational from an immediate political point of view, the choice to divert more gas into the domestic sector is highly problematic from an*

---

[295] *Unión Fenosa Gas, S.A. v. Egyptian Natural Gas Holding Company*, CRCICA No. 899/2013, Notice of Arbitration, [R-0044], Paragraph 2.
[296] EGAS Annual Report 2012-2013, Chairman's Message, [C-0351].
[297] B. Wedeman, R. Sayah, M. Smith, "Coup topples Egypt's Morsy; deposed president under 'house arrest'," *CNN* (4 July 2013), [R-0171].
[298] "Egypt turmoil: Interim cabinet sworn in," *BBC News* (July 16, 2013), [R-0173].
[299] Y. Saleh, "Egypt court rules post-Morsi state of emergency ended," *Reuters* (12 November 2013), [R-0179].

> *economic point of view, where the real value of Egyptian gas lies in its export.*[300]

5.285 *September 2013*: UFG meets the Minister of Petroleum regarding the proposed Transient Agreement (described below). This meeting is referred to in a later letter dared 8 November 2011 from UFG to the Minister:

> *We would like to commence by stressing the importance of your participation in the process* [...] *As your Excellency noted during our last meeting in Cairo in September, a new stage in the Project commences, and we are prepared to work together with our Egyptian Partners under the steer of Your Excellency to bring additional value to all stakeholders by maximizing the utilization ratios of the Plant and increasing our gas intake during the Transient Period and beyond.*[301]

5.286 *29 October 2013*: EGAS and UFG execute the Transient Agreement of 29 October 2013 to restart gas supply to the Damietta Plant in an attempt to resolve their differences relating to EGAS' failure to supply gas to the Damietta Plant.[302] Because the Transient Agreement postpones some of EGAS' delivery obligations to later dates, it requires EGAS to deliver only gas sufficient to produce two LNG cargoes during the last two months of 2013, as well as to make certain payments for outstanding Toll-or-Pay Fees. It provides (*inter alia*):

> *Article 4(II):* [T]*he Settlement Schedule under section I of this article does, not affect UFG's right to receive the quantities of NG to which UFG would be entitled under the UFG Contracts from the beginning of the SPA until the end of the Ramp Up Period to the extent that these quantities of NG shall become Total Lost Quantities pursuant to the HOA, including Article 3 thereof.*[303]

5.287 On the same day, EGAS and SEGAS execute the Transient Agreement (the "Transient Agreement") to resume Toll-or-Pay Payments under the EGAS Tolling Contract:

> *Article 2: The Purpose of this SEGAS Transient Agreement is: (i) to allow SEGAS to fulfil its minimum financial commitments in view of its current financial situation; (ii) to settle all currently outstanding dues owed to SEGAS by EGAS in respect of its toll-or-pay and tolling fee obligations.*[304]

---

[300] "Egypt's Energy Trap," *Egypt Oil & Gas* (August 2013), [C-0399].
[301] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 8 November 2013, [C-0313].
[302] Transient Framework between EGAS and UFG, 29 October 2013, [C-0064].
[303] Transient Framework between EGAS and UFG, 29 October 2013, [C-0064].
[304] Transient Agreement between EGAS and SEGAS, 29 October 2013, [C-0065].

5.288   *31 October 2013*: EGAS confirms that it has obtained the requisite approvals of the Transient Agreement from EGAS' governing bodies.

> *I hereby write to inform you, pursuant to Article 1.III of the SEGAS Transient Agreement dated 29 October 2013 ('SEGAS Transient Agreement'), that EGAS has obtained all necessary approvals from the respective governing bodies in connection with the SEGAS Transient Agreement.*[305]

5.289   *7 November 2013*: EGAS informs UFG of the commencement date for gas deliveries to the Damietta Plant pursuant to the Transient Agreement:

> *Further to the UFG Transient Agreement signed on 29th October 2013 (hereinafter referred as the 'Agreement') and to the Delivery Schedule 2013 agreed between the Parties as per article 3 of the Agreement which agreed and signed on 29th October 2013 and to your letter dated on 6th November 2013, we would like to confirm that the commencement day of deliveries of Gas to start up operations will be 8th November 2013 @ 06:00 AM.*
>
> *In this respect [...] we firmly stress you and SEGAS to communicate and follow all information that will be issued by GASCO to avoid any problems in the National Grid.*[306]

5.290   *8 November 2013*: UFG expresses its appreciation to the Minister of Petroleum for participating in the negotiation for the Transient Agreement, stressing the importance of the Minister's "participation in the process":

> *We would like to commence by stressing the importance of your participation in the process [...]*
>
> *As your Excellency noted during our last meeting in Cairo in September, a new stage in the Project commences, and we are prepared to work together with our Egyptian Partners under the steer of Your Excellency to bring additional value to all stakeholders by maximizing the utilization rations of the Plant and increasing our gas intake during the Transient Period and beyond.*
>
> *On a personal note, we are convinced that the decided contribution of Your Excellency and EGAS Chairman have been key to reach these agreements that, as they are implemented, will assure the future of our Joint Project.  For that we would like to transmit to Your Excellency and*

---

[305] Email from EGAS (Taher Abdelraheem) to SEGAS, Approval Notification – SEGAS Transient Agreement, [C-0483].
[306] Letter from EGAS (Khaled Abdel Badie) to UFG (Ignacio de la Peña), 7 November 2013, [C-0066].

> *EGAS Chairman our highest appreciation, making ourselves available at your earliest convenience to meet Your Excellency.*[307]

5.291   *11 November 2013*: A former head of EGAS confirms that the oil industry was not impacted by the Egyptian revolution:

> *Engineer, oil expert and managing director of Citadel Group energy department Mohammed Shoaib says the only industry unaffected by events in Egypt following the January 25th revolution may be the oil industry. This is due to work sites and oil fields being located far from unrest, meaning that production did not stop at any of Egypt's oil fields throughout the period of instability, he said.*[308]

5.292   *12 November 2013*: SEGAS writes to EGAS and requests a ramp up of feedgas from EGAS in order to resume LNG production under the Transient Agreement:

> W*e would like to thank you for the support given to us during the past four days while we were conducting the re-commissioning of SEGAS Plant.* [...]
>
> *We thank you in advance for your support and we will keep waiting for your confirmation at earliest to proceed.*[309]

5.293   *12 November 2013*: EGAS refuses SEGAS' request to ramp up feedgas in order to resume LNG production under the Transient Agreement.

> *Pls be informed that the current status of the national gas grid now does not support your request to load Segas plant tomorrow as per your request, as we encountered several unforeseen major problems with the gas production flow rate to the grid in the past few days where you can notice the effect of that on the drastic reduction in the grid pressure in general and particularly in front of Segas plant at* [Damietta] *where the grid pressure dropped from about 50 bar to about 33 bar.*[310]

5.294   *12 November 2013*: UFG reiterates the supply commitments made by EGAS under the Transient Agreement; UFG rejects the application of any conditions to EGAS' supply commitments, including the prioritisation of the functioning of the National Grid:

> *Reference is made to the UFG Transient Agreement dated October 29th, 2013* [...] *To such regard UFG would like to state as follows:*
>
> *i. In accordance with Article 3 of the Transient Agreement, the Parties have agreed [on] a Delivery Schedule for the year 2013* [...]

---

[307] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 8 November 2013, [C-0313].

[308] "Oil expert Mohammed Shoaib:  Petroleum production and refinement operations unaffected by events after January 25 Revolution," *Al Borsa* (11 November 2013), [C-0376].

[309] Email from SEGAS (José Luis Torre) to EGAS (Khaled Abdel Badie), 12 November 2013 (11:57), [C-0067].

[310] Email from EGAS (Khaled Abdel Badie) to SEGAS (José Luis Torre), 12 November 2013 (12:43), [C-0068].

*ii. SEGAS' request to ramp up feed gas ratios from current feedgas rate [...] has to be attended by EGAS to as to assure start-up operations in accordance with the Delivery Schedule and the Transient Agreement.*

*iii. [...] [A]fter start up operations EGAS is under an undertaking to supply to UFG sufficient NG to ensure that UFG will lift no less than one cargo in November 2013. The NG has to be supplied by EGAS at the rate of no less than 335 mmscfd for a continuous period of at least 12 days in November 2013.*

*iv. EGAS' obligations under the Transient Agreements are not subject to the conditions, status or functioning of the National Grid and EGAS is obliged to take all necessary actions to ensure full compliance with such obligations.*[311]

5.295  *14 November 2013*: UFG requests delivery of feed-gas in accordance with the terms of the Transient Agreement:

*SEGAS is ready (and request to) start ramp up [...] as [...] agreed in the Delivery Schedule for the year 2013 [...]*

*EGAS has the obligation to provide sufficient NG to cover this ramp up from today, November 14th, 2013.*

*As you should know Damietta LNG Plant is in an unstable situation and ramp-up process has to continue as agreed in the Delivery Schedule [...] without delay or interruption.*

*EGAS ['] obligations under UFG Transient Agreements are not subject to the conditions, status or functioning of the National Grid and EGAS is obliged to take all necessary actions to ensure full compliance with such obligations being, in terms of LNG Cargoes, only 2 loadings in 2013 and 6 in 2014.*

*In line with all [of the] above we strongly request EGAS to provide NG for such ramp-up operation [...] Finally let me stress that EGAS['] unfulfillment of its obligations under* [the] *UFG Transient Agreement [...] constitutes a breach of* [the] *UFG Transient Agreement"*[312]

5.296  *14 November 2013*: EGAS requests a reduction of feedgas consumption by the Damietta Plant:

*Ref. to our telecom this morning pertaining* [to] *the current gas grid condition, and as we were suffering this week from several major production facilities shut down ending with* [Burullus] *s/d this morning whereby the grid pressure now is in the lowest operable condition which does not support at all the plant loading as per the agreed schedule.*

---

[311] Email from UFG (Ignacio de la Peña Zarzuelo) to EGAS (Khaled Abdel Badie), 12 November 2013, [C-0069].

[312] Letter from UFG (Javier Sáez Ramírez) to EGAS (Khaled Abdel Badie), 14 November 2013, [C-0070].

> *In this* [sic] *circumstances please refrain from loading up the plant as that will cause the full collapse of the national gas grid pressure.*

> [Y]*ou will be notified as soon* [as] *the grid condition get* [sic] *improved to retry the plan operation sequence again.*[313]

5.297   *15 November 2013*: EGAS announces the shutdown of the Damietta Plant, by an email message to Mr Sáez Ramírez of UFG:

> *As per my telephone call with Jose now, we are going to shut down the Damietta LNG plant at 1 pm.   We are recommending to meet early next week to re-evaluate the situation and decide when we are going to restart."*[314]

5.298   *15 November 2013*: UFG proposes a revised delivery schedule for feedgas supply under the Transient Agreement:

> *We write you further to the UFG Transient Agreement* [...] *your phone call and your request to re-schedule the November 2013 Program for Damietta LNG Plant.   We would like to record our idea for the path forward and the production of the November LNG Cargo under the Agreement.* [...]

> *Please confirm by return email your acceptance and if so, please send us back a copy of the attachment executed.   For the avoidance of doubt, unless we both sign a new amended delivery schedule comprising November cargo, we consider the current agreed Delivery Schedule as enforceable.*[315]

5.299   *15 November 2013*: EGAS requires the shutdown of the Damietta Plant:

> *Please be informed that we accept to shut down today at 19:30. The plan for restart will be discussed with you as explained in my call with you this morning in a similar conference call on Sunday.   By that time we will have better view of the grid situation.*[316]

5.300   *15 November 2013*: UFG rejects EGAS' request and seeks information on the start-up and rescheduling of EGAS' supply commitments:

> *UFG does not agree to suspend the start up operations of the LNG Plant today without knowing precisely when such start up operations will recommence.   The UFG Transient Agreement requires that EGAS supplies the NG necessary to assure that UFG has a full LNG cargo available in*

---

[313] Email from EGAS (Khaled Abdel Badie) to UFG (Jose Luis Torre), 14 November 2013 (12:00), [C-0071].

[314] Email from EGAS (Taher Abdelraheem) to UFG (Javier Sáez Ramírez), 15 November 2013 (8:24), [C-0074].

[315] Email from UFG (Javier Sáez Ramírez) to EGAS (Taher Abdelraheem), 15 November 2013 (12:24), [C-0075].

[316] Email from EGAS (Taher Abdelraheem) to UFG (Javier Sáez Ramírez), 15 November 2013 (15:31), [C-0076].

*November, and to do it in accordance with an agreed Delivery Schedule. EGAS shall avail the necessary gas to support this commitment.*

*We have worked out a […] possible path forward to address your operational request within the contractual framework of the Transient Agreement, but the precise terms of the Delivery Schedule for the November Cargo have to be established today if the start up sequence is going to be interrupted.*[317]

5.301   *15 November 2013*: EGAS informs SEGAS that the gas grid pressure is critical and that partial blackouts occurred as a result of SEGAS' non-compliance with EGAS request to reduce consumption:

*The pressure now* [in] *the gas grid is very critical and it gets more worst every hour especially during night time where the electricity peak start,*

*Yesterday we were trying to recover the grid pressure but we failed mainly as a result of Segas non compliance with our request to reduce the current gas consumption of Segas plant (as Segas plant now is the biggest gas consumer from the gas grid), and as a result of that further reduction in the gas grid pressure took place.* [...]

*Despite of that, and in order to try to recover the gas grid pressure today Segas we asked to perform temporally normal and controlled stop to the plant for a while by going to recycle mode [...] in order to fix the gas grid low pressure problem and resume the grid normal pressure but again Segas didn't comply with gasco gas grid control center and that caused further affect on the power stations during peak time with relevant partial black out in some districts today*[...]  [G]*as grid pressure is expected to collapse in any time and that will dramatically negatively affect all the consumers and power stations in the area* […][318]

5.302   *16 November 2013*: UFG reiterates its offer to EGAS to revise the delivery schedule under the Transient Agreement:

*Dear Khaled,*

*As you know, Ufg has offered Egas to re-program the agreed delivery schedule to support your request to shutdown* <u>*today,*</u> *coupled with the requirement to Egas to commit to a date to resume the start up operation (proposed 19th nov).*

*To date, ufg has not concluded any agreement to amend* [N]*ovember delivery schedule, but we remain at your full disposal to discuss such*

---

[317] Email from UFG (Javier Sáez Ramírez) to EGAS (Taher Abdelraheem), 15 November 2013 (16:16), [C-0077].
[318] Email from EGAS (Khaled Abdel Badie et al.) to SEGAS (José Luis Torre) 15 November 2013 (23:53), [C-0078].

*delivery schedule in terms compliant with our contractual transient agreement.*[319]

5.303  *16 November 2013*: EGAS asks UFG to cooperate with its efforts to avoid the risk of a sudden gas grid pressure drop:

> [I] *think you feel the serious situation that we are all currently encounter, i am fully understand your contractual point of view as mentioned in your mail below, however we are now in a middle of action and we need to take decisions on the ground to rescue the gas grid in order to be restored again and then we can sit and appraise the situation and you can agree with Egas on whatever you will conclude with them.*
>
> *Meanwhile, please help me now to fix this situation for the sake of all of us including Segas plant to avoid the risk of sudden gas grid pressure drop in the area which can take place in any time and at that case the situation will be out of control especially that we will start the first working day of the week after few hours where additional consumption loads is expected with relevant further gas pressure reduction in the grid is expected as well.*[320]

5.304  *16 November 2013*: EGAS requests UFG to stop the Damietta Plant.[321] On the same date, EGAS informs UFG of a new emergency situation.[322]

5.305  *16 November 2013*: UFG announces the shutdown of the Damietta Plant:

> *Further to Egas request and telecom this morning, Segas* [LNG] *plant will suspend the start up operations. As per agreement, tomorrow Sunday at 10 hrs Cairo time we will hold a teleconference to confirm the new delivery program as per yesterday's UFG proposal, and including Egas comments, but, as agreed, in all circumstances assuring that sufficient NG will be availed to produce UFG November 2013 LNG cargo.*
>
> *Our proposal from yesterday included both stopping plant and set*[t]*ing a recom*[m]*encement date for the start up process.*[323]

5.306  *19 November 2013*: UFG requests the terms of a revised delivery schedule from EGAS:

> *It is a matter of fact that: i) EGAS is now not in the position to fulfill one of its essential obligations under Article 3.1 of the UFG Transient Agreement, which is to supply at least 12 days of continuous feedgas @ the minimum*

---

[319] Email from UFG (Javier Sáez Ramírez) to EGAS (Khaled Abdel Badie) 16 November 2013 (1:48), [C-0079].
[320] Email from EGAS (Khaled Abdel Badie) to UFG (Javier Sáez Ramírez) 16 November 2013 (5:01), [C-0080].
[321] Email from EGAS (Taher Abdelraheem) to UFG (Javier Sáez Ramírez), 16 November 2013 (6:48), [C-0081].
[322] Email from EGAS (Khaled Abdel Badie) to UFG (Javier Sáez Ramírez), 16 November 2013 (8:04), [C-0082].
[323] Email from UFG (Javier Sáez Ramírez) to EGAS (Taher Abdelraheem) 16 November 2013 (9:55), [C-0187].

*rate of 335 mmscfd during November and ii) neither has EGAS met its commitment with reference to the Delivery Schedule for the year 2013 in order to supply the minimum NG necessary to ensure start-up operations [...]*

*[O]nce the Delivery Schedule is agreed between the Parties with such short notice, that becomes a no-return point in which UFG can neither re-schedule nor re-consider its obligations mid- and downstream, and all of them bring us direct costs without any possibility to be mitigated.*

*Currently, EGAS has suspended any operational communication and despite the urgency and gravity of the situation, we do not have any detailed information from your side about EGAS' plans to resume production [...]*[324]

5.307   *24 November 2013*: The Minister of Petroleum (Mr Sherif Ismail) states that local market needs take priority over supply to the Damietta Plant. Local media reports:

*In terms of the current international arbitration lawsuit with the Spanish Unión Fenosa; Sheref Ismail said that we should first cover local market's needs from natural gas, pointing out that the agreement with UFG is a long term agreement that will last for more than 15 years so we have the opportunity to find a solution.  He added that minister of petroleum currently negotiates with UFG to reach an agreement that satisfies all parties, but first we have to cover local market's needs.*[325]

5.308   *24 November 2013*: UFG submits to EGAS a notice of intent to terminate the Transient Agreement:

*Pursuant to Article 3 of the UFG Transient Agreement, EGAS undertook to supply to UFG NG to ensure that UFG will lift at least one (1) LNG Cargo in November 2013 and at the rate of no less than 335 million standard cubic feet per day, in order to enable the Damietta LNG Plant to operate for a continuous period of at least 12 days per Calendar Month, not allowing the operative and material conditions to lift the November LNG Cargo.*

*As at November 24, 2013, EGAS has failed to comply with its delivery commitments under the UFG Transient Agreement.*

*In accordance with Article 5.III of the UFG Transient Agreement, EGAS has a period of thirty (30) days since the date this Notice of Intent to Terminate is received to come into compliance with the abovementioned obligations [...] Failure to comply with such obligations after the 30 days'*

---

[324] Letter from UFG (Ignacio de la Peña) to EGAS (Khaled Abdel Badie), 19 November 2013, [C-0083].
[325] "Petroleum minister: Butane distribution to be revised," *Al Gomhouria*, 24 November 2013, [C-0280].

*period shall entitle UFG to exercise its right to terminate the UFG Transient Agreement.* [326]

5.309  *26 November 2013*: UFG meets the Minister of Petroleum and the chairman of EGPC and EGAS regarding the termination of the Transient Agreement. The outcome of the meeting is referred to in a letter of 5 December 2013 from UFG to EGAS:

> *We write you further to the meeting that, together with the Chairman of EGPC and the Chairman of EGAS, we held with Your Excellency on November 26th at the Ministry's premises* [...]

> *Our meeting with Your Excellency of November 26th takes place at a very difficult instance, after EGAS failed to deliver natural gas for the production of at least one LNG cargo during November.  [S]uch obligation was unconditional under the Transient Agreement* [...]

> *EGAS' unapologetic refusal to comply with the Agreement less than a month after its entry into force is astonishing.  We note, in this context, your equally distressing statement during our meeting on November 26th that Egypt will in fact not comply with its obligations in the near future.*

> *We have listened to your explanations during the meeting but, although we appreciate any efforts that the Petroleum Ministry and EGAS may have made to obtain the minimal quantities of gas during the short time of the LNG Plant's cooldown, we cannot accept your assertion that the reason not to supply feedgas to the LNG Plant was the need to prioritize the available gas to other customers which cannot be curtailed.  It is clear to us that the reason for shutting down the Damietta LNG Plant has been the deliberate decision to discriminate, once more, against UFG by directing available natural gas to the rest of the consumers (exports to Jordan, exports of LNG in the other Egyptian export project, all industrial and petrochemical customers, including exporters of industrial and petrochemical products and gas-based power generation).* [327]

5.310  Mr Egea Krauel testified about this meeting in his written evidence, as follows:

> *My colleagues and I went to Cairo and met with Sherif Ismail (who had now become Minister of Petroleum), Taher Abdelraheem (Chairman of EGAS) and Sherif Hadara (Chairman of EGPC) on November 26, 2013, approximately ten days after we were forced to shut down the Damietta LNG Plant.  Minister Ismail and Mr Abdelraheem apologized for EGAS's failure to meet its supply commitments.  They explained that they had faced some diminution in gas production.  Minister Ismail said that he could not stop supply to electricity generators and fertilizer producers and thus had to stop supplying UFG.  He said that he had received phone calls*

---

[326] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to EGAS (Taher Abdelraheem), 24 November 2013, [C-0084/C-0315].
[327] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 5 December 2013, [C-0085].

*from the Ministers of Electricity and Industry asking him not to shut down supply to power generators and the industrial consumers.   This explanation (which had nothing to do with the alleged 'national security' issues) left no doubt as to the fact that the Government's decision to cut supply to UFG was motivated by political convenience: it was less politically damaging to cut supply to one large consumer (especially when that consumer is a foreign company) than to apportion a reduction of supply across different users and economic sectors. Minister Ismail said that despite having agreed to the Transient Agreement, there was no gas for UFG.  With great astonishment, I responded that, given the very low commitments agreed upon in the Transient Agreements, the Ministry of Petroleum and EGAS should have foreseen this issue, and had other customers ready to reduce their gas intake instead of yet again sacrificing UFG.   I particularly insisted on the fact that fertilizer producers were essentially gas exporters (fertilizer production consumes enormous quantities of gas and Egyptian producers ultimately export a significant part of their fertilizers) and there was thus reason to curtail their supply as well.  I summarized the main content of the meeting held on November 26, 2013 in my letter sent on December 5, 2013, which makes clear that the Minister of Petroleum had instructed EGAS to stop supplying the Damietta LNG Plant.*[328]

5.311   Mr Sáez Ramírez also described the meeting in his written evidence:

*We met with the Minister of Petroleum (Mr Sherif Ismail) [...] He said that he could not give us any gas because the Ministry had to prioritize diverting the gas to power generation plants throughout the country, as well as other industrial consumers, and added that he could not stop the fertilizers and power plants, cement plants, and other industrial users. Unlike the correspondence that we had received from EGAS just a few days earlier, there was no mention of any 'national security' issues.*[329]

5.312   *December 2013*: EGAS fails to comply with the terms of the Transient Agreement by defaulting on payments due to SEGAS under the EGAS Tolling Contract. On 5 December 2013, UFG writes to EGAS:

*Additionally we would like to underline that as at this date EGAS has not made the payments due to SEGAS on November 2013.*[330]

---

[328] Egea Krauel WS, Paragraph 34.
[329] Sáez Ramírez WS1, Paragraph 37.
[330] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 5 December 2013, [C-0085].

*2014*

5.313   *19 January 2014:* The Respondent replies to UFG's letter of 5 December 2013.[331] It merits citing in full:

> *We are in receipt of your letter of 5 December 2013 wherein you make several allegations against the Government of Egypt in connection with gas delivery to Union Fenosa Gas (UFG) and the Spanish Egyptian Gas Company (SEGAS).*
>
> *We observe that gas deliveries to UFG and SEGAS are governed by agreements entered into by UFG (or its subsidiaries), SEGAS, the Egyptian General Petroleum Corporation and/or the Egyptian Natural Gas Holding Company (EGAS). The Government of Egypt is in no way, either directly or indirectly, a party to those agreements. We are, therefore, not in a position to comment on their content or performance. Any dispute arising under the agreements would be purely contractual in nature and should be resolved directly with the relevant counterparty (or counterparties).*
>
> *In this context, we strongly reject your allegations that Egypt has 'repudiated' certain undertakings or failed to 'fulfill its minimal commitments' or that Egypt made statements to the effect that it would not 'comply with its obligations in the near future', As Egypt is not bound by any contractual commitments in respect of the delivery of gas to UFO or SEGAS, it cannot have 'repudiated' or failed to honor any 'commitments' in this regard.*
>
> *We similarly strongly reject your contention that Egypt is deliberately discriminating against UFG by 'directing available natural gas to the rest of the consumers' and has allegedly given 'instruction' to EGAS to halt deliveries to UFG and SEGAS. We regret that you would make such a serious allegation without offering any substantiation thereof.*
>
> *We are also extremely surprised and disappointed by UFG's blatant mischaracterization of the conversations which took place during our meetings of September and November 2013 and by your suggestion that the Ministry was somehow a party to the negotiation and/or performance of the so-called Transient Agreement between EGAS and UFG. We therefore reject this disingenuous attempt at distorting the record which appears to be designed for the sole purpose of implicating the Government of Egypt in a contractual dispute to which it is not a party. As you correctly observe, the Government of Egypt places great emphasis on maintaining the confidence of foreign companies in the face of the ongoing difficulties confronting Egypt's economy and, in particular, its energy industry. It was strictly in accordance with this spirit that the Ministry of Petroleum and Mineral Resources sought to lend its support to the*

---

[331] Letter from Ministry of Petroleum (Sherif Sousa) to UFG (José María Egea Krauel and Cesare Cuniberto), 19 January 2014, [C-0086].

*ongoing negotiations between UFG and EGAS. The Ministry's involvement goes no further and certainly cannot ensure any favorable outcome to the negotiations.*

*That said, we still hope that UFG and EGAS will soon reach an amicable resolution of the dispute between them.*

5.314 It is unnecessary to refer here to the Parties' further correspondence. By this time, the Parties' correspondence was most probably being drafted by their respective legal advisers within the context of this ICSID arbitration; and, as a result, they are less useful as evidence of contemporary facts for present purposes.

5.315 *22 January 2014*: The media report that the Minister of Petroleum identifies the local market gas needs as the top priority. This is reported in the local press, as follows:

*Eng. Sherief Ismail, petroleum minister confirmed that covering local market's needs from petroleum products and natural gas tops the ministry's priorities, especially production sectors and service sectors that increases its consumption by 6% a year as it reached last year 75 mn equivalent tons of oil and gas.[332]*

5.316 *13 February 2014*: UFG issues its notice of termination of the Transient Agreement to EGAS:

*The thirty-day period triggered by UFG's Notice of Intent to Terminate lapsed on 26 December 2013 [...] EGAS has not remedied the situation [...] Not only did EGAS fail to carry out any actions to remedy this breach but it also failed to fulfil its delivery commitments for December 2013 and January 2014 [...]*

*As a further result of EGAS' ongoing breach, pursuant to Article 5.III of the UFG Transient Agreement, UFG hereby terminates the UFG Transient Agreement with immediate effect as of the date of this notice. Accordingly, this letter constitutes a Notice of Termination of the UFG Transient Agreement pursuant to Article 5.III thereof.[333]*

5.317 *24 February 2014:* The Prime Minister and members of the Cabinet resign.[334]

5.318 *24 March 2014*: The Minister of Petroleum delivers a speech to the American Chamber of Commerce in Egypt, noting energy "challenges" in Egypt:

---

[332] "$8.5 bn in investments to be pumped into the petroleum sector," *Al Gomhouria* (22 January 2014), [C-0249].
[333] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to EGAS (Taher Abdelraheem), 13 February 2014, [C-0235].
[334] K. Fahim, M. El Sheikh, "Government and Premier of Egypt Quit in Abrupt Move," *New York Times* (24 February 2014), [R-0183].

*The challenges that is facing right now the petroleum sector [are] primarily: (i) the unbalanced energy mix; (ii) energy pricing crisis; (iii) supply/demand; (iv) aging infrastructure; (v) arbitration and disputes as a result of all of the above; and (vi) the mineral resources. [...]*

*Supply and demand gap.  From the supply side: (i) most of the [gas] fields are mature fields.  This means they are on the decline side of the production; (ii) Delayed field development [...]; (iii) Gas production on decline since 2009; (iv) Oil and gas condensate production is reasonably stable.  On the demand side: (i) High energy intensity industries: GDP growth to some extent for some years was based on the continuous development of some highly intensive consuming industries (cement factory, bricks [...]).  This is good, this is not bad, but the intensity of consuming energy in Egypt is high compared to any other country worldwide; (ii) Primarily relying on source of energy (oil and gas); (iii) Irrational consumption due to subsidy.[335]*

5.319   *12 May 2014*: The Ministry of Petroleum announces that Egypt will use floating regasification plants to regasify imported LNG:

> *Egypt's oil ministry and Hoegh LNG […] had reached an agreement for Egypt to use of one of Hoegh's Floating Storage and Regasification Units (FSRU).[336]*

5.320   *04 June 2014:* General El-Sisi is elected the President of Egypt.[337]

5.321   *13 June 2014*: The Minister of Petroleum announces increased gas production plans in Egypt. This was reported in the media:

> *The Oil Minister, Sherif Ismail, said on Wednesday that natural gas production would increase by 500 million cubic feet daily by December, when several gas fields are due to come on stream. […]*
>
> *The boost would bring gas production to 5.2 billion cubic feet (bcf) per day by the end of December, Minister Ismail said.[338]*

5.322   *19 December 2014:* UFG sends a Notice of Force Majeure to UFGC;[339] and UFGC does the same to Gas Natural Fenosa's subsidiaries.[340] The former provides (in material part):

---

[335] "The Oil and Gas Sector in Egypt: Vision and Challenges" – Speech (unofficial transcript) of Sherif Ismail, Egyptian Minister of Petroleum at the American Chamber of Commerce in Egypt, 24 March 2014, [C-0192].

[336] "Egypt reaches deal with Norway's Hoegh on LNG import terminal," *Reuters* (12 May 2014), [C-0366].

[337] M. El Sheikh, "Egypt: Sisi Wins With 97 Percent," *New York Times* (June 15, 2014), [R-0187].

[338] "Gas Production up in December 2014, Minister says," *The Egyptian Gazette – Al Ahram Al Massai* (13 June 2014), [C-0282].

[339] Notice of Force Majeure from UFG to UFGC, 19 December 2014, [C-0431].

> *Pursuant to Article 5 of the Agreement, introduced via Addendum No. 7, dated July 1, 2011, you are hereby notified of the occurrence of an event of Force Majeure. The cause behind this Force Majeure declaration, as you are aware, is the protracted interruption of gas supply from the Damietta (Egypt) liquefaction plant, which is one of long-term supply sources we had available to supply gas to you and has been fully interrupted since mid-2012. Despite having made our best efforts to keep up the gas supply, which reflects our good faith and has caused us to incur significant loss, the situation has been unsustainable since early 2013.*

5.323   At this time, the Damietta Plant remains idle.

**2015**

5.324   *13-15 March 2015*: At the Sharm El-Sheikh Investment Conference, the Minister of Electricity and the Minister of Petroleum deliver speeches acknowledging that energy policy in Egypt, including subsidies and excessive demand, are the causes of the gas supply/demand imbalance and shortages. The Minister of Electricity's speech includes as key points:

> *The Government is committed to address the electricity sector's bottlenecks. Sector challenges* [include] *growing energy demand and high energy intensity* [and] *unsustainable financial burden due to subsidies.*

And:

> *Subsidies represent a huge fiscal burden.*[341]

The speech of the Minister of Petroleum includes as a key topic for discussion:

> *Petroleum Sector Strategic Pillars and Action Areas* [...] *Financial Sustainability – Address historic debts [and] reform energy subsidies.*[342]

5.325   *16 March 2015*: The Prime Minister of Egypt acknowledges that payment of dues to foreign oil companies is of paramount importance to attract foreign investment to Egypt. An article in the local press summarises the statement:

---

[340] Letters from UFGC (Cesare Cuniberto) to GNF subsidiary one, 19 December 2014, (redacted) [C-0432]; Notice of Force Majeure from UFGC to GNF subsidiary two, 12 December 2014 (redacted), [C-0433]; Notice of Force Majeure from UFGC to GNF subsidiary three, 12 December 2014 (redacted), [C-0434].

[341] Presentation of Minister of Electricity & Renewable Energy, Dr Mohamed Shaker El-Markabi, "Addressing Egypt's Electricity Vision," 13-15 March 2015, [C-0225].

[342] Presentation of Minister of Petroleum and Mineral Resources (Sherif Ismail), "Petroleum and Mining Sector in Egypt: Unlocking Egypt's Energy Potential," 13-15 March 2015, [C-0218].

> *Prime Minister Eng. Ibrahim Mehleb and the Egyptian Petroleum Minister met on Sunday with British Petroleum (BP) CEO Bob Dudley at the Economic Summit in Sharm el-Sheikh.* […]
>
> *The Prime Minister stressed that it is a top priority for the government to pay the dues to foreign oil companies operating in Egypt.* [343]

5.326   *17 March 2015*: The Minister of Industry announces that he hopes for a potential settlement of the dispute with UFG; he acknowledges that gas shortages are due to "poor planning by the previous administration." As reported, the Minister of Industry, expresses hope that Egypt's dispute with Gas Natural Fenosa would be finally settled by the end of the year.  He states that:

> *When Gas Natural Fenosa commissioned the plant, Egypt was a major oil and gas exporter. Unfortunately, as a result of poor planning by the previous administration, my country was suddenly left without gas and crude oil with which to satisfy not only Gas Natural Fenosa's demand but also that of our own industry.  We are now importing gas and we hope the company will be able to resume its operations at the plant in the next few months.  We kindly ask them to be patient, because their troubles are our own, and we are as eager as them to find a solution soon.*

The Minister's statements followed his visit to Spain in February 2015 and a subsequent visit by the Spanish Minister to Egypt. [344]

5.327   *12 September 2015*: Mr Sherif Ismail, the former Minister of Petroleum, becomes Egypt's Prime Minister. A news article reports:

> *Sherif Ismail was named Egypt's new prime minister* [...] *on Saturday, tasked by President Abdel Fattah al-Sisi with forming a new government, after surviving two cabinet reshuffles as petroleum minister.* [345]

5.328   *30 September 2015*: The Ministry of Petroleum announces that EGAS will import LNG to meet domestic gas needs and use floating regasification plants to regasify imported LNG:

> [This] *will allow Egypt to import LNG and convert it to natural gas to be pumped into the National gas grid.* [346]

---

[343] "Mehleb to BP: Paying our dues to foreign companies is our top priority," *Daily Oil News* (16 March 2015), [C-0377].

[344] "The issue with Fenosa will be settled this year," *El Pais* (18 March 2015), [C-0178].

[345] "Meet Egypt's New Prime Minister: Sherif Ismail," *Mada Masr* (13 September 2015), [C-0391].

[346] Ministry of Petroleum Press Release, "The arrival of the second FSRU, to import LNG to the port of Ain Sokhna," 30 September 2015, [C-0418].

5.329   *23 November 2015 :* The World Bank publishes a report on "Energy Pricing Strategy in Egypt."[347]

5.330   *2015:* The IMF Working Paper "How Large Are Global Energy Subsidies" is published, concluding that "Energy subsidies discourage needed investments in energy efficiency [...] and energy infrastructure, and increase the vulnerability of countries to volatile international energy prices."[348]

*2016*

5.331   *11 January 2016*: The Minister of Petroleum (Mr Tarek El Molla) delivers a speech to American Chamber of Commerce in Egypt, acknowledging energy policy problems in Egypt. The Minister's presentation refers to "irrational local demand growth" and "mature oil and gas fields" as challenges to Egypt's energy security. [349] It notes as a further challenge to energy security that "[m]ost of Egypt's oil and Gas Fields [are] in the Mature and declining stage," and proposes a "Comprehensive Energy Subsidy Reform Program."[350]

5.332   *3 August 2016*: The Ministry of Petroleum announces its intention to restore full capacity to the Damietta Plant by 2020/2021. As reported in the local press:

> *The Ministry of Petroleum and Mineral Resources aims to rerun ADCO and Damietta factories for liquefaction in their full capacity in order to export gas shipments to global markets by 2020/2021.*[351]

5.333   *21 September 2016*: The Minister of Petroleum heads the General Assembly of EGAS to review EGAS' fiscal results. As reported by a local industry publication:

> *A press release from the Egyptian Ministry of Petroleum and Mineral Resources stated that the minister, Tarek El Molla, headed the General*

---

[347] International Bank for Reconstruction and Development, "Program Document for a Proposed Loan in the Amount of US $1,000 Million to The Arab Republic of Egypt for a First Fiscal Consolidation, Sustainable Energy and Competitiveness Programmatic Development Policy Financing," 23 November 2015, [BRG-255].
[348] IMF Working Paper, "How Large Are Global Energy Subsidies," [RPS-08], Page 4.
[349] Tarek El Molla, "Egypt's Oil and Gas Sector: Strategies and Reforms," American Chamber of Commerce in Egypt, 11 January 2016, [BRG-246], Page 11.
[350] Tarek El Molla, "Egypt's Oil and Gas Sector: Strategies and Reforms," American Chamber of Commerce in Egypt, 11 January 2016, [BRG-246], Pages 16 and 30.
[351] M. Adel, "Petroleum Ministry to rerun ADCO and Damietta liquefaction factories by 2020/2021: minister," *Daily News* (3 August 2016), [C-0345].

*Assembly of the Egyptian Natural Gas Holding Company (EGAS) to review its fiscal results for 2015/2016.[352]*

***2017-2018***

5.334   The Damietta Plant remains idle, as it still does as at the date of this Award.

---

[352] "El Molla Reviewed EGAS Fiscal Results," *Egypt Oil & Gas* (21 September 2016), [C-0408].

## PART VI: JURISDICTION ISSUES

### (1) Introduction

6.1   It is appropriate to address the Respondent's jurisdictional objections under four headings (as alleged by the Respondent): (i) the absence of any protected investments within the meaning of Article 1 of the Treaty and Article 25(1) of the ICSID Convention; (ii) the "claim-splitting" tactics employed by the Claimant and SEGAS in their disputes with the Respondent and EGAS; (iii) the contractual nature of the Claimant's claims; and (iv) corruption by the Claimant (including its predecessor UFACEX) in procuring the SPA made with EGPC (succeeded by EGAS). As regards (ii) and (iv), the objection may raise issues as to admissibility, i.e. the non-exercise of jurisdiction by the Tribunal as distinct from jurisdiction. However, for the purpose of this Award, this is a distinction that makes no difference; and it is therefore convenient to subsume all issues of admissibility with issues of jurisdiction.

6.2   As regards (iv) corruption, the Tribunal addresses the Parties' dispute separately in Part VII below. This Part VI addresses only (i) the "investment" issues; (ii) the "claim-splitting" issues and (iii) the "contractual nature" of the Claimant's claims (which partly overlaps with the previous issues).

6.3   The *Treaty:* Article 1 of the Treaty defines "Investor" and "Investment": see the text cited in Part III(2) above. It is not disputed that the Claimant is an "Investor," *ratione personae*, as a legal entity incorporated in Spain under Article 1(1)(b) of the Treaty. As to "Investment" under Article 1(2) of the Treaty, issues arise from the Claimant's participation in the SPA, its performance by the Claimant and its successive amendments. In regard to the Claimant's shares in SEGAS, as an Egyptian legal entity involved in the Damietta Project, issues arise as to whether the Claimant maintained its ownership of those shares and, also, whether SEGAS owned any relevant rights under its EGAS Tolling Contract with EGAS, thereby affecting the status or value of the Claimant's shareholding in SEGAS as an investment under Article 1(2) of the Treaty.

6.4   *Article 25(1) of the ICSID Convention:* There appears to be no separate issue regarding the requirement for an "investment" under Article 25(1) of the ICSID Convention (for its text, see Part III(5) above). Subject to the issue over SEGAS'

rights under the EGAS Tolling Contract, if the Claimant, as an "investor" had an "investment" satisfying the test under Article 1 of the Treaty, it satisfied Article 25(1) of the ICSID Convention as regards this same test. The Tribunal considers that both Article 25(1) and Article 1 include, as part of the same test, a "holistic approach" and the "indicia" of an investment listed in *Salini v. Morocco* (2001).[1]

6.5    *"Claim-Splitting"*: The Respondent contends that the Tribunal should not exercise its jurisdiction in this arbitration on the ground that the Claimant and SEGAS have improperly engaged in claim-splitting between the ICC, CRCICA and Treaty arbitrations. It is here appropriate to describe these ICC and CRCICA international commercial arbitrations.

6.6    The ICC Arbitration (ICC 19382/MD/TO) was commenced by SEGAS against EGAS on 11 April 2013 claiming Toll-or-Pay fees under the EGAS Tolling Contract, in the amount of approximately US$ 82.9 million. (Following its second partial award of 24 May 2016, the ICC tribunal issued its final award dismissing SEGAS's claim; there was no pleaded issue of corruption by EGAS; and this arbitration is now at an end).

6.7    This ICC Arbitration was followed by a second ICC arbitration brought by HSBC against EGAS in February 2018, apparently as the assignee of SEGAS in respect of rights to tolling fees under the EGAS Tolling Contract. (The Tribunal refers to this second ICC arbitration as the "HSBC Arbitration"). It is pending.

6.8    The first CRCICA Arbitration (896) was commenced by the Claimant against EGAS on 17 May 2013, claiming damages for the failure to comply with provisions for price adjustments under the SPA, in the amount of approximately US$ 9.7 million. This first CRCICA tribunal, with its seat in Cairo, issued a partial award on 7 August 2015 and a final award on 21 December 2017, dismissing (*inter alia*) the Claimant's claims; there was also an issue of corruption pleaded by EGAS against the Claimant which was rejected by the tribunal. This arbitration is now at an end.

6.9    The second CRCICA Arbitration (899) was commenced by the Claimant against EGAS on 30 May 2013 claiming damages for the failure to supply natural gas under the SPA, in the amount of approximately US$ 2.8 billion. This arbitration was stayed;

---

[1] *Salini v. Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001, [CL-0006].

but the stay was lifted in early 2018 following the final award issued by the tribunal in the first CRCICA Arbitration (896). This second CRCICA Arbitration remains pending, with oral hearings apparently fixed for October and December 2018.

6.10    *Corruption*: The Respondent contends that the Tribunal has no jurisdiction or cannot exercise its jurisdiction under the Treaty on the ground that the Claimant (with its associated companies, including UFACEX) procured the SPA by means of corruption. The Tribunal addresses this jurisdictional objection separately below, following its decisions on the Respondent's other jurisdictional objections.

6.11    Before its analyses and decisions, the Tribunal summarises below the Parties' respective cases on the issues of jurisdiction, "claim-splitting" and corruption. As indicated in other Parts of this Award, such summaries do not recite in full either Party's written and oral submissions. Nonetheless, the Tribunal has considered such submissions in full; and the omission of a reference to any submission should not be treated as an indication that it has not been considered by the Tribunal. (As earlier, for ease of reference, the Tribunal does not distinguish between the Claimant, "UFG" and UFACEX unless the context requires otherwise).

### (2) The Respondent's Case

6.12    In summary, it is the Respondent's case that the Tribunal lacks jurisdiction because the Claimant has failed to establish that it has protected investments. The Respondent also argues that the Tribunal lacks or should decline to exercise jurisdiction because the "gas supply dispute" between the parties is contractual in nature and is to be settled by the contractually agreed *fora* and because the Claimant (with SEGAS) has engaged in claim-splitting and its claims in this ICSID arbitration have the same "fundamental basis" as those raised in the CRCICA and ICC arbitrations.[2]

6.13    The Respondent concludes that the Tribunal lacks *ratione materiae* jurisdiction over the dispute and refers to: (a) the pledge of UFG's shares in SEGAS; (b) the assignment of SEGAS' rights under the EGAS Tolling Contract; and (c) the SPA which, according to the Respondent, does not qualify as "an investment."

---

[2] Resp Obj Jur & Req for Bif, Paragraphs 43-77; Resp Rep Bif, Paragraphs 28-52; Resp Rep Jur, Paragraphs 48-100.

*(a) The Pledge of UFG's* Shares *in SEGAS*

6.14    The Respondent submits that an investment of an investor of the other Contracting Party must exist at the time of the measures alleged to constitute a treaty violation.[3] Relying on the award in *Phoenix v. Czech Republic* (2009),[4] the Respondent asserts that an investment treaty tribunal lacks jurisdiction over measures alleged to constitute a treaty violation that occur after an investor loses its status as an investor with a protected investment.[5]

6.15    The Respondent disputes that the Claimant owns its shares in SEGAS at the relevant time. The Respondent contends that UFG pledged its shares in SEGAS to HSBC Bank Egypt S.A.E ("HSBC Egypt") as collateral against possible default by SEGAS (the owner of the Damietta Plant) on the loan repayment in the context of SEGAS' debt refinancing arrangements in July 2007.[6]

6.16    Referring to the award in *Cementownia v. Turkey* (2009),[7] and other ICSID awards that adopted similar reasoning, the Respondent contends that the Claimant bears the burden of proving that it held the investment at issue at the time of the measures alleged to constitute the treaty violation.[8]

6.17    The Respondent submits the Claimant has failed to satisfy its burden to establish that it has remained at all relevant times the owner of the SEGAS shares.[9] First, the Respondent contends that the Claimant has failed to provide any affirmative evidence of ownership, such as share certificates, which the Respondent notes are in the physical possession of HSBC. Second, the Respondent rejects the Claimant's "bare" allegation that it has retained "full ownership" of the SEGAS shares following the

---

[3] Resp Obj Jur & Req for Bif, Paragraph 43; Resp Rep Bif, Paragraph 28.
[4] *Phoenix v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, [RL-0004], Paragraphs 68-70; also cited, *Occidental v. Ecuador,* ICSID Case No. ARB/06/11, Decision of the *Ad Hoc* Committee, 20 October 2015, [RL-0024], Paragraphs 262-264.
[5] Resp Obj Jur & Req for Bif, Paragraph 43.
[6] Resp Obj Jur & Req for Bif, Paragraph 44, referring to Cl Mem Merits, Paragraph 179.
[7] *Cementownia v. Turkey*, ICSID Case No. ARB(AF)/06/2, Award, 17 September 2009, [RL-0023], Paragraphs 112-114.
[8] Resp Rep Bif, Paragraph 30; Resp Rep Jur, Paragraph 51, citing *CCL v. Kazakhstan,* SCC Case No. 122/2001, Jurisdictional Award, 1 January 2003, Stockholm International Arbitration Review (2005), [RL-0132], 152; *Perenco v. Ecuador*, ICSID Case No. ARB/08/6, Decision on Jurisdiction, 30 June 2011, [RL-0088], Paragraphs 97-98; *Libananco v. Turkey,* ICSID Case No. ARB/06/8, Award, 2 September 2011, [RL-0054], Paragraphs 121-128.
[9] Resp Rep Jur, Paragraph 52.

Share Pledge Agreement;[10] and it argues: "the terms of the Share Pledge Agreement belie this allegation."[11] The Respondent points out that Clause 9.1 of the Share Pledge Agreement, on which the Claimant relies,[12] provides that UFG could no longer assign "any of its rights, title and interest in, to and under [the SEGAS shares]" without meeting certain conditions "to the satisfaction of [HSBC], acting reasonably."[13] The Respondent argues that the Share Pledge Agreement therefore supports its case that, as a result of the pledge, the Claimant could no longer exercise full ownership rights in relation to the SEGAS shares, including the right to dispose of these shares.[14]

6.18    The Respondent rejects the Claimant's alternative argument that even if, *in eventu*, UFG transferred "legal ownership" of the SEGAS shares to HSBC, it retained "beneficial ownership" of the shares.[15] The Respondent observes that the Claimant has failed to point to any investment treaty tribunal that has accepted jurisdiction in the absence of legal ownership.[16] According to the Respondent, whether the Claimant remained the owner after pledging its shares and transferring the share certificates to HSBC is "a serious question that requires analysis under Egyptian law," which governs the Share Pledge Agreement.[17] The Respondent submits that the Claimant has failed to establish that the Egyptian law even recognizes the concept of beneficial ownership.[18]

6.19    Further, the Respondent objects to the Claimant's argument that, irrespective of the issue of ownership rights in the SEGAS shares, the Claimant's "contractual rights under the Share Pledge Agreement independently satisfy the BIT's definition of investment," specifically a "'form … of participation' in SEGAS within the meaning of Article 1(2) of the […] Treaty."[19]  The Respondent notes that the Share Pledge Agreement is not an agreement between UFG and SEGAS (concerning UFG's participation in SEGAS), but rather between UFG and SEGAS, on the one hand, and HSBC, on the other.  Moreover, "the Share Pledge Agreement does not confer on the

---

[10] Resp Rep Jur, Paragraph 53, referring to Cl Rej Bif, Paragraph 21.
[11] Resp Rep Jur, Paragraph 53.
[12] Resp Rep Jur, Paragraph 53, referring to Cl CM Jur, Paragraph 56.
[13] Share Pledge Agreement between UFG, SEGAS, and HSBC Bank Egypt S.A.E., 27 July 2007, [C-0325], Article 9.1.
[14] Resp Rep Jur, Paragraph 53.
[15] Cl Obj Bif, Paragraph 70.
[16] Resp Rep Bif, Paragraph 31.
[17] Resp Rep Bif, Paragraph 30.
[18] Resp Rep Bif, Paragraph 31.
[19] Resp Rep Jur, Paragraph 54, citing from Cl CM Jur, Paragraph 58.

Claimant any 'governance rights' vis-à-vis SEGAS or any other form of participation in SEGAS"; nor does it grant any other rights to the Claimant, as it only serves "to limit or potentially transfer any such rights."[20]

6.20  In conclusion, the Respondent argues that with respect to the SEGAS shares, the Claimant has failed to establish that these shares were investments by the Claimant as a Spanish investor at the time of the alleged violation of the Treaty.[21]

*(b) The* Assignment *of SEGAS' Rights under the Tolling Contracts*

6.21  According to the Respondent, SEGAS' contractual rights under the Tolling Contracts do not constitute "an investment" protected under the Treaty because of the absolute assignment of these rights.[22] The Respondent observes that SEGAS has assigned by way of security to HSBC Bank Plc. ("HSBC UK") all of its present and future contractual rights under the Tolling Contracts, pursuant to the Offshore Security Agreement between SEGAS and HSBC UK[23] (as trustee for the financial institutions providing funds to SEGAS), under the same refinancing agreements that included the Share Pledge Agreement.[24] In support of its position, the Respondent refers to the ICC tribunal's award of 24 March 2016 in the arbitration initiated by SEGAS against EGAS for unpaid tolling fee under the EGAS Tolling Contract, which held (in relevant part) that:

> [B]*y executing the Offshore Security Agreement and related documents in July 2007, SEGAS assigned to HSBC absolutely its rights under the EGAS Tolling Contract and* […] *those rights were not effectively transferred back to SEGAS by the Deed of Reassignment.*[25]

6.22  The Respondent submits that the ICC tribunal's determination that SEGAS assigned to HSBC UK "absolutely" its rights under the EGAS Tolling Contract is also controlling as to SEGAS' rights under the UFG Tolling Contract because the Offshore

---

[20] Resp Rep Jur, Paragraphs 54-55.
[21] Resp Obj Jur & Req for Bif, Paragraph 50; Resp Rep Jur, Paragraph 56.
[22] Resp Obj Jur & Req for Bif, Paragraphs 45-50; Resp Rep Jur, Paragraphs 57-62.
[23] Resp Obj Jur & Req for Bif, Paragraphs 45-46, referring to the Offshore Security Agreement between SEGAS and HSBC UK, 27 July 2007, [C-0343/R-0038], Clause 3.1.
[24] Resp Rep Jur, Paragraph 57; Resp Obj Jur & Req for Bif, Paragraphs 45-50; Resp Rep Bif, Paragraphs 33-35.
[25] Resp Rep Jur, Paragraph 58, citing *Spanish Egyptian Gas Company v. Egyptian Natural Gas Holding Company*, ICC Case No. 19392/MD/TO, Second Partial Final Award, 24 May 2016, [R-0323], Paragraph 378.

Security Agreement and related instruments transferred rights under the UFG Tolling Contract on the same terms as the rights under the EGAS Tolling Contract.[26]

6.23    The Respondent rejects the Claimant's allegations that irrespective of whether "specific legal rights under the Tolling Contracts formally belong to SEGAS or HSBC as a result of the assignment, EGAS has a contractual obligation to pay tolling and toll-or-pay fees" under the EGAS Tolling Contract.[27] The Respondent argues that EGAS has committed to make payments to SEGAS and not to HSBC UK;[28] and, thus, "the Claimant misses the point." The Respondent concludes that there is no basis for the Tribunal to determine whether EGAS has payment obligations under the EGAS Tolling Contract because SEGAS "has no rights under that contract."[29] In support, the Respondent refers again to the ICC tribunal's award providing that "the sums claimed for outstanding toll-or-pay amounts and tolling fees under the EGAS Tolling Contract are not recoverable by SEGAS, because of the absolute assignment created by the Offshore Security Agreement."[30]

6.24    In conclusion, the Respondent therefore submits that the Claimant can "neither […] argue that it held indirect investment in the Tolling Contract between SEGAS and EGAS, nor […] to claim damages in relation to any dividends […] recoverable under the Tolling Agreement."[31]

*(c) The SPA*

6.25    The Respondent submits that the SPA (as a natural gas sale and purchase contract) is a commercial transaction that is not protected under the Treaty or Article 25(1) of the ICSID Convention.[32]  According to the Respondent, even if the SPA could constitute an investment for the purposes of Article 1(2) of the Treaty, the Claimant must still establish the existence of "an investment" under *both* the ICSID Convention and the

---

[26] Resp Rep Jur, Paragraph 59, referring to the Offshore Security Agreement between SEGAS and HSBC UK, 27 July 2007, [C-0343/R-0038]; Direct Agreement between EGAS, UFG, SEGAS and HSBC, 27 July 2007, [C-0326].
[27] Cl CM Jur, Paragraph 63.
[28] Resp Rep Bif, Paragraph 34; Resp Rep Jur, Paragraph 60.
[29] Resp Rep Jur, Paragraph 60.
[30] *Spanish Egyptian Gas Company v. Egyptian Natural Gas Holding Company*, ICC Case No. 19392/MD/TO, Second Partial Final Award, 24 May 2016, [R-0323], Paragraph 379(ii).
[31] Resp Rep Jur, Paragraph 62.
[32] Resp Rep Bif, Paragraph 35; Resp Rep Jur, Paragraph 63.

Treaty. Relying on *Salini v. Morocco* and other ICSID awards,[33] the Respondent maintains that the "investment" must meet certain objective requirements. The Respondent submits that it is well established that commercial transactions, such as the SPA, do not meet the inherent characteristics of contribution, duration and risk that define "an investment."[34]

6.26    For the reasons described below, the Respondent rejects the Claimant's allegations that ICSID jurisdiction exists under the SPA based "on a theory that legal rights [associated with the SEGAS shares] and UFG's rights under the SPA comprise parts of the same investment and must be viewed holistically."[35]

6.27    The Respondent argues that none of the legal materials cited by the Claimant in support to such "holistic approach" stand for the proposition that a dispute regarding the non-performance of a sale and purchase contract constitutes "a dispute arising directly out of an investment" under Article 25(1) of the ICSID Convention.[36]

6.28    The Respondent notes that the Claimant's principal claims in this ICSID arbitration, and all claims for compensation, are based upon the Respondent's alleged failure, through EGAS, to supply contractually agreed volumes of gas under the SPA. The Respondent also points out that the Claimant does not seek any compensation for

---

[33] Resp Rep Jur, Paragraphs 64-67, citing *Salini v. Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001, [CL-0143], Paragraph 44; *Global Trading v. Ukraine*, ICSID Case No. ARB/09/11, Award, 1 December 2010, [RL-0068], Paragraph 43; *Patrick Mitchell v. Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006, [RL-0133], Paragraph 25; *Phoenix v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, [RL-0004], Paragraphs 74 and 96; *Joy Mining v. Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004, [CL-0059], Paragraphs 49-50; *Pey Casado v. Chile*, ICSID Case No. ARB/98/2, Award, 8 May 2008, [RL-0134], Paragraph 232; *OI European v. Venezuela*, ICSID Case No. ARB/11/25, Award 10 March 2015, [RL-0136], Paragraph 218; *TSA v. Argentina*, ICSID Case No. ARB/05/5, Award, 19 December 2008, [RL-0137], Paragraph 134; *GEA v. Ukraine*, ICSID Case No. ARB/08/16, Award, 31 March 2011, [RL-0139], Paragraph 141; *Alps Finance and Trade AG v. Slovak Republic*, UNCITRAL, Award, 5 March 2011, [RL-0140], Paragraph 240; *KT Asia v. Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013, [RL-0141], Paragraph 165; and referring to *Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007, [RL-0135], Paragraph 116; *Romak v. Uzbekistan*, UNCITRAL, PCA Case No. AA280, Award, 26 November 2009, [RL-0138], Paragraph 207.

[34] Resp Rep Jur, Paragraph 68 citing *Global Trading v. Ukraine*, ICSID Case No. ARB/09/11, Award, 1 December 2010, [RL-0068], Paragraphs 56-57; *Nova Scotia v. Venezuela*, ICSID Case No. ARB(AF)/11/1, Excerpts of Award, 30 April 2014, [RL-0066], Paragraph 113; *Joy Mining v. Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004, [CL-0059], Paragraph 58; *Salini v. Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001, [CL-0143], Paragraph 52; and referring to *Joy Mining v. Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004, [CL-0059], Paragraph 53; *Helnan v. Egypt*, ICSID Case No. ARB/05/19, Decision of the Tribunal on Objection to Jurisdiction, 17 October 2006, [RL-0142], Paragraph 77; *Patrick Mitchell v. Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006, [RL-0133], Paragraph 27.

[35] Resp Reply Jur, Paragraph 69, citing from Cl CM Jur, Paragraph 65.

[36] Resp Rep Jur, Paragraph 71.

damages in relation to any money it had invested to construct the Damietta Plant, but instead bases its claims on purported lost cash flows "resulting from its failure to receive the gas it was entitled under the SPA" and dividends it would have allegedly received "had the Damietta Plant received the gas that it was supposed to receive under the SPA."[37]

6.29    In conclusion, the Respondent submits that the fundamental nature of the Claimant's claim in this arbitration is a commercial transaction, namely the SPA; and, thus, that the Tribunal lacks jurisdiction *ratione materiae* over the dispute.[38]

*(d) Contractual Claims and "Claim-Splitting"*

6.30    The Respondent contends that the Tribunal lacks jurisdiction or, alternatively (if it had any jurisdiction), the Tribunal should decline to exercise such jurisdiction, because the "gas supply dispute" is essentially contractual in nature and is to be settled by the contractually agreed *fora* (and not ICSID arbitration).

6.31    The Respondent submits that the Tribunal lacks jurisdiction over the present dispute because the bases of the Claimant's claims in the CRCICA and ICC arbitrations and its principal claims and all claims for compensation in the present arbitration are predicated on EGAS's alleged failure to perform its contractual obligations, *i.e.*, to supply the contractually-agreed volumes of natural gas under the SPA.[39]

6.32    The Respondent invokes the doctrine of sovereign authority to argue that it does not bear state responsibility for EGAS's breaches of the SPA. Relying on *Suez v. Argentina* and other ICSID awards, the Respondent argues that for a State to incur responsibility for investment treaty breaches, it must act in the exercise of its sovereign powers.[40] The Respondent notes that while the Claimant refers to the Respondent's policies, and alleged acts of EGAS in conformity with those policies, the Claimant has failed to identify a sovereign act of the Respondent, such as a law, decree or judgment, that would have caused EGAS acts or omissions alleged to constitute a violation of the SPA. The Respondent therefore submits that its

---

[37] Resp Rep Jur, Paragraph 73, referring to Cl CM Merits, Paragraphs 593-594.
[38] Resp Rep Jur, Paragraph 74.
[39] Resp Obj Jur & Req for Bif, Paragraphs 51-63; Resp Rep Jur, Paragraphs 75-100.
[40] Resp Obj Jur & Req for Bif, Paragraph 53, citing *Suez v. Argentina*, ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010, [CL-0037], Paragraph 142.

international responsibility cannot be engaged for the purpose of Article 11 of the Treaty (providing for ISDS).[41]

6.33   The Respondent also submits that the Tribunal lacks jurisdiction because the present dispute has previously been submitted by SEGAS to CRCICA and ICC arbitrations.[42] The Respondent notes that the Claimant has failed to address the meaning of Article 11 of the Treaty, which provide the investor "a choice" between SCC, ICC, CRCICA or ICSID Convention arbitration, and the meaning of Article 26 of the ICSID Convention which ensures that ICSID arbitration is the exclusive remedy absent agreement to the contrary.[43]

6.34   The Respondent submits that because the dispute before this Tribunal shares the same "fundamental basis" as the disputes previously submitted to CRCICA and ICC arbitrations, the Tribunal lacks jurisdiction over such dispute under Article 11 of the Treaty and Article 26 of the ICSID Convention.[44] Referring to the "fundamental basis of the claim" test adopted by the tribunals in *H&H v. Egypt* and *Pantechniki v. Albania*,[45] the Respondent argues that the essence of the dispute submitted by the Claimant to ICSID arbitration and all of its ICSID claims, with the exception of its claims claim based on the revocation of SEGAS Free Zone licenses, is that the Respondent, through EGAS, has failed to supply the contractually agreed gas and has thus treated the Claimant less favorably than other consumers.[46]

6.35   The Respondent rejects the Claimant's allegations that the "triple identity test" leads to the opposite conclusion. Relying on the award in *Grynberg v. Grenada,*[47] the Respondent argues that the Claimant may not maintain, on the one hand, that its control over SEGAS gives rise to jurisdiction over the investment and then claim that it is not a party to the ICC arbitration, on the other.[48] According to the Respondent, the factual and legal grounds in the parallel commercial arbitrations are "inextricably

---

[41] Resp Obj Jur & Req for Bif, Paragraphs 52-56; Resp Rep Jur, Paragraph77.
[42] Resp Obj Jur & Req for Bif, Paragraphs 64-77; Resp Rep Bif, Paragraphs 44-56; Resp Rep Jur, Paragraphs 75-100.
[43] Resp Rep Bif, Paragraph 45.
[44] Resp Rep Jur, Paragraph 78.
[45] *H&H v. Egypt*, ICSID Case No. ARB/09/15, Award, 6 May 2014, [RL-0026]; *Pantechniki v. Albania,* ICSID Case No. ARB/07/21, Award, 30 July 2009, [RL-0028].
[46] Resp Rep Jur, Paragraph 85.
[47] *Grynberg v. Grenada*, ICSID Case No. ARB/10/6, Award, 10 December 2010, [RL-0045], Paragraph 7.1.5.
[48] Resp Rep Jur, Paragraphs 87-88.

linked" to those in the ICSID arbitration.[49] The Respondent rejects the Claimant's argument that the damages issues in the four arbitrations are different. The Respondent argues that the Claimant seeks damages on the same precise bases as in the ICSID arbitration.[50]

6.36   In conclusion, the Respondent argues that the Claimant has failed to show that its claims in this arbitration have an autonomous existence outside the SPA and related agreements. According to the Respondent, because the CRCICA and ICC arbitrations share the same fundamental basis, the Tribunal lacks jurisdiction over the claims under Article 11 of the Treaty and Article 25 of the ICSID Convention.[51] According to the Respondent, the Tribunal should "decline jurisdiction pursuant to the principle of *lis pendens* to prevent Claimant's abusive multiple claims strategy (claim-splitting)."[52]

### (3) The Claimant's Case

6.37   The Claimant contends that the Tribunal has jurisdiction over the Parties' dispute as all the requirements for jurisdiction in both the Treaty and the ICSID Convention are satisfied.[53] According to the Claimant, the Respondent's challenges to the Claimant's ownership and control over its investment are meritless. The Claimant asserts that its approximately 80% shareholding of SEGAS, its contractual and legal rights under and relating to the SPA, its rights under related agreements, and its money, services and resources invested in the Damietta Project are all rights and assets which constitute, individually and collectively, protected investments within the meaning of both Article 1(2) of the Treaty and Article 25(1) of the ICSID Convention.[54]

### (a) The Pledge of UFG's Shares in SEGAS

6.38   The Claimant submits that it has owned its shares in SEGAS at all relevant times and has fully met its burden of proof.  The Claimant contends that, whilst it did grant to HSBC a security interest in those shares by means of the Share Pledge Agreement, the pledge did not deprive its ownership in the shares. Under Egyptian law (as the

---

[49] Resp Rep Jur, Paragraph 92.
[50] Resp Rep Jur, Paragraphs 96.
[51] Resp Rep Jur, Paragraph 99.
[52] Resp Rep Jur, Paragraph 100.
[53] Cl Mem Merits, Paragraphs 304-326.
[54] Cl Mem Merits, Paragraphs 310 and 319-321.

governing law of the Share Pledge Agreement) a pledge of shares as security does not transfer ownership from the pledgor to the pledgee.[55] The Claimant relies in this regard on Articles 125 and 129 of the Egyptian Commercial Code.[56]

6.39   The Claimant rejects the Respondent's contention that it has not remained the legal and beneficial owner of the SEGAS shares, allegedly because UFG may not sell its shares without complying with certain conditions to the satisfaction of HSBC.[57] The Claimant submits that the Respondent's position contradicts the express terms of Clause 8.1(a) of the Share Pledge Agreement that recognises the Claimant as "the sole legal and beneficial owner of the Secured Assets" at the time the Share Pledge Agreement was concluded.  The Claimant argues that Clause 8.1(e) further recognises that UFG will continue to own the SEGAS shares for the duration of the Agreement, given that in this provision UFG warrants that it will not pledge or assign its interest in SEGAS in the future.[58]  According to the Claimant, Clause 6 of the Share Pledge Agreement further confirms UFG's continuing ownership of the SEGAS' shares, because HSBC may not enforce its security interest save in the case of default. [59]

6.40   The Claimant asserts that it "expressly retained almost all of its ownership rights, including the right (subject to certain conditions) to sell the secured assets [Clause 9], the right to vote its shares in SEGAS and the right to dividends [Clause 5]."[60] According to the Claimant, those interests constitute the essence of ownership and comprise a "forms of participation in a company", which satisfy the Treaty's definition of "investment."

6.41   The Claimant points out that HSBC's rights over SEGAS' shares under the Share Pledge Agreement (as governed by Egyptian law) contrast significantly with the HSBC UK's rights over SEGAS' interests in the Tolling Contracts under the Offshore Security Agreement (as governed by English law). Under the latter Agreement, SEGAS has "assigned absolutely" its rights in the EGAS and UFG Tolling Contracts. The Claimant acknowledges that, under English law, an "absolute assignment" entails

---

[55] Cl CM Jur, Paragraph 56; Cl Rej Bif, Paragraph 20, citing the Egyptian Commercial Code, Articles 125 and 129, [C-0335].
[56] Cl Rej Jur, Paragraph 134.
[57] Cl Rej Jur, Paragraph 135; Cl CM Jur, Paragraphs 67-68; Cl Obj Bif, Paragraph 68.
[58] Cl Rej Jur, Paragraph 137.
[59] Cl Rej Jur, Paragraphs 135-138.
[60] Cl Rej. Jur., Paragraph 133.

the complete transfer of legal rights from one party to the other.  The Claimant asserts that the concept of "absolute assignment" does not exist under Egyptian law.[61]

6.42    The Claimant maintains that its protected investments include not only its shares in SEGAS, but also the rights corresponding to these shares.  The Claimant asserts that its expressly retained voting rights and rights to dividends corresponding to these shares alone constitute a protected investment, regardless of the party that may formally own SEGAS' shares. The Claimant submits that those rights satisfy the Treaty's definition of "rights arising from all types of contributions made for the purpose of creating economic value": see Article 1(2)[2].[62]

6.43    In conclusion, the Claimant asserts that it continues to own its shares in SEGAS despite the share transfer to HSBC under the Share Pledge Agreement.  Since that Agreement expressly provides that voting and dividend rights have been retained by the Claimant, the Claimant concludes that such rights satisfy the Treaty's definition of "investment" whether or not they "flow from its independent ownership of its shares in SEGAS or from the Share Pledge Agreement or from a combination both."[63]

*(b) The Assignment of SEGAS' Rights under the Tolling Contracts*

6.44    The Claimant contends that SEGAS' assignment of its rights under the Tolling Contracts does not impact this Tribunal's jurisdiction.

6.45    According to the Claimant, SEGAS' Tolling Contracts are only relevant to the extent they might affect the dividends that SEGAS would have paid to the Claimant, which is an issue of damages.[64] The Claimant acknowledges that SEGAS' right to payment under its Tolling Contracts with EGAS and UFG belong to HSBC UK; but it points out that the assignment is part of a financing arrangement and that HSBC UK is obliged to assign the rights back to the Claimant once SEGAS' debts have been repaid.[65]

6.46    The Claimant submits that, under Article 15 of the Offshore Security Agreement, any payments received under the Tolling Contracts, including payments made by EGAS,

---

[61] Cl Rej Jur, Paragraph 139.
[62] Cl Rej Jur, Paragraphs 141.
[63] Cl Rej Jur, Paragraph 143.
[64] Cl CM Jur, Paragraph 63; Cl Rej Jur, Paragraph 144.
[65] Cl Rej Jur, Paragraph 145.

are to be paid to a specific HSBC account and used for specific purposes, *i.e.*, financing SEGAS' operations, paying SEGAS' debt and paying dividends to SEGAS' shareholders (*i.e.*, UFG and EGAS). Accordingly, the Claimant and SEGAS both have an interest in EGAS' performing its obligations under the EGAS Tolling Contract.[66]

6.47    The Claimant re-asserts that it expressly holds the right to receive dividends from SEGAS and that right constitutes part of its "investment" under the Treaty as it is "clearly an ownership interest, or at least a form of participation."[67] The Claimant therefore concludes that the Tribunal has jurisdiction over its claim that the conduct of the Respondent affected the amount of dividends that the Claimant received from SEGAS.  The separate issues of whether or how much SEGAS would have paid to the Claimant, by way of dividends, are relevant to damages - but not jurisdiction.

*(c) The* SPA

6.48    The Claimant contends that the SPA satisfies the Treaty's definition of "investment" and therefore constitutes a protected investment under Article 25(1) of the ICSID Convention, as also Article 1(2) of the Treaty.[68]

6.49    The Claimant submits that the SPA is not a "simple sales agreement," as characterised by the Respondent. It is part of a larger investment that is to be viewed "holistically."[69] The Claimant relies on several awards, including *Chevron v. Ecuador*[70] in support to its case that the majority of investment tribunals employ a "holistic view" of investments. The Claimant submits that its property and contract

---

[66] Cl Rej Jur, Paragraph 145.
[67] Cl Rej Jur, Paragraph 146.
[68] Cl CM Jur, Paragraph 68; Cl Rej Jur, Paragraph 147.
[69] Cl CM Jur, Paragraph 65; Cl Rej Jur, Paragraph 147.
[70] *Chevron v. Ecuador*, PCA Case No. AA277, Interim Award, 1 December 2008, Paragraphs 86 and 163-164, [CL-0171]; *see also Mytilineos v. Serbia*, UNCITRAL, Partial Award on Jurisdiction, 8 September 2008, [CL-0172], Paragraph 120; *ADC v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, [CL-0095], Paragraph 331; *Duke Energy v. Peru*, ICSID Case No. ARB/03/28, Decision on Jurisdiction, 1 February 2006, [CL-0073], Paragraph 131; *Joy Mining v. Egypt*, ICSID Case No ARB/03/11, Award on Jurisdiction, 6 August 2004, [CL-0059], Paragraph 54; *Mondev v. United States*, Case No. ARB(AF)/99/2, Award, 11 October 2002, [CL-0053], Paragraphs 80-81 and 105-108; *CSOB v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999, [CL-0002], Paragraph 64; *CSOB v. Slovak Republic*, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999, [CL-0174], Paragraph 72; *SOABI v. Senegal*, ICSID Case No. ARB/82/1, Award, 25 February 1988, 2 ICSID Report 190 (1994), [CL-0175]; *Klöckner v. Cameroon*, ICSID Case No. ARB/81/2, Award, 21 October 1983, 2 ICSID Report 9 (1994), [CL-0176], 65-66.

rights in shares of SEGAS and its rights under the SPA comprise parts of the same investment and must be viewed holistically.[71]

6.50    The Claimant further argues that even if it had no legal interests in SEGAS, the SPA would still constitute an investment, because it was a component of the legal arrangements for the Damietta LNG Plant.[72]

6.51    While acknowledging that some ICSID tribunals have employed the *Salini* test and held that investment must satisfy the *Salini* criteria to qualify as "an investment" under Article 25(1) of the ICSID Convention, the Claimant cites a number of contrary materials, such as the annulment decision in *Malaysian Historical Salvors v. Malaysia* (2009).[73] It contends that other tribunals have not applied *Salini* as separate, additional criteria, especially when the definition of investment under the applicable treaty does not contradict the general understanding of this term.[74]

6.52    The Claimant observes that the Respondent has not addressed the issues of whether the SPA satisfies the *Salini* test. The Claimant submits that the SPA satisfies all four criteria for an investment under the *Salini* test, namely (i) duration; (iii) regularity of profit and return; (iii) assumption of risk; and (iv) substantial commitment.[75]

6.53    The Claimant distinguishes the present case from *Global Trading v. Ukraine* (2010),[76] on which the Respondent relies to argue that a sale-and-purchase contract can never satisfy the *Salini* test.  The Claimant points out that the *Global Trading* tribunal found that the sale and purchase contacts in that case lacked the essential "connecting factor of being 'associated with an investment.'"[77] The Claimant submits that, in contrast, the SPA is an essential part of the Damietta LNG Project.

6.54    In conclusion, the Claimant submits that the SPA cannot be isolated from its overall investment in Egypt when the Tribunal analyses whether an investment exists for the jurisdictional purposes of the Treaty and the ICSID Convention.  The Claimant argues that the Tribunal should reject all jurisdictional objections of the Respondent

---

[71] Cl CM Jur, Paragraph 65.
[72] Cl CM Jur, Paragraph 66.
[73] *Malaysian Historical Salvors v. Malaysia*, ICSID Case No. ARB/05/10, Decision on the Application for Annulment, 16 April 2009, [RL-0069], Paragraphs 80-81.
[74] Cl CM Jur, Paragraph 68; Cl Rej Jur, Paragraph 150.
[75] Cl CM Jur, Paragraph 69 and Foonote 125; Cl Rej Jur, Paragraph 154.
[76] *Global Trading v. Ukraine*, ICSID Case No. ARB/09/11, Award, 1 December 2010, [RL-0068].
[77] Cl Rej Jur, Paragraph 155.

regarding an "investment," since the Respondent has failed to provide any valid arguments as to why the Claimant's claims do not satisfy the jurisdictional requirements of the Treaty.[78]

*(d)* Contractual *Claims under the Treaty and "Claim-Splitting"*

6.55    The Claimant submits that its treaty claims have not been submitted to any form of arbitration.[79] The Claimant rejects the Respondent's contentions that the Tribunal lacks jurisdiction over the Claimant's treaty claims because the Claimant has only suffered wrongs comprising contractual breaches by EGAS and that the contractual fora prevail over this ICSID arbitration. The Claimant submits that it has raised legitimate treaty claims against the Respondent that are distinct from the claims by SEGAS in the CRCICA and ICC arbitrations.[80]

6.56    As a preliminary matter, the Claimant relies on the *Oil Platform Case* (1996)[81] and ICSID decisions that have followed the same reasoning, in support of its case that, for jurisdictional purposes, it need only to establish a *prima facie* case that the Respondent has breached the Treaty.[82] The Claimant notes that the Respondent has provided no argument or evidence to rebut the *prima facie* legitimacy of the Claimant's claims for treaty breaches.[83] According to the Claimant, the filing of the CRCICA and ICC arbitrations before this Treaty arbitration is "by pure happenstance"; and that fact does not "lessen the seriousness to Egypt's Treaty breaches."[84] The Claimant concludes that it has established a *prima facie* case in which each of its treaty claims falls within the substantive protections of the Treaty.

6.57    The Claimant also asserts that the forum selection clause in the SPA does not bar ICSID jurisdiction. The Claimant relies on a number of decisions in which ICSID tribunals have recognised that a contract's forum selection clause did not foreclose the right of the claimant to bring an ICSID arbitration.[85]

---

[78] Cl CM Jur, Paragraph 70.
[79] Cl CM Jur, Paragraphs 71-88.
[80] Cl Rej Jur, Paragraphs 156-163.
[81] *Oil Platforms Case*, International Court of Justice, Separate Opinion of Judge Higgins, 12 December 1996, I.C.J. Reports 1996, [CL-0233].
[82] Cl Rej Jur, Paragraph 158.
[83] Cl Rej Jur, Paragraph 160.
[84] Cl Rej Jur, Paragraph 161.
[85] Cl Rej Jur, Paragraph 167.

6.58    The Claimant argues that the adjudication of its claims against EGAS in the two CRCICA arbitrations cannot be dispositive of the Claimant's treaty claims against the Respondent in this Treaty arbitration.[86] While the Claimant acknowledges that some of its treaty claims share some factual background with SEGAS' contractual claims, it argues that its treaty claims are not contractual in nature since they are predicated on the Respondent's breaches of the Treaty and are grounded on international law and not on EGAS' contractual obligations under the SPA and Egyptian law. The Claimant maintains that the underlying factual matrices of the parallel arbitrations are not sufficient to sustain a jurisdictional objection in this ICSID arbitration.[87]

6.59    With respect to the ICC arbitration between SEGAS and EGAS, the Claimant disputes the Respondent's allegations that the decision of the ICC tribunal is dispositive of claims in this arbitration.   The Claimant argues that its right to dividends from SEGAS is based on its position as SEGAS' shareholder.  According to the Claimant, the ICC tribunal made no finding on the substantive merits of the Claimant's claim to dividends from SEGAS because the ICC arbitration concerned SEGAS' own right to bring a claim under the EGAS Tolling Contract for EGAS' failure to make Toll-or-Pay payments due to SEGAS.[88] The Claimant submits that whilst the ICC tribunal found that SEGAS could not exercise its rights under the Tolling Contract because of the assignment of these rights to HSBC UK, that tribunal did not make findings that Toll-or-Pay payments were not due from EGAS and did not dismiss SEGAS' claims on the merits.[89]

6.60    The Claimant submits that: "[t]he analytical prism that most clearly illustrates the core distinctions between the claims in this ICSID arbitration and those in the three different commercial arbitrations is the triple-identity test."[90] The Claimant submits that this legal standard, which requires the identity of the parties, the causes of action, and the relief sought, has been applied by the majority of investment tribunals;[91] and

---

[86] Cl Rej Jur, Paragraphs 164-170.
[87] Cl Rej Jur, Paragraph 172.
[88] Cl Rej Jur, Paragraph 165.
[89] Tr. D2 393:5-12.
[90] Cl CM Jur, Paragraph 78.
[91] Cl Rej Jur, Paragraph 177, referring to *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision of the Arbitral Tribunal on Objections to Jurisdiction, 30 April 2004, [CL-0239], Paragraphs 74-76; *Champion Trading v. Egypt*, ICSID Case No. ARB/02/9, Decision on Jurisdiction, 21 October 2003, [CL-0240], Paragraphs 3.4.3.1-3.4.3.4; *Lauder v. Czech Republic*, UNCITRAL, Final Award, 3 September 2001, [CL-0092], Paragraphs 159-166; *Alex Genin v. Estonia*, ICSID Case No. ARB/99/2, Award, 25 June 2001,

that the Tribunal "should look, in particular, at the identity of the claims and the causes of action to determine whether the claims are the same of different."[92]

6.61    The Claimant rejects the Respondent's contention that the Claimant's claims in this arbitration have the same "fundamental basis" as the Claimant's and SEGAS' contractual claims against EGAS. The Claimant submits that the Respondent's jurisdictional objection is effectively a "fork-in-the-road" argument.[93]  The Claimant submits that Article 11 of the Treaty does not contain a 'fork-in-the-road' provision; and it does not require the Claimant to choose one form of dispute resolution to the exclusion of others.[94] Contrary to the Respondent's position, the Claimant argues that Article 26 of the ICSID Convention does not preclude this Tribunal's jurisdiction, because the Claimant did not take the Parties' dispute before multiple investment tribunals.[95] Finally, the Claimant contests the Respondent's invocation of *lis pendens*. The Claimant asserts that that "the initiation of multiple proceedings does not itself evidence an abuse of process" and argues that it has dully demonstrated that the commercial arbitrations will not dispose of its claims before this Tribunal.[96]

6.62    In conclusion, the Claimant submits that its claims in this arbitration are plainly treaty claims.[97] The Claimant also concludes that for the purposes of assessing jurisdiction, it is for the Claimant to define the nature of its claims, and the Respondent should not be permitted to profit from the mis-characterisation of the Claimant's claims.[98]

### *(4) The Tribunal's Analyses and Decisions*

6.63    The Tribunal addresses in turn the Respondent's jurisdictional objections based on: (i) "investment"; (ii) "claim-splitting"; and (iii) the contractual nature of the Claimant's claims.

---

[CL-0151], Paragraph 332; *Maffezini v. Spain*, ICSID Case No. ARB/97/7, Decision of the Tribunal on Objections to Jurisdiction, 25 January 2000, [CL-0066], Paragraphs 63-64.
[92] Tr. D2 397:18-22.
[93] Tr. D2 396:2-7.
[94] Cl Rej Jur, Paragraphs 170 and 171-178.
[95] Cl Rej Jur, Paragraph 170.
[96] Cl Rej Jur, Paragraph 192.
[97] Cl Rej Bif, Paragraph 37; Cl CM Jur, Paragraph 81; Cl Rej Jur, Paragraph 187.
[98] Cl Rej Jur, Paragraph 187.

6.64    *Investment*: The Claimant asserts that it is a protected investor with a protected investment under Article 1(2) the Treaty and Article 25(1) of the ICSID Convention, in the form of: (i) the SPA; and (ii) its shares in SEGAS, an Egyptian company.

6.65    The Tribunal decides that the Claimant is an "investor" under Article 1(1) of the Treaty, as a legal entity incorporated in Spain and as a member of the Unión Fenosa association of Spanish companies.  As already indicated, this factor does not appear to be an issue between the Parties.

6.66    As to the SPA, its execution, amendments and performance by the Claimant, the Tribunal decides that, together, these amount to an "Investment" under Article 1(2)[5] of the Treaty, as "rights to engage in economic and commercial activities authorized by law or by virtue of a contract, particularly those rights to […] exploit natural resources." It also decides, on the facts in this case, that these rights satisfy the guidelines provided by the ICSID award in *Salini v. Morocco* (2001) in regard to duration, profit and return, risk and commitment to the development of the Respondent's economy.[99] The Tribunal reaches the same conclusion as regards Article 25(1) of the ICSID Convention. In support of these conclusions, the Tribunal points to the facts of this case, as set out in Part V above, which speak for themselves.

6.67    As to its shares in SEGAS, as at the time of their acquisition by the Claimant, the Tribunal decides that these qualified as an "Investment" under Article 1(2)[1] of the Treaty, as "shares and other forms of participation in companies" and Article 25 of the ICSID Convention, subject to the issue addressed below regarding the continuity of such share ownership and SEGAS' rights under the EGAS Tolling Contract.

6.68    The Tribunal also decides that these investments are to be treated "holistically" as one overall investment made by the Claimant comprising the Damietta Project.

6.69    The issue arises whether the Claimant subsequently lost part of this investment by SEGAS assigning absolutely to HSBC UK its rights under the EGAS Tolling

---

[99] *Salini v. Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001, [CL-0006].

Contract, by virtue of Clause 3.1(ii) of the Offshore Security Agreement dated 27 July 2007 between SEGAS and HSBC UK ("the Offshore Security Agreement").[100]

6.70    The law applicable to the Offshore Security Agreement was English law: see Clause 28. The law applying to the EGAS Tolling Contract was also English law: see Article 11.1.[101] The Claimant acknowledges that SEGAS' rights under the EGAS Tolling Contract were pledged to HSBC UK as security under the Offshore Security Agreement. The question is whether SEGAS agreed to more than a mere form of security.

6.71    It was decided by the ICC tribunal in its second partial award of 24 May 2016 in the ICC Arbitration between SEGAS and EGAS that SEGAS, following its absolute assignment to HSBC UK, could no longer claim tolling fees from EGAS under the EGAS Tolling Contract.[102] Paragraphs 376 and 379(ii) of this award contained the ICC tribunal's decision (with Paragraphs 313ff), as follows:

> *376. The Tribunal has found that, by executing the Offshore Security Agreement and related documents in July 2007, SEGAS assigned to HSBC absolutely its rights under the EGAS Tolling Contract and that those rights were not effectively transferred back to SEGAS by the Deed of Reassignment. Although EGAS was late in pleading the Assignment as a ground for opposing SEGAS's claims, having done so in the Rejoinder, it is not now estopped from relying on the Assignment to object to SEGAS claiming rights retained by HSBC. Thus, the Tribunal finds that SEGAS is not entitled to recover from EGAS the toll and pay amounts and tolling fees claimed in this arbitration.*

> […]

> *379. For the reasons stated, the Tribunal hereby Awards, Orders and Declares:* […]

> *(ii) The sums claimed for outstanding toll-or-pay amounts and tolling fees under the EGAS Tolling Contract are not recoverable by SEGAS, because of the absolute assignment created by the Offshore Security Agreement.*

6.72    The ICC tribunal's decision is legally binding upon EGAS and SEGAS, as *res judicata* under the ICC Rules. However, the Claimant was not a party to this ICC

---

[100] Offshore Security Agreement between Spanish Egyptian Gas Company "SEGAS" as Borrower and HSBC Bank PLC as Offshore Security Trustee, 27 July 2007 [C-0343/R-0038], Clause 3.1, Schedule 1.
[101] Tolling Contract between SEGAS and EGAS, 30 June 2003, [C-0003].
[102] *Spanish Egyptian Gas Company v. Egyptian Natural Gas Holding Company*, ICC Case No. 19392/MD/TO, Second Partial Final Award, 24 May 2016, [R-0323].

arbitration; nor was the Respondent. There is therefore an issue as to the *res judicata* effect of this award upon the Parties in this arbitration.

6.73    This ICC award does not preclude the Claimant's shares in SEGAS qualifying as an investment as at the time of the Claimant's acquisition of those shares, prior to the Offshore Security Agreement. The issue arises only from the terms of the Offshore Security Agreement, as decided by the ICC tribunal in its ICC award.

6.74    Whilst the Offshore Security Agreement provided for an "absolute assignment" of SEGAS' rights under the EGAS Tolling Contract, the Claimant did not thereby absolutely assign to HSBC the ownership of its shares in SEGAS. This is confirmed by Clause 9 of the Share Pledge Agreement of 27 July 2007 between the Claimant, SEGAS and HSBC Egypt whereby the Claimant remained conditionally entitled to maintain its interest in those shares. [103] Its shares in SEGAS did not become worthless or non-existent with the Offshore Security Agreement (see also Clause 3.1(ii) of the Offshore Security Agreement).

6.75    Article 9.1 of the Share Pledge Agreement, subject to the Offshore Agreement, permitted the Claimant (*inter alia*) to sell, transfer, part with its interest in, dispose of or otherwise deal with any of the rights, title and interest in its SEGAS shares, subject to four conditions "to the satisfaction of the Onshore Security Agent, acting reasonably." That agent was HSBC. The law applicable to the Share Pledge Agreement was the law of Egypt: see Article 18.1. The Tribunal has been shown no provisions of Egyptian law that treat Article 9 as being consistent only with an absolute assignment of the Claimant's shares in SEGAS to HSBC, depriving those shares of any value or existence as regards the Claimant.

6.76    In the Tribunal's view, after the Offshore Security Agreement, these retained rights by the Claimant over its shares in SEGAS were sufficient to maintain the Claimant's "investment" under Article 1(2) of the Treaty and Article 25(1) of the ICSID Convention. Nonetheless, the value of those rights, in the form of any dividends payable by SEGAS to the Claimant, could be affected by SEGAS' inability, under the ICC award or otherwise, to recover fees due from EGAS under the EGAS Tolling

---

[103] Share Pledge Agreement between UFG, SEGAS, and HSBC Bank Egypt S.A.E., 27 July 2007, [C-0325].

Contract. That factor, however, may raise an issue as to compensation for a breach of the Treaty by the Respondent; but not an issue of jurisdiction.

6.77    *"Claim-Splitting"*: The Respondent contends that the Claimant (with SEGAS) has engaged in an elaborate and improper strategy of "claim-splitting." It points to the two CRCICA Arbitrations commenced by the Claimant, the ICC Arbitration commenced by SEGAS and this arbitration, with the significant overlap of factual and expert witnesses in the four separate arbitrations.[104] The Respondent also points to the formal relief claimed by EGAS, as the respondent in the CRCICA Arbitration (896), that the CRCICA tribunal should "[f]ind and declare that EGAS's gas supply obligations have been relieved by reason Force Majeure."[105]

6.78    The Respondent relies upon several awards to support its submission that the Claimant's claims in this arbitration are precluded by such claim-splitting and overlapping issues, including *Helnan v. Egypt* (2008)[106] and *Grynberg v. Grenada* (2010).[107] To a similar but greater effect, the Respondent might now also rely upon the recent award in *Orascom v. Algeria* (2017).[108]

6.79    In *Orascom v. Algeria* (2017), the tribunal decided, based on the general principles of good faith and abuse of rights under international law, as follows:

> *542. In particular, an investor who controls several entities in a vertical chain of companies may commit an abuse if it seeks to impugn the same host state measures and claims for the same harm at various levels of the chain in reliance on several investment treaties concluded by the host state. It goes without saying that structuring an investment through several layers of corporate entities in different states is not illegitimate. Indeed, the structure may well pursue legitimate corporate, tax, or pre-dispute BIT nationality planning purposes. In the field of investment treaties, the existence of a vertical corporate chain and of treaty protection covering 'indirect' investments implies that several entities in the chain may claim treaty protection, especially where a host state has entered into several investment treaties. In other words, several corporate entities in the chain may be in a position to bring an arbitration against the host state in relation to the same investment. This possibility, however,*

---

[104] Tr. D1 251-258; ROS, Vol. II, Slides 66-67.
[105] *Unión Fenosa Gas S.A. v. Egyptian Natural Gas Holding Company*, CRCICA Case No. 896/2013, EGAS's Reply to Counter Defense, 30 September 2016, [R-0359], Paragraph 377(ii).
[106] *Helnan v. Egypt*, ICSID Case No. ARB/05/19, Award, 3 July 2008, [RL-0025], Paragraph 163.
[107] *Grynberg v. Grenada*, ICSID Case No. ARB/10/6, Award, 10 December 2010, [RL-0045], Paragraph 7.1.11.
[108] *Orascom v. Algeria*, ICSID Case No. ARB/12/36, Award, 31 May 2017, Paragraph 542 (footnote omitted, citing *Grynberg v. Grenada*).

> *does not mean that the host state has accepted to be sued multiple times by various entities under the same control that are part of the vertical chain in relation to the same investment, the same measures and the same harm.*

6.80   In the Tribunal's view, the Claimant and SEGAS have come close to the dividing line between proper and improper conduct in pursuing four separate arbitrations, under the Treaty, the SPA and the EGAS Tolling Contract with such overlapping factual issues and evidence.

6.81   However, the position in the present case is materially different from the situations addressed in *Helnan v. Egypt* (2008), *Grynberg v. Grenada* (2010) and *Orascom v. Algeria* (2017). In those cases, there was bad faith and/or *res judicata* found against the claimants. In this case, given the cumulative effect of the different disputing parties, applicable laws and causes of action under the separate legal instruments, there can be no *res judicata* effect of the ICC arbitration award upon the Claimant and the Respondent in this ICSID arbitration. As to bad faith, the Tribunal does not find that the Claimant (with SEGAS) was not acting in good faith, although its tactics appear to the Tribunal be wasteful of time, effort and expense, both for EGAS and the Respondent but also, possibly, for the Claimant and SEGAS. Unfortunately, consensual arbitration ill serves multi-party disputes. As to *Orascom v. Algeria* (2017), the investor had deliberately structured its investment through several layers of corporate entities so as to gain the protection of multiple investment treaties. That is not the present case.

6.82   The Tribunal emphasises that this analysis is limited to the issues of jurisdiction. As will appear from Part X below, the Tribunal returns to the indirect effect of the ICC award on the Claimant's claims under the Treaty. It also takes steps in this Award to ensure that the Claimant does not benefit from any 'double recovery' in respect of equivalent losses under the Treaty, the SPA and the EGAS Tolling Contract. The Tribunal also addresses the risk of inconsistent findings between the other arbitrations and this Award in deciding the Respondent's application for a stay or suspension of this arbitration, in Parts X and XI below.

6.83   As to the nature of the Claimant's claims in this ICSID arbitration, the Claimant has made it abundantly clear that all its claims are based on alleged breaches of the Respondent's obligations under the Treaty and not for any contractual breaches of the

SPA or related agreements by EGAS. The Tribunal accepts the Claimant's formulation of its claims, although it recognizes (as will be apparent below) that there is a significant factual overlap between issues common to these treaty and contractual claims.

*(5)  **Summary of Decisions***

6.84    These conclusions as to jurisdiction are subject to the Tribunal's decisions on corruption addressed in Part VII below.

6.85    As a matter of jurisdiction, the Tribunal decides that the Claimant is a protected investor with a protected investment under the Treaty and the ICSID Convention, sufficient to establish the jurisdiction of the Tribunal to address and decide on their merits its claims pleaded in this arbitration under the Treaty.

6.86    As a matter of admissibility, the Tribunal decides that it may exercise such jurisdiction to address and decide on their merits the claims pleaded by the Claimant in this arbitration under the Treaty,

6.87    As matters of jurisdiction and admissibility, the Tribunal decides to dismiss the Respondent's objections to the Tribunal's jurisdiction and to exercise of such jurisdiction to address and to decide on their merits the Claimant's claims pleaded in this arbitration under the Treaty.

## PART VII: THE CORRUPTION ISSUES

### (1) Introduction

7.1   As indicated in Part VI above, the Tribunal addresses here in Part VII the Respondent's other jurisdictional objections based on "corruption," namely the alleged acts of corruption by the Claimant (including its predecessor UFACEX) in procuring the SPA made with EGPC (succeeded by EGAS).

### (2) The Respondent's Case

7.2   In summary, the Respondent contends that the Tribunal lacks jurisdiction or should decline to exercise jurisdiction over the Claimant's investments because they were procured through corrupt and illegal practices to which the Claimant was a party. The Respondent submits that such investments are not protected under the Treaty and the ICSID Convention.[1]

7.3   The Respondent contends that arrangements at the inception of the Damietta Project prove the procurement of the Project through corrupt means. The Respondent alleges three separate instances of corrupt conduct.

7.4   First, the Respondent asserts that the Claimant's "process to select the subcontractor to build the Damietta Plant was […] rife with corruption."[2]  Specifically, the Claimant awarded the EPC Contract for the Damietta Plant to a joint venture consortium led by Halliburton/KBR, whose bid was US$ 50 million higher than that of the next competitor. Halliburton/KBR's CEO later pleaded guilty in the USA to violations of the US Foreign Corrupt Practices Act for bribing Egyptian Government officials in connection with an "unnamed Egypt LNG project." According to the Respondent, the reference was to the Damietta Project because at the time there were only two such projects in Egypt; and Halliburton had no involvement in the other project.[3]

7.5   Second, the Respondent argues that the Claimant engaged Mr Hussein Salem, a "former Egyptian intelligence officer and friend of then-President Mubarak," who

---

[1] Resp Obj Jur & Req for Bif, Paragraphs 14-42; Resp Rep Bif, Paragraphs 19-27; Resp Rep Jur, Paragraphs 7-47; Tr. D2 322:14-17; ROS, Vol. IV, Slide 21.
[2] Resp Obj Jur & Req for Bif, Paragraph 26.
[3] Resp Obj Jur & Req for Bif, Paragraph 26; Resp Rep Jur, Paragraph 20, Footnote 31; Resp CM Merits, Paragraphs 47-49.

himself publicly stated that he "used his personal connections in the Egyptian Government for UFG's benefit."[4] According to the Respondent, Mr Salem fled Egypt after the 2011 Revolution and was implicated in several additional instances of corruption.

7.6    Third, the Respondent alleges corruption relating to the Claimant's association with Mr Yehia El Komy. The Respondent contends that the Damietta Project "was the result of influence peddling and corrupt practices as the then-Minister of Petroleum, Mr Sameh Fahmy, steered the Damietta LNG Project to UFG at the behest of a personal friend, Mr Yehia El Komy, based on their personal relationship and to enrich Mr El Komy."[5]

7.7    The Respondent alleges that Mr El Komy arranged for the Claimant to enter the Egyptian gas market and procure the Damietta Project corruptly.[6] The Respondent observes that the Claimant had no prior LNG experience; and that it came as "a surprise in the industry when the company was awarded the Damietta Project."[7] The Respondent notes that Mr El Komy's family-owned company, EATCO, only added gas and petroleum investments to its corporate activities more than a year after the conclusion of the SPA.[8]

7.8    According to the Respondent, Mr El Komy was brought on board by the Claimant for his connection to the then Minister of Petroleum Mr Sameh Fahmy, who, in the words of UFG's officials, had a "personal interest in the [Damietta Project] and entering the Spanish market."[9] According to the Respondent, Mr El Komy was an "agent" or "intermediary" hired by the Claimant to use his illicit influence over the Minister to secure that the SPA was awarded to UFACEX.

---

[4] Resp Obj Jur & Req for Bif, Paragraph 18 and Footnote 13.
[5] Resp Obj Jur & Req for Bif, Paragraph 14.
[6] Resp Obj Jur & Req for Bif, Paragraphs 15-17; Resp Rep Jur, Paragraphs 9-18.
[7] Tr. D2 309-310.
[8] Tr. D2 310-311; ROS, Vol. IV, Slide 5; Summary of the amendment of the Limited Partnership Contract of the Egyptian Arab Trading Company, 22 September 2001, [R-0330], Page 2; Excerpt of the Commercial Registry of the Egyptian Arab Trading Company, 18 December 2016, [R-0327], Page 2.
[9] UFACEX Memorandum to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 January 2000, [C-0344].

7.9     The Respondent submits that Mr El Komy, "who was not stranger to wielding his influence for profit,"[10] procured the SPA for the Claimant in exchange ██████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████.[11]

7.10    The Respondent observes that ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████ █ ███████████████████████████ ███████████████████████████████████████████ ████████████████████████████.

7.11    The Respondent disputes the Claimant's allegations that the ██████████████ ████████████████████████████████ are "wholly consistent with the role of a local partner." According to the Respondent, they demonstrate the illicit purpose of the arrangements.

7.12    The Respondent points to the contingencies of these payments.  It argues that "███ ███████████████████████████████████████████ █████████████████████████████████████████.   The Respondent notes that ████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████ ████████████ ███████████████████████████████████████████

---

[10] Tr. D2 311:14-17; Resp Obj Jur & Req for Bif, Paragraph 17 and Footnote 12; "Court Sentences Former Housing Minister, Alaa Mubarak's Father-in-Law to Prison," *Egypt Independent* (29 March 2012), [R-0016]; "Businessman Yehia El Komy sentenced to 3 years in prison," *Mada Al Balad* (27 December 2011), [R-0335].
[11] Resp Rep Jur, Paragraphs 15-17 (brackets in original); ████████████████████████████████████
████████████████████████████
[12] Resp Rep Jur, Paragraph 15.
[13] Tr. D2.313.



7.13    The Respondent argues that ███████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ ██ According to the Respondent, "there is simply no legitimate reasons justifying the huge payments to Mr El Komy."[16]

7.14    ████████████████████████████████████████ the Respondent notes that the amount of money to acquire such shares was "conveniently" ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ ██ The Respondent rejects as "meaningless" the Claimant's assertions that Mr El Komy was a true "business partner," given "the clear record that UFACEX contributed the entire amount for Mr El Komy's participation in SEGAS."[18] Mr El Komy never contributed his own capital and only contributed to SEGAS' share capital a total of US$ 6.88 million,[19] selling later his stake to UFACEX for "solid profits." According to the Respondent, "Mr El Komy's 'contribution' was nothing more than money funneled to him by Claimant in exchange for his personal connections and back-channel influence."[20]

7.15    The Respondent contends that, in addition to securing the Damietta Project through influence peddling, the Claimant did not obtain the SPA through an open or competitive bid process, as required by Egyptian law. The Respondent argues that the acquisition of the SPA without a tender process violated Article 15 of the EGPC Commercial Activity Regulation because there was no "case of necessity" to contract with UFG, which possessed no experience in the LNG sector, the Damietta Project did not involve appropriate prices, and was unilaterally approved by the Minister of Petroleum (Mr Fahmy) without a recommendation of EGPC's Deciding Committee to

---

[14] Tr. D2 317:21-22; Tr. D2 318:1-4.
[15] Resp Rep Jur, Paragraph 18.
[16] Tr. D2, 325:3-4.
[17] Tr. D2, 318:5-16; Resp Rep Jur, Paragraph 16.
[18] Resp Rep Jur, Paragraph 18.
[19] Resp Obj Jur & Req for Bif, Paragraph 16; Tr. D2 318:17-22, 319:1-2.
[20] Resp Rep Jur, Paragraph 16 (emphasis in original).

give UFG a non-bid contract.[21] Rather, the SPA was obtained through "covert dealings behind closed doors,"[22] a course "clearly unlawful under Egyptian law."[23] According to the Respondent, the short period for negotiations leading to the SPA is also consistent with the existence of corruption. As a result, the SPA was awarded in breach of mandatory requirements of Egyptian law.

7.16    The Respondent submits that the corrupt and illegal practices that surround the Damietta Project disqualify the Claimant's alleged investments from protection under the Treaty and the ICSID Convention, and warrant the dismissal of the case on jurisdictional grounds or, in the alternative, render the Claimant's claims inadmissible.[24]

7.17    The Respondent asserts that contracts obtained through acts of corruption are contrary to Egyptian law and international public policy. The Respondent refers to several decisions of the Egyptian courts, which have held that such contracts are null and void.[25] According to the Respondent, as a result, the SPA, the Tolling Contracts, and all ancillary agreements are invalid and legally unenforceable as a matter of international, Egyptian and English law; and any rights under these agreements or rights or assets resulting from their implementation are not protected under the Treaty and the ICSID Convention.[26]

7.18    The Respondent refers to the wording of Articles 3(1), 1(2) and 1(2)[5] of the Treaty, which expressly provide that: "[e]ach Party shall protect in its territory the investments made in accordance with its laws and regulations,"[27] and defines protected investments as "any kind of assets, such as goods and rights of all sorts, acquired under the law of the host country of the investment and in particular, […] rights to engage in economic and commercial activities authorized by law or by virtue

---

[21] Resp Rep Jur, Paragraph 23; Resp Obj Jur & Req for Bif, Paragraphs 23-25.
[22] Resp Obj Jur & Req for Bif, Paragraph 20; Resp Rep Jur, Paragraphs 22-23.
[23] Resp Obj Jur & Req for Bif, Paragraph 28.
[24] Resp Obj Jur & Req for Bif, Paragraphs 31-42; Resp Rep Jur, Paragraphs 31-47; Tr. D2 321.
[25] Resp Obj Jur & Req for Bif, Paragraph 30, citing Case No. 11492 of 65 J, Administrative Court, Economic and Investment Disputes Division, 7th Circuit, 7 May 2011, [R-0033]; Case No. 40510 of 65 J, Administrative Court, Economic and Investment Disputes Division, 7th Circuit, 21 September 2011, [R-0034]; Case No. 34248 of 65 J, Administrative Court, Economic and Investment Disputes Division, 7th Circuit, 21 September 2011, [R-0035]; Resp Rep Jur, Paragraph 34.
[26] Resp Obj Jur & Req for Bif, Paragraphs 36 and 41; Resp Rep Jur, Paragraph 34.
[27] Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, [C-0001], Article 3(1).

of a contract, particularly those rights to search for […] or exploit natural resources, in accordance with existing laws and regulations."[28] The Respondent submits that the Treaty does not protect investments in violation of the host State's laws and, relying on *Inceysa v. El Salvador* (2006), it argues that investment tribunals may deny treaty protection to investments for which the required tender process was not followed.[29]

7.19    The Respondent rejects the Claimant's case that corruption should "not automatically be considered a jurisdictional issue."[30] The Respondent points out that "as Claimant itself recognizes, arbitral tribunals have not only dismissed claims based on '*contracts of corruption*', but also claims based in 'contracts obtained by corruption,' as was the case in *World Duty Free Company v. Kenya*."[31] Moreover, so the Respondent submits, ICSID tribunals have "overwhelmingly" declined to exercise jurisdiction where an investment have been obtained through corruption; and that such an approach ensures the promotion of the rule of law.[32]

7.20    The Respondent also disputes that the applicable standard of proof for corruption allegation is one of "clear and convincing evidence."[33] The Respondent submits that no uniform standard exists. The Respondent asserts that tribunals have held that the difficulty of proving allegations of corruption and illegality renders it inappropriate to apply a heightened standard of proof for such allegations and have in practice tailored the standard of proof to the circumstances of each case, accepting circumstantial evidence as means of proving allegations of corruption and bribery. The Respondent

---

[28] Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, [C-0001], Article 1(2).
[29] Resp Rep Jur, Paragraph 33, referring to *Inceysa v. El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, [RL-0001], Paragraph 242; *Metal-Tech v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, [RL-0002], Paragraphs 372-373; *Fraport v. Philippines*, ICSID Case No. ARB/11/12, Award, 10 December 2014, [RL-0003], Paragraphs 467-468.
[30] Resp Rep Jur, Paragraph 35, citing from Cl CM Jur, Paragraph 36.
[31] Resp Rep Jur, Paragraph 35 (footnote omitted, emphasis in original), citing *World Duty Free v. Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006, [RL-0020].
[32] Resp Obj Jur & Req for Bif, Paragraph 38; ICC Case No. 3916 (1982), *in* Sigvard Jarvin & Yves Derains, *Collection of ICC Arbitral Awards 1974-1985* (1994), [RL-0017], 510-511; ICC Case No. 3913 (1981), *in* Sigvard Jarvin & Yves Derains, *Collection of ICC Arbitral Awards 1974-1985* (1994), [RL-0018], 498; Tr. D2 323:2-8; ROS, Vol. IV, Slide 22, citing *Metal-Tech v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, [RL-0002], Paragraph 389.
[33] Resp Rep Jur, Paragraph 29 (emphasis in original), referring to Cl CM Jur, Paragraph 8.

asserts that, whatever the applicable standard, it has met its burden of proof in demonstrating corruption at the inception of the Damietta Project. [34]

7.21   The Respondent argues that, contrary to the Claimant's assertions based on Article 45 of the ILC Articles on State Responsibility, it has neither waived nor acquiesced in the conduct through the lapse of time; and that it continues to investigate the corruption surrounding the Damietta Project.[35]   In response to the Claimant's argument that EGAS has ratified the corruption and the Respondent is barred from invoking corruption due to its alleged "continuing adherence" to the SPA, the Respondent points out that it is not a contractual party to the SPA; and that, therefore, it cannot be said that the Respondent "continues to adhere" to the SPA.[36]

7.22   Lastly, the Respondent submits that its allegations of corruption are not time-barred, as the Claimant asserts. It is the Respondent's case that, even if the Egyptian statute of limitations barred the prosecution of the corrupt practices at issue, the Respondent is not prevented from seeking the dismissal of these ICSID proceedings under international law, because a domestic statute of limitation "cannot apply to claims filed under the ICSID Convention," as was decided in *Maffezini v. Spain* (2000).[37]

### (3) The Claimant's Case

7.23   In summary, the Claimant denies the Respondent's allegations of corruption and asserts that they are "wholly unsubstantiated and false."[38] The Claimant asserts that the Respondent lacks any evidence to establish that corruption occurred or that the SPA was illegally concluded.

---

[34] Resp Rep Jur, Paragraph 29, citing *Metal-Tech v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, [RL-0002], Paragraphs 238-239; *AAPL v. Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, [RL-0116], Paragraph 56, Rule (R); *Middle East Cement v. Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, [CL-0102], Paragraph 94; *Alpha v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, [CL-0061], Paragraph 238; *EDF (Services) v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, [CL-0038], Paragraph 221; *Fraport v. Philippines*, ICSID Case No. ARB/03/25, Award, 16 August 2007, [CL-0126], Paragraph 399; *Libananco v. Turkey*, ICSID Case No. ARB/06/8, Award, 2 September 2011, [RL-0054], Paragraph 25; *Rumeli v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, [CL-0020], Paragraph 446; *Metal-Tech v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, [RL-0002], Paragraphs 201-203, 208-212 and 216.
[35] Resp Rep Jur, Paragraphs 43-45; Tr. D2 323.
[36] Resp Rep Jur, Paragraph 41; Resp CM Merits, Paragraph 34; Tr. D2 323.
[37] Resp Rep Jur, Paragraph 46, citing *Maffezini v. Spain*, ICSID Case No. ARB/97/7, Award, 13 November 2000, [CL-0070], Paragraph 93.
[38] Cl Rej Jur, Paragraph 16; Cl Obj Bif, Paragraph 27.

7.24    According to the Claimant, even if the Respondent's submissions were accepted as credibly raising claims of corruption, they provide no basis for ousting the Tribunal's jurisdiction or depriving the Claimant from its treaty protections for the following reasons. First, a finding of corruption is not an automatic jurisdictional "trump" card. Second, the Respondent has failed to prosecute public officials for any alleged corruption relating to the SPA. Third, the Respondent has ratified the SPA through subsequent acts, including six amendments to the SPA, which can also be considered protected new "investments" not tainted by corruption allegations relating to the inception of the project.[39]

7.25    The Claimant asserts that the Respondent is required to prove its corruption allegations following the "clear and convincing evidence" standard of proof.[40] According to the Claimant, the Respondent has failed to meet such standard and has not provided any actual evidence to support its corruption allegations, let alone sufficient evidence to meet the requisite standard. For this reason alone, the allegations merit summary dismissal. [41]

7.26    According to the Claimant, the timing of the Respondent's allegations confirms their opportunistic nature. The Claimant notes that the Respondent did not claim that the SPA was corruptly obtained until 15 years after it was signed, after the Claimant had submitted its Memorial on the Merits in this ICSID arbitration.[42]

7.27    The Claimant further observes that the Respondent has effectively dropped two of its initially three allegations of corrupt conduct and seeks to suppress evidence disproving the third. In addition, the Respondent resorts to misrepresentations and maintains allegations that lack any factual support.

7.28    With respect to the first allegation of corrupt conduct regarding Halliburton, the Claimant denies that it has anything to do with the corruption identified in the plea agreement of the former Halliburton/KBR CEO under the US Foreign Corrupt Practices Act.[43] The Claimant submits that any corrupt arrangements at Halliburton involved its own CEO and a "consultant" who was a former Halliburton employee,

---

[39] Cl Obj Bif, Paragraph 28.
[40] Cl Obj Bif, Paragraph 29 (emphasis omitted); Cl Rej Jur, Paragraphs 10 and 25.
[41] Cl CM Jur, Paragraph 8.
[42] Tr. D2 359:12-18.
[43] Cl CM Jur, Paragraphs 11-12.

but not anyone at UFG. With respect to the payment of US$ 10 million under such an arrangement between Halliburton and a consultant on the Damietta EPC bid, the Claimant denies any knowledge of and involvement in any such scheme.[44]

7.29   With respect to the second allegation, the Claimant maintains that the Respondent's allegations concerning Mr Hussein Salem have no merit.[45] The Claimant asserts that it has never had any dealings with Mr Salem; and it denies that Mr Salem had any involvement in the negotiation of the SPA. The Claimant further submits that the Respondent has not provided any evidence to the contrary.

7.30   With respect to the third allegation, the Claimant contends that the corruption and illegality allegations of the Respondent relating to Mr Yehia El Komy are equally meritless and unsubstantiated by evidence.[46]

7.31   The Claimant denies that Mr El Komy was UFACEX's "agent" or "broker" engaged to buy influence.[47]  The Claimant describes Mr El Komy as a local businessman, with a degree in geology and experience as investor in the petroleum industry, who "decided to establish an LNG facility in Egypt" and had "the necessary technical and industry knowledge to put this project together."[48]  The Claimant asserts that Mr El Komy was instrumental in the inception of the Damietta Project.[49]  Moreover, EATCO's role in handling local regulatory and logistical matters was clear from the outset;[50] and ▮▮▮▮▮▮▮▮▮▮ confirms the role played in the early days of the Project and its value for the Claimant. ▮▮▮▮▮▮▮▮ was terminated less than a year after its conclusion.  For the Claimant, Mr El Komy's role is consistent with the usual role of a local partner in substantial international investment projects.[51]

7.32   According to the Claimant, Mr El Komy's active role as a business partner in the early days of the Project is supported by the evidence. The Claimant asserts that Mr El Komy proposed the idea of the Damietta Project to UFACEX.[52] Specifically, Mr El Komy and EATCO played a leading role in the incorporation of SEGAS, securing

---

[44] Cl CM Jur, Paragraph 12.
[45] Cl CM Jur, Paragraphs 13-14.
[46] Cl CM Jur, Paragraphs 15-32.
[47] Cl CM Jur, Paragraph 17 ; Cl Rej Jur, Paragraph 30.
[48] Cl Rej Jur, Paragraph 34.
[49] Cl CM Jur, Paragraph 18.
[50] Cl Rej Jur, Paragraph 22.
[51] Cl CM Jur, Paragraph 17; Cl Rej Jur, Paragraph 8.
[52] Cl Rej Jur, Paragraphs 8, 18, 22, 30, 44, 50, 55 and 57.

government permits necessary to develop the Project, identifying of suitable locations for the Damietta Plant, participating in the selection of the Damietta Plant's EPC contractor, and securing of the necessary agreements, permits and licenses for the construction of the Plant.[53]

7.33    The Claimant rejects the Respondent's assertions that Mr El Komy was an instrument to facilitate corruption by exerting improper influence over Minister Fahmy and points out that there is no evidence to support such assertions.[54] The Claimant argues that the Respondent's sole "evidence" ███████████████████████████████, which the Claimant freely produced during the document production phase in this arbitration.   The Claimant asserts that ██████ only serves to emphasise Mr El Komy's and EATCO's key role in the development of the Damietta Project.[55] According to the Claimant, Mr El Komy was "the originator of the project, the 'first mover' and a true partner [of] UFACEX."[56] The Claimant asserts that ██████████ ██ reflect Mr El Komy' instrumental role in the inception of the Project, EATCO's level of participation in SEGAS, and the bargaining power of the parties at the time.[57]

7.34    According to the Claimant, ████████████████████ ███████████████████████████ have nothing to do with corruption. ██ ███████████████████████████████████████ was the result of commercial compromise and not corruption.[58]

7.35    The Claimant rejects as false the Respondent's allegations that Mr El Komy was to contribute only US$ 10 million to SEGAS' issued share capital.[59] The Claimant asserts that EATCO was to contribute US$ 40 million (25% to be paid-up within three months of SEGAS' incorporation and 75% over the next five years).[60] The Claimant points out that ██████████████████████████████ ███████████████████████████████ █████ The Claimant decided to end its partnership with EATCO because of

[53] Cl Rej Jur, Paragraph 50.
[54] Cl CM Jur, Paragraph 21; Cl Rej Jur, Paragraph 30.
[55] Cl Rej Jur, Paragraphs 26-27.
[56] Cl Rej Jur, Paragraph 8.
[57] Cl Rej Jur, Paragraph 29.
[58] Cl Rej Jur, Paragraph 44.
[59] Cl Rej Jur, Paragraph 58.
[60] Cl Rej Jur, Paragraph 59.
[61] Cl Rej Jur, Paragraph 60.

EATCO's failure to contribute to SEGAS' capital.  The buy-out of Mr El Komy's shares was considered necessary;[62] and the price paid by UFACEX was fair and reasonable.[63]

7.36    The Claimant further asserts that ██████████████████████████ does not establish the existence of any corruption.[64] There is also no evidence that any payment was made to Minister Fahmy on behalf of UFG.[65] ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████.[66] The Claimant emphasises that ████████████████████████████ ████████████████████████████████████████ ████ █

7.37    The Claimant asserts that there is nothing inappropriate about ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ ████████ only demonstrates EATCO's "expansive and continuing role in the Project."[68] ████████████████████████████████████████ ████████████████████████ █

7.38    With respect to ████████████████████ the Claimant asserts that it served primarily to compensate the imbalance that existed between UFACEX and EATCO in their respective receipts derived from the Project.[70] ████████████ ████████████████████████████████████████ ████████████████ The Claimant submits that ████████████████ ████████████████████ which it submits "was a relatively modest amount

---

[62] Cl CM Jur, Paragraph 22; Cl Rej Jur, Paragraph 61.
[63] Cl Rej Jur, Paragraph 62.
[64] Cl Rej Jur, Paragraph 49.
[65] Cl Rej Jur, Paragraph 52.
[66] Cl Rej Jur, Paragraphs 46-48; Tr. D2 380.
[67] Cl Rej Jur, Paragraph 48 (emphasis omitted).
[68] Cl Rej Jur, Paragraph 49.
[69] Cl Rej Jur, Paragraphs 7 and 112.
[70] Cl Rej Jur, Paragraph 53.

of compensation to EATCO in comparison to the billions of dollars the [UFG] expected to generate over the life of the Project."[71]

7.39    The Claimant further asserts that the SPA was the result of genuine arm's length negotiations between UFACEX and EGPC.[72] Specifically, the Claimant argues that the Respondent has not demonstrated that the SPA is a "direct agreement" and, even if it were, all conditions for the SPA were fully satisfied.[73] According to the Claimant, the SPA was the product of a competitive process in accordance with Egyptian law.[74] As a factual matter, there was no violation of EGPC's internal bidding rules.[75] Moreover, the Claimant asserts that it is entitled to rely on Article 24.1 of the SPA, in which the EGPC's Chairman warranted that he had "all powers, authority and applicable approvals (it any) necessary to enter into the Agreement."[76] Further, the Claimant asserts that the Respondent itself determined that the SPA was "necessary" for its economic development.[77] In addition, the Claimant points out that the price for natural gas was genuinely and intensely negotiated between the Parties, was *increased* by the Minister of Petroleum, and that it was considered to be "appropriate" according to EGPC itself.[78] The Claimant also argues that the price was approved by the Respondent's Council of Ministers.[79] Also, the Claimant rejects the Respondent's assertions that the SPA was unilaterally approved by the Minister of Petroleum and maintains that the SPA was approved by the Respondent's Cabinet and by the Economic Commission of EGPC's Board of Directors.[80]

7.40    According to the Claimant, corruption is not an issue of jurisdiction or admissibility in this case. It submits that any consequences of corruption (which it denies) should form part of the merits.[81] Moreover, even if corruption were found to be implicated in the conclusion of the SPA, that would make the SPA voidable and not void

---

[71] Cl Rej Jur, Paragraph 54.
[72] Cl Rej Jur, Paragraphs 70-96.
[73] Cl Rej Jur, Paragraph 76; Tr. D2 385.
[74] Cl Rej Jur, Paragraphs 73-76.
[75] Cl Rej Jur, Paragraph 97; Tr. D2 383:384.
[76] Cl CM Jur, Paragraph 28.
[77] Cl Rej Jur, Paragraphs 77-82.
[78] Cl Rej Jur, Paragraphs 83-84.
[79] Cl Rej Jur, Paragraphs 85.
[80] Cl Rej Jur, Paragraphs 93-96; Tr. D2 383.
[81] Cl CM Jur, Paragraphs 33-39.

automatically. It is therefore for the Tribunal to determine whether the SPA is to be considered avoided in all the circumstances.[82]

7.41    The Claimant further alleges that the Respondent misstates the law governing corruption issues and that the Respondent's assertion that the Tribunal lacks jurisdiction on the basis of corruption and illegality has no legal basis.  The Claimant submits that corruption allegations could not lead to a dismissal of the present case on jurisdictional grounds.

7.42    First, the Claimant submits, international anti-corruption law, as well as policy considerations in international investment arbitration, demand that corruption not be treated as an inflexible automatic jurisdictional "trump" card leading to an automatic dismissal of the case for lack of jurisdiction.[83] The Claimant argues that the legal materials cited by the Respondent in support of it jurisdictional objections based on corruption allegations are either inapplicable or support the Claimant's case.[84]

7.43    Second, the Claimant contends that the Respondent's failure to prosecute the former Minister Fahmy deprives it of the right to invoke corruption in this arbitration.[85]  The Claimant points out that the Respondent has not offered any reasons why the Tribunal should not apply the *Wena v. Egypt* standard that lack of prosecution is a ground for disregarding a State's corruption defences.[86]

7.44    Third, the Claimant submits that, by its implementation and further amendments to the SPA for the past fifteen or more years, the Respondent has acquiesced in or ratified any corruption or any violation of public bidding regulations that may have occurred in regard to the SPA.[87]

7.45    Lastly, the Claimant contends that all periods for civil and criminal liability for any acts of corruption have already passed and, consequently, that the Respondent has lost the right to raise corruption as a jurisdictional objection or defence on the merits.[88] The Claimant submits that the Respondent's reliance on *Maffezini v. Spain* (2000) in

---

[82] Tr. D2 391:5-15.
[83] Cl CM Jur, Paragraphs 34-39; Cl Rej Jur, Paragraphs 101-107.
[84] Cl Rej Jur, Paragraphs 108-112.
[85] Cl Rej Jur, Paragraphs 113-116.
[86] Cl Rej Jur, Paragraph 114.
[87] Cl Rej Jur, Paragraphs 117-122.
[88] Cl Rej Jur, Paragraphs 123-126.

support of it position that a domestic statute of limitation does not apply to claims under the ICSID Convention is misguided.  According to the Claimant, *Maffezini v. Spain* (2000) stands for the principle that in treaty arbitration an investor's treaty claim should not be barred by domestic statutes of limitation because it is based on international law. The Claimant notes that, to the contrary, the Respondent's "corruption and illegality defences are based precisely upon violation of national law."[89]

### *(4) The Tribunal's Analyses and Decisions*

7.46    The Tribunal's starting-point is necessarily the Treaty. Article 1(2) defines an "investment" as assets and rights "acquired under the law of the host country [Egypt]." Article 3 provides protection for investments "made in accordance with [Egypt's] laws and regulations by investors of [Spain]." In the Tribunal's view, an investment made corruptly by a Spanish investor under the laws of Egypt does not qualify for protection under the Treaty.

7.47    The SPA was subject to, as its "governing law," the laws of Egypt: see Article 16.1 of the SPA. The SPA also contained a provision for CRCICA arbitration, in Egypt: see Article 16.4 of the SPA. The Tribunal takes judicial notice that a party's corrupt acts in procuring a contract in Egypt, such as the SPA with EGPC, are criminal offences under Egyptian law.

7.48    Thus, so the Tribunal concludes, the effect of international public policy under the Treaty as a matter of international law and also as a matter of Egyptian law, proven corruption by the Claimant in procuring the SPA would be fatal to the Claimant's claims derived from the SPA in this arbitration, as regards jurisdiction, admissibility and the merits.

7.49    The Respondent's case, however, turns on the facts alleged by the Respondent and denied by the Claimant, rather than upon any material difference as to the legal principles applicable to the Respondent's case. Hence, this Part of the Award should be read with the facts found by the Tribunal in Part V of this Award.

---

[89] Cl Rej Jur, Paragraph 126.

7.50   The Claimant was not an original party to the SPA. However, as elsewhere decided in this Award, the Claimant stands in the shoes of the original Buyer (UFACEX). The Claimant can have no better rights under the Treaty than UFACEX, its associated company. The original Buyer and the Claimant were, together, closely involved in the Damietta Project from the outset.

7.51   The Respondent advanced, in its pleadings, three separate allegations of corruption against the Claimant and its associated companies, all members of the Unión Fenosa group of companies, to the effect that the "Damietta LNG Project was riddled with corruption."[90] These concerned, as listed above: (i) the EPC Contract with Halliburton; (ii) the SPA and Mr Hussein Salem; and (iii) the SPA and Mr Yehia El Komy. The Tribunal addresses each of these allegations below; but it is appropriate first to identify certain common features.

7.52   The first feature is the legal burden and standard of proof for these allegations of corruption against the Claimant. As the party making these allegations, the Respondent bears the legal burden of proof. As to the standard of proof, although these allegations amount to serious criminal misconduct, the Tribunal considers that the standard of proof remains "the balance of probabilities." As has long been recognised, corruption is rarely proven by direct cogent evidence; but, rather, it usually depends upon an accumulation of circumstantial evidence. Circumstantial evidence of corruption is as good as direct evidence in proving corruption. There is no reason in this arbitration, which is not a criminal proceeding, to impose a higher standard of proof: see the *Libananco* award (2011).[91]

7.53   The second feature is the timing of these allegations. They were first made in this arbitration by the Respondent on 25 November 2015, more than 15 years after the SPA of 1 August 2000. Whilst the lapse of time provides, by itself, no complete answer to the Respondent's allegations under international law, it raises doubts as to why such allegations were not raised and investigated by the Respondent's criminal authorities long before 2015; and why criminal prosecutions have still not been brought against certain individuals in Egypt.

---

[90] Resp Obj Jur & Req for Bif, Paragraph 5.
[91] *Libananco v. Turkey*, ICSID Case No. ARB/06/8, Award, 2 September 2011, [RL-0054], Paragraph 125.

7.54   The third feature is the SPA itself, as "endorsed" by the Respondent at the time, both in draft form and as executed by the parties. It was signed by EGPC's chairman. Under Article 24.1 of the SPA, EGPC represented and warranted that the SPA had been authorised and approved; that the SPA constituted the valid, binding and enforceable obligation of EGPC; and that the execution and performance of the SPA would not cause it to violate any law or regulation. Whilst the terms of Article 24.1 provide, by themselves, no complete answer to the Respondent's allegations under international law, these raise a presumption of legality, albeit rebuttable, that is inconsistent with corruption by the parties to the SPA.

7.55   *(i) Halliburton*: The Halliburton KBR consortium was granted the EPC Contract by SEGAS on 19 December 2001 (see Part V above).

7.56   Later, Halliburton's Chief Executive Officer, Mr Albert Stanley, pleaded guilty to corruption under the USA's Foreign Corrupt Practices Act; and the SEC (with the USA's Department of Justice) charged Halliburton (with others) with paying bribes to obtain illegally contracts worth more than US$ 6 billion.[92]

7.57   These acts of corruption by bribery (with kickbacks), as publicly reported, included one or more unnamed projects in Egypt. The Tribunal assumes, on the limited materials before it, that one such project was the Damietta Project. There are no evidential materials before this Tribunal linking such corrupt acts with the Claimant or the SPA.

7.58   The Respondent has the legal burden of proving that the Claimant (or any of its associated companies) was party or privy to acts of corruption by Halliburton and officers of the Respondent in regard to the execution or performance of the EPC Contract. Its case cannot succeed without such proof. There can be no such guilt inferred from Halliburton's mere association with SEGAS as the Claimant's majority-owned subsidiary under the EPC Contract.

7.59   The Tribunal has considered these limited materials in regard to Halliburton. There is no proof in these proceedings of any involvement by the Claimant or SEGAS in any

---

[92] Zachary A. Goldfarb, "Halliburton, KBR Settle Bribery Allegations," *The Washington Post* (12 February 2009), [R-0025]; Chris Baltimore, "Ex-KBR CEO Gets 30 Months for Nigeria Scheme," *Reuters* (23 February 2012), [R-0026]; "U.S. Targets Overseas Bribery; KBR Exec's Plea Widens Probe," *Pro Publica* (9 September 2008), [R-0027].

corrupt acts by Halliburton in regard to EPC Contract, the SPA or the Damietta Project. Accordingly, the Tribunal decides that the Respondent has not discharged its legal burden of proof, on a balance of probabilities, in regard to corruption by Halliburton.

7.60     *(ii) Mr Hussein Salem*: According to the Respondent, Mr Salem was a close "confidant" of President Mubarak. After the Egyptian Revolution, it was publicly reported in 2012 that Mr Salem (who was no longer in Egypt) had been involved in corrupt practices in regard to Egyptian sales of natural gas.

7.61     He was publicly quoted in the press as saying: "Yes I made gas deals with Israel. We have a lot of gas in Egypt and can export it. I made an agreement with Israel which had political undertones, […]. As for sending gas to Spain – well I owe them, because they gave me Spanish citizenship and welcomed me and my family."[93]

7.62     There is no contemporary evidence that Mr Salem was involved in the negotiations for or the execution or the performance of the SPA; nor that Mr Salem ever met an officer or employee of the Claimant (or any of its associated companies). The only evidence of possible corruption is Mr Salem's statement contained in the press report cited above.

7.63     That statement is obviously disturbing. However, by itself, it does not implicate the Claimant in acts of corruption in the negotiations for and execution or performance of the SPA. The Tribunal decides, on this limited material, that the Respondent has not discharged its legal burden of proof, again on a balance of probabilities, in regard to alleged corruption by Mr Salem.

7.64     (iii) *Mr Yehia El Komy*:  The Respondent's case regarding Mr El Komy developed during these arbitration proceedings, culminating in the documentation and submissions made by the Respondent pursuant to the Tribunal's Procedural Orders Nos 13, 14 and 15 on the "Six Documents" (see Part I above).

---

[93] "Fugitive Tycoon Hussein Salem Smuggled 450 Million Euros out of Egypt During Revolution, Claims Heikal," *Ahram Online* (9 February 2012) [R-0017].

7.65    The Tribunal considers that the Respondent's case raises serious factual issues that require consideration at some length of the relevant evidence adduced before this Tribunal.

7.66    The Respondent's allegations concern Mr El Komy's relationship with the Claimant (including the Claimant's associated companies), Mr Sameh Fahmy (as the Minister of Petroleum at the time the SPA was executed on 1 August 2000) and, so it seems, President Mubarak. It is alleged by the Respondent that unnamed persons corruptly within EGPC or the Ministry procured the SPA with the connivance of UFACEX and the Claimant (including their associated companies).

7.67    Mr El Komy was an Egyptian geological engineer and businessman, working in Egypt. He had no relevant background in the production and sale of natural gas. Mr El Komy (with his family) owned and controlled an Egyptian company, the Egyptian Arab Trading Company formed in 1996 ("EATCO").[94]

7.68    Following the Egyptian Revolution in 2011, Mr El Komy was arrested by the Egyptian authorities. On 27 December 2011, he was convicted of credit fraud and sentenced to three years' imprisonment; and on 29 March 2012, he was again convicted and sentenced to a suspended term of imprisonment and heavily fined for fraud and corruption.[95] None of these charges related to the Claimant, the SPA or the Damietta Project.

7.69    At the Hearing, the Respondent's Counsel informed the Tribunal that Mr Fahmy and Mr El Komy were both "under investigation by Egyptian authorities in connection with the corruption surrounding the Damietta Project and, in particular, the gas price terms of the [SPA]." [96] These investigations appear to have begun in 2015 and remain pending.[97]

---

[94] Summary of the Constitution Contract of the Egyptian Arab Trading Company Limited Partnership, 14 April 1996, [R-0328].
[95] "Court Sentences Former Housing Minister, Alaa Mubarak's Father-in-Law to Prison," *Egypt Independent* (29 March 2012), [R-0016]; "Businessman Yehia El Komy sentenced to 3 years in prison," *Mada Al Balad* (27 December 2011), [R-0335].
[96] Tr. D2 312.
[97] Letter from Public Prosecution Office to Egyptian State Lawsuits Authority, 12 February 20015, [R-0031]; Memorandum from Public Prosecution Office to Egyptian State Lawsuits Authority, 18 August 2016, [R-0320].

7.70 As publicly reported from an interview in 2007, Mr El Komy explained his involvement with the Damietta Project, as follows:[98]

> *During this period, [about 1999] I became familiar with Union Fenosa, which was looking to buy natural gas, so I proposed that they build a plant to liquefy gas and export it to Spain. I was trying to get a 50% share in this plant with the Spaniards, but they requested a higher share of the project, so the shares became 60% for Union Fenosa and 40% for me. I submitted the project to the government, which approved it because it was profitable and brought new technology for the first time into Egypt.*
>
> *[…]*
>
> *I have not completely withdrawn from the Project, but rather I have sold my share in it and kept a share in the Spanish Union Fenosa, but only a small share. My departure was due to disagreements about a number of points inside the Project, including the project site. I would have preferred it to be in Idku, because if we had built the plant in Idku, we would have benefitted from the Brent gas fields in the area.*
>
> *[…]*
>
> *Then we faced another point of disagreement, which was choosing the contractor. Fenosa preferred the Japanese company Chiyoda over the American company Kellogg, which is a subsidiary of Halliburton [sic: it was in fact the other way around], despite there being a difference in cost of around USD 50 million more to be paid to the American company.*
>
> *[…]*
>
> *I faced pressure that led me to sell my 40% share of the Project, as the Government wanted to increase the capital of the Project since the Project's investments were valued at USD 400 million. With the increase, I was asked to pay USD 160 million at the time, and obstacles were placed in front of me. I felt that the Government was pressuring me to withdraw from the Project.*
>
> *[…]*
>
> *Q: Did you propose the Damietta Project to Dr Hamdi el Banbi when he was Minister of Petroleum and he refused it, as is rumored?*
>
> *A: No, I did not propose the Project to him. Talk about the Project began in 1999 when Engineer Sameh Fahmy became the minister.*
>
> *Q: What are the facts behind your relationship with the father of the current Minister of Petroleum Sameh Fahmy? Was he a partner of yours in one of your petroleum projects?*

---

[98] "Yehya el Komy, Former Partner in the Damietta LNG Project, Reveals: the Government Pressured Me to Sell My Share in the Project," *Egypt Independent* (21 July 2007), [R-0004].

> *A: The father of the Petroleum Minister had a consulting office, and he prepared the study for the oil refinery that I established in 10P th P [sic] of Ramadan City. However, that goes back to about 1995 only. He didn't participate as a partner with me in the crude oil refining company, but he held 300 membership shares as a member of the company's board of directors only.*

7.71   From this evidence, as also confirmed by other materials, the Tribunal concludes that Mr El Komy had a prior business relationship with Mr Sameh Fahmy's father in or about 1995, but none with Mr Sameh Fahmy personally as at 1999 onwards. Although Mr El Komy's experience did not include natural gas projects before the SPA, the Tribunal accepts that both he and EATCO had some professional and business experience with oil and petrochemical projects.[99]

7.72   The Respondent contends that the Claimant (with its associated companies), with Mr El Komy as an intermediary, corrupted unnamed person(s) in order to procure the SPA for UFACEX during the period from January 2000 to 1 August 2000. Despite the juxtaposition of his name, there is no specific allegation from the Respondent that such corrupt persons included the Minister of Petroleum at the time, Mr Sameh Fahmy, personally.

7.73   The Respondent's case against the Claimant, its associated companies, Mr El Komy and EATCO turns on a succession of inferences drawn from contemporary documentation, as now known to the Respondent. The Tribunal considers each of these documents separately, before considering the Respondent's allegations as a whole.

7.74   This contemporary documentation comprises the "Six Documents" (in fact, seven) described and cited in Part V above. It is appropriate to address each of these documents in turn.[100]

*(i) The fax of 21 January 2000 from Messrs Ortega and El Maatawy to Mr Elías Velasco Garcia of Unión Fenosa, with an attached fax of 20 January 2000 from Mr El Komy:*[101]

---

[99] UFACEX Memorandum to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 January 2000, [C-0344]; Agreement between Omar El-Komy, Hamed El-Maatawy and Yehya El-Komy, 9 May 2000, [C-0438]; Agreement between EATCO and UFACEX, 28 June 2000, [R-0318].

[100] The Tribunal has considered as regards these seven documents (*inter alia*) the Respondent's submissions by its letters dated 21 December 2017 and 22 January 2018.

7.75    In the Tribunal's view, the relevant document is Mr El Komy's attached fax message. It evidences an earlier meeting of 10 January 2000 between Mr El Komy and others regarding "the Spanish company interest" to construct a plant using Egyptian natural gas; and it refers to a prospective meeting on 23 January 2000 with the Minister of Petroleum (then, Mr Sameh Fahmy). The Tribunal sees nothing in this fax evidencing any corrupt purpose. Its contents are consistent with Mr El Komy's description of himself as a substantive business partner of the Claimant and its associated companies, rather than a mere broker or agent.

7.76    These were early days for the Damietta Project, with much to be settled even as a proposal to be formulated by UFACEX. The reference to "initial approval of the Egyptian Government" could not therefore be an actual "approval," but rather only initial support for the eventual Damietta Project (whatever it might be). There was a later meeting with the Minister attended by Mr El Komy and Unión Fenosa during the latter's visit to Egypt from 26 to 30 January 2000. The UFACEX memorandum is of that meeting consistent with the Tribunal's finding.[102]

*(ii) The Minutes of the UFACEX internal meeting of 2 March 2000:*[103]

7.77    At this meeting, the participants discussed a draft Memorandum of Understanding with EATCO, in two different versions. The first treated EATCO "simply as an agent activating the project." The second treated EATCO as "more of an investor partner." The choice required further agreement with EATCO.

7.78    These were, again, early days in the relationship between the Claimant (UFACEX) and Mr El Komy and EATCO. It is clear that Mr El Komy was thought to have sufficient experience with sufficient resources to be an "investor partner," as he was to be. The reference to EATCO's alternative role as an "agent" is not, by itself proof of any corrupt intent. There is nothing suspicious about UFACEX's need to discuss the forms of the agreement with Mr El Komy.

███████████████████████████████████████████████

███████████████████████

---

[101] *See* Part V above, at Paragraphs 5.26ff.
[102] *See* Part V above, at Paragraphs 5.31ff.
[103] *See* Part V above, at Paragraphs 5.34ff.



7.79       It was one of many contracts between these parties in what had become a complicated project, with multiple parties executing different legal agreements at different times. In the Tribunal's view, whilst its terms were generous to EATCO, this agreement is consistent with Mr El Komy's role as an investor and business partner in the Damietta Project. It is not proof, by itself, of any corrupt activity by the Claimant, Mr El Komy or EATCO.

7.80       The Tribunal notes that the choice of site for the Damietta Project was important: the LNG facilities situated at Damietta would not have access to its own gas field, but would be dependent on the Respondent's national grid for its supply of natural gas.

7.81

7.82       The Tribunal considers that this agreement means what it states. It is inconsistent with any reward for corrupt acts by Mr El Komy and EATCO. The Tribunal sees no reason to treat the terms as a disguise for nefarious conduct by any of the parties. Even if one or more the parties misreported the sale price of SEGAS' shares to the Cairo Stock

---

[104] *See* Part V above, at Paragraphs 5.79ff.
[105] *See* Part V above, at Paragraphs 5.103ff.
[106] *See* Part V above, at Paragraph 5.111ff.

Exchange (as the Respondent contends), by itself, that delinquency does not evidence corruption in regard to the SPA, as alleged by the Respondent.



7.83   ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ In the Tribunal's view, as with the earlier exiting agreements of April-May 2002, this agreement does not evidence corrupt acts by the Claimant, Mr El Komy or EATCO.

7.84   Ostensibly, this agreement terminates the Claimant's relationship with Mr El Komy. However, if not (as the Respondent contends), it evidences only a residual relationship between the Claimant, Mr El Komy and EATCO in limited terms similar to ████████████████████████████████████████. Its financial terms were certainly not ungenerous. However, again, the Tribunal cannot see this agreement as evidencing corrupt acts of the Claimant, Mr El Komy or EATCO in regard to the SPA.

7.85   Many of these agreements contain "confidentiality" clauses, from which the Respondent draws malign inferences. In the Tribunal's view, that practice is not unusual for transnational commercial agreements. It is not therefore proof, by itself, that contractual parties have guilty minds with something to hide.

7.86   The Respondent also drew further inferences from the "economical truth" employed by the Claimant, particularly its change in emphasis in describing Mr El Komy's role in the Damietta Project during the course of this arbitration. Faced with allegations of corruption pleaded by the Respondent in this arbitration, the Claimant's reticence is

---

[107] See Part V above, at Paragraph 5.116ff.
[108] *See* Part V above, at Paragraphs 5.127ff.

perhaps comprehensible. In any event, it was not, in the Tribunal's view, the sign of guilty minds by the Claimant (or its counsel).

7.87   The Respondent also criticised Mr Fernández Martínez (of SEGAS) for limiting his testimony to exclude or limit his involvement with Mr El Komy, ███████████ ████████████████████████████████████████████████████ ██████████████████████████ With hindsight, Mr Fernández Martínez might well have been more forthcoming about his role in regard to that agreement. However, the Tribunal cannot fault him for misrepresenting his testimony to this Tribunal (as alleged by the Respondent), neither in writing nor in answers to questions at the Hearing, where he was cross-examined by the Respondent.

7.88   The Tribunal has already taken note that the several payments received by Mr El Komy and EATCO in regard to the Damietta Project seem generous. However, it is not for this Tribunal to second-guess, long after the events, upon what conditions the Claimant (with its associated companies) should have paid for the work of Mr El Komy and EATCO. Over a period of some two years, Mr El Komy, as an "investor-partner" provided personal services for the Damietta Project; and EATCO also made contributions to the Project. For example, EATCO took part in the preparation of the Pre-Feasibility Study;[110] it prepared studies on possible sites for the Plant;[111] it was responsible for the proposal from Chiyoda and APCI for the EPC contract;[112] it negotiated and signed the Damietta Port Agreement of 8 August 2000 between UFACEX and the Damietta Port Authority;[113] it procured licences from the Damietta Port Authority for SEGAS' work in December 2000 and March 2001;[114] and it participated in the handover from the Damietta Port Authority to SEGAS of the land plot and jetty in April 2001.[115] The reward for all this was a commercial matter for negotiation and agreement between the parties at the time. In the Tribunal's view, the several payments received by Mr El Komy and EATCO, by themselves, do not support any necessary inference that they formed part of a corrupt scheme relating to

---

[109] *See* Part V above, Paragraph 5.116ff.
[110] Agreement between UFACEX and EATCO, 9 March 2000, [C-0439], Pages 1-2.
[111] Minutes of Meeting sent by Antonio Hernando to Elías Velasco *et al.*, 14 June 2000, [C-0444], Page 2.
[112] Minutes of Meeting sent by Antonio Hernando to Elías Velasco *et al.*, 14 June 2000, [C-0444], Page 3; Email from Ricardo Villanueva, 5 July 2000, [C-0446]; Email from Ricardo Villanueva, 17 July 2000, [C-0447]; Fax from Ricardo Villanueva to Yehia El-Komy, undated, probably July 2000, [C-0467]
[113] Agreement with the Damietta Port Authority, 8 August 2000, [C-0448].
[114] Letter from SEGAS to the Damietta Port Authority, 21 March 2001, [C-329].
[115] Plot Handover Minutes, 1 April 2001, [C-0451].

the SPA. The Tribunal also notes that the relations between the Claimant (with SEGAS) and Mr El Komy (with EATCO), as originally envisaged, were prematurely brought to an end in mid-2002. Accordingly, the payments originally agreed between these parties reflected an intent to form a much longer relationship.

7.89   The Respondent also submits that the SPA was executed by EGPC in breach of its own procedures as regards a public bid.[116] Mr Ahmed Shaaban testified that EGPC, during the SPA's negotiations with UFACEX was "negotiating in its own name and independently;" and that he was not aware "of any instructions given by the Ministry [of Petroleum]."[117]

7.90   In the Tribunal's view, even if correct, this breach can support no inference of corruption by the Claimant in circumstances where the SPA was approved in draft by the Egyptian Council of Ministers and, after its execution, "endorsed" by the Minister of Petroleum. Moreover, the SPA was thereafter amended several times. If there had been any breach of procedures in first signing the SPA, it would be odd that such a breach was not later identified by EGPC (later EGAS) and acted upon before agreeing to such amendments.  It never was.

7.91    Thus far, the Tribunal has considered these materials individually, together with the related testimony adduced in writing and orally at the Hearing. The Tribunal concludes that, taken individually, the Respondent has not proven its case on the basis of inferences drawn from these materials, including the "Six Documents." It is, however, necessary for the Tribunal to stand back from these individual factors, assessed separately, so as to consider the Respondent's allegations more broadly.

7.92    As to the source of funds for the Damietta Project, there is no evidence that Mr El Komy provided any significant capital. Mr El Komy's fax message of 20 January 2000 (Document (i) above) records his expectation that "the Spanish company will fund the company *completely* and will be able to utilize *all* LNG produced" (emphasis supplied). Whilst UFACEX's internal memorandum dated 28 January 2000 notes Mr

---

[116] Resp Obj to Jur, Paragraphs 21ff.
[117] Shaaban WS1, Paragraph 7.

El Komy's offer to secure "financial capacity," it confirms that Mr El Komy "expects that we [UFG] provide financing and markets."[118]

7.93   From the evidence before this Tribunal, it does not appear that Mr El Komy provided any funding net of what he received, or was due to receive, from the Claimant ███ ███████████████████████████████████████████ alone dwarfed the U$ 2.87 million he paid in as capital (quite apart from the ███████████████ ██████████████████ ).  Nor was Mr El Komy contemplated as a customer for production from the Damietta Plant; nor was he in fact.

7.94   The Tribunal concludes that the Claimant's choice of Mr El Komy as a local partner for the Damietta Project cannot be explained on the basis that Mr El Komy (with EATCO) was a net source of capital for the project.

7.95   As to the expertise of Mr El Komy and EATCO, neither appear to have brought any particular specialist expertise to the project. Mr El Komy was trained as a geological engineer; but it is undisputed that he had no personal expertise or experience in the LNG industry. It is also far from clear that he had had any extensive business experience in the petroleum industry more widely in regard to major projects.

7.96   UFACEX's internal memorandum dated 28 January 2000 reporting on the early discussions with Mr El Komy cites three categories of experience: he is "currently the leading company in a joint venture […] whose purpose is to build 'a State of the art used lube oil refining facility and blending lube oil plant in the new satellite industrial city east of Cairo' called Tenth of Ramadan"; he is "currently pursuing a number of oil concessions in the Gulf of Suez; and he "is developing together with other partners the Suez Petrochemical Company (SPC) Project, consisting in the production of polyethylene and polypropylene."[119] As can be seen, all three are *prospective* projects.

7.97   The first project appears to have been a low-level motor oil recycling venture. It was eventually established sometime before 2007, according to the press interview Mr El

---

[118] UFACEX Memorandum to Elias Velasco and Santiago Roura re "LNG – Egypt," 28 January 2000, [C-0344].
[119] UFACEX Memorandum to Elias Velasco and Santiago Roura re "LNG – Egypt," 28 January 2000, [C-0344].

Komy gave that year;[120] that it was still in the future as of January 2000 is confirmed by the agreement dated 9 May 2000 between Mr El Komy, Mr Omar El-Komy and Mr El Maatawy:[121] "[EATCO] is currently establishing an oil refinery factory." The third project appears to be the methanol-to-olefins project mentioned in the press report of January 2002,[122] as something that EATCO Petrochemical Company "is to have," but that, as of Mr El Komy's 2007 interview, was still being worked on but lacked funding.[123]

7.98     The MOU dated 9 March 2000 between the Claimant and Mr El Komy seems to recognise this situation. It notes (in the present tense) that Mr El Komy "is also investing in several projects in oil and petrochemical sector."[124] In his 2007 press interview, Mr El Komy states that at some time after working as an engineer in Libya, he bought an oil field services company.[125] However, EATCO appears to have added oil field services and oil and gas investments to its authorised company activities only in 2001, towards the end of Mr El Komy's active relationship with the Claimant.[126]

7.99     Thus, although the MOU dated 9 March 2000 records that Mr El Komy "has been rendering advisory and assistance services in Egypt for many years;"[127] and ████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████,"[128] Mr El Komy's relevant experience was limited and recent. It would appear to have been acquired in 1999-2000 only.

7.100     The Tribunal concludes the Mr El Komy's professional expertise (with EATCO) cannot explain the Claimant's choice of Mr El Komy as a local partner for the Damietta Project.

---

[120] "Yehya el Komy, Former Partner in the Damietta LNG Project, Reveals: the Government Pressured Me to Sell My Share in the Project," *Egypt Independent* (21 July 2007), [R-0004].
[121] Agreement between Yehia El Komy, Omar El Komy and Hamed El Maatawy, [C-0438].
[122] "EGYPT – Egyptian LNG & P/L Gas Exports May Exceed 27 BCM/Y by 2010," *APS Review Oil Market Trends,* [R-0005].
[123] "Yehya el Komy, Former Partner in the Damietta LNG Project, Reveals: the Government Pressured Me to Sell My Share in the Project," *Egypt Independent* (21 July 2007), [R-0004].
[124] Agreement between UFACEX and EATCO, 9 March 2000, [C-0439].
[125] "Yehya el Komy, Former Partner in the Damietta LNG Project, Reveals: the Government Pressured Me to Sell My Share in the Project," *Egypt Independent* (21 July 2007), [R-0004].
[126] Tr. D2 309-310; Excerpt of the Commercial Registry of the Egyptian Arab Trading Company, 18 December 2016, [R-0327].
[127] Agreement between UFACEX and EATCO, 9 March 2000, [C-0439].
[128] ████████████████████████████████████████████

7.101    As to access to senior decision-makers, the evidence for an explanation is stronger. Access to government power can be a valuable asset to bring to a project involving the purchase of natural resources from the State or State entity, particularly when such natural resources comprise highly regulated sectors of the economy controlled by the State. Different States have a variety of standards governing the propriety of taking advantage of such access; lobbying can take many forms; and a paid lobbyist is not necessarily committing a crime or other impropriety.

7.102    In the Tribunal's view, Mr El Komy was chosen by the Claimant primarily to act as a lobbyist with access to senior figures in EGPC and the Ministry of Petroleum. That is not, by itself, evidence of corruption. The factual question is whether Mr El Komy was more than a lobbyist, on the evidence adduced before this Tribunal.

7.103    The Claimant denies that Mr El Komy offered any advantages from special access to the Respondent's decision-makers in regard to the SPA.  Indeed, the Claimant goes to great pains to stress the absence of any special relationship between Mr El Komy and Minister Fahmy, pleading that "this so-called 'fact' is nothing of the sort," and that "Egypt has provided no evidence whatsoever that anyone exercised any back-channel influence."[129]

7.104    he Claimant's explanation for why it chose Mr El Komy as a business partner, as pleaded in its Rejoinder on Jurisdiction, is that: "[t]he project was the original idea of El-Komy;";  that "he conceived of the idea and […] [w]ithout his 'first mover' participation, the Project would not have been initiated and moved forward;" and that "he was the person who initially brought the proposal to Unión Fenosa." The Claimant alleges that Mr El Komy himself "decided to establish an LNG facility in Egypt" and agreed, not only to share the opportunity with claimant, but also to the "relinquishment of equal control in the Project."[130]

7.105    In the Tribunal's view, the evidence adduced in this arbitration does not support the Claimant's explanation.

7.106    In his witness statement, Mr Fernández Martínez (of SEGAS), who was responsible for overseeing the Damietta Project, testified that: "[b]y 1999, Unión Fenosa had been

---

[129] Cl Rej Jur, Paragraphs 24 and 520.
[130] Cl Rej Jur, Paragraphs 8, 18, 22, 34 and 49.

assessing several options to secure long-term gas supply […] [and it] was *at that time* that Unión Fenosa heard of an opportunity to develop an LNG project in Egypt" (emphasis supplied). He also testified that the Claimant "decided to explore this possibility and several executives met with the Egyptian Minister of Petroleum in November or December of 1999."[131]

7.107   The Tribunal infers that the Project was conceived by Unión Fenosa in 1999, before Mr El Komy became involved with the Claimant in early 2000. He did not bring the project to the Claimant. The Tribunal also infers that the project had been the subject of previous development on the Claimant's behalf by other, qualified persons. One or more of these persons later brought Mr El Komy into their discussions.

7.108   The Tribunal accepts, as the Claimant's Rejoinder pleads, that "Mr El-Komy and EATCO […] were from the outset viewed as necessary to the Project."[132] The question is "why."

7.109   Mr El Komy and EATCO were not passive or secretive participants in the Damietta Project. He openly identified himself (with EATCO) and was publicly identified with UFACEX from the outset of his involvement in the Project with UFACEX. He did not act as a covert peddler of influence, with his principal's identity kept hidden from the Respondent's decision-makers. To this extent, the Tribunal accepts the Claimant's submission that no evidence exists, in this arbitration, of any "back-channel influence." However, the Tribunal does not accept that there was no "influence." It concludes that there was influence exercised by Mr El Komy over senior decision-makers at the Ministry of Petroleum and EGPC over the SPA; but that it was not corrupt.

7.110   This conclusion is supported by three factors. First, the Respondent's case does not prove that any monies passed from Mr El Komy or EATCO to any senior decision-maker. There was, on the evidence adduced before this Tribunal, no bribe paid or promised to any such decision-maker. Mr El Komy and EATCO were well-rewarded for their involvement in the Damietta Project. However, in the absence of corruption and as already indicated, it is not for this Tribunal to second-guess, with hindsight and

---

[131] Fernández Martínez WS, Paragraph 6.
[132] Cl Rej Jur, Paragraph 57.

the lapse of time, commercial decisions that were made by the Claimant towards Mr El Komy that may now seem mistakenly generous.

7.111   Second, the relevant events occurred more than fifteen years ago. Although Mr El Komy was prosecuted and convicted for other crimes in Egypt, it is significant that he has never been prosecuted by the Respondent for criminal conduct in regard to the SPA. Nor has any senior decision-maker at EGPC or the Ministry of Petroleum (including Minister Fahmy) been prosecuted in regard to the SPA.

7.112   Third, the belated plea of corruption, raised by the Respondent as a jurisdictional objection after the commencement of this arbitration, raises a suspicion that the plea serves a convenient tactical purpose. This suggestion is strengthened by the weakness of the Respondent's two other pleas relating to Halliburton and Mr Hussein Salem, both of which seemed only to serve a tactical purpose in seeking to defeat or delay the Claimant's claims against the Respondent. These two pleas should not have been made by the Respondent based on the materials presented by it to the Tribunal.

7.113   Nonetheless, contrary to the Claimant's submissions, the Respondent and its legal representatives should not be criticised for raising its allegations of corruption in this arbitration in regard to Mr El Komy. These allegations were not frivolous. Several were classic "red flags"; but even the reddest of red flags does not suffice without proof of corruption before the tribunal. Whilst it can be relatively easy to allege corruption, it is less easy to prove it, as observed in the *Metal-Tech* award (2013).[133] Suspicion is not equivalent to proof. Unanswered queries may have innocent explanations, not amounting (in the absence of explanations) to proof of corruption. With hindsight, what business people agree not infrequently defies logic or common-sense to non-business people, again without amounting to proof of corruption. The legal burden of proving corruption rests upon the party alleging corruption; and it is not discharged by placing the burden on the adverse party to prove the absence of corruption.

7.114   Moreover, with a case dependent upon circumstantial evidence (as in the present case), it is often a question of joining up the dots; but there have first to be dots in the

---

[133] *Metal-Tech v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, [RL-0002].

evidence adduced before the tribunal. In this case, so the Tribunal decides, there are insufficient dots; and the red flags are outnumbered by neutral black flags.

7.115   Lastly, the Tribunal has read the Final Award dated 21 December 2017 issued in the CRCICA arbitration (896), as submitted in these arbitration proceedings by the Claimant and the subject of written comments by the Respondent. The CRCICA tribunal there dismissed a similar plea of corruption made by EGAS as the respondent against the Claimant as the claimant. It is apparent that the CRCICA tribunal received more evidential materials from the parties (including specific oral testimony) than were adduced by the Parties in this arbitration. Moreover, given that the parties in the CRCICA arbitration are not both the same as the Parties to this arbitration, the Tribunal has thought it right to pay no regard to the CRCICA tribunal's analysis or decision in its award. The Tribunal has therefore not done so for the purpose of this Award. Nor has this Tribunal thought it appropriate to take into account evidence adduced before the CRICA tribunal (as recorded in its award). Such evidence is not evidence in this arbitration between different parties. Nonetheless, having reached its conclusion on the Parties' submissions and evidential materials in this arbitration, the Tribunal draws some comfort that its conclusion appears to be consistent with the decision of the CRICICA tribunal.

### (5) Summary of Decisions

7.116   The Tribunal finds, as facts relevant to jurisdiction (with admissibility) and the merits, that there was no evidence of corruption against the Claimant (including UFACEX) in regard to the SPA proven by the Respondent in this arbitration, where the Respondent bore the legal burden of proving its allegations on a balance of probabilities.

7.117   For all the reasons stated above, the Tribunal dismisses the Respondent's three allegations of corruption by the Claimant in regard to the SPA.

## PART VIII: THE NECESSITY ISSUES

### (1) Introduction

8.1     The Tribunal addresses here the defence of necessity under customary international law pleaded by the Respondent to preclude its international responsibility for the alleged international wrongs under the Treaty towards the Claimant, particularly under the FET standard in Article 4(1) of the Treaty. The Treaty does not contain any specific provision on the defence of necessity.

8.2     Under customary international law, necessity is one of the circumstances that the State can invoke to preclude the wrongfulness of an act in breach of an international obligation of that State, including a breach of its obligations under a bilateral treaty.

8.3     The conditions to invoke a plea of necessity under international are confirmed in Article 25 of the ILC Articles on State Responsibility.[1] It provides as follows:

> *1. Necessity may not be invoked by a State as a ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act:*
>
> *(a) is the only way for the State to safeguard an essential interest against a grave and imminent peril; and*
>
> *(b) does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.*
>
> *2. In any case, necessity may not be invoked by a State as a ground for precluding wrongfulness if:*
>
> *(a) the international obligation in question excludes the possibility of invoking necessity; or*
>
> *(b) the State has contributed to the situation of necessity.*

8.4     Article 25 was cited by both Parties in this arbitration. Thus, the Tribunal is content to apply its terms, as explained by the ILC's commentary.[2]

---

[1] International Law Commission, *Articles on Responsibility of States for Internationally Wrongful Acts with Commentaries*, Report of the Commission to the General Assembly on the Work of its Fifty-Third Session, UN Doc. A/CN.4/SER.A/2001/Add.1 (Part. 2), Yearbook of the International Law Commission (2001), Vol. II (2) ("ILC Articles on State Responsibility"), [CL-0064], Article 25.

[2] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 178ff.

### (2) *The Respondent's Case*

8.5     In summary, the Respondent invokes the state of necessity as an alternative defence in the event that the Tribunal were to find that the alleged acts committed by the Respondent, or by EGAS or EGPG attributable to the Respondent, breached its obligations under the Treaty.[3]

8.6     Such a defence was recognized in *Gabčíkovo-Nagymaros* (1997), on which the Claimant also relies, and in *Continental Casualty v. Argentina* (2008).[4] The Respondent submits that the conditions for the defence of necessity in Article 25 of the ILC Articles are fulfilled in the present case.[5] Its case falls under the following several headings.

8.7     *Prioritisation:* The Respondent asserts that the prioritisation of the domestic electricity was the only way to safeguard Egypt's essential interests from a grave and imminent peril.[6]

8.8     In its submissions, the Respondent refers to ICSID decisions on disputes that arose from the Argentinian economic crisis: *LG&E v. Argentina* (2006) and *Impregilo v. Argentina* (2011); and also from the Zimbabwean political crisis: *Von Pezold v. Zimbabwe* (2015)*. In these cases*, the ICSID tribunals decided that an "essential interest" of a State and its "existence" extend (*inter alia*) to the social, economic, financial and political interests of the State. Thus, contrary to the Claimant's case, such an interest includes the maintenance of the State's public order and stability, as well as the maintenance of its basic services.[7] The Respondent notes in this regard

---

[3] Resp CM Merits, Paragraphs 331ff; Resp Rej Merits, Paragraphs 360ff.
[4] Resp Rej Merits, Paragraph 361, citing *Gabčíkovo-Nagymaros Project (Hungary/Slovaquia)*, Judgment, 25 September 1997, *I.C.J. Reports 1997*, p.7, [RL-0112], Paragraph 48; *Continental Casualty v. Argentina*, ICSID Case No. ARB/03/9, Award, 5 September 2008, [CL-0049], Paragraphs 160-161.
[5] Resp CM Merits, Section VIII(B); Resp Rej Merits, Paragraph 362.
[6] Resp CM Merits, Paragraphs 335-351.
[7] Resp CM Merits, Paragraphs 336-340, citing *Gabčíkovo-Nagymaros Project (Hungary/Slovaquia)*, Judgment, 25 September 1997, *I.C.J. Reports 1997*, p.7, [RL-0112], Paragraph 53 (citing International Law Commission, *Articles on Responsibility of States for Internationally Wrongful Acts with Commentaries*, Report of the Commission to the General Assembly on the Work of its Fifty-Third Session, UN Doc. A/CN.4/SER.A/1980/Add.1 (Part. 2), Yearbook of the International Law Commission (1980), Vol. II (2), [RL-0114], 49, Paragraph 32); *LG&E. v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraph 251; *Impregilo v. Argentina*, ICSID Case No. ARB/07/17, Final Award, 21 June 2011, [RL-0089], Paragraph 346; *Von Pezold v. Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, [RL-0113], Paragraphs 628-630; Resp Rej Merits, Paragraphs 368-371.

that the *Impregilo* tribunal decided that water and sewage services qualified as an essential interest within the meaning of Article 25 of the ILC Articles.[8]

8.9    Drawing a parallel analysis with these decisions, the Respondent submits that the reasons that were absent in *Von Pezold v. Zimbabwe* (2015) (as to which the tribunal found that there was no threat to Zimbabwe's essential interests) are clearly present in this case.[9] Unlike *Von Pezold v. Zimbabwe* (2015), the Respondent's essential interest in maintaining stability, security and internal peace was threatened because the situation in Egypt.

8.10    That situation, so the Respondent submits: "(i) reached historic levels of violence, (ii) was out of control due to riots and clashes across the country, (iii) could not be brought under control by police or otherwise, (iv) reached a level far beyond a threat solely to the party in power in Egypt, and (v) constituted a threat to the basic functioning of society and the maintenance of internal stability."[10] All this caused a dramatic drop in the supply of natural gas both internally and for exportation. That led to repeated blackouts across the country and consequently to more widespread violence and unrest.[11]

8.11    The Respondent submits that all these factors, on which other tribunals have relied in deciding the same issue of necessity, demonstrate that a "grave and imminent peril" was present in the present case.[12] The Respondent contests the Claimant's understanding of the term "immediate" and "proximate" as misleading. It wrongly limits the peril to physical proximity.

8.12    Relying on the same case as the Claimant, namely the decision in *Gabčíkovo-Nagymaros* (1997), the Respondent emphasises that the ICJ decided that "a 'peril' appearing in the long term might be held to be 'imminent' as soon as it is established, at the relevant point in time, that the realization of that peril, however far off it might

---

[8] Resp CM Merits, Paragraphs 339; ROS, Vol. III, Slide 76; Resp Rej Merits, Paragraphs 369-371.
[9] Resp CM Merits, Paragraphs 341-344.
[10] Resp CM Merits, Paragraph 345; Resp Rej Merits, Paragraphs 363-366; ROS, Vol. III, Slide 75, referring to the Minutes of the Meeting of the UFG Board of Directors in March 2013 where the Managing Director stated that the situation in Egypt was "out of control"; Minutes of the Meeting of the Board of Directors of the company Unión Fenosa, S.A., 20 March 2013, [R-0353], Pages 8-9.
[11] Resp CM Merits, Paragraphs 343-344; Resp Rej Merits, Paragraph 363.
[12] Resp CM Merits, Paragraphs 344-346 referring to *Sempra v. Argentina*, ICSID Case No. ARB/02/16, Award, 28 September 2007, [CL-0032], Paragraph 349; *Von Pezold v. Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, [RL-0113], Paragraph 636; Resp Rej Merits, Paragraphs 363 and 368-371.

be, [is] certain and inevitable." The Respondent contends that this approach applies to the present case with respect to the risk of total blackouts that would have "certainly and inevitably" occurred, had the Respondent not prioritised the needs of domestic users in Egypt.[13]

8.13   The Respondent also asserts, contrary to the Claimant's suggestions, that the prioritisation of gas supply to domestic needs was "the only way" to maintain public order and basic services, as "the electricity sector in Egypt was largely dependent on natural gas to fuel it."[14] If the Respondent had acted otherwise, it "would thus have led to more numerous and prolonged blackouts, and even more severe accompanying violent protests and demonstrations, further aggravating the perilous security situation."[15]

8.14   The Respondent emphasises that a "balanced" interpretation of this factor is required, otherwise it would be "virtually impossible" for a State successfully to invoke the defence of necessity.[16] The Respondent refers to the ICSID *ad hoc* committee's analysis in *Enron v. Argentine* (2010), noting that the requirement "is not one of certainty, but one of reasonable probability."[17] Relying on the ILC Commentary to Article 25 of the ILC Articles (with the decisions of ICSID tribunals), the Respondent submits that the fact that there are different views as to whether the conduct followed was the only way to respond to the situation, does not bar the State from invoking the defence of necessity.[18]

8.15   *Spain:* The Respondent submits that the prioritisation of the domestic electricity did not impair an essential interest of the State towards which the obligation exists under the Treaty, *i.e.* Spain.[19] The Respondent asserts that its "essential interest in providing electricity to its population to avoid further aggravating an already violent and unstable situation clearly outweighs any interest of Spain or [the] Claimant in

---

[13] Resp Rej Merits, Paragraphs 372-375, citing *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, *I.C.J. Reports 1997*, p.7, [RL-0112], Paragraph 54.
[14] Resp CM Merits, Paragraph 351; Resp Rej Merits, Paragraphs 374-388.
[15] Resp CM Merits, Paragraph 351 (footnote omitted); Resp Rej Merits, Paragraphs 374-388.
[16] Resp CM Merits, Paragraph 348; Resp Rej Merits, Paragraphs 374-377.
[17] Resp CM Merits, Paragraph 348; Resp Rej Merits, Paragraphs 374-383; *Enron v. Argentina*, ICSID Case No. ARB/01/3, Decision of the *ad hoc* Committee on the Application for Annulment, 30 July 2010, [RL-0115], Paragraph 371.
[18] Resp CM Merits, Paragraphs 349-350; ILC Articles on State Responsibility, [CL-0064], 83, Comment (16).
[19] Resp CM Merits, Paragraphs 352-354.

exporting additional LNG from the Damietta Plant."[20] The Respondent points out that the Claimant's assertions in this regard fail to prove that Spain had an "essential interest" in Egyptian gas and that such assertions had no support in the Ministry of Petroleum's statement invoked by the Claimant.[21]

8.16   Citing the *Impregilo* award (with several other awards that adopted the same reasoning), the Respondent contends that the interests of one or more foreign investors do not amount to essential interests of their home State for the purposes of Article 25 of the ILC Articles.[22] The Respondent also contends that the present case does not involve any *erga omnes* international obligations, unlike *Von Pezold v. Zimbabwe* (2015).[23]

8.17   *The Treaty*: The Respondent submits that nothing in the Treaty excludes the possibility for either State to rely on the defence of necessity.[24]

8.18   *Contribution*: The Respondent submits that the State's contribution under Article 25 of the ILC Articles "must be sufficiently substantial and not merely incidental or peripheral," so as to exclude the defence of necessity.[25] The Respondent submits that it did not contribute substantially to the state of necessity which it here invokes as a defence.[26] The Respondent contends that the severe shortages in gas supply were due to the Egyptian revolution that was beyond its control and resulted in the overthrow of President Mubarak's regime.[27]

8.19   Referring to ICSID decisions, the Respondent submits that a State's "misguided" policies cannot constitute the "contribution" under Article 25. Nor can a mere factual connection between the State's conduct and the situation of necessity constitute a

---

[20] Resp CM Merits, Paragraph 353.

[21] Resp Rej Merits Paragraphs 389-392.

[22] Resp CM Merits, Paragraphs 352-353, citing *Impregilo v. Argentina*, ICSID Case No. ARB/07/17, Final Award, 21 June 2011, [RL-0089], Paragraph 354; *Suez v. Argentina*, ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010, [CL-0037], Paragraph 239; *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraph 257; *Enron v. Argentina*, ICSID Case No. ARB/01/3, Award, 22 May 2007, [CL-0079], Paragraph 341; *Sempra v. Argentina*, ICSID Case No. ARB/02/16, Award, 28 September 2007, [CL-0032], Paragraph 390; *CMS v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, [RL-0103], Paragraph 358.

[23] Resp CM Merits, Paragraph 354.

[24] Resp CM Merits, Paragraphs 355-356.

[25] Resp CM Merits, Paragraph 357; Resp Rej Merits, Paragraph 399, citing the ILC Articles on State Responsibility, [CL-0064], 84, Comment (20).

[26] Resp CM Merits, Paragraphs 357-364; Resp Rej Merits, Paragraphs 393-399; *see* ILC Articles on State Responsibility, [CL-0064], 84, Comment (20).

[27] Resp CM Merits, Paragraphs 358 and 363.

basis for the determination of such contribution.[28] The Respondent contends that the Claimant's assertions are misleading; the Claimant fails to demonstrate "a direct link" between the Respondent's policies and the economic and political crisis during the Egyptian revolution.[29] The Respondent further submits that it repeatedly tried to control the situation, but the revolution left the Respondent with no discretion as to its policies for the supply of gas to domestic users.[30]

8.20    *Compensation*: The Respondent challenges the Claimant's submission that the Claimant is nonetheless entitled to compensation even if the necessity defence was made out by the Respondent. That submission finds no support in the legal materials upon which the Claimant relies. Rather, so the Respondent submits, these materials merely provide for the possibility of compensation; it is not a requirement.[31] Also, there is no such compensation to investors or for investments required under the Treaty.[32] The Respondent contends that the Claimant must "bear the risk of the state of necessity and its consequences and be denied the compensation it requests,"[33] as in *LG&E v. Argentina* (2006) where the tribunal decided to the same effect.[34]

8.21    In conclusion, the Respondent reiterates that:

> [T]*he state of necessity caused by the revolution that erupted in Egypt and whose after-effects persist to this day precludes any wrongfulness of the conduct alleged to constitute a violation of the Spain-Egypt BIT even if, quod non, the conduct complained of were attributable to Respondent, constituted an exercise of 'puissance publique' and were not in conformity with obligations under the Spain-Egypt BIT.*[35]

### (3) The Claimant's Case

8.22    In summary, the Claimant contends that the Respondent has failed to prove its plea of necessity because:

---

[28] Resp CM Merits, Paragraphs 360-363, citing *Enron v. Argentina*, ICSID Case No. ARB/01/3, Decision of the *ad hoc* Committee on the Application for Annulment, 30 July 2010, [RL-0115], Paragraphs 392-393; *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraphs 256-257.
[29] Resp Rej Merits, Paragraphs 393-399.
[30] Resp CM Merits, Paragraph 363.
[31] Resp Rej Merits, Paragraphs 400-406.
[32] Resp Rej Merits, Paragraphs 407-408.
[33] Resp Rej Merits, Paragraph 411.
[34] Resp Rej Merits, Paragraphs 409-411, citing *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraphs 264 and 267(e).
[35] Resp CM Merits, Paragraph 364.

> *(i) there was no essential interest of Egypt that was threatened by a grave and imminent danger that required cutting off the gas supply to UFG; (ii) Egypt's decision to prioritize the domestic market and to cut off all gas supply to UFG was not the 'only way' to safeguard any purported 'essential interest' from a 'grave and imminent threat'; and (iii) the Respondent 'contributed to the situation of necessity' by adopting policies that inflated demand for natural gas and depressed supply, thereby directly causing its own gas shortages, and then it chose to cut off all gas supply to UFG and failed to treat it proportionally to other commercial and industrial customers. In addition, Spain itself has an interest in the gas supply provided by UFG from Egypt, and that interest was impaired by Egypt's conduct.* [36]

8.23    The Claimant submits that, since the defence of necessity is a ground precluding the wrongfulness of an act violating an international obligation, by invoking the state of necessity the Respondent concedes that its acts as alleged by the Claimant are wrongful.[37] In support of this submission, the Claimant refers to the ICJ's reasoning in *Gabčíkovo-Nagymaros* (1997)*,* as well as several ICSID awards to the same effect.[38]

8.24    As to the ILC Commentary on Article 25 of the ILC Articles and *Gabčíkovo-Nagymaros* (1997), the Claimant submits that necessity is an exceptional defence; and that is subject to "stringent" conditions to avoid abuse. According to the Claimant, this is reflected in the negative wording of Article 25 but also in the "only way" requirement and the safeguard of an "essential" interest from a grave and imminent peril.[39]

8.25    The Claimant further submits that the Respondent should bear the legal burden of proving the existence of a condition of necessity. It is a cumulative multi-element standard. Accordingly, failing to satisfy any element should negate the application of the defence of necessity. The Respondent has failed to prove any of these multiple

---

[36] Cl Rep Merits, Paragraph 407 (footnote omitted); COS, Part I, Slide 69.

[37] Cl Rep Merits, Paragraphs 401-402.

[38] Cl Rep Merits, Paragraphs 401-402, citing *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, *I.C.J. Reports 1997,* p.7, [RL-0112], Paragraph 48; *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraph 249; *Ioan Micula, v. Romania*, ICSID Case No. ARB/05/20, Separate Opinion of Professor Georges Abi-Saab, 5 December 2013, [CL-0195], Paragraph 10.

[39] Cl Rep Merits, Paragraphs 403-405; COS, Part I, Slides 70-72, citing *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, *I.C.J. Reports 1997,* p.7, [RL-0112], Paragraphs 51-52.

elements.[40] In support of its submissions, the Claimant relies upon several awards where tribunals have rejected the defence of necessity. The Claimant notes in this regard that most of the cases that the Respondent invoked for its case did not in fact find in favour of the defence of necessity.[41]

8.26    Addressing the cumulative requirements of Article 25 of the ILC Articles, the Claimant contends that the Respondent did not prove that the Egyptian revolution constituted a grave threat to an essential interest; nor did the Respondent demonstrate the causal link between the situation trigged by the revolution and the breaches of the Treaty.[42] In particular, the Claimant submits that the Respondent has failed to prove that cutting off the gas supply to the Plant was necessary to safeguard an essential interest against a grave and imminent peril, *i.e.* to address the blackouts and the violence such blackouts allegedly generated or to avoid even further violence.[43] According to the Claimant, the Respondent's assertions are not proven on the evidence adduced in this arbitration.

8.27    The Claimant contends that EGAS announced the reduction in the gas supply to the Plant a year before the revolution began. Such reductions were the result of "misguided" policies that caused an imbalance between the demand for and the supply of gas in Egypt.[44] Therefore, cutting off the gas supply to the Plant was intended by the Respondent to address gas shortages and not blackouts.[45]

8.28    In addition, the Claimant submits that the revolution relates to a political crisis mainly pertaining to the Mubarak and Morsi regimes and that the widespread protests, as described by the Respondent, did not impact the Plant at Damietta. Thus, there was no "imminent" or "proximate" danger relevant to the gas supply to the Plant.

---

[40] Cl Rep Merits, Paragraphs 406-407, citing *National Grid v. Argentina*, UNCITRAL, Award, 3 November 2008, [CL-0008], Paragraph 262.
[41] Cl Rep Merits, Paragraphs 409-411, citing *Von Pezold v. Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, [RL-0113], Paragraph 668; *SAUR v. Argentina*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012, [CL-0198], Paragraph 463; *Total v. Argentina*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, [CL-0042/CL-0199]; *AWG v. Argentina*, UNCITRAL, Decision on Liability, 30 July 2010, [CL-0200], Paragraph 265; *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraph 266; *Sempra v. Argentina*, ICSID Case No ARB/02/16, Decision on the Argentine's Republic Application for Annulment of the Award, 29 June 2010, [CL-0201], Paragraph 208.
[42] Cl Rep Merits, Paragraphs 408-416.
[43] Cl Rep Merits, Paragraphs 408-416 and 418-428.
[44] Cl Rep Merits, Paragraphs 412-417 and 425.
[45] Cl Rep Merits, Paragraphs 412-416; COS, Part I, Slides 79-81.

Accordingly, the Respondent's defence of necessity is unfounded and cannot excuse the Respondent's failure to comply with its obligations under the Treaty.[46]

8.29    Further, the Claimant contends that cutting off the gas supply was not the "only way" to safeguard the Respondent's essential interest in maintaining public order and providing basic services against a grave and imminent peril allegedly threatened by the violent protests and the blackouts during the Egyptian revolution.

8.30    According to the Claimant, the Respondent had other alternatives. Citing *Sempra v. Argentina* (2007)*, CMS v. Argentina* (2005) and *AWG v. Argentina* (2010), the Claimant notes that the Tribunal does not need to determine policy alternatives that the Respondent could have adopted. Rather, the Tribunal should only determine whether the policy adopted was the only way to remedy the situation.[47]

8.31    To that end, the Claimant submits that:

> *Egypt and EGAS could have set aside and provided for the warranted supply – and the promised back-up supply – for the Claimant as contracted. The Respondent could also have bought gas abroad and supplied the Claimant; or at least it could have supplied* [the Claimant] *proportionately with supplies to other users, as required by the SPA. Finally, and at a minimum,* [the Respondent] *could have compensated* [the Claimant] *for its costs of obtaining a replacement supply for* [its requirements in] *Spain. But* [the] *Respondent took none of these actions, preferring instead to force the full consequences of* [its] *decisions onto* [the Claimant]*, a foreign investor, whilst privileging other domestic industries.*[48]

8.32    In support of a strict interpretation of the "only way" requirement in Article 25(1)(a) of the ILC Articles, the Claimant relies on the reasoning of the *LG&E* tribunal and the commentary to Article 25 on State Responsibility. Both confirm, so it submits, that the defence of necessity cannot be invoked if other means were available, even if they were "more costly or less convenient." That was the case here for the Respondent.[49]

---

[46] Cl Rep Merits, Paragraphs 419-429.

[47] Cl Rep Merits, Paragraphs 430-433, citing *Sempra v. Argentina*, ICSID Case No. ARB/02/16, Award, 28 September 2007, [CL-0032], Paragraph 351; *CMS v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, [RL-0103], Paragraph 323; *AWG v. Argentina*, UNCITRAL, Decision on Liability, 30 July 2010, [CL-0200], Paragraph 260.

[48] Cl Rep Merits, Paragraph 450 and 435-450; COS, Part I, Slide 86.

[49] Cl Rep Merits, Paragraphs 440-442, citing *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraph 251; James Crawford, *The ILC's Articles on State*

8.33    The Claimant opposes the Respondent's argument for a "balanced" interpretation of the requirement for necessity, relying on the ICSID *ad hoc* committee's decision in *Enron v. Argentina* (2010). In fact, so the Claimant contends, the "only way" being a "reasonable probability requirement", was one of the issues which the ICSID *ad hoc* committee decided not to answer.[50]

8.34    Based on the testimony of its expert witnesses, the Claimant contends that the Respondent contributed to its alleged situation of necessity through its "ill-advised" and "inadequate" gas policies that caused a demand-supply imbalance, hence the gas supply shortages and the Respondent's failure to comply with its obligations towards the Claimant.[51] In support of this assertion, the Claimant relies on the *Impregilo* tribunal's decision to similar effect.[52] The Claimant further asserts that the gas supply shortages had an impact on Spain's interest to provide gas for its citizens.[53]

8.35    The Claimant contends that the Respondent's failure to comply with its obligations persisted even after the alleged period of necessity. That continued failure does not conform to the requirements of Article 25 of the ILC Articles, as it has been recognized by several arbitral tribunals deciding the same issue.[54] The Claimant contends that the Respondent provided no evidence as to the continuation of any situation of necessity.[55]

8.36    Lastly, the Claimant submits that even if the defence of necessity were accepted by the Tribunal, it could not relieve the Respondent from its obligation to compensate the Claimant under the Treaty. The Claimant submits that such compensation is required in Article 27 of the ILC Article. It is further confirmed in the ILC Commentary to the ILC Articles, as well as the ICJ decision in *Gabčíkovo-Nagymaros* (1997) and the ICSID tribunal's in *EDF v. Argentina* (2012).[56]

---

*Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 183, Article 25, Comment (15).

[50] Cl Rep Merits, Paragraphs 443-449, citing *Enron v. Argentina*, ICSID Case No. ARB/01/3, Decision of the *ad hoc* Committee on the Application for Annulment, 30 July 2010, [RL-0115], Paragraphs 371 and 373.

[51] Cl Rep Merits, Paragraphs 451-460; COS, Part I, Slides 87-90.

[52] Cl Rep Merits, Paragraph 459, citing *Impregilo v. Argentina*, ICSID Case No. ARB/07/17, Final Award, 21 June 2011, [RL-0089], Paragraph 356.

[53] Cl Rep Merits, Paragraph 461.

[54] Cl Rep Merits, Paragraphs 462-464.

[55] Cl Rep Merits, Paragraphs 462-464.

[56] Cl Rep Merits, Paragraphs 465-471; COS, Slides 91-92, citing *Gabčíkovo-Nagymaros Project (Hungary/Slovaquia)*, Judgment, 25 September 1997, *I.C.J. Reports 1997,* p.7, [RL-0112], Paragraph 48; *EDF*

### *(4) The Tribunal's Analyses and Decisions*

8.37    The Respondent pleads "necessity" as an alternative defence to its primary case denying any liability to the Claimant under the Treaty. It is none the worse for that. It deserves to be addressed upon its own terms, however inconsistent it may be with the Respondent's primary case. Alternative cases are invariably inconsistent with primary cases; the latter should not infect the former; nor vice-versa.

8.38    The Tribunal decides that the Respondent bears the legal burden of proving its defence of "necessity" under customary international law, as a positive allegation. Moreover, the elements of that defence, as listed in Article 25 of the ILC Articles, are cumulative. In other words, it is for the Respondent to prove each of the relevant elements and not for the Claimant to disprove any of them. That is clear from the negative formulation of Article 25(1) and 25(2) ("may not be invoked", "unless" and "if"), together with elements that fall almost exclusively within the actual knowledge of the State invoking the defence of "necessity." This approach also accords with the ILC's Commentary applicable to Article 25 of the ILC Articles: see Chapter V at Comment (8) and Comment (14) on Article 25.[57]

8.39    The first element is listed in Article 25(1) of the ILC Articles as "the wrongfulness of an act not in conformity with an international obligation" of the State. Applied to the present case, that "act" is the Respondent's alleged breach of the Treaty's FET standard in Article 4(1) of the Treaty. That breach allegedly consisted of the Respondent's interference with the supply of gas by EGAS to the Plant, thereby frustrating the Claimant's legitimate expectations based upon the Respondent's undertaking in the Ministry of Petroleum's letter dated 5 August 2000 issued pursuant to Article 21.1 of the SPA (as explained later in this Award).

8.40    That interference began before 2010 (*i.e.* before the Global Financial Crisis and the Egyptian revolution). It has continued to the present day. During 2012 and 2013, of a total gas production in Egypt of 58.8 Bcma, only 0.3 Bcma was supplied to the Plant.

---

*International v. Argentina*, ICSID Case No. ARB/03/23, Award, 11 June 2012, [CL-0158], Paragraph 1177; *Draft Articles on State Responsibility with Commentaries thereto adopted by the International Law Commission on First Reading*, January 1997, [CL-0205], 244; James Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press 2002), [CL-0185], 183, Article 25, Comment (15).

[57] James Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press 2002), [CL-0185], 162 and 183.

As already found above, this minimal quantity compares starkly with supplies to the Respondent's preferred users of gas: 28.8 Bcma to Power Plants, 14.7 Bcma to industrial users and 5.7 Bcma to the Idku Plant.[58] There was no attempt by the Respondent to ensure that the Claimant be treated "no worse," for an indefinite period, than any other purchaser of natural gas in Egypt, using the words of Article 15.2 of the SPA.

8.41   The second element listed in Article 25(1)(a) relates to "the only way for the State to safeguard an essential interest against a grave and imminent peril." In the Tribunal's view, the application of this second element to the present case raises important issues of timing.

8.42   As the first issue of timing, the Egyptian revolution began during the spring of 2011 (when President Mubarak resigned from office). It was only by EGAS's letter of 4 February 2013 to the Claimant that any suggestion was made that "the continuing social and political instability in Egypt" was an event of "force majeure" under the SPA, followed by EGAS' formal notice of force majeure on 24 February 2013.

8.43   Yet, disruptions in the supply of gas to the Plant had begun in 2006, long before EGAS' invocation of *force majeure* under the SPA in 2013.

8.44   By 2012, there were temporary black-outs in Egypt, caused by the lack of electricity. These were caused by an inadequate national grid and a lack of power generation capacity, particularly at times of peak demand. This was well-known at the time. As Professor Medlock testified, "[t]he tightened electricity market balance in Egypt over the past several years is well documented."[59] This imbalance was in turn caused by the Respondent's earlier decisions not to promote the development of gas deposits in Egypt, not to improve the national grid and not to build more power generating plants, with a mix of fuels. By 2012, the black-outs required the Respondent to prioritise gas supplies to generate electricity for consumers.

8.45   The Tribunal does not discount the fact of social unrest or the Respondent's reasonable concerns that serious unrest might ensue, still less the fact of the Egyptian revolution beginning in early 2011. Yet, the curtailment of gas to the Damietta Plant

---

[58] BRG ER1, Figure 24, Annex B-3.
[59] Medlock ER1, Paragraph 24.

both pre-dated and post-dated the Egyptian revolution. It was not the proximate cause for curtailing gas supplies to the Plant. That proximate cause lay in the Respondent's long-standing policies as to the development of gas deposits, electrical power generation, the national grid and the preferential use of gas for users and consumers in Egypt.

8.46    In other words, the "act" was not "the only way" for the Respondent "to safeguard an essential interest against a grave and imminent peril," using the words in Article 25(1)(a) of the ILC Articles. In contrast to the Claimant and the Damietta Plant, other commercial users of gas remained preferred by the Respondent. This is confirmed by the disproportionality in the reductions for delivered gas between the Damietta Plant and other commercial users in 2012-2013; namely: 12% reductions for Industrial users (receiving 14.8 Bcma), 14% for Power users (28.9 Bcma), 14% for Idku (5.7 Bcma) and 60% (0.3 Bcma) for the Damietta Plant (from a total production of 58.8 Bcma); and the Plant's reduction resulted in a curtailment of 96% in the Claimant's contractual volumes for export.[60] In 2012-2013, if the "act" had been "the only way," it would have been equally necessary for the Respondent to curtail supplies to other commercial users to a similarly minimal level as the Damietta Plant and the Claimant. That was not done.

8.47    As to the second timing issue, the Egyptian revolution had ceased by 2015. Yet, the resumption of gas supplies to the Plant did not then take place; nor has any such resumption taken place to date. As confirmed by the ILC's commentary on Article 27, the defence of necessity under international law lapses "if and to the extent that the circumstance precluding wrongfulness no longer exists."[61]

8.48    In these circumstances, the Tribunal finds that the non-supply of gas to the Plant was not attributable to the Egyptian revolution or social unrest; nor was it begun or maintained as the only way to safeguard the Respondent's essential interest against a grave and imminent peril, within the meaning of Article 25 of the ILC Articles.

---

[60] BRG ER 1, page 73, Figure 24 ("Disproportionality of Damietta Plant Curtailments to Uncurtailed Demand (FY 2012-13)" with Annexes B-3 & B-16, BRG ER2, page 68, Table 9 ("Summary of Exporter Curtailments"); *see also* COS, Part I, Slide 57.

[61] ILC Articles on State Responsibility, [CL-0064], Article 27; James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 189ff.

8.49    The third element listed in Article 25(1)(a) relates to an "essential interest" against a grave and imminent peril. In the Tribunal's view, for present purposes, the Respondent's relevant interest under Article 25 at the material time lay, not in the maintenance of public safety, but in the shortage of gas in Egypt.

8.50    That shortage originated in the Respondent's long-standing policies of subsidising domestic users of gas and electricity, together with a statement of policy (but not actual practice) to encourage the finding of gas deposits in Egypt.

8.51    These events had begun in the late 1990s, following the discovery of natural gas deposits off the Egyptian coast. It led to a public statement of policy by the Respondent to develop the use of natural gas as a substitute for liquid fuels in several economic sectors.[62] To encourage that use, the Respondent promoted the use of gas in the electricity sectors of the Egyptian economy; and it subsidised users of natural gas, both as gas itself and gas as a means of generating electricity.[63]

8.52    As to the statement of policy intended to encourage new discoveries of natural gas, the Respondent did not later translate that statement into policies sufficient to attract producers to discover and develop new natural gas fields. There was sufficient gas in existing fields and proven reserves to meet demand, at least up to 2017.[64] From 2000 to 2008, however, with the rise in oil prices, the Respondent introduced a price cap for all-natural gas agreements.[65] Even when the costs to producers significantly increased from 2004 onwards, the Respondent maintained the price cap.[66]

8.53    The result was an imbalance between the supply and demand of Egyptian gas. It was well established by 2006, as an increasing trend.[67] This was well known at the time. Later, as already recited in Part V above, on 24 March 2014, the Minister of Petroleum, subsequently Prime Minister (Mr Sherif Ismail) acknowledged that a

---

[62] BRG ER1, Paragraphs 34-35; Egyptian Environmental Affairs Agency, "The Arab Republic of Egypt: Initial Communication on Climate Change," June 1999, [BRG-165].
[63] BRG ER1, Paragraphs 66ff and 77ff; Medlock ER1, Paragraph 22.
[64] Wood McKenzie Report, "Development Timetable for gas Fields in Egypt," [RPS-16]
[65] BRG ER1, Paragraphs 40 and 135.
[66] RPS ER1, Figure 8.
[67] Tabulation of Data used by RPS, [RPS-4].

contributing factor to such imbalance had been the "irrational" consumption of Egyptian gas due to "subsidy."[68]

8.54    As to gas subsidy, when it was eventually reformed by the Respondent in 2014, the World Bank calculated in 2015 that the reform had already yielded cost savings equivalent to 3.3% of Egypt's GDP.[69]

8.55    As to gas supply, the imbalance could not be swiftly corrected, even if the Respondent had been minded to do so. There is a significant time lag between the first discovery of a new gas field and its first commercial production, particularly for offshore fields. For onshore fields, according to testimony from Mr Davison and Mr Walkup, the time lag is about six to seven years and, for offshore fields, about nine years.[70] Mr Goncalves testified that it took longer in Egypt, up to 12 years.[71] This time lag was also well-known at the time.

8.56    Nonetheless, little or no steps were taken by the Respondent to encourage producers to discover and develop new gas fields. As a result, Egyptian gas production reached its apogee in 2009 and then began to flatten.[72] This was before the Egyptian revolution.

8.57    In the Tribunal's view, the imbalance between supply and demand was not caused by the Egyptian revolution or the Global Financial Crisis. That was not the proximate cause of the non-supply of gas to the Claimant. The proximate cause was an overall shortage of Egyptian gas, applied by the Respondent inequitably amongst different users in Egypt.

8.58    Contrary to the Respondent's submission, that shortage of gas was not the relevant "essential interest" of the Respondent at the material time, sufficient to justify the defence of necessity against "a grave and imminent peril" within the meaning of Article 25 of the ILC Articles.

---

[68] "The Oil and Gas Sector in Egypt: Vision and Challenges," Speech (unofficial transcript) of Sherif Ismail, Egyptian Minister of Petroleum at the American Chamber of Commerce in Egypt (24 March 2014), [C-0192].
[69] International Bank for Reconstruction and Development, "Program Document for a Proposed Loan in the Amount of US $1,000 Million to The Arab Republic of Egypt for a First Fiscal Consolidation, Sustainable Energy and Competitiveness Programmatic Development Policy Financing" (23 November 2015), [BRG-255].
[70] RPS ER2, Paragraph 67; Walkup ER1, Paragraph 37.
[71] BRG ER1, Paragraph 93.
[72] RPS ER2, Figure 6.

8.59    As to the fourth element listed in Article 25(2)(b) of the ILC Articles, the issue arises whether the Respondent "contributed to the situation of necessity." In the Tribunal's view, this concept does not fit easily with long term macro-economics, such as is present in this case.

8.60    To an extent, a situation of necessity can always be traced back, as a matter of history, to political and economic mistakes made by a State years, if not decades, earlier. It may involve the State's relations with one or more other States, including economic and political factors lying outside its border (such as the Global Financial Crisis). Ordinarily, at the time when such mistakes were made, the State may not know of the consequences of its mistake, still less know that it has even made any mistake. Accordingly, this element of contribution requires a common-sense interpretation, placing the contributory event in chronologically proximity to the situation of necessity. Also, as the ILC Commentary to Article 25 of the ILC Articles states, "the contribution to the situation of necessity must be sufficiently substantial and not merely incidental or peripheral."[73]

8.61    The Tribunal is not inclined to find that the Respondent's defence of necessity, if otherwise made out, would fail under this fourth element of "contribution" under Article 25. The Respondent did not subjectively intend that social unrest should take place, leading to the Egyptian revolution and its consequences of 2011-2014. It did not cause or foresee the consequences of the Global Financial Crisis of 2007-2008. Nor did the Respondent subjectively intend that there would be, independently from these events, a shortage in electricity supply and a shortage of gas in Egypt. However, it is unnecessary for the Tribunal to decide this fourth element, one way or the other, given the Tribunal's earlier decisions above.

*(5) Summary of Decisions*

8.62    For the reasons stated above, the Tribunal decides that the Respondent has not proven the defence of "necessity" under customary international law, as expressed in Article 25  of  the  ILC  Articles  on  State  Responsibility.  In  these  circumstances,  it  is

---

[73] James  Crawford,  *The  ILC's  Articles  on  State  Responsibility:  Introduction,  Text  and  Commentaries* (Cambridge University Press, 2002), [CL-0185], Article 25, Comment (20).

unnecessary for the Tribunal to address the Claimant's further submissions on Article 27 of the ILC Articles.

### PART IX:  THE MERITS ISSUES

#### (1) Introduction

9.1     The Tribunal here addresses the merits of the Claimant's claims and the Respondent's defences under Articles 3(1), 4(1), 4(2) and 4(5) of the Treaty.[1]

9.2     Article 3(1) of the Treaty requires the Respondent to protect in its territory the investments made in accordance with its laws and regulations by investors of Spain and "shall not hamper, by means of unjustified or discriminatory measures, the management, maintenance, use, enjoyment, expansion, sale and if is the case, the liquidation of such investments."

9.3     Article 4(1) of the Treaty provides that the Respondent "shall guarantee in its territory fair and equitable treatment for the investments made by investors of [Spain]" (the "FET standard").

9.4     Articles 4(2) and 4(5) of the Treaty address discriminatory or "less favourable" treatment for the covered investments than that applied to investments by investors of a third country or by Egyptian investors.

9.5     There is a substantial overlap between these respective protections, as applied to the present case. For this reason, the Tribunal here focuses on the Claimant's case under the FET standard under customary international law in Article 4(1) of the Treaty.

#### (2) The Claimant's Case

9.6     *FET Standard:* In summary, the Claimant contends that the Respondent breached the FET standard in Article 4(1) of the Treaty, through its actions and omissions and by the acts and omissions of the Respondent and of EGAS, EGPC and their affiliates attributable to the Respondent.[2]

9.7     In particular, the Claimant submits that the Respondent failed to afford fair and equitable treatment to its investment in the Damietta Plant by: (i) creating and then frustrating the Claimant's legitimate expectations in the contractual performance of

---

[1] Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, [C-0001].
[2] RfA, Paragraphs 2, 9, 16-17 and 24-25; Cl Mem Merits, Section IV.A; Cl Rep Merits, Section IV; COS, Part I, Slide 9.

the SPA; (ii) failing to ensure an adequate gas supply to the Damietta Plant and prioritising the domestic market and other gas consumers at the Claimant's expense; (iii) pursuing gas sector policies and market interventions that caused gas shortages and invoking them to avoid its obligations; and (iv) undersupplying the Damietta Plant and allocating available gas in a discriminatory, disproportionate and non-transparent manner.[3] The Claimant also contends that the Respondent violated the FET standard when it undermined the stability of the Claimant's legal and business framework by enacting Law No. 114 for 2008 that amended the Investment Guarantees and Incentives Law and cancelled SEGAS' Free Zone License.[4]

9.8     The Claimant points to the ordinary meaning of "fair and equitable treatment" in the FET standard as "just, even-handed, unbiased, legitimate, reasonable."[5] It notes that other tribunals have decided that the FET standard "ensures that the foreign investor is not unjustly treated, with due regard to all surrounding circumstances, and that it is a means to guarantee justice to foreign investors."[6] The Claimant submits that the FET standard is "inherently flexible" that may be implicated by "different types of host State misconduct,"[7] and encompasses the protection of investors' "legitimate expectations."[8] The Claimant emphasises that "no investment tribunal has ever

---

[3] RfA, Paragraphs 9, 16-17 and 24-26; Cl Mem Merits, Section IV.A; Cl Rep Merits, Section IV; COS, Part I, Slide 9.

[4] Cl Mem Merits, Section IV.A.3, Paragraphs 334 and 503-506; The Claimant does not devote a specific section of its Reply on the Merits to its free zone claim; *see also* Cl Mem Merits, Section II.D.3; Cl Rep Merits, Section II.D, for the factual background on the Free Zone status.

[5] Cl Mem Merits, Paragraph 329, citing *National Grid v. Argentina*, UNCITRAL, Award, 3 November 2008, [CL-0008], Paragraph 168; *Siemens v. Argentina*, ICSID Case No. ARB/02/8, Award, 6 February 2007, [CL-0009], Paragraph 290; *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Award, 14 July 2006, [CL-0010], Paragraph 360; *MTD v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, [CL-0011], Paragraph 113.

[6] Cl Mem Merits, Paragraph 299, citing *Swisslion v. FYR Macedonia*, ICSID Case No. ARB/09/16, Award, 6 July 2012, [CL-0012], Paragraph 273; Cl Rep Merits, Paragraph 303.

[7] Cl Mem Merits, Paragraph 330; Cl Rep Merits, Paragraph 303.

[8] Cl Mem Merits, Paragraphs 335-336; Cl Rep Merits, Paragraph 304; COS, Part I, Slide 10, citing *Saluka v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, [CL-0067], Paragraph 302; *National Grid v. Argentina*, UNCITRAL, Award, 3 November 2008, [CL-0008], Paragraph 173; *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Award, 14 July 2006, [CL-0010], Paragraph 372; *MTD v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, [CL-0011], Paragraphs 113-115; *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, [CL-0013], Paragraph 450; *Biwater v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, [CL-0014], Paragraph 602; *LG&E v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, [CL-0016], Paragraphs 124-125; *Técnicas v. Mexico*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, Award, [CL-0019], Paragraph 154; *Rumeli v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, [CL-0020], Paragraph 609; *CME v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, [CL-0029], Paragraph 611; *PSEG v. Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, [CL-0030], Paragraph 240; *Eureko v. Poland*, Ad hoc Arbitration, Partial Award, 19 August 2005, [CL-0031], Paragraph 235; *Bogdanov v. Moldova*, SCC Case Award, 22 September 2005, [CL-0035], Paragraph 4.2.4.4; *CMS v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, [CL-0076], Paragraph 274–76; *Bayindir v. Pakistan*, ICSID Case No. ARB/03/26, Decision on Jurisdiction, 14 November 2005, [CL-0161], Paragraphs

refused to find that the [FET] standard protects legitimate expectations."[9] In response to the Respondent's argument that legitimate expectations are limited to a "specific commitment,"[10] the Claimant replies that the concept is broader and claims that a "State's unilateral declarations, its regulatory framework, and other conduct and circumstances can create legitimate expectations" and that each situation must be evaluated individually.[11]

9.9     The Claimant suggests a three-stage approach for discerning whether a host State has breached the FET standard by frustrating an investor's legitimate expectations: "(i) Did the host State's conduct create legitimate expectations on the part of the investor? (ii) Did the investor rely on the State's conduct at the time it invested? And (iii) did the host State subsequently fail to honor the expectations it created?"[12]

9.10    Citing *Parkerings v. Lithuania* (2007), the Claimant contends that:

> [A] *host State's conduct can give rise to legitimate expectations if: (i) the investor received an explicit promise or guarantee from the host State; (ii) the investor received implicit promises or guarantees that it then took into account in making its investment; or (iii) absent such assurances or representations, the circumstances surrounding the investment were such as to give rise to a legitimate expectation.*[13]

9.11    In the present case, the Claimant contends that the Respondent created legitimate expectations that it would "ensure [the] availability of sufficient volumes of natural gas for the fulfillment of the SPA and the operation of the LNG [Damietta] Plant"[14] in several different ways, including explicit promises, guarantees, assurances and representations.[15] The Claimant points in particular to its contractual arrangement with EGPC (later EGAS) and the Respondent's conduct that created the legitimate expectations that the Respondent would not interfere with the agreed upon

---

237-239; *Kardassopoulos and Fuchs v. Georgia*, ICSID Cases Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, [CL-0208], Paragraph 440.
[9] Cl Rep Merits, Paragraph 304; Cl Mem Merits, Paragraph 336.
[10] Resp CM Merits, Paragraphs 223-226.
[11] Cl Rep Merits, Paragraph 304.
[12] Cl Mem Merits, Paragraph 338.
[13] Cl Mem Merits, Paragraph 341, citing *Parkerings v. Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, [CL-0045], Paragraph 331.
[14] Cl Mem Merits, Paragraph 332.
[15] Cl Mem Merits, Paragraph 342; Cl Rep Merits, Paragraph 316.

relationship and "a firm gas supply commitment over a period of 25 years" to supply gas as reflected in the SPA.[16]

9.12   On the ability of the SPA to create legitimate expectations, the Claimant submits that the SPA is an "investment agreement" under international law that set out the legal obligations, at least in part, that would apply to the Claimant's investment in the Damietta Plant.[17] The Claimant contends that because the SPA was concluded with EGPC, a State-owned company the conduct of which is attributable to the Respondent, the Respondent created legitimate expectations that it would comply with the SPA.[18]

9.13   In any event, the SPA articulated the Claimant's legitimate expectations of compliance with at least three gas supply obligations: (i) to sell and deliver to the Claimant 4 BCM of gas annually, (ii) to secure and maintain an adequate gas supply to the Damietta Plant for the 25-year life of the project, and (iii) at all times keep a reserve supply to meet an on-stream factor of 95% of the LNG Complex.[19]

9.14   The Claimant further contends that EGPC (later EGAS) agreed never to treat the Claimant worse than any other customer, including domestic consumers, in the event of "*force majeure*" partially affecting its ability to supply natural gas.[20] EGPC also allegedly undertook to ensure that Egyptian authorities would not interfere with the Project or the Claimant's rights under the SPA, even in the case of a natural gas shortage.[21]

9.15   In support of its case that the Respondent created the Claimant's legitimate expectations, the Claimant points out that the Minister of Petroleum affirmed the Egyptian Government's support for the Project and committed to providing gas over

---

[16] Cl Mem Merits, Paragraphs 342-349; COS, Part I, Slide 11, citing *Suez v. Argentina*, ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010, [CL-0037], Paragraph 212; *see also Total v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, [CL-0042], Paragraph 117; *Continental Casualty v. Argentina*, ICSID Case No. ARB/03/9, Award, 5 September 2008, [CL-0049], Paragraph 261; COS, Part I, Slide 12; Cl Mem Merits, Paragraph 414, citing *Alpha v. Ukraine*, ICSID Case No. ARB/07/16, 8 November 2010, [CL-0061], Paragraph 422.
[17] Cl Rep Merits, Paragraphs 319-320,
[18] Cl Rep Merits, Paragraphs 321-324.
[19] Cl Mem Merits, Paragraphs 350-358; Cl Rep Merits, Paragraphs 325-327; COS, Part I, Slide 13, referring to Natural Gas Sale and Purchase Agreement, [C-0002], Articles 5.1, 23.2 and 24.3.
[20] Cl Mem Merits, Paragraphs 446-447; Cl Rep Merits, Paragraph 327; COS, Part I, Slide 14; citing Natural Gas Sale and Purchase Agreement, [C-0002], Article 15.2.
[21] Cl Mem Merits, Paragraphs 414 and 446-0447; COS, Part I, Slide 15, citing Natural Gas Sale and Purchase Agreement, [C-0002], Article 21.1.

the term of the SPA at a competitive price.[22] The Council of Ministers then acknowledged these commitments in approving the Project following the conclusion of the SPA between EGPC and UFG that reflected the principles, obligations and rights of each party.[23] The Government celebrated the SPA as a historical first contract to export Egyptian gas;[24] and it further endorsed the SPA.[25] The Claimant maintains that the Respondent not only promoted a solicited investment in its natural gas industry as a matter of general policy, it also "specifically encouraged UFG to invest in Egypt" and "to build what was to become the largest-single-train liquefaction facility in the world and the only such facility in Egypt."[26]

9.16    The Claimant asserts that it "heavily relied on Egypt's conduct and representations […] when UFG undertook to make its investment in Egypt"; and that it was this reliance that "was the final element that led to UFG's legitimate expectation that the Egyptian Government would ensure availability of adequate natural gas reserves throughout the life of the Damietta project."[27] The Claimant contends that without this guarantee, "the proposed LNG liquefaction plant would never have been built."[28]

---

[22] Cl Mem Merits, Paragraphs 11-12; Cl Rep Merits, Paragraphs 306-307; COS, Part I, Slide 16, citing UFACEX Memorandum to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 January 2000, [C-0344].

[23] Cl Mem Merits, Paragraph 11; Cl Rep Merits, Paragraph 330; COS, Part I, Slides 17-19, citing Memorandum to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458]; Memorandum from the Technical Affairs office of the Ministry of Petroleum, 29 July 2000, [C-0459]; Memorandum on Contracting with Union Fenosa Gas on Natural Gas Sale and Purchase to Establish Natural Gas Liquefaction and Export Plant signed by Sherif Ismail and Ismail Karara, 27 August 2007, [C-0460]; *see also* Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 August 2000, [C-0169]; Memorandum from the Minister of Petroleum (Sameh Fahmy) to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458]; Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr. Atef Ebeid (Prime Minister), 27 July 2000, [C-0461]; Memorandum to be submitted to Eng. Sameh Fahmy, Minister of Petroleum on contracting with Union Fenosa on adjusting the prices of Natural Gas supplied to the company in Damietta liquefaction Plant, 14 November 2006, [C-0462]; Memorandum to be submitted to Eng. Sameh Fahmy, Minister of Petroleum on contracting with Union Fenosa on adjusting the prices of Natural Gas supplied to the company in Damietta liquefaction Plant, January 2008, [C-0463].

[24] Cl Mem Merits, Paragraphs 170 and 379, citing "Egypt exports LNG to Spain," *Gulf Daily News* (24 January 2005), [C-0155]; COS, Part I, Slide 19, citing Memorandum from the Minister of Petroleum (Sameh Fahmy) to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458]; Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr. Atef Ebeid (Prime Minister), 27 July 2000, [C-0461].

[25] Cl Mem Merits, Paragraphs 130, 156, 188, 339, 368 and 447; COS, Part I, Slide 20, citing Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 August 2000, [C-0169].

[26] Cl Mem Merits, Paragraph 380.

[27] Cl Mem Merits, Paragraph 387.

[28] Cl Mem Merits, Paragraph 389.

9.17    It is the Claimant's case that the Respondent is responsible for the lack of gas supply to the Claimant. The Claimant submits that whilst the Government endorsed the SPA, it also adopted policies that undermined EGPC and EGAS' obligations to the Claimant and used EGAS to implement the Ministry's strategy of prioritising the domestic market over the Claimant.[29] The Claimant claims that the Government's policies, including subsidising gas usage across industries, over-stimulated demand for gas and led to a domestic gas shortfall.[30] Paired with the Government's strategy of giving local market demand priority – a strategy that did not exist when the SPA was signed – the Government caused EGPC and EGAS to fall short of meeting their obligations to the Claimant by 190 million MMBtus between 2006 and 2010, and to fail to deliver any gas since 2012.[31] In response to the Respondent's argument that the decision to cut off the gas supply to the Claimant did not involve sovereign authority, the Claimant refers the Tribunal to its arguments on attribution (see below).

9.18    The Claimant also contends that EGAS prioritised the domestic market pursuant to the Government's political strategy and against its own commercial interest, further supporting the notion that EGAS is not an autonomous commercial company, but is rather subject to the Respondent's sovereign policies.[32] The Claimant points to the Respondent's plea of necessity as an admission that the decision to prioritise the domestic market, through EGAS, was a sovereign act, and not a commercial decision.[33]

9.19    Further, the Claimant alleges that the Respondent violated the FET standard by revoking, by Law No. 114 of 2008, the Free Zone status of SEGAS originally established under Law No. 8 of 1997, which excluded the profits and dividends of projects established in free zones from Egyptian tax and regulations.[34] The Claimant contends that it had relied on this status in making its investment in the Project and is significantly harmed through its revocation.[35]

---

[29] Cl Mem Merits, Paragraphs 257-263, 396-413; COS, Part I, Slide 22.
[30] Cl Mem Merits, Paragraphs 199, 396, 403 and 413; Cl Rep Merits, Paragraph 307; COS, Part I, Slides 25-26.
[31] Cl Mem Merits, Paragraph 512; Cl Rep Merits, Paragraphs 307-308; COS, Part I, Slides 28-30.
[32] Cl Mem Merits, Paragraph 461; COS, Part I, Slides 38-43.
[33] Cl Mem Merits, Paragraph 46; Cl Rep Merits, Paragraph 313; COS, Part I, Slide 46.
[34] Cl Mem Merits, Paragraphs 275, 334, 504 and 569; COS, Part I, Slide 48; citing Investment Guarantees and Incentives Law No. 8 of 1997, and the 25-year licence granted to SEGAS for the LNG complex to operate as a "private Free Zone Company," [C-0109]; "Doing Business in Egypt," *Practical Law* (2015), [C-0293].
[35] Cl Mem Merits, Paragraph 503, citing Fernández Martínez WS, Paragraph 16; COS, Part I, Slide 49.

9.20    Finally, the Claimant argues that "international trade law further confirms UFG's legitimate expectations" and refers to the World Trade Organization ("WTO") Agreements, including the General Agreement on Tariffs and Trade of 1994 ("GATT") "which sets out binding rules that limit the right of WTO Members to restrict or prohibit exports to other Members."[36] The Claimant asserts that WTO jurisprudence on Article XI:1 of the GATT "'lays down a general obligation to eliminate quantitative restrictions' on trade" and "forbids not only outright prohibitions on importation or exportation but also other 'restrictions'," including "measures that create uncertainties and affect investment plans, restrict market access for imports, or make importation prohibitively costly" or "ha[ve] a limiting effect."[37] The Claimant thus concludes that "Egypt's international obligation to ensure compliance with WTO rules in good faith further confirms the [Claimant]'s legitimate expectation that Egypt would neither require nor allow the prioritization or exclusive allocation of natural gas for domestic use in violation of WTO rules" and "to suggest otherwise is to suggest that the [Claimant] should have anticipated that Egypt would violate its treaty obligations."[38]

9.21    The Claimant concludes, on the merits, that the Respondent breached the FET standard in Article 4(1) of the Treaty by creating and then violating the Claimant's legitimate expectation, and consequently impaired its investment.

9.22    *Attribution*: In summary, as to attribution to the Respondent in regard to EGPC and EGAS, the Claimant contends that their conduct, although for different purposes, is attributable to the Respondent as a matter of international law. Thus, the Claimant asserts that, whilst its main case is that "Egypt itself, through the Ministry of Petroleum and other agencies and officials, made the decision to decrease (and then stop altogether) the supply of natural gas to the [Claimant] in order to prioritize

---

[36] Cl Rep Merits, Paragraph 335, citing in particular Article XI:1 of the GATT, which provides that "No prohibitions or restrictions other than duties, taxes or other charges, whether made effective through quotas, import or export licenses or other measures, shall be instituted or maintained by any contracting party on the importation of any product of the territory of any other contracting party or on the exportation or sale for export of any product destined for the territory of any other contracting party."; *see also* Cl Rep Merits, Paragraph 260.
[37] Cl Rep Merits, Paragraph 335-336; *see generally* Paragraphs 335-337, citing Appellate Body Report, *Argentina – Measures Affecting the Importation of Goods*, WT/DS438/AB/R, WT/DS444/AB/R, WT/DS445/AB/R, 15 January 2015, [CL-0191]; Panel Report, *China – Measures Related to the Exportation of Various Raw Materials*, WT/DS394/R, WT/DS395/R, WT/DS398/R, 5 July 2011, [CL-0192]; and Panel Report, *China – Measures Related to the Exportation of Rare Earths, Tungsten and Molybdenum,* WT/DS431/R, WT/DS432/R, WT/DS433/R, 26 March 2014, [CL-0193].
[38] Cl Rep Merits, Paragraph 338.

Egypt's domestic market," EGPC's and EGAS' conduct "equally implicates Egypt's liability for breaching the BIT."[39]

9.23    The Claimant submits that EGPC's execution of the SPA is attributable to the Respondent primarily because EGPC was an organ of the State under Article 4 of the ILC Articles on State Responsibility (being declaratory of international law),[40] and thus that EGPC's obligations under the SPA to supply gas are the basis of legitimate expectations that the Respondent would assure such supply.[41] The Claimant submits that, despite the fact that EGPC "assigned" (novated) the SPA to EGAS in 2002 (effective as from 1 August 2001),[42] EGPC remains "responsible for the obligations under it."[43]

9.24    The Claimant submits that EGAS's failure to supply gas to the Claimant under the SPA is also attributable to the Respondent, under international law, because EGAS, too, is an organ of the State under Article 4 of the ILC Articles on State Responsibility. According to the Claimant, EGAS' decision to curtail supplies to the Damietta Plant was an exercise of governmental authority under Article 5 of the ILC Articles on State Responsibility; and that EGAS did so on the instructions of or under the direction or control of the Respondent within the meaning of Article 8 of the ILC Articles on State Responsibility. As a result, so the Claimant concludes, the Respondent is itself responsible for the curtailment of supply of feed gas under the SPA.

9.25    For the purpose of Article 4 of the ILC Articles, the Claimant contends that EGPC is an organ of the Respondent under Article 4 by reason of the following factors:

(i)     The fact that EGPC enjoys separate legal personality under Egyptian law is not determinative of its status as an organ of the State under international law;

---

[39] Cl Rep Merits, Paragraph 206.
[40] ILC Articles on State Responsibility, [CL-0064].
[41] Cl Rep Merits, Paragraph 318.
[42] Letter from EGPC (Ibrahim Saleh) and EGAS (Mohamed Tawila) to Unión Fenosa, S.A. (Elías Velasco), 17 October 2002, [C-0170].
[43] Cl Rep Merits, Footnote 530 ("Although EGPC assigned the SPA to EGAS, it remains responsible for the obligations under it. But in any event, UFG's expectations must be measured at the time the contract was signed, and it was signed with EGPC as a state organ. EGAS is also an organ of the state.").

(ii)   EGPC is wholly owned by the Respondent and was created by Law No. 20 of 1976 to manage all sectors of the Egyptian petroleum industry,[44] that the Claimant contends is a core governmental function.[45] EGPC is, by statute and along with the Ministry of Petroleum and EGAS, a constituent part of the Egyptian "Petroleum Sector," that developed national strategies for the gas industry;[46]

(iii)   "[A]s a 'public authority' operating under the guidance of the Ministry of Petroleum,"[47] EGPC is governed by public law and its decisions are administrative decisions subject to the review of the Egyptian State Council;[48]

(iv)   EGPC is controlled by the Government with the chairman of its board of directors appointed by the Respondent's President and other board members appointed by the Prime Minister based recommendations of the Minister of Petroleum.[49] By law, EGPC is subject to the financial supervision of the Government's Central Audit Agency,[50] and all of the decisions of EGPC's board of directors must be sent to the Minister of Petroleum for ratification, amendment or rescission.[51] EGPC is not "operationally autonomous" of the Government, as demonstrated by the fact that the Ministry of Petroleum closely controls its decision-making and operations;[52]

(v)   EGPC has represented itself in a private offering memorandum to potential investors that it was an "economic authority of the Arab Republic of Egypt,

---

[44] Cl Mem Merits, Paragraph 359.

[45] Cl Rep Merits, Paragraph 267.

[46] Cl Rep Merits, Paragraph 32 ("The term 'Egyptian Petroleum Sector' used in EGAS' reports is a term of art that refers to the Ministry of Petroleum, EGPC and EGAS, and the reports note the Sector's sovereign policies and strategies, which as one can readily see, changed over time."); Cl Rep Merits, Footnote 48, ("See, e.g., Exhibit C-0352, Prime Minister's Decree No. 356/1980, Article 1 (recognizing that the Supreme Council of the Petroleum Sector shall be chaired by the Minister of Petroleum with the membership of EGPC and other public companies in this sector); Prime Minister's Decree No. 321/1982, [C-0353]; Minister of Petroleum's Decree No. 401/1984, [C-0354], Article 4 (defining the employees of the Petroleum Sector as those of the Ministry of Petroleum, EGPC, and the public and common sector petroleum companies);, Minister of Petroleum's Decree No. 1020/1993, [C-0355], Article 4 (stating that the Petroleum Sector shall mean the following entities: the Minister of Petroleum, EGPC, and the public and jointly owned sector petroleum companies).

[47] Cl Mem Merits, Paragraph 359.

[48] Cl Mem Merits, Paragraphs 361 and 492.

[49] Cl Mem Merits, Paragraph 360, referring to Law No. 20 of 1976, [C-0126], Article 8.

[50] Cl Rep Merits 492, referring to Law No. 144 for year 1988, Article 3, [C-0209].

[51] Law No. 20 of 1976, [C-0126], Article 11 ("The Chairman of the Board of Directors of the Corporation shall notify the Board's decisions to the Minister of Petroleum for consideration in adoption and he shall have the power to amend or abolish them, and has to take its decision about them and notify it to the Board within thirty days from the date of the arrival of the papers to him.").

[52] Cl Rep Merits, Paragraph 267.

rather than a corporation, with the same legal status as the Central Bank of Egypt and the Suez Canal Authority," with all decisions of the Board of Directors being required to be notified to the Minister of Petroleum for approval;[53] and

(vi)    The ICSID tribunal in *Ampal v. Egypt* (2017) decided that EGPC was an organ of the Egyptian State.[54]

### *(3) The Respondent's Case*

9.26    *FET Standard*: In summary, the Respondent contends that the Claimant has failed to prove any of its allegations that the Respondent has breached Article 4(1) of the Treaty.

9.27    The Respondent maintains that the "Claimant has failed to establish that the conduct of EGPC and EGAS at issue in this arbitration constitutes an exercise of "puissance publique."[55] According to the Respondent, the Claimant cannot identify "any act or omission by EGAS or EGPC related to the present dispute that could not have been an act or omission of a private contracting party." The Respondent asserts that such conduct "cannot engage Respondent's liability under the [Treaty], even if Claimant could show, *quod non*, that EGAS or EGPC acted under Respondent's instructions."[56]

9.28    Consequently, absent the identification of a sovereign act by the Respondent, "such as the enactment of a law, decree or judgment, that caused EGAS's alleged violations of the Natural Gas Sale and Purchase Agreement and related agreements," the Respondent dismisses the Claimant's numerous references to the Respondent's alleged policies as "beside the point."[57] The Respondent focuses its response to the Claimant's claims based on "legitimate expectations" and the change in SEGAS' tax-free status.[58]

9.29    The Respondent denies that it has breached the FET standard. It submits that the Claimant has not established that the Respondent's conduct gave rise to any

---

[53] Tr. D1 74:15-19; COS, Part I, Slide 24; Cl Mem Merits, Paragraph 63, citing Offering Memorandum for Petroleum Export Limited, 14 July 2005, [C-0125], Page 32.
[54] Tr. D1 74:15-19; *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 138.
[55] Resp CM Merits, Paragraph 216, referring also to Resp Obj Jur, Paragraphs 51-52.
[56] Resp CM Merits, Paragraph 216.
[57] Resp CM Merits, Paragraph 217.
[58] Resp CM Merits, Paragraph 218.

"legitimate expectations" on which it relied in making its investment; that the Respondent frustrated these expectations; and that the Respondent has otherwise violated the FET standard.[59]

9.30    Whilst the Respondent accepts that legitimate expectations are an essential element of the FET standard, the Respondent contends that the standard is not "flexible" (as the Claimant argues), but rather presents a "high threshold". According to the Respondent, the Claimant has not met this threshold.[60] The Respondent relies on *Waste Management v. Mexico II* (2004) to argue that the standard requires "arbitrary, grossly unfair, unjust or idiosyncratic" conduct leading to "an outcome which offends judicial propriety" to breach the FET minimum standard.[61]

9.31    The Respondent maintains that the conduct of EGAS/EGPC is not attributable to the State.[62] Nevertheless, the Respondent contends that the Claimant has not demonstrated that it had any "reasonable and legitimate expectations" with regard to the gas supply obligations under the SPA, or with regard to the permanence of the tax regime in place at the time of the "investment" in 2000.[63] Additionally, the Respondent asserts that the Claimant has not shown that the Respondent interfered with the Claimant's contractual relationship with EGAS or that the reduction and ultimate shutdown of the gas supply was discriminatory, disproportionate or lacking in transparency.[64] Overall, the Respondent argues that the Claimant's free zone claim, gas policy claim, and gas supply claims are meritless; and that, in any event, the state of necessity following the 2011 Egyptian revolution precludes any finding of wrongful conduct related to gas shortages.[65]

9.32    On the specific issue of "legitimate expectations," the Respondent contends that the FET standard requires the existence of specific, unambiguous commitments by the State and the investor's reliance upon these commitments in making the investment –

---

[59] Resp CM Merits, Paragraphs 218-219; Resp Rej Merits, Paragraph 213.
[60] Resp CM Merits, Paragraphs 220-222, citing *Biwater v. Tanzania,* ICSID Case No. ARB/05/22, Award, 24 July 2008, [CL-0014], Paragraph 597; Resp Rej Merits, Paragraph 214.
[61] Resp Rej Merits, Paragraph 214, citing *Waste Management v. Mexico II*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, [CL-0033], Paragraph 98.
[62] Resp CM Merits, Paragraph 222, referring to Sections III and IV of Resp CM Merits; Resp Rej Merits, Paragraph 215.
[63] Resp CM Merits, Paragraph 222; Resp Rej Merits, Paragraph 216.
[64] Resp CM Merits, Paragraph 222; Resp Rej Merits, Paragraph 217.
[65] Resp CM Merits, Paragraph 331; ROS, Vol. III, Slide 1.

elements that are absent in this case.[66] Responding to the Claimant's allegations regarding the Government's support for the Project, the Respondent asserts that expressing an interest in a nationally significant investment is not equivalent to assuming any obligations under the SPA executed between UFACEX/UFG and EGPC/EGAS, especially without the State's involvement in the negotiation of the SPA.[67]

9.33    The Respondent submits that the Claimant could not derive reasonable and legitimate expectations of the Respondent itself assuming any obligations with respect to the supply of gas under the SPA, because the Respondent is not a party to the SPA and "[t]he contractual commitments of EGPC and EGAS are not Respondent's commitments."[68] Citing *Parkerings v. Lithuania* (2007), the Respondent contends that any contractual expectations created by the SPA are not necessarily protected under the Treaty and that redress for any frustration of those expectations should be sought before national courts.[69]

9.34    The Respondent thus maintains that the Claimant has failed to establish any specific representation made by the Respondent regarding the supply of gas to the Damietta Plant and characterises any expectations that the Claimant may have had with respect to a "firm" gas supply for 25 years or otherwise, as contractual and not protected under international law.[70]

9.35    Further, the Respondent asserts that the Claimant has failed to demonstrate that it relied upon any representations by the Respondent in making its investment in Egypt. The Respondent points out that the Claimant claims reliance upon a statement by the Egyptian Minister of Petroleum in 2005, years after its investment in 2000, whilst its

---

[66] Resp CM Merits, Paragraph 223, citing *Parkerings v. Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, [CL-0045], Paragraph 331; *PSEG v. Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, [CL-0030], Paragraph 241; *El Paso v. Argentina*, ICSID Case No. ARB/03/15, Award, 31 October 2011, [CL-0075], Paragraph 376; *EDF (Services) v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, [CL-0038], Paragraph 217; *National Grid v. Argentina*, UNCITRAL, Award, 3 November 2008, [CL-0008], Paragraph 173, among other cases; Resp Rej Merits, Paragraphs 219-220.
[67] Resp CM Merits, Paragraph 226; Resp Rej Merits, Paragraph 221.
[68] Resp CM Merits, Paragraphs 230-232, distinguishing *Perenco v. Ecuador*, *Invesmart v. Czech Republic*, *Continental Casualty v. Argentina* and *Suez v. Argentina* from the present case, where the contractual commitment did not come from a governmental entity; Resp Rej Merits, Paragraph 223.
[69] Resp CM Merits, Paragraphs 233-235, citing *Parkerings v. Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, [CL-0045], Paragraph 344; *Duke Energy v. Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, [CL-0018], Paragraph 358.
[70] Resp CM Merits, Paragraphs 226, 232-236. ROS, Vol. III, Slides 19-22, citing Natural Gas Sale and Purchase Agreement, [C-0002], Articles 5.1, 23.2, 24.1; Resp Rej Merits, Paragraphs 225-229.

witness on this point (Mr Fernández Martínez) "was not involved in the negotiation and drafting of the [SPA]" and thus cannot speak to the Claimant's reliance on any alleged representations at the time.[71] The Respondent contends that expectations arising after an investment is made are not protected under the FET standard.[72]

9.36    Turning to the Claimant's Free Zone claim in respect of SEGAS, the Respondent contends that the claim is meritless for four reasons: (i) absent a stabilisation agreement, changes in the Respondent's tax regulations cannot give rise to a violation of the Treaty's FET standard; (ii) it is undisputed that the Parties never entered into a tax stabilisation agreement; (iii) the Claimant bears the consequences of its decision to invest despite the lack of any stabilisation agreement and in any event fails to show any investment-backed expectations; and (iv) the change in the legal framework governing free zones was fair and equitable in light of the circumstances.[73] The Respondent further notes that this claim is absent from the Claimant's Reply Memorial on the Merits.[74]

9.37    Referring to the decisions in *Perenco v. Ecuador* (2014), *Duke Energy v. Ecuador* (2008), and *El Paso v. Argentina* (2011), the Respondent maintains that the FET standard does not guarantee that the legal and business framework will remain unaltered; and, in any event, that it must be assessed objectively.[75] Relying upon the award in *Encana Corp. v. Ecuador* (2006), the Respondent asserts that, in the absence of a specific commitment from the host State like a stabilisation agreement, the foreign investor has no right or legitimate expectation that the tax regime will not change during the life of the investment.[76] In this regard, the Respondent notes that "it is undisputed that the Parties never entered into a tax stabilization agreement" and the

---

[71] Resp CM Merits, Paragraph 227, citing Fernández Martínez WS, Paragraph 8; Cl Merits, Paragraph 384; Resp Rej Merits, Paragraphs 230-235.
[72] Resp CM Merits, Paragraphs 227-228, citing *National Grid v. Argentina*, UNCITRAL, Award, 3 November 2008, [CL-0008], Paragraph 173; *Thunderbird v. Mexico*, UNCITRAL, Final Award, 26 January 2006, [CL-0039], Paragraph 167; and distinguishing *Walter Bau v. Thailand*, , UNCITRAL, Award, 1 July 2009, [CL-0050], by pointing out that the agreement in that case was prepared by the government and proposed a rate of return to the investor in incentivize participation.
[73] Resp CM Merits, Paragraphs 237-242 and 247-248; Resp Rej Merits, Section II(A)(4); ROS, Vol. III, Slide 2.
[74] Resp Rej Merits, Paragraph 213, Footnote 372.
[75] Resp CM Merits, Paragraphs 243-247, citing *Perenco v. Ecuador*, ICSID Case No. ARB/08/6, Decision on the Remaining Issues of Jurisdiction and on Liability, 12 September 2014, [CL-0047], Paragraph 560; *Duke Energy v. Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, [CL-0018], Paragraph 340; ROS, Vol. III, Slide 6, citing *El Paso v. Argentina*, ICSID Case No. ARB/03/15, Award, 31 October 2011, [CL-0075], Paragraph 350.
[76] Resp CM Merits, Paragraphs 238-240; ROS Vol. III, Slide 7, citing to *Encana Corp. v. Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, [CL-0015], Paragraph 173.

Claimant invested knowing that SEGAS was subject to changes in the regulation of free zones under Investment Law No. 8 of 1997.[77] Again referring to *Parkerings v. Lithuania* (2007), the Respondent submits that, by investing without a stabilisation agreement, the Claimant bears the risk of any changes in the legal framework.[78]

9.38   Citing *Saluka v. Czech Republic* (2006) and *Duke Energy v. Ecuador* (2008), amongst other decisions, the Respondent further contends that, in any event, the change in the legal framework governing Free Zones was fair and equitable in light of the circumstances and based on a weighing of the parties' interests.[79] The Respondent put in place the 2008 Budgetary Law (that amended the Free Zone status) in the context of ongoing public demonstrations and popular discontent in the face of a social and security crisis involving strikes and protests against rising food costs and low wages.[80]

9.39   In response to the Claimant's submissions about the Respondent's gas policies, the Respondent submits that these lack merit because (i) the Respondent's gas polices were known to the Claimant at the outset; (ii) the Claimant has not shown any reasonable expectation of a 25-year firm gas supply *vis-à-vis* the Respondent; (iii) the Claimant complains that pre-existing gas policies are "consistent with the energy policies of an emerging economy transitioning from reliance on liquid fuel to natural gas"; and (iv) the 2011 Egyptian revolution made it impossible to "adopt new policies in general, not to mention policies in a sensitive sector, such as the energy sector, which is critical to the Egyptian population." [81]

9.40   With regard to the duration of the Respondent's gas policies, the Respondent asserts that gas and other subsidies have been in place for decades and are "historically embedded in the social welfare system."[82] The Respondent points to this factor, to

---

[77] Resp CM Merits, Paragraphs 61-64 and 295; Resp Rej Merits, Paragraph 48, citing Law No. 114 of 2008, regarding the Opening of Two Additional Funds in the General Budget of the Financial Year 2007/2008, [R-0080]; ROS Vol. III, Slide 9, citing to Decision of the Director of GAFI No. 3336 of 2001 regarding a License for the Spanish Egyptian Gas Company (SEGAS) to Carry out its Activities in accordance to the Private Free Zone Regime, 9 December 2001, [R-0075], Article 12.
[78] Resp CM Merits, Paragraphs 241-242; ROS, Vol. III, Slide 11, citing *Parkerings v. Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, [CL-0045], Paragraphs 332 and 335-336.
[79] Resp CM Merits, Paragraphs 243-246; ROS, Vol. III, Slide 13, citing *Saluka v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, [CL-0067], Paragraphs 304-306; *Duke Energy v. Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, [CL-0018], Paragraph 340.
[80] Resp CM Merits, Paragraphs 247-248; ROS, Vol. III, Slide 14.
[81] Resp CM Merits, Paragraph 249; Resp Rej Merits, Paragraph 290.
[82] Resp CM Merits, Paragraphs 169-171; Resp Rej Merits, Paragraphs 266 and 287; ROS, Vol. III, Slide 25, citing Khan ER, Paragraphs 22-23.

argue that, to be protected, the Claimant's expectations must be legitimate and reasonable at the time the investment is made, taking into account all circumstances, including the "political, socioeconomic, cultural and historical conditions prevailing in the host State."[83]

9.41    Further, the Respondent asserts that the Claimant has failed to establish that it was the Respondent's gas policies that cause the gas shortages, and not the Global Financial Crisis of 2008 or the Egyptian revolution in 2011.[84] The Respondent notes that the Claimant agrees that gas production decelerated and declined as a result of declining investment in new production needed to offset declines in existing fields.[85] The Respondent relies upon the expert reports showing that the Global Financial Crisis and the Egyptian revolution were the primary causes of the stagnation and decline in gas production during the relevant period.[86] The Respondent further asserts that the Claimant recognised the deep economic, political and social crisis unfolding in Egypt, and even recognized the existence of *force majeure* circumstances, through its own Managing Director's statement made within Unión Fenosa.[87]

9.42    On the Claimant's invocation of the Respondent's WTO obligations to derive legitimate expectations, the Respondent asserts that this Tribunal lacks jurisdiction over such an international trade law claim; and, in any event, that the claim must fail for much the same reasons as the Claimant's FET claim under the Treaty.[88]

9.43    The Respondent maintains that, even if the Claimant were to establish that it had legitimate expectations of the Respondent to provide a firm supply of gas to the Damietta Plant, "the mere undersupply of gas would not give rise to a violation of the

---

[83] Resp CM Merits, Paragraph 244; Resp Rej Merits, Paragraph 268; ROS, Vol. III, Slide 26, citing *Duke Energy v. Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, [CL-0018], Paragraph 340.
[84] Resp CM Merits, Paragraphs 253; Resp Rej Merits, Paragraph 255; ROS, Vol. III, Slide 15.
[85]- Resp Rej Merits, Paragraph 99; ROS, Vol. III, Slide 29.
[86] Resp CM Merits, Section II.B and II.C; Resp Rej Merits, Paragraphs Section II.B and II.C; ROS, Vol. III, Slide 30, citing RPS ER2, Page 17, Figure 6.
[87] Resp CM Merits, Paragraphs 122-132; Resp Rej Merits, Paragraphs 71-77; ROS, Vol. III, Slides 32-33, citing Report of the Managing Director to the Board of Directors Meeting, "Gas S&P Contracts. Analysis Of Current Stand and Proposal of Improvement Measures," 20 March 2013, [R-0379], Pages 5 and 7; ROS, Vol. III, Slides 34-35, citing Minutes of the Meeting of the Board of Directors of the Company Unión Fenosa, S.A., 20 March 2013, [R-0353], Page 13; Report of the Managing Director to the Board of Directors Meeting, "Gas S&P Contracts. Analysis of Current Stand and Proposal of Improvement Measures," 20 March 2013, [R-0379], Page 15.
[88] Resp Rej Merits, Paragraphs 271-277.

fair and equitable treatment standard."[89] Based on a weighing of the investor's reasonable and legitimate expectations and the State's sovereign right to regulate in the public interest, the Respondent contends that the Claimant has failed to show that the Respondent's conduct was "manifestly inconsistent, non-transparent, unreasonable […] or discriminatory" and thus has not established a violation of the FET standard in the Treaty.[90]

9.44  Moreover, the Respondent notes that "not all differential treatment is discriminatory" and argues that, to establish unfair and inequitable treatment, the Claimant has to prove that "investors (i) in like circumstances (ii) were treated differently (iii) because of their nationality and (iv) without reasonable justification." which the Respondent alleges has not been proven by the Claimant within the meaning of the FET standard in Article 4(1) of the Treaty (nor under Articles 3(1), 4(2) or 4(3) of the Treaty).[91]

9.45  *Attribution*: In summary, the Respondent contests the Claimant's characterisations as to attribution under Articles 4, 5 and 8 of the ILC Articles on State Responsibility. It contends that the standards of international law for determining attribution are demanding; and that the Claimant has failed to meet any of them.

9.46  As regards EGPC, the Respondent denies that EGPC is an organ of the State; and it maintains that, in any event, as a result of EGPC's "assignment" (or novation) of its rights and obligations under the SPA, no responsibility by EGPC for subsequent conduct by EGAS can arise.[92]

9.47  As regards EGAS, the Respondent also contests that EGAS is an organ of the State;[93] that EGAS exercised any government authority by conduct[94] and that EGAS was instructed or directed in such conduct by organs of the Respondent.[95]

---

[89] Resp Rej Merits, paragraph 278.
[90] Resp Rej Merits, Paragraph 279-280, citing *Saluka v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, [CL-0067], Paragraph 309.
[91] Resp CM Merits, Paragraphs 268-270; Resp Rej Merits, Paragraph 292.
[92] Resp Rej Merits, Paragraph 145, Footnote 244 ("Because the breaches alleged by Claimant in this case concern conduct that occurred after EGPC assigned its rights and obligations under the Natural Gas Sale and Purchase Agreement to EGAS in 2002, it is unnecessary for Respondent to address any of Claimant's further arguments in this respect. To the extent Claimant has argued that as a result of EGPC's entering into the Natural Gas Sale and Purchase Agreement, Claimant has reasonably relied on legitimate expectations vis-à-vis Respondent at the time of the making of its investment, Respondent will show that this is unsupported and unsupportable as a legal and factual matter.").
[93] Resp Rej Merits, Paragraphs 145-146 and 195; Resp CM Merits, Paragraphs 183-191.

9.48 As regards Article 4 of the ILC Articles, the Respondent disputes that EGPC is an organ of the State by reason of the following factors:

(i) The fact that an entity has separate legal personality is determinative that it is not an organ of the State, at least in the absence of exceptional circumstances;[96]

(ii) State organs are entities that are part of the structure of the State and act on its behalf,[97] whereas EGPC is a corporation having legal personality separate from the State.[98]

(iii) EGPC is not considered to be a State organ under Egyptian law,[99] and the fact that it is owned by the State does not make it part of the organisation of the State under international law;[100]

(iv) EGPC is engaged in the development and exploitation of petroleum resources, which is a commercial rather than a governmental activity.[101]

(v) The fact that EGPC is subject to the financial supervision of the Egyptian Central Audit Agency does not make it part of the structure of the State;[102] indeed, it has "an independent planning budget prepared on the same pattern as commercial budgets."[103]

(vi) The fact that certain of EGPC's decisions have been held to be subject to Egyptian administrative law is irrelevant to the question of whether the conduct of EGPC at issue in this case is attributable to the Egyptian State under international law;

---

[94] Resp Rej Merits, Paragraphs 145 and 166-178; Resp CM Merits, Paragraphs 192-202.
[95] Resp Rej Merits, Paragraphs 145 and 179-186; Resp CM Merits, Paragraphs 203-212.
[96] Tr. D1 231:22; Tr. D1 232:1-8.
[97] Resp CM Merits, Paragraph 185.
[98] Resp CM Merits, Paragraph 183, citing Law No. 20 of 1976 regarding the Egyptian General Petroleum Corporation, 17 March 1976, [R-0002], Article 1 ("Egyptian General Petroleum Corporation is a general corporation having an independent legal personality.").
[99] Resp CM Merits, Paragraph 189.
[100] Resp CM Merits, Paragraph 190.
[101] Resp CM Merits, Paragraph 199.
[102] Resp CM Merits, Paragraph 189.
[103] Resp CM Merits, Paragraph 187; Law No. 20 of 1976 regarding the Egyptian General Petroleum Corporation, [R-0002 SUP], Article 5 ("The financial year of the Corporation starts with the financial year of the State and ends with its end. Taking into account the provisions of law No 53 of year 1973 on State General Budget, the Corporation shall have an independent planning budget prepared on the same pattern as commercial budgets, and the Corporation funds are considered as private property owned by the State.").

(vi)   The negotiation and execution of the SPA by EGPC were no more the exercise of governmental authority than similar actions by a private contractor;[104] and

(vii)   The decision in *Ampal v. Egypt* (2017) is both distinguishable and flawed in its reasoning.[105]

### *(4) The Tribunal's Analyses and Decisions*

9.49   *Introduction:* As already indicated above, the Tribunal focuses on the Claimant's claim under the FET standard in Article 4(1) of the Treaty. The Tribunal determines the issues of attribution by reference to Articles 4, 5, 8 and 11 of the ILC's Articles on State Responsibility, being declaratory of customary international law, as argued by the Parties.

9.50   The Tribunal first addresses the Claimant's case under the FET standard in Article 4(1) of the Treaty. As already indicated, the Respondent denies any liability to the Claimant under any provision in the Treaty, including Article 4(1). The Tribunal's analysis below should be read with the fuller description of material events in Part V above, together with the complete text of the relevant legal provisions in Part III above.

9.51   *The FET Standard*: Article 4(1) of the Treaty requires the Respondent, towards the Claimant, "to guarantee in its territory fair and equitable treatment of the investments made by investors of the other Party." This FET standard provides a broad protection to covered investments and investors. The Tribunal is content to apply under Article 4(1) the customary international law standard as prohibiting (*inter alia*) conduct by the host State "which is unjust, arbitrary, unfair, discriminatory or in violation of due process," including conduct that frustrates an investor's "legitimate expectations," as decided by the NAFTA tribunal in *Merrill v. Canada* (2010).[106]

9.52   *Legitimate Expectations:* As to "legitimate expectations," the Tribunal is content to adopt the statement, as cited by the Respondent,[107] in *Philip Morris v. Uruguay* (2016): "It clearly emerges from the analysis of the FET standard by investment

---

[104] Resp CM Merits, Paragraph 201.
[105] Tr. D1 246:4-247:22.
[106] *Merrill v. Canada*, ICSID Case No. UNCT/07/1, Award, 31 March 2010, [RL-0070], Paragraph 208.
[107] Tr. D1 268:11-18.

tribunals that legitimate expectations depend on specific undertakings and representations made by the host State to induce investors to make an investment." [108]

9.53   The Tribunal has also been guided by several other decisions cited by the Parties, including *Parkerings v. Lithuania* (2007), *Glamis v. USA* (2009)[109] and *Mobil v. Canada* (2012).[110] Applying these materials, in addition to the requirement for a specific undertaking or representation attributable to the Respondent, the Claimant must also establish that: (i) its expectations were reasonable in the circumstances; (ii) it relied upon such undertaking or representation when it made its investment in Egypt; and (iii) that the Respondent's non-compliance with its undertaking or representation violated the FET standard in Article 4(1) of the Treaty. The Tribunal does not consider that such a representation or undertaking amounts to a free-standing part of the FET standard but, rather, that it is "a relevant factor" in assessing whether or not the Respondent violated the FET standard, as was decided in *Mobil v. Canada* (2012).[111]

9.54   Whether such a factor applies to any particular case, however, must depend upon the particular circumstances of that case, both as to the State and to an organ of the State (including the question of whether it is an organ of the State). In the Tribunal's view, these several tests are largely fact-specific in the present case.

9.55   The Claimant emphasises that this "is not a contract case."[112]  If it were, the Claimant's contractual rights would be subject to the applicable laws and dispute resolution provisions in its contracts. The Claimant contends, however, that the Respondent violated the FET standard in Article 4(1) of the Treaty under international law. The Tribunal accepts, as the Respondent submits, that it has no jurisdiction to decide any claim by the Claimant for breach any of contractual rights under any agreement made by the Claimant and its associated companies subject to their applicable municipal laws and provisions for dispute resolution before international

---

[108] *Philip Morris v. Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, [RL-0151] (emphasis omitted).
[109] *Glamis v. United States*, Award, 8 June 2009.
[110]  *Mobil v. Canada*, Decision on Liability and on Principles of Quantum, 22 May 2012, [CL-0043].
[111] *Mobil v. Canada*, Decision on Liability and on Principles of Quantum, 22 May 2012, [CL-0043], Paragraph 152; *see also CMS v. Argentina*, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine, 25 September 2007, [RL-0162], Paragraph 89; *Waste Management v. Mexico II*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, [CL-0033], Paragraph 98; See also *MTD v. Chile*, Decision on Annulment, 21 March 2007, Paragraph 67.
[112] Tr. D1 63:1; Tr. D1 66.

commercial arbitration tribunals. The Tribunal here asserts its jurisdiction under the Treaty in respect only of alleged violations of the Respondent's obligations towards the Claimant under the Treaty.

9.56   The Claimant contends under international law that (*inter alia*) the Respondent frustrated the Claimant's legitimate expectations, in breach of the Ministry of Petroleum's undertaking of 5 August 2000, by interfering with the performance by EGPC and subsequently EGAS of their contractual obligations under the SPA (with the EGAS and UFG Tolling Contracts); by engaging in inconsistent conduct towards the Claimant; by adopting discriminatory measures towards the Claimant; and by conduct that lacked proportionality and transparency towards the Claimant. To that end, the Claimant relies upon expectations derived from (but not based on) its contractual rights, the Respondent's own conduct and the status of EGPC and EGAS as legal entities wholly-owned by the Respondent whose acts and omissions are attributable to the Respondent under international law.

9.57   The Claimant's case relies first, for its "legitimate expectations," on the Ministry's undertaking of 5 August 2000 and rights derived from the SPA between the Claimant (as UFICEX's "assignee") and the Seller (originally EGPC succeeded by EGAS), whereby, in the Claimant's submission, "EGPC/EGAS" (as the Seller) undertook several obligations for the supply of natural gas to UFACEX/UFG during the SPA's term of 25 years. These included the following contractual terms:

(i)    Under Article 5.1, the Seller agreed to sell and deliver 4 BCM of gas annually;

(ii)   Under Article 5.1[5], the Seller "shall at all times keep a backup supply to meet an on stream (load) factor of 95% of the LNG Complex."

(iii)  Under Article 15.2 of the SPA, in the event of "*Force Majeure*" (as there defined), the Seller "shall treat Buyer no worse than any other present or future purchaser/s [sic] of NG"; and "[t]his right shall be binding upon the Parties at all time, including the event of shortage of NG."[113]

(iv)   Under Article 15.3(b):

---

[113] Natural Gas Sale and Purchase Agreement, [C-0002].

*In the case of the Seller, Force Majeure shall not include changes in market conditions including, without limitation, changes that: (i) Directly or indirectly affect the demand for or price of NG; (ii) Result in the diversion of NG to other users; (iii) Are due to the inability of the transportation system and/or pipeline (whether for reasons of maintenance, repairs or lack of capacity or otherwise) to meet consumer demand and/or Buyer demand.*

(v)     Under Article 21.1:

*EGPC undertakes to procure that the Egyptian authorities undertake not to interfere with the rights of Buyer under this Agreement, and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer under this Agreement, or affect the capacity of Buyer to perform its obligations under this Agreement, even in the case of a NG shortage in Egypt, save for Force Majeure situations as defined in this Agreement.*

(vi)    Under Article 23.2:

*Seller is the sole responsible* [sic] *for securing adequate supplies of NG for performance of its obligations hereunder. Seller shall, throughout the Term, provide Buyer or Lenders with such further assurances as Buyer or Lenders may reasonably request from time to time regarding the continued adequacy of NG supply sources relied upon by Seller to perform hereunder. In no case this shall represent for Seller additional obligations to those set forth in this Agreement.*

(vii)   Under Article 24.3, the Seller acknowledged that it:

*is aware that the supply of NG to Buyer* […] *is a key element of the successful development of the Project, and therefore Seller represents and warrants that its availability of NG will be sufficient to feed the Complex under the terms and conditions of this Agreement. Also Seller represents and warrants that it has, and will have during the Term, all the legal, administrative and corporate rights, licenses and authorizations to deliver the NG at the Delivery Point and to comply with all its obligations under this Agreement.*

9.58    Under the terms of the SPA, EGPC acted as a principal towards UFACEX in regard to the SPA: Article 24.1(h). EGPC was not, however, an entity created and operating in the private sector of the Egyptian economy. As already indicated, EGPC was wholly owned by the Respondent. Yet, EGPC had a separate legal personality under Egyptian law. Thus, Article 20 of the SPA addressed sovereign immunity; and the waiver of such immunity clearly targeted EGPC (later, EGAS), rather than UFACEX (later, the Claimant).

9.59   The Respondent was not a contractual party to the SPA, as confirmed by Articles 21.1 and 24.1(h) of the SPA, and also the separate approval of the SPA by the Respondent's executive branch. Such separate approval would not have been necessary if the Respondent were a contractual party to the SPA. As to such approval, it took place by the Council of Ministers on 25 July 2000 (before the SPA was executed) and by the Ministry of Petroleum's letter dated 5 August 2000 to the Claimant (shortly after such execution).

9.60   The Ministry's letter dated 5 August 2000 provided, in material part:[114] "On behalf of the Ministry of Petroleum I have the pleasure to Inform you that the Egyptian Government official [sic] endorsed the natural gas Sales and Purchase Agreement signed on August 1, 2000 between UFACEX and EGPC."

9.61   This letter uses the phrase (in English) that the Egyptian Government "official[ly] endorsed" the SPA. It was a shorthand term signifying, in the circumstances known to the Government, EGPC and UFACEX, something more specific. In the Tribunal's view, the Respondent was thereby associating itself, as a non-contractual party, with the terms of Article 21.1 of the SPA.

9.62   Under this provision, EGPC expressly:

> *Undertakes to procure that the Egyptian authorities undertake not to interfere with the rights of the Buyer under this Agreement and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer under this Agreement, or affect the capacity of Buyer [sic: Seller] to perform its obligations under this Agreement, even in the case of a NG shortage in Egypt, save for Force Majeure situations as defined in this Agreement […]*

The Tribunal emphases the phrase "to procure that the Egyptian authorities undertake." As a matter of ordinary English, this necessarily refers to a separate extra-contractual "undertaking" by the Egyptian authorities, and not to an undertaking by EGPC alone under the SPA. EGPC's contractual undertaking was to procure the undertaking from the Egyptian authorities. By the term "Egyptian authorities," the

---

[114] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 August 2000, [C-0169]. The Tribunal does not consider that this statement by the Respondent falls within Article 24.1(f) and (g) of the SPA: it was not a "mutual representation" made between EGPC and UFACEX as the contractual parties to the SPA.

contracting parties were referring to the Egyptian Governmental authorities, including the Ministry of Petroleum.

9.63 EGPC discharged its undertaking to "procure" the undertaking by the Egyptian Governmental authorities, in accordance with Article 21.1, in the form of the Ministry of Petroleum's letter dated 5 August 2000. The Respondent's "official endorsement" of the SPA is, in the circumstances, to be understood as comprising the separate, extra-contractual undertaking required under Article 21.1 of the SPA. In the Tribunal's view, the juxtaposition of timing and the terms of Article 21.1 and the letter exclude any other objective interpretation.

9.64 Moreover, the Respondent's 'undertaking' was an important extra-contractual condition for UFACEX's participation in the Project. Without such an endorsement from the Respondent, conforming to the undertaking required under Article 21.1 of the SPA, the Damietta Project would not have proceeded beyond the signing of the SPA. A breach of EGPC's undertaking to procure the Respondent's undertaking would have amounted to the wholesale repudiation of the SPA and the immediate renunciation of the Project. At the time, it does not appear that this requirement for the Respondent's undertaking was in the least controversial. The Respondent (by its Ministry of Petroleum) was supporting the Project; and the Respondent's Council of Ministers had approved the draft SPA.

9.65 It was essential for the Claimant to receive natural gas under the SPA. There was no other source of natural gas for the Plant. It was to be connected to the national grid; and it was not to be supplied from its own gas field. Without such supply, the Plant would become a "white elephant."

9.66 In the Tribunal's view, nothing could be clearer than the provisions in the SPA, principally Article 24.3 recording the Seller's awareness "that the supply of NG to Buyer under this Agreement is a key element for the successful development of the Project, and therefore Seller represents and warrants that its availability of NG will be sufficient to feed the Complex under the terms and conditions of this Agreement." It is also evident from Articles 21.1, 24.1 and 24.3 whereby the Seller was responsible for securing all necessary permits and support from the Respondent's administrative and other agencies, so as to perform its obligations to supply natural gas to the Plant.

9.67    All this was known to the Respondent at the material time, from its approval of the SPA's draft terms by its Council of Ministers on 25 July 2000 (based on the Minister of Petroleum's memoranda) and, particularly, at the time of the Ministry of Petroleum's letter dated 5 August 2000. As more fully explained in Part V above, the Minister of Petroleum "endorsed," *i.e.* approved, the decision of EGPC's board of directors dated 14 July 2000 authorising EGPC to execute the SPA.[115] The Minister's memorandum of July 2000 (otherwise undated but preceding EGPC's execution of the SPA on 1 August 2000) requested the Council of Ministers also to approve the signing of the SPA, as there described.[116] Whilst the Minister was primarily concerned with the pricing mechanisms under the SPA, it is inconceivable that both the Minister and the Ministry of Petroleum were unaware of the draft SPA's non-pricing terms, including Article 21.1 of the SPA.

9.68    For all these reasons, the Tribunal discounts the Respondent's attempts to downplay the significance of the Ministry of Petroleum's letter dated 5 August 2000. Given the importance to UFACEX of the Respondent's undertaking required under Article 21.1 of the SPA, if no such extra-contractual undertaking had been forthcoming from the Respondent, there would have been prompt and strenuous protests from UFACEX at the time. There were none.

9.69    Conversely, the Tribunal discounts the Claimant's attempts to transform the terms of the Ministry's letter dated 5 August 2000 and associated conduct into a general guarantee of EGPC's contractual obligations as Seller under the SPA. Under the SPA, EGPC was not acting as an agent for the Respondent but expressly as a principal, as already noted above (see Article 24.1(h) of the SPA). Under Egyptian law as the SPA's applicable law (Article 1.1 of the SPA), EGPC's contractual obligations under the SPA did not accrue to the Respondent given EGPC's separate legal status from the Respondent. If it had been intended to bind the Respondent generally to the terms of the SPA as a guarantor or primary co-obligor, it would have been easy for UFACEX, EGPC and the Respondent to use contractual language to such effect. There was none in the Ministry's letter dated 5 August 2000 or the SPA.

---

[115] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000, [C-0359].
[116] Memorandum from the Minister of Petroleum (Sameh Fahmy) to be submitted to the Cabinet on Contracting with the Spanish Company (Unión Fenosa) for Exporting the Egyptian Natural Gas, July 2000, [C-0458].

9.70   Thus, the Tribunal returns to the Ministry's letter dated 5 August 2000 and the wording to which it relates, namely Article 21.1 of the SPA, as constituting a separate extra-contractual undertaking made by the Respondent under the FET standard in Article 4(1) of the Treaty.

9.71   In the Tribunal's view, the effect of this undertaking was to preclude the Respondent, in the absence of good faith over the 25-year term of the SPA, from: (i) interfering with the rights under the SPA of the Buyer (UFACEX, later the Claimant); (ii) dictating or promulgating any act or regulation which could directly or indirectly affect the rights of the Buyer under the SPA; and (iii) affecting the capacity of the Buyer to perform its obligations under the SPA, even in the case of a shortage of natural gas in Egypt – subject to *force majeure* situations as defined in the SPA. Non-compliance in bad faith with the undertaking, assessed objectively, would amount to a breach of the Respondent's obligations under the FET standard in Article 4(1) of the Treaty.

9.72   The proviso regarding *force majeure* in the Ministry's letter was clearly intended to protect the Respondent from responsibility for a situation where the performance of the SPA was suspended for *force majeure* under Article 15 of the SPA. It is complicated definition, albeit subject to specific conditions.

9.73   First, as a matter of English, the proviso cannot swallow the Respondent's undertaking, so as to render it nugatory. It must be read (with Article 15 of the SPA) as being subordinate to the undertaking, *i.e.* as an exception limiting but not extinguishing the scope of the undertaking.

9.74   Second, Article 15.1 of the SPA provides that any "force majeure" event or circumstance must lie "beyond the reasonable control of a Party or Parties (acting and having acted with a reasonable level of due diligence)." It is a qualified protection. It would not be open to the Respondent to breach its undertaking so as to cause a *force majeure* event and then to assert *force majeure* as a defence under the FET standard.

9.75   Third, Article 15.2 provides relief "for so long as and to the extent that" a "force majeure" event or circumstance exists. Its Sub-paragraph (A) provides similarly that the Seller is relieved from liability only (*inter alia*) "for so long and to the extent that due to 'Force Majeure' […]. Seller is unable to make available the properly

nominated quantity of NG in accordance with [the SPA]." This is an important temporal limitation.

9.76   Fourth, Sub-paragraph (A) also provides that where a "force majeure" event or circumstance "partially affects" the Seller's obligations to supply natural gas, the Seller "shall treat Buyer no worse than any other present or future purchasers of NG […] including the event of shortage of NG." This is, again, an important limitation, excluding adverse discrimination in the supply of gas to the Buyer at times of shortage.

9.77   Fifth, by Article 15.3(b) of the SPA, "force majeure" does not include "changes in market conditions […] that (i) [d]irectly or indirectly affect the demand for […] NG; (ii) [r]esult in the diversion of NG to other users; (iii) [a]re due to the inability of the transportation system and/or pipeline […] to meet consumer demand and/or Buyer demand." This is an important limitation as to the scope of *force majeure*.

9.78   Lastly, Article 15.4 requires a party seeking relief for "force majeure" to give prompt notice with relevant information, including "full particulars of the Force Majeure event, its effects on the affected Party, and the remedial measures proposed." (It will be recalled that EGAS gave written notice of *force majeure* under Article 15.4 of the SPA on 31 January 2012 and 24 February 2013: see Part V above). For the purposes of this Award, the Tribunal assumes that such notice complied with the formal requirements of Article 15.4 of the SPA.

9.79   In the Tribunal's view, the Respondent' separate extra-contractual undertaking by the Ministry of Petroleum's letter dated 5 August 2000 extends, in accordance with its terms, only to the SPA (as amended subsequently). It does not extend, in accordance with its terms, to the EGAS or UFG Tolling Contracts or any other contractual agreements relating to the Damietta Plant. Neither of these Tolling Contracts existed at the time of the Ministry's letter, being agreed later on 30 June 2003.

9.80   At the time when the SPA was executed on 1 August 2000, the Buyer was UFACEX. Pursuant to Article 18 of the SPA, UFACEX assigned its rights to the Claimant on 30 June 2003. On 17 October 2002, EGPC gave notice that it had assigned (or novated) its rights and responsibilities under the SPA to EGAS, to be effective as from 1 August 2000.

9.81   In the Tribunal's view, upon this "assignment" by UFACEX, the Claimant acquired the full benefits possessed by UFACEX in regard to the SPA, including the Ministry's letter of 5 August 2000 (addressed, in fact, not to UFACEX, but to Unión Fenosa). UFACEX was and remains the Claimant's sister company, within the Unión Fenosa Group of companies, with Spanish nationality. The Claimant was not, therefore, a stranger intervening in the Project.  To the contrary, it had been involved in the Project from the beginning. The Claimant therefore stands in the shoes of UFACEX, as from 1 August 2000 onwards, in regard to the effect of the Ministry's letter dated 5 August 2000.

9.82   As a party to the SPA, the Claimant (with members of the Unión Fenosa Group) entered into long-term agreements to supply natural gas to Spanish power plants and other agreements to supply gas to Spanish industrial plants. It also proceeded to complete the Plant (with SEGAS), at a cost of US$ 1.4 billion.

9.83   On the evidence adduced in this arbitration, the Tribunal concludes that the Claimant reasonably formed legitimate expectations based on the letter of 5 August 2000 from the Respondent's Ministry of Petroleum that, in the words of Article 21.1 of the SPA, the Respondent (*inter alia*) would not interfere with the rights of the Buyer under the SPA or dictate any act which could directly or indirectly affect the rights of the Buyer under the SPA, save for *force majeure* situations as defined in Article 15 of the SPA.

9.84   The Tribunal also concludes that the Claimant reasonably relied upon those expectations, to its subsequent considerable detriment. There can be no doubt that the Claimant has been almost ruined by the non-supply of natural gas under the SPA. From the time when the Plant's commercial operations began on 15 October 2006 to the end of 2010, the shortfall was 190 million BTUs;[117] and from 2012 to 2014, the supply was too limited to comprise even a single cargo. The Damietta Plant has lain idle since 2014; and it remains idle to the present day.

9.85   *The Tolling Contracts*: The Claimant next relies upon the two Tolling Contracts (i) between EGAS (as Toller) and SEGAS (as Owner) dated 30 June 2003[118] and (ii)

---

[117] Heads of Agreement between EGAS and UFG, 23 November 2011, [C-0010].
[118] Tolling Agreement between SEGAS and EGAS, 30 June 2003, [C-0003], to be later amended on (*inter alia*) 31 March 2004; Amendment No. 3 to the Tolling Contract between EGAS and SEGAS, 31 March 2004, [C-0174].

between SEGAS (as Owner) and the Claimant (as Toller) also dated 30 June 2003.[119] The Claimant is not a party to the EGAS Tolling Contract.  The Respondent is not a contractual party to either Tolling Contract.

9.86   In theory, under these two Tolling Contracts, EGAS would supply feed gas for the Plant to SEGAS and, indirectly to the Claimant. These Tolling Contracts became effective on the date of the Plant's Commercial Start Date; namely 15 October 2006 (see Part V above).

9.87   The EGAS Tolling Contract has its own provisions on applicable law and dispute resolution. Article 11.1 provides for English law "as its applicable law". Article 11.3 provides for ICC arbitration in Paris. (It gave rise to the "ICC Arbitration" described above in Parts I and VI of this Award). As with the SPA, there is a provision on the waiver of sovereign immunity (Article 12); and a representation and warranty that SEGAS and EGAS were acting as principals and not therefore as agents of the Claimant or Respondent respectively (Article 13(f)). There is no provision similar to Article 21.1 of the SPA.

9.88   The Tribunal has already decided that the Tolling Contracts do not fall within the terms of the letter dated 5 August 2000 from the Ministry of Petroleum. Hence, the Claimant cannot make a direct claim for "legitimate expectations" under the FET standard in respect of these Tolling Contracts. (Indirectly, the Claimant claims US$ 404,745,000 as "unpaid dividends" payable by EGAS to the Claimant (as SEGAS's majority shareholder) derived, at least in material part, from tolling fees due, but unpaid, under the EGAS Tolling Contract). The Tribunal considers other aspects of this claim below.

9.89   *SEGAS' Lost Free Zone Status:* SEGAS was granted its tax-free status in the Damietta Free Zone on 9 December 2001. That status was revoked on 5 May 2008. As with the Tolling Contracts, this claim for US$ 107 million does not, so the Tribunal decides, benefit from the Ministry's letter dated 5 August 2000; and it cannot therefore derive support from the Claimant's case on "legitimate expectations" under the FET standard. The Tribunal considers other aspects of this claim below.

---

[119] Tolling Contract between UFG and SEGAS, 30 June 2003, [C-0188], to be later amended on (*inter alia*) 31 March 2004; Amendment No. 3 to the Tolling Contract between UFG and SEGAS, [C-0173].

9.90   *Attribution*: It is appropriate to consider next the position of (i) the Respondent's executive branch and (ii) the positions of EGPC and EGAS under international law. As already indicated, the Tribunal here addresses the Parties' respective cases on the basis of the ILC Articles on State Responsibility.[120] These are generally accepted as authoritatively reflecting the principles of customary international law as they relate to attribution; as such, both the Claimant and the Respondent relied upon them in this arbitration; and the Tribunal is here content to do the same.

9.91   Article 4 of the ILC Articles, "Conduct of Organs of a State," provides:

> *(1) The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.*
>
> *(2) An organ includes any person or entity which has that status in accordance with the internal law of the State.*

9.92   As to the Respondent's executive branch as an organ of the Respondent, no controversy arises as to attribution. Article 4 of the ILC Articles on State Responsibility confirms that, under international law, the conduct of a State's executive branch shall be considered as an act of that State. Hence, the conduct of the Ministry of Petroleum, as with other Ministries and the Council of Ministers, is attributable to the Respondent.

9.93   According to the ILC Commentary to Article 4, "[t]he reference to a 'State organ' covers all the individual or collective entities which make up the organization of the State and act on its behalf."[121] Of course, a State may become subject to obligations entered into on its behalf by entities other that organs of the State, but this is governed by general principles of the law of agency (not attribution).

9.94   Entities considered to be organs automatically include "any person or entity which has that status in accordance with the internal law of the State."[122] This normally excludes

---

[120] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], Article 4.

[121] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 94, Comment (1).

[122] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], Article 4(2).

entities that enjoy separate legal personality under internal law.[123] However, according to the ILC Commentary, "the conduct of certain institutions performing public functions and exercising public powers (e.g. the police) is attributed to the State even if those institutions are regarded in internal law as autonomous and independent of the executive government."[124]

9.95    Thus, as the tribunal in *Almås v. Poland* (2016) decided: "[I]nternal status does not necessarily imply that an entity is not a State organ if other factors, such as the performance of core governmental functions, direct day-to-day subordination to central government, or lack of all operational autonomy, point the other way."[125]

9.96    At the same time, circumstances sufficient to connote the status of an organ of the State to a separate legal person must be extraordinary, involving functions and powers considered to be as quintessentially powers of Statehood, such as those exercised by police authorities. As the International Court of Justice stated in the *Bosnian Genocide Case* (2007), "to equate persons or entities with State organs when they do not have that status under internal law must be exceptional, for it requires proof of a particularly great degree of State control over them, a relationship which the Court's Judgment quoted above expressly described as 'complete dependence'."[126]

9.97    The Tribunal accepts that EGPC is not considered to be an organ of the State under Egyptian law; and that it instead enjoys a separate legal personality under Egyptian law.[127] The fact that it is wholly owned by the State is of no material consequence.[128]

---

[123] *See Bayindir v. Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, [CL-0086], Paragraph 119 (holding that Pakistan's National Highway Authority was not a State organ, because of its separate legal personality under internal law); *EDF (Services) v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, [CL-0038], Paragraph 190 (holding that a State-owned airport holding company and a State airline were not State organs because they both "possess[ed] legal personality under Romanian law separate and distinct from that of the State."); *Hamester v. Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, [RL-0009], Paragraph 184 (holding that the Ghanaian Cocoa Board was not a State organ principally because it was "not classified as a State organ under Ghanaian law, but was created as a 'corporate body,' which can be 'sued in its corporate name.'"); *see also* James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 112, Comment (6) ("Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, prima facie their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority within the meaning of article 5.").
[124] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 92, Comment (6).
[125] *Almås v. Poland*, UNCITRAL, Award, 27 June 2016, [CL-0186], Paragraph 207.
[126] *Bosnia and Herzegovina v. Serbia and Montenegro*, *I.C.J. Reports 2007*, p. 43, [RL-0049], Paragraph 393.
[127] Law No. 20 of 1976, [C-0126] ("Article 1: Egyptian General Petroleum Corporation is a public authority having a juristic legal personality working for the development and best exploitation of petroleum resources, and providing for the country's needs of different petroleum products.").

Corporate state enterprises existing outside of the structure of the State are a common phenomenon.

9.98    Nor does the Tribunal consider the facts that EGPC is denominated by Egyptian law as a "public authority" and is statutorily part of the Egyptian "Petroleum Sector" that develops strategies for the natural gas sector to be sufficient to make it part of the structure of the State, and thus one of its organs under international law. Both State ownership of entities and their involvement in the development of State-owned natural resource necessarily implicate public sector concerns. But participation in the public sector is not the same thing as being integral to the State apparatus, as was decided by the tribunal in *Ulysseas v. Ecuador* (2012).[129]

9.99    Implicating public concerns as they do, it is unsurprising that State-owned non-organs would be subject to State-run financial auditing under the same mechanism that applies to entities that are organs of the State. Nor is it dispositive that certain decisions of an entity are subject to oversight under administrative public law, as is alleged here by the Claimant, especially if other decisions it takes are not.

9.100  These specific factors were considered by the *Ulysseas* tribunal, which did not find that they connoted the status of a State organ under Article 4 of the ILC Articles.[130] Moreover, as the Respondent contends, there has been no proof that the conduct at issue here, namely EGPC's entering into the SPA, constituted an administrative law decision.[131]

[128] *See* Abby Cohen Smutny, "State Responsibility and Attribution, When is a State Responsible for Acts of States Enterprises? Maffezini v. Spain," in T. Weiler (ed), *International Investment Law and Arbitration: Leading Cases from the ICSID, NAFTA, Bilateral Treaties and Customary International Law* (2005), [CL-0065], 35 ("State ownership is not sufficient to constitute a State organ, as a State may be a shareholder in a private law company."); *see also* James Crawford, *State Responsibility* (Cambridge University Press, 2013), [RL-0080], 118 ("Mere ownership of an entity by a state, however, will not automatically convert that entity into an organ of the state.").
[129] *See* Resp CM Merits, Paragraph 189 Footnote 443, citing *Ulysseas v. Ecuador*, UNCITRAL, Final Award, 12 June 2012, [RL-0079], Paragraph 135 ("The circumstances that the Entities are part of the Ecuadorian public sector and are subject to a system of controls by the State in view of the public interests involved in their capacity does not make them organs of the Ecuadorian State for the purposes of Article 4 of the ILC Articles.").
[130] *See Ulysseas v. Ecuador*, UNCITRAL, Final Award, 12 June 2012, [RL-0079], Paragraph 134 ("All Entities are subject to a system of controls under the 1998 Constitution, which is exercised by the Office of the Comptroller General of Ecuador as to their revenues, expenses and investments and the utilization and custody of public property. The 2008 Constitution reinforced the public nature of the Entities by providing that they "shall operate as companies subject to public law.") (footnote omitted).
[131] Resp CM Merits, Paragraph 201.

9.101   Nor can EGPC's engagement in the development and exploitation of natural resources be considered as a purely governmental activity, as opposed to a commercial activity. It is uncontested between the Parties, as the Tribunal accepts, that EGPC has the power to contract in its own name and for its own account, as a principal, as it did with the SPA.  It has an "independent schematic budget prepared on the same pattern of commercial budgets" and "the Corporation funds are funds owned by the State private ownership."[132] As the *Almås* tribunal decided, "where an entity engages on its own account in commercial transactions, even if these are important to the national economy, this inference [that it is a *de facto* organ] will not be drawn."[133]

9.102   In support of its case that EGPC's functions are governmental in nature,[134] the Claimant contends that "exporting natural gas in its natural state or liquefied, and its derivatives, to international markets" is a "sovereign function."[135]  But, whilst "under the Egyptian Constitution, all minerals, including solid, liquid and gaseous resources, are the property of the [S]tate," as the Claimant points out,[136] private companies manage private natural gas resources as a matter of course and, notwithstanding the fact that governmental export approval may be required, the act of exporting natural gas in any form is not, by its own nature, a sovereign act.

9.103   Whilst the Parties agree that the "right to grant concessions […] is certainly a governmental function,"[137] requiring a decision by the President of the Republic and approval of the National Assembly,[138] they differ on the role played by EGPC (and later by EGAS). The Claimant submits that EGPC and EGAS "enter […] into concession contracts with producers"[139] and are "the vehicle by which Egypt grants concession rights."[140]

---

[132] Law No. 20 of 1976, [C-0126] ("Article 5: The financial year of the Corporation starts with the financial year of the State and ends with its end. And with taking into consideration the provisions of law No 53 for year 1973 about State General Budget, the corporation shall have an independent schematic budget prepared on the same pattern of commercial budgets, and the Corporation funds are funds owned by the State private ownership.")

[133] *Almås v. Poland*, UNCITRAL, Award, 27 June 2016, [CL-0186], Paragraph 210.

[134] Cl Mem Merits, Paragraphs 488 and 491.

[135] Cl Rep Merits, Paragraph 285.

[136] Cl Mem Merits, Paragraph 495 (brackets in original).

[137] Cl Mem Merits, Paragraph 495; Law No. 61 of 1958 on the Award of Concessions Relating to the Investments of Natural Resources and Public Utilities and the Amendment of the Concessions' Terms as amended by Law No. 152 of 1960, [R-0282].

[138] Resp CM Merits, Paragraph135; Cl Rep Merits, Paragraph 170; Resp Rej Merits, Paragraph 32.

[139] Rep Merits, Paragraph 283.

[140] Rep Merits, Paragraph 283.

9.104  As already found by the Tribunal, the Government is a non-contractual party to the SPA and other agreements concluded by EGPC and EGAS. As the Respondent submits, the SPA itself is not a concession agreement, but a commercial agreement for the sale of natural gas.[141] Indeed, the Claimant itself describes the SPA as among "the contracts and *commercial* decisions and operations of [Egypt's] State-owned companies."[142]

9.105  Moreover, whilst EGPC is "owned by and *in that sense* subject to the control of the State,"[143] the Claimant has not proven with respect to EGPC a "direct day-to-day subordination to central government, or lack of all operational autonomy," in the words of the *Almås* tribunal.[144]

9.106  The Claimant relies on the fact that EGPC's chairman and board members are designated by Government officials and that the board members appointed include Government officials. In the Tribunal's view, these factors are insufficient to show that EGPC is "lacking any real autonomy" and does not have at least "some qualified, but real, margin of independence."[145] Private parent corporations routinely appoint their officers as members of the boards of directors of their wholly-owned subsidiaries without thereby losing shareholder immunity from liability.

9.107  The fact that decisions of EGPC's board of directors must be sent to the Minister of Petroleum for possible ratification, amendment or rescission does not show that the Minister actually used this authority (which is no different from a shareholder override in a privately owned corporation) to supervise EGPC's regular activities. For example, the tribunal in *Jan de Nul v. Egypt* (2008) declined to find that the Suez

---

[141] Resp CM Merits, Paragraph 200; Resp Rej Merits, Paragraph 160.

[142] Cl Mem Merits, Paragraph 17 (emphasis added) ("The Government was, of course, free to undertake any of these policies, but having made representations and commitments to UFG that it would ensure the availability of sufficient gas for the next 25 years to ensure fulfillment of the contractual supply to UFG, the Government was required to comply with its commitments and to enable its State-owned companies to do so. Moreover, the Government was required not to interfere, in its sovereign capacity and for policy reasons, *with the contracts and commercial decisions and operations of its State-owned companies*. Yet, the Government did exactly this, by causing the diversion of gas supplies away from UFG and toward what it called the 'domestic market,' without offering or paying compensation to UFG.") (emphasis here added).

[143] *See also* James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 112, Comment (6) ("Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, prima facie their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority within the meaning of article 5.")(emphasis added).

[144] *Almås v. Poland*, UNCITRAL, Award, 27 June 2016, [CL-0186], Paragraph 207; Cl Rep Merits 272.

[145] *Bosnia and Herzegovina v. Serbia and Montenegro*, *I.C.J. Reports 2007*, p. 43, [RL-0049], Paragraph 394.

Canal Authority was an organ of the Egyptian State, despite the involvement of the Egyptian Government nearly identical to that alleged there.[146]

9.108 This conclusion gives context to EGPC's representation in the private offering memorandum to potential investors, relied upon by the Claimant, that it had "the same legal status as the Central Bank of Egypt and the Suez Canal Authority." In the light of the decision in *Jan de Nul v. Egypt* (2008), that representation is consistent with the Respondent's submissions in this case. Indeed, notwithstanding the fact that, as the prospectus pointed out, EGPC was an "economic authority" and that "[a]ll decisions of the Board of Directors are required to be notified to the Minister of Petroleum for approval," the offering memorandum expressly states in the same passage that "[t]he Arab Republic of Egypt and the Egyptian Government, however, are not legally liable for EGPC's obligations to third parties unless expressly guaranteed."[147]

9.109 The ICSID tribunal in *Ampal v. Egypt* (2017) came to a different conclusion with respect to EGPC's status as an organ of the Egyptian State within the meaning of Article 4 of the ILC Articles.[148] That tribunal cited as reasons EGPC's designation as a "public authority" "overseen by the Minister of Petroleum," with capital consisting of "[f]unds allocated to it by the State" and a chairman and board appointed by and partially consisting of Government officials, with the Minister of Petroleum "empowered to amend or cancel [Board] resolutions."[149]  However, the decision does not explain why these factors show that EGPC is part of the structure of the State so

---

[146] *Jan de Nul v. Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008, [CL-0022], Paragraph 146 ("Applying a structural test, the Claimants put forward that (i) SCA is considered a 'Public Authority' by Egyptian law (Article 2, Paragraph  1 of Law No. 30/1975);(ii) SCA's Chairman, Directors of the Board, Managing Director and General Manager are all appointed by means of presidential decrees of the President of the Republic (who also decides on their salaries, their removal and their bonuses) (Article 3 of Law No. 30/1975); (iii) SCA reports to the Prime Minister, who must also approve all the decisions of its Board of Directors before they become effective (Article 2, Paragraph  2 and Article 3, Paragraph  2, of Law No. 30/1975); (iv) the charges collected by SCA are included in the Public Treasury Balance Sheet and SCA's accounts and balance sheets are supervised by the Central Auditing Department, the State organ exercising financial control over the administration of public funds (Article 5 of Law No. 30/1975); (v) all SCA's employees have the status of public officials (Article 13 of Law No. 30/1975); (vi) SCA is subject to the rules on public procurement which apply to ministries and State authorities (citation omitted); (vi) SCA's acts are subject to the judicial review of the administrative courts, whose jurisdiction is limited to disputes with the government and government entities") (emphasis omitted); *see also* Paragraph 162 ("For these reasons, the Tribunal concludes that the SCA is not an organ of the State, and that, as a consequence, its acts cannot be attributed to Egypt.").

[147] Offering Memorandum for Petroleum Export Limited, 14 July 2005, [C-0125], Page 32.

[148] Tr. D1 74:15-19; *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 138.

[149] *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 138 (brackets in original).

as to deny its autonomous existence. Indeed, as noted earlier, these factors all have analogues in private companies that clearly do not have the effect of subjecting shareholders to liability for corporate obligations.

9.110 In addition, as regards Article 4 of the ILC Articles, the *Ampal* award is distinguishable from the circumstances of this case. The transaction at issue there arose from an earlier agreement between the States of Israel and Egypt. A Council of Ministers' resolution in furtherance of that inter-State agreement expressly "[a]uthorize[d] the Ministry of Petroleum *represented by the Egyptian General Petroleum Corporation* to negotiate […] and conclude the contract."[150] An agency relationship binds a State as principal whether or not the agent (EGPC) is an organ of the State. Here, as the Tribunal has already decided, EGPC was expressly acting as a principal and not as an agent for the Respondent in concluding the SPA.

9.111 For this same reason, in the Tribunal's view, the Claimant's reliance on the award in *Wintershall v. Qatar* (1989) is misplaced.[151] While the tribunal there agreed with the claimant's argument in that contractual case that, "[a]s a matter of Qatari law it is clear that QGPC operates as *an arm or agent* of the Government in respect of the concession areas held by it,"[152] its dispositive conclusion was that "QGPC was acting as an agent of the Government of Qatar and, therefore, all actions attributed to QGPC in this case must be attributed to the Government,"[153] and that "[t]he mere fact that QGPC is acting as agent for the Government, rather than the Government itself so acting, does not in any sense take away from the Tribunal's jurisdiction in this case."[154] Again, here, EGPC was not acting as the Respondent's agent in concluding the SPA.

9.112 For the above reasons, the Tribunal concludes that EGPC was not an organ of the Egyptian State with respect to the SPA, within the meaning of Article 4 of the ILC Articles on State Responsibility. The same reasoning applies to EGAS (as EGPC's

---

[150] *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 141.
[151] Cl Rep Merits, Paragraph 275.
[152] *Wintershall v. Qatar*, Final Award, 5 February 1988 and 31 May 1988, 28 ILM 795 (1989), [CL-0188], 812 (emphasis added).
[153] *Wintershall v. Qatar*, Final Award, 5 February 1988 and 31 May 1988, 28 ILM 795 (1989), [CL-0188], 811.
[154] *Wintershall v. Qatar*, Final Award, 5 February 1988 and 31 May 1988, 28 ILM 795 (1989), [CL-0188], 812.

"assignee" in October 2002), on materially similar facts. Thus, EGAS was not an organ of the Respondent under Article 4 of the ILC Articles.

9.113   The Tribunal turns to Article 5 of the ILC Articles, "Conduct of Persons or Entities exercising Elements of Governmental Authority." It provides:

> *The conduct of a person or entity which is not an organ of the State under Article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.*

9.114   The Tribunal does not consider that the Claimant's case is separately advanced by Article 5 of the ILC Articles in regard to EGPC and EGAS. The Claimant has not established that EGPC or EGAS are "empowered" by Egyptian law to exercise governmental authority. As the ILC Commentary explains, "the internal law in question must specifically authorize the conduct as involving the exercise of public authority; it is not enough that it permits activity as part of the general regulation of the affairs of the community. It is accordingly a narrow category." The ILC Commentary also states that a situation falling within Article 5 "is to be distinguished from situations where an entity acts under the direction or control of the State, which [i] covered by Article 8."[155] The Tribunal has not been shown any provision of Egyptian law 'specifically authorising' EGPC to conclude the SPA in the exercise of the Respondent's public authority.

9.115   The Tribunal therefore turns to Article 8 of the ILC Articles, "Conduct Directed or Controlled by a State." It provides:

> *The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.*

9.116   Under Article 8 of the ILC Articles on State Responsibility, the conduct of a person (not being an organ of the State) shall be considered an act of a State under international law if the person is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct. Its application, as the ILC Commentary states, depends upon "a specific factual relationship" between the

---

[155] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 101-102, Comment (7).

person engaging in the conduct and the State.[156]  The ILC Commentary addresses the position of state entities, as follows: "[…] The fact that a State initially establishes a corporate entity […] is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity."[157] Moreover, there is a distinction to be drawn between the conduct of the State itself and the conduct of a person attributable to the State, as was held by the ICJ in *Nicaragua v. USA*.[158]

9.117   The Tribunal does not consider that the Claimant's case is advanced by Article 8 of the ILC Articles in regard to EGPC's conclusion of the SPA. The factors identified above in regard to Article 4 of the ILC Articles apply equally to Article 8.

9.118   The position in regard to EGAS is different, following the "assignment" between EGPC and EGAS on 17 October 2002. Thereafter, as regards the curtailment in the supply of natural gas to the Damietta Plant, the Tribunal considers that EGAS did act on the instructions of and under the control and direction of the Respondent, namely its Ministry of Petroleum, within the meaning of Article 8 of the ILC Articles. As to that factual relationship, the Tribunal addresses EGAS' role further below.

9.119    The Tribunal notes that, in the *Ampal* award, the tribunal likewise decided (*inter alia*) that EGAS, in regard to the termination of its agreement to export natural gas to Israel, did act under the direction and control of the Respondent, within the meaning of Article 8 of the ILC Articles:[159]

> *The Tribunal finds that there is overwhelming evidence that the decisions of EGPC and EGAS to conclude and terminate the GSPA were all taken with the blessing of the highest levels of the Egyptian Government. Such acts are attributable to the Respondent pursuant to Article 8 of the ILC Draft Articles on State Responsibility as EGPC and EGAS were 'in fact acting on the instructions of, or under the direction or control of' the Respondent in relation to the particular conduct.*

9.120   The Claimant also invokes Article 11 of the ILC Articles, "Conduct Acknowledged and Adopted by a State." It provides:

---

[156] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 110, Comment (1).
[157] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], 112, Comment (6).
[158] *Nicaragua v. USA*, *I.C.J. Reports 1986*, p. 14.
[159] *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 146.

*Conduct which is not attributable to a State under the preceding articles shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.*

9.121   The Tribunal does not consider that Article 11 of the ILC Articles in regard to EGPC and EGAS separately advances the Claimant's case. As the ILC Commentary explains, there is a difference between "acknowledgment and adoption of the conduct in question as its own" and "cases of mere support or endorsement" by the State; and that what is required is that "the State identifies the conduct in question and makes it its own."[160] That was not so in regard to EGPC's conclusion of the SPA, by reason of the factors identified above in regard to Article 4 of the ILC Articles. As regards EGAS' performance of the SPA following the "assignment" in 2002, the matter is covered by Article 8 of the ILC Articles to be addressed (on the facts).

9.122   *Breach:* It is appropriate to address separately the Claimant's several claims that the Respondent breached the FET standard in Article 4(1) of the Treaty; namely: (i) the curtailed supply of natural gas to the Damietta Plant under the SPA; (ii) the non-payment of fees due to SEGAS under the EGAS Tolling Contract; and (iii) the loss of SEGAS' Free Zone tax status.

9.123   *(i) Gas Supply:* Under the SPA, the "Commercial Operations Date" of the Damietta Plant occurred on 15 October 2006. There were, almost immediately, shortages in the supply of gas to the Plant, leading to the Claimant's letter to EGAS dated 26 January 2007, followed by the Claimant's further letter dated 29 May 2007. Shortages continued, leading to the first draft Side Letter of 11 July 2008 between the Claimant and EGAS. The problem was not resolved, leading to the Claimant's letter dated 26 August 2008 and the meeting with the Minister of Petroleum on 16 October 2008. All this took place before the Global Financial Crisis and long before the Egyptian revolution.

9.124   These shortages of feed gas to the Plant continued in 2009 to 2010. In late 2008, the Global Financial Crisis had begun. In early 2011, the Egyptian revolution began. Neither affected the Damietta Plant physically (then or later). Shortages continued as from 2010 onwards, as described in Part V above. On 31 January 2012 and 24

---

[160] James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], Article 11.

February 2013, EGAS sent to the Claimant notices of *force majeure* under Article 15 of the SPA.

9.125   During this period, the Claimant (with SEGAS) regularly complained to EGAS, EGPC and the Ministry of Petroleum: see the former's letters and email messages dated 13 January 2010, 26 January 2010, 26 January 2010, 16 February 2010 (with the meetings on 16 March and 15 April 2010), 27 April 2010, 6 August 2010, 3 December 2010 (with the draft HOA of 23 February 2011), 13 August 2011, 4 November 2011 (with the HOA of 23 November 2011 and the meeting of 27 February 2012), 15 March 2012, 8 May 2012, 22-29 May 2012, 11 June 2012, 28 June 2012, 15 July 2012, 25 July 2012, 26 August 2012, 9 October 2012 (following the meeting with the Minister of Petroleum on 16 September 2012), 17 October 2012, 6 November 2012, 15 November 2012, 16 November, 5 December 2012 (following the meeting with the Minister of Investment on 14 November 2012 and the Minister of Petroleum on 27 November 2012), 10 December 2012 and 12 December 2012. It is unnecessary here to recite the terms and contract of these communications: these are set out, to the extent relevant, in Part V above.

9.126   As already found by the Tribunal, the Claimant has been almost ruined by the non-supply of natural gas to the Claimant under the SPA; and the Damietta Plant has become a "white elephant." The Tribunal identifies two overlapping phases of this curtailed supply for natural gas feeding the Plant.

9.127   The first phase from early 2010 originated from the Respondent's own policies. As described more fully in Part VIII above, these were long-standing policies of subsidising domestic users of gas and electricity, together with the failure to encourage the finding of gas deposits in Egypt (notwithstanding a statement of policy otherwise). Beginning before 2010, the Respondent over-stimulated local demand for natural gas by providing subsidies to consumers of gas and electricity (generated from gas) and by encouraging local industries to convert to gas; and, on the supply side, by pricing and other policies that restricted the further development by local gas producers of Egypt's natural gas resources.

9.128   The results were foreseeable and actually foreseen in the Wood Mackenzie report of 28 May 2007 on SEGAS' Damietta LNG Financing (see Part V above). It identified

(inter alia) a "supply-demand gap" emerging in the short term (2009-2010) unless "progress is made on signing upstream GSAs and sanctioning new development projects this year [2007]." The Respondent chose not to encourage the finding and development of further gas deposits in Egypt; and, as a result, together with its policies on subsidising domestic users of gas and gas-produced electricity, the curtailment of feed gas to the Damietta Plant was inevitable.

9.129   These consequences were acknowledged by the Minister of Petroleum. In his public address on 24 March 2014, the Minister recognised that there was in Egypt an "irrational consumption due to subsidy."[161] That "irrationality" had begun after the SPA's execution with the Ministry's strategy to focus on the local demand for natural gas and give it "absolute priority."[162]  It was not reasonable foreseeable, nor actually foreseen by UFACEX (or the Claimant) in August 2000.

9.130  As to this first phase, the Tribunal concludes that the Respondent frustrated the Claimant's legitimate expectations derived from the Ministry of Petroleum's undertaking in regard to the SPA, in the form of its letter dated 5 August 2000.

9.131  The second phase began with EGAS notice of *force majeure* on 24 February 2013. Before that date, the Respondent had decided to discriminate between users of gas. Exercising its sovereign authority and public powers, the Respondent directed EGAS to limit and eventually stop the supply of feed gas under the SPA to the Damietta Plant. The Respondent's decision to discriminate against the Plant placed an excessive and disproportionate burden on the Claimant, in comparison to other non-consumer users of gas supplied by EGAS in Egypt, both Egyptian and Non-Egyptian.

9.132  In his speech to the Egyptian Parliament on 15 October 2012, the Minister for Petroleum explained that the Respondent had stopped the exporting of gas to Jordan and Spain "because of increasing consumption in the domestic market."[163] The reference to Spain clearly indicated the Claimant's exports to Spain from the Damietta Plant: it was the only exporter of Egyptian natural gas to Spain.

---

[161] "The Oil and Gas Sector in Egypt: Vision and Challenges" – Speech (unofficial transcript) of Sherif Ismail, Egyptian Minister of Petroleum at the American Chamber of Commerce in Egypt, 24 March 2014, [C-0192].
[162] EGAS Annual Report 2010-2011, [C-0350], Page 5; El Mahdy WS2, Paragraph 5.
[163] "Petroleum Minister: Gas Exports to Jordan, Spain Halted," *Egypt Independent* (15 October 2012), [C-0286].

9.133   There had earlier been a meeting between the Claimant and the Minister of Petroleum on 16 September 2012, in response to the Claimant's letter dated 26 August 2012. The meeting is described in the testimony of Mr Egea Krauel and Mr Sáez Ramírez,[164] as also in the Claimant's contemporary letter dated 21 September 2012. The Minister stated that he was "in the process of reviewing the situation of every exporter [of natural gas]" (including the Claimant), and that he was "analysing the contractual frameworks and the legal conditions for stopping gas deliveries to one consumer in order to improve supply to other gas users." As recited in Part V, Mr Egea Krauel testified that the Claimant realised from the Minister's statements that "UFG had been singled out as the offtaker of gas from the grid whose supply would be indefinitely interrupted."

9.134   Following this meeting and the absence of any material response from the Ministry of Petroleum, the Claimant's letter dated 9 October 2012 to the Minister stated (*inter alia*) as follows:

> *UFG expresses concern to EGAS about EGAS' discriminatory treatment of UFG in the supply of gas. As we had the opportunity to discuss in such meetings, UFG is deeply worried because of the current situation of the feed gas supply to Damietta Plant since, despite of our constant spirit of cooperation, the actual level of supply in the past few months has been considerably lower than EGAS commitments in previous meetings and tremendously below the contractual volumes under the SPA and the agreed Minimum Feed Gas Commitment for the period. Far from improving, the situation has further deteriorated to the point that no supply of gas has been delivered to the Damietta Plant since 16 July 2012, as explained in more detail below. Furthermore, this shortage of supply represents a clear discriminatory measure against UFG by EGAS and the Egyptian authorities, as evidenced by the fact that the supply of gas has not been interrupted to other consumers (such as, for example, the liquefaction plant in Idku)* […]

9.135   The Damietta Plant was shut down in early November 2013, for want of feed gas. Subsequent public and private statements by the Minister of Petroleum further confirmed that the Damietta Plant had been targeted by the Respondent in favour of supplying gas to other users and consumers in Egypt, both Egyptian and Non-Egyptian.

---

[164] Egea Krauel WS, Paragraphs 21-22; Sáez Ramírez WS1, Paragraph 25; Letter from UFG (José Maria Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 5 December 2013 [C-0085].

9.136  As reported in the press on 24 November 2013, the Minister of Petroleum stated that, as regards "the Spanish Union Fenosa," "we should first cover [the] local market's need from natural gas."[165] In a private meeting with the Claimant on 26 November 2013, so Mr Egea Krauel and Mr Sáez Ramírez testified (as also confirmed in the Claimant's letter dated 5 December 2013 to the Minister), the Minister said that Egypt will in fact not comply with its obligations in the near future and that "he could not give us any gas because the Ministry had to prioritize the gas to power generation plants throughout the country, as well as other industrial consumers."[166]

9.137  As the Claimant correctly concluded, it was politically more expedient for the Respondent to curtail and cut supply to one large consumer (*i.e.* the Claimant) than to apportion a reduction of supply across different users equitably.

9.138  In the Tribunal's view, as regards both phases, the Respondent's decisions to cut and curtail gas supply to the Damietta Plant was, by its nature and purpose, a sovereign act by the Respondent under international law. It was also, of course, a political decision by the Respondent in the broadest sense. It was not a decision required by Egyptian law; and it was not a commercial or operational decision originating with EGAS. It was, in fact, a decision against EGAS' commercial interest, given the higher prices under the SPA and the lower prices for the subsidised Egyptian electricity sector. Nor was the decision the enforced result of the Global Financial Crisis of 2007-2008 or the Egyptian revolution during 2011-2014: the decision would have been made without these events or their consequences, given the Respondent's earlier long-term policies on the development of new gas field, compounded by gas subsidies favouring domestic users, well established before 2010.

9.139  As regards the Respondent's undertaking by reference to Article 15 of the SPA, the Respondent's discrimination against the Damietta Plant conflicted with the definition of *force majeure* in Article 15.2, Sub-paragraph (A) of the SPA, precluding discriminatory treatment compared to "any other present or future purchaser/s [sic] of LNG".

---

[165] "Petroleum minister: Butane distribution to be revised," *Al Gomhouria* (24 November 2013), [C-0280].
[166] Sáez Ramírez WS1, Paragraph 37; Egea Krauel WS, Paragraph 34; Letter from UFG (José Maria Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 5 December 2013 [C-0085].

9.140   The fact of such discrimination was established by the expert testimony from Mr Goncalves (of BRG) in this arbitration. He analysed four different categories of gas users in Egypt: (i) industrial plants; (ii) power plants; (iii) LNG exporters of Egyptian LNG; and (iv) pipeline exporters of Egyptian gas. He concluded that the curtailment of gas to the Damietta Plant began first, lasted longer and was the most severe.

9.141   From a total of 58.8 Bcma supplied in 2012-2013, the power plants received 28.9 Bcma; industrial customers 14.8 Bcma; the Idku Plant 5.7 Bcma; and the Damietta Plant 0.3 Bcma.[167] As regards LNG and Pipeline export curtailments from 2006 to 2011, the Damietta Plant's supply was curtailed by 60.5%, the Idku Plant by 6.6% and the pipelines by 22.7%. [168]

9.142   During the same period, the Damietta Plant's supply of gas was curtailed by 96%, whereas foreign-owned industrial plants were curtailed by 15% to 34%; namely EFC (Netherlands) as to 28%, EBIC (Netherlands) as to 34%, Emethanex (Canada) as to 25%, and Lafarge (France) as to 15%.[169] As to Egyptian-owned industries, there were no curtailments or only minor curtailments; namely Alexandria FC none prior to 2014, Misr FPC none before mid-2014, Helwan FC none prior to mid-2015; Misr BSC minor disruptions prior to late 2013, and SVC minor disruptions also prior to late 2013.[170]

9.143   The Respondent's conduct also conflicted with the exclusion from *force majeure*, under Article 15.3 of the SPA, of "market conditions" and suspensions of an indefinite period extending beyond *force majeure* situations.

9.144   Thus, by reason of these three factors, the Respondent is not entitled to relief from liability under the FET standard in Article 4(1) of the Treaty based upon the proviso regarding *force majeure* subsumed by the letter dated 5 August 2000 from the Ministry of Petroleum.

9.145   In the Tribunal's view, over these two phases of limited and non-supply of natural gas to the Plant, the Respondent's conduct failed to meet its obligations under the FET standard in Article 4(1) of the Treaty, taking into account as a relevant factor the

---

[167] BRG ER1, Figure 24, Annex B-16, with Annex B-3.
[168] BRG ER2, Technical Annex.
[169] BRG ER1, Table 7.
[170] BRG ER1, Table 8.

legitimate expectations generated by the Respondent's undertaking in the form of the Ministry of Petroleum's letter dated 5 August 2000, as described above. The Respondent's undertaking is the decisive tipping factor in establishing the Respondent's breach of Article 4(1) of the Treaty. In the Tribunal's view, it colours the Respondent's conduct as an exercise lacking good faith or, in the words of *Merrill v. Canada* (2010) conduct that was materially "unjust", "discriminatory" and "unfair."

9.146   In the absence of such an undertaking, the Tribunal does not consider that the Claimant has established on the evidence before this Tribunal any other violation of Articles 3(1), 4(1), 4(2) or 4(5) of the Treaty. The Respondent's conduct (by itself and by EGAS attributable to the Respondent), absent this tipping factor, does not meet the exacting test for a violation of the FET standard, as decided in *Merrill v. Canada* (2010) and other legal materials cited by the Parties. In any event, having found the Respondent liable under the FET standard in Article 4(1) of the Treaty on the basis of the Ministry's letter dated 5 August 2000, it would be otiose for the Tribunal to address these other claims by the Claimant: their grounds can add nothing material to the Respondent's liability under the FET standard under Article 4(1) of the Treaty.

9.147   *(ii) Lost Dividends:* The Claimant claims a total principal sum of US$ 404,745,000 for injury in the form of "Lost Dividends" as a shareholder in EGAS resulting from the non-payment of tolling fees by EGAS to SEGAS under the EGAS Tolling Contract. This loss was indirectly consequential (at last in in material part) upon EGAS' curtailment of feed gas to the Damietta Plant under the SPA. In principle, subject to issues of compensation considered later in Part X this Award, the Tribunal decides that this claim succeeds as regards a technical breach of the Respondent's undertaking (in the form of the Ministry of Petroleum's letter dated 5 August 2000) of the FET standard under Article 4(1) of the Treaty.

*9.148*   *(iii) The Free Zone Claim*: The Claimant claims a total principal sum of US$ 107 million for injury suffered from the revocation of SEGAS' Free Zone status on 5 May 2008, by the Law No. 114.

9.149   As recited in Part V, SEGAS held a licence to operate "as a private Free Zone Company" under Egyptian Law, namely Law No. 8 of 1997 on Investment

Guarantees and Incentives.[171] Under Article 35 of Law No 8, profits and dividends of projects established in Free Zones "shall not be subject to the provisions of Egyptian tax and regulations."[172] SEGAS acquitted its licence on 9 December 2001.[173]

9.150   Under Law No 114 of 2008, the Respondent revoked all Free Zone licences and tax exemptions for companies in the natural gas industry.[174] As a result, SEGAS suffered losses from increased taxes and the Claimant, so it submits, suffered consequential losses of US$ 107 million.

9.151   The revocation of Free Zone licences did not target SEGAS. Such revocation was applied generally to licence holders, following a budgetary decision by the Respondent to increase national wages. SEGAS had no agreement with the Respondent or its agencies for stabilisation of the tax regime. There was no guarantee, under Egyptian law or the Treaty, that the tax regime in the zone would remain forever unchanged during the 25-year term of the SPA.

9.152   As decided by the ICSID tribunal in *El Paso v. Argentina* (2011),[175] "Such a standard of behaviour, if strictly applied, is not realistic, nor is it the [Treaty]'s purpose that States guarantee that the economic and legal conditions in which investments take place will remain unaltered *ad infinitum*." The UNCITRAL tribunal in *Encana Corp. v. Ecuador* (2006) came to a similar conclusion: "In the absence of a specific commitment from the host State, the foreign investor has neither the right nor any legitimate expectation that the tax regime will not change, perhaps to its disadvantage, during the period of the investment."[176]

9.153   In the Tribunal's view, the revocation of SEGAS' licence was not discriminatory or otherwise a breach of the FET standard in Article 4(1) of the Treaty or of Articles 3(1), 4(2) or 4(5) of the Treaty. The Respondent's undertaking in regard to the SPA by the Ministry's letter of 5 August 2015 to the Claimant did not extend to SEGAS's tax status. That status, subsequently acquired by a licence was independent from the

---

[171] Investment Guarantees and Incentives Law No. 8 of 1997, [C-0109].
[172] Investment Guarantees and Incentives Law No. 8 of 1997, [C-0109].
[173] Decision of the Director of GAFI No. 3336 of 2001 regarding a License for the Spanish Egyptian Gas Company (SEGAS) to Carry out its Activities in accordance to the Private Free Zone Regime, 9 December 2001, [R-0075].
[174] Law No. 114 of 2008, regarding the Opening of Two Additional Funds in the General Budget of the Financial Year 2007/2008, [R-0080], Article 11.
[175] *El Paso v. Argentina*, ICSID Case No. ARB/03/15, Award, 31 October 2011, [CL-0075], Paragraph 350.
[176] *Encana Corp. v. Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, [CL-0015].

supply of gas to the Damietta Plant under the SPA. In short, there was no "legitimate expectation" by the Respondent, still less SEGAS, that SEGAS's tax status would not be changed.

9.154 For all these reasons, the Tribunal dismisses the Claimant's Free Zone Claim under the Treaty incurred as a result of the revocation of SEGAS' tax status as a Free Zone company.

*(5) Summary of Decisions*

9.155 For the reasons set out above, subject to further issues addressed in the following Parts of this Award, the Tribunal decides that the Claimant established the liability of the Respondent for breach of its obligations under the FET standard in Article 4(1) the Treaty, in regard to certain of its claims made by reference to Respondent's undertaking by its Ministry of Petroleum's letter dated 5 August 2000.

9.156 The Tribunal does not consider that the Claimant established the liability of the Respondent for breach of its obligations under the FET standard in Article 4(1) the Treaty, absent the Respondent's said undertaking.

9.157 The Tribunal dismisses as to liability under the Treaty the Claimant's Free Zone Claim in the sum of US$ 107 million.

9.158 In these circumstances, the Tribunal thinks it unnecessary to address the Claimant's case under Articles 3(1), 4(2) and 4(5) of the Treaty, which cannot affect any of the decisions summarized above.

## PART X: THE COMPENSATION ISSUES

### (1) Introduction

10.1    In this Part X of the Award, the Tribunal summarises the Parties' respective submissions and applies the legal principles applicable to an award of compensation under the FET standard in Article 4(1) of the Treaty and international law. The Claimants advances four alternative case as to compensation, all of which are put in issue by the Respondent.

10.2    *Primary Case*: As to its primary case, the Claimant claims compensation for the period from 2006 to 2015 in the total principal amount of US$ 3,219,458,000 (before interest). This amount comprises: (I) US$ 2,814,713,000 as "Nominal Lost Cash Flows on Contractual Rights," *i.e.* incremental costs from the non-delivery of natural gas under the SPA; and (II) US$ 404,745,000 for "Lost Dividends" as a shareholder in SEGAS.[1]

10.3    The Claimant's incremental costs under (I), against a "but for" delivery of natural gas from the Seller under the SPA totalling 1,312 trillion BTUs between 2006 and 2015, comprise: (i) US$ 678 million for increased operating costs from 547 trillion BTUs of gas delivered in Egypt; (ii) US$ 1.745 billion for increased costs to purchase 459 trillion BTUs replacement gas for gas not delivered in Egypt; (iii) US$ 613 million for 306 trillion BTUs for losses from 306 trillion BTUs of gas not delivered in Egypt and not replaceable by the Claimant; and (iv) US$ 107 million from the loss of SEGAS' Free Zone status, based on "the nominal international damages claim of US$ 3.2 billion."[2]

10.4    As regards the latter claim for US$ 107 million, the Tribunal has decided that the Respondent is not liable under the Treaty for such claim. Accordingly, this claim is not considered as regards compensation in this Part X of the Award.

10.5    As to (i) increased operating costs, these comprised: (a) the cost of gas under the SPA; and (b) shipping expenses and losses.[3]

---

[1] Navigant ER2, Page 72, Table 23 (incremental costs, lost profits and lost SEGAS dividends).
[2] Tr. D1 156:13-14.
[3] Navigant ER2, Appendix C.1.4 (updated).

10.6    As to (ii) increased costs to purchase replacement gas, these costs resulted from prices generally higher than the costs of gas under the SPA.[4] These costs are not advanced as a claim for lost profits but as "direct damages."[5] (They were originally incurred, in part, by UFGC as addressed below.)

10.7    As to (iii) gas not delivered in Egypt and not replaceable, the losses are calculated by reference to the Claimant's increased unit costs resulting from non-deliveries of gas measured against the volume of gas which should have been delivered under the SPA.[6]

10.8    The Claimant's lost dividends of US$ 404,745,000 under (II), derive from fees payable but unpaid by EGAS to SEGAS under the SEGAS Tolling Contract of 2003, in the form of unpaid dividends payable by SEGAS to the Claimant (as SEGAS' majority shareholder).

10.9    The Claimant acknowledged at the Hearing, that its figures should be reduced overall by US$ 220 million to reflect the Claimant's lesser need for working capital and taxes, as submitted by the Respondent and its expert witness, Mr MacGregor (of BDO).[7]

10.10   *First Alternative Case:* In its first alternative case, the Claimant claims compensation in the total principal amount of US$ 2,826,868,000 (before interest). This amount comprises: (i) US$ 2,422,123,000 as "Nominal Lost Cash Flows on Contractual Rights," *i.e.* for the non-delivery of natural gas under the SPA (but here excluding "lost profits" in the amount of US$ 613 million); and (ii) the same US$ 404,745,000 for "Lost Dividends" as a shareholder in SEGAS.[8]

10.11   *Second Alternative Case:* In its second alternative case, the Claimant claims compensation in the total principal amount of US$ 2,580,991,000 (before interest). This amount excludes from the Claimant's primary case losses by UFGC, if not

---

[4] Navigant ER2, Appendices C.7.a, D.2 and F.1 (updated).
[5] Tr. D1 149-152.
[6] Tr. D1 146; Navigant ER1, Paragraph 20; Navigant ER2, Appendix C.1.3.
[7] Tr. D1 143-145.
[8] Navigant ER2, Page 79, Table 25 (as updated).

suffered by the Claimant under international law (contrary to the Claimant's submission).[9]

10.12   *Third Alternative Case:* In its third alternative case, the Claimant claims compensation in the total principal amount of US$ 2,418,036,000 (before interest). This amount is calculated by reference to the limiting terms of the SPA as to compensation for "lost profits" etc. It comprises: (i) US$ 2,013,291,000 as the Claimant's "Lost Cash Flows";[10] and (ii) US$ 404,745,000 as the Claimant's "Lost Dividends" (as a shareholder in SEGAS). It excludes the Claimant's claim for US$ 107 million for loss of SEGAS' Free Zone status. It also excludes losses suffered by UFGC prior to June 2013; but it includes the Claimant's own "incremental costs passed on by UFGC to UFG" from June 2013 onwards in the amount of US$ 291,894,832.[11]

10.13   The Claimant acknowledged that it is not entitled to "double-recovery" for amounts awarded in the CRCICA and ICC arbitrations. As it acknowledged in its written pleadings:

> *To the extent that UFG receives an award in the commercial arbitrations that provides damages sought in this arbitration, this Tribunal may deduct such an amount from its award in order to remove the possibility of double-recovery. Similarly, to the extent this Tribunal awards damages before the conclusion of the commercial cases, EGAS may seek an offset in any award issued by the commercial tribunals.[12]*

10.14   The Tribunal summarises the Parties' respective cases on compensation below. The Tribunal emphasises, again, that these summaries are necessarily abbreviations of the Parties' respective full cases on compensation.

### (2) The Claimant's Case

10.15   In summary, the Claimant submits that it is entitled to full compensation, according to the principles established in the PCIJ's decision in *Chorzów Factory* (1928).[13]

---

[9] Navigant, ER2, Page 78, Table 24.
[10] Navigant, ER2, Page 80, Table 26.
[11] Navigant ER2, Page 79 ,Table 25 (as updated) and Appendix C.1.4; as explained by the Claimant: Tr. D1.139 and 167-172.
[12] Cl Rep Merits, Paragraph 430 (Page 208), Footnote 762.
[13] Cl Mem Merits, Paragraphs 582-584; Cl Rep Merits, Paragraph 472 (Page 204); *Chorzów Factory*, PCIJ Rep Series A No 17 (1928), [CL-0094], Paragraph 47.

10.16   In that case, the Permanent Court of International Justice expressed the general principle of compensation as follows: "reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."  The Permanent Court of International Justice also noted that "the compensation due […] is not necessarily limited to the value of the undertaking at the moment of dispossession, plus interest to the day of payment."

10.17   According to the Claimant, the *Chorzów Factory* standard was adopted by the Iran-US Claims Tribunal in *Amoco v. Iran* (1987):[14]

> *According to the Court in Chorzów Factory, an obligation of reparation of all the damages sustained by the owner of expropriated property arises from an unlawful expropriation. The rules of international law relating to international responsibility of States apply in such a case. They provide for restitutio in integrum: restitution in kind, or if impossible, its monetary equivalent. If need be, 'damages for loss sustained which would not be covered by restitution' should also be awarded.*

10.18   The same standard was applied by the Tribunal in *MTD v. Chile* (2004)[15] and in several other decisions.

10.19   According to the Claimant, the *Chorzów Factory* standard of compensation has been applied with respect to treaty violations, other than expropriation. Specifically, it was applied to a violation of the obligation to provide full protection and security, as in *AAPL v Sri Lanka*:[16]

> *Both parties are equally in agreement about the principle, according to which, in case of property destruction, the amount of the compensation due has to be calculated in a manner that adequately reflects the full value of the investment lost as a result of said destruction and the damages incurred as a result thereof.*

10.20   The Claimant relies on the decision in *Compañia de Aguas v. Argentina* (2007), where the tribunal decided that it was generally accepted that "regardless of the nature of the illegitimate measure, the level of damages awarded in international investment

---

[14] Cl Mem Merits, Paragraph 584, citing *Amoco v. Iran*, 15 Iran-U.S. C.T.R. 189, Partial Award No. 310-56-3, 14 July 1987, [CL-0097], Paragraphs 189, 191-193.
[15] Cl Mem Merits, Paragraphs 585-588, citing *MTD v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, [CL-0011], Paragraph 238.
[16] Cl Mem Merits, Paragraph 586, citing *AAPL v. Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, [CL-0098], Paragraph 88.

arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action."[17]

10.21   Finally, the Claimant cites the decision of the Annulment Committee in *Azurix v. Argentina* (2009), as determining that the Tribunal has a discretion in determining what approach it should take as to damages.[18]

10.22   The Claimant contends that the application of the *Chorzów Factory* standard to the present case means that it is entitled to compensation representing the cash flows that the Claimant's investment would have generated had the Respondent not violated the Treaty by curtailing and then stopping the supply of gas to the Damietta Plant, and by depriving SEGAS of its status as a tax-free company in the Damietta Free Zone.[19] In particular, the Claimant contends that it is entitled to compensation under the following headings:[20]

(i)   Lost cash flows arising from its failure to receive, and therefore inability to on-sell, gas to which it was entitled under the SPA from 2006 to 2015; and

(ii)   Dividends it would have received from SEGAS had the Damietta Plant received the gas it should have received under the SPA, with the EGAS and UFG Tolling Contracts, from 2006 to the end of 2014.

10.23   The Claimant relies upon the expert report prepared by Mr Kaczmarek and Mr Sequeira (of Navigant) and the oral testimony of Mr Sequeira. These expert witnesses calculated that the Claimant's total damages from 2006 to 2015 amounted, on its primary case, to the total principal sum of US$ 3,219,458 (post tax, without interest). These expert witnesses made similar calculations on different hypotheses (resulting in different figures) for the Claimant's first, second and third alternative cases. For the Claimant's third alternative case, they calculated the total principal sum of US$ 2,418,036,000 (post tax, without interest).

---

[17] Cl Mem Merits, Paragraph 587, citing *Compañia de Aguas v. Argentina*, ICSID Case No. ARB/97/3, Award, 20 August 2007, [CL-0021], Paragraph 8.2.7,
[18] Cl Mem Merits, Paragraph 588, citing *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Annulment Decision, 1 September 2009, [CL-0099], Paragraph 332.
[19] Cl Mem Merits, Paragraph 590.
[20] Cl Mem Merits, Paragraphs 590-622.

10.24   The Claimant submits that its lost cash flows were sustained with respect to three different types of transactions it undertook to on-sell gas through its wholly-owned subsidiaries. First, the Claimant and its subsidiaries had long-term supply contracts in Spain with four further related companies (all subsidiaries of Gas Natural Fenosa or "GNF"), which it had intended to satisfy with gas from the Damietta Plant. Instead, the Claimant and its subsidiaries have had to buy more expensive gas in order to fulfill their existing supply obligations. They also had to reduce their on-selling commitments. Second, the Claimant and its subsidiaries sold gas to industrial consumers in Spain under one-year renewable contracts. Sales pursuant to these contracts had to be reduced. Third, the Claimant and its subsidiaries sold gas in the international market, which had to be stopped altogether.[21]

10.25   To the extent that some gas was still produced by the Damietta Plant during the relevant period (2006-2015), that gas was more expensive for the Claimant, because the Damietta Plant ran less efficiently with reduced capacity, the Claimant had to make Toll-or-Pay payments to SEGAS under the UFG Tolling Contract when it could not satisfy its allotted capacities, and the Claimant incurred additional logistical costs.[22]

10.26   In their expert testimony, Mr Kaczmarek and Mr Sequeira concluded that, if the full volumes of gas required under the SPA had been provided by the Seller, the Claimant (with its subsidiaries) would have had additional cash flows from the sale of that gas in the amount of US$ 2.881 billion. This figure was reached by predicting the total income that the Claimant (with its subsidiaries) would have derived from sale of the full volumes of gas, and then subtracting the income that was actually earned, as well as the cost of operating expenses.[23]

10.27   The Claimant defends Mr Kaczmarek and Mr Sequeira's testimony. It was not "speculative," contrary to the Respondent's assertion. It is based on tangible historical data showing the price that the Claimant was likely to have been able to sell the gas volumes in a "but for" scenario. When arbitration tribunals have criticised damages claims as being too speculative, they have referred to claims for future losses based on

---

[21] Cl Mem Merits, Paragraph 602.
[22] Cl Mem Merits, Paragraph 602.
[23] Cl Mem Merits, Paragraphs 603-610.

speculative predictions that the claimant company would make profits in the future, even though there was no evidence that the company had made profits in the past. The Claimant contends that the Respondent's criticism of Mr Kaczmarek and Mr Sequeira's report as being "speculative" is therefore inapposite.[24]

10.28 The Claimant also rejects the Respondent's other criticisms of Mr Kaczmarek and Mr Sequeira's testimony, submitting that most of those criticisms related to formatting matters. The Claimant notes that the few technical errors identified by the Respondent result in a reduction of only 1.3% in the compensation claimed by the Claimant.[25]

10.29 Mr Kaczmarek and Mr Sequeira's assumptions in calculating the Claimant's income and operating expenses but for the Respondent's breaches, were as follows:

(i)     The volume of sales that would have been provided under the SPA but for the Respondent's breaches of the Treaty should be calculated without reference to the HOA and the Transient Agreement, because both agreements were only entered into in consequence of the Respondent's breaches of the Treaty;[26]

(ii)    The Claimant's operating costs would have been lower but for the Respondent's breaches of the Treaty, because (*inter alia*):[27]

   i.    The price of purchasing gas from the Damietta Plant would have been lower than the price of purchasing gas on the international spot market;

   ii.   The per-unit cost of producing LNG at the Damietta Plant would have been lower had the Plant been operating at full capacity;

   iii.  If the Respondent had complied with obligations, the Claimant would not have had to make Toll-or-Pay payments under the UFG Tolling Contract;

   iv.   If the Respondent had complied with its obligations, then the Claimant (with its subsidiaries) would have been able to on-sell more gas by way of the three types of transactions set out above.  As it was, the Claimant had

---

[24] Cl Rep Merits, Paragraphs 464-467 (Pages 222-223).
[25] Cl Rep Merits, Paragraph 450 (Page 233).
[26] Cl Mem Merits, Paragraph 604.
[27] Cl Mem Merits, Paragraph 606.

to reduce each type of onsell to the extent possible. Mr Kaczmarek and Mr Sequeira refer to these as the "unreplaced volumes";[28] and

v.   All increases in the gas prices that the Claimant and EGAS agreed in side letters and in the HOA amending the SPA would have occurred even if gas supplies had not been reduced. The Claimant asserts that this is a conservative assumption.[29]

10.30   The Claimant contends that the losses suffered by its Spanish subsidiary (UFGC) are attributable to the Claimant because international tribunals routinely treat companies within the same group as comprising the same economic reality, when appropriate. The Claimant relies on the "group of companies doctrine" applied in *Dow Chemical France* (1982),[30] where an arbitration agreement was extended to a non-signatory because "irrespective of the distinct juridical identity of each of its members, a group of companies constitutes one and the same economic reality."[31]

10.31   The Claimant distinguishes the award in *Gemplus v. Mexico* (2010),[32] which (so the Respondent submits) decided that a shareholder could not directly claim losses suffered by another company, even where its has ownership interests; and that its claim at most would be limited to demonstrable losses suffered to its shareholding in that other company. The Claimant submits that here the position is materially different, where the Claimant effectively owns and controls EGPC.[33]

10.32   UFGC is 99.99% owned by the Claimant. It has no employees; and it is run entirely by the Claimant's employees who see it as a "tool company."[34] The Claimant is required by Spanish regulations to have its gas marketed in Spain through an entity separate from the members of the corporate group that participates in different activities. This is the reason why the Claimant sold the gas to UFGC.[35] However,

---

[28] Cl Mem Merits, Paragraph 607.
[29] Cl Mem Merits, Paragraph 608.
[30] *Dow Chemical France & Ors v Isover St Gobain*, ICC Case No. 4131, Interim Award, 23 September 1982, [CL-0210], Paragraph 136.
[31] Cl Rep Merits, Paragraphs 444-445 (Page 215).
[32] *Gemplus v. Mexico*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010, [CL-0135], Part XII, Paragraphs 12-50.
[33] Cl Rep Merits, Paragraphs 446-447 (Pages 215-216), citing *Gemplus v. Mexico*, ICSID Case No. ARB(AF)/04/3 and ARB(AF)/04/4, Award, 16 June 2010, [CL-0135], Part XII, Paragraphs 12-50.
[34] Cl Rep Merits, Paragraphs 439 and 441-443 (Pages 212-215).
[35] Cl Rep Merits, Paragraphs 438-439 and 441-443 (Pages 212-215).

UFGC's activities form the cornerstone of the Claimant's business. Without its profits, the Claimant would not be a viable company.[36] When the Claimant negotiated with the Respondent for the construction of the Damietta Plant and the supply of gas, the Respondent was always aware that the Claimant's purpose was to sell gas in Spain. The Claimant would not have entered into the negotiations but for this purpose. It is therefore appropriate to treat the Claimant and UFGC as functionally equivalent entities because, to fulfill that purpose, the Claimant necessarily had to sell gas through UFGC. In consequence, so the Claimant contends, it is appropriate to treat the Claimant and UFGC as part of the same economic reality, and for the latter's losses to be treated as the Claimant's losses for its claims against the Respondent.[37]

10.33   Further, the Claimant contends that it is entitled to claim directly for UFGC's losses because it is contemplated in the SPA that the Claimant would be able to do so. Article 8.1 of the SPA specifically permits the Claimant to claim for "third party's claims and penalties against [the Claimant]." As the Claimant absorbed UFGC's additional costs by way of adjustments to transfer pricing and, from mid-2012 onwards, by directly compensating UFGC for its losses, then if UFGC really is to be treated as separate to the Claimant (as the Respondent submits), then UFGC is a "third party" and all of these losses are "claims" within the meaning of Article 8.1 of the SPA.[38]

10.34   Alternatively, the Claimant contends, its losses amounted to 99.99% of UFGC's losses.[39]

10.35   Alternatively, Mr Kaczmarek and Mr Sequeira have calculated the amount that the Claimant directly lost in revenue, rather than the amount that UFGC lost in revenue. This calculation is based on the Claimant's submission that it always transferred any of UFGC's profits and losses to itself by way of its control of the transfer prices charged to UFGC for sales of gas.  The transfer prices the Claimant charged to UFGC were consistently adjusted to maintain a consistent (and low) level of profits or losses

---

[36] Cl Rep Merits, Paragraphs 439 and 441 (Pages 212-213).
[37] Cl Rep Merits, Paragraph 439 (Page 212).
[38] Cl Rep Merits, Paragraphs 443-444 (Page 230).
[39] Cl Rep Merits, Paragraph 439 (Page 212).

in UFGC. Therefore, losses suffered by UFGC as a result of the curtailment of supply to the Damietta Plant were absorbed by the Claimant.[40]

10.36   Moreover, some of the replacement gas purchased on the international spot market, in order to replace the volumes of gas needed to satisfy UFGC's supply obligations, was purchased by the Claimant. Therefore, these losses were directly suffered by the Claimant.[41]

10.37   According to the Claimant, from mid-2013, UFGC's losses were such that it the Claimant recognised that it needed to amend its contract with UFGC. It therefore executed an addendum which provided that it would compensate UFGC on a monthly basis for costs associated with the purchase of replacement volumes of gas.  Thus, from mid-2013, all of UFGC's losses incurred by having to purchase more expensive gas, to replace the lost volumes from the Damietta Plant, were directly attributable to the Claimant.[42]

10.38   In its Reply, the Claimant responds to the Respondent's argument that its cash flow losses must be limited by the terms of the SPA. The Claimant says that this misconstrues its claim. It is a claim for breaches of the Treaty by the Respondent. It is not for breaches of the SPA by EGAS, even though the breaches of the Treaty also involved breaches of the SPA.[43] The Claimant cites, in support of this distinction, the award in *Kardassopoulos and Fuchs v. Georgia* (2010).[44]

10.39   As this Tribunal was constituted under the Treaty and not the SPA, the Claimant contends that the SPA's provisions do not provide the legal framework for determining compensation due from the Respondent under the Treaty.[45]

10.40   The Claimant submits that the Respondent also misconstrues the *Chorzów Factory* test by seeking to put the Claimant in the position it would have been in had it made a

---

[40] Cl Rep Merits, Paragraphs 449, 459 (Pages 216, 220) and 435 (Pages 227-228).
[41] Cl Rep Merits, Paragraphs 458-462 (Pages 220-222).
[42] Cl Rep Merits, Paragraphs 461-462 (Page 221) and 438 (Pages 228-229).
[43] Cl Rep Merits, Paragraphs 430-431 and 434 (Pages 207-209).
[44] *Kardassopoulos and Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, [CL-0208], Paragraph 480.
[45] Cl Rep Merits, Paragraph 435 (Page 210).

claim under the SPA, not the position it would have been in had the Respondent not violated the Treaty.[46]

10.41 Further, Mr Kaczmarek and Mr Sequeira have calculated that, even applying the SPA's limitations on recoverable damages, the Claimant's losses from reduced cash flows amount to US$ 2,013,291,000.[47] (This is the part of the Claimant's third alternative case on compensation, described above).

10.42 These losses are calculated by reference to:

(i) The Claimant's increased costs of lifting and transporting gas from the Damietta Plant (which were increased because the cost of processing gas remained relatively fixed but because the Claimant could not lift full quantities of LNG the lifting and transporting cost per unit increased);[48] and

(ii) The Claimant's increased costs of purchasing replacement volumes of gas from the international spot market.[49]

10.43 The Claimant contends that it is entitled to claim these additional costs by reference to Article 8.1 of the SPA. Although Article 8.1 limits the amount of damages the Claimant can claim under the SPA to the value of 90% of gas volumes not supplied by EGAS to the Damietta Plant, that value is greater than the Claimant's losses. Therefore, Article 1 does not impose a cap on the Claimant's losses claimed in this arbitration.[50]

10.44 On the basis of Mr Kaczmarek and Mr Sequeira's expert testimony, the Claimant contends that, as at 2015, its post-tax lost dividends from SEGAS arising from the Respondent's breaches of the Treaty, amount to US$ 303,559,000. Grossed up to account for the tax, the principal amount is US$ 404,745,000.

10.45 As to these lost dividends, the Claimant submits that SEGAS' only sources of income were Tolling Fees and Toll-or-Pay Fees, which are alternative fees that both the Claimant and EGAS were required to pay SEGAS under the EGAS and UFG Tolling

---

[46] Cl Rep Merits, Paragraphs 432 and 436-437 (Pages 207, 210-211); but see Paragraph 10.12 above.
[47] Cl Rep Merits, Paragraph 468 (Page 224).
[48] Cl Rep Merits, Paragraphs 425-426 (Pages 224-225).
[49] Cl Rep Merits, Paragraph 426 (Page 225); Cl Mem Merits, Paragraphs 593, 602 and 606.
[50] Cl Rep Merits, Paragraphs 427-428 (Page 225).

Contracts. The Claimant contends that, from November 2012, EGAS stopped making Toll-or-Pay payments to SEGAS under the EGAS Tolling Contract (even with respect to payments then already overdue); and that EGAS has not made any such payments since.

10.46   A portion of EGAS' Toll-or-Pay payments for 2011, and the entire 2012, 2013 and 2014 Toll-or-Pay payments remain outstanding.[51] This coincided with the complete stoppage of all gas supplies to the Damietta Plant, meaning that neither EGAS nor the Claimant were any longer required to pay Tolling Fees to SEGAS.

10.47   In the circumstances, EGAS' failure to make its Toll-or-Pay payments put SEGAS in financial jeopardy and rendered it unable to distribute any dividends, such that it distributed only limited dividends to the Claimant in 2011 and 2012.  Moreover, so the Claimant contends, starting in 2008 and more frequently from 2012, SEGAS requested advance payments under the Tolling Contracts from its Tollers to meet its expenses (*i.e.*, EGAS and the Claimant). The Claimant made these advance payments; but EGAS has not.[52]

10.48   The Claimant contends that the reduction in dividends paid by SEGAS was caused by the Respondent's breaches of the Treaty. Had the Respondent not curtailed the gas supply to the Damietta Plant, then EGAS would have been liable to pay Tolling Fees, rather than Toll-or-Pay Fees. If EGAS had paid Tolling Fees, then SEGAS would have been put in a financial position to distribute dividends to the Claimant.[53]

10.49   Mr Kaczmarek and Mr Sequeira have calculated that, if the full volumes of gas to the Damietta Plant had been supplied (and if SEGAS' Free Zone company status had not been revoked), then the Claimant would have received US$ 252.3 million more in dividends from SEGAS.[54] This conclusion was reached by calculating what SEGAS' income would have been, using the monthly tolling price under the Tolling Contracts.

10.50   The Claimant submits that this is a conservative calculation because:[55]

---

[51] Cl Mem Merits, Paragraph 614.
[52] Cl Mem Merits, Paragraph 615.
[53] Cl Mem Merits, Paragraph 615.
[54] Cl Mem Merits, Paragraphs 619-622.
[55] Cl Mem Merits, Paragraphs 620-621.

(i)     It results in a lower amount than an alternative method, using the Tolling Contracts' provision for the tolling price to be revised at the end of each year to ensure an 11% return on equity to investors; and

(ii)    Although a higher monthly tolling price was agreed in 2012, which would have resulted in a greater than 11% return to investors, Mr Kaczmarek and Mr Sequeira's calculations from 2012 are capped at an 11% return on equity.

10.51   The Claimant contends that its claim for lost dividends cannot be curtailed by any limitations on damages contained in the SPA, because the SPA does not govern dividends paid out by SEGAS to its shareholders, including the Claimant.[56]

10.52   The Claimant rejects the Respondent's submission that the Claimant failed unreasonably to mitigate its losses.

10.53   The Claimant reduced its downstream commitments, where possible, in order to reduce the costs of buying more expensive replacement gas to fulfill those commitments, by searching for the cheapest possible replacement gas,[57] by allowing supply contracts to expire and therefore reducing its market share in Spain,[58] and by declaring *force majeure* to some of its customers in 2014.[59] However, the Claimant's ability to do so was impaired by the Respondent's and EGAS' continual representations from 2006 to late 2013 that EGAS would meet its contractual commitments in future, including representations set out in various side-letters and amendments to the SPA.[60]

10.54   In these circumstances, it was reasonable for the Claimant to have waited until 2014 to declare *force majeure* on its downstream supply contracts, because of the doubts that existed over whether an unpredictable, fluctuating and insufficient supply of gas constituted a *force majeure* event.[61]

---

[56] Cl Rep Merits, Paragraph 446 (Page 231).
[57] Cl Rep Merits, Paragraph 458 (Page 237).
[58] Cl Rep Merits, Paragraph 454 and 459 (Pages 233 and 237).
[59] Cl Rep Merits, Paragraphs 454, 457 and 459 (Pages 233 and 236-237).
[60] Cl Rep Merits, Paragraphs 451-456 (Pages 233-235).
[61] Cl Rep Merits, Paragraph 457 (Pages  236-237).

10.55   The Claimant has also requested an order that the Respondent pay pre-award and post-award interest, based on international commercial rates.[62] The Claimant relies on three alternative interest calculations performed by Mr Kaczmarek and Mr Sequeira:[63]

(i)   The LIBOR + 2.5% rate (which the SPA applies to late payments), and a form of which international arbitral tribunals often apply;[64]

(ii)   The US Prime rate of interest + 2%, with the 2% addition to reflect the fact that the US Prime rate is lower than that broadly available to the market. A form of this rate is also used often by international arbitral tribunals;[65] and

(iii)   The yield on the Respondent's sovereign bonds issued in US dollars, to reflect the fact that the Claimant is effectively an unwilling lender to the Respondent. As yields on US dollar denominated bonds of the Respondent were not available for 2006-2009, a US Prime rate + 2% was used for this period.

10.56   The Claimant has requested that an award of interest be compounded.[66] The Claimant contends that an award of compound interest is the generally accepted standard for compensation in international investment treaty arbitrations.[67] In support of this proposition, it quotes from *Middle East Cement v. Egypt* (2002), *Compañia de Aguas v. Argentina* (2007), and *Siag v. Egypt* (2009).[68]

10.57   The Claimant refers the Tribunal to the decision in *Compañia del Desarrollo v. Costa Rica* (2000) [69] where two reasons were proposed for awarding compound interest:[70]

> *(i) to ensure that a claimant receives 'the full present value of the compensation that it should have received at the time of the taking'; and (ii) to prevent 'the State [from being] unjustly [...] enrich[ed] [...] by reason of the fact that the payment of compensation has long been delayed.'*

---

[62] Cl Mem Merits, Paragraph 623.
[63] Cl Mem Merits, Paragraphs 624-626.
[64] Cl Rep Merits, Paragraph 462 (Page 239).
[65] Cl Rep Merits, Paragraph 464 (Page 240).
[66] Cl Mem Merits, Paragraph 628.
[67] Cl Mem Merits, Paragraph 628.
[68] Cl Mem Merits, Paragraphs 628-632, citing *Middle East Cement v. Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, [CL-0102], Paragraph 174; *Compañia de Aguas v. Argentina*, ICSID Case No. ARB/97/3, Award, 20 August 2007, [CL-0021], Paragraph 9.2.6.; *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, [CL-0013], Paragraph 595.
[69] *Compañia del Desarrollo v. Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, [CL-0100], Paragraph 101.
[70] Cl Mem Merits, Paragraph 629 (brackets in original).

10.58   The Claimant also refers to *Wena Hotels v. Egypt* (2000),[71] where the Tribunal stated:[72]

> [A]n award of compound (as opposed to simple) interest is generally appropriate in most modern, commercial arbitrations [...] '[A]lmost all financing and modern investment vehicles involve compound interest. [...] If the claimant could have received compound interest merely by placing its money in a readily available and commonly used investment vehicle, it is neither logical nor equitable to award the claimant only simple interest.

10.59   The Claimant relies on *Bernardus Henricus v. Zimbabwe* (2009),[73] where the Tribunal decided that compound interest is a "'mechanism to ensure that compensation awarded to the Claimant is appropriate in the circumstances.' This explains why, in many ICSID cases, such compound interests have been granted."[74]

10.60   In addition, the Claimant contends that the award of compound interest promotes efficiency by removing an incentive for a respondent to delay the arbitral proceedings, or payment of the award, so as to be able to profit from the use of money during that time.[75]

### (3) The Respondent's Case

10.61   In summary, the Respondent contests the Claimant's entitlement to compensation for any liability under the Treaty, on four principal grounds.[76]

10.62   First, the Respondent contends that a substantial portion of the damage of which the Claimant complains was suffered by its subsidiary, UFGC, which was the Claimant's Spanish subsidiary. The Claimant sold the gas processed by the Damietta Plant to UFGC, which then on-sold it to various Spanish customers.

10.63   It was UFGC, not the Claimant, that had contractual obligations to supply gas. Any lost cash flow suffered by UFGC as a result of being unable to on-sell gas, that it otherwise might have acquired, is a lost cash flow suffered by UFGC.

---

[71] *Wena v. Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, [CL-0101], Paragraph 129.
[72] Cl Mem Merits, Paragraph 629 (brackets in original).
[73] *Bernardus Henricus v. Zimbabwe*, ICSID Case No. ARB/05/6, Award, 15 April 2009, [CL-0104], Paragraph 146.
[74] Cl Mem Merits, Paragraph 630.
[75] Cl Mem Merits, Paragraph 633.
[76] Resp CM Merits, Paragraphs 365-388; Resp Rej Merits, Paragraphs 412ff.; Tr. D2 328ff.; ROS, Vol. V, Slides 1-28.

10.64 The Claimant's calculation of its damages is therefore incorrect. It is based on prices that UFGC would have charged to downstream customers, instead of the prices that the Claimant would have charged to UFGC.

10.65 Further, it was UFGC, not the Claimant, that actually purchased gas on the international spot market in order to fulfill its contractual obligations under its supply contracts. Therefore, it was UFGC, not the Claimant, that incurred the higher cost of that replacement gas.[77]

10.66 According to the Respondent, a claimant cannot directly claim losses suffered by another company in which it has an ownership interest.

10.67 The Respondent relies on the decision in *Gemplus v. Mexico* (2010),[78] in which the ICSID tribunal decided:[79]

> *The Claimants' claims for compensation derive only from their status as investors with investments in the form of their respective minority shareholdings in the Concessionaire, as distinct from any claim by the Concessionaire itself. Perhaps inevitably, the Parties' submissions occasionally elided this important distinction, effectively treating the valuation of the Concessionaire's future profits (if any) as the relevant exercise for the assessment of compensation due to the Claimants. The exercise required of this Tribunal is, in contrast, the valuation of the Claimants' lost investments in the form of their shares in the Concessionaire and not, as such, the lost profits incurred by the Concessionaire under the Concession Agreement.*

10.68 In its Rejoinder, the Respondent contests the Claimant's attempt to rely on *Gemplus v. Mexico* (2010). The Respondent submits that the claimant in that case was allowed to recover damages to a company in which it held shares only on the basis that the shareholding was the investment protected under a BIT. That is not the case here in regard to UFGC.[80]

10.69 The Respondent's Rejoinder also rejects the Claimant's attempt to rely on a "single economic reality" or "group of companies doctrine" to argue that UFGC's losses should be attributed to the Claimant. The Respondent contends that there is no

---

[77] Resp CM Merits, Paragraph 369; Resp Rej Merits, Paragraphs 422-433.
[78] *Gemplus v. Mexico*, ICSID Case Nos. ARB(AF)/04/3 and ARB(AF)/04/4, Award, 16 June 2010, [CL-0135], Part XII, Paragraph 50.
[79] Resp CM Merits, Paragraph 371.
[80] Resp Rej Merits, Paragraph 424.

relevant authority supporting the use of such a doctrine in a situation like the present case, where the subsidiary company that suffered losses was incorporated in a State that was not the respondent State.[81]

10.70   In particular, the Respondent contends that arbitral decisions concerning the scope of private-party arbitration agreements are irrelevant to the question of attribution of damages under international law.[82] The fact that Spanish regulations require a particular corporate structure is not relevant to deciding whether the Claimant should be entitled to recover losses that were actually suffered by a different entity.[83]

10.71   The Respondent contends that the only way that UFGC's losses can be relevant to calculating compensation for the Claimant, is if the Claimant contends that its damages arise from a loss of the value of its shareholding in UFGC. However, as the Claimant has not asserted a claim for such damages, nor submitted any evidence on it, this Tribunal cannot determine what such loss may amount to.[84]

10.72   On the Respondent's case, the Claimant might also have made a claim for losses suffered as a result of its transactions with UFGC. However, the Claimant has failed to provide evidence relating to those transactions. It therefore cannot make such a claim.[85]

10.73   The Respondent rejects the Claimant's contention that it is entitled under Article 8.1 of the SPA to claim for losses suffered by UFGC as a "third party" within the meaning of that provision.[86]

10.74   The Respondent contends that UFGC did not make any "claims" against the Claimant, but rather: first, that the Claimant agreed to make payments to UFGC as part of a commercial arrangement; second, that this agreement was driven by the allocation of lost profits, which are not recoverable under Article 8.1; and that, because the Claimant's transfer pricing was motivated by a desire to keep UFGC's profits and losses at a particular level, that transfer pricing cannot have been caused

---

[81] Resp Rej Merits, Paragraph 423.
[82] Resp Rej Merits, Paragraph 425.
[83] Resp Rej Merits, Paragraph 426.
[84] Resp CM Merits, Paragraphs 371-372.
[85] Resp CM Merits, Paragraph 373.
[86] Resp Rej Merits, Paragraph 431.

by any of the Respondent's actions.[87] Moreover, the Respondent contends that the entitlement to losses for third party claims, under Article 8.1, does not apply if the third party claims were the result of *force majeure*, as in this case.[88]

10.75 Second, the Respondent contends that the Claimant's alleged losses are too speculative and uncertain. It contends that Article 36(2) of the ILC Articles on State Responsibility, codifying customary international law, only allows compensation for assessable damage "insofar as it is established."[89] The Respondent also relies on the ILC Commentary to Article 36, explaining that "[t]ribunals have been reluctant to provide compensation for claims with inherently speculative elements."[90]

10.76 Further, the tribunal in *Amoco v. Iran* (1987)[91] decided:

> *One of the best settled rules of the law of international responsibility of States is that no reparation for speculative or uncertain damage can be awarded. […] It does not permit the use of a method which yields uncertain figures for the valuation of damages, even if the existence of damages is certain.*[92]

10.77 The Respondent submits that Mr Kaczmarek and Mr Sequeira's testimony has failed to establish the Claimant's damages claim, because it contains errors, because its calculations were not made on the basis of documents (but on the basis of assumptions instructed by the Claimant's Counsel), and because it uses spreadsheets that are opaque, nearly incomprehensible, poorly supported, contain irrelevant information, and omit useful information and important calculations. The Respondent contends that there are numerous unexplained inconsistencies between the figures Mr Kaczmarek and Mr Sequeira stated they were using, and the actual figures used in their spreadsheets.

10.78 The Respondent concludes that Mr Kaczmarek and Mr Sequeira's failure to substantiate figures used in their calculations, and to explain those calculations, means

---

[87] Resp. Rej Merits, Paragraph 433(a), (c) and (d).
[88] Resp. Rej Merits, Paragraph 433(b).
[89] Resp CM Merits, Paragragh 376, citing ILC Articles on State Responsibility, [CL-0064], Article 36(2).
[90] Resp CM Merits, Paragraph 376, citing ILC Articles on State Responsibility, [CL-0064], 104, Comment (27).
[91] *Amoco v. Iran*, 15 Iran-U.S. C.T.R. 189, Partial Award No. 310-56-3, 14 July 1987, [CL-0097].
[92] Resp CM Merits, Paragraph 376; *Amoco v. Iran*, 15 Iran-U.S. C.T.R. 189, Partial Award No. 310-56-3, 14 July 1987, [CL-0097], Paragraph 238.

that the Claimant's attempt to quantify its damages is too uncertain to be the basis of any award by this Tribunal.[93]

10.79   Further, so the Respondent contends, there are speculative elements to the Claimant's alleged damages. First, Mr Kaczmarek and Mr Sequeira have assumed that the Claimant or its subsidiaries would have been able to sell large volumes of gas in Spain and on the international market, had it not been for the reduction of supplies to the Damietta Plant. This is speculative, and not supported by the reality of the gas markets, which saw a drop in prices and demand during the relevant period. Second, because that demand for gas is speculative, it is also speculative for Mr Kaczmarek and Mr Sequeira to have assumed that SEGAS would have processed gas to the Damietta Plant's full capacity during the whole of the relevant period.[94]

10.80   Another problem with Mr Kaczmarek and Mr Sequeira's testimony, according to the Respondent, is that they do not take into account price increases for natural gas agreed by the Claimant, in the HOA and the Transient Agreement. Having agreed to them, the Claimant cannot escape their terms.[95]

10.81   With respect to the testimony of Mr Kaczmarek and Mr Sequeira, the Respondent contends that the Claimant has not demonstrated a single instance of a supply contract under which the Claimant was obligated to sell gas at a price that did not reflect the price the Claimant actually paid for the gas. The Claimant's expert reports are presented in such a way that it is not possible to identify any such instances from those reports.[96]

10.82   Third, the Respondent contends that the Claimant's entitlement to compensation is limited by the terms of the SPA. The Respondent submits that the Claimant's claims are necessarily linked to the SPA because the compensation it seeks is essentially the difference between (i) the SPA's contractual volumes and pricing and (ii) the volumes the Claimant contends it actually received and the prices it actually paid under the SPA.[97] Moreover, the Claimant, having elsewhere argued that the Respondent and

---

[93] Resp CM Merits, Paragraph 377; Resp Rej Merits, Paragraphs 434-444.
[94] Resp CM Merits, Paragraphs 378-379.
[95] Resp Rej Merits, Paragraph 421.
[96] Resp Rej Merits, 420-421.
[97] Resp CM Merits, Paragraphs 380-383; Resp Rej Merits, Paragraph 414.

EGAS should be conflated, cannot now argue that the Respondent is not a party to the SPA and abandon the SPA for the purposes of calculating its compensation.[98]

10.83   The Claimant's legitimate expectations are also relevant to establishing the "but for" scenario. The Respondent contends that those expectations are necessarily defined and constrained by the terms of the SPA, because the volumes and prices on which the Claimant has based calculations are ones that were agreed as a package that included the SPA's limitations on liability.[99]

10.84   Put another way, the Claimant's legitimate expectations were that EGAS would comply with the SPA, and that compliance might be made either by providing the agreed-upon gas volumes or by paying the agreed-upon damages.[100] In consequence, any compensation to the Claimant for non-delivery of gas under the SPA should not exceed the compensation the Claimant could have expected under the SPA.

10.85   Moreover, Article 8.1 of the SPA sets a cap on damages at 90% of the contractual price of any gas not supplied, which was not taken into account in Mr Kaczmarek and Mr Sequeira's calculations.[101]

10.86   Article 8.1 of the SPA also excludes any entitlement to consequential damages and loss of profits. The Respondent contends that this dooms the Claimant's argument that it is entitled to damages for both the unreplaced volumes of gas that it was unable to on-sell, and for the replaced volumes of gas on which the Claimant and its subsidiaries suffered losses by having to buy more expensive gas to meet downstream supply obligations. Both types of damages are "lost profits." The Respondent contends that Mr Kaczmarek and Mr Sequeira have conceded that the claim for unreplaced volumes is a claim for lost profits.[102]

10.87   The Respondent contests the Claimant's reliance on the decisions in *Chorzów Factory* (1928) and *Kadassopoulos and Fuchs v. Georgia* (2010) to argue that the SPA's limitations on recoverable damages do not apply to its claim.  As these were cases concerning expropriation of property, the question of how to assess damages was

---

[98] Resp Rej Merits, Paragraph 413.
[99] Resp Rej Merits, Paragraph 414.
[100] Resp Rej Merits, Paragragh 417.
[101] Resp CM Merits, Paragraphs 380-383; Resp Rej Merits, Paragraphs 419-420 and 433(d).
[102] Resp CM Merits, Paragraphs 380-383; Resp Rej Merits, Paragraphs 419-420.

completely different to the present case.  Moreover, the Respondent contends that the tribunal in the latter case did consider any contracts to be "relevant to the factual matrix which underpins [the] claims."[103]

10.88   Fourth, the Respondent submits that the Claimant has failed to demonstrate that it has mitigated any losses it suffered.  The Respondent contends that, as the Claimant's downstream supply contracts were mainly with subsidiaries, it is unlikely that they would have refused to cooperate if the Claimant had requested reductions in supply commitments.  The Respondent submits that the Claimant has not disclosed the downstream supply contracts, nor provided information about its relationship with downstream counterparties during the relevant period, such that the Claimant has not proved it would have suffered any penalty had it failed to meet its supply obligations.[104]

10.89   The Respondent contends that the Claimant's business records show that its own management thought that it should have declared *force majeure* on its downstream supply contracts earlier than it did.  By failing to do so until 2014, the Claimant failed to mitigate its losses.[105]

10.90   Further, the Respondent contends that the Claimant had already purchased gas from Oman, which was available for the Claimant to use to meet its downstream supply obligations.  Its failure to do so, and its purchase of more expensive gas on the international spot market instead, is an instance of its failure to mitigate losses.[106]

10.91   Fifth, the Respondent attacks the amount of the Claimant's asserted losses as a result of reduced dividends paid from SEGAS.  The Respondent contends that because there was a *force majeure* situation, EGAS was no longer obliged to continue supplying gas from either June 2012 (when that situation of *force majeure* arose) or from 24 February 2013 (when EGAS sent its second *force majeure* notice to the Claimant).  From one of those times, any loss of dividends to be paid by SEGAS cannot have

---

[103] Resp Rej Merits, Paragraphs 415-416, citing *Kardassopoulos and Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, [CL-0208], Paragraphs 482 and 484 (brackets in original).
[104] Resp CM Merits, Paragraphs 384-386; Resp Rej Merits, Paragraphs 446 and 452.
[105] Resp Rej Merits, Paragraphs 447-451.
[106] Resp Rej Merits, Paragraphs 454-455.

been caused by any breach by the Respondent of the Treaty; and therefore the Claimant is not entitled to these damages.[107]

10.92   Sixth, the Respondent disputes the interest rates proposed by the Claimant, submitting that a more appropriate rate would be: (i) the US T-Bill rate; or (ii) LIBOR + 1%, to reflect the borrowing rate for companies like the Claimant.[108]

10.93   Lastly, the Respondent submits that any award of compensation to the Claimant should be reduced to account for the severe economic difficulties faced by the Respondent.[109]

### (4) The Tribunal's Analyses and Decisions

10.94   *Introduction:* The Tribunal has determined that the Respondent has violated the FET standard in Article 4(1) of the Treaty. Its liability under Article 4(1) derives from the Claimant's legitimate expectations based upon the Ministry of Petroleum's letter dated 5 August 2003 in regard to Article 21.1 of the SPA. The assessment of compensation therefore rests on the Respondent's violation of Article 4(1) of the Treaty. It does not rest upon the SPA itself.

10.95   *Standard of Compensation:* The Treaty does not set out a standard of compensation to be applied in the case of any violations of the Treaty, save as regards expropriation under Article 6 of the Treaty. Expropriation is not alleged by the Claimant to have taken place, at least for the purpose of its present claims in this particular arbitration.

10.96   It follows that any compensation to be awarded by this Tribunal is to be decided by applying principles of customary international law, namely "full reparation" to wipe out, as far as possible, the consequences of the Respondent's international wrongs under the general principle long established in the PCIJ's judgment in *Chorsów Factory* (1928),[110] as also confirmed by Articles 31 and 36 of the ILC Articles on State Responsibility.[111]

---

[107] Resp Rej Merits, Paragraph 456.
[108] Resp CM Merits, Paragraphs 387-388; Resp Rej Merits, Paragraphs 461-462.
[109] Resp Rej Merits, Paragraphs 463-464.
[110] *Chorsów Factory*, PCIJ Rep Series A No. 17 (1928), [CL-0094], Paragraph 47.
[111] ILC Articles on State Responsibility, [CL-0064], Articles 31 and 36; *see also* ILC Articles on State Responsibility, [CL-0064], 91, Comment (3).

10.97   Article 36 of the ILC Articles provides:

> *1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.*
>
> *2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established.*

10.98   The Tribunal also notes the Institute of International Law's Resolution made in Tokyo: "Legal Aspects of Recourse to Arbitration by an Investor Against the Authorities of the Host State under Inter-State Treaties" of 13 September 2013. Article 13, paragraph 3, provides: "[c]ompensation due to an investor for violation of the FET standard shall be assessed without regard to compensation that could be allocated in case of an expropriation, in accordance with the damage suffered by the investor."

10.99   *Assessment of Compensation*: The Tribunal accepts that both Parties' expert witnesses on the compensation issues, Messrs Kaczmarek and Sequeira (of Navigant) and Mr MacGregor (of BDO), sought to assist the Tribunal in good faith, to the best of their professional abilities. Many of their disagreements resulted from a different appreciation of the factual evidence and different instructions from the Parties' counsel as to the legal and other non-expert issues. Where there exist relevant differences between these experts, save where otherwise indicated below, the Tribunal has preferred to be guided by the testimony of Messrs Kaczmarek and Sequeira.

10.100   As is now not unusual for an investor-State tribunal, this Tribunal is confronted with the awkward task of assessing compensation based on a multiplicity of factual, legal and expert issues, as to which the Parties and their experts come to very different figures. It is therefore necessary to explain at the outset the Tribunal's general approach to the assessment of compensation.

10.101   The assessment of compensation is rarely a science or an exercise of arithmetical precision by an arbitration tribunal. Complex factual, legal and expert issues of compensation, dividing the disputing parties and their expert witnesses, can require a margin of appreciation by a tribunal applying the wording of a treaty and international law. The required exercise can be therefore less than exact. For this case, the Tribunal refers to the general approach taken by international arbitration tribunals, as recorded

in the ICSID awards in *Sistem v. Kyrgyz Republic* (2009),[112] *ADC v. Hungary* (2006),[113] and *Gold Reserve v. Venezuela* (2014).[114] The Tribunal has adopted that general approach to the present case.

10.102 *The Respondent's Undertaking:* As stated many times in this Award, the Claimant's claim for compensation is based on the Treaty under international law against the Respondent. It is not based on the SPA or under Egyptian law. Accordingly, without more, the Treaty and international law do not require the Tribunal to apply the SPA's contractual limitations on compensation for breach of the SPA by EGPC or EGAS, as if the Claimant's claim were making a contractual claim against its co-contractor, EGAS.

10.103 Such was the decision reached by the ICSID tribunal in its award in *Kardassopoulos and Fuchs v. Georgia* (2010):[115]

> *480. The Tribunal recalls that the Claimants' claims are treaty-based. Therefore the relevant provisions for the purpose of both liability and quantum are contained in the treaties and, more broadly, international law. Whilst the JVA and Deed of Concession are relevant to the factual matrix which underpins those claims, the Tribunal has not been constituted under the provisions of the JVA nor the Deed of Concession to consider the Parties' contractual dispute. Article 12 of the JVA and Article 21 of the Deed do not, therefore, as such, govern the legal framework within which the Tribunal must consider the compensation owing to the Claimants for breach of the ECT and the BITs.*

> *481. This finding is without prejudice to a host State and an investor's ability to contractually limit the compensation which may be owed following an expropriation where a treaty is also in play. Indeed, the Tribunal is loathe to accept the categorical denial of such an arrangement urged by the Claimants as a matter of law. [...]*

10.104 The Tribunal notes the tribunal's significant qualifications in these passages. Moreover, in the Tribunal's view, the facts of this case lead necessarily to a different conclusion.

---

[112] *Sistem v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, 9 September 2009.
[113] *ADC v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, [CL-0095], Paragraph 521.
[114] *Gold Reserve v. Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, [CL-0040], Paragraph 832.
[115] *Kardassopoulos and Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, [CL-0208].

10.105 As decided in Part IX above, the Respondent's international wrong derives from its undertaking in the letter dated 5 August 2000 from the Ministry of Petroleum to the Claimant. That undertaking was made in regard to the Seller's obligations under the SPA, pursuant to Article 21.1 of the SPA. In this sense, the Respondent's undertaking limited the compensation that might be owed following an international wrong under the Treaty to the compensation under the SPA as regards Article 4(1) of the Treaty. The Respondent was not a guarantor of the Seller's obligations under the SPA, still less a primary co-obligor. It would an odd result if, in such circumstances, the Respondent assumed a greater liability to pay compensation under the Treaty than the maximum liability assumed by the Seller under the SPA.

10.106 Hence, the Tribunal selects the Claimant's third alternative case on compensation as the appropriate methodology for assessing the compensation payable by the Respondent under the Treaty and international law, as summarised above at the beginning of this Part X. Accordingly, the Tribunal rejects the Claimant's primary case and its first and second alternative cases on compensation, as there also summarised.

10.107 In these circumstances, applying the "but for" test for causation, it follows that compensation for the Respondent's international wrong under the Treaty cannot exceed the Seller's obligations under the SPA. Those obligations, as to the Seller's liability for non-performance, are qualified (*inter alia*) by the limitations on recoverable compensation under the terms of the SPA.

10.108 Article 8.1[1] of the SPA provides that, for a breach of the obligation to deliver the stipulated quantity of gas, the Seller

> *shall be liable to Buyer for any damages, costs and/or expenses (to the extent permissible under Egyptian laws, but excluding consequential damages and loss of profits) arising from Seller's failure to supply, including (i) third party's claims and penalties against Buyer, (ii) costs, extra-costs, damages and expenses caused to the Complex arising from Seller's failure to supply, including operation and maintenance costs (expressed in USD per MMBTU), and capital investment costs (expressed in USD per MMBTU).*

10.109 The cap on damages as to 90% of undelivered gas provided by Article 8.1[2] of the SPA is not relevant to the Claimant's claims made by reference to Article 8.1[1]. Mr

Kaczmarek and Mr Sequeira calculated the US$ value of this cap as US$ 3.04 billion, an amount in excess of the Claimant's total claims.[116]

10.110 The Tribunal turns to the SPA's other limitations on recoverable damages later below.

10.111 *Loss of Profits:* As already noted above, the Claimant claims a total principal sum of US$ 2,013,291,000 for damages recoverable by reference to the SPA; namely "Lost Cash Flows" under its third alternative case on compensation. That amount excludes any "loss of profits" on the calculations made by the Claimant and its expert witnesses, Mr Kaczmarek and Sequeira. In the Tribunal's view, by reason of Article 8.1[1] of the SPA, the Claimant was correct in not here claiming "loss of profits" (as the Respondent contended).

10.112 *SEGAS' Lost Dividends:* The Claimant also claims US$ 404,745,000 for "Nominal Lost Dividends" from the Claimant's majority shareholding in SEGAS.[117]   These losses were caused by two cumulative factors: (i) the failure of EGAS to pay fees due to SEGAS under the EGAS Tolling Contract and (ii) the non-payment of dividends by EGAS to the Claimant owing to to SEGAS's precarious financial condition, that were not solely caused by EGAS (*i.e.* including SEGAS' lost Free Zone status).

10.113 In the Tribunal's view, by reason of Article 8.1[1] of the SPA, the Claimant cannot here claim its nominal lost dividends unpaid by SEGAS, being "consequential damages and loss of profits" (as the Respondent contended).

10.114 The Tribunal is also required, as to the assessment of compensation, to take account of the ICC tribunal's award in the ICC arbitration between SEGAS and EGAS (as summarised above). As the ICC tribunal there decided, EGAS was not entitled to fees from EGAS under the EGAS Tolling Contract by reason of SEGAS' absolute assignment of its contractual rights to HSBC. It must follow, as a matter of fact, that no such fees could be passed by EGAS through SEGAS to the Claimant in the form of dividends.

10.115 Accordingly, in the absence of such fees being due to SEGAS under the EGAS Tolling Contract, it must follow that no such losses were incurred by the Claimant.

---

[116] Navigant ER2, Paragraph 212.
[117] Navigant ER2, Table 25 (updated).

The Respondent is not, of course, legally responsible for SEGAS' absolute assignment of its rights to HSBC under the Offshore Security Agreement.

10.116 *UFGC:* As to UFGC, it is a Spanish company forming part of the Unión Fenosa group of companies. It is owned as 99.99% by the Claimant; and it is managed by the Claimant's employees, subject to the operational control of the Claimant. UFGC was formed by the Claimant for the specific purpose of allowing the Claimant to market gas in Spain, as required by regulatory provisions of Spanish law.[118]

10.117 Under the agreement between UFGC and the Claimant,[119] UFGC's costs flowed through to the Claimant. UFGC's remitted receipts accounted for two thirds of the Claimant's revenue.[120] As a wholly owned and integrated subsidiary, the operating costs and financial results of UFGC were consolidated into the Claimant's financial statements, so that any losses sustained by UFGC were directly reflected in the Claimant's financial statements.[121] In legal and contractual terms, however, UFGC was a stranger, or third party, to the SPA.

10.118 As a factual matter, there is no doubt that losses sustained by UFGC were passed through and directly suffered as losses by the Claimant. As the Respondent's expert witness (Mr MacGregor) accepted, if the Claimant had to reimburse UFGC for its purchases from third parties (which UFGC otherwise would have purchased from the Claimant), the Claimant could claim damages under the SPA by reference to the extra costs incurred by UFGC.[122]

10.119 The Tribunal can see no logical reason why the same result should not apply under the Treaty and international law. This is not a case of a claimant claiming as damages a loss or expense incurred by a company in which it has only a minority interest and no direct control over that company. In such circumstances, a minority shareholder may make a claim for the diminution in the value of its shareholding; but it cannot claim, even prorated according to the number of its shares, the damages suffered only by the company. Such a claim is not pleaded by the Claimant in this arbitration.

---

[118] Sáez Ramírez WS2, Paragraphs 4 and 10.
[119] Liquefied Natural Gas Purchase and Sale Agreement between UFG and UFGC, 15 May 2005 (redacted), [C-0428].
[120] Cl Rep Merits, Paragraphs 448-450; Conti WS, Paragraphs 23-25.
[121] Navigant ER1, Paragraphs 43-45.
[122] BDO ER1, Paragraph 7.17.

10.120 Moreover, from June 2013 onwards, UFGC has in fact invoiced the Claimant on a monthly basis for extra costs incurred in its purchases of replacement gas, in place of the Claimant's sales of gas to UFGC. The Claimant has paid those invoices.[123] The claim in respect of costs incurred to EGPC is made for the period from June 2013 onwards, during this invoicing period.[124]

10.121 Article 8.1 of the SPA imposes a liability on the Seller for the "costs" incurred by the Buyer from third parties. It follows that the Claimant's costs incurred and paid to UFGC would be recoverable from the Seller (EGAS) under the SPA and thus also recoverable from the Respondent under the Treaty.

10.122 Accordingly, the Tribunal considers that the Claimant's third alternative case on compensation, as supported by Mr Kaczmarek and Sequeira, correctly includes the amount of US$ 291,894,831 as the Claimant's own "incremental costs passed on by UFGC to UFG" from June 2013 onwards.

10.123 *The Free Zone Claim:* The Claimant claims a total principal sum of US$ 107 million for damages suffered from the revocation of SEGAS' Free Zone status in May 2008. The Tribunal has dismissed this claim, as to liability, in Part IX above. Hence, it is here unnecessary to address and decide the Parties' submissions as to compensation regarding the Claimant's Free Zone Claim. However, it is necessary to exclude this claim and related claims from the assessment of compensation, To the Tribunal's understanding, the Claimant has done so in calculating its third alternative case on compensation.

10.124 *Mitigation:* The Claimant cannot claim compensation from the Respondent to the extent that the Claimant has failed unreasonably to mitigate its losss in accordance with international law. In the Tribunal's view, the legal test is based upon a reasonable and not an absolute standard, as confirmed by Comment (11) to Article 31 of the ILC Articles and Article 39 of the ILC Articles.

---

[123] Conti WS, Paragraph 26; Navigant ER1, Paragraph 205; UFGC-UFG Invoices under Amendment 10 2013-2015, [NAV-197].
[124] Tr. D1 170.

10.125 Article 39 of the ILC Articles provides:

> *In the determination of reparation, account shall be taken of the contribution to the injury by willful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought.*

10.126 Moreover, the test is to be applied as at the relevant time, without the benefit of hindsight. The legal burden of proving such unreasonableness in this arbitration rests upon the Respondent.

10.127 The Respondent contends that the Claimant should have terminated or suspended commitments to downstream buyers, if necessary using a defence of *force majeure* based on events in Egypt occurring from 2011 onward. Applied generally, such terminations and suspensions would have effectively closed down most, if not all, of the Claimant's business.

10.128 The Tribunal does not consider that the Claimant can reasonably be required to have effectively closed down its business, in whole or in substantial part. Moreover, if it had done so, it is not obvious that the overall amount of its claims would be reduced, albeit perhaps differently formulated against the Respondent. It is even likely that the amount of these claims could have increased.

10.129 Further, Mr Conti (of the Claimant) testified that the Claimant did take steps to adjust its downstream sales, as follows:[125]

> *This imbalance between supply and sales forced us to restructure our downstream portfolio to accommodate the change. One measure we took was to reduce our sales volume downstream. Due to Egypt's breach we have reduced our sales volumes in Spain since 2011 by more than 40 percent overall and almost 50 percent in the industrial sector. We also had to adjust the type of customer we supplied. We had structured our downstream sales expecting that we would benefit from a lower, long-term sales price from EGAS, allowing us to charge lower prices to high-volume customers. By supplying high-volume customers at a lower price, we ensured that we could earn a profit and could also sell the entire 4.4 bcm we expected from Egypt. Now that we have to pay higher spot-market prices, we cannot continue to service the same type of customer and/or the same volumes - the prices are too low. Instead of supplying a limited number of high-volume industrial customers, we now must supply low-volume users to obtain a better downstream price. But because these are*

---

[125] Conti WS, Paragraph 17.

> *low-volume customers, we must reach agreements with a substantially higher number of individual customers to reach a volume, which, even if much lower, allows UFG to at least to keep a structural presence in the market and to optimize logistic parameters. So even though UFG has substantially reduced its industrial portfolio in terms of volume - by about half over the past few years - it has had to take on many more customers to reach that lower volume. While UFG used to supply about 170 customers in 2011 and 2012 (but supply a much higher volume), now it supplies about 370 customers.*

The Tribunal accepts the truth of this testimony. Mr Conti was not called by the Respondent for cross-examination at the Hearing.

10.130 As also described by Mr Conti and assessed as at the relevant time, the Tribunal does not consider the Claimant's conduct unreasonable. In short, the Respondent did not prove its case on mitigation, as to which (as decided above) it bore the legal burden of proof.

10.131 *ENI:* The Respondent complains that the Claimant purchased replacement gas from its parent company (ENI) and other affiliated companies, thereby leading to a possible "windfall." The Claimant explained that these purchases were transactions made at arm's length, at average prices lower than those available from other unrelated companies. Overall, as Mr Kaczmarek and Mr Sequeira testified, the Claimant thereby reduced its losses, which would have been greater if it had purchased the same replacement gas from non-affiliated sellers.[126]

10.132 The Tribunal has considered the other matters raised by the Respondent to support its allegation that the Claimant's compensation should be reduced for its unreasonable failure to mitigate its losses. The Tribunal rejects them all. As already indicated, the legal test for mitigation applies a reasonable standard at the relevant time, not a multitude of second-guesses made years applying an absolute standard to the Claimant's conduct with the benefit of hindsight. Moreover, it cannot be forgotten that the Claimant's predicament requiring such mitigatory conduct was caused by the Respondent's international wrong under the Treaty.

10.133 *Conclusion:* In conclusion, for the several reasons stated above, by reference to the Claimant's third alternative case on compensation, the Tribunal assesses the

---

[126] Navigant ER1, Appendix 1; Navigant ER2, Page 29, Figure 3.

compensation due from the Respondent to the Claimant in the total principal sum of US$ 2,013,071,000  (after tax, but before interest), as explained below.

10.134 The total amount of USS 2,013,071,000 comprises the amount of US$ 2,013,291,000 (as the Claimant's "Lost Cash Flows") that itself includes the amount of US$ 291,891,832 (as the Claimant's "own incremental costs passed on by UGPC" to the Claimant from June 2013 onwards). It is reduced  by US$ 220 million, as described in Paragraph 10.9 above (as accepted by the Parties' experts).

10.135 This total amount of USS 2,013,071,000 does not include the Claimant's figure of US$ 404,745,000 (as the Claimant's "Lost Dividends" from SEGAS).That claim has been dismissed by the Tribunal.

10.136 It also does not include - the Claimant's claim for US$ 107 million for the loss of SEGAS' tax-free status in the Damietta Free Zone (not being a claim advanced under the Claimant's third alternative case on compensation and, in any event, a claim dismissed by the Tribunal).

10.137 The Tribunal also dismisses the Claimant's figures for its primary case on compensation, together with its first and second alternative cases on compensation, as summarised above.

*(5) Interest*

10.138 There is no prescribed rate of interest in the Treaty. The Tribunal decides to use Three-Month LIBOR + 2.0% compounded quarterly as the appropriate rate for pre-award interest. The Tribunal considers that rate to reflect a reasonable rate of interest applicable to the Project as an investment by the Claimant, in concordance with the principles in *Chorzów Factory* (1928) and Article 36 of the ILC Articles on State Responsibility. It is less than a commercial rate and the rate prescribed in the SPA, in recognition that the Respondent is a State and not a commercial party, liable under the Treaty and not under the SPA.

10.139 As regards the form of interest, as already indicated, the Tribunal decides to apply compound interest. In selecting compound interest, the Tribunal adopts the reasoning

in the awards in *Compañia del Desarrollo v. Costa Rica* (2000) and *Gemplus v. Mexico* (2000).

10.140 Applied to calculate pre-award interest, the Tribunal selects 1 January 2016 as the commencement date and the date of this Award as the end-date.

10.141 As to post-award interest, the Tribunal decides to apply the same rate of Three-Month LIBOR + 2.0% compounded quarterly, from the date of this Award until payment to the Claimant.

10.142 In the event of the Claimant receiving any monies under this Award, the Claimant is forever precluded from claiming against the Respondent or EGAS any compensation in respect of the same monies in any legal or arbitration proceedings against the Respondent, EGPC or EGAS, including the pending second CRCICA arbitration (899) between the Claimant and EGAS. The Tribunal records that the Claimant has undertaken in this arbitration, as stated in its written submissions and its submissions at the Hearing, that it will not make any attempt at "double-recovery."

### *(6) Summary of the Tribunal's Decisions*

10.143 The total principal sum of compensation to be paid by the Respondent is US$ 2,013,071,000 (after tax, but before interest).

10.144 As to pre-award interest to be paid by the Respondent on the said principal sum, from 1 January 2016 to the date of this Award, the rate is Three-Month LIBOR + 2.0% compounded quaterly.

10.145 As to post-award interest to be paid by the Respondent on the said principal sum, from the date of this Award until payment, the rate is Three-Month LIBOR + 2.0% compounded quarterly.

## PART XI: THE STAY/SUSPENSION ISSUES

### (1) Introduction

11.1   If the Tribunal were to decide that it had jurisdiction (as it has in Part VI above), the Respondent contended that the Tribunal should decline to exercise its jurisdiction, or at the minimum, order a stay (or suspension) of this arbitration pending the resolution of the CRCICA and ICC arbitrations.[1]

11.2   On 22 December 2015, the Tribunal issued Procedural Order No. 4, reserving, for the time being, its decision regarding the Respondent's request for a stay of this arbitration.

11.3   On 4 March 2016, the Tribunal issued Procedural Order No. 5 addressing the two procedural issues of bifurcation and the stay of this arbitration. On the Respondent's application for a stay, the Tribunal requested that "it continue to be informed on regular basis by the Parties of the progress made in the CRICCA [sic] and ICC arbitrations (insofar as it may be permissible for each of them to do so). For the time being, the Tribunal reserves its decision regarding the Respondent's stay application and makes no order for a stay of these arbitration proceedings."[2]

11.4   The Parties' respective positions on the stay are summarised below, taken from their written submissions. To a significant extent, at least as regards the ICC arbitration and the first CRCICA arbitration (896/2013), these submissions have only an historical value.

### (2) The Respondent's Case

11.5   In summary, the Respondent submits that this Treaty arbitration comes on top of four arbitration proceedings initiated by the Claimant before different *fora*, namely the ICC and CRCICA.[3] The Respondent submits that all these other arbitrations relate to a dispute that arose out of "EGAS's alleged failure to supply the Damietta Plant with

---

[1] Resp Obj Jur & Req for Bif, Paragraphs 9-13 and 78-96.
[2] PO5, Paragraph 3.11.
[3] ICC Arbitration No. 19392/MD/TO, CRCICA Arbitration No. 896/2013 and CRCICA Arbitration No. 899/2013; Resp Obj Jur & Req for Bif, Paragraph 9.

volumes of natural gas agreed under the Natural Gas Sale and Purchase Agreement."[4] The Respondent contends that this Tribunal "should decline to exercise jurisdiction or, at a minimum, stay [this arbitration] pending the resolution of the Contractual [*i.e.* the CRCICA and ICC] Arbitrations pursued and prioritized by Claimant."[5]

11.6   Referring to international tribunals' inherent power, discretion and pragmatic approach to decline jurisdiction or to stay proceedings when appropriate, the Respondent contends that such a power relies upon the principles of *lis pendens*, comity, collateral estoppel and *res judicata*. These principles ensure sound judicial administration, procedural efficiency and protection against abuses, conflicting decisions, double recovery and duplication of costs. According to the Respondent, this has been confirmed by several tribunals, as well as the International Law Associations' 2006 Recommendations on *Lis Pendens* and *Res Judicata* and Arbitration (the "ILA Recommendations").[6]

11.7   The Respondent submits that these concerns are further underscored by the ICC partial award of May 2016, which decided that SEGAS did not have any rights under the EGAS Tolling Agreement.[7]

11.8   In support of its submissions, the Respondent refers to the decisions of the arbitral tribunal constituted under Annex VII of the UNCLOS in *The Mox Plant Case* (2003) and also the ICSID tribunal in *SPP v. Egypt* (1985). There both tribunals stayed their proceedings pending another court's ruling in a matter related to their respective dispute.[8] The Respondent also refers to several investment treaty cases, in particular *SGS v. Philippines*, (2004), involving treaty and contract claims, where tribunals have

---

[4] Resp Obj Jur & Req for Bif, Paragraph 9.
[5] Resp Obj Jur & Req for Bif, Paragraph 12; Resp Rep Bif, Paragraph 73; Resp Rep Jur, Paragraph 110.
[6] Resp Obj Jur & Req for Bif, Paragraphs 78, 86-87 and 90;  Resp Rep Bif, Paragraphs, 68-71, Resp Rep Jur, Paragraph 108, citing *ILA Recommendations on Lis pendens and Res judicata and Arbitration*, Seventy-second International Law Association Conference on International Commercial Arbitration, Toronto, Canada, 4-8 June 2006, [RL-0050], Paragraphs 5-6; *Grynberg v. Grenada*, ICSID Case No. ARB/10/6, Award, 10 December 2010, [RL-0045], Paragraphs 7.1.2-7.1.3; *Apotex v. United States*, ICSID Case No. ARB(AF)12/1, Award, 25 August 2014, [RL-0047], Paragraphs 7.11 and 7.59; the Respondent further cites, among others, Professors Lowe and Shany who expressed statements to the same effect; Vaughan Lowe, *Overlapping Jurisdiction in International Law*, 20 Australian Year Book of International Law 191 (1999), [RL-0036], 202-203; and Yuval Shany, *Regulating Jurisdictional Relations Between National and International Courts* (Oxford University Press 2007), [RL-0040], 166.
[7] Resp Rep Jur, Paragraphs 101-104.
[8] Resp Obj Jur & Req for Bif, Paragraphs 81-82 citing *The Mox Plant Case*, Order No. 3, 24 June 2003, 42 ILM 1187 (2003), [RL-0041], Paragraphs 26-28; *SPP v. Egypt*, ICSID Case No. ARB/84/3, Decision on Preliminary Objections to Jurisdiction, 27 November 1985, 106 ILR 512 (1997), [RL-0042], Paragraph 87.

stayed the proceedings pending the resolution of the contractual claim by a different forum.[9]

11.9  The Respondent contends that the Claimant's common objective in the other arbitrations is to vindicate its contractual rights allegedly breached under the SPA, upon which its investment treaty claims before this Tribunal are predicated.[10] Accordingly, this Tribunal should decline jurisdiction or stay this arbitration. Otherwise, it would be "inappropriate or, at the very least, premature for the Tribunal to adjudicate Claimant's duplicative treaty claims."[11]

11.10  In addition, the Respondent reiterates that if the Tribunal does not decline jurisdiction, it should stay the proceedings pending the outcome of the contractual arbitrations because:

(i)  In the CRCICA and ICC arbitrations, the tribunals upheld jurisdiction and several rounds of submissions and hearings on jurisdiction and admissibility took place, respectively.[12] Hence, their outcome would assist this Tribunal in the determination of relevant factual and legal matters and would help avoid the duplication of costs and the risk of contradictory decisions;[13]

(ii)  A stay of this arbitration "would not materially prejudice" the Claimant.[14] It was the latter's choice to "prioritize the Contractual Arbitrations over the ICSID arbitration."[15] That was further confirmed by the Claimant's acknowledgement that this ICSID arbitration and the Contractual Arbitrations are inseparable and "inextricably linked";[16] and

(iii)  A stay of this arbitration is not barred by any other compelling reason given that the Claimant's contractual claims are granted due process in the Contractual

---

[9] Resp Obj Jur & Req for Bif, Paragraph 83, citing *SGS v. Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, 29 January 2004, [RL-0030], Paragraph 162; *see also Bureau Veritas v. Paraguay*, ICSID Case No. ARB/07/9, Further Decision on Objections, 9 October 2012, [RL-0043], Paragraph 290.

[10] Resp Obj Jur & Req for Bif, Paragraphs 84-92; Resp Rep Bif, Paragraph 72; Resp Rep Jur, Paragraph 109.

[11] Resp Obj Jur & Req for Bif, Paragraphs 91-92; Resp Rep Bif Paragraph 72.

[12] Resp Obj Jur & Req for Bif, Paragraph 92.

[13] Resp Obj Jur & Req for Bif, Paragraph 95, Resp Rep Bif, Paragraph 69; Resp Rep Jur, Paragraph 107.

[14] Resp Obj Jur & Req for Bif, Paragraph 93.

[15] Resp Obj Jur & Req for Bif, Paragraph 93.

[16] Resp Obj Jur & Req for Bif, Paragraph 93, referring to the Claimant's letter to the Tribunal of 23 September 2015, Page 3; *see also* Resp Rep Bif, Paragraph 69.

Arbitrations and the enforceability of these commercial awards under the New York Arbitration Convention of 1958.[17]

### (3) The Claimant's Case

11.11   In summary, the Claimant opposes the Respondent's application for the dismissal or the stay/suspension of this arbitration. It invites the Tribunal to reject the application because: (i) the doctrines of *res judicata* and collateral estoppel do not warrant the dismissal of the Claimant's claims or any stay of these arbitration proceedings; (ii) the Respondent's reliance upon the doctrine of *lis pendens* is inapposite; and (iii) judicial comity and procedural efficiency require that these arbitration proceedings continue without any stay.[18]

11.12   The Claimant submits that the Respondent's arguments are flawed because they are based on the Respondent's mischaracterization of the Claimant's claims.

11.13   The Claimant contends that its contractual and treaty claims have different natures with different factual backgrounds.[19] The Claimant submits that the Claimant is not a party to the ICC arbitration and that, in the current proceeding, "[the Claimant] is seeking to engage *Egypt's international responsibility* for violations of the Spain-Egypt BIT. By contrast, in the Contractual Arbitrations, [the Claimant] and SEGAS are seeking to engage EGAS' *contractual liability* for breaches of the SPA, as amended by the Heads of Agreements and the Transient Agreement, and of the SEGAS [and UFG] Tolling Agreement."[20]

11.14   The Claimant submits that the existence of certain overlapping facts between these contractual and treaty claims does not mean that they are identical or constitute the same dispute. Thus, the same facts could give rise to distinct claims before different *fora*.

11.15   The Claimant submits that this has been generally known as the distinction between "contract claims" and "treaty claims" and widely recognized by investment treaty

---

[17] Resp Obj Jur & Req for Bif, Paragraph 94.
[18] Cl Rej Bif, Paragraphs 72-89.
[19] Cl Obj Bif, Paragraphs 102-103; Cl Rej Bif, Paragraph 77; Cl Rej Jur, Paragraphs 195-198.
[20] Cl Obj Bif, Paragraphs 102-103 (emphasis in original); *see also* Cl Rej Bif, Paragraph 77; Cl Rej Jur, Paragraphs 195-198 and 206.

tribunals, *inter alia*, *SGS v. Pakistan* (2003) *Impregilo v. Pakistan* (2005) and *Toto v. Lebanon* (2009). The Claimant submits that these tribunals all refused to grant a stay of their proceedings.[21]

11.16   According to the Claimant, the Respondent's reliance on *SGS v. Philippines* is unavailing, not only because it is an isolated and widely criticised case, but also because the circumstances were different from the current proceedings. The tribunal there had to address a breach of the treaty's umbrella clause which made the outcome of the contractual claim relevant for the determination of the treaty claim.[22]

11.17   The Claimant dismisses the Respondent's argument that the ICC tribunal's partial award (deciding that SEGAS has no rights under the EGAS Tolling Contract) impacts the Claimant's claims in the present proceeding. It should not affect the Tribunal's jurisdiction since the Respondent failed to state any cogent reasons for its conclusion.[23]

11.18   The Claimant further contends that the Contractual Arbitrations will not have any material impact on this Tribunal's decisions. This Tribunal's jurisdiction should not be affected in the event that it decided that the Claimant's contractual and treaty claims have the same "fundamental basis" (which the Claimant restates that they do not).[24]

11.19   The Claimant contends that the doctrine of *res judicata* only applies when there is an earlier and final decision by a tribunal or a court. It contends that the doctrine of collateral estoppel only applies when a particular fact or legal matter has been decided by a prior action between the same disputing parties. In the present proceedings, no decisions, let alone final ones, have been yet been rendered in the Contractual Arbitrations.[25]

---

[21] Cl Obj Bif, Paragraph 104; Cl Rej Bif, Paragraphs 82-88; Cl Rej Jur, Paragraphs 209-210, citing *SGS v. Pakistan*, ICSID Case No. ARB/01/13, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003, [CL-0062], Paragraph 186; *Toto v. Lebanon*, ICSID Case No ARB/07/12, Decision on Jurisdiction, 11 September 2009, [CL-0150], Paragraph 220.
[22] Cl Rej Bif, Paragraph 84.
[23] Cl Rej Jur, Paragraphs 193-194 and 197-198.
[24] Cl Obj Bif, Paragraphs 107-109; Cl Rej Bif, Paragraphs 78 and 89.
[25] Cl Rej Bif, Paragraphs 74-75.

11.20 In addition, given that the Claimant's claims in these Commercial Arbitrations are "legally distinct" from the claims before this Tribunal, "it is therefore doubtful that an award in one of these cases could produce *res judicata* effect in the other case." [26]

11.21 The Claimant also contends that the Respondent's reliance on the *lis pendens* doctrine is inapposite. The "triple-identity test" applicable to *res judicata* should also be satisfied to warrant a stay based on *lis pendens*, which has been regularly recognized by international tribunals and scholars. [27]

11.22 The Claimant further refers to the ILA Recommendations which state that a tribunal's power to stay a proceeding should "be [] exercised very sparingly." It also refers to the ILA Final Report of 2009 which states that *lis pendens* does not apply to "supra-national tribunals." [28] Therefore, so the Claimant contends, this Tribunal should not "subordinate its authority to that of private arbitral tribunals for reasons of alleged *lis pendens* that the latter tribunals had already found inapposite." [29]

11.23 The Claimant further submits that the ILA Recommendations state that the stay should not materially prejudice the party opposing the stay. Contrary to the Respondent's argument, the Claimant contends that granting a stay of this arbitration would add further delay in the adjudication of its claims. This would materially prejudice the Claimant's "financial viability." [30] Also, if this Treaty arbitration were to be stayed, some of the Claimant's damages claims that are only raised before this Tribunal would remain unresolved. [31]

11.24 For these reasons, the Claimant contends that the Respondent's arguments based on *res judicata* and *lis pendens* do not apply to the present case and, thus, do not justify a stay of this arbitration. [32]

---

[26] Cl Rej Bif, Paragraphs 73-74.
[27] Cl Rej Bif, Paragraph 76, citing *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, [CL-0133], Paragraph 88; *EDF International v. Argentina*, ICSID Case No. ARB/03/23, Award, 11 June 2012, [CL-0158], Paragraph 1132; Bernardo M. Cremades and Ignacio Madalena, *Parallel Proceedings in International Arbitration*, 24(4) Arb. Int'l 507 (2008), [CL-0156], 509.
[28] Cl Rej Jur, Paragraph 201.
[29] Cl Rej Jur, Paragraph 201.
[30] Cl Rej Bif, Paragraphs 79 and 89; Cl Rej Jur, Paragraph 202.
[31] Cl Rej Bif, Paragraphs 79; Cl Rej Jur, Paragraphs 207-208.
[32] Cl Rej Bif, Paragraph 77; Cl Rej Jur, Paragraphs 199-200 and 209.

11.25   As to the risk of double recovery raised by the Respondent, the Claimant contends that the risk of double recovery does not suffice to justify the granting of a stay of these proceedings, given the numerous ways developed by tribunals to prevent such a risk.[33] Adding that it is not its intention to collect any double recovery, the Claimant states that in case such a risk were to occur, it would amend its claims for damages accordingly.[34]

11.26   The Claimant requests the Tribunal to dismiss the Respondent's application for the dismissal or stay of this arbitration as meritless; it does not afford procedural efficiency; and the Respondent has failed to show that there is any compelling reason that justifies granting any stay of this arbitration.[35] To the contrary, the Claimant contends that "[t]o grant a stay in application of these doctrines, one or more issues to be decided in the Commercial Arbitrations must be crucial to the adjudication of UFG's claims in this arbitration."[36] The Claimant therefore submits that the Respondent's request is an improper attempt to achieve further delay.[37]

11.27   For all the above-mentioned reasons, the Claimant requests that the Tribunal reject the Respondent's application for the dismissal or stay/suspension of this arbitration.[38]

### (4) The Tribunal's Analyses and Decision

11.28   The ICC arbitration and the first CRCICA arbitration (896/2013) are at an end. There is therefore no question now of any stay or suspension of this arbitration to await the end-result of these two arbitrations.

11.29   The second CRCICA arbitration (899/2013) is pending. Its proceedings, once stayed, have resumed following the final award of the first CRICICA arbitration last December 2017. The Tribunal is not aware of the likely timetable for the end-result of

---

[33] Cl Rej Bif, Paragraph 86; Cl Rej Jur, Paragraphs 203-204, citing *Camuzzi v. Argentina*, ICSID Case No. ARB/03/2, Decision on Objections to Jurisdiction, 11 May 2005, [CL-0162], Paragraph 91; *Lauder v. Czech Republic*, UNCITRAL, Final Award, 3 September 2001, [CL-0092], Paragraph 172; *See also Quasar de Valores v. Russia*, SCC, Award, 20 July 2012, [CL-0244], Paragraph 34; *BCB v. Belize*, PCA Case No. 2010-18/BCB-BZ, UNCITRAL, Award, 19 December 2014, [CL-0236], Paragraphs 190-191; *Hochtief v. Argentina*, ICSID Case No. ARB/07/31, Decision on Liability, 29 December 2014, [CL-0247], Paragraph 180; *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, [CL-0133], Paragraph 101.
[34] Cl Rej Jur, Paragraph 205.
[35] Cl Rej Bif, Paragraph 80.
[36] Cl Rej Bif, Paragraph 80.
[37] Cl Obj Bif, Paragraph 111; Cl Rej Bif, Paragraph 89; Cl Rej Jur, Paragraph 193.
[38] Cl Rej Bif, Paragraph 89.

this second CRICICA arbitration. Although hearings have been fixed for October and December 2018, that end-result may well be one or more years away.

11.30   In these circumstances, given also that the second CRCICA arbitration involves a different respondent (EGAS) from the Respondent in this arbitration, the Tribunal considers that it would be inappropriate to stay or suspend this arbitration to await a final award in the CRCICA arbitration. Although there are likely to be certain overlapping factual, expert and other issues between the arbitrations, any likely mischief would come from the risk of inconsistent decisions on similar issues and double-recovery of compensation by the Claimant.

11.31   As to the risk of inconsistent decisions, that is the inevitable consequence of the long-standing inability of consensual arbitration to address satisfactorily the problems of multi-party disputes. It is not cured by dismissals, stays or suspensions.

11.32   As to *res judicata*, the Tribunal considers that none of its decisions, orders or award can bind EGAS in the second CRCICA arbitration. There is insufficient privity between EGAS, the Claimant and the Respondent in these two separate arbitrations.

11.33   As to the risk of double-recovery by the Claimant in respect of the same losses claimed in this arbitration and the second CRCICA arbitration, the Tribunal has taken steps in this Award, in accordance with the Claimant's own stated unequivocal position, to ensure that this will not happen.

11.34   The Tribunal sees no cause to dismiss this arbitration, on account of the pending second CRCICA Arbitration.

11.35   Given the decisions in this Award, the Tribunal sees no risk of inconstancy or procedural difficulty arising from the pending HSBC Arbitration.

### (5) Summary of Decisions

11.36   Accordingly, the Tribunal decides not to dismiss, stay or suspend this arbitration pending the end-result of the second CRCICA arbitration, as requested by the Respondent. Nor the HSBC Arbitration. Its application is therefore dismissed, together with all other grounds invoked by the Respondent in support such application.

## PART XII: THE COSTS ISSUES

### (1) Introduction

12.1    Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings, the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

12.2    On the last day of the Hearing (11 March 2017), the Tribunal and the Parties discussed issues of costs. Having heard the Parties, the Tribunal directed the Parties to file their respective costs submissions simultaneously on 11 May 2017. [1] The Parties subsequently agreed to extend the deadline to 17 May 2017. They filed their respective costs submissions on that date.

12.3    The Parties agreed to forgo submitting arguments regarding the allocation of costs in their costs submissions and rely instead on their previous positions regarding costs, as pleaded in their respective claims for relief in their earlier submissions. The Parties similarly agreed to submit a table with their costs and fees, without supporting documentation.

### (2) The Claimant's Case

12.4    In its submissions, the Claimant contends that the Respondent should bear in full the total arbitration and legal costs incurred by Claimant. [2] In its costs submission of 17 May 2017, the Claimant submits that the fees and expenses incurred by UFG on an aggregated basis totalling US$ 12,407,199.71 are broken down in the table provided by the Claimant as follows:

---

[1] Tr. D6 1789.

[2] Cl Mem Merits, Paragraph 638(d) ("UFG respectfully requests that the Arbitral Tribunal: […] Order Egypt to pay all costs and expenses of this arbitration, including ICSID's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of UFG's legal representatives in respect of this arbitration, and any other costs of this arbitration […]."); *see also* Cl Rep Merits, Paragraph 473(d). UFG has asked for the same allocation of costs in the jurisdictional phase of this proceeding; Cl CM Jur, Paragraph 89(b) ("UFG respectfully requests that the Tribunal: […] Order Egypt to pay all costs and expenses of the jurisdictional phase of this arbitration, including the fees and expenses of UFG's legal representatives in respect of this phase and any other costs.").

| Entity | Fees | Expenses | Total amount (US$) |
|---|---|---|---|
| UFG | N/A | 120,239.07 | 120,239.07 |
| King & Spalding | 8,605,531.71 | 379,588.51 | 8,985,120.22 |
| Christopher John Goncalves | 1,336,096.67 | 79,981.24 | 1,416,077.91 |
| Gardner William Walkup, Jr. | 357,281.25 | 18,388.95 | 375,670.20 |
| Navigant Consulting, Inc. | 1,413,376.99 | 26,242.32 | 1,439,619.31 |
| Dr Kenneth Medlock | 70,473 | N/A | 70,473 |
| **Total** | 11,782,759.62 | 624,440.09 | 12,407,199.71 |

12.5   The Claimant submits that this amount does not include ICSID's administrative fees and the fees and expenses of the Tribunal.

12.6   The Claimant advances its claim on the basis of the Respondent's breaches of its obligations to the Claimant under the Treaty.[3] The Claimant contends that other ICSID Tribunals have awarded claimants their costs and fees on this basis where the claimants have prevailed on their claims.[4]

12.7   The Claimant further submits that while it seeks full recovery of its costs in the arbitration in general, it is also "compelled to give a particular emphasis to the costs relating to [the Respondent's] corruption and illegality allegations, which are completely baseless and which have been unjustly imposed on UFG."[5] The Claimant argues that the "inordinate resources – in time and money – spent on Egypt's spurious allegation of corruption and illegality", should weigh heavily in favour of full cost order against Egypt.[6]

12.8   In its costs submissions of 17 May 2017, the Claimant records that it has initiated three separate proceedings related to the Damietta Plant: two Cairo Regional Center proceedings, CRCICA Case 899/2013 and CRCICA Case 896/2013, and this arbitration. The Claimant's expert witnesses in this arbitration have also provided

---

[3] Cl Mem Merits, Paragraph 637.
[4] Cl Mem Merits, Paragraph 637; *Wena v. Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, [CL-0101], Paragraph 130; *ADC v. Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, [CL-0095], Paragraphs 525-529; *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, [CL-0013], Paragraph 630.
[5] Cl Rej Jur, Paragraph 128.
[6] Cl Rej Jur, Paragraph 128.

expert testimony in one or both of the CRCICA arbitrations. he Claimant submits that its Counsel and experts have used their best efforts to allocate fees and expenses to the appropriate arbitration. The Claimant  represents that in no instance has any fee or expense been double-counted.

12.9    In its same submission, the Claimant also submits that the fees and expenses comprising its legal costs were necessary for the proper conduct of this arbitration and that their amounts are reasonable and appropriate given this arbitration's complexities and the amount in dispute. The Claimant also submits that all of these fees and expenses have been invoiced to the Claimant; and that the Claimant has paid them all, with the exception of the invoices for the month of March 2017, which the Claimant was still processing at the time of its  costs submissions of 17 May 2017.

*(3) The Respondent's Case*

12.10   In its submissions, the Respondent requests the Tribunal to order the Claimant to pay all the costs of this arbitration, as well as the Respondent's legal costs and expenses in connection with this arbitration (including but not limited to its attorney's fees and expenses and the fees and expenses of its experts) on a full indemnity basis. The Respondent also claims interest on any costs awarded to it in an amount to be determined by the Tribunal.[7]

12.11   In its costs submissions of 17 May 2017, the Respondent provides line items and then a total of costs incurred by the Respondent, totalling €1,386,951.25; $159,959.13; £69,608.94 and EGP 666,345.40, broken down as follows:

A.  Attorneys' Fees and Expenses

1.  Cleary Gottlieb Steen & Hamilton LLP

For professional services rendered to the Arab Republic of Egypt with respect to the arbitration commenced by Unión Fenosa Gas, S.A. under the Spain-Egypt Bilateral Investment Treaty, including (i) review of background materials, (ii) legal research, (iii) review and analysis of Claimant's Memorial on the Merits, (iv) meetings with representatives of the Egyptian State Lawsuits Authority, (v) preparation of Respondent's Memorial on Objections to Jurisdiction and Request for Bifurcation,

---

[7] Resp Rej Merits, Paragraph 465(e); Resp CM Merits, Paragraph 389(e); Resp Obj Jur & Req for Bif, Paragraph 110(e); Resp Rep Jur, Paragraph 111(f).

analysis of Claimant's Objection to Respondent's Request for Bifurcation, and preparation of Respondent's Reply Memorial on Request for Bifurcation, (vi) meetings and communications with potential fact witnesses, (vii) meetings and communications with experts on the Egyptian economy, natural gas production and demand in  Egypt, natural gas demand in Spain, and damages issues,

(viii) preparation of Respondent's Counter-Memorial on the Merits, (ix) preparation of the parties' Redfern schedules, review of documents produced by Claimant, and production of Respondent's responsive documents and privilege log, (x) analysis of Claimant's Counter-Memorial on Jurisdiction, (xi) preparation and submission of Respondent's Reply on Jurisdiction and Admissibility, (xii) analysis of Claimant's Reply Memorial on the Merits, (xiii) further meetings and communications with fact witnesses and experts, (xiv) preparation and submission of Respondent's Rejoinder on the Merits, (xv) conferences and correspondence with the Tribunal, ICSID, and Claimant's counsel regarding procedure for the evidentiary hearing of March 6-11,  2017,

(xvi) organization of logistical issues for the hearing, (xvii) preparation of Respondent's fact witnesses and experts for cross-examination, preparation for cross-examination of Claimant's witnesses and experts, (xix) preparation of oral pleadings for the hearing, (xx) correspondence with Claimant's counsel and the Tribunal regarding Claimant's requests to submit new and confidential documents prior to the hearing, (xxi) participation in March 6-11, 2017 evidentiary hearing, (xxii) preparation of transcript errata.

Professional services  rendered

€900,000.00

Ancillary expenses (computer research, travel and accommodation, document services, translation & interpretation, telecommunications)

€197,603.59

Sub-Total

€1,097,603.59

B.  Experts' Fees and Expenses

1.  Dr. Mohsin Khan

Services provided in connection with meetings and consultation with Cleary Gottlieb Steen & Hamilton LLP, review and analysis of Claimant's submissions and expert reports of Berkley Research Group, preparation of expert report on the impact of the Global Financial Crisis and Egyptian Revolution on the Egyptian economy, preparation for testimony at the March 6-11, 2017 evidentiary hearing.

Sub-Total

$75,000.00

2. RPS Energy (Mr Ian Davison)

Services provided in connection with meetings and consultation with Cleary Gottlieb Steen & Hamilton LLP, review and analysis of Claimant's submissions and expert reports of Berkley Research Group, preparation of first and second expert report on natural gas production and demand in Egypt, preparation for testimony at the March 6-11, 2017 evidentiary hearing, participation and cross-examination at the hearing, and related expenses.

Professional services rendered

£60,750.00

Ancillary expenses

£8,858.94

Sub-Total

£69,608.94

3. Compass Lexecon (Mr Anton García)

Services provided in connection with meetings and consultation with Cleary Gottlieb Steen & Hamilton LLP, review and analysis of Claimant's submissions and expert reports of Navigant Consulting, preparation of expert report on natural gas demand in Spain, preparation for testimony at the March 6-11, 2017 evidentiary hearing, participation and cross-examination at the hearing, and related expenses.

Professional services rendered

$70,950.00

Ancillary expenses

$14,009.13

Sub-Total

$84,959.13

4.   BDO (Mr Gervase MacGregor)

Services provided in connection with meetings and consultation
with Cleary Gottlieb Steen & Hamilton LLP, review and analysis
of Claimant's submissions and damages reports of Navigant
Consulting, preparation of first and second expert reports on
damages issues, preparation for testimony at the March 6-11, 2017
evidentiary hearing, participation and cross-examination at the
hearing, and related expenses.

Professional services rendered

€260,000.00

Ancillary expenses

€29,347.66

Sub-Total

€289,347.66

C.   Other Expenses

Travel and accommodation expenses for representatives of the
Egyptian State Lawsuits Authority and Respondent's fact witnesses
at the arbitral hearing in Washington D.C.

Sub-Total

EGP666,345.40

Total Costs Incurred by the Respondent

€1,386,951.25

$159,959.13

£69,608.94

EGP666,345.40

12.12   In its cost submissions of 17 May 2017, the Respondent submits that these costs are
reasonable, considering the size and complexity of this arbitration.

12.13   The Respondent further notes that here is no specific agreement regarding the final
allocation of costs between the Parties in this arbitration, nor does the Treaty have any
provision relating to the apportionment of costs. The Respondent submits that in
the absence of such an agreement or guidance, in accordance with the ICSID

Convention and Arbitration Rules, the allocation of costs is left to the Tribunal's discretion.

### (4) The Tribunal's Analyses and Decisions

12.14   *Legal Costs:* In the absence of agreement between the Parties or any provision in the Treaty otherwise, the Tribunal has a broad discretion in regard to the allocation and assessment of the Parties' legal costs under Article 61(2) of the ICSID Convention. The Tribunal considers that the Claimant, as the successful party in this arbitration, should in principle recover its legal costs from the Respondent; and, conversely, that the Respondent, as the non-successful party in this arbitration, should in principle not recover its legal costs from the Claimant.

12.15   The Tribunal bases this decision on the 'loser pays' principle applied by the majority of ICSID tribunals to compensate a successful claimant for the expenses of bringing a meritorious claim against a respondent. Without such compensation, a successful claimant would be penalised for resorting to ICSID arbitration. In this case, the Tribunal can see no reason to depart from the general principle that a successful claimant should be reimbursed for its legal costs by an unsuccessful respondent. For the avoidance of doubt, the Tribunal confirms that its decision is not based upon any desire to punish the Respondent for procedural misconduct or for perversely defending a meritorious claim. To the contrary, the Tribunal considers that both the Respondent and the Claimant (together with their respective Counsel) conducted this complex arbitration in good faith, without any impropriety.

12.16   As to the assessment of the Claimant's legal costs, such costs must be reasonable in amount and also reasonably incurred by the Claimant. For a case of this complexity and size, both substantive and procedural, the Tribunal does not consider that the Claimant's claim for legal costs fails to meet these tests – but for one factor. There is a marked discrepancy between the total legal costs claimed by the Claimant and the total legal costs claimed by the Respondent. It is not fully explained on the materials before the Tribunal. The Tribunal recognises that an ICSID arbitration is often more expensive for a claimant (who bears the burden of proving its claim) than for a respondent and that there are sometimes special factors in costing a law firm's services to a respondent State.

12.17   Taking this factor partially into account, the Tribunal considers that US$ 10 million is a reasonable amount for legal costs reasonably incurred by the Claimant in this arbitration. Accordingly, the Tribunal decides that the Respondent shall reimburse the Claimant for its legal costs in the total amount of US$ 10 million.

12.18   *Arbitration Costs:* The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount (in US$) to:[8]

<blockquote>

Arbitrators' fees and expenses

| | |
|---|---|
| Mr Veeder: | US$ 156,865.41 |
| Mr Rowley: | US$ 128.055.09 |
| Mr Clodfelter: | US$ 184,076.64 |
| | |
| ICSID's administrative fees: | US$ 138,00.00 |
| Direct expenses (estimated):[9] | US$  83,083.05 |
| *Total:* | US$ 690,080.19 |

</blockquote>

12.19   These arbitration costs have been paid out of the advances totaling US$ 700,000.00 made by the Claimant to ICSID, following the Respondent's default on all requested advance payments to ICSID.[10]

12.20   In accordance with the same principle applied above to the allocation of legal costs, the Tribunal decides that the Respondent shall reimburse the Claimant for its arbitration costs in the total amount of its advances to ICSID, namely US$ 700,000.00. The Claimant, however, shall give credit to the Respondent for any reimbursement of its advances by ICSID, whether by way of set-off against any sums due under this Award or otherwise.

---

[8] The ICSID Secretariat shall provide to the Parties a detailed Financial Statement of the case account once all invoices are received and the account is final.
[9] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying).
[10] The remaining balance shall be reimbursed by ICSID to the Parties in the same proportion to the payments advanced by them to ICSID; *i.e.* in this case to the Claimant only.

*PART XIII: THE OPERATIVE PART*

13.1    **For the reasons set out above, the Tribunal decides and awards as follows (by a majority where marked thus "\*"):**

13.2    **Jurisdiction and Admissibility:\*** As a matter of jurisdiction, the Claimant is a protected investor with a protected investment under the Treaty and the ICSID Convention, sufficient to establish the jurisdiction of ICSID and also the competence of the Tribunal to decide on their merits in this arbitration the Claimant's claims against the Respondent pleaded under the Treaty.

13.3    As a matter of admissibility,\* the Tribunal decides that it may exercise such jurisdiction to decide on their merits the said claims pleaded by the Claimant in this arbitration.

13.4    As matters of jurisdiction\* and admissibility\*, the Tribunal decides to dismiss the Respondent's objections to the Tribunal's jurisdiction and the exercise of such jurisdiction to decide on their merits the Claimant's said claims.

13.5    **Corruption:\*** On the evidential materials placed before this Tribunal, there was no corruption against the Claimant (including UFACEX) proven by the Respondent.

13.6    **Necessity:** The Respondent did not prove the defence of necessity under customary international law, as expressed in Article 25 of the ILC Articles of Sate Responsibility.

13.7    **Merits:\*** The Respondent violated its obligations under the FET standard in Article 4(1) the Treaty, rendering it liable to the Claimant as regards its claims made by reference to Respondent's undertaking by its Ministry of Petroleum's letter dated 5 August 2000.

13.8    **Compensation:\*** In respect of its said liability under the FET standard in Article 4(1) of the Treaty, the total principal sum of compensation to be paid to the Claimant by the Respondent is US$ 2,013,071,000 (after tax, but before interest).

13.9   **Pre-Award Interest:** As to pre-award interest to be paid by the Respondent to the Claimant on the said principal sum, from 1 January 2016 to the date of this Award, the rate shall be Three-Month LIBOR + 2.0% compounded quarterly.

13.10  **Post-Award Interest:** As to post-award interest to be paid by the Respondent to the Claimant on the said principal sum, from the date of this Award until payment, the rate shall be Three-Month LIBOR + 2.0% compounded quarterly.

13.11  **Stay/Suspension:** There shall be no stay or suspension of this arbitration pending the end-result of the second CRCICA Arbitration (or any other arbitration); and the Respondent's application is dismissed.

13.12  **Legal and Arbitration Costs:\*** As to costs under Article 61(2) of the ICSID Convention, the Respondent shall pay to the Claimant its legal costs in the total amount of US$ 10 million; and as to arbitration costs the Respondent shall reimburse the Claimant in the sum of US$ 700,000 paid by the Claimant to ICSID (or such lesser sum as may be notified by the ICSID Secretariat to the Parties within 60 days of the date of this Award).

13.13  **Miscellaneous:\*** Save as hereinbefore expressly set out, all claims for relief made by each of the Parties are hereby dismissed.

_J. William Rowley_
_Arbitrator_

**Date:** 11 July 2018

_Mark A. Clodfelter_
_Arbitrator_

**Date: 31 August 2018**

**(subject to his dissenting opinion
under Article 48(4) of the ICSID
Convention)**

**V.V. Veeder**
_President of the Tribunal_

**Date: 31 August 2018**

**Dissenting Opinion of**
**Mark Clodfelter**

**in**

**Unión Fenosa Gas, S.A. and Arab Republic of Egypt**

**(ICSID Case No. ARB/14/4)**

1. This case presents many complex issues of fact and law and the Tribunal has devoted considerable attention to the relevant evidence and authorities. However, these efforts have led me to conclusions that are dramatically different from those of my distinguished co-arbitrators, on jurisdiction, liability and damages, and, accordingly, costs. Indeed, our respective conclusions are so different that I feel compelled to set forth my views on the most important differences in this dissenting opinion.

**Jurisdiction**

2. My principal disagreement[1] with the majority regarding jurisdiction concerns the overriding issue of whether or not the SPA was procured through corrupt means.

3. I fully concur with the majority's determination that such corruption, if proven, would, under the Treaty and as a matter of international public policy under international law, defeat jurisdiction over the claims, deny their admissibility, and render them unmeritorious.

4. I also agree that the Respondent bears the legal burden of proving corruption under a "balance of probabilities" test, whether by means of direct evidence or circumstantial evidence. And I also agree that Respondent failed to meet its burden with respect to its allegations of corruption in the award of the EPC Contract to Halliburton and in Mr. Hussein Salem's involvement with the SPA.

5. However, I believe that Respondent did meet its burden of proof with respect to Mr. Yehia El Komy's involvement with the project. The Respondent has demonstrated that there was a huge disproportion between, ███████████████████████████████ ████████████████ and, on the other hand, his apparent contribution to the project. This demonstration of a classic red flag[2] was sufficient to require a plausible and credible explanation from Claimant. But the explanations provided by Claimant were neither plausible nor credible and have been rejected even by the majority. As a result, the

---

[1] I do not agree that the majority's statement at para. 6.65 that Claimant is a "member of the Unión Fenosa association of Spanish companies" is relevant to the issue of whether or not Claimant is an "investor" within the meaning of Article 1(1) of the Treaty. I also do not agree with the statement at para. 6.68 that Claimant's investment should be treated "holistically" as "one overall investment made by the Claimant comprising the Damietta Project."

[2] V. Khvalei, Using Red Flags to Prevent Arbitration from Becoming a Safe Harbour for Contracts that Disguise Corruption, in SPECIAL ICC SUPPLEMENT: TACKLING CORRUPTION IN ARBITRATION (2013), page 22 [RL-0168]. To be sure, Respondent has also cited numerous other red flags that are unnecessary to address here. *See* Respondent's letter to the Tribunal dated 21 Dec. 2017, Annex 1, pages 4-5.

only inference that can be drawn is the one Claimant has sought to avoid, namely that Mr. El Komy's high compensation was for the purpose of exerting improper influence upon government officials in allowing the project and awarding the SPA.

6. UFACEX's arrangements with Mr. El Komy and his company, EATCO, envisaged enormous compensation, ██████████████████████████████████████████ ████████████████████████████████████████████████████████ Even more significantly, ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████[3] Whether ██████████████████████ in a US$ 1.4 billion project were just the normal compensation commensurate with the role of "local partner" depends upon what Mr. El Komy actually did and was expected to do in the way of contributing to the project.

7. As the majority points out, it does not appear that Mr. El Komy provided any funding net ████████████████████████████████████████████████████████████ ██████████████ His compensation as a local partner cannot be explained on the basis that he was a net source of capital.

8. As the majority also points out, Mr. El Komy does not appear to have brought any particular technical or other specialist expertise to the project. He had no personal expertise or experience in the LNG industry, no relevant background in the production and sale of natural gas, and his business experience in the petroleum industry generally was very limited and had only recently been acquired. Moreover, while Claimant asserts that Mr. El Komy was needed to help navigate the local permitting process and deal with national regulations relating to the project site, it offered no evidence that he had any particular ability or experience in this respect. Thus, none of these characteristics suggest a value to the project justifying such compensation.

9. The evidence of what Mr. El Komy and EATCO actually did on the project also falls short of demonstrating a contribution commensurate with the compensation he was given. The majority cites, at para. 7.88, the facts that "EATCO took part in the preparation of the Pre-Feasibility Study; it prepared studies on possible sites for the Plant; it was responsible for the proposal from Chiyoda and APCI for the EPC contract; it negotiated and signed the Damietta Port Agreement of 8 August 2000 between UFACEX and the Damietta Port Authority; it procured licences from the Damietta Port Authority for SEGAS's work in December 2000 and March 2001; and it participated in the handover from the Damietta Port Authority to SEGAS of the land plot and jetty in April 2001." In my view these assertions overreach the evidence and overstate the facts.

10. As evidence that Mr. El Komy assisted with a pre-feasibility study, Claimant cites the 9 March 2000 EATCO-UFG preliminary agreement, which states that "EATCO will support UFACEX in the development of a pre-Feasibility Study" with "Technical Works."[4] But no such works were introduced or even referred to in the evidence. Nor is there evidence that

---

[3] Cl. Rej. Jur., Paragraph 62 (footnotes omitted).

[4] Agreement between UFACEX and EATCO, 9 Mar. 2000, page 2 [C-0439].

EATCO prepared an "Analysis of the Sites," as was contemplated in that Agreement.[5] Indeed, Mr. El Komy seems to have played only a small role in the identification of a site; he attended only the last of a series of meeting with technical consultants engaged to advise on this and other technical questions[6] and Claimant seems to have struggled with how to involve him more.[7] Claimant's official, Mr. Fernández Martínez, testified that EATCO was only one of many other participants in the site survey;[8] its role did not even merit a mention in his written witness statements. In fact, the Damietta site was selected early on despite Mr. El Komy's preference for a different site, undermining the suggestion that his input was indispensable as alleged.

11. Similarly, Mr. El Komy's role in involving Chiyoda Corporation appears to have been merely as a go-between; in fact, another consultant already working with Claimant on the project, Mr. Omar El Komy (no relation, but who later joined EATCO), was the one who contacted Chiyoda and introduced both that company and APCI Company to Mr. Yehia El Komy.[9] The latter's other involvement appears to have been tangential at best.[10]

12. Moreover, there is no evidence whatsoever that Mr. El Komy negotiated agreements with the Damietta Port Authority. At most, the evidence cited by Claimant shows that he signed as a witness to Claimant's own signature to such agreements and co-signed the eventual license along with Claimant, both as owners on behalf of SEGAS which was then still in formation.[11] It is not even clear that Mr. El Komy was involved in the incorporation of SEGAS (a task which in any event could have been accomplished by any competent law firm), the only evidence being that he brought a photocopy of company registration papers with him to a meeting.[12] Other indications of Mr. El Komy's involvement are of even less importance. Indeed, while securing the SPA was his first identified duty,[13] Claimant denies that, after the initial meeting with the Petroleum Minister in January 2000, Mr. El Komy "participate[d] any further in the substantive negotiations that led to the SPA."[14]

---

[5] *Id.*

[6] Fax from A. Hernando to R. Villanueva (undated) [C-0445].

[7] Minutes of Meeting sent by Antonio Hernando to Elías Velasco et al., 14 June 2000 [C-0444].

[8] Tr. Day 2, page 620:18-22.

[9] Agreement between Omar El-Komy, Hamed El- Maatawy and Yehya El-Komy, 9 May 2000 [C-0438].

[10] Email from R. Villanueva, 17 July 2000 [C-0447]; Fax from R. Villanueva to Y. El-Komy (undated) [C-0467].

[11] Damietta Port Authority License, 16 Dec. 2000 [C-0328]; Agreement between UFACEX and the Damietta Port Authority, 8 Aug. 2000 [C-0448]; Agreement between SEGAS and the Damietta Port Authority, 18 Oct. 2000 [C-0449].

[12] Letter from G. Fernandez to J. Portero, 7 May 2001 [C-0452].

[13] UFACEX memo to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 Jan. 2000 [C-0344].

[14] Cl. CM Jur., Paragraph 20.

13. Thus, Claimant's efforts to chronical Mr. El Komy's "indispensable" role in implementing the project, something that should have been easy to demonstrate if true, are actually undermined by the weakness of the evidence it has provided.

14. Claimant's further explanation for Mr. El Komy's compensation, emphasized in its Rejoinder on Jurisdiction and Admissibility – that he had conceived of and originated the idea for the project, was the "first mover" and was the person who initially brought the project to Claimant[15] – is rightly rejected by the majority, since the evidence so clearly contradicts these assertions. Based on Claimant's own evidence as recounted by the majority, the project had been conceived by Claimant itself and had been developed on the Claimant's behalf by other consultants, who themselves later brought Mr. El Komy into the mix.

15. Even more mysteriously, Claimant also alleges that Mr. El Komy had "decided to establish an LNG facility in Egypt"[16] himself and agreed to the "relinquishment of equal control in the Project" in favor ▮▮▮▮▮▮▮, as if he and not the government enjoyed the authority to confer the rights to develop the LNG facility.[17] Claimant does not explain how Mr. El Komy's "decision" to build the facility himself (despite his obvious lack of credentials for doing so) gave him any measure of "control" to relinquish to begin with, much less how it affected the relative "bargaining power of the parties" that Claimant says is reflected in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮[18] This is especially glaring in light of Claimant's denial that Mr. El Komy exercised any special access to government authorities.

16. As noted earlier, I agree with the majority that Respondent bears the burden of proving corruption, and I agree that there has been no direct evidence of bribery or money passing hands from Mr. El Komy or his company to others. But what the evidence does prove is that there is a tremendous and unexplained discrepancy between Mr. El Komy's involvement in the project and the compensation he was awarded. This clear red flag is sufficient, not to shift to Claimant a burden of proving that there was no corruption, as worries the majority, but to require Claimant *to go forward* with, at very least, a plausible and credible explanation.

17. It is not for the Tribunal to supply such an explanation. This is why I cannot accept the majority's conclusion that Mr. El Komy acted as a lobbyist with *non*-corrupt access to and

---

[15] Cl. Rej. Jur., Paragraph 29 ("In reality, the payments to be received by EATCO pursuant to this contract were the result of negotiations between UFACEX and Mr. El-Komy regarding the commercial terms of their partnership. ▮▮▮▮▮▮▮ reflected each party's bargaining power at the time, and comport with the central role that Mr. El-Komy played *in conceiving* the Damietta LNG Project and *bringing this business opportunity to UFG's attention.*") (emphasis added); *Id.*, Paragraph 30 ("UFG need not belabor the obvious: a first mover who presents a potentially lucrative idea has leverage to capture a substantial amount of the economic gains.").

[16] *Id.*, Paragraph 34.

[17] *Id.*, Paragraph 49.

[18] *Id.*, Paragraph 29. Claimant's reliance upon a clause in the UFACEX-EATCO preliminary agreement under which both sides agreed for three years to pursue the project together, and not alone or with others, begs the question of what gave Mr. El Komy the leverage to command such exclusivity. *See id.*, Paragraph 40; Agreement between UFACEX and EATCO, 9 Mar. 2000 [C-0439].

influence over senior government officials. Not only is there no evidence of *non*-corrupt influence, this is not *Claimant's* explanation and indeed flies in the face of Claimant's own denials that Mr. El Komy exerted *any* influence on government officials at all.

18. Nor is this a matter of second guessing a commercial decision, but rather one of understanding the reasons for that decision in a situation where such understanding is required. As the majority notes, unanswered queries may have innocent explanations. But when the answers to queries that are actually proffered are not proven in circumstances where, if true, it should have been easy to do so, or worse, when the evidence affirmatively disproves them, I see no alternative but to infer that the true explanation is not an innocent one.[19]

19. For these reasons, I believe that we should conclude that corruption has been established by circumstantial evidence and that the claims should be dismissed.

**Liability**

20. I also disagree with the majority's conclusions with respect to the Respondent's liability for a breach of the fair and equitable treatment provision in Article 4.1 of the Treaty. This includes my disagreement with the standards accepted by the majority for establishing a violation of this provision, which I will not address in light of the Parties' mutual treatment of the factor of legitimate expectations in assessing a violation of this particular treaty. I do however agree with Respondent that, even accepting the role of legitimate expectations, the threshold is high.[20]

21. I agree with the majority's statement that "legitimate expectations depend on specific undertakings and representations," quoting the award in *Philip Morris v. Uruguay*.[21] However, I do wish to set out in some detail why I do not believe that either the 25 July 2000 Council of Ministers decision,[22] or the 5 August 2000 Ministry of Petroleum letter,[23] both of which are relied upon by the majority, provide the basis for any legitimate expectation that Egypt would forswear policies that either allegedly "over"-incentivized NG consumption or "under"-incentivized NG production. I also do not believe that those policies can be said to have caused the under-supply of gas to Claimant. Finally, I do not consider that Claimant has proven that EGAS's decision to deny gas to Claimant in favor of domestic demand was directed or instructed by the government of Egypt.

---

[19] This inference is not affected by the fact either that it was raised by Respondent only after arbitral proceedings were begun or that criminal investigations of Mr. El Komy in connection with the project were only begun years after the fact and are still ongoing.

[20] Resp. Rej. Merits, Paragraph 221.

[21] *Philip Morris v. Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, Paragraph 426 (emphasis omitted) [RL-151]. I also agree with the majority that, in the absence of such an undertaking, Claimant has not established any other violation of Articles 3(1), 4(1), 4(2) or 4(5) of the Treaty.

[22] Minutes of the 18th Meeting of the Council of Ministers of 25 July 2000 [C-0456].

[23] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa, Chairman (José Maria Amustategui), 5 Aug. 2000 [C-0169/C-0413].

22. It must be assumed that, at the time it pursued the project, UFACEX knew that it was a national policy priority to guarantee the supply of domestic demand for natural gas.[24] To overcome such a policy, a clear and specific undertaking by the government would have been necessary. But the government was unwilling to provide UFACEX with a guarantee of EGPC's supply obligations to assure that gas would be supplied even if it meant domestic demand was unmet. One of the goals of UFACEX's January 2000 meeting with Minister Fahmy was "identifying the support/guarantees that the Government of Egypt can provide to the Project."[25] But all they were able to obtain was Minister Fahmy's personal "support" and "commitment."[26] Indeed, the 17 May 2000 MOU between UFACEX and EPGC is express in stating that EGPC would be its own guarantor.[27] This is a repudiation of the notion that the government was ever willing to guarantee EGPC's SPA commitments.

23. Nonetheless, the majority accepts the proposition that the 25 July 2000 Council of Ministers decision[28] and the 5 August 2000 Ministry of Petroleum letter[29] together amount to a "specific undertaking" sufficient to support a legitimate expectation that the government would tailor its policies to assure adequate supply to Damietta. But I do not think that such a momentous undertaking can be inferred from these acts.

24. The chronology of events shows that, apart from evidencing approval of the project in general, the approvals given by the Ministry of Petroleum and the Council of Ministers related specifically to the SPA's prices for the volumes of gas to be sold, an issue which was always, and expressly, subject to government approval.

---

[24] *See, e.g.,* "Egypt – Integrated Gas Strategy; Exports Won't Exceed 25% of Output," APS Review Gas Market Trends , 17 January 2000 [BRG-31] ("The following are the six points of the Master Plan, approved in October 1999 by the new government of Dr. Atef Obeid which expressed clear support for proposals to export gas in liquid form and by pipeline as well as proposals to accelerate Egypt's shift from oil to gas for domestic energy and industrial feedstocks:

> 1. Gas exports should at no time exceed 25% of Egypt's total output capacity. *This means the domestic gas requirements of Egypt - a top priority of the current Egyptian regime under President Hosni Mubarak - will always be guaranteed.*") (emphasis added).

[25] UFACEX memo to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 Jan. 2000, page 1 [C-0344].

[26] *Id.*, page 2.

[27] Memorandum of Understanding Between EGPC and UFACEX [for the] Development Of A Natural Gas Liquefaction Facility, 17 May 2000, Appendix 1 [C-0168]:

> "*APPENDIX 1: TERM SHEET OF THE NATURAL GAS SALE AND PURCHASE AGREEMENT*
>
> *Seller: EGPC.*
>
> *Seller's Guarantor: The EGPC shall guarantee all and any obligations of Seller under the Natural Gas Sale and Purchase Agreement*."

[28] Minutes of the 18th Meeting of the Council of Ministers, 25 July 2000 [C-0456]

[29] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 Aug. 2000 [C-0169/C-0413].

25. All of the basic economic terms of the SPA *except price* (i.e., volume, take-or-pay percentage, performance stand-by letter of credit, start date) were already fixed in the 17 May 2000 MOU between UFACEX and EGPC; price was to be "finally agreed" in the SPA.[30]

26. Negotiations on the price and all other terms of the SPA were completed by 15 July 2000 when the SPA was signed in principle.[31] At that point, the SPA was subject to government approval only of "*the agreements that have been made **regarding the price of the gas**.*"[32]

27. On 20 July 2000, the EGPC Board approved a memorandum that described the agreed price and other basic economic terms of the SPA, and authorized action "*to conclude the contractual procedures as required.*"[33] But the Board was obviously concerned with the maximum price provisions, because its decision was marked up to note that a further meeting was to be held with UFACEX "*in order to increase the maximum price ceilings.*"[34] (As with all Board decisions, these conclusions were notified to and endorsed by Minister Fahmy, in accordance with EGPC's foundational statute.[35])

28. As had been understood, the "conclusion of the contract procedures" required government approval of the agreed prices. To this end, a memorandum was prepared by the Ministry of Petroleum for the Council of Ministers that, again, summarized the basic economic terms of the SPA, including the price terms as had been agreed on 15 July 2000, and requested approval for the conclusion of a contract "*according to the conditions and prices mentioned in the memorandum to be paid in dollars.*"[36] Based upon this memorandum, on 25 July 2000 the Council of Ministers gave its approval to the "signing [of] a memorandum of understanding with Unión Fenosa Company to develop a project for the liquefaction of natural gas for export to Spain."[37]

29. The majority considers at paras. 9.57 and 9.66 that the approvals of the government related to specific provisions of the SPA by which, among other things, EGPC warranted an adequate supply of gas to meet contract requirements (Sections 23.2 and 24. 3), agreed to

---

[30]   Memorandum of Understanding Between EGPC and UFACEX [for the] Development Of A Natural Gas Liquefaction Facility, 17 May 2000, Appendix 1 [C-0168].

[31] See Draft Memorandum Number 56, 2000 [C-0360].

[32] *Id.* (emphasis added).

[33] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000 (emphasis added) [C-0359].

[34] *Id.* (emphasis added).

[35] Law 20 of 1976 [C-0126] ("Article 11: The Chairman of the Board of Directors of the Corporation shall notify the Board's decisions to the Minister of Petroleum for consideration in adoption and he shall have the power to amend or abolish them, and has to take its decision about them and notify it to the Board within thirty days from the date of the arrival of the papers to him.").

[36] Memorandum to be submitted to the Cabinet on Contracting with the Spanish Company (Union Fenosa) for Exporting the Egyptian Natural Gas, July 2000, page 11 (emphasis added) [C-0458].

[37] Minutes of the 18th Meeting of the Council of Ministers of 25 July 2000, page 3 [C-0456].

limitations on the invocation of *force majeure* (Sections 15.2 and 15.3(b)) and, most importantly, committed "*to procure that the Egyptian authorities undertake not to interfere with the rights of Buyer under this Agreement, and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer under this Agreement, or affect the capacity of Buyer to perform its obligations under this Agreement, even in the case of a NG shortage in Egypt, save for Force Majeure situations as defined in this Agreement*" (Section 21.1). But the evidence indicates the government approvers were not even provided with the full terms agreed-upon, but rather only with summaries of key terms necessary to evaluate the adequacy of the price terms.

30. None of the particular terms cited is even described in the memorandum that went to the EGPC Board[38] which, on 20 July 2000, approved "the contents of the memorandum" and, on that basis, authorized the concluding of contract procedures.[39] These were the decisions "endorsed" by Minister Fahmy in his 24 July 2000 notation to the minutes.[40]

31. These provisions were also not described in the similar memorandum that went to the Council of Ministers on 25 July 2000, which requested approval for signing a contract "*according to the conditions and prices mentioned in the memorandum*";[41] the Council's actual decision was to approve signing a contract for "*a project for the liquefaction of natural gas....*"[42] Minister Fahmy's 27 July 2000 letter to the Prime Minister reported that the contract had been agreed "*according to the above mentioned* [prices] *and the main conditions which were stated in the memorandum submitted to the Cabinet.*"[43]

32. The 29 July 2000 Technical Department Memorandum describes the decisions of EGPC's Board of Directors and the Council of Ministers as approvals of "the project" and does not include any of these particular provisions in its summary of the "main characteristic[s]" of the SPA.[44]

33. In short, while these particular terms were clearly binding on EGPC, there does not appear to be any evidence that they were known to, much less approved by, the government officials involved. Their concern was for the prices to be charged at the volume promised.

34. Most importantly, I do not believe that there is any basis for concluding that the 5 August 2000 Ministry letter to UFG's Chairman constitutes in particular the undertaking of the Egyptian authorities "not to interfere with the rights of [the] Buyer" that EGPC was

---

[38] Draft Memorandum Number 56, 2000 [C-0360].

[39] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000 [C-0359].

[40] *Id.*

[41] Memorandum to be submitted to the Cabinet on Contracting with the Spanish Company (Union Fenosa) for Exporting the Egyptian Natural Gas, July 2000 (emphasis added) [C-0458].

[42] Minutes of the 18th Meeting of the Council of Ministers of 25 July 2000 (emphasis added) [C-0456].

[43] Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr. Atef Ebeid (Prime Minister), 27 July 2000 [C-0461].

[44] Memorandum from the Technical Affairs Office of the Ministry of Petroleum, 29 July 2000 [C-0459].

obligated to procure in SPA Section 21.1. The letter merely states, in full pertinent part, "On behalf of the Ministry of Petroleum I have the pleasure to inform you that the Egyptian Government official [*sic*] endorsed the natural gas Sales and Purchase Agreement signed on August 1st, 2000 between UFACEX and EGPC."[45] This single sentence simply cannot bear the weight assigned to it by the majority at para. 9.145 as the "the decisive tipping factor in establishing the Respondent's breach of Article 4(1) of the Treaty."

35. The letter makes no reference whatsoever to Section 21.1. It does not even use any of the terminology of Section 21.1. There is no contemporaneous evidence at all that it was intended or considered to implement Section 21.1.[46]

36. If Unión Fenosa had actually considered it as such, it would certainly have cited it in its letters to the Ministry seeking its help with regard to EGAS's performance of the SPA, especially after EGAS expressly noted in its 16 October 2005 letter to UFG that it considered its supply commitment to be subject to "*the priority given to local demand.*"[47] But, neither Section 21.1 nor the 5 August 2000 letter is ever mentioned in any of the communications of complaint by Claimant listed in para. 9.125 of the award.

37. The absence of such evidence is even odder in light of the contention that a government undertaking under Section 21.1 was a *sine qua non* to UFACEX's agreement to the SPA. If it was truly an "essential condition" of the transaction, Section 21.1 would have been drafted as a condition precedent, not as an obligation to be performed in the future. It is difficult to see how an investor could reasonably have understood such terms of the 5 August 2000 letter to constitute a specific assurance to make domestic demand a subsidiary priority, and to have based a major investment on such terms.

38. In the end, for this reason, I do not believe that such an undertaking by the government, while perhaps highly desirable, was an essential condition of UFACEX's investment.[48] In

---

[45] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 August 2000 [C-169].

[46] Nor do I consider that, as the majority maintains in para. 9.61, the Respondent was "associating itself" with Section 21.1 by means of the 5 August 2000 letter in the sense that it was somehow agreeing to effectuate EGPC's obligation to procure a government undertaking. As noted in para. 9.121 of the Award, the commentary to the ILC Articles explains that there is a difference between a State's "acknowledgment and adoption of the conduct in question as its own" and "cases of mere support or endorsement" by the State. *See* James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], Article 11.

[47] Letter from EGAS to UFG, 16 Oct. 2005 [R-364].

[48] It is notable that a government guarantee or non-interference undertaking was not among the "Main Principles" set forth in the 17 May 2000 MOU. *See id.*, Article 4 ("ARTICLE 4 MAIN PRINCIPLES OF THE NATURAL GAS SALE AND PURCHASE AGREEMENT - The Natural Gas Sale and Purchase Agreement shall be negotiated in good faith between the Parties and its content shall observe the basic terms and conditions set forth in Appendix 1 hereto") and Appendix 1. Nor were these mentioned in the MOU as one of the "Additional Commitments." *Id.*, Article 5 ("ARTICLE 5 ADDITIONAL COMMITMENTS BY EGPC IN CONNECTION WITH THE PROJECT - 5.1 EGPC is aware that the execution of the Natural Gas Sale and Purchase Agreement is a key element for the successful development of the Project. 5.2 EGPC agree to use its best efforts to assist in issuing all necessary permits, licences and authorizations for the development of the Project in accordance with

making the investment, UFACEX appears to have justified taking the risk of under-supply on the basis of considerations other than any specific assurance by the government, namely, EGPC's own promise to supply Damietta in preference to domestic demand and, most importantly, the then-current optimistic projections of future natural gas production in Egypt. This explains why there were no strenuous protests when a real Section 21.1 undertaking was not procured by EGPC.

39. This is supported by provisions of the SPA. Section 24.1, entitled "Mutual Representations," states that UFACEX, as well as EGPC, represented and warranted that "*(f) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions (including decisions regarding the suitability of this Agreement)* **based upon its own judgement** *and upon any advice from such advisors as it has deemed necessary* **and not upon any view expressed by the other Party**," "*(g) it understands the terms, conditions, and risks of this Agreement and is capable of assuming and* **willing to assume (financially and otherwise) those risks**," and "*(h) it is* **acting as principal**, *and not as agent, fiduciary, or any other capacity*." Section 25.9 would seem to describe the universe of persons/entities bound by the terms of the SPA: "*This Agreement shall be* **binding upon** *and shall inure to the benefit of* **the Parties hereto and their respective successors and permitted assigns**."[49]

40. The majority considers that the juxtaposition of timing and the terms of Article 21.1, on one hand, and the letter, on the other, excludes any objective interpretation other than that the letter was the separate, extra-contractual undertaking required under Section 21.1. But, in my view, there is a much simpler and likely interpretation.

41. As noted above, the EGPC Board's 20 July 2000 decision to approve the memorandum on the SPA noted that a further meeting was to be held with UFACEX "*in order to increase the maximum price ceilings*."[50] In fact, the day after the meeting of the Council of Ministers, on 26 July 2000, EGPC had such a meeting with UFACEX and the parties agreed to raise the maximum prices from $1.00/MMBTU to $1.25/MMBTU.[51] However, as Claimant states, "the executed version of the SPA contains a handwritten note from EGPC Chairman Mohammed Tawila that '**[t]***he price* **[of gas]** *is subject to final approval by the Egyptian Governmental authorities*.'"[52]

42. Thus, at signing, the single remaining pre-condition to, and the only additional approval required for, the full effectiveness of the SPA was approval of the final price. In this circumstance, it was clearly the function of the 5 August 2000 Ministry letter to give notice

---

Egyptian regulations and applicable laws. 5.3 EGPC represents and warrants to UFACEX that its surplus of natural gas will be sufficient to feed the Complex under the terms and conditions set forth in Appendix 1.").

[49] Natural Gas Sale and Purchase Agreement, 1 Aug. 2000 (emphasis added) [C-0002].

[50] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000 (emphasis added) [C-0359].

[51] Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr. Atef Ebeid (Prime Minister), 27 July 2000 [C-0461].

[52] Cl. Mem. Merits, Paragraph 127. *See also*, Natural Gas Sale and Purchase Agreement, 1 Aug. 2000, signature page [C-0002].

of the approval given for the new price terms. There has been no contention that such notice of this outstanding approval was accomplished by any other means.

43. Thus, I believe that both the 25 July 2000 Council of Ministers decision and the 5 August 2000 Ministry of Petroleum letter must be read as approving the project generally and approving, specifically, the price to be paid for the gas at agreed volumes, and nothing else.[53] I do not see a basis for concluding that they gave rise to any legitimate expectation that Egypt would forswear its natural gas consumption and production policies in order to guarantee EGAS's supply commitments.

44. In the majority's view, at para. 9.145, "the Respondent's conduct failed to meet its obligations under the FET standard in Article 4(1) of the Treaty, taking into account as a relevant factor the legitimate expectations generated by the Respondent's undertaking in the form of the Ministry of Petroleum's letter dated 5 August 2000, as described above." The majority finds that Respondent frustrated Claimant's legitimate expectations in two ways. First, it finds that the shortages in gas supply to Claimant beginning in 2010 were due to "long-standing policies of subsidising domestic users of gas and electricity," which it says began after execution of the SPA, "together with the failure to encourage the finding of gas deposits in Egypt" (paras. 9. 127 – 9.130). Second, it finds that, at some point before EGAS's 24 February 2103 notice of *force majeure*, the government had "*directed* EGAS to limit and eventually stop the supply of feed gas under the SPA to the Damietta Plant." I disagree with both of these conclusions.

45. First, as verified by Claimant's own expert,[54] domestic subsidies long predated the SPA and, indeed, domestic energy pricing had not previously increased since 1993.[55] More importantly, Egyptian gas production under the government's policies was obviously sufficient to meet the requirements of the SPA, given that the demands of the Damietta Plant[56] constituted only a fraction of total production. Short of holding that Respondent had given assurances to Claimant that it would guarantee enough production to supply *all* customers, there is no basis to say that these policies caused undersupply to Claimant. And this is aside from the immensity of holding a State's entire energy policy to constitute an FET violation.

46. Second, there is no direct evidence, and insufficient indirect evidence, that EGAS acted under the government's direction and control in curtailing supplies under the SPA.[57] Respondent

---

[53] This is not contradicted by the documents relating to the price increases in 2006, 2007 and 2008 (C-0320, C-0392, C-0460, C-0462, C-0463), which cite Minister Fahmy's involvement only in the final price negotiations of 26 July 2000.

[54] BRG ER1, Paragraph 32.

[55] Egyptian Environmental Affairs Agency, *The Arab Republic of Egypt: Initial Communication on Climate Change*, June 1999, page 27 [BRG-165].

[56] Equating Damietta Plant issues with Claimant's particular issues is misleading since Claimant only has rights to just under 60 % of Damietta tolling capacity, with EGAS itself enjoying the rights to the just-over 40% remaining. Cl. Mem. Merits, Paragraph 172.

[57] I do not consider the holding in the *Ampal v. Egypt* to support an opposite conclusion. Unlike the situation here, in *Ampal*, as the Award notes in para. 9.110, the Ministry of Petroleum acted as the principal in the transactions at issue by operation of a resolution of the Council of Ministers. *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 141.

denies any such direction or instruction and produced witness testimony to support that denial.[58] None of the public statements by officials cited by the majority supports the assertion that EGAS acted under instruction. The brief press report of Minister Kamal's 15 October 2012 statement that "Egypt has stopped exporting gas to Jordan and Spain" does not quote him, does not refer to any government decisions and correctly observes what was happening within Egypt as a collective.[59] Similarly, the equally brief press report paraphrasing Minister Ismail's 24 November 2013 statement in relationship to one of the arbitrations commenced by Claimant that "we should first cover local market's need from natural gas," also does not mention any government decision and at most speaks to the consonant policies of EGAS and the government.[60]

47. The other statements attributed to government officials during meetings are similarly deficient in their support of the majority's conclusion. The testimony of Mr. Egea Krauel that Minister Kamal's alleged undertaking to study the situation made him realize that Claimant was being singled out is a *non sequitur* and hardly proof of an instruction to EGAS. Indeed he does not even corroborate Mr. Sáez Ramírez's testimony that Minister Kamal had undertaken to "make a decision;"[61] Mr. Sáez Ramírez fails in any case to state what the subject matter of such a decision was to be. (The letter sent by UFG following this meeting makes no mention of either of these statements attributed to Minister Kamal.[62])

48. The claim that Minister Ismail stated in a 26 November 2103 meeting that "Egypt will in fact not comply with its obligations in the near future"[63] seems hard to credit and does not corroborate an instruction to EGAS. Moreover, that such a statement was made was vigorously denied in the reply by the Ministry.[64]

49. Thus, I do not believe that there was a violation of the Treaty's FET provision based upon either the assertion that government energy policies caused the under-supply or the assertion that EGAS acted to curtail supply under the direction and control of the government.[65]

---

[58] Hameed WS, Paragraph 25.

[59] "Petroleum Minister: Gas exports to Jordan, Spain halted," Egypt Independent [C-0286].

[60] "Petroleum minister: Butane distribution to be revised," Al Gomhouria (undated) [C-0280].

[61] Sáez Ramírez WS1, Paragraph 25.

[62] Letter from UFG (Jose María Egea Krauel and Cesare Cuniberto) to Minster of Petroleum (Osama Kamal), 21 September 2012 [C-0048].

[63] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 5 December 2013 [C-0085]. It is worth noting that, despite its reference to "Egypt's obligations," even this letter, sent shortly before the notice of dispute was served, makes no allusion whatsoever to either Article 21.1 of the SPA or to the Ministry's 5 August 2000 letter.

[64] Letter from Ministry of Petroleum (Sherif Sousa) to UFG (José María Egea Krauel and Cesare Cuniberto), 19 January 2014 [C-0086].

[65] For this reason, I also do not agree with the majority's conclusion in para. 9.147 that there was a technical FET violation resulting from the non-payment of tolling fees by EGAS to SEGAS under the EGAS Tolling Contract.

**Damages**

50. Regarding damages, I agree with the majority on the exclusion by operation of SPA Section 8.1[1] and other reasons of Claimant's claims for lost dividends from SEGAS and loss of profits on undelivered gas that was not replaced by UFG. I also agree, that as a result of our unanimous decision to dismiss Claimant's tax-free zone claim, we need not consider the related claim to damages. However, I dissent from the majority's ultimate conclusions with respect to other damages that would be claimable if Egypt's liability had been demonstrated.

51. The majority is of the view at paras. 9.84 and 9.126 that Claimant has been "almost ruined" by the non-supply of gas under the SPA. But I think that this significantly overstates Claimant's situation. Indeed, the Unión Fenosa Gas Group's 2014 annual report states only that "[t]he absence of Egyptian gas caused the Company's supply costs rise [*sic*], reducing profits compared with previous years."[66] The Group's Directors' Report for the financial year ending on 31 December 2015 states that "[t]he absence of Egyptian gas, along with the effects derived from the fall in the global energy scenario, has caused a notable reduction in profits compared with previous years."[67] Thus, far from being an issue of Claimant's survival, the Egyptian non-supply is a matter only of reduced profits.

52. Similarly, I find Claimant's presentation on quantification of damages to be greatly overstated.

53. First, while the majority prefers the approach of the Claimant's experts, that approach, even in its third alternative, suffers from a number of deficiencies that make it excessively speculative. This is primarily because, rather than producing many of the underlying transactional documents or even verifying them, it has relied upon print-outs from Claimant's own internal databases. This is particularly true with respect to documentation of individual transactions on which Claimant may have suffered any actual loss;[68] there is no ability for Respondent to contest whether Claimant allocated Claimant's most expensive replacement gas to replace the Egyptian gas to maximize the claim.[69]

54. Claimant's experts argue that, because they are the product of a large company accounting system, it has no reason to doubt the accuracy of the data,[70] and that it would have been too

---

[66] 2014 Annual Report of Unión Fenosa Gas Group, page 190 [R-0345].

[67] Directors' Report For The Financial Year Ended 31 December 2015, page 1 [NAV-185, page 1 following the Consolidated Annual Accounts.] The report also states that, while "[a]lso in 2015, the toller EGAS has maintained its suspended payment of the amounts due to SEGAS, putting *the subsidiary* in a critical situation with respect to its financial backers and suppliers, although *all its financial obligations have been correctly settled*." *Id.*, page 3 (emphasis added). *See also* the testimony of Claimant's expert that "over the entire period, from 2006 to 2015, UFG generally made profits at a portfolio level." Tr. Day 5, page 1446:15-16.

[68] Tr. Day 6, page 1600:1-3.

[69] BDO ER2, Paragraph 10.66.

[70] Navigant ER2, Paragraphs 10-12.

13

"burdensome" to produce many of the documents themselves.[71] But, notwithstanding the fact that Claimant's accounts are audited for purposes of financial reporting, data produced for litigation is not subject to audit for the purpose. Moreover, while "burdensomeness" may well be a ground for objecting to discovery requests, it is the not a ground for failing actually to prove damages suffered. In the context of a US$ 4 billion claim, producing such documents, or at least a forensic audit of such data, for review by a respondent is not only reasonable, but necessary.

55. Second, the Tribunal finds that SPA Section's 8.1[2]'s 90%-of-price limitation does not affect damages because the Claimant's experts calculated the limitation's threshold to be higher than the nominal amounts claimed for extra costs for delivered gas and costs of replacing undelivered gas. But at the hearing, Respondent's expert submitted, without objection, a calculation based, not on monthly totals as used by Claimant's expert, but on transaction-by-transaction totals (using Claimant's data), concluding that the resulting limitation was US$ 567 million below the nominal amounts claimed.[72] I am persuaded that such a basis more accurately tracks the actual costs suffered due to gas not delivered within the meaning of SPA Section 8.1[2] and thus that the SPA provision limits the amount claimable to US$ 1.853 billion.

56. Third, I disagree with the majority that further efforts to mitigate damages could not reasonably be required of Claimant. Respondent has provided sufficient evidence through its experts to show that Claimant had plentiful opportunities beyond those identified by Claimant's financial executive Mr. Conti[73] to reduce its delivery obligations that would have allowed it to avoid substantial portions of its replacement costs. These include renegotiating existing contracts in the favorable environment of declining gas demand in Spain, declining to enter into new short-term contracts and invoking *force majeure* on existing contracts. Without the benefit of contract terms known only to Claimant, Respondent's expert testified that short-term industrial contracts alone could have accounted for as much as US$ 841 million of Claimant's claimed losses.[74] While these changes would have necessitated further alterations to Claimant's business model, the temporary curtailment of particular lines of business does not imply that Claimant would thereby have had to close substantially or completely its multi-line business.[75]

57. Nor could invoking *force majeure* on its downstream contracts earlier than it did on 14 December 2014[76] be considered as unreasonable requirement. As early 20 March 2013, half

---

[71] Navigant Hearing Presentation, page 25.

[72] Tr. Day 2, pages 1577:22 – 1582:5.

[73] Conti WS, Paragraph 17.

[74] BDO ER2, Paragraph 9.10.

[75] I also do not consider relevant that the fact that mitigation is required at all is due to Respondent's treaty breach; by definition, the question of mitigation never arises at all unless there has been some breach.

[76] Cl. Rep. Merits, Paragraph 457. *See also* Notice of Force Majeure from UFG to UFGC, 12 Dec. 2014 [C-0431]; Notice of Force Majeure from UFGC to GNF subsidiary one 12 Dec. 2014 [C-0432]; Notice of Force Majeure from UFGC to GNF subsidiary two 12 Dec. 2014 [C-0433]; Notice of Force Majeure from UFGC to GNF subsidiary three 12 Dec. 2014 [C-0434].

of Claimant's Board of Directors and its CEO argued for taking just such a step.[77] The fact that the other half of the Board squelched this idea cannot render it unreasonable, and any costs incurred subsequent to that date should be considered as a business decision purely to Claimant's account.

58. The area in which further mitigation by Claimant could have had its greatest impact would have been in the diversion of all of the LNG it had under contract from Oman to downstream customers. While Claimant made the point that it is not claiming for any costs of replacing Omani LNG, it never denied that diverting the 2.2 bcma available from Oman would have substantially reduced the need to purchase higher priced gas to replace Damietta LNG. While this would have eliminated the profits that Claimant would otherwise have gained from the sale of the Omani LNG on the Asian spot market, such lost profits would not have been claimable here under the Tribunal's decision. By the uncontested calculation by Respondent's expert, this would have reduced this head of damages to at most US$ 241 million.

**Costs**

59. Finally, as a result of my differences with the majority on the above issues, I also disagree that costs should be awarded to the Claimant.

<strong>Dissent</strong>

60. For all of the above reasons, I respectfully dissent to the award as set forth, including the dispositions in Operative Part XIII as indicated therein.

Mark Clodfelter<br>
Arbitrator<br>
Date: 31 August 2018

---

[77] Minutes of the Meeting of the Board of Directors of the Company Unión Fenosa, S.A., Mar. 20, 2013 [R-0353].