Exhibit D

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

**In the matter of**

**UNIÓN FENOSA GAS, S.A.**

**Claimant**

**v.**

**THE ARAB REPUBLIC OF EGYPT**

**Respondent**

---

**Request for Arbitration**

---

February 14, 2014

**King &Spalding LLP**
R. Doak Bishop
Isabel Fernandez de la Cuesta
Louis-Alexis Bret

**King & Spalding International LLP**
James E. Castello

**On behalf of Unión Fenosa Gas, S.A.**

## CLAIMANT'S REQUEST FOR ARBITRATION

1.      Pursuant to both Article 11 of the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt (the "BIT")[1] and Article 36 of the Convention on Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention"), Claimant Unión Fenosa Gas, S.A. ("UFG") hereby requests that the Secretary-General of the International Centre for Settlement of Investment Disputes ("ICSID") institute an arbitration proceeding against Respondent, the Arab Republic of Egypt ("Egypt" or "the Government").

### SUMMARY OF THE DISPUTE

2.      A legal dispute currently exists between UFG, a company organized and existing under the laws of Spain, and Egypt with respect to UFG's investments in Egypt, including the Damietta natural gas liquefaction plant located in northeast Egypt (the "Damietta Plant" or the "Plant"), and associated legal and contractual rights.  Egypt has failed, through its acts and omissions and through the acts and omissions of its State instrumentalities and organs for which it bears responsibility, to afford UFG's investment in Egypt the protections guaranteed in the BIT.

3.      UFG's    business    concerns    the    liquefaction,    shipping,    regasification,    and commercialization of natural gas.  UFG directly and indirectly owns and controls significant investments in the gas industry in Egypt, relating to the Damietta Plant.  UFG's investments in Egypt have suffered, and continue to suffer significant harm as a result of the Government's decision to cut the supply of natural gas to UFG and the Damietta Plant, which resulted in the Plant's shut-down for lack of the necessary gas supply.

---

[1] **Exhibit C-1**, Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, signed November 3, 1992 (the "BIT").

4.     UFG's predecessor-in-interest, Unión Fenosa Desarrollo y Acción Exterior, S.A. ("UFACEX"), first invested in the Egyptian gas sector when it entered into a Natural Gas Sale and Purchase Agreement dated August 1, 2000 (the "SPA") with the Egyptian General Petroleum Corporation ("EGPC").  EGPC subsequently assigned its rights and responsibilities under the SPA to the Egyptian Natural Gas Holding Company ("EGAS").[2]  Under the SPA as amended in June 2003, UFG has the right to receive from EGAS a certain supply of natural gas at the Damietta Plant over a period of at least 25 years.  UFG invested an amount in excess of US$ 1.2 billion to build the Damietta Plant and the associated facilities in Egypt.  The Plant is an integrated single-train facility for the production of liquefied natural gas ("LNG") located in the Damietta Port Private Free Zone about 60 kilometers west of Port Said and the Suez Canal.  UFG then established the Spanish Egyptian Gas Company ("SEGAS"), a majority-owned subsidiary, to develop and operate the Plant under a concession from the relevant Egyptian governmental authorities.  At the time of its construction, the Damietta Plant comprised the largest natural gas liquefaction train operating in the world.

5.     Under the SPA, EGAS commits to supplying up to the maximum amount of natural gas needed for the nominal capacity of the Plant, which resulted in a gas quantity of 7.56 billion cubic meters per annum ("bcma").  The economics of the entire underlying project, including, but not limited to, the Damietta Plant itself, rests on UFG and the Damietta Plant's receiving the contractually-agreed quantities of natural gas to feed up to the nominal capacity of the Plant.  Recognizing that only they could supply this natural gas, EGAS, EGPC, and the Government repeatedly represented and warranted to UFG that they would furnish an adequate supply of natural gas to UFG and to the Plant, even in the case of natural gas shortages in Egypt.  The

---

[2] **Exhibit C-2**, Natural Gas Sale and Purchase Agreement dated August 1, 2000 The parties have subsequently amended the SPA in several occasions.

current contractual framework (including the Tolling Agreement signed between SEGAS and EGAS on June 30, 2003) reserves up to 41.8% (3.16 bcma out of 7.56 bcma) of the Plant's production capacity for EGAS, which sells the LNG produced on international markets.[3]

6.      Egypt created EGPC by law in 1976 as an organ of the government to regulate and manage the Egyptian hydrocarbons sector.  EGAS, which is wholly owned by EGPC, was created by Decree of the Egyptian Minister of Petroleum in August 2001 to regulate, organize, and handle Egypt's natural gas resources.  The Government created its national companies EGAS and EGPC to allow it to exercise control over the hydrocarbons and energy sectors in Egypt.  It continues to use these tools and their affiliates to exercise governmental authority and to dominate all aspects of natural gas exploration, development, production, liquefaction and sale in the country.

7.      Since the Plant's entry into service in December 2004, Egypt, through EGAS and EGPC, has never fully complied with its supply obligations.  From that date until 2012, EGAS' annual gas supply to UFG has ranged between 85% and 50% of the contractually-agreed supply. After 2012, the situation rapidly and dramatically deteriorated, with EGAS restricting and then essentially halting all gas supply to UFG and the Plant.  This intolerable situation resulted from the Government's decision to block delivery of contractually-agreed gas supply to UFG and SEGAS while diverting it to other purchasers, most notably to the domestic electricity generation sector.  As a result of these actions, UFG has only been able to lift one full cargo of LNG from the Plant since July 2012 instead of the 69 cargoes originally planned and agreed for this period. Indeed, since December 2012, no LNG has been lifted from the Plant, which has remained idle.

---

[3] **Exhibit C-3**, Tolling Agreement signed between SEGAS and EGAS dated June 30, 2003.

8.      The Government's disregard for UFG's investment has become even more manifest in recent months.  In an effort to solve this dispute, in late October 2013, UFG and EGAS—with Egypt's approval—entered into a settlement (known as the "UFG Transient Agreement"), in an attempt to resolve their differences relating to EGAS' failure to supply gas to UFG. Because the Transient Agreement postponed some of EGAS' delivery obligations to later dates, it required EGAS to deliver only gas sufficient to produce two LNG cargoes during the last two months of 2013.  Astonishingly, however, EGAS breached the settlement agreement a mere two weeks after its entry into force and, a few days thereafter, both the Ministry of Petroleum and EGAS' chairman told UFG that EGAS, as directed by the Ministry of Petroleum, would not comply with the Transient Agreement. As a result, the Transient Agreement has now been terminated and the Damietta Plant continues to sit idle today.

9.      Egypt, through its own actions and omissions and by the acts and omissions of EGAS, EGPC, and their affiliates, has breached its substantive obligations under the BIT including, *inter alia*: (i) the obligation to grant fair and equitable treatment to UFG's investments; (ii) the obligation not to hamper by means of unjustified or discriminatory measures the management, maintenance, use, enjoyment, expansion or disposal of UFG's investment; (iii) the obligation to protect UFG's investment; (iv) the obligation to provide UFG's investment with treatment not less favorable than that accorded to investments made by its own nationals or investors of a third country; and (v) the prohibition on expropriation without full compensation.

## PARTIES TO THE DISPUTE

10.     Claimant UFG is a company duly incorporated under the laws of the Kingdom of Spain and is headquartered at:

> Unión Fenosa Gas
>
> Parque empresarial Alvento
>
> Vía de los Poblados, 1
>
> 28033 Madrid, Spain

11.     Claimant should be contacted through the undersigned counsel, who are fully authorized to represent it in this arbitration.[4]

12.     Respondent is the Arab Republic of Egypt, a sovereign state and a Party to the BIT.  To Claimant's knowledge, Egypt has not yet appointed counsel in these proceedings.  For purposes of this dispute, Egypt is represented by the Egyptian State Lawsuits Authority, which is located at the following address:

> The Egyptian State Lawsuits Authority
>
> 10th Floor, Mogamma Building
>
> Tahrir Square
>
> Cairo, Egypt

### NATURE OF THE DISPUTE AND UFG'S CLAIM

#### UFG's Investment in Egypt

13.     Incorporated in 1998 in Spain, UFG was originally founded as a gas subsidiary of the Spanish electricity utility Unión Fenosa.  UFG's investments in Egypt date from 2000 when, after a period of preliminary negotiations, UFACEX concluded the SPA with EGPC (EGAS' contractual predecessor-in-interest) on August 1, 2000.  Under the SPA, UFACEX agreed to make a substantial long-term investment for the implementation and development of the Damietta Plant.

---

[4] *See* Power of Attorney, December 25, 2013.

14.     Construction of the Damietta Plant began in September 2001, and the complex came on-stream in early December 2004.   The first LNG cargo was loaded in January 2005.   In constructing the Plant, UFG invested an amount in excess of US$ 1.2 billion, providing work for more than 40 qualified Egyptian contractors and approximately 7,000 Egyptian skilled workers. When the Damietta Plant became operational, it comprised the largest LNG train in the world and the first LNG plant in Egypt, allowing Egypt to monetize its considerable natural gas resources by accessing international LNG markets.

15.     UFG's investments in Egypt include at least the following:

a.      UFG holds 80% of the outstanding stock of its subsidiary, SEGAS, a company incorporated under the laws of Egypt as an Egyptian joint stock company (S.A.E.).   SEGAS obtained a license and concession from the Damietta Port Authority issued by Prime Minister's Decree No. 335 on March 17, 2001, ratified by the Cabinet on the same date, which allowed it to build, operate, and transfer a specialized LNG jetty in the Damietta Port, and to build, own, and operate the LNG complex called the Damietta Plant.

b.      Under the SPA as originally negotiated and signed, UFG had the right to receive from EGAS supply of natural gas at the Damietta Plant of approximately 4.0 bcma of natural gas per year over a period of at least 25 years.   The Parties subsequently stated their mutual understanding on the natural gas quantities to be delivered annually by EGAS by virtue of, among others, the Framework Agreement of June 30, 2003, which requires delivery to UFG of 4.4 bcma from the 5th Contract Year onwards.

7

c.      UFG is a party to the Coordination, Operating and Measurement Agreement executed by UFG and EGAS on March 31, 2004 (the "COMAS"), which specifies the conditions of the gas supply to UFG at the Damietta Plant under the SPA.

d.      UFG is a party to the Tolling Contract with SEGAS dated June 30, 2003, through which UFG has contracted the utilization of 58.2% of the Plant's liquefaction capacity for a period of 20 years, in exchange for UFG's payment of a tolling fee.[5]   UFG is also a party to the Coordination Agreement entered into by SEGAS, UFG, and EGAS on March 31, 2004 (the "COMAT"), which regulates the conditions of the feed gas supply to the Damietta Plant and the lifting of LNG by the Parties in accordance with the respective Tolling Agreements signed by SEGAS with EGAS and with UFG.   UFG is also a party to the Participation Agreement executed by EGPC, EGAS, and UFG on June 30, 2003 (the "Participation Agreement").

e.      Finally, UFG is also a party to various amendments with EGAS and EGPC concerning certain aspects of the relationship established by the foregoing contracts.

These contractual and other interests, as well as tangible and intangible property, including movable and immovable property and property rights, contractual and legal rights, capital, stock, debt, or any other kind of asset, or other investments as defined in Article 1(2) of the BIT, directly and indirectly owned by UFG, constitute protected investments under the BIT.

---

[5] EGAS is a party to another Tolling Contract with SEGAS dated June 30, 2003, through which EGAS has contracted for utilization of the remaining part of the Plant's liquefaction capacity (41.8%) for a period of 20 years, in exchange for its payment of a tolling fee.

**Background of the Dispute**

16.     This investment dispute arises out of Egypt's and EGPC's preventing delivery by EGAS of contractually-mandated quantities of natural gas to UFG and the Damietta Plant under the SPA and related agreements, and otherwise interfering with UFG's investment in Egypt, including with UFG's affiliate SEGAS, as explained below.

17.     EGAS, EGPC and their affiliates are State organs, exercise governmental authority in their actions with respect to UFG and its investment and, in any event, act under the instruction, direction, or control of the Egyptian Government.  In particular, the Government has required, directly or indirectly through EGAS' subsidiary, the Egyptian Natural Gas Company ("GASCO", the Egyptian midstream gas distribution company, which operates the Egyptian national gas grid) or otherwise, that natural gas supplies cease to be delivered to UFG and, in certain circumstances, be diverted to consumers other than UFG.  The Government's decision to prevent delivery of UFG's contractually-agreed gas supply and allocate it to other purchasers has placed EGAS, EGPC, and Egypt, respectively, in breach of the relevant contracts and the BIT.

18.     Egypt has not subjected other commercial and industrial companies to the same kind of natural gas restrictions as those suffered by UFG and the Damietta Plant.  To the contrary, at the same time that EGAS critically reduced and then halted its gas deliveries to the Damietta Plant, it has continued to supply natural gas to other foreign companies as well as the domestic market (the latter at artificially depressed prices), in some cases in increasing amounts.  In particular, available market data confirms that EGAS has continued to supply substantial amounts of gas to the domestic market and even to other export projects such as Egyptian LNG's Idku plant, a large LNG production facility jointly owned and operated by EGPC, EGAS, Petronas, British

Gas and GDF Suez, which is located less than 100 miles from Damietta. EGAS has also continued to supply gas to various commercial and industrial users in Egypt.

19.     Egypt's actions and omissions have caused UFG effectively to lose the value of its investment and the Damietta Plant—which cannot operate without a minimum gas supply and is, therefore, standing idle—and have deprived UFG of revenues derived from or connected with the Damietta Plant and the SPA, and have also imposed serious extra costs. The economic losses to UFG in all aspects of its investment include, but are not limited to: (i) higher operation and maintenance costs of the Damietta plant due to its failure to operate at capacity (or at all), and thus higher unit costs; (ii) stranded costs arising from the under-utilization of UFG's LNG vessels as a result to the under-utilization and idling of the Damietta LNG Plant; (iii) direct extra costs associated with securing alternate supply for UFG to meet its obligations to downstream customers; (iv) lost profits; and (v) capital investment costs, including but not limited to, the risk of an inability to meet payment obligations to lenders.

20.     UFG's investment in the Damietta Plant was made in accordance with, and in reliance upon, the benefits granted by the Egyptian private free zones regulations issued under the Investment Guaranties and Incentives Law (Law No. 8) of 1997, as demonstrated on the face of the Damietta Port Authority's license to SEGAS. The applicable laws and regulations provided legal rights and legitimate expectations to UFG. On May 5, 2008, however, Egypt enacted Law No. 114, which amended the Investment Guaranties and Incentives Law and abrogated tax benefits under the private free zones regulations. This unexpected change of SEGAS' fiscal regime has had a significant impact on UFG's investment in Egypt, and in part gives rise to this investment dispute.

21.     In addition, EGAS has failed to pay the tolling fees owed to SEGAS for 2012. The Tolling Contract between EGAS and SEGAS grants EGAS 41.8% of the Plant's liquefaction capacity in exchange for a fee.  EGAS was obliged to pay a percentage of this fee on a toll-or-pay basis even in the absence of gas delivery.  In other words, even if EGAS does not supply to SEGAS the contractually-agreed quantity of natural gas through the Damietta Plant for liquefaction, EGAS is still obliged to safeguard the financial sustainability of SEGAS by paying a percentage of that fee in all cases.  EGAS' unjustified failure to supply such gas, coupled with its failure to pay the tolling fee, has left SEGAS unable to meet its operating costs and to repay its lenders without UFG's making addition payments (as it did during 2013) in order to cover SEGAS' cash needs.

22.     Since UFG tendered a written notice of dispute under the BIT to the Government on January 29, 2013,[6] Egypt and EGAS misleadingly drew UFG into prolonged negotiations to restore gas supply to the Damietta Plant and secure the payment of the tolling fees EGAS owed to SEGAS.   These negotiations culminated with the signature, in late October, 2013, of a Transient Agreement between UFG and EGAS. It is now abundantly clear that Egypt and EGAS have not complied and will not comply with the—significantly restructured—commitments agreed upon during these negotiations. Because of the desperate financial situation in which EGAS' years of contractual abuse have left SEGAS, UFG had no other choice but to participate in these negotiations.  Alas, within weeks of the parties' adoption of their Transient Agreement on October 29, 2013, the Ministry of Petroleum and EGAS informed UFG that commercial production at the Damietta Plant would not be restarted for the foreseeable future because EGAS and the Government would not supply the agreed-upon minimum quantities of natural gas, due

---

[6] **Exhibit C-4**, Written Notice of Dispute from UFG to the Government of Egypt, dated January 29, 2013.

to alleged political pressure to prioritize the availability of gas to other customers.  Faced with this deliberate decision to breach the UFG Transient Agreement, UFG terminated the Agreement. UFG has no choice but to initiate this international arbitration proceeding to vindicate its rights.

23.     Because the Damietta Project was on the verge of default under the financing agreements secured with several international financial institutions following EGAS' refusal to pay the tolling fees owed to SEGAS, in late 2013 EGAS and SEGAS also entered into another settlement, the SEGAS Transient Agreement,  for the financial sustainability of SEGAS and the project, which the parties negotiated in parallel to the UFG Transient Agreement.  Under the SEGAS Transient Agreement, EGAS agreed to make a down-payment to SEGAS of approximately US$9 million within 10 days of the Agreement's entry into force, as well as the first of a series of monthly payments, which was due at the end of November.  But, just as EGAS blatantly refused to comply with its obligations under the UFG Transient Agreement, so it failed to make these payments, and otherwise to comply with the SEGAS Transient Agreement immediately following its signature.  As a result, UFG continues to be alone in providing financial support to SEGAS—which constitutes a very significant burden.  These actions and omissions have significantly harmed and further jeopardize UFG's substantial investments in Egypt, have placed the creditworthiness of UFG in question and, therefore, have significantly harmed UFG's position for future investments.

## EGYPT HAS VIOLATED THE BIT

24.     The BIT imposes certain legally-binding obligations and standards of conduct on Egypt. As set out herein, Egypt has failed, through its acts and omissions and through the acts and

omissions of its State instrumentalities and organs for which it bears responsibility, to comply with its obligations towards UFG provided under the BIT.

25.     The actions of EGAS, EGPC, and their affiliates with respect to UFG are fully attributable to Egypt.  EGAS, EGPC and their affiliates are State organs, exercise governmental authority with respect to UFG and its investment, and act under the instruction, direction, or control of the Government.  Examining their structure and their function confirms that their conduct, acts, and omissions are attributable to Egypt.

26.     UFG and its predecessor-in-interest have invested in Egypt over US$ 1.2 billion in the Damietta Plant and associated facilities, from which Egypt benefitted greatly, both technically and financially.  By refusing to live up to their commitment to provide adequate supply of natural gas to the Damietta Plant and to UFG, Egypt and its State instrumentalities and organs have treated UFG and its investment unfairly and inequitably, in breach of their obligations under Article 4.1 of the BIT.

27.     Egypt also impaired UFG's investment by imposing arbitrary and discriminatory measures affecting UFG's management, maintenance, use, enjoyment and expansion of its investment in Egypt, and by failing to protect UFG's investment, as required under Article 3.1 of the BIT.

28.     By continuing to supply other foreign purchasers, large commercial and industrial users, and its domestic market (especially the subsidized power generation sector) at the same time as it critically reduced and halted its gas deliveries to the Damietta Plant, Egypt breached its obligation to treat UFG's investment no less favorably than investments made by its own investors (Article 4.5 of the BIT) or those of any third State (Article 4.2 of the BIT).

29.     Egypt further breached the BIT by effectively and wrongfully depriving UFG of the value and returns of its investment through unjustified and discriminatory measures without providing prompt, adequate, and effective compensation, as required under Article 6 of the BIT.

## RESOLUTION OF THE DISPUTE

### The BIT Provides for Resolution of Investment Disputes Before ICSID

30.     The BIT was signed between Spain and Egypt on November 3, 1992, and entered into force on April 26, 1994.  Article 11 of the BIT states:

*Article 11 Disputes between One Party and Investors of the Other Party*

1.     Disputes between one of the Parties and one investor of the other Party shall be notified in writing, including a detailed information, by the investor to the host Party of the investment. As far as possible the Parties shall endeavour to settle these differences by means of a friendly agreement.

2.     If these disputes cannot be settled in this way within six months from the date of the written notification mentioned in paragraph **1**, the conflict shall be submitted, at the choice of the investor, to:
   - a court of arbitration in accordance with the Rules of Procedure of the Arbitration Institute of the Stockholm Chamber of Commerce.
   - the court of arbitration of the Paris International Chamber of Commerce.
   - the ad hoc court of arbitration established under the Arbitration Rules of Procedure of the United Nations Commission for International Trade Law.
   - the International Center for Settlement of Investment Disputes (ICSID) set up by the "Convention on Settlement of Investment Disputes between States and Nationals of other States", in case both Parties become signatories of this Convention.
   - Regional Center for International Commercial arbitration in Cairo.

3.     The arbitration shall be based on:
   - the provisions of this agreement;
   - the national law of the Party in whose territory the investment was made, including the rules relative to conflicts of law;
   - the rules and the universally accepted principles of international law.

4.     The arbitration decisions shall be final and binding for the parties in conflict. Each Party undertakes to execute the decisions in accordance with its national law.

Accordingly, Egypt consented in the BIT to resolve this dispute by international arbitration before ICSID and under the ICSID Convention, which Egypt and Spain have both signed and ratified.   UFG hereby consents to the submission of this dispute to international arbitration before ICSID and under the ICSID Convention.

**The BIT's Requirements for the Submission of the Dispute to International Arbitration Have Been Met**

31.     Under the BIT, a party may pursue arbitration if: (i) the dispute relates to an investment, (ii) the party has given written notification of the dispute; and (iii) the dispute cannot be resolved by amicable negotiations within a six-month period after the dispute was notified.

        *i.*     *The Dispute Relates to an Investment in Egypt*

32.     At all pertinent times, UFG or its predecessor directly or indirectly owned or controlled substantial investments in Egypt, including the Damietta LNG Plant and associated contractual rights, and have invested over US$ 1.2 billion in Egypt.

        *ii.*     *UFG Has Given Written Notice of the Dispute*

33.     On January 29, 2013, UFG tendered a written notice of dispute under the BIT to the Government, providing among other things, detailed information regarding the dispute.  A true copy of the notice letter is attached to the present Request for Arbitration.

        *iii.*     *Six Months Have Lapsed from the Written Notice of Dispute*

34.     The six-month waiting period triggered by UFG's January 29, 2013 letter lapsed on July 29, 2013.   As evidence of its good faith, UFG did not immediately initiate arbitration proceedings after the expiry of the waiting period but continued instead to negotiate with the Government and EGAS.  The Government and EGAS' recent attitude, however, leaves no doubt as to the Parties' inability to resolve this dispute within the period designated for such possibility

under the BIT.  UFG therefore refers the dispute to international arbitration before ICSID, and has complied with all prerequisites in the BIT to submitting this dispute to ICSID arbitration.

### ICSID Jurisdiction

35.     In accordance with Article 25 of the ICSID Convention, the requirements for ICSID jurisdiction are that: (i) the dispute in question must be a legal dispute; (ii) the dispute must involve an investment; (iii) one party must be a Contracting State to the ICSID Convention; (iv) the opposing party must be a private party that is a national or company of another Contracting State to the ICSID Convention; and (v) the parties must have consented in writing to ICSID jurisdiction.  Each of these requirements is met.

*i.     Legal Dispute*

36.     The issues in dispute involve whether Egypt has violated its obligations under the BIT, and the amount of compensation due as a result.  They involve a conflict of legal rights and entail legal remedies and therefore constitute a classic legal dispute.

*ii.     Investment*

37.     UFG and its predecessor have invested over US$ 1.2 billion in Egypt.  This constitutes an investment within the meaning of the ICSID Convention and the BIT.  The dispute described in this Request for Arbitration arises directly from, and is directly related to, UFG's investment in Egypt.

38.     UFG's investment falls within the broad definition of "investment" contained within Article 1.2 of the BIT, to which Egypt has agreed.  The BIT defines the term "investment" to include "any kind of assets, such as goods and rights of all sorts, acquired under the law of the host country of the investment."

   iii. *Contracting State Party or Agency of a Contracting State Designated to the Centre by that State*

39. Egypt is a Contracting Party to the ICSID Convention.  Egypt signed the ICSID Convention on February 11, 1972, and deposited its instruments of ratification of the Convention on May 3, 1972.  The ICSID Convention entered into force for Egypt on June 2, 1972.

   iv. *National of Another Contracting State*

40. Spain is a Contracting Party to the ICSID Convention. Spain signed the ICSID Convention on March 21, 1994, and deposited its instruments of ratification of the Convention on August 18, 1994.  The ICSID Convention entered into force for Spain on September 17, 1994.

41. UFG is incorporated in Spain.  Therefore, UFG is a national of a Contracting Party under Article 25 of the ICSID Convention.  Throughout the events giving rise to this dispute and continuing today, UFG has directly and indirectly owned its investments in Egypt.

   v. *Consent in Writing*

42. Egypt consented to ICSID jurisdiction when it signed and ratified the BIT containing its Article 11, by which it gave its consent to ICSID arbitration.

43. UFG hereby consents to ICSID arbitration and accepts Egypt's offer and consent to the submission of this dispute to international arbitration before ICSID and under the ICSID Convention.

## PROCEDURAL MATTERS

### Language and Place of Arbitration

44. The BIT does not specify the language or place of the arbitration or a dispute arising under it.

45.     Pursuant to rule 22(1) of the ICSID Rules of Procedure for Arbitration Proceedings, UFG selects English as the procedural language for this arbitration proceeding.

46.     Pursuant to Article 62, UFG agrees that the arbitration be held at the seat of ICSID in Washington, D.C., USA, which is the headquarters of ICSID.

### Number of Arbitrators

47.     The arbitration agreement in Article 11 of the BIT does not specify the number of arbitrators to hear and decide the dispute or the method of their appointment.

48.     Pursuant to Article 37 of the ICSID Convention, unless the Parties agree to a sole arbitrator, the tribunal shall consist of three arbitrators.  Claimant will appoint its arbitrator in due course pursuant to Article 37(2)(b) of the ICSID Convention.

### Documentation

49.     Attached is the documentation required by Rule 2(2) of the rules of Procedure for the Institution of Conciliation and Arbitration Proceedings, provided in accordance with ICSID Administrative and Financial Regulation 30.  In particular, Egypt's and UFG's instruments of consent to ICSID arbitration are attached to the present Request for Arbitration.

### CONCLUSION

50.     For the reasons stated above, Claimant UFG requests the institution of an ICSID arbitration proceeding in accordance with the provisions of Article 11 of the BIT.  UFG requests that, after the submission of argument and evidence, and the conduct of an evidentiary hearing, the Arbitral Tribunal issue a Final Award accepting and adopting UFG's claim and position, and granting UFG the relief requested.

### RELIEF REQUESTED

51.     In view of the foregoing, UFG respectfully requests that the Arbitral Tribunal:

a.      Declare that Egypt has violated the BIT in connection with its treatment of UFG and UFG's investment;

b.      Award Claimant compensation for the full amount of damages it suffered due to Egypt's breaches of its BIT obligations, in an amount to be determined based upon the evidence;

c.      Order Egypt to pay all costs and expenses of this arbitration, including ICSID's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of UFG's legal representatives in respect of this arbitration, and any other costs of this arbitration;

d.      Award Claimant pre-award and post-award interest on any compensatory amounts until the date of full satisfaction of the award, at a rate to be determined by the Tribunal in accordance with the BIT; and

e.      Grant any other and further relief that it deems just and proper.

52.     UFG reserves its right to seek additional or other relief to which it may be entitled.

February 14, 2014                              Respectfully submitted,

19

R. Doak Bishop

dbishop@kslaw.com

Tel: + 1 713 751 3205

**King & Spalding LLP**

1100 Louisiana Street, Suite 4000

Houston, Texas 77002, U.S.A.


Isabel Fernández de la Cuesta

ifernandez@kslaw.com

Tel: + 1 212 556 2115

Louis-Alexis Bret

lbret@kslaw.com

Tel: + 1 212 556 2283

**King & Spalding LLP**

1185 Avenue of the Americas

New York, New York 10036, U.S.A.


James E. Castello

jcastello@kslaw.com

Tel: + 33 1 73 00 39 06

**King & Spalding International LLP**

12 Cours Albert 1er

75008 Paris, France