## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNION FENOSA GAS, S.A. | |
| *Plaintiff,* | |
| v. | No. 1:18-cv-02395-JEB |
| ARAB REPUBLIC OF EGYPT | |
| *Defendant.* | |

## MOTION TO SET ASIDE DEFAULT AND TO STAY FURTHER PROCEEDINGS
## (ORAL ARGUMENT REQUESTED)

Respondent, the Arab Republic of Egypt ("Egypt"), hereby moves to set aside the February 4, 2020 entry of default entered by the clerk against Egypt and stay this proceeding pending the resolution of ongoing proceedings under the auspices of the International Centre for Settlement of Investment Disputes.  In the alternative to the stay, Egypt moves for a briefing schedule for Egypt's motion to dismiss the Complaint.

Consistent with Local Civil Rule 7(m), counsel for Egypt spoke with counsel for UFG to see whether UFG would consent to the relief requested in this motion.  Counsel for UFG stated that he would need to discuss the issues with UFG before responding.  Pursuant to Local Civil Rule 7(f), Egypt respectfully requests that the Court schedule an oral hearing on its motion.

This motion is based upon the accompanying (1) Memorandum of Law in Support of Motion to Set Aside Default and to Stay Further Proceedings and (2) Declaration of Matthew D. Slater.

WHEREFORE, Egypt respectfully requests that its motion to set aside the default and to stay further proceedings be granted.

Dated: March 6, 2020
      Washington, DC

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

*/s/ Matthew D. Slater*
Matthew D. Slater
2112 Pennsylvania Avenue, NW
Washington, DC 20037
202-974-1930
mslater@cgsh.com

*Counsel for Arab Republic of Egypt*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNION FENOSA GAS, S.A. | |
| *Plaintiff,* | |
| v. | No. 1:18-cv-02395-JEB |
| ARAB REPUBLIC OF EGYPT | |
| *Defendant.* | |

**DEFENDANT ARAB REPUBLIC OF EGYPT'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SET ASIDE DEFAULT**
**AND TO STAY FURTHER PROCEEDINGS**
**<u>(ORAL ARGUMENT REQUESTED)</u>**

The Arab Republic of Egypt ("Egypt") submits this memorandum in support of its motion to set aside the Clerk's default entered against it and to stay this proceeding pending the resolution of ongoing proceedings under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID") to annul the arbitral award at issue in this case.

First, vacating the default is appropriate because, under the ICSID Convention[1], enforcement of that award was stayed at the time that Plaintiff asserts Egypt should have responded to the Complaint in this Court and up until just over a month ago.  Accordingly, Egypt's purported default was not willful.  Moreover, Unión Fenosa Gas, S.A. ("UFG") has not been prejudiced in the least.  Before the purported date for response in this Court, counsel for Egypt contacted counsel for UFG to discuss a stay of proceedings in this Court, but UFG declined to engage one way or another.  Egypt then sought and was granted a stay under the ICSID Convention and Rules.  UFG's status reports have repeatedly noted the stay of proceedings, and never suggested that Egypt was delinquent or that this Court should or even could proceed with its application while the stay was in effect.  Indeed, its most recent status report sought the establishment of a schedule for Egypt to respond, not the entry of default.  Further, Egypt has meritorious defenses to recognition of the award at issue.  And it is well established that cases against foreign sovereigns should be decided on their merits, not by default.  *See, e.g., Enka Insaat Ve Sanayi A.S. v. Gabonese Republic*, 406 F. Supp. 3d 84, 87 (D.D.C. 2019).

Second, the Court should suspend this proceeding in the interest of judicial economy, comity, and the balance of hardships between the parties.  The grounds for Egypt's defense to recognition of the award parallel grounds it has advanced for annulment of the award

---

[1]     Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, art. 52(5), Oct. 14, 1966, 17 U.S.T. 1270, 575 U.N.T.S. 159 ("ICSID Convention").

before an ICSID annulment committee, which is scheduled to conduct a hearing on annulment in July of this year and can be expected to rule expeditiously thereafter.  As this Court recently recognized, staying proceedings in this Court while the annulment proceeds will help avoid potentially inconsistent decisions and potentially wrongful attachment of assets and the need for their return, and will spare the Court and parties inefficient and duplicative proceedings that may be avoided in the event the award is annulled.  *See Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34 (D.D.C. 2019).

Third, and in the alternative, Egypt respectfully requests that, if this proceeding moves forward now, the Court adopt a briefing schedule for Egypt's response to the Complaint, as UFG requested in its status report of January 27, 2020.  *See* ECF No. 13.

## BACKGROUND

This dispute arises out of claims by the Spanish company, UFG, that the Egyptian government violated certain treaty protections in connection with UFG's operation of a natural gas liquefaction plant in Egypt.  *See* Compl. ¶ 7 (ECF No. 1).[2]  UFG submitted its grievances to arbitration, and the majority of an ICSID arbitral tribunal rendered an award on those claims on August 31, 2018, with one member of the tribunal issuing a dissenting opinion. *See id.* ¶ 35; Ex. 1 (Dissenting Opinion of Mark Clodfelter).[3]  In brief, the majority of the tribunal concluded that the suspension of natural gas deliveries to UFG, certain decisions by the Egyptian government regarding the allocation of the country's natural gas resources in the face of shortages of production, and domestic economic policy, amounted to a denial of "fair and equitable treatment"

---

[2]     For purposes of the present motion only, Egypt accepts the allegations of the Complaint, without prejudice to Egypt's right to defend against and refute those allegations.

[3]     Citations to Exhibits 1 through 6 in this memorandum are references to the exhibits attached to the accompanying Declaration of Matthew D. Slater.

under a bilateral investment treaty between Egypt and Spain, *i.e.,* the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt, 1820 U.N.T.S. 175 (Nov. 3, 1992) (the "Egypt-Spain BIT"). *See, e.g.,* Ex. A to Compl. ("Award") at ¶¶ 9.127-138; Compl. ¶ 7.

The majority's decision drew a strong dissent from one member of the ICSID tribunal, U.S. national Mark Clodfelter, who previously served as head of treaty arbitration for the United States Government within the Office of the Legal Advisor of the Department of State.  It is unusual for there to be a dissent in an ISCID arbitration, and the dissent concerns the vexing issue of investors engaging in corrupt practices in securing government concession contracts, as well as the majority's improper and exceptional treatment of that issue, which underlies one of Egypt's primary defenses.

Specifically, Egypt argued that the contracts at the heart of UFG's claims were obtained through corruption because UFG's predecessor-in-interest hired an influence peddler named Yehya El Komy to persuade the Egyptian Minister of Petroleum and other officials to approve UFG's natural gas project under circumstances highly probative of corruption.  UFG, for its part, maintained throughout the arbitration that Mr. El Komy was hired for his talent and expertise and was a genuine business partner.  But it was undisputed that Mr. El Komy had no training or technical expertise in the natural gas industry; nor did he have prior dealings with UFG. He did, however, have close personal relationships with the Minister of Petroleum, then-President Hosni Mubarak, and other senior government officials.  And he was compensated exorbitantly in stock-ownership for his "services," receiving promises of millions of dollars and 40% of the shares of the UFG subsidiary that was to construct and run the plant.

The majority of the ICSID tribunal did not accept UFG's argument that Mr. El Komy was a legitimate business partner.  But then, without notice to the parties and without giving Egypt the chance to respond, the majority invented a new construct and concluded that Mr. El Komy was a non-corrupt "lobbyist," an argument UFG never made in the arbitration and Egypt therefore never had the opportunity to address.  As the dissenting opinion observed:  "It is not for the Tribunal to supply [an innocent] explanation [for UFG's conduct].  This is why I cannot accept the majority's conclusion that Mr. El Komy acted as a lobbyist with *non*-corrupt access to and influence over senior government officials.  Not only is there no evidence of *non*-corrupt influence, this is not *[UFG]'s* explanation and indeed flies in the face of UFG's own denials that Mr. El Komy exerted *any* influence on government officials at all."  Ex. 1 (Dissenting Opinion of Mark Clodfelter).

On October 17, 2018, UFG filed its complaint in this case, seeking recognition of the Award under 22 U.S.C. § 1650a and the entry of a judgment against Egypt.  Compl. ¶ 1.  UFG has submitted documents purporting to show that service of the Complaint was completed in accordance with the Hague Service Convention on November 17, 2018.  ECF No. 8 at ¶ 3.

On December 21, 2018, before any response in this Court was even arguably due, Egypt timely submitted to the ICSID Secretariat an application under Article 52 of the ICSID Convention requesting the annulment of the Award, the effect of which was to stay all proceedings for enforcement of the Award.  Ex. 2 (Egypt's Application for Annulment (Dec. 21, 2018)).  In particular, in its request for annulment, Egypt invoked Article 52(5) of the ICSID Convention and requested that enforcement of the Award be stayed pending resolution of the application for annulment.  Article 52(5) provides, "If the applicant requests a stay of enforcement of the award in his application, enforcement *shall be stayed* provisionally until the Committee rules on such

request." (emphasis added).  Counsel for Egypt also approached UFG to formally stay proceedings in this Court, but UFG did not engage one way or another.  Slater Decl. at ¶¶3–6.  In due course, ICSID appointed an *ad hoc* committee to consider Egypt's application for annulment, as well as its request for a stay of enforcement of the Award.  The Committee decided on October 18, 2019, to grant Egypt's request for a continued stay of enforcement, but only on the condition that Egypt post certain security and provide certain written undertakings by December 17, 2019.  Ex. 3 (Decision On The Applicant's Request For A Continued Stay Of Enforcement Of The Award (Oct. 18, 2019)).  When Egypt was not able to satisfy those conditions within the time allowed, UFG petitioned the *ad hoc* Committee to lift the stay.  On January 24, 2020, the *ad hoc* Committee terminated the stay.  Ex. 4 (Decision to Terminate the Stay of Enforcement of the Award (Jan. 24, 2020)).

On January 22, 2020, the ICSID *ad hoc* Committee adopted a schedule under which the parties' briefing on Egypt's application for annulment will be completed on May 18, 2020. *See* Ex. 5 (Email from ICSID Secretariat (Jan. 22, 2020)).  The final hearing on Egypt's application for annulment is scheduled for mid-July 2020.  *See* Ex. 6 (Procedural Order No. 1 (July 26, 2019)) at Annex A.

On January 27, 2020, UFG filed a status report with this Court requesting a briefing schedule for Egypt's response to UFG's complaint.  ECF No. 13.  The following day, the Court instead *sua sponte* directed UFG to file an affidavit of default, which UFG filed on February 4, 2020, ECF No. 14.  The Clerk entered a default against Egypt on the following day.  ECF No. 15.  UFG filed a motion for default judgment on March 5, 2020.  ECF No. 16.

**ARGUMENT**

## I.   THIS COURT SHOULD VACATE THE DEFAULT ENTERED BY THE CLERK.

Rule 55(c) of the Rules of Civil Procedure permits this court to "set aside an entry

of default for good cause." Fed. R. Civ. P. 55(c).  "In demonstrating good cause, the party moving

to set aside a default must provide an explanation for the default" and "give reasons why vacation

of the default entry would serve the interests of justice." *Enka*, 406 F. Supp. 3d at 87 (internal

quotation marks omitted).  "In determining whether or not to set aside a default, a court must

consider (1) the willfulness of the respondent's default, if any; (2) whether there is any prejudice

to the petitioner; and (3) the merit of respondent's alleged defenses." *Id.* (citing *Keegel v. Key*

*West & Carribean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980)).

Moreover, this Court and the D.C. Circuit have repeatedly noted that default

judgments against sovereigns are disfavored, and, accordingly, Egypt should be afforded the

opportunity to respond to UFG's complaint on the merits. *Enka*, 406 F. Supp. 3d at 87 ("The

United States Court of Appeals for the D.C. Circuit . . . has indicated that there is a presumption

against default judgments in cases involving foreign sovereigns." (citing *Practical Concepts, Inc.*

*v. Republic of Bolivia*, 811 F.3d 1543, 1551-52 (D.C. Cir. 1987)); *Owens v. Republic of Sudan*,

374 F. Supp. 2d 1, 9 (D.D.C. 2005) ("Th[ere is a] strong presumption against the entry of default

judgment against a foreign state that has appeared in the case and expressed a desire to contest the

claims . . . .").

### A.   There Has Been No Willful Default.

Egypt has not willfully defaulted in this case.  The Foreign Sovereign Immunities

Act ("FSIA") affords Egypt sixty days from the date of service to respond to the Complaint.  28

U.S.C. § 1608(d).  Accepting for purposes of this motion that service was completed on November

17, 2018, Egypt's time to respond had not yet expired when enforcement of the Award was automatically stayed on December 21, 2018, because of Egypt's request for a stay in its application to ICSID and by operation of the mandatory stay requirement in Article 52(2) of the ICSID Convention.  Because that stay operates for both UFG and Egypt as parties to the ICSID proceeding, it was reasonable for Egypt to refrain from taking any steps in this enforcement action while the stay remained in place.  UFG appears to agree that the stay under the Convention applied here and that Egypt was not obliged to respond to the Complaint previously.  Even after it informed the Court of purported service, UFG's periodic status reports did not suggest that Egypt was in default or that proceedings could or should be commenced against it here.  And in its most recent status report on January 27, 2020, following termination of the stay, UFG did not argue that Egypt was already in default or untimely in responding to the Complaint.  Rather, UFG only asked this Court to set a schedule for Egypt's response.  ECF No. 13 at ¶ 5.

Moreover, before the automatic stay under the ICSID Convention went into effect, the undersigned counsel for Egypt affirmatively reached out to UFG's counsel in mid-December 2018 to discuss scheduling options for this case, including by suggesting a stay until the termination of the ICSID annulment proceedings.  *See* Slater Decl. at ¶ 3.  UFG's counsel declined to engage on the subject until Egypt filed its annulment application.  *Id*. ¶ 4.  Egypt filed its annulment application on December 21, 2018, which caused the stay under Article 52(5) of the Convention to come into effect.  Undersigned counsel provided UFG's counsel notice of the annulment application on December 21, and on January 9, 2019, provided a copy of ICSID's formal registration of the application and confirmation of the stay.  *Id*. ¶ 5.  UFG's counsel did not contact Egypt's counsel about this matter thereafter, but rather correctly observed that enforcement proceedings were stayed pending further action by the ICSID *ad hoc* committee.  *Id.* at ¶ 6; ECF

No. 6; ECF No. 8.  Once the stay was lifted, UFG's counsel again did not contact UFG's counsel to seek agreement to set a schedule, but instead made its application for the Court to do so.  *See* ECF No. 13 ¶ 5.  The decision by UFG's counsel not to engage with the undersigned here is different than UFG's behavior in enforcement litigation about the same Award before English courts, where UFG's counsel has engaged extensively with attorneys from the undersigned's firm's London office and, despite substantial arguments to the contrary, have insisted that they appear in those proceedings.  Slater Decl. at ¶ 7.

The ICSID stay was lifted on January 24, 2020, only 42 days ago.  Moreover, Egypt has not been dilatory in the time since the *ad hoc* Committee lifted the stay.  Rather, Egypt has been diligently preparing this request that further action here be stayed pending the resolution of the ICSID annulment process.  Thus, there has been no willful failure to respond on Egypt's part.

## B.     UFG Will Not Be Prejudiced If The Clerk's Default Is Lifted.

The Clerk entered the default only 30 days ago.  In that time, it is not credible that UFG has relied on that default in any material way.  Moreover, lifting the default would merely place UFG in the same status that it requested in its most recent status report—awaiting a decision from the Court on the schedule for further proceedings on the Complaint.  Indeed, as described in the papers that UFG submitted today, it has agreed to resolve this dispute, *see* ECF No. 16-2 ¶ 15, which further demonstrates the absence of prejudice.

Accordingly, this factor weighs in favor of lifting the stay.

## C.     Egypt Has Meritorious Defenses.

A default is also inappropriate here because Egypt has meritorious defenses. "Meritorious in this context does not mean 'likelihood of success,' but rather, defenses are meritorious for the purpose of setting aside a default if they contain even a hint of a suggestion

which, if proven at trial, would constitute a complete defense." *Enka*, 406 F. Supp. 3d at 89–90

(quoting *Keegel*, 627 F.2d at 373) (internal quotation marks and citation omitted). Here, Egypt's

defenses would afford a complete defense.

This Court may decline to enforce an ICSID award on the same grounds that it may

refuse to recognize a state court judgment under the Full Faith and Credit Clause of the U.S.

Constitution. *See* 22 U.S.C. § 1650a(a) (allowing district courts to decline recognition of ICSID

awards on the same bases as they may decline recognition of state-court judgments under the Full

Faith and Credit Clause). Full faith and credit may be denied a state court judgment where the

issuing tribunal deprived the defendant of due process of law. *World-Wide Volkswagen Corp. v.

Woodson*, 444 U.S. 286, 291 (1980) ("A judgment rendered in violation of due process is void in

the rendering State and is not entitled to full faith and credit elsewhere."). Likewise, this Court

may decline to give full faith and credit to state court judgments on the basis that the issuing court

lacked subject matter jurisdiction. *Underwriters Nat'l. Assurance Co. v. N.C. Life & Accident &

Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) (explaining that a state court must have

jurisdiction over a dispute before its judgment can be entitled to full faith and credit). Both grounds

are implicated here.

First, as the dissenting member of the ICSID tribunal indicated, Ex. 1 at ¶ 17, the

majority denied Egypt's due process rights when it rejected Egypt's corruption defense on a theory

that was incompatible with both parties' submissions and as to which Egypt was not afforded the

opportunity to respond. *See Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) ("In our

adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow

the principle of party presentation. That is, we rely on the parties to frame the issues for decision

and assign to courts the role of neutral arbiter of matters the parties present. [Courts] do not, or

should not, sally forth each day looking for wrongs to right.  [They] wait for cases to come to [them], and when they do [courts] normally decide only questions presented by the parties."); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."); *Carducci v. Regan*, 714 F.2d 171, 176 (D.C. Cir. 1983) ("[While] not all deprivations of interests protected by [the due process clause] are entitled to the same elements of process, . . . the element of knowing, and therefore having an opportunity to refute, all of the evidence on the basis of which the harmful action is taken, is a fairly rudimentary one." (internal citations omitted)).

Second, in this case, the ICSID tribunal lacked jurisdiction because UFG's contracts were obtained by corruption.  Pursuant to Article 25 of the ICSID Convention, the tribunal could only have had jurisdiction by Egypt's consent.  Although the majority purported to find consent in the Egypt-Spain BIT, that treaty only affords rights to investments made "in accordance with [Egypt's] laws and regulations."  Egypt-Spain BIT, art. 3(1).  It does not apply to contracts obtained though corrupt influence peddling.  Nor does it apply to contracts obtained through the services of a paid "lobbyist," as the majority postulated, because Egyptian law also does not permit paid lobbying services.

It is no excuse that an ICSID arbitral tribunal may generally consider its own jurisdiction.  This Court is to treat the Award as if it were a state-court judgment, and federal courts asked to enforce a state-court judgment may inspect the issuing court's jurisdiction if the question of jurisdiction was not fully and fairly litigated in the first instance.  *Underwriters Nat'l. Assurance Co.*, 455 U.S. at 706.  Here, the tribunal's jurisdiction was not fully and fairly litigated because the majority reached its jurisdictional conclusion on grounds that were not advanced by or supported by UFG and therefore without providing Egypt the opportunity to fully and fairly ventilate the

implications under Egyptian law of the theory the majority created without notice of a "non-corrupt lobbyist." Therefore, this court will be called upon to examine the tribunal's purported jurisdiction anew. *Cf. LeDonne v. Gulf Air, Inc.*, 700 F. Supp. 1400 (E.D. Va. 1988) (declining to enforce Illinois state court judgment after independently determining that Illinois court lacked jurisdiction under the FSIA).

These defenses are more than sufficiently meritorious to justify vacating the Clerk's entry of default. These issues are also now pending before the ICSID Annulment Committee, which, for reasons discussed next, warrants staying these proceedings pending resolution of Egypt's application for annulment.

## II.    THE COURT SHOULD STAY THIS PROCEEDING PENDING CONCLUSION OF THE ICSID ANNULMENT PROCEEDINGS.

After setting aside the Clerk's default, the Court should then stay these proceedings pending the resolution of Egypt's annulment application (or, if sooner, dismissal of the matter pursuant to the pending resolution to which UFG has referred). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In considering a motion to stay proceedings, courts must "weigh competing interests and maintain an even balance between the court's interest in judicial economy and any possible hardship to the parties." *Belize v. Soc. Dev. Ltd. v. Gov's of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (internal quotation marks and citation omitted).

As this Court recently held in a case involving an attempt to enforce an ICSID award against Spain, "the pendency of . . . ICSID annulment proceeding[s]" warrants a stay "in the interest of avoiding cross-border, piecemeal litigation." *Masdar*, 397 F. Supp. 3d at 40 (noting that "[m]any courts have reached the same conclusion in similar circumstances" and collecting

cases).  Here, too, it would be in the interests of the Court and the parties to stay this action until the *ad hoc* Committee completes its deliberations on Egypt's application for annulment.

First, "the international character of this action and the intricacies of the issues involved support the issuance of a stay." *Id.*  "The reasons for [staying recognition proceedings on an arbitral award] are especially strong where a parallel proceeding is ongoing . . . and there is a possibility that the award will be set aside . . . ." *Higgins v. SPX Corp.*, 2006 WL 1008677, at *4 (W.D. Mich. Apr. 18, 2006) (internal quotation marks omitted) (staying recognition petition governed by the New York Convention during annulment litigation before a foreign court).  As suggested above, consideration of UFG's application here will involve a host of intricate and complex questions, including:

(1) whether the majority of the ICSID tribunal violated Egypt's due process rights when it invented *sua sponte* an argument about "non-corrupt" influence peddling by UFG's "business partner" that was incompatible with UFG's own submissions about the "business partner's" behavior, and which Egypt was denied the opportunity to address;

(2) whether the ICSID tribunal lacked jurisdiction over the dispute because UFG's contracts were obtained through corruption as Egypt alleged, and the Tribunal's ruling does not refute, because Egyptian law does not allow for the paid lobbying the Tribunal construed the outlandish and exorbitant arrangement with Mr. El Komy to be; and

(3) whether principles of comity would require this Court to refrain from enforcing the Award where payment of it would amount to compulsion of Egyptian government officials to distribute the public fisc in payment of a contract that was obtained illegally as a matter of Egyptian law, *see, e.g., In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir. 1987) (declining to enforce sanctions for failing to comply with a subpoena after a

fact-driven inquiry into the balance of interests where it would "represent an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory").[4]

Just as in *Masdar*, this Court should not "wade into this territory unnecessarily," 397 F. Supp. 3d at 40.   Instead, the better course would be to stay these proceedings because the Annulment Committee's eventual decision may well render their resolution unnecessary, or at least inform the Court's further consideration of them.

Second, considerations of judicial economy favor a stay.   "Although a stay would immediate[ly] delay the resolution of the parties' dispute, it would still likely be shorter than the possible delay and expense that would occur if this Court were to confirm the award and [ICSID] were to then set it aside."  *In re: Arbitration of Certain Controversies Between Getma Int'l & Republic of Guinea*, 142 F. Supp. 3d 110, 114 (D.D.C. 2015) (internal quotation marks and alterations omitted).  If this Court declines to stay the case, the parties will incur substantial expense litigating complex questions before this Court without knowing whether there will even still be an Award to enforce a few months from now.

Moreover, several issues Egypt has raised in its annulment application are the same or similar to the issues it would assert in defending against UFG's complaint in this Court.  These include whether the Majority's *sua sponte* creation of a rebuttal to Egypt's corruption defense deprived Egypt of due process and whether that rebuttal, even on its own terms much less on the actual facts, would satisfy the jurisdictional requirement that UFG's investment be in accordance

---

[4]     The scope and content of Egyptian law prohibiting paid lobbying activities is in dispute between the parties in the ICSID annulment proceeding.  Those issues will confront this Court here as well, if it advances to the merits of UFG's Complaint.  *See Animal Sci. Prods., Inc. v. Hebel Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865 (2018) (instructing district courts to perform their own analysis of the content for foreign law when conducting a comity analysis).

with Egyptian law.  At the very least, "litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interests." *Naegele v. Albers*, 355 F. Supp. 2d 129, 141 (D.D.C. 2005) (internal quotation marks omitted).

Finally, any balance of hardships favors Egypt.  Egypt "will undeniably be burdened by having to attack the validity of the arbitral award in two forums, and perhaps in ultimately having to recover assets seized during this action should the annulment proceeding go its way."  *Masdar*, 397 F. Supp. 3d at 40.  While UFG may in theory have "an interest in expeditiously collecting an award," *id.*, the delay in this case will be relatively limited as the annulment briefing before ICSID is scheduled to be completed by mid-May, and the final hearing is scheduled for mid-July of this year.

Moreover, as UFG has reported, it has entered into a series of agreements for the purpose of settling this dispute.  ECF No. 16-2 at ¶ 15.  This, too, supports entry of a stay and further counsels against expending judicial resources adjudicating the issues discussed above, and demonstrates the absence of prejudice to UFG from suspending proceedings.

## III.   IN THE ALTERNATIVE, THE COURT SHOULD SET A BRIEFING SCHEDULE FOR EGYPT'S RESPONSE TO UFG'S COMPLAINT.

If the Court declines to stay these proceedings, the Court should set a briefing schedule to allow Egypt to respond to UFG's complaint.

In light of the strong arguments in favor of a stay and in the interest of economy (of both judicial resources and the resources of the parties), Egypt has not included a verified answer with this motion under Local Civil Rule 7(g).  As noted above, however, Egypt has defenses against UFG's complaint and intends to defend itself against UFG's request for recognition of the Award moving to dismiss the Complaint.  Therefore, if the Court denies Egypt's request for a stay, Egypt respectfully requests that the Court enter the following briefing schedule:

| Event | Deadline |
|---|---|
| Egypt's motion to dismiss | 45 days after the Court's decision on the present motion |
| UFG's opposition to motion to dismiss | 45 days after Egypt's motion |
| Egypt's reply in support of its motion | 21 days after UFG's opposition |

This proposal is consistent with this Court's past practice, *Acree v. Republic of Iraq*, 658 F. Supp. 2d 124, 127–28 (D.D.C. 2009), and the strong presumption against granting a default judgment against a foreign sovereign, *Enka*, 406 F. Supp. 3d at 87.

## CONCLUSION

For all the foregoing reasons, Egypt respectfully requests that this Court vacate the entry of default against Egypt and stay this proceeding pending the resolution of its application for annulment before ICSID, or, in the alternative, set a briefing schedule for Egypt's motion to dismiss UFG's complaint.

Dated: March 6, 2020
      Washington, DC

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Matthew D. Slater*
Matthew D. Slater (D.C. Bar No. 386986)
2112 Pennsylvania Avenue, NW
Washington, DC 20037
202-974-1930
mslater@cgsh.com

*Counsel for Arab Republic of Egypt*