# EXHIBIT 1

**Dissenting Opinion of
Mark Clodfelter**

in

**Unión Fenosa Gas, S.A. and Arab Republic of Egypt**

**(ICSID Case No. ARB/14/4)**

1. This case presents many complex issues of fact and law and the Tribunal has devoted considerable attention to the relevant evidence and authorities. However, these efforts have led me to conclusions that are dramatically different from those of my distinguished co-arbitrators, on jurisdiction, liability and damages, and, accordingly, costs. Indeed, our respective conclusions are so different that I feel compelled to set forth my views on the most important differences in this dissenting opinion.

**Jurisdiction**

2. My principal disagreement[1] with the majority regarding jurisdiction concerns the overriding issue of whether or not the SPA was procured through corrupt means.

3. I fully concur with the majority's determination that such corruption, if proven, would, under the Treaty and as a matter of international public policy under international law, defeat jurisdiction over the claims, deny their admissibility, and render them unmeritorious.

4. I also agree that the Respondent bears the legal burden of proving corruption under a "balance of probabilities" test, whether by means of direct evidence or circumstantial evidence. And I also agree that Respondent failed to meet its burden with respect to its allegations of corruption in the award of the EPC Contract to Halliburton and in Mr. Hussein Salem's involvement with the SPA.

5. However, I believe that Respondent did meet its burden of proof with respect to Mr. Yehia El Komy's involvement with the project. The Respondent has demonstrated that there was a huge disproportion between, on one hand, the compensation that Mr. El Komy was promised under the JVA with UFACEX and, on the other hand, his apparent contribution to the project. This demonstration of a classic red flag[2] was sufficient to require a plausible and credible explanation from Claimant. But the explanations provided by Claimant were neither plausible nor credible and have been rejected even by the majority. As a result, the

---

[1] I do not agree that the majority's statement at para. 6.65 that Claimant is a "member of the Unión Fenosa association of Spanish companies" is relevant to the issue of whether or not Claimant is an "investor" within the meaning of Article 1(1) of the Treaty. I also do not agree with the statement at para. 6.68 that Claimant's investment should be treated "holistically" as "one overall investment made by the Claimant comprising the Damietta Project."

[2] V. Khvalei, Using Red Flags to Prevent Arbitration from Becoming a Safe Harbour for Contracts that Disguise Corruption, in SPECIAL ICC SUPPLEMENT: TACKLING CORRUPTION IN ARBITRATION (2013), page 22 [RL-0168]. To be sure, Respondent has also cited numerous other red flags that are unnecessary to address here. *See* Respondent's letter to the Tribunal dated 21 Dec. 2017, Annex 1, pages 4-5.

only inference that can be drawn is the one Claimant has sought to avoid, namely that Mr. El Komy's high compensation was for the purpose of exerting improper influence upon government officials in allowing the project and awarding the SPA.

6. UFACEX's arrangements with Mr. El Komy and his company, EATCO, envisaged enormous compensation, including a US$ 10 million success fee, together with other fees of up to US$ 7.6 million per year based upon the volume and price of natural gas. Even more significantly, Mr. El Komy was to receive a 40% shareholding in SEGAS, to be financed mostly out the success fee and under favorable loan terms by Claimant, and the potential dividends resulting therefrom, which Claimant itself states could have amounted to "tens of millions of dollars."[3] Whether these fees and the 40% ownership interest in a US$ 1.4 billion project were just the normal compensation commensurate with the role of "local partner" depends upon what Mr. El Komy actually did and was expected to do in the way of contributing to the project.

7. As the majority points out, it does not appear that Mr. El Komy provided any funding net of what he received, or was due to receive, from the Claimant under the JVA and its related agreements. His compensation as a local partner cannot be explained on the basis that he was a net source of capital.

8. As the majority also points out, Mr. El Komy does not appear to have brought any particular technical or other specialist expertise to the project. He had no personal expertise or experience in the LNG industry, no relevant background in the production and sale of natural gas, and his business experience in the petroleum industry generally was very limited and had only recently been acquired. Moreover, while Claimant asserts that Mr. El Komy was needed to help navigate the local permitting process and deal with national regulations relating to the project site, it offered no evidence that he had any particular ability or experience in this respect. Thus, none of these characteristics suggest a value to the project justifying such compensation.

9. The evidence of what Mr. El Komy and EATCO actually did on the project also falls short of demonstrating a contribution commensurate with the compensation he was given. The majority cites, at para. 7.88, the facts that "EATCO took part in the preparation of the Pre-Feasibility Study; it prepared studies on possible sites for the Plant; it was responsible for the proposal from Chiyoda and APCI for the EPC contract; it negotiated and signed the Damietta Port Agreement of 8 August 2000 between UFACEX and the Damietta Port Authority; it procured licences from the Damietta Port Authority for SEGAS's work in December 2000 and March 2001; and it participated in the handover from the Damietta Port Authority to SEGAS of the land plot and jetty in April 2001." In my view these assertions overreach the evidence and overstate the facts.

10. As evidence that Mr. El Komy assisted with a pre-feasibility study, Claimant cites the 9 March 2000 EATCO-UFG preliminary agreement, which states that "EATCO will support UFACEX in the development of a pre-Feasibility Study" with "Technical Works."[4] But no such works were introduced or even referred to in the evidence. Nor is there evidence that

---

[3] Cl. Rej. Jur., Paragraph 62 (footnotes omitted).

[4] Agreement between UFACEX and EATCO, 9 Mar. 2000, page 2 [C-0439].

2

    EATCO prepared an "Analysis of the Sites," as was contemplated in that Agreement.[5] Indeed, Mr. El Komy seems to have played only a small role in the identification of a site; he attended only the last of a series of meeting with technical consultants engaged to advise on this and other technical questions[6] and Claimant seems to have struggled with how to involve him more.[7] Claimant's official, Mr. Fernández Martínez, testified that EATCO was only one of many other participants in the site survey;[8] its role did not even merit a mention in his written witness statements. In fact, the Damietta site was selected early on despite Mr. El Komy's preference for a different site, undermining the suggestion that his input was indispensable as alleged.

11. Similarly, Mr. El Komy's role in involving Chiyoda Corporation appears to have been merely as a go-between; in fact, another consultant already working with Claimant on the project, Mr. Omar El Komy (no relation, but who later joined EATCO), was the one who contacted Chiyoda and introduced both that company and APCI Company to Mr. Yehia El Komy.[9] The latter's other involvement appears to have been tangential at best.[10]

12. Moreover, there is no evidence whatsoever that Mr. El Komy negotiated agreements with the Damietta Port Authority. At most, the evidence cited by Claimant shows that he signed as a witness to Claimant's own signature to such agreements and co-signed the eventual license along with Claimant, both as owners on behalf of SEGAS which was then still in formation.[11] It is not even clear that Mr. El Komy was involved in the incorporation of SEGAS (a task which in any event could have been accomplished by any competent law firm), the only evidence being that he brought a photocopy of company registration papers with him to a meeting.[12] Other indications of Mr. El Komy's involvement are of even less importance. Indeed, while securing the SPA was his first identified duty,[13] Claimant denies that, after the initial meeting with the Petroleum Minister in January 2000, Mr. El Komy "participate[d] any further in the substantive negotiations that led to the SPA."[14]

---

[5] *Id.*

[6] Fax from A. Hernando to R. Villanueva (undated) [C-0445].

[7] Minutes of Meeting sent by Antonio Hernando to Elías Velasco et al., 14 June 2000 [C-0444].

[8] Tr. Day 2, page 620:18-22.

[9] Agreement between Omar El-Komy, Hamed El- Maatawy and Yehya El-Komy, 9 May 2000 [C-0438].

[10] Email from R. Villanueva, 17 July 2000 [C-0447]; Fax from R. Villanueva to Y. El-Komy (undated) [C-0467].

[11] Damietta Port Authority License, 16 Dec. 2000 [C-0328]; Agreement between UFACEX and the Damietta Port Authority, 8 Aug. 2000 [C-0448]; Agreement between SEGAS and the Damietta Port Authority, 18 Oct. 2000 [C-0449].

[12] Letter from G. Fernandez to J. Portero, 7 May 2001 [C-0452].

[13] UFACEX memo to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 Jan. 2000 [C-0344].

[14] Cl. CM Jur., Paragraph 20.

13. Thus, Claimant's efforts to chronical Mr. El Komy's "indispensable" role in implementing the project, something that should have been easy to demonstrate if true, are actually undermined by the weakness of the evidence it has provided.

14. Claimant's further explanation for Mr. El Komy's compensation, emphasized in its Rejoinder on Jurisdiction and Admissibility – that he had conceived of and originated the idea for the project, was the "first mover" and was the person who initially brought the project to Claimant[15] – is rightly rejected by the majority, since the evidence so clearly contradicts these assertions. Based on Claimant's own evidence as recounted by the majority, the project had been conceived by Claimant itself and had been developed on the Claimant's behalf by other consultants, who themselves later brought Mr. El Komy into the mix.

15. Even more mysteriously, Claimant also alleges that Mr. El Komy had "decided to establish an LNG facility in Egypt"[16] himself and agreed to the "relinquishment of equal control in the Project" in favor of a 40% interest, as if he and not the government enjoyed the authority to confer the rights to develop the LNG facility.[17] Claimant does not explain how Mr. El Komy's "decision" to build the facility himself (despite his obvious lack of credentials for doing so) gave him any measure of "control" to relinquish to begin with, much less how it affected the relative "bargaining power of the parties" that Claimant says is reflected in the compensation provisions of the JVA.[18] This is especially glaring in light of Claimant's denial that Mr. El Komy exercised any special access to government authorities.

16. As noted earlier, I agree with the majority that Respondent bears the burden of proving corruption, and I agree that there has been no direct evidence of bribery or money passing hands from Mr. El Komy or his company to others. But what the evidence does prove is that there is a tremendous and unexplained discrepancy between Mr. El Komy's involvement in the project and the compensation he was awarded. This clear red flag is sufficient, not to shift to Claimant a burden of proving that there was no corruption, as worries the majority, but to require Claimant *to go forward* with, at very least, a plausible and credible explanation.

17. It is not for the Tribunal to supply such an explanation. This is why I cannot accept the majority's conclusion that Mr. El Komy acted as a lobbyist with *non*-corrupt access to and

---

[15] Cl. Rej. Jur., Paragraph 29 ("In reality, the payments to be received by EATCO pursuant to this contract were the result of negotiations between UFACEX and Mr. El-Komy regarding the commercial terms of their partnership. These payments, as well as EATCO's level of participation in SEGAS (and the financing of such participation), reflected each party's bargaining power at the time, and comport with the central role that Mr. El-Komy played *in conceiving* the Damietta LNG Project and *bringing this business opportunity to UFG's attention*.") (emphasis added); *Id.*, Paragraph 30 ("UFG need not belabor the obvious: a first mover who presents a potentially lucrative idea has leverage to capture a substantial amount of the economic gains.").

[16] *Id.*, Paragraph 34.

[17] *Id.*, Paragraph 49.

[18] *Id.*, Paragraph 29. Claimant's reliance upon a clause in the UFACEX-EATCO preliminary agreement under which both sides agreed for three years to pursue the project together, and not alone or with others, begs the question of what gave Mr. El Komy the leverage to command such exclusivity. *See id.*, Paragraph 40; Agreement between UFACEX and EATCO, 9 Mar. 2000 [C-0439].

influence over senior government officials. Not only is there no evidence of *non*-corrupt influence, this is not *Claimant's* explanation and indeed flies in the face of Claimant's own denials that Mr. El Komy exerted *any* influence on government officials at all.

18. Nor is this a matter of second guessing a commercial decision, but rather one of understanding the reasons for that decision in a situation where such understanding is required. As the majority notes, unanswered queries may have innocent explanations. But when the answers to queries that are actually proffered are not proven in circumstances where, if true, it should have been easy to do so, or worse, when the evidence affirmatively disproves them, I see no alternative but to infer that the true explanation is not an innocent one.[19]

19. For these reasons, I believe that we should conclude that corruption has been established by circumstantial evidence and that the claims should be dismissed.

**Liability**

20. I also disagree with the majority's conclusions with respect to the Respondent's liability for a breach of the fair and equitable treatment provision in Article 4.1 of the Treaty. This includes my disagreement with the standards accepted by the majority for establishing a violation of this provision, which I will not address in light of the Parties' mutual treatment of the factor of legitimate expectations in assessing a violation of this particular treaty. I do however agree with Respondent that, even accepting the role of legitimate expectations, the threshold is high.[20]

21. I agree with the majority's statement that "legitimate expectations depend on specific undertakings and representations," quoting the award in *Philip Morris v. Uruguay*.[21] However, I do wish to set out in some detail why I do not believe that either the 25 July 2000 Council of Ministers decision,[22] or the 5 August 2000 Ministry of Petroleum letter,[23] both of which are relied upon by the majority, provide the basis for any legitimate expectation that Egypt would forswear policies that either allegedly "over"-incentivized NG consumption or "under"-incentivized NG production. I also do not believe that those policies can be said to have caused the under-supply of gas to Claimant. Finally, I do not consider that Claimant has proven that EGAS's decision to deny gas to Claimant in favor of domestic demand was directed or instructed by the government of Egypt.

---

[19] This inference is not affected by the fact either that it was raised by Respondent only after arbitral proceedings were begun or that criminal investigations of Mr. El Komy in connection with the project were only begun years after the fact and are still ongoing.

[20] Resp. Rej. Merits, Paragraph 221.

[21] *Philip Morris v. Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, Paragraph 426 (emphasis omitted) [RL-151]. I also agree with the majority that, in the absence of such an undertaking, Claimant has not established any other violation of Articles 3(1), 4(1), 4(2) or 4(5) of the Treaty.

[22] Minutes of the 18th Meeting of the Council of Ministers of 25 July 2000 [C-0456].

[23] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa, Chairman (José Maria Amustategui), 5 Aug. 2000 [C-0169/C-0413].

22. It must be assumed that, at the time it pursued the project, UFACEX knew that it was a national policy priority to guarantee the supply of domestic demand for natural gas.[24] To overcome such a policy, a clear and specific undertaking by the government would have been necessary. But the government was unwilling to provide UFACEX with a guarantee of EGPC's supply obligations to assure that gas would be supplied even if it meant domestic demand was unmet. One of the goals of UFACEX's January 2000 meeting with Minister Fahmy was "identifying the support/guarantees that the Government of Egypt can provide to the Project."[25] But all they were able to obtain was Minister Fahmy's personal "support" and "commitment."[26] Indeed, the 17 May 2000 MOU between UFACEX and EPGC is express in stating that EGPC would be its own guarantor.[27] This is a repudiation of the notion that the government was ever willing to guarantee EGPC's SPA commitments.

23. Nonetheless, the majority accepts the proposition that the 25 July 2000 Council of Ministers decision[28] and the 5 August 2000 Ministry of Petroleum letter[29] together amount to a "specific undertaking" sufficient to support a legitimate expectation that the government would tailor its policies to assure adequate supply to Damietta. But I do not think that such a momentous undertaking can be inferred from these acts.

24. The chronology of events shows that, apart from evidencing approval of the project in general, the approvals given by the Ministry of Petroleum and the Council of Ministers related specifically to the SPA's prices for the volumes of gas to be sold, an issue which was always, and expressly, subject to government approval.

---

[24] *See, e.g.,* "Egypt – Integrated Gas Strategy; Exports Won't Exceed 25% of Output," APS Review Gas Market Trends , 17 January 2000 [BRG-31] ("The following are the six points of the Master Plan, approved in October 1999 by the new government of Dr. Atef Obeid which expressed clear support for proposals to export gas in liquid form and by pipeline as well as proposals to accelerate Egypt's shift from oil to gas for domestic energy and industrial feedstocks:

> 1. Gas exports should at no time exceed 25% of Egypt's total output capacity. *This means the domestic gas requirements of Egypt - a top priority of the current Egyptian regime under President Hosni Mubarak - will always be guaranteed.*") (emphasis added).

[25] UFACEX memo to Elías Velasco and Santiago Roura re "LNG – Egypt," 28 Jan. 2000, page 1 [C-0344].

[26] *Id*., page 2.

[27] Memorandum of Understanding Between EGPC and UFACEX [for the] Development Of A Natural Gas Liquefaction Facility, 17 May 2000, Appendix 1 [C-0168]:

> "*APPENDIX 1: TERM SHEET OF THE NATURAL GAS SALE AND PURCHASE AGREEMENT*
> 
> *Seller: EGPC.*
> 
> *Seller's Guarantor: The EGPC shall guarantee all and any obligations of Seller under the Natural Gas Sale and Purchase Agreement*."

[28] Minutes of the 18th Meeting of the Council of Ministers, 25 July 2000 [C-0456]

[29] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 Aug. 2000 [C-0169/C-0413].

25. All of the basic economic terms of the SPA *except price* (i.e., volume, take-or-pay percentage, performance stand-by letter of credit, start date) were already fixed in the 17 May 2000 MOU between UFACEX and EGPC; price was to be "finally agreed" in the SPA.[30]

26. Negotiations on the price and all other terms of the SPA were completed by 15 July 2000 when the SPA was signed in principle.[31] At that point, the SPA was subject to government approval only of "*the agreements that have been made **regarding the price of the gas***."[32]

27. On 20 July 2000, the EGPC Board approved a memorandum that described the agreed price and other basic economic terms of the SPA, and authorized action "*to conclude the contractual procedures as required.*"[33] But the Board was obviously concerned with the maximum price provisions, because its decision was marked up to note that a further meeting was to be held with UFACEX "*in order to increase the maximum price ceilings.*"[34] (As with all Board decisions, these conclusions were notified to and endorsed by Minister Fahmy, in accordance with EGPC's foundational statute.[35])

28. As had been understood, the "conclusion of the contract procedures" required government approval of the agreed prices. To this end, a memorandum was prepared by the Ministry of Petroleum for the Council of Ministers that, again, summarized the basic economic terms of the SPA, including the price terms as had been agreed on 15 July 2000, and requested approval for the conclusion of a contract "*according to the conditions and prices mentioned in the memorandum to be paid in dollars.*"[36] Based upon this memorandum, on 25 July 2000 the Council of Ministers gave its approval to the "signing [of] a memorandum of understanding with Unión Fenosa Company to develop a project for the liquefaction of natural gas for export to Spain."[37]

29. The majority considers at paras. 9.57 and 9.66 that the approvals of the government related to specific provisions of the SPA by which, among other things, EGPC warranted an adequate supply of gas to meet contract requirements (Sections 23.2 and 24. 3), agreed to

---

[30] Memorandum of Understanding Between EGPC and UFACEX [for the] Development Of A Natural Gas Liquefaction Facility, 17 May 2000, Appendix 1 [C-0168].

[31] See Draft Memorandum Number 56, 2000 [C-0360].

[32] *Id.* (emphasis added).

[33] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000 (emphasis added) [C-0359].

[34] *Id.* (emphasis added).

[35] Law 20 of 1976 [C-0126] ("Article 11: The Chairman of the Board of Directors of the Corporation shall notify the Board's decisions to the Minister of Petroleum for consideration in adoption and he shall have the power to amend or abolish them, and has to take its decision about them and notify it to the Board within thirty days from the date of the arrival of the papers to him.").

[36] Memorandum to be submitted to the Cabinet on Contracting with the Spanish Company (Union Fenosa) for Exporting the Egyptian Natural Gas, July 2000, page 11 (emphasis added) [C-0458].

[37] Minutes of the 18th Meeting of the Council of Ministers of 25 July 2000, page 3 [C-0456].

limitations on the invocation of *force majeure* (Sections 15.2 and 15.3(b)) and, most importantly, committed "*to procure that the Egyptian authorities undertake not to interfere with the rights of Buyer under this Agreement, and not to dictate or promulgate any act or regulation which could directly or indirectly affect the rights of Buyer under this Agreement, or affect the capacity of Buyer to perform its obligations under this Agreement, even in the case of a NG shortage in Egypt, save for Force Majeure situations as defined in this Agreement*" (Section 21.1). But the evidence indicates the government approvers were not even provided with the full terms agreed-upon, but rather only with summaries of key terms necessary to evaluate the adequacy of the price terms.

30. None of the particular terms cited is even described in the memorandum that went to the EGPC Board[38] which, on 20 July 2000, approved "the contents of the memorandum" and, on that basis, authorized the concluding of contract procedures.[39] These were the decisions "endorsed" by Minister Fahmy in his 24 July 2000 notation to the minutes.[40]

31. These provisions were also not described in the similar memorandum that went to the Council of Ministers on 25 July 2000, which requested approval for signing a contract "*according to the conditions and prices mentioned in the memorandum*";[41] the Council's actual decision was to approve signing a contract for "*a project for the liquefaction of natural gas….*"[42] Minister Fahmy's 27 July 2000 letter to the Prime Minister reported that the contract had been agreed "*according to the above mentioned* [prices] *and the main conditions which were stated in the memorandum submitted to the Cabinet.*"[43]

32. The 29 July 2000 Technical Department Memorandum describes the decisions of EGPC's Board of Directors and the Council of Ministers as approvals of "the project" and does not include any of these particular provisions in its summary of the "main characteristic[s]" of the SPA.[44]

33. In short, while these particular terms were clearly binding on EGPC, there does not appear to be any evidence that they were known to, much less approved by, the government officials involved. Their concern was for the prices to be charged at the volume promised.

34. Most importantly, I do not believe that there is any basis for concluding that the 5 August 2000 Ministry letter to UFG's Chairman constitutes in particular the undertaking of the Egyptian authorities "not to interfere with the rights of [the] Buyer" that EGPC was

---

[38] Draft Memorandum Number 56, 2000 [C-0360].

[39] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000 [C-0359].

[40] *Id.*

[41] Memorandum to be submitted to the Cabinet on Contracting with the Spanish Company (Union Fenosa) for Exporting the Egyptian Natural Gas, July 2000 (emphasis added) [C-0458].

[42] Minutes of the 18th Meeting of the Council of Ministers of 25 July 2000 (emphasis added) [C-0456].

[43] Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr. Atef Ebeid (Prime Minister), 27 July 2000 [C-0461].

[44] Memorandum from the Technical Affairs Office of the Ministry of Petroleum, 29 July 2000 [C-0459].

obligated to procure in SPA Section 21.1. The letter merely states, in full pertinent part, "On behalf of the Ministry of Petroleum I have the pleasure to inform you that the Egyptian Government official [*sic*] endorsed the natural gas Sales and Purchase Agreement signed on August 1st, 2000 between UFACEX and EGPC."[45] This single sentence simply cannot bear the weight assigned to it by the majority at para. 9.145 as the "the decisive tipping factor in establishing the Respondent's breach of Article 4(1) of the Treaty."

35. The letter makes no reference whatsoever to Section 21.1. It does not even use any of the terminology of Section 21.1. There is no contemporaneous evidence at all that it was intended or considered to implement Section 21.1.[46]

36. If Unión Fenosa had actually considered it as such, it would certainly have cited it in its letters to the Ministry seeking its help with regard to EGAS's performance of the SPA, especially after EGAS expressly noted in its 16 October 2005 letter to UFG that it considered its supply commitment to be subject to "*the priority given to local demand.*"[47] But, neither Section 21.1 nor the 5 August 2000 letter is ever mentioned in any of the communications of complaint by Claimant listed in para. 9.125 of the award.

37. The absence of such evidence is even odder in light of the contention that a government undertaking under Section 21.1 was a *sine qua non* to UFACEX's agreement to the SPA. If it was truly an "essential condition" of the transaction, Section 21.1 would have been drafted as a condition precedent, not as an obligation to be performed in the future. It is difficult to see how an investor could reasonably have understood such terms of the 5 August 2000 letter to constitute a specific assurance to make domestic demand a subsidiary priority, and to have based a major investment on such terms.

38. In the end, for this reason, I do not believe that such an undertaking by the government, while perhaps highly desirable, was an essential condition of UFACEX's investment.[48] In

---

[45] Letter from Ministry of Petroleum, First Undersecretary (Ismail Karara) to Unión Fenosa S.A., Chairman (José Maria Amustategui), 5 August 2000 [C-169].

[46] Nor do I consider that, as the majority maintains in para. 9.61, the Respondent was "associating itself" with Section 21.1 by means of the 5 August 2000 letter in the sense that it was somehow agreeing to effectuate EGPC's obligation to procure a government undertaking. As noted in para. 9.121 of the Award, the commentary to the ILC Articles explains that there is a difference between a State's "acknowledgment and adoption of the conduct in question as its own" and "cases of mere support or endorsement" by the State. *See* James Crawford, *The ILC's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002), [CL-0185], Article 11.

[47] Letter from EGAS to UFG, 16 Oct. 2005 [R-364].

[48] It is notable that a government guarantee or non-interference undertaking was not among the "Main Principles" set forth in the 17 May 2000 MOU. *See id.*, Article 4 ("ARTICLE 4 MAIN PRINCIPLES OF THE NATURAL GAS SALE AND PURCHASE AGREEMENT - The Natural Gas Sale and Purchase Agreement shall be negotiated in good faith between the Parties and its content shall observe the basic terms and conditions set forth in Appendix 1 hereto") and Appendix 1. Nor were these mentioned in the MOU as one of the "Additional Commitments." *Id.*, Article 5 ("ARTICLE 5 ADDITIONAL COMMITMENTS BY EGPC IN CONNECTION WITH THE PROJECT - 5.1 EGPC is aware that the execution of the Natural Gas Sale and Purchase Agreement is a key element for the successful development of the Project. 5.2 EGPC agree to use its best efforts to assist in issuing all necessary permits, licences and authorizations for the development of the Project in accordance with

9

making the investment, UFACEX appears to have justified taking the risk of under-supply on the basis of considerations other than any specific assurance by the government, namely, EGPC's own promise to supply Damietta in preference to domestic demand and, most importantly, the then-current optimistic projections of future natural gas production in Egypt. This explains why there were no strenuous protests when a real Section 21.1 undertaking was not procured by EGPC.

39. This is supported by provisions of the SPA. Section 24.1, entitled "Mutual Representations," states that UFACEX, as well as EGPC, represented and warranted that "*(f) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions (including decisions regarding the suitability of this Agreement)* **based upon its own judgement** *and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other Party*," "*(g) it understands the terms, conditions, and risks of this Agreement and is capable of assuming and* **willing to assume (financially and otherwise) those risks**," and "*(h) it is* **acting as principal**, *and not as agent, fiduciary, or any other capacity*." Section 25.9 would seem to describe the universe of persons/entities bound by the terms of the SPA: "*This Agreement shall be* **binding upon** *and shall inure to the benefit of* **the Parties hereto and their respective successors and permitted assigns**."[49]

40. The majority considers that the juxtaposition of timing and the terms of Article 21.1, on one hand, and the letter, on the other, excludes any objective interpretation other than that the letter was the separate, extra-contractual undertaking required under Section 21.1. But, in my view, there is a much simpler and likely interpretation.

41. As noted above, the EGPC Board's 20 July 2000 decision to approve the memorandum on the SPA noted that a further meeting was to be held with UFACEX "*in order to increase the maximum price ceilings*."[50] In fact, the day after the meeting of the Council of Ministers, on 26 July 2000, EGPC had such a meeting with UFACEX and the parties agreed to raise the maximum prices from $1.00/MMBTU to $1.25/MMBTU.[51] However, as Claimant states, "the executed version of the SPA contains a handwritten note from EGPC Chairman Mohammed Tawila that '[t]*he price* [of gas] *is subject to final approval by the Egyptian Governmental authorities*.'"[52]

42. Thus, at signing, the single remaining pre-condition to, and the only additional approval required for, the full effectiveness of the SPA was approval of the final price. In this circumstance, it was clearly the function of the 5 August 2000 Ministry letter to give notice

---

Egyptian regulations and applicable laws. 5.3 EGPC represents and warrants to UFACEX that its surplus of natural gas will be sufficient to feed the Complex under the terms and conditions set forth in Appendix 1.").

[49] Natural Gas Sale and Purchase Agreement, 1 Aug. 2000 (emphasis added) [C-0002].

[50] Memorandum number 56, Agenda of the XIIIth Meeting of the Board of Directors of the Egyptian General Petroleum Commission, 20 July 2000 (emphasis added) [C-0359].

[51] Letter from S. Fahmy (Minister of Petroleum) to H.E. Dr. Atef Ebeid (Prime Minister), 27 July 2000 [C-0461].

[52] Cl. Mem. Merits, Paragraph 127. *See also*, Natural Gas Sale and Purchase Agreement, 1 Aug. 2000, signature page [C-0002].

10

of the approval given for the new price terms. There has been no contention that such notice of this outstanding approval was accomplished by any other means.

43. Thus, I believe that both the 25 July 2000 Council of Ministers decision and the 5 August 2000 Ministry of Petroleum letter must be read as approving the project generally and approving, specifically, the price to be paid for the gas at agreed volumes, and nothing else.[53] I do not see a basis for concluding that they gave rise to any legitimate expectation that Egypt would forswear its natural gas consumption and production policies in order to guarantee EGAS's supply commitments.

44. In the majority's view, at para. 9.145, "the Respondent's conduct failed to meet its obligations under the FET standard in Article 4(1) of the Treaty, taking into account as a relevant factor the legitimate expectations generated by the Respondent's undertaking in the form of the Ministry of Petroleum's letter dated 5 August 2000, as described above." The majority finds that Respondent frustrated Claimant's legitimate expectations in two ways. First, it finds that the shortages in gas supply to Claimant beginning in 2010 were due to "long-standing policies of subsidising domestic users of gas and electricity," which it says began after execution of the SPA, "together with the failure to encourage the finding of gas deposits in Egypt" (paras. 9. 127 – 9.130). Second, it finds that, at some point before EGAS's 24 February 2103 notice of *force majeure*, the government had "*directed* EGAS to limit and eventually stop the supply of feed gas under the SPA to the Damietta Plant." I disagree with both of these conclusions.

45. First, as verified by Claimant's own expert,[54] domestic subsidies long predated the SPA and, indeed, domestic energy pricing had not previously increased since 1993.[55] More importantly, Egyptian gas production under the government's policies was obviously sufficient to meet the requirements of the SPA, given that the demands of the Damietta Plant[56] constituted only a fraction of total production. Short of holding that Respondent had given assurances to Claimant that it would guarantee enough production to supply *all* customers, there is no basis to say that these policies caused undersupply to Claimant. And this is aside from the immensity of holding a State's entire energy policy to constitute an FET violation.

46. Second, there is no direct evidence, and insufficient indirect evidence, that EGAS acted under the government's direction and control in curtailing supplies under the SPA.[57] Respondent

---

[53] This is not contradicted by the documents relating to the price increases in 2006, 2007 and 2008 (C-0320, C-0392, C-0460, C-0462, C-0463), which cite Minister Fahmy's involvement only in the final price negotiations of 26 July 2000.

[54] BRG ER1, Paragraph 32.

[55] Egyptian Environmental Affairs Agency, *The Arab Republic of Egypt: Initial Communication on Climate Change*, June 1999, page 27 [BRG-165].

[56] Equating Damietta Plant issues with Claimant's particular issues is misleading since Claimant only has rights to just under 60 % of Damietta tolling capacity, with EGAS itself enjoying the rights to the just-over 40% remaining. Cl. Mem. Merits, Paragraph 172.

[57] I do not consider the holding in the *Ampal v. Egypt* to support an opposite conclusion. Unlike the situation here, in *Ampal,* as the Award notes in para. 9.110, the Ministry of Petroleum acted as the principal in the transactions at issue by operation of a resolution of the Council of Ministers. *Ampal v. Egypt*, ICSID Case No. ARB/12/11, Decision on Liability and Heads of Loss, 21 February 2017, [CL-0273], Paragraph 141.

denies any such direction or instruction and produced witness testimony to support that denial.[58] None of the public statements by officials cited by the majority supports the assertion that EGAS acted under instruction. The brief press report of Minister Kamal's 15 October 2012 statement that "Egypt has stopped exporting gas to Jordan and Spain" does not quote him, does not refer to any government decisions and correctly observes what was happening within Egypt as a collective.[59] Similarly, the equally brief press report paraphrasing Minister Ismail's 24 November 2013 statement in relationship to one of the arbitrations commenced by Claimant that "we should first cover local market's need from natural gas," also does not mention any government decision and at most speaks to the consonant policies of EGAS and the government.[60]

47. The other statements attributed to government officials during meetings are similarly deficient in their support of the majority's conclusion. The testimony of Mr. Egea Krauel that Minister Kamal's alleged undertaking to study the situation made him realize that Claimant was being singled out is a *non sequitur* and hardly proof of an instruction to EGAS. Indeed he does not even corroborate Mr. Sáez Ramírez's testimony that Minister Kamal had undertaken to "make a decision;"[61] Mr. Sáez Ramírez fails in any case to state what the subject matter of such a decision was to be. (The letter sent by UFG following this meeting makes no mention of either of these statements attributed to Minister Kamal.[62])

48. The claim that Minister Ismail stated in a 26 November 2103 meeting that "Egypt will in fact not comply with its obligations in the near future"[63] seems hard to credit and does not corroborate an instruction to EGAS. Moreover, that such a statement was made was vigorously denied in the reply by the Ministry.[64]

49. Thus, I do not believe that there was a violation of the Treaty's FET provision based upon either the assertion that government energy policies caused the under-supply or the assertion that EGAS acted to curtail supply under the direction and control of the government.[65]

---

[58] Hameed WS, Paragraph 25.

[59] "Petroleum Minister: Gas exports to Jordan, Spain halted," Egypt Independent [C-0286].

[60] "Petroleum minister: Butane distribution to be revised," Al Gomhouria (undated) [C-0280].

[61] Sáez Ramírez WS1, Paragraph 25.

[62] Letter from UFG (Jose María Egea Krauel and Cesare Cuniberto) to Minster of Petroleum (Osama Kamal), 21 September 2012 [C-0048].

[63] Letter from UFG (José María Egea Krauel and Cesare Cuniberto) to Minister of Petroleum (Sherif Ismail), 5 December 2013 [C-0085]. It is worth noting that, despite its reference to "Egypt's obligations," even this letter, sent shortly before the notice of dispute was served, makes no allusion whatsoever to either Article 21.1 of the SPA or to the Ministry's 5 August 2000 letter.

[64] Letter from Ministry of Petroleum (Sherif Sousa) to UFG (José María Egea Krauel and Cesare Cuniberto), 19 January 2014 [C-0086].

[65] For this reason, I also do not agree with the majority's conclusion in para. 9.147 that there was a technical FET violation resulting from the non-payment of tolling fees by EGAS to SEGAS under the EGAS Tolling Contract.

**Damages**

50. Regarding damages, I agree with the majority on the exclusion by operation of SPA Section 8.1[1] and other reasons of Claimant's claims for lost dividends from SEGAS and loss of profits on undelivered gas that was not replaced by UFG. I also agree, that as a result of our unanimous decision to dismiss Claimant's tax-free zone claim, we need not consider the related claim to damages. However, I dissent from the majority's ultimate conclusions with respect to other damages that would be claimable if Egypt's liability had been demonstrated.

51. The majority is of the view at paras. 9.84 and 9.126 that Claimant has been "almost ruined" by the non-supply of gas under the SPA. But I think that this significantly overstates Claimant's situation. Indeed, the Unión Fenosa Gas Group's 2014 annual report states only that "[t]he absence of Egyptian gas caused the Company's supply costs rise [*sic*], reducing profits compared with previous years."[66] The Group's Directors' Report for the financial year ending on 31 December 2015 states that "[t]he absence of Egyptian gas, along with the effects derived from the fall in the global energy scenario, has caused a notable reduction in profits compared with previous years."[67] Thus, far from being an issue of Claimant's survival, the Egyptian non-supply is a matter only of reduced profits.

52. Similarly, I find Claimant's presentation on quantification of damages to be greatly overstated.

53. First, while the majority prefers the approach of the Claimant's experts, that approach, even in its third alternative, suffers from a number of deficiencies that make it excessively speculative. This is primarily because, rather than producing many of the underlying transactional documents or even verifying them, it has relied upon print-outs from Claimant's own internal databases. This is particularly true with respect to documentation of individual transactions on which Claimant may have suffered any actual loss;[68] there is no ability for Respondent to contest whether Claimant allocated Claimant's most expensive replacement gas to replace the Egyptian gas to maximize the claim.[69]

54. Claimant's experts argue that, because they are the product of a large company accounting system, it has no reason to doubt the accuracy of the data,[70] and that it would have been too

---

[66] 2014 Annual Report of Unión Fenosa Gas Group, page 190 [R-0345].

[67] Directors' Report For The Financial Year Ended 31 December 2015, page 1 [NAV-185, page 1 following the Consolidated Annual Accounts.] The report also states that, while "[a]lso in 2015, the toller EGAS has maintained its suspended payment of the amounts due to SEGAS, putting *the subsidiary* in a critical situation with respect to its financial backers and suppliers, although *all its financial obligations have been correctly settled*." *Id.*, page 3 (emphasis added). *See also* the testimony of Claimant's expert that "over the entire period, from 2006 to 2015, UFG generally made profits at a portfolio level." Tr. Day 5, page 1446:15-16.

[68] Tr. Day 6, page 1600:1-3.

[69] BDO ER2, Paragraph 10.66.

[70] Navigant ER2, Paragraphs 10-12.

"burdensome" to produce many of the documents themselves.[71] But, notwithstanding the fact that Claimant's accounts are audited for purposes of financial reporting, data produced for litigation is not subject to audit for the purpose. Moreover, while "burdensomeness" may well be a ground for objecting to discovery requests, it is the not a ground for failing actually to prove damages suffered. In the context of a US$ 4 billion claim, producing such documents, or at least a forensic audit of such data, for review by a respondent is not only reasonable, but necessary.

55. Second, the Tribunal finds that SPA Section's 8.1[2]'s 90%-of-price limitation does not affect damages because the Claimant's experts calculated the limitation's threshold to be higher than the nominal amounts claimed for extra costs for delivered gas and costs of replacing undelivered gas. But at the hearing, Respondent's expert submitted, without objection, a calculation based, not on monthly totals as used by Claimant's expert, but on transaction-by-transaction totals (using Claimant's data), concluding that the resulting limitation was US$ 567 million below the nominal amounts claimed.[72] I am persuaded that such a basis more accurately tracks the actual costs suffered due to gas not delivered within the meaning of SPA Section 8.1[2] and thus that the SPA provision limits the amount claimable to US$ 1.853 billion.

56. Third, I disagree with the majority that further efforts to mitigate damages could not reasonably be required of Claimant. Respondent has provided sufficient evidence through its experts to show that Claimant had plentiful opportunities beyond those identified by Claimant's financial executive Mr. Conti[73] to reduce its delivery obligations that would have allowed it to avoid substantial portions of its replacement costs. These include renegotiating existing contracts in the favorable environment of declining gas demand in Spain, declining to enter into new short-term contracts and invoking *force majeure* on existing contracts. Without the benefit of contract terms known only to Claimant, Respondent's expert testified that short-term industrial contracts alone could have accounted for as much as US$ 841 million of Claimant's claimed losses.[74] While these changes would have necessitated further alterations to Claimant's business model, the temporary curtailment of particular lines of business does not imply that Claimant would thereby have had to close substantially or completely its multi-line business.[75]

57. Nor could invoking *force majeure* on its downstream contracts earlier than it did on 14 December 2014[76] be considered as unreasonable requirement. As early 20 March 2013, half

---

[71] Navigant Hearing Presentation, page 25.

[72] Tr. Day 2, pages 1577:22 – 1582:5.

[73] Conti WS, Paragraph 17.

[74] BDO ER2, Paragraph 9.10.

[75] I also do not consider relevant that the fact that mitigation is required at all is due to Respondent's treaty breach; by definition, the question of mitigation never arises at all unless there has been some breach.

[76] Cl. Rep. Merits, Paragraph 457. *See also* Notice of Force Majeure from UFG to UFGC, 12 Dec. 2014 [C-0431]; Notice of Force Majeure from UFGC to GNF subsidiary one 12 Dec. 2014 [C-0432]; Notice of Force Majeure from UFGC to GNF subsidiary two 12 Dec. 2014 [C-0433]; Notice of Force Majeure from UFGC to GNF subsidiary three 12 Dec. 2014 [C-0434].

of Claimant's Board of Directors and its CEO argued for taking just such a step.[77] The fact that the other half of the Board squelched this idea cannot render it unreasonable, and any costs incurred subsequent to that date should be considered as a business decision purely to Claimant's account.

58. The area in which further mitigation by Claimant could have had its greatest impact would have been in the diversion of all of the LNG it had under contract from Oman to downstream customers. While Claimant made the point that it is not claiming for any costs of replacing Omani LNG, it never denied that diverting the 2.2 bcma available from Oman would have substantially reduced the need to purchase higher priced gas to replace Damietta LNG. While this would have eliminated the profits that Claimant would otherwise have gained from the sale of the Omani LNG on the Asian spot market, such lost profits would not have been claimable here under the Tribunal's decision. By the uncontested calculation by Respondent's expert, this would have reduced this head of damages to at most US$ 241 million.

**Costs**

59. Finally, as a result of my differences with the majority on the above issues, I also disagree that costs should be awarded to the Claimant.

**Dissent**

60. For all of the above reasons, I respectfully dissent to the award as set forth, including the dispositions in Operative Part XIII as indicated therein.

_[signature]_

_____

Mark Clodfelter
Arbitrator
Date: 31 August 2018

---

[77] Minutes of the Meeting of the Board of Directors of the Company Unión Fenosa, S.A., Mar. 20, 2013 [R-0353].