# EXHIBIT 2

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

ICSID CASE No. ARB/14/4

UNIÓN FENOSA GAS, S.A.

*Claimant,*

— v.—

ARAB REPUBLIC OF EGYPT

*Respondent.*

**APPLICATION FOR ANNULMENT AND REQUEST FOR STAY OF ENFORCEMENT OF ARBITRAL AWARD**

December 21, 2018

I.    INTRODUCTION.................................................................................................2

II.   BACKGROUND .................................................................................................3

  A.   The Origins Of The Damietta LNG Project.................................................3

  B.   The Global Financial Crisis And The Egyptian Revolution.........................5

  C.   Gas Shortages In Egypt Impact The Damietta Plant ...................................7

  D.   UFG Commences Multiple Parallel Arbitrations ........................................7

  E.   The Award .................................................................................................8

    1. Corruption .............................................................................................9

    2. Merits ..................................................................................................10

    3. Compensation......................................................................................11

III.  GROUNDS FOR ANNULMENT ....................................................................12

  A.   There Has Been A Serious Departure From A Fundamental Rule Of Procedure .......14

    1. The Majority Denied Egypt The Opportunity To Be Heard With Respect To Its Findings On Mr. El Komy's Involvement In The Damietta Project...........................15

    2. The Majority Denied Egypt Its Right To Confront The Evidence Used Against It ................................................................................................21

      a)   Denial Of Egypt's Right To Confront The Evidence On Which Claimant's Calculations Of "Damages" Were Based ............................21
      b)   Denial Of Egypt's Right To Confront Claimant's Quantum Expert On Whom The Majority Relied ................................................23

  B.   The Award Failed To State The Reasons On Which It Is Based................25

    1. The Award Failed To State The Reasons For Its Conclusion That The Natural Gas Sale And Purchase Agreement Was Not Procured By Corruption....................25

    2. The Award Failed To State Reasons For Its Conclusion That The Curtailment Of Gas To The Damietta Plant Was Attributable To Respondent Under Article 8 Of The ILC Articles Of State Responsibility................................31

    3. The Award Failed To State Reasons For Rejecting Many Of Egypt's Arguments With Regards To Compensation .........................................34

      a)   Effect Of The SPA On Claimant's Entitlement To Compensation ....................35
      b)   The Reliability Of UFG's Expert Submissions ....................................39
      c)   Claimant's Failure To Mitigate.........................................................39

  C.   The Tribunal Manifestly Exceeded Its Powers........................................41

    1. The Tribunal Assumed Jurisdiction Over UFG's Claims Despite The Investment Having Been Obtained By Corrupt Or Other Unlawful Means .............42

    2. The Tribunal Failed To Apply The Proper Law In Its Attribution Analysis .............45

    3. The Tribunal Read Out The Cap On Damages Agreed In The SPA .........................49

IV.   REQUEST FOR A STAY OF ENFORCEMENT OF THE AWARD.....................51

V.    REQUEST FOR RELIEF .................................................................................52

## I.   **INTRODUCTION**

1.     Pursuant to Article 52 of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States ("Convention") and Rule 50 of the Rules of Procedure for Arbitration Proceedings ("Arbitration Rules"), the Arab Republic of Egypt ("Egypt," or "Respondent") respectfully submits to the Secretary-General of the International Centre for Settlement of Investment Disputes (the "Centre" or "ICSID") this Application for Annulment of the Award dated August 31, 2018 in *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/14/4 ("Award"), an ICSID arbitration initiated by Unión Fenosa Gas, S.A. ("UFG" or "Claimant") under the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt of November 3, 1992 ("Spain-Egypt BIT").

2.     Egypt seeks annulment of the Award on the grounds that:

  (1)    there has been a serious departure from a fundamental rule of procedure (Article 52(1)(d) of the Convention);

  (2)    the Award failed to state the reasons on which it is based (Article 52(1)(e) of the Convention); and

  (3)    the Tribunal manifestly exceeded its powers (Article 52(1)(b) of the Convention).

3.     On December 19, 2018, Egypt paid the USD 25,000 fee required by ICSID's Schedule of Fees (effective July 1, 2017) in order for a party to be able to apply for annulment of an arbitral award rendered pursuant to the Convention.

4.     Supporting factual exhibits and legal authorities are annexed hereto as Exhibits RA-01 through RA-10 and Exhibits RLA-01 through RLA-26, respectively, according to the accompanying indices.[1]

5.     In accordance with Rule 18 of the Arbitration Rules, the following shall serve as Egypt's agents, counsel and advocates in connection with the present Application and the ensuing annulment proceedings:

---

[1]    For documents already exhibited in the underlying record of ICSID Case No. ARB/14/4, the Application refers to the original exhibit numbers from the arbitration.  The Application does not exhibit the underlying submissions and pleadings from ICSID Case No. ARB/14/4 either.  All documents being relied on will be included in the electronic version of the filing folder.

H.E. Counsellor Hussein Khalil Hamza
Counsellor Mohamed Khalaf
Counsellor Amr Arafa Hassan
Counsellor Yousria El Gamal
Counsellor Nada Morsy Elzahar

Egyptian State Lawsuits Authority (ESLA)
42 Gameat El Dowal El Arabiya St.
Mohandeseen, Giza, Cairo
P.O. Box: 12311
Egypt

and

Dr. Claudia Annacker
Mr. J. Cameron Murphy
Ms. Laurie Achtouk-Spivak
Mr. Larry C. Work-Dembowski
Ms. Ariella Rosenberg
Mr. Pablo Mateos Rodríguez
Ms. Zeïneb Bouraoui

Cleary Gottlieb Steen & Hamilton LLP
12, rue de Tilsitt
75008 Paris
France

6.      For the purpose of this proceeding, Egypt's address of record shall be deemed to be that of its counsel of record, and all communications shall be served on it through counsel.

## II.      **BACKGROUND**

7.      Egypt sets forth below a brief summary of the factual background of the dispute and the findings of the majority in the Award, which should assist the *ad hoc* Committee in understanding the reasons why the Award should be annulled, as detailed in Sections III.A-III.C.

### A.      The Origins Of The Damietta LNG Project

8.      UFG is a company incorporated under the laws of Spain, and by assignment a contractual party to the Natural Gas Sale and Purchase Agreement of August 1, 2000 ("SPA") at the heart of this dispute.[2]

---

[2]     *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt,* ICSID Case No. ARB/14/4, Award (Aug. 31, 2018) ("**Award**") (Exhibit RA-02), ¶¶ 1.1, 3.8, 5.3, 5.121.

9.      A delegation from UFG's predecessor, Unión Fenosa Desarrollo y Acción Exterior, S.A. ("UFACEX") first met with Egypt's Minister of Petroleum in early 2000 to discuss potential development of the first liquefied natural gas ("LNG") plant in Egypt, to be built in the town of Damietta ("Damietta Project").[3]  Although UFACEX had "*no previous experience in the LNG field*,"[4] and no tender was held, the Egyptian General Petroleum Corporation ("EGPC"), a state-owned company, signed a Memorandum of Understanding with UFACEX on May 17, 2000 for the Project.[5]  UFG established an Egyptian joint stock company, the Spanish-Egyptian Gas Company S.A.E. ("SEGAS"), to develop and operate the Damietta Plant, with majority ownership by UFG.[6]

10.     On June 28, 2000, during the negotiations leading up to the execution of the SPA, UFACEX concluded a Joint Venture Agreement ("JVA") with EATCO, a company run by Mr. Yehya El Komy, an Egyptian businessman.[7]  Pursuant to the JVA, EATCO, which was not authorized to operate in the oil and gas sector at the time,[8] was to receive: (i) a "*Success Fee*" totaling US$ 10 million;[9] (ii) a "*Fuel Management & Support Fee*," worth close to US$ 200 million dollars over the 25-year life of the contract by UFG's own calculations;[10] and (iii) a 40% share of SEGAS.[11]  Mr. El Komy had a relationship with the father of the then-Minister of Petroleum, Sameh Fahmy, [12] who was in turn described by UFG in contemporaneous documents as having a "*personal interest in the* [Damietta] *project and entering the Spanish market*."[13]  Mr. El Komy has been convicted for crimes of corruption and

---

[3]      Award (Exhibit RA-02), ¶ 5.31.

[4]      *Egyptian LNG & P/L Gas Exports May Exceed 27 BCM/Y By 2010*, Aps Review Oil Market Trends (Jan. 14, 2002) (Exhibit R-0005), p. 2.

[5]      Award (Exhibit RA-02), ¶ 5.41.

[6]      Award (Exhibit RA-02), ¶ 5.6.

[7]      Award  (Exhibit RA-02), ¶¶ 5.12-5.13;  Agreement  between  EATCO  and  UFACEX  (June 28, 2000) (Exhibit R-0318).

[8]      Award (Exhibit RA-02), ¶ 7.98.

[9]      Award  (Exhibit RA-02),  ¶ 7.93;  Agreement  between  EATCO  and  UFACEX  (June 28,  2000) (Exhibit R-0318), ¶¶ 3.2, 4.1.

[10]     Award  (Exhibit RA-02),  ¶ 7.38;  Agreement  between  EATCO  and  UFACEX  (June 28,  2000) (Exhibit R-0318), ¶¶ 3.1, 4.1.

[11]     Award  (Exhibit RA-02),  ¶ 5.99;  Agreement  between  EATCO  and  UFACEX  (June 28,  2000) (Exhibit R-0318), ¶¶ 1.2, 1.4, 4.1.

[12]     A. Hammouda, *Billionaire Named Yehya El Komy…The Broker!*, Masrina (Nov. 6, 2014) (Exhibit R-0009), p. 2.

[13]     Award (Exhibit RA-02), ¶ 5.31.

fraud,[14] and both Mr. El Komy and Minister Fahmy continue to be under criminal investigation by Egyptian authorities in connection with the corruption surrounding the Damietta Project.[15]

11.   On August 1, 2000, a month after entering into the JVA with Mr. El Komy's EATCO, UFACEX and EGPC executed the SPA, a twenty-five year gas sale and purchase agreement for the Damietta Project, under which UFACEX would purchase natural gas from EGPC.[16] EGPC subsequently assigned its rights and obligations under the SPA to its wholly-owned subsidiary, the Egyptian Natural Gas Holding Company ("EGAS"), while UFACEX subsequently assigned its rights and obligations under the SPA to UFG.[17]

12.   UFG designed and built the Damietta Plant to be the largest integrated single-train facility for the production of LNG in the world.[18]   This design required the Plant to be supplied with an enormous amount of natural gas to be able even to operate, making it highly vulnerable to supply disruptions.[19]   The construction of the Plant was completed in late 2004, and the Plant was inaugurated in May 2005, with commercial operations beginning in October 2006.[20]

### B.   The Global Financial Crisis And The Egyptian Revolution

13.   While according to industry surveys Egypt consistently had ranked as one of the top three most attractive oil and gas exploration markets in the world from 2005 to 2009,[21] two major and unexpected shocks interrupted that balance, which defied predictions.

14.   First, in late 2008 the Global Financial Crisis began, resulting in a drop in foreign direct investment across Egypt between 2008 and 2010.[22]   The global decrease in natural gas exploration and development due to tighter credit, lower profitability, and reduced need for capacity,[23] together with declining oil prices, meant that those that had already invested in the

---

[14]   Award (Exhibit RA-02), ¶ 7.68.

[15]   Award (Exhibit RA-02), ¶ 7.69.

[16]   Award (Exhibit RA-02), ¶ 5.58; Natural Gas Sale and Purchase Agreement (Aug. 1, 2000) (Exhibit C-0002), Section 2.1.

[17]   Award (Exhibit RA-02), ¶¶ 3.8, 5.3, 5.17, 5.120-5.121.

[18]   Award (Exhibit RA-02), ¶ 5.97.

[19]   Witness Statement of Mahmoud Abdel Hameed ("**Hameed Witness Statement**"), ¶ 28.

[20]   Award (Exhibit RA-02), ¶¶ 5.136, 5.139, 5.148.

[21]   OME, Mediterranean Energy Perspectives - Egypt (2011) (Exhibit R-0344), p. 121.

[22]   Award (Exhibit RA-02), ¶ 5.176.

[23]   S. Heiberg, Impact of the Financial Crisis Investments (UNECE) (2009) (Exhibit R-0346), pp. 5-6; World Energy Outlook, *Chapter 3, Impact of the Financial Crisis on Energy Investment – A Threat or an Opportunity?*, International Energy Agency (2009) (Exhibit R-0096), pp. 135-163.

Egyptian oil and gas sector scaled back their investments in exploration and production.[24] Thus, after reaching a high point in 2007, investment in key gas fields in Egypt fell by an average of 13.5% per year to only US$ 1.7 billion in 2009.[25] This decline in investment in Egypt's upstream gas sector ultimately led to a decline in gas production.[26]

15.  Second, any economic recovery on the horizon in Egypt was upended by the eruption of the Egyptian Revolution in 2011, which led to social and political chaos, the effects of which are still being felt throughout the Egyptian economy today.  The events that unfolded in the Middle East and North Africa beginning in 2010 led to the resignation of President Hosni Mubarak in February 2011.[27]  Violence and civil unrest continued throughout 2011 as instability deepened and the security situation drastically worsened.[28]  The investment environment in Egypt suffered dramatically, with foreign direct investment plummeting in 2011, including zero investment in the petroleum industry, which accounted for a large portion of pre-Revolution investment.[29]  The failure of gas exploration and production companies to follow through on planned projects and maintain those already close to full operation led to a severe drop in the production of natural gas in Egypt.  The resulting shortages affected not only the Damietta Plant, but all buyers of gas in the country.

16.  During this period, several Prime Ministers and the Egyptian Cabinet resigned.[30]  In June 2014, President el-Sisi was elected,[31] and while violence and terrorist attacks continued throughout 2014,[32] some stability was restored in the country.

17.  The Revolution and its aftermath devastated gas production in Egypt both indirectly, as a result of decreased investment in the gas sector, and directly, as a result of disruptions and

---

[24]  Award (Exhibit RA-02), ¶ 5.176.

[25]  Second Expert Report of RPS Energy Consultants ("**Second RPS Report**"), ¶ 56.

[26]  Award (Exhibit RA-02), ¶ 5.176.

[27]  Award (Exhibit RA-02), ¶ 5.199.

[28]  Award (Exhibit RA-02), ¶¶ 5.192-5.195, 5.198.

[29]  CBE, Annual Report 2011/2012 (MK-0056), p. 78.

[30]  Award (Exhibit RA-02), ¶¶ 5.192-5.195, 5.198, 5.214, 5.317.

[31]  Award (Exhibit RA-02), ¶ 5.320.

[32]  D. D. Kirkpatrick, E. Schmitt, *Jihadist Return is Said to Drive Attacks in Egypt*, New York Times (Feb. 5, 2014) (Exhibit R-0182). K. Fahim, *Deadly Attacks Heighten Tension in Egypt*, New York Times (May 2, 2014) (Exhibit R-0186).

delays in exploration, development, and production activities caused by the widespread violence, labor unrest, and political paralysis.[33]

### C.   Gas Shortages In Egypt Impact The Damietta Plant

18.   As acknowledged by UFG at the time, the situation in Egypt following the Egyptian Revolution was "*outside the control of authorities*."[34]   Acute gas shortages in Egypt caused frequent power outages, and regular blackouts in homes, schools, businesses and hospitals, and led to widespread, often violent, protests.[35]   The maintenance of peace and stability, including through the provision of basic energy needs to the population, could only be achieved by prioritizing the domestic electricity generation sector.   Accordingly, EGAS decided to "*supply gas to essential services such as electricity generation during this time of crisis*."[36]   Every exporter operating in Egypt, including UFG, suffered gas shortages as a result of the Egyptian Revolution.[37]

19.   On February 4, 2013, EGAS asserted that the Global Financial Crisis and Egyptian Revolution impaired EGAS's ability to fully supply the Damietta Plant and constituted a situation of *force majeure*, sending UFG a notice of *force majeure* under the SPA on February 24, 2013.[38]

### D.   UFG Commences Multiple Parallel Arbitrations

20.   On February 14, 2014, UFG filed a request for arbitration with ICSID.   UFG alleged that Egypt had failed, through its own acts and omissions, and through those of EGAS and EGPC, to accord UFG's investments the protections under the Spain-Egypt BIT.   In particular, UFG alleged that its investments suffered significant harm as a result of the decisions attributable to Egypt to curtail and cut the supply of natural gas to the Damietta Plant, eventually resulting in the Damietta Plant's shutdown.

21.   In parallel to the ICSID arbitration, UFG (either in its own name or through its subsidiary SEGAS) initiated multiple arbitrations in different *fora* to assert claims based on EGAS's

---

[33]   Award (Exhibit RA-02), ¶¶ 5.192-5.195, 5.198.

[34]   Report of the Managing Director to the Board of Directors Meeting, *Gas S&P Contracts. Analysis Of Current Stand And Proposal Of Improvement Measures* (Mar. 20, 2013) (Exhibit R-0379), pp. 7, 14.

[35]   Award (Exhibit RA-02), ¶ 5.243.

[36]   Hameed Witness Statement, ¶¶ 24-25.

[37]   Hameed Witness Statement, ¶¶ 21, 24-26.

[38]   Award (Exhibit RA-02), ¶¶ 5.271-5.272.

failure to deliver gas to the Damietta Plant.[39]  First, on April 11, 2013, SEGAS commenced an arbitration against EGAS under the Arbitration Rules of the International Chamber of Commerce (ICC Case No. 19382/MD/TO), claiming approximately US$ 82.9 million in outstanding tolling fees arising from the non-delivery of gas.[40]  The ICC tribunal dismissed SEGAS's claim in May 2016 because SEGAS had assigned the rights at issue to a third party.[41]  Second, on May 17, 2013, UFG commenced an arbitration against EGAS under the Arbitration Rules of the Cairo Regional Centre for International Commercial Arbitration ("CRCICA" Arbitration No. 896/2013), seated in Cairo, claiming damages of approximately US$ 9.7 million related to certain price adjustments under the SPA.[42]  By a partial award rendered on August 7, 2015 and a final award on December 21, 2017, the tribunal dismissed UFG's claims.[43]  Lastly, on May 31, 2013, UFG commenced yet another arbitration against EGAS, again under the CRCICA Rules but seated in Madrid (CRCICA Arbitration No. 899/2013), claiming damages of approximately US$ 2.8 billion for non-delivery of gas to the Damietta Plant.  The second CRCICA arbitration remains pending, with a scheduled in December 2018.[44]

### E.   The Award

22. In its Award dated August 31, 2018, the Tribunal rejected Egypt's jurisdictional objections and upheld jurisdiction by majority.[45]  The majority also rejected Egypt's necessity defense under customary international law.[46]  The majority ruled that Egypt had breached its obligations under the fair and equitable treatment ("FET") standard in Article 4(1) of the Spain-Egypt BIT in regard to certain of UFG's claims.[47]  Having found Egypt liable for breach of the FET standard, the majority considered it unnecessary to address UFG's claims of discriminatory treatment and failure to protect UFG's investment under Article 3(1), and of failure to provide UFG's investment with treatment not less favourable than that accorded to

---

[39]   Award (Exhibit RA-02), ¶¶ 6.6-6.9, 6.83.

[40]   Award (Exhibit RA-02), ¶ 6.6.

[41]   Award (Exhibit RA-02), ¶ 6.6.  In February 2018, the assignee of those rights (HSBC) brought a further ICC arbitration for the same allegedly outstanding fees.  Award (Exhibit RA-02), ¶ 6.7.  That arbitration is still pending.

[42]   Award (Exhibit RA-02), ¶ 6.8.

[43]   Award (Exhibit RA-02), ¶ 6.8.

[44]   Award (Exhibit RA-02), ¶ 6.9.

[45]   Award (Exhibit RA-02), ¶¶ 6.63-6.87, 7.116-7.117.

[46]   Award (Exhibit RA-02), ¶ 8.62.

[47]   Award (Exhibit RA-02), ¶¶ 9.83, 9.155-9.156.

investments made by its own nationals or investors of a third country under Articles 4(2) and 4(5).[48]  The Tribunal by majority awarded US$ 2.013 billion plus interest to UFG.[49]

23.  Arbitrator Mark Clodfelter issued a dissenting opinion, setting out his conclusions, which he described as being "*dramatically different*" from those reached by the majority.[50]  The Dissenting Opinion strongly criticizes the majority's findings on jurisdiction, liability, damages, and costs.

24.  Set forth below is a summary of certain portions of the Award and Dissenting Opinion that are relevant to Egypt's Application for Annulment.

### 1.   Corruption

25.  In upholding jurisdiction, the majority dismissed Egypt's objection that UFG's investments were procured through corrupt and illegal practices, depriving them of protection under the Spain-Egypt BIT.[51]  In particular, the majority rejected Egypt's contention that Mr. El Komy arranged for UFG to enter the Egyptian gas market and procure the Damietta Project corruptly, instead concluding that Mr. El Komy had served the role of a "*lobbyist with access to senior figures in EGPC and the Ministry of Petroleum*."[52]  Although UFG itself denied "*that Mr El Komy offered any advantages from special access to the Respondent's decision-makers in regard to the SPA,*"[53] the majority concluded "*that there was influence exercised by Mr El Komy over senior decision-makers at the Ministry of Petroleum and EGPC over the SPA; but that it was not corrupt.*"[54]

26.  In denying Egypt's corruption defense, the majority also rejected UFG's factual account of Mr. El Komy's role in the Damietta Project.  Thus, while UFG had described Mr. El Komy as "*the originator of the project, the 'first mover' and a true partner [of] UFACEX,*"[55] alleging that the Damietta Project was his "*original idea,*"[56] the majority concluded that "*the evidence*

---

[48]   Award (Exhibit RA-02), ¶ 9.158.

[49]   Award (Exhibit RA-02), ¶ 13.8.

[50]   *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/14/4, Award (Aug. 31, 2018), Dissenting Opinion of Mr. Mark Clodfelter ("**Dissenting Opinion**") (Exhibit RA-03), ¶ 1.

[51]   Award (Exhibit RA-02), ¶¶ 7.116-7.117.

[52]   Award (Exhibit RA-02), ¶ 7.102.

[53]   Award (Exhibit RA-02), ¶ 7.103.

[54]   Award (Exhibit RA-02), ¶ 7.109.

[55]   Award (Exhibit RA-02), ¶ 7.33.

[56]   Award (Exhibit RA-02), ¶ 7.104.

*adduced in this arbitration does not support the Claimant's explanation*."[57]   The majority instead concluded, in contravention of what UFG had argued, that Mr. El Komy "*did not bring the project to the Claimant,*"[58] that his "*U$ 10 million success fee alone dwarfed the U$ 2.87 million he paid in as capital*" to the Project, meaning that UFG's "*choice of Mr El Komy as a local partner for the Damietta Project cannot be explained on the basis that Mr El Komy (with EATCO) was a net source of capital for the project.*"[59]   The majority likewise rejected Claimant's argument as to Mr. El Komy's substantive contributions to the project,[60] observing that, "[a]*s to the expertise of Mr El Komy and EATCO, neither appear to have brought any particular specialist expertise to the project*,"[61] and concluding that "*Mr El Komy's professional expertise (with EATCO) cannot explain the Claimant's choice of Mr El Komy as a local partner for the Damietta Project.*"[62]

27.   Likewise, Mr. Clodfelter rejected UFG's account of Mr. El Komy's role in the Damietta Project.   However, he also rejected the majority's conclusions on the corruption defense, stating: "*I cannot accept the majority's conclusion that Mr. El Komy acted as a lobbyist with* non-*corrupt access to and influence over senior government officials.   Not only is there no evidence of* non-*corrupt influence, this is not* Claimant's *explanation and indeed flies in the face of Claimant's own denials that Mr. El Komy exerted* any *influence on government officials at all.*"[63]   Accordingly, Mr. Clodfelter concluded that "*corruption has been established by circumstantial evidence and that the claims should be dismissed*."[64]

## 2.   Merits

28.   On the merits, the majority ruled that Egypt breached the FET standard in Article 4(1) of the Spain-Egypt BIT in regard to certain of UFG's claims.[65] The majority found that Egypt's liability resulted from a July 25, 2000 Council of Ministers decision and an August 5, 2000 letter from the Ministry of Petroleum, which together amounted to an undertaking that the

---

[57]   Award (Exhibit RA-02), ¶ 7.105.

[58]   Award (Exhibit RA-02), ¶ 7.107.

[59]   Award (Exhibit RA-02), ¶¶ 7.93-7.94.

[60]   Award (Exhibit RA-02), ¶¶ 7.31-7.32.

[61]   Award (Exhibit RA-02), ¶ 7.95.

[62]   Award (Exhibit RA-02), ¶ 7.100.

[63]   Dissenting Opinion (Exhibit RA-03), ¶¶ 16-17.

[64]   Dissenting Opinion (Exhibit RA-03), ¶ 19.

[65]   Award (Exhibit RA-02), ¶ 9.155.

Government would not interfere with or directly or indirectly affect EGAS's supply commitments under the SPA.[66]  The majority expressly stated that, absent such an undertaking, it "*does not consider that the Claimant established the liability of the Respondent for breach of its obligations under the FET standard in Article 4(1) the Treaty.*"[67]  The Dissenting Opinion strongly took issue with the Tribunal's finding that the July 25, 2000 Council of Ministers decision and the August 5, 2000 letter constituted such an undertaking by Egypt and rejected "*any basis*" for concluding that these two documents gave rise to any legitimate expectations.[68]

29.  The majority concluded that Egypt had frustrated UFG's legitimate expectations in two ways.  First, it found that the gas supply shortages to the Damietta Plant beginning in 2010 were due to Egypt's policies of over-stimulating local demand for natural gas whilst at the same time restricting the development of gas deposits in Egypt.[69]  Second, it found that prior to EGAS's February 24, 2013 notice of *force majeure*, Egypt had directed EGAS's decision to limit and eventually stop the supply of feed gas to the Damietta Plant.[70]  In attributing EGAS's decision to Egypt, the majority "*consider*[ed] *that EGAS did act on the instructions of and under the control and direction of the Respondent, namely its Ministry of Petroleum, within the meaning of Article 8 of the ILC Articles.*"[71]  The Dissenting Opinion, on the other hand, found "*no direct evidence and insufficient indirect evidence*" that EGAS had acted under Egypt's direction and control in curtailing supplies under the SPA.[72]

### 3.    Compensation

30.  The majority awarded US$ 2,013,071,000 plus interest to UFG.[73]  The majority stated at the outset that this compensation was assessed on the basis of Egypt's breach of Article 4(1) of the Spain-Egypt BIT, and not "*upon the SPA itself.*"[74]  However, the majority also found that "[i]*t would* [be] *an odd result if* […] *the Respondent assumed a greater liability to pay compensation under the Treaty than the maximum liability assumed by the Seller under the*

---

[66]    Award (Exhibit RA-02), ¶¶ 9.83, 9.155-9.156.

[67]    Award (Exhibit RA-02), ¶ 9.156.

[68]    Dissenting Opinion (Exhibit RA-03), ¶¶ 34, 43.

[69]    Award (Exhibit RA-02), ¶¶ 9.127-9.130.

[70]    Award (Exhibit RA-02), ¶ 9.131.

[71]    Award (Exhibit RA-02), ¶ 9.118.

[72]    Dissenting Opinion (Exhibit RA-03), ¶ 46.

[73]    Award (Exhibit RA-02), ¶ 13.8.

[74]    Award (Exhibit RA-02), ¶ 10.94.

*SPA*"[75] and that "*compensation for the Respondent's international wrong under the Treaty cannot exceed* [EGAS's] *obligations under the SPA.*"[76]

31.  Separately, although the majority acknowledged that Egypt had challenged the reliability and suitability of UFG's use of summary tables, refusing to provide supporting evidence, in its compensation analysis, as well as numerous flaws, errors, and a lack of transparency in UFG's expert's calculations,[77] the majority did not address these arguments or provide reasons for rejecting them.

32.  The Dissenting Opinion, by contrast, noted that "*rather than producing many of the underlying transactional documents or even verifying them,* [UFG] *has relied upon print-outs from Claimant's own internal databases* [and] *there is no ability for Respondent to contest whether Claimant allocated Claimant's most expensive replacement gas to replace the Egyptian gas to maximize the claim*."[78]

33.  Lastly, the majority accepted Egypt's argument that UFG could not claim amounts for injury that it could have reasonably mitigated, but stated that Egypt had the burden to "*prove its case on mitigation*" and had failed to do so.[79]  The Dissenting Opinion disagrees with the majority's ruling on mitigation, stating that UFG could have undertaken further efforts to mitigate damages.[80]  Specifically, the Dissenting Opinion concludes that Egypt did meet the burden of proof by "*provid*[ing] *sufficient evidence* [...] *to show that* [UFG] *had plentiful opportunities* [...] *to reduce its delivery obligations that would have allowed it to avoid substantial portions of its replacement costs*,"[81] and that UFG could have greatly reduced its damages by using lower-priced gas that was already available to it.[82]

## III.   GROUNDS FOR ANNULMENT

34.  Egypt requests that the Award be annulled for the reasons set forth in Sections III.A to III.C below.

---

[75]   Award (Exhibit RA-02), ¶ 10.105.

[76]   Award (Exhibit RA-02), ¶ 10.107.

[77]   Award (Exhibit RA-02), ¶¶ 10.75-10.77.

[78]   Dissenting Opinion (Exhibit RA-03), ¶ 53.

[79]   Award (Exhibit RA-02), ¶ 10.130.

[80]   Dissenting Opinion (Exhibit RA-03), ¶ 56.

[81]   Dissenting Opinion (Exhibit RA-03), ¶ 56.

[82]   Dissenting Opinion (Exhibit RA-03), ¶ 58.

35.     Among the Award's most egregious deficiencies warranting annulment are the following:

- In rejecting Egypt's jurisdictional objection that the SPA was procured corruptly, the Tribunal seriously departed from a fundamental rule of procedure when it denied Egypt its right to be heard in supplying a novel explanation for why Claimant chose Mr. El Komy.   The majority's explanation contradicted Claimant's own explanation and was never raised by the Tribunal prior to the Award.   Under the majority's theory, Mr. El Komy was a highly-paid non-corrupt "lobbyist."   Had Egypt been granted the right to be heard on this theory, it would have shown that the theory was both untenable as a matter of fact and flew in the face of Egyptian law which criminalizes paid lobbying services.

- The Tribunal failed to state the reasons on which its Award was based when it (i) limited itself to observing that, a paid lobbyist is "*not necessarily*" committing a crime or other impropriety, without making a finding that or providing any reasoning why, Mr. El Komy's highly paid lobbying services in procuring the Damietta Project for Claimant were in fact lawful, (ii) made contradictory findings as to Mr. El Komy's role, and  (iii) provided contradictory and frivolous reasons for why clear "red flags" of corruption should be discarded in favor of a theory that contradicts Claimant's own case.

- The Tribunal manifestly exceeded its powers when it assumed jurisdiction over claims based on an investment that was procured by corrupt or other unlawful means.   The majority ignored the existence of numerous red flags surrounding Mr. El Komy's involvement in the Damietta Project, and instead characterized his services to Claimant in procuring the Damietta Project as highly paid "lobbying services," services that would constitute a criminal offense under Egyptian law.

- The Tribunal awarded the largest compensation ever in an ICSID arbitration. In doing so, the Tribunal denied Egypt its right to confront the evidence used against it and inexplicably ignored the price cap in the SPA.

## A.   There Has Been A Serious Departure From A Fundamental Rule Of Procedure

36.   Pursuant to Article 52(1)(d) of the Convention, a party may request annulment of an ICSID award on the ground "*that there has been a serious departure from a fundamental rule of procedure.*"  As set forth in ICSID's Updated Background Paper on Annulment, the drafting history of the Convention "*indicates that this ground is concerned with the integrity and fairness of the arbitral process.*"[83]

37.   *Ad hoc* committees have generally applied a dual test to assess whether there has been a serious departure from a fundamental rule of procedure.[84]

38.   First, the rule of procedure must be fundamental.  *Ad hoc* committees have consistently held that the right to be heard constitutes such a fundamental rule of procedure, a failure of which may merit annulment under Article 52(1)(d) of the Convention.[85]  As the *Fraport v. Philippines ad hoc* Committee explained:

> "The requirement that the parties be heard is undoubtedly accepted as a fundamental rule of procedure, a serious failure of which could merit annulment.  It was expressly referred to as an example of such a rule by the framers of the ICSID Convention and was accepted as such by both parties to the present annulment proceeding."[86]

---

[83]   ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID (May 5, 2016) (Exhibit RLA-01), ¶ 98.

[84]   *See*, *e.g.*, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment (Apr. 5, 2016) (Exhibit CL-0213), ¶ 81; *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited (TANESCO)*, ICSID Case No. ARB/10/20, Decision on the Application for Annulment (Aug. 22, 2018) (Exhibit RLA-02), ¶ 387; *Fraport AG Frankfurt Airport Services Worldwide v. Republic Of The Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment (Dec. 23, 2010) (Exhibit RLA-03), ¶ 80.

[85]   *Amco Asia Corporation and others v. Republic of Indonesia II*, ICSID Case No. ARB/81/1, Decisions on the Applications for Annulment of the 1990 Award and the 1990 Supplemental Award (Dec. 17, 1992) (Exhibit RLA-04), ¶¶ 9.05-9.10; *Wena Hotels v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment (Feb. 5, 2002) (Exhibit RLA-05), ¶ 57; *CDC Group plc v. Republic of Seychelles*, ICSID Case No. ARB/02/14, Decision on Annulment (June 29, 2005) (Exhibit RLA-06), ¶ 49; *Fraport AG Frankfurt Airport Services Worldwide v. The Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide (Dec. 23, 2010) (Exhibit RLA-03), ¶ 197; *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited (July 3, 2013) (Exhibit RLA-07), ¶ 29; *Iberdrola Energía S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on Annulment (Jan. 13, 2015) (Exhibit RLA-08), ¶ 105.

[86]   *Fraport AG Frankfurt Airport Services Worldwide v. Republic Of The Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment (Dec. 23, 2010) (Exhibit RLA-03), ¶ 197. *See also Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., et al. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (Dec. 27, 2016) (Exhibit RLA-09), ¶ 149; *Maritime International Nominees Establishment (MINE) v. Republic of Guinea*, ICSID Case No. ARB/84/4,

39.    The *Victor Pey Casado I ad hoc* Committee further confirmed that "*there is a departure from the right to be heard, which is a fundamental rule of procedure, when a party is not given a full, fair, or comparatively equal opportunity to state its case, present its defense, or produce evidence regarding every claim and issue at every stage of the arbitral proceeding.*"[87]

40.    Second, the violation of the rule of procedure must be serious, *i.e.*, there must have been a "*substantial*" departure from the rule of procedure, such as where a violation of the right to be heard had the potential of causing the tribunal to render an award substantially different from its actual decision.[88]

41.    Here, the majority substantially departed from a fundamental rule of procedure when it violated Egypt's right to be heard and denied Egypt its right to confront the evidence used against it.  Such violations of Egypt's rights had the potential of materially impacting, and did materially impact, the majority's findings on corruption and compensation, which directly affect the Tribunal's competence, and the Centre's jurisdiction, over the dispute as well as the Tribunal's authority to award compensation and the quantum awarded.  Accordingly, the Award must be annulled.

    1. <u>The Majority Denied Egypt The Opportunity To Be Heard With Respect To Its Findings On Mr. El Komy's Involvement In The Damietta Project</u>

42.    It is a fundamental principle essential to the fairness of the arbitral process that each party be afforded a right to be heard on all issues affecting its legal position.  *Ad hoc* committees have found that this principle "*ensures equality of the parties in an adversarial proceeding,*"[89] and that the inability of a party to fully present its defense warrants annulment.[90]  *Ad hoc*

---

Decision on the Application by Guinea for Partial Annulment of the Arbitral Award (Dec. 22, 1989) (<u>Exhibit RLA-10</u>), ¶ 5.06.

[87]    *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile (Dec. 18, 2012) (<u>Exhibit RLA-11</u>), ¶ 184.  *See also Central European Aluminium Company (CEAC) v. Montenegro*, ICSID Case No. ARB/14/8, Decision on Annulment (May 1, 2018) (<u>Exhibit RLA-12</u>), ¶ 110.

[88]    *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment (Dec. 30, 2015) (<u>Exhibit RLA-13</u>), ¶ 78.  *See also Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile (Dec. 18, 2012) (<u>Exhibit RLA-11</u>), ¶ 269.

[89]    *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on Annulment (July 3, 2013) (<u>Exhibit RLA-07</u>), ¶ 36.

[90]    *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile (Dec. 18, 2012) (<u>Exhibit RLA-11</u>), ¶ 184.

committees have also confirmed that it is "*a rule of the utmost importance that each party must be given an equal opportunity to put evidence before a tribunal* […]."[91]

43.    The majority denied Egypt the opportunity to be heard when it provided – for the first time in its Award – its own, novel explanation of Mr. El Komy's role as a highly paid "lobbyist" with non-corrupt access to senior Egyptian officials, exercising non-corrupt influence over such officials.[92]  Claimant never argued that it hired Mr. El Komy to provide lobbying services or "*that there was influence exercised by Mr El Komy over senior decision-makers at the Ministry of Petroleum and EGPC over the SPA; but that it was not corrupt.*"[93]  In fact, Claimant denied that Mr. El Komy exercised any such influence, as the majority itself recognized:

> "<u>In the Tribunal's view, Mr El Komy was chosen by the Claimant primarily to act as a lobbyist with access to senior figures in EGPC and the Ministry of Petroleum.</u>  That is not, by itself, evidence of corruption.  The factual question is whether Mr El Komy was more than a lobbyist, on the evidence adduced before this Tribunal.
>
> <u>The Claimant denies that Mr El Komy offered any advantages from special access to the Respondent's decision-makers in regard to the SPA.  Indeed, the Claimant goes to great pains to stress the absence of any special relationship between Mr El Komy and Minister Fahmy,</u> pleading that 'this so-called 'fact' is nothing of the sort,' and that 'Egypt has provided no evidence whatsoever that anyone exercised any back-channel influence.'"[94]
>
> "The Claimant's explanation for why it chose Mr El Komy as a business partner, as pleaded in its Rejoinder on Jurisdiction, is that: '[t]he project was the original idea of El-Komy;'; that 'he conceived of the idea and […] [w]ithout his 'first mover' participation, the Project would not have been initiated and moved forward. […]
>
> In the Tribunal's view, <u>the evidence adduced in this arbitration does not support the Claimant's explanation.</u>"[95]

---

[91]   *Central European Aluminium Company (CEAC ) v. Montenegro*, ICSID Case No. ARB/14/8, Decision on Annulment (May 1, 2018) (<u>Exhibit RLA-12</u>), ¶ 110.

[92]   Award (<u>Exhibit RA-02</u>), ¶¶ 7.102, 7.109.

[93]   Award (<u>Exhibit RA-02</u>), ¶ 7.109.

[94]   Award (<u>Exhibit RA-02</u>), ¶¶ 7.102-7.103.

[95]   Award (<u>Exhibit RA-02</u>), ¶¶ 7.104-7.105 [emphases added].

44.    The theory that Mr. El Komy was a highly paid "lobbyist" with non-corrupt access to senior Egyptian officials was not put forward by either party – or by the Tribunal – at any stage of the proceedings.

45.    UFG never advanced this theory.  As the passage quoted above demonstrates, UFG in fact argued the opposite.  Rather than a "lobbyist" who served to advance UFG's policy preferences, UFG argued that Mr. El Komy's role was that of a "*first-mover*" on the Damietta Project, and a "*true partner*" of UFG.[96]  UFG denied that Mr. El Komy had any special relationship with Minister of Petroleum Sameh Fahmy,[97] or served as an "*intermediary*" or "*broker*,"[98] and emphasized that Mr. El Komy, far from undertaking successful "lobbying" efforts, was pressured to withdraw from the Damietta Project by Government officials only a year after the SPA's signature.[99]

46.    Although UFG was not always consistent in its portrayal of Mr. El Komy's role, it never ascribed to him anything approaching the role of a "lobbyist."  UFG's Memorial on the Merits mentioned Mr. El Komy only once, in a footnote that merely identified former shareholders of SEGAS,[100] and Claimant's only fact witness who was present at the time of the conclusion of the SPA failed to mention Mr. El Komy in his witness statement[101] and did not suggest in his oral testimony that Mr. El Komy was a "lobbyist."[102]

47.    Egypt also did not characterize Mr. El Komy as a "*lobbyist with non-corrupt access to and influence over senior government officials*."  Rather, it was Egypt's position that "*that Mr El Komy arranged for the Claimant to enter the Egyptian gas market and procure the Damietta Project corruptly*."[103]

---

[96]    Award (Exhibit RA-02), ¶ 7.33.  *See also* Claimant's Rejoinder Memorial on Jurisdiction and Admissibility, ¶ 8.

[97]    Claimant's Rejoinder Memorial on Jurisdiction and Admissibility, ¶¶ 24-25.

[98]    Claimant's Rejoinder Memorial on Jurisdiction and Admissibility, ¶¶ 45, 63-64.

[99]    Claimant's Rejoinder Memorial on Jurisdiction and Admissibility, ¶¶ 61-62.

[100]    Claimant's Memorial on the Merits, note 221.

[101]    Witness Statement of José Javier Fernández Martínez ("**Martínez Witness Statement**").

[102]    *Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/14/4, Final Hearing Transcript, Day 2 (Mar. 7, 2017) ("Tr. Day 2"), pp. 567-630.

[103]    Award (Exhibit RA-02), ¶ 7.7.

48.     In short, the majority supplied an entirely novel explanation why Claimant chose Mr. El Komy that was not provided by Claimant, and in fact contradicts Claimant's explanation why it did choose Mr. El Komy, as the Dissenting Opinion points out:

> "But what the evidence does prove is that there is a tremendous and unexplained discrepancy between Mr. El Komy's involvement in the project and the compensation he was awarded.  This clear red flag is sufficient, not to shift to Claimant a burden of proving that there was no corruption, as worries the majority, but to require Claimant to *go forward* with, at very least, a plausible and credible explanation.  It is not for the Tribunal to supply such an explanation.  This is why I cannot accept the majority's conclusion that Mr. El Komy acted as a lobbyist with *non*-corrupt access to and influence over senior government officials."[104]

49.     Because such theory was neither raised by the Tribunal, the Claimant, or its witnesses at any stage of the proceedings prior to the issuance of the Award, Respondent was denied the right to be heard on this important issue.  Such denial amounts to a serious departure from a fundamental rule of procedure, and warrants annulment of the Award.

50.     The *TECO v. Guatemala ad hoc* Committee found that the arbitral tribunal violated the parties' right to be heard when it relied *sua sponte* on the concept of unjust enrichment though "*neither the Parties nor the Arbitral Tribunal raised the concept of 'unjust enrichment' during the discussions* […] *before the Award was rendered*," and "[t]*he concept never came up in the Parties' submissions, at the hearing or in the Tribunal's letter of questions to the Parties which post-dated the hearing.*"[105]  The Committee consequently held that "*the Parties' right to be heard on the issue of unjust enrichment was breached*," that "*the departure from this fundamental rule of procedure was serious*," and that "*if given the right to comment on this issue by the Tribunal,* [the parties] *could have made arguments that at least had the potential to affect the ultimate financial outcome of the case*."[106]  Ultimately, this was "*sufficient for the*

---

[104]   Dissenting Opinion (Exhibit RA-03), ¶¶ 16-17 [emphasis added].

[105]   *TECO Guatemala Holdings LLC v. Republic of Guatemala,* ICSID Case No. ARB/10/23, Decision on Annulment (Apr. 5, 2016) (Exhibit CL-0213), ¶ 189.

[106]   *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment (Apr. 5, 2016) (Exhibit CL-0213), ¶¶ 191, 192, 195.

*Committee to hold that the departure from the Parties' right to be heard was serious and warrants annulment.*"[107]

51.    Similarly, Egypt had no opportunity to address the majority's *sua sponte* theory of Mr. El Komy as highly paid non-corrupt "lobbyist."  Had Egypt been on notice of the majority's novel lobbyist theory, it could have and would have responded.  For example, Egypt could have pointed out that "lobbying" figures nowhere among the numerous activities listed in the commercial registry for the small shell company through which Mr. El-Komy operated, nor could they because Egyptian law imposes criminal liability on any consideration in exchange for exerting or alleging to exert influence over public officials to obtain an agreement or a benefit of any kind.[108]  Given the opportunity, Egypt could also have challenged the need for UFG to enter into a joint venture agreement in June 2000 to pay Mr. El Komy hundreds of millions of dollars for "lobbying" services,[109] when internal UFG documents show that by January 2000 Minister of Petroleum Sameh Fahmy had already "*openly confirmed the support of the Government of Egypt for this Projec*t."[110]  Egypt could also have asked why, if Mr. El Komy was indeed providing non-corrupt "lobbying" services, it was necessary or appropriate for UFG to enter into a joint venture agreement with him providing for "*mistakenly generous*"[111] compensation based on his involvement in the Damietta Project as Claimant's business partner.  Egypt may also have marshalled further information and conducted cross-examination and made arguments on the nature of his highly paid, non-corrupt "lobbying," but it had no reason to do so because of UFG's clearly stated position that Mr. El Komy was not chosen to exert, and did not exert, any influence over Egyptian officials.

52.    In *Fraport v. Philippines*,[112] where the tribunal admitted new evidence without permitting the parties to comment, the *ad hoc* Committee made clear that "*the Tribunal's failure to permit the parties to make fresh submissions to it in the light of important new*

---

[107]  *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment (Apr. 5, 2016) (Exhibit CL-0213), ¶ 195.

[108]  Excerpt of the commercial registry of the Egyptian Arab Trading Company (Dec. 18, 2016) (Exhibit R-0327); Summary of the Amendment of the Limited Partnership Contract of the Egyptian Arab Trading Company (Sept. 22, 2001) (Exhibit R-0330); Egyptian Criminal Code, Parts 3-4 (Exhibit R-0032), Article 106bis.

[109]  *See* Agreement between EATCO and UFACEX (June 28, 2000) (Exhibit R-0318), ¶¶ 3.1, 3.2.  *See also* above ¶ 11.

[110]  Award (Exhibit RA-02), ¶ 5.31 (citing Exhibit C-0344).

[111]  Award (Exhibit RA-02), ¶ 7.110.

[112]  *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on Annulment (Dec. 23, 2010) (Exhibit RLA-03), ¶¶ 218, 247.

*material casting doubt on the whole basis on which the Tribunal was proceeding underscores the serious nature of the departure from the right to be heard*."[113]  Likewise, here, Egypt should have been given the opportunity to "*make fresh submissions*" on the majority's new theory that went to the core of "*the whole basis on which the* [majority] *was proceeding*."

53.    Setting aside an arbitral award, a recent decision of the English High Court also confirms that "*it is a serious irregularity* […] *for an arbitrator to decide a dispute on a basis significantly different to anything raised by or with the parties, if that causes or will cause substantial injustice.*"[114]  In that case, the tribunal had rendered the award on the basis of an argument as to share ownership structure that had not been raised by the parties or the tribunal at any stage of the proceedings.  The tribunal failed to provide the parties with an opportunity to comment on this new argument, which the English High Court considered tantamount to a serious irregularity justifying the setting aside of the award.  The Court clarified that although "*arbitrators are not restricted to choosing between whatever rival contentions are developed by the parties*," it remains that "*if they are to contemplate determining a dispute on some different basis, fairness dictates* […] *that the parties be given notice and a proper opportunity to consider and respond to the new point*."[115]

54.    By introducing for the first time in its Award a new theory regarding Mr. El Komy's role as a highly paid, non-corrupt "lobbyist" with access to senior Egyptian officials, the majority denied Egypt its right to be heard both on the tenability of that theory in light of the clear red flags in the record, and on the legality under Egyptian law of such alleged non-corrupt "lobbyist" services.

55.    This serious departure from Egypt's right to be heard is compounded by the fact that by preventing Egypt from commenting on the novel highly paid, non-corrupt "lobbyist" theory, the majority denied Egypt its right to be heard on whether an investment procured through non-corrupt "lobbyist" means qualifies for protection under the Spain-Egypt BIT.  In fact, the majority's unsupported conclusion that "*a paid lobbyist is not necessarily committing a crime or other impropriety*"[116] is wrong as a matter of Egyptian law.  The act of exerting real or

---

[113]  *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on Annulment (Dec. 23, 2010) (Exhibit RLA-03), ¶ 235.

[114]  *RJ, L Ltd. v. HB,* Judgment of the High Court of Justice, Business and Property Courts of England and Wales Queen's Bench Division Commercial Court (Oct. 26, 2018) (Exhibit RLA-14), ¶ 27.

[115]  *RJ, L Ltd. v. HB,* Judgment of the High Court of Justice, Business and Property Courts of England and Wales Queen's Bench Division Commercial Court (Oct. 26, 2018) (Exhibit RLA-14), ¶ 27.

[116]  Award (Exhibit RA-02), ¶ 7.101.

alleged influence over public officials for consideration in order to obtain an agreement or a benefit of any kind is a criminal offense under Egyptian law.[117]   Article 106 bis of the Egyptian Criminal Code penalizes any act by which any person, on behalf of itself or a third party, "*accepts or takes a <u>promise or donation in order to use a genuine or alleged influence</u>, or to obtain or try to obtain from any public authority, works, orders, rulings, decisions, medals, a concession, a <u>license, an agreement for supply or a contracting agreement, a position, a service, or any privilege and benefit of any kind</u>*."[118]   Had Egypt been given an opportunity to respond to the majority's *sua sponte* theory of Mr. El Komy's role as a highly paid, non-corrupt "lobbyist," Egypt would have therefore been able to demonstrate that UFG's investment was procured through illegal practices under Egyptian law and that the highly paid, non-corrupt "lobbyist" theory of the Tribunal was not tenable.

56.   There can be no serious doubt that the failure to grant Egypt the opportunity to be heard and the majority's determination that Mr. El Komy was a highly paid, non-corrupt "lobbyist" had a material impact on the outcome of the case.  Significantly, and as the majority recognizes at the outset of its analysis, the Spain-Egypt BIT protects assets and rights "*acquired under the law of the host country*" and "*made in accordance with [Egypt's] laws and regulations*."[119]

57.   In conclusion, the majority seriously departed from a fundamental rule of procedure by denying Egypt its right to be heard on the majority's novel highly paid, non-corrupt "lobbyist" theory.  The Award must therefore be annulled under Article 52(1)(d) of the Convention.

> 2.   <u>The Majority Denied Egypt Its Right To Confront The Evidence Used Against It</u>
>
> a)   <u>*Denial Of Egypt's Right To Confront The Evidence On Which Claimant's Calculations Of "Damages" Were Based*</u>

58.   The majority denied Egypt its procedural right to confront the "evidence" on which the entirety of the compensation award rests.  The Claimant's calculations of its alleged damages or "*lost cash flows*" all rely on the allegation that Claimant bought and sold gas in certain volumes and at certain prices, but instead of transactional records or contracts showing the details of those alleged purchases and sales, Claimant's experts relied on simplistic summary tables that Claimant alleged (without any supporting evidence) were drawn from its accounting

---

[117]   Egyptian Criminal Code, Parts 3-4 (<u>Exhibit R-0032</u>), Art. 106 bis.

[118]   Egyptian Criminal Code, Parts 3-4 (<u>Exhibit R-0032</u>), Art. 106 bis [emphasis added].

[119]   Award (<u>Exhibit RA-02</u>), ¶ 7.46.

systems. Egypt requested disclosure of the supposed underlying transactional records that would have allowed Egypt and the Tribunal to assess the correctness and veracity of the generic summaries that Claimant's experts used. The Tribunal denied those requests.[120]

59.     The majority's acceptance of Claimant's calculations based on summaries allegedly drawn from Claimant's accounting systems without affording Egypt the opportunity to examine the underlying records was an improper denial of Egypt's right to confront the evidence used against it. Although ICSID tribunals have substantial discretion in managing document disclosure, it is well recognized that when exercising its discretion, a tribunal must afford basic procedural protections to the parties. The *Occidental Petroleum v. Ecuador* Committee, for example, held that "[i]*f a tribunal violates due process, and deprives a party of its right to be heard on equal terms and to contradict the arguments of the other party, annulment of the award is justified; justice cannot be achieved through a deeply flawed procedure.*"[121]

60.     Egypt's requests for disclosure were not the type of "*fishing expedition*" that other tribunals and *ad hoc* committees have criticized for seeking evidence that might support a new line of defense from the files of an opponent. Rather, the requests were the only means available for confronting the very "evidence" on which the Claimant relied and for testing whether that "evidence" had any support aside from Claimant's allegations.[122]

61.     In addition, Claimant's reliance on summaries that provided no insight into the details of underlying transactions also prevented Egypt from confronting Claimant's assertions about an alleged causal link between the transactions that Claimant chose to include in the summaries and the alleged breaches. As noted in the Dissenting Opinion, the absence of this key evidence meant that there was "*no ability for Respondent to contest whether Claimant allocated Claimant's most expensive replacement gas to replace the Egyptian gas to maximize the claim.*"[123]

---

[120]   Procedural Order No. 7 (addressing Respondent's Request Nos. 21, 22, 31, 32).

[121]   *Occidental Petroleum Corporation v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment (Nov. 2, 2015) (Exhibit RLA-15), ¶ 60.

[122]   As discussed in Section III.B.3 below, the majority compounded the problem of denying Egypt access to the supporting materials for this critical evidence by failing even to address Egypt's arguments identifying problems and inconsistencies apparent on the face of Claimant's summaries.

[123]   Dissenting Opinion (Exhibit RA-03), ¶ 53.

62.     Claimant did not and could not allege that the requested documents did not exist; such an allegation would have undermined its own summaries.  Nor was there a dispute as to the materiality of the requested documents; if the summaries of those documents were sufficiently material for Claimant's experts to rely on them, the underlying information must also have been material.  Instead, the Tribunal refused Egypt's request merely on a boilerplate objection from Claimant that it would be too burdensome to collect and produce them.  In other words, the Tribunal chose to protect Claimant from an unspecified burden of collecting documents that Claimant itself must have already identified and been able to find in its accounting records in disregard of Egypt's right to confront the evidence used against it.  That decision was improper.  The mere fact that there might have been a large volume of responsive documents does not warrant a departure from Egypt's right to confront evidence used against it, in particular given the vast sum of money that Claimant demanded (and that the majority awarded).  As noted in the Dissenting Opinion, "*while 'burdensomeness' may well be a ground for objecting to discovery requests, it is not a ground for failing actually to prove damages suffered.  In the context of a US$ 4 billion claim, producing such documents, or at least a forensic audit of such data, for review by a respondent is not only reasonable, but necessary.*"[124]

63.     Without even attempting to establish the underlying *bona fides* of its summaries, Claimant did not meet its burden of proof in establishing damages, and it was a further error by the majority to accept Claimant's "evidence."

> b)     <u>Denial Of Egypt's Right To Confront Claimant's Quantum Expert On Whom The Majority Relied</u>

64.     The majority denied Egypt the right to confront Claimant's expert on quantum, Mr. Brent Kaczmarek, by holding on the eve of the merits hearing that his name was to be struck from the written record, but then expressly relying on him in the Award.  Egypt was thus deprived of the opportunity to cross examine Mr. Kaczmarek, and the majority reversed the Tribunal's procedural order without explanation or input from the parties.

65.     On February 8, 2017, in accordance with Procedural Order No. 1, Egypt timely requested the attendance of Mr. Kaczmarek for cross examination at the hearing.[125]  Egypt did not request

---

[124]   Dissenting Opinion (<u>Exhibit RA-03</u>), ¶ 54.

[125]   Letter from C. Annacker to Opposing Party Counsel (Feb. 8, 2017) (<u>Exhibit RA-04</u>).

to cross-examine Claimant's second quantum expert, Mr. Sequeira.[126]  More than two weeks later, and shortly before the start of the hearing, Claimant informed the Tribunal and Respondent for the first time that it would not make Mr. Kaczmarek available for cross-examination and requested that the Tribunal excuse his absence.[127]  In response, the Tribunal issued Procedural Order No. 11, in which it recognized that Egypt would suffer procedural prejudice if Mr. Kaczmarek was not made available for cross-examination but still remained an operative part of the case.  In an attempt to resolve that prejudice, the Tribunal ordered, "*the Tribunal grants the Claimant's application, as follows: There is no material prejudice to the Respondent in having Mr Sequeira testify in place of Mr Kaczmarek, with the latter's name stricken from the written record leaving the Claimant to rely upon Mr Sequeira's testimony only* […]."[128]  With that order in place, Egypt could not cross-examine Mr. Kaczmarek about issues specific to him, and Egypt made all of its subsequent procedural and strategic decisions (including but not limited to agreeing to forego post-hearing briefing)[129] against the backdrop of Mr. Kaczmarek's testimony having been "*stricken from the written record*."

66.    The Award mentions that "[o]*n 1 March 2017, the Tribunal issued Procedural Order No. 11 ('PO11'), concerning the examination of expert witnesses.*"[130]  However, the majority then, without explanation, effectively reversed Procedural Order No. 11 and wrote Mr. Kaczmarek back into the record by expressly relying on him and reattributing his written testimony to the Claimant.[131]  The Award states that, "[w]*here there exist relevant differences between* [the parties'] *experts, save where otherwise indicated below, the Tribunal has preferred to be guided by the testimony of Messrs Kaczmarek and Sequeira.*"[132]  As such, it is apparent that in rendering its award against Egypt, the majority relied at least in part on the weight of Mr. Kaczmarek's expertise and his support of the Claimant's case.

---

[126]    Letter from C. Annacker to Opposing Party Counsel (Feb. 8, 2017) (<u>Exhibit RA-04</u>).

[127]    Letter from R. D. Bishop to the Arbitral Tribunal (Feb. 23, 2017) (<u>Exhibit RA-05</u>).

[128]    Procedural Order No. 11 (Mar. 1, 2017).

[129]    *See Unión Fenosa Gas, S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/14/4, Final Hearing, Transcript Day 6 (Mar. 11, 2017) ("Tr. Day 6"), 1568:09-1568:16.

[130]    Award (<u>Exhibit RA-02</u>), ¶ 1.53.

[131]    *See* Award (<u>Exhibit RA-02</u>), ¶ 10.23.

[132]    Award (<u>Exhibit RA-02</u>), ¶ 10.99.  Moreover, throughout its compensation discussion, the majority consistently relied on both of Claimant's experts, "Mr Kaczmarek and Sequeira."  *See*, *e.g.*, Award (<u>Exhibit RA-02</u>), ¶¶ 10.26-10.29, 10.35, 10.41, 10.44, 10.49, 10.55, 10.77-10.81, 10.99, 10.109, 10.111, 10.122, 10.131.

67.     The denial of Egypt's opportunity to cross-examine Mr. Kaczmarek, coupled with the striking and un-striking of him from the record and the reliance by the majority on his written testimony, resulted in a denial of Egypt's right to confront Claimant's quantum expert.

## B.     The Award Failed To State The Reasons On Which It Is Based

68.     Article 48(3) of the Convention requires every ICSID award to "*deal with every question submitted to the Tribunal*" and to "*state the reasons upon which it is based*."   An award that fails to state the reasons on which it is based is subject to annulment under Article 52(1)(e) of the Convention.   The majority's Award fails to state reasons for its conclusions on corruption, attribution, and compensation, and should thus be annulled pursuant to Article 52(1)(e).

### 1.     The Award Failed To State The Reasons For Its Conclusion That The Natural Gas Sale And Purchase Agreement Was Not Procured By Corruption

69.     *Ad hoc* committees have held that, in addition to a complete absence of reasons, frivolous or contradictory reasons which do not enable the reader to follow the tribunal's reasoning from one point to the next constitute a failure to state reasons.[133]   The *Victor Pey Casado I ad hoc* Committee, for example, annulled a section of the award where the tribunal relied on contradictory reasoning in its determination of damages, stating that "*as long as there is no express rationale for the conclusions with respect to a pivotal or outcome-determinative point, an annulment must follow, whether the lack of rationale is due to a complete absence of reasons or the result of frivolous or contradictory explanations.*"[134]

70.     The *MINE v. Guinea ad hoc* Committee likewise held that an award "*must enable the reader to follow the reasoning of the Tribunal on points of fact and law,*"[135] a requirement that is "*not satisfied by either contradictory or frivolous reasons.*"[136]   The Committee annulled the award for failure to state reasons, because it found that the tribunal had contradicted itself by rejecting both of the damages calculations put forward by the claimants, and adopting, without

---

[133]   *See, e.g.*, *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP (Feb. 21, 2014) (Exhibit RLA-16), ¶ 185; *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (Dec. 27, 2016) (Exhibit RLA-09), ¶ 196.

[134]   *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile (Dec. 18, 2012) (Exhibit RLA-11), ¶¶ 86, 287.

[135]   *Maritime International Nominees Establishment (MINE) v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on Annulment (Dec. 22, 1989) (Exhibit RLA-10), ¶ 5.08.

[136]   *Maritime International Nominees Establishment (MINE) v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on Annulment (Dec. 22, 1989) (Exhibit RLA-10), ¶ 5.09.

explanation one of its own: "[h]*aving concluded that theories 'Y' and 'Z' were unusable because of their speculative character, the Tribunal could not, without contradicting itself, adopt a 'damages theory' which disregarded the real situation and relied on hypotheses which the Tribunal itself had rejected as a basis for the calculation of damages.*"[137]

71.     The majority held that "*a paid lobbyist is <u>not necessarily</u> committing a crime or other impropriety.*"[138]  But the majority provided no reasoning whatsoever why Mr. El Komy did not commit a crime if he acted as a highly paid lobbyist for UFG, as the majority found.  Indeed, the majority made no finding that Mr. El Komy actually acted lawfully and rested entirely on its observation that a "*a paid lobbyist is <u>not necessarily</u> committing a crime or other impropriety.*"  There is thus a glaring hole in the majority's reasoning and findings.  Had the majority considered whether Mr. El Komy did commit a crime if he acted as a highly paid lobbyist for UFG, it would have had to find that paid lobbying services are prohibited under Article 106bis of the Egyptian Criminal Code[139] and that UFG's investment is not protected under the Spain-Egypt BIT because the SPA was procured in violation of Egyptian law.[140]

72.     Moreover, the majority rejected UFG's characterization of Mr. El Komy as an investor in and business partner for the Damietta Project, yet, based on those same assertions, and on other facts it rejects elsewhere in the Award, adopted a theory that his role was that of a highly paid, non-corrupt "lobbyist."  The majority's reasoning on the absence of corruption is rife with contradiction and logical gaps.

73.     First, the majority rejects UFG's allegations that Mr. El Komy made substantial contributions to the Damietta Project, concluding that:

- contrary to UFG's allegations,[141] "*the Claimant's choice of Mr El Komy as a local partner for the Damietta Project cannot be explained on the basis that Mr El Komy (with EATCO) was a net source of capital for the project*;"[142]

---

[137]   *Maritime International Nominees Establishment (MINE) v. Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on Annulment (Dec. 22, 1989) (<u>Exhibit RLA-10</u>), ¶ 6.107.

[138]   Award (<u>Exhibit RA-02</u>), ¶ 7.101 [emphasis added].

[139]   Egyptian Criminal Code, Parts 3-4 (<u>Exhibit R-0032</u>), Art. 106bis.

[140]   *See supra*, ¶ 56.

[141]   Award (<u>Exhibit RA-02</u>), ¶ 7.35.

[142]   Award (<u>Exhibit RA-02</u>), ¶ 7.94.

- contrary to UFG's allegations, [143] "*Mr El Komy's professional expertise (with EATCO) cannot explain the Claimant's choice of Mr El Komy as a local partner for the Damietta Project*;"[144]

- contrary to UFG's allegation that Mr. El Komy was a "*first mover*" on the Project, "*the evidence adduced in this arbitration does not support the Claimant's explanation.*"[145]

74.    Yet despite rejecting Claimant's various arguments for how Mr. El Komy contributed to the Damietta Project, the majority inexplicably "*accepts, <u>as the Claimant's Rejoinder pleads,</u> that 'Mr El-Komy and EATCO […] were from the outset <u>viewed as necessary to the Project.</u>'*"[146]  The conclusion that Mr. El Komy was "*viewed as necessary*" to the Project does not follow from the majority's rejection of all of Claimant's explanations for why he was necessary to the Project, and in fact directly contradicts its rejection of Claimant's arguments.

75.    Second, the majority rejects Respondent's allegation that Mr. El Komy had a close personal relationship with then Minister of Petroleum Sameh Fahmy that he used to wield corrupt influence to win the SPA,[147] concluding instead "*that Mr El Komy had a prior business relationship with Mr Sameh Fahmy's father in or about 1995, <u>but none with Mr Sameh Fahmy personally as at 1999 onwards.</u>*"[148]  Yet having concluded that Mr. El Komy had no close personal relationship with the Minister of Petroleum, the majority inexplicably arrives at the conclusion that "[i]*n the Tribunal's view, <u>Mr El Komy was chosen by the Claimant primarily to act as a lobbyist with access to senior figures in EGPC and the Ministry of Petroleum.</u>*"[149] There is a logical gap in reaching the majority's conclusion that UFG chose Mr. El Komy, who had no close relationship with the Minister of Petroleum, and on UFG's own case, no "*special access to the Respondent's decision-makers in regard to the SPA,*"[150] as a non-corrupt "lobbyist" because of his access to senior figures at the Ministry of Petroleum and other senior Egyptian Government officials.

---

[143]    Award (<u>Exhibit RA-02</u>), ¶¶ 7.31-7.32.

[144]    Award (<u>Exhibit RA-02</u>), ¶ 7.100.

[145]    Award (<u>Exhibit RA-02</u>), ¶¶ 7.104-7.105.

[146]    Award (<u>Exhibit RA-02</u>), ¶ 7.108 [emphases added].

[147]    Award (<u>Exhibit RA-02</u>), ¶ 7.6.

[148]    Award (<u>Exhibit RA-02</u>), ¶ 7.71 [emphasis added].

[149]    Award (<u>Exhibit RA-02</u>), ¶ 7.102 [emphasis added].

[150]    Award (<u>Exhibit RA-02</u>), ¶ 7.103.

76.     Third, the majority repeatedly contradicts itself in support of its contradictory findings that Mr. El Komy was necessary to the Damietta Project, but made no real contribution, and had no personal relationship with the Minister of Petroleum, yet was selected as a lobbyist due to his access to the Ministry of Petroleum.  Thus, while the Award on the one hand discards UFG's theory of Mr. El Komy as a substantive business partner to the Damietta Project, accepting that his "*relevant experience was limited and recent*," acquired only in the year before the SPA was signed,[151] and that his "*professional expertise (with EATCO) cannot explain the Claimant's choice of Mr El Komy as a local partner for the Damietta Project*,"[152] it, on the other hand, relies on his purported substantive business contributions to brush aside evidence of his inordinate compensation.  The majority finds that:

- Mr. El Komy "*as an 'investor-partner' provided personal services for the Damietta Project; and EATCO also made contributions to the Project*," such as the "*preparation of the Pre-Feasibility Study*," "*studies on possible sites for the Plant*," and responsibility for proposals from potential contractors;[153]

- "*The sums involved are not inconsistent with Mr El Komy's role as an existing business partner of the Claimant as regards the Damietta Project and SEGAS, with a residual role as a consultant to the Damietta Project*."[154]

- the contents of an early fax message from Mr. El Komy to UFG "*are consistent with El Komy's description of himself as a substantive business partner of the Claimant and its associated companies, rather than a mere broker or agent*."[155]

- an agreement reflecting "*generous*" terms to Mr. El Komy "*is consistent with Mr El Komy's role as an investor and business partner* in the Damietta Project,"[156] despite its conclusion four pages later that "[f]*rom the evidence before this Tribunal, it does not appear that Mr El Komy provided any funding net of what he received.*"[157]

---

[151]   Award (Exhibit RA-02), ¶ 7.99.

[152]   Award (Exhibit RA-02), ¶ 7.100.

[153]   Award (Exhibit RA-02), ¶ 7.88 [emphases added].

[154]   Award (Exhibit RA-02), ¶ 7.83 [emphases added].

[155]   Award (Exhibit RA-02), ¶ 7.75 [emphases added].

[156]   Award (Exhibit RA-02), ¶ 7.79 [emphasis added].

[157]   Award (Exhibit RA-02), ¶ 7.93 [emphasis added].

77.     It is plainly contradictory to find that "*professional expertise*" in the petroleum industry could not explain the choice of Mr. El Komy as a business partner for the Damietta Project, and that Mr. El Komy provided no funding to the Damietta Project, and then to disregard the "*classic red flag*" of his hugely disproportionate compensation on the basis of his professional expertise and status as an investor in the Project.[158]

78.     Fourth, despite not uncovering any reference to "*lobbying*" services upon exhaustive review of UFG's confidential agreements with Mr. El Komy,[159] the majority finds that Mr. El Komy:

> "<u>did not act as a covert peddler of influence, with his principal's identity kept hidden from the Respondent's decision-makers</u>.  To this extent, the Tribunal accepts the Claimant's submission that no evidence exists, in this arbitration, of any 'back-channel influence.'  However, the Tribunal does not accept that there was no 'influence.'  It concludes that <u>there was influence exercised by Mr El Komy over senior decision-makers at the Ministry of Petroleum and EGPC over the SPA</u>; but that it was not corrupt."[160]

This conclusion, as well as the "*three factors*"[161] that are said to support it, are contradictory and contain serious logical gaps.

79.     As to the conclusion, the majority does not explain how a confidential agreement with a "*joint venture*" partner is evidence of a non-corrupt, non-covert agreement for "*lobbying*" services, or why UFG entered into a joint venture agreement, rather than a lobbying service agreement, unless it sought to hide what was actually being agreed upon and provide cover for Mr. El Komy's inordinate compensation.

80.     Moreover, the majority determines that because Mr. El Komy "*did not act as a covert peddler of influence, with his principal's identity kept hidden from Respondent's decision-makers,*" the "*Tribunal accepts the Claimant's submission that no evidence exists […] of any 'back-channel influence.'*"[162]  But a corrupt influence-peddler with "*back-channel influence*" would <u>not</u> have kept UFG's identity hidden from senior government officials if he were

---

[158]   *See* Award (<u>Exhibit RA-02</u>), ¶ 7.113.

[159]   Award (<u>Exhibit RA-02</u>), ¶¶ 7.74-7.85, 7.98-7.99.

[160]   Award (<u>Exhibit RA-02</u>), ¶ 7.109 [emphases added].

[161]   Award (<u>Exhibit RA-02</u>), ¶ 7.110.

[162]   Award (<u>Exhibit RA-02</u>), ¶ 7.109.

currying favor specifically for UFG.  The majority's contention that not keeping his principal's identity hidden is evidence of the absence of corruption, is thus a frivolous reason in support of its conclusion.

81.     The "*three factors*" on which the majority relied for its conclusion that the influence that Mr. El Komy exercised was not corrupt are also contradictory.

82.     The first factor is that Egypt "*does not prove that any monies passed from Mr El Komy or EATCO to any senior decision-maker*" and it is not for the Tribunal to second-guess commercial decisions that "*may now seem mistakenly generous.*"[163]  The reader cannot reconcile the majority's finding that UFG deliberately hired a lobbyist with the majority's reasoning that his compensation was "*mistakenly generous.*"[164]

83.     The second factor on which the majority relied is that "[a]*lthough Mr El Komy was prosecuted and convicted for other crimes in Egypt, it is significant that he has never been prosecuted by the Respondent for criminal conduct in regard to the SPA,*" and no senior decision-maker, including Minister Fahmy, has been prosecuted.[165]  This directly contradicts the majority's recognition that investigations of Mr. El Komy and Minister Fahmy in connection with the SPA "*appear to have begun in 2015 and remain pending.*"[166]  The document cited by the majority in support is dated 2015, but states that the investigations were initiated on January 27, 2014.[167]

84.     The third factor said to support the majority's conclusion is that "*the belated plea of corruption, raised by the Respondent as a jurisdictional objection after the commencement of this arbitration, raises a suspicion that the plea serves a convenient tactical purpose.*"[168]  As the document relied upon by the majority at paragraph 7.69 of the Award states, the criminal investigation of Mr. El Komy and Minister Fahmy began in January 2014, <u>before</u> the Request for Arbitration was filed,[169] and after the Mubarak regime had been overthrown.  Moreover,

---

[163]   Award (<u>Exhibit RA-02</u>), ¶ 7.110.

[164]   Award (<u>Exhibit RA-02</u>), ¶ 7.110.

[165]   Award (<u>Exhibit RA-02</u>), ¶ 7.111.

[166]   Award (<u>Exhibit RA-02</u>), ¶ 7.69.

[167]   Award (<u>Exhibit RA-02</u>), note 97; Letter from the Public Prosecution Office to the Egyptian State Lawsuits Authority (Feb. 12, 2015) (<u>Exhibit R-0031</u>).

[168]   Award (<u>Exhibit RA-02</u>), ¶ 7.112.

[169]   *See* Award (<u>Exhibit RA-02</u>), ¶ 1.4.

far from being belated, the jurisdictional objection was raised on November 25, 2015, in Respondent's Memorial on Jurisdiction and Request for Bifurcation.[170]

85.    In sum, the majority failed to make any finding that and provide any reasoning for why Mr. El Komy's highly paid "lobbying" services were lawful, and its reasons in support of its conclusion that Mr. El Komy was a highly paid, non-corrupt "lobbyist" are contradictory and frivolous.  As set forth above,[171] the majority's failures in this regard were also outcome determinative.  Investments made in violation of Egyptian law are not protected under the Spain-Egypt BIT, and the Award expressly states that "*proven corruption by the Claimant in procuring the SPA would be fatal to the Claimant's claims derived from the SPA in this arbitration, as regards jurisdiction, admissibility and the merits.*"[172]

> 2.    The Award Failed To State Reasons For Its Conclusion That The Curtailment Of Gas To The Damietta Plant Was Attributable To Respondent Under Article 8 Of The ILC Articles Of State Responsibility

86.    The Award failed to state reasons for the majority's conclusion that EGAS's conduct was attributable to Egypt under Article 8 of the ILC Articles on Responsibility of States for Internationally Wrongful Act ("ILC Articles on State Responsibility").[173]

87.    Article 5 of the ILC Articles on State Responsibility provides:

> "The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance."[174]

88.    Article 8 of the ILC Articles on State Responsibility provides:

> "The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the

---

[170]    Award (Exhibit RA-02), ¶¶ 1.23, 7.53.

[171]    *See supra*, Section III.A.1.

[172]    Award (Exhibit RA-02), ¶ 7.48.

[173]    Award (Exhibit RA-02), ¶ 9.118.

[174]    *Draft articles on Responsibility of States for Internationally, Wrongful Acts, with commentaries*, Yearbook of the International Law Commission (2001), Vol. II, Part 2, p. 31 (Exhibit CL-0064), Art. 5 [emphases added].

<u>instructions of, or under the direction or control of, that State in carrying out the conduct</u>."[175]

89.    The majority concluded that the requirements of Article 5 of the ILC Articles on State Responsibility were not satisfied because EGPC and EGAS were not empowered by Egyptian law to exercise governmental authority.[176]   The majority specifically emphasized that "*a situation falling within Article 5 'is to be distinguished from situations where an entity acts under the direction or control of the State, which [i] [sic] covered by Article 8*.*"*[177]   As the majority recognized, under Article 8,"*the conduct of a person (not being an organ of the State) shall be considered an act of a State under international law if the person is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.*"[178]

90.    However, despite having rejected that EGAS's conduct was attributable to Egypt under Article 5 of the ILC Articles on State Responsibility, and having instead found that "*EGAS did act on the instructions and under the control and direction of the Respondent, namely its Ministry of Petroleum, within the meaning of Article 8 of the ILC Articles,*"[179] the majority concluded that Respondent's decision to cut and curtail gas supply to the Damietta Plant was a sovereign act:

> "In the Tribunal's view, as regards both phases, the <u>Respondent's decisions to cut and curtail gas supply to the Damietta Plant was, by its nature and purpose, a sovereign act by the Respondent under international law.  It was also, of course, a political decision by the Respondent in the broadest sense.  It was not a decision required by Egyptian law; and it was not a commercial or operational decision originating with EGAS.  It was, in fact, a decision against EGAS' commercial interest,</u> given the higher prices under the SPA and the lower prices for the subsidised Egyptian electricity sector."[180]

---

[175]    *Draft articles on Responsibility of States for Internationally, Wrongful Acts, with commentaries*, Yearbook of the International Law Commission (2001), Vol. II, Part 2, p. 31 (<u>Exhibit CL-0064</u>), Art. 8 [emphasis added].

[176]    Award (<u>Exhibit RA-02</u>), ¶ 9.114.

[177]    Award (<u>Exhibit RA-02</u>), ¶ 9.114 [emphasis added].

[178]    Award (<u>Exhibit RA-02</u>), ¶ 9.116.

[179]    Award (<u>Exhibit RA-02</u>), ¶ 9.118.

[180]    Award (<u>Exhibit RA-02</u>), ¶ 9.138 [emphasis added].

A "*political decision by the Respondent in the broadest sense,*" is hardly evidence of a specific instruction by the Respondent that would be required to attribute EGAS's conduct to Egypt under Article 8.

91.    In stating the standard under Article 8, the majority clearly stated that "[u]*nder Article 8 of the ILC Articles on State Responsibility, the conduct of a person (not being an organ of the State) shall be considered an act of a State under international law if the person is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.*"[181]   The majority further made clear that "[i]*ts application […] depends upon 'a specific factual relationship' between the person engaging in the conduct and the State.*"[182] The majority accepts that "[t]*he fact that a State initially establishes a corporate entity […] is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity.*"[183] However, the majority does not apply these principles in reaching the conclusion that EGAS acted "*on the instructions of and under the control and direction of*" Egypt in curtailing gas supplies to the Damietta Plant.[184]

92.    The majority likewise fails to cite to any "*instruction*" or "*direction*" from Egypt to EGAS to meet its stated standard.  The press reports and testimonies of UFG witnesses cited in the relevant portions of the Award[185] do not evidence a specific instruction or direction by Egypt, nor does the majority purport to state they do.  Instead the majority cites them to bolster its conclusion that Egypt's purported decision to cut supply to the Damietta Plant was a sovereign act, a conclusion from which it does not logically follow that EGAS acted under the specific instruction, direction or control of Egypt.

93.    The majority thus failed to state reasons for its conclusion that EGAS acted under Egypt's specific instructions and that EGAS's decision to curtail gas supplies to the Damietta Plant was therefore attributable to Egypt under Article 8 of the ILC Articles on State Responsibility.

94.    The majority's finding of attribution of EGAS's conduct to Egypt was, at a minimum, outcome determinative for the so-called "*second phase*" which "*began with EGAS notice of*

---

[181]    Award (Exhibit RA-02), ¶ 9.116 [emphasis added].

[182]    Award (Exhibit RA-02), ¶ 9.116 [emphasis added].

[183]    Award (Exhibit RA-02), ¶ 9.116 [emphasis added].

[184]    Award (Exhibit RA-02), ¶ 9.118.

[185]    Award (Exhibit RA-02), ¶¶ 9.132-9.136.

force majeure *on 24 February 2013*."[186]   Accordingly, the Award must be annulled in relevant part for failing to state reasons.

### 3.   The Award Failed To State Reasons For Rejecting Many Of Egypt's Arguments With Regards To Compensation

95.   As the *Wena Hotels v. Egypt ad hoc* Committee held, the ground for annulment under Article 52(1)(e) of the Convention is "*based on the Tribunal's duty to identify, and to let the parties know, the factual and legal premises leading the Tribunal to its decision.*"[187]   The majority failed in numerous instances to state reasons for rejecting Egypt's arguments about Claimant's entitlement to compensation, either by wholly ignoring issues that Egypt raised, stating conclusions with no rationale, or taking internally inconsistent positions.   Such failures warrant, at a minimum, annulment under Article 52(1)(e) of the Convention of the portion of the Award relating to damages.

96.   Although an arbitral tribunal is generally allowed a measure of discretion in assessing the specific amount of compensation due to a claimant, that discretion is not unfettered and does not absolve the tribunal of the need to provide a rationale that addresses the parties' contentions and explains why it endorses or rejects each party's arguments.   The *Tidewater v. Venezuela ad hoc* Committee explained in this regard that "[t]*he Tribunal is entitled to use its discretion and may estimate the correct compensation as long as it explains the process leading to the estimation*."[188]   Similarly, the *ad hoc* Committee in *Rumeli v. Kazakhstan* confirmed that "[i]*t is highly desirable that tribunals should minimize to the greatest extent possible the element of estimation in their quantification of damages and maximise the specifics of the ratiocination explaining how the ultimate figure was arrived at.*"[189]

97.   Egypt sets forth below several instances of the majority's failure to provide reasons on decisive arguments that would have had a material impact on the scope or amount of compensation awarded.   These include (i) the impact of the SPA on Claimant's entitlement to

---

[186]   Award (Exhibit RA-02), ¶ 9.131.

[187]   *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment (Feb. 5, 2002) (Exhibit RLA-05), ¶ 79.

[188]   *Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (Dec. 27, 2016) (Exhibit RLA-09), ¶ 192.

[189]   *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v, Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision on Annulment (Mar. 25, 2010) (Exhibit RLA-17), ¶ 178.

compensation, (ii) the reliability of UFG's expert calculations, and (iii) Claimant's failure to mitigate.

### a) *Effect Of The SPA On Claimant's Entitlement To Compensation*

98.     The majority held that "*compensation for the Respondent's international wrong under the Treaty cannot exceed the Seller's obligations under the SPA*."[190]  This holding is central to the majority's compensation considerations because it defines both the outer bounds of any possible compensation and the nature of that compensation.  But the majority failed to apply this holding consistently or to explain its reasoning for rejecting several of Egypt's arguments about the meaning and impact of the SPA's terms.

99.     First, the majority agreed with Egypt that the SPA precluded recovery for lost profits, but it applied that holding inconsistently and failed to state reasons for doing so.[191]  The majority correctly denied recovery for one category of Claimant's alleged damages, "*lost dividends*" from a subsidiary, because they constituted lost profits.[192]  But the majority inconsistently granted Claimant more than two billion dollars without even addressing Egypt's argument that this amount also constitutes lost profits and must be excluded for that reason.  Specifically, the majority awarded US$ 2,013,291,000 under UFG's "*third alternative case on compensation*," described this two billion dollar claim as comprising "*Claimant's 'Lost Cash Flows*,'"[193] asserted that this amount "*excludes any 'loss of profits*,'" and stated that "*Claimant was correct in not here claiming 'loss of profits' (as the Respondent contended).*"[194]  Egypt had argued that what Claimant depicted as "*lost cash flows*" amounted to "*loss of profits*" under the SPA because it reflects nothing more than the increased profits that UFG allegedly would have enjoyed if it had bought gas at lower prices under the SPA.  Indeed, Claimant's own submissions equated such "*lost cash flows*" with "*lost profits*."[195]  Nevertheless, the majority failed to state any reason for rejecting Egypt's arguments about the nature of these amounts, or

---

[190]   Award (Exhibit RA-02), ¶ 10.107.  *See also* Award (Exhibit RA-02), ¶ 10.105 (Egypt's undertaking to UFG limited "the compensation that might be owed following an international wrong under the Treaty to the compensation under the SPA as regards Article 4(1) of the Treaty" and "[i]t would [sic] an odd result if, in such circumstances, the Respondent assumed a greater liability to pay compensation under the Treaty than the maximum liability assumed by [EGAS] under the SPA.").

[191]   Award (Exhibit RA-02), ¶¶ 10.111, 10.113.

[192]   Award (Exhibit RA-02), ¶ 10.113.

[193]   Award (Exhibit RA-02), ¶ 10.12.

[194]   Award (Exhibit RA-02), ¶ 10.111.

[195]   Tr. Day 2, pp. 333-336; Respondent's Opening Presentation, Vol. V, slides 11-13; Claimant's Reply on the Merits, ¶ 452 ("*Lost Cash Flows (i.e., Lost Profits) = Revenue – Costs*").

how it reached the conclusion that the "*lost cash flows*" were not "*loss of profits*" in the face of Claimant's own statements otherwise.[196]  This lack of rationale means that the entire grant of US$ 2 billion must be annulled.

100.    Second, it was common ground that the SPA contains a provision that limits UFG's maximum compensation for non-delivery to no more than 90% of the contract price for non-delivered gas.  Specifically, Section 8.1 of the SPA provides:

> "**Section 8.1.  Failure to supply NG**.  If Seller, for reasons other than Force Majeure or Buyer's failure to take, fails to deliver at the Delivery Point a quantity of NG nominated by Buyer according to this Agreement, Seller shall be liable to Buyer for any damages, costs and/or expenses (to the extent permissible under Egyptian laws, but excluding consequential damages and loss of profits) arising from Seller's failure to supply, including (i) third party's claims and penalties against Buyer, (ii) costs, extra-costs, damages and expenses caused to the Complex arising from Seller's failure to supply, including operation and maintenance costs (expressed in USD per MMBTU), and (iii) capital investment costs (expressed in USD per MMBTU).
>
> Seller's liability vis-a-vis Buyer as a result of this Section 8.1 shall not exceed an amount equivalent to ninety per cent (90%) of the Price applicable to the NG not delivered by Seller."[197]

101.    However, the parties submitted competing arguments and calculations for the impact of this provision.[198]  Under Claimant's calculation, the limitation had no impact.[199]  Under Egypt's approach, however, the limitation would have meant a reduction of the amount claimed by more than US$ 500 million.[200]  The Award does not mention Egypt's calculation, which was submitted without objection at the hearing on the merits.[201]

102.    Instead, the Award concludes vaguely and without explanation or reasoning that "[t]*he cap on damages as to 90% of undelivered gas provided by Article 8.1[2] of the SPA is not*

---

[196]    The Dissenting Opinion recognizes that "*the Egyptian non-supply is a matter only of reduced profits,*" Dissenting Opinion (Exhibit RA-03), ¶ 51.

[197]    Natural Gas Sale and Purchase Agreement (Aug. 1, 2000) (Exhibit C-0002), Section 8.1.

[198]    *See* Award (Exhibit RA-02), ¶ 10.43.

[199]    *See* Award (Exhibit RA-02), ¶¶ 10.43, 10.109.

[200]    Tr. Day 6, 1579:18-1581:17; BDO Supplemental Appendix to the presentation to the Tribunal of Gervase MacGregor of BDO LLP (Mar. 11, 2017) ("Reduction in claim" of USD 567,148,565.93), p. 7.

[201]    Tr. Day 6, 1578:21-1579:1.

*relevant to the Claimant's claims made by reference to Article 8.1[1].  Mr Kaczmarek and Mr Sequeira calculated the US$ value of this cap as US$ 3.04 billion, an amount in excess of the Claimant's total claims*."[202]  This holding may be read two ways, neither of which properly states reasons.

103.    First, because the observation about UFG's expert's calculation immediately follows the statement that the 90% cap is "*irrelevant*," the majority might have meant that this calculation was the justification for its conclusion.  But that is not a reason.  It is merely a restatement of Claimant's position, and it does not provide any rationale for why the majority concluded that Claimant's calculation is correct or why Egypt's interpretation and calculation were incorrect.  The majority entirely failed to engage with Egypt's submission on this point.  In light of the majority's lack of reasoning, the Dissenting Opinion observes that Egypt's approach "*more accurately tracks the actual costs suffered due to gas not delivered* […]."[203]

104.    Second, the holding might be read to suggest that the majority believed that the first and second sentences of Section 8.1 of the SPA have nothing to do with one another, so that because UFG asserted claims "*by reference to*" the first sentence ("*8.1[1]*"), the limitation in the second sentence ("*8.1[2]*") cannot apply.[204]  If that were the majority's holding, it would dictate annulment because (i) it amounts to willfully ignoring evidence, the plain language of the second sentence, which applies broadly to "*this Section 8.1*,"[205] and the fact that there is nothing suggesting that the 90% cap could apply to other than the categories of liability in the first sentence, and (ii) it would be another newly created theory by the majority because neither UFG nor Egypt ever asserted that the 90% cap was not relevant to any category of damages simply because they were related to the first sentence of Section 8.1.[206]

---

[202]    Award (Exhibit RA-02), ¶ 10.109.

[203]    Dissenting Opinion (Exhibit RA-03), ¶ 55.

[204]    It is telling that the majority did not include the text of the second sentence in its discussion at paragraphs 10.108 and 10.109 of the Award, giving the impression that the second sentence is intrinsically separable from the first.  Likewise, where the Tribunal repeated several passages from the SPA earlier in the Award (Exhibit RA-02), ¶ 3.11, it artificially added bracketed numbers ("*[1]*" and "*[2]*") before the component sentences as if those sentences were separate subparts in the original.  Neither party presented Section 8.1 this way in its memorials, and the original document has no such sub-numbering of the sentences.  *See* Natural Gas Sale and Purchase Agreement (Aug. 1, 2000) (Exhibit C-0002), Section 8.1.

[205]    Natural Gas Sale and Purchase Agreement (Aug. 1, 2000) (Exhibit C-0002) [emphasis added].

[206]    UFG specifically argued the opposite, *i.e.*, assuming the cap applied at all, "the actual dollar value of the limitation imposed by Section 8.1 depends on the total price of the feed gas that UFG did not receive at the Damietta Plant."  Claimant's Reply Memorial on the Merits, ¶ 427.

105.     Similarly, in *Venezuela Holdings v. Venezuela,* the *ad hoc* Committee noted the tribunal's lack of reasoning with regard to the applicability of the price cap to the assessment of the amount of compensation.  The *ad hoc* Committee addressed Venezuela's challenge to the tribunal's failure to give effect, in its assessment of the amount of compensation due to the Claimant, to a contractual price cap similar to that in Section 8.1 of the SPA.  The Committee observed that "*at no stage does the Tribunal give any consideration to what relevance the limitations on the investors' rights embodied in the Price Cap might actually have to the application of the mandatory criteria laid down in the BIT for compensation.*" [207]   The Committee thus held:

> "Those parts of the Award that purport to set aside altogether the potential relevance, for the purposes of applying the provisions of the BIT, of the compensation provisions forming part of the Mobil Parties' investment in the Cerro Negro Project are unsupported by analysis and based on contradictory reasoning, and thus fail to state the reasons on which they are based." [208]

106.    Equally here the majority's lack of analysis when concluding that the price cap is "*not relevant*" amounts to a failure to state reasons.

107.    Finally, the majority also failed to give any reasoning as to how its holding that Claimant's compensation may not exceed EGAS's liability under the SPA is to be reconciled with the fact that the EGAS's liability under the SPA remains to be determined by a CRCICA tribunal established under the SPA. [209]  Nothing in the majority's reasoning or its award of compensation addresses how the Award could be made compatible with a potential finding by that tribunal that EGAS is liable for any amount less than what the majority awarded here.  This unresolved conflict is heightened by the Tribunal's inconsistent position on the effect of the SPA's *force majeure* provisions.  Despite holding in the context of its compensation analysis that Egypt's liability to compensate UFG cannot exceed EGAS's liability under the SPA, the majority held elsewhere that Egypt "*is not entitled to relief from liability under the FET standard in Article 4(1) of the Treaty based upon the proviso regarding* force majeure *subsumed by the letter dated 5 August 2000 from the Ministry of Petroleum.*" [210]  This

---

[207]   *Venezuela Holdings B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment (Mar. 9, 2017) (Exhibit RLA-18), ¶ 184.

[208]   *Venezuela Holdings B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment (Mar. 9, 2017) (Exhibit RLA-18), ¶ 188.

[209]   *See* Award (Exhibit RA-02), ¶ 6.9.

[210]   Award (Exhibit RA-02), ¶ 9.144.

inconsistency in its own holdings invites an inconsistency in results between this proceeding and the pending CRCICA Arbitration No. 899/2013 that will consider the actual extent of EGAS's liability under the SPA, including its *force majeure* provisions.[211]

108.    The Tribunal's failure to state reasons on Claimant's entitlement to compensation warrants annulment of the entire award of compensation.

### b)    *The Reliability Of UFG's Expert Submissions*

109.    In describing Egypt's arguments, the majority acknowledged that Egypt had challenged the reliability and suitability of Claimant's use of simple spreadsheets without underlying documentary support as well as the numerous flaws and errors in Claimant's expert's calculations.[212]   The majority then chose not to address any of these arguments, much less state reasons for rejecting them, in addition to improperly denying Egypt the ability to confront the evidence.[213]   This failure to state reasons also warrants annulment of the entire award of compensation.

### c)    *Claimant's Failure To Mitigate*

110.    The majority provided contradictory reasoning and ignored evidence in concluding that it would not reduce the compensation award for Claimant's failure to take reasonable steps to mitigate its alleged damages.

---

[211]   Relatedly, the majority created a risk of double compensation for the same non-deliveries of gas under the SPA, and the Tribunal failed to address Egypt's arguments about this risk.  In denying Egypt's request for a stay, the Tribunal stated cryptically that it "*has taken steps in this Award, in accordance with the Claimant's own stated unequivocal position, to ensure that this* [double-recovery] *will not happen.*"  Award (Exhibit RA-02), ¶ 11.33.  But it gave no explanation of what "*steps in this Award*" could possibly prevent the Claimant from obtaining double recovery, and it made no finding to that effect in the operative part of the Award.  For example, the majority did not build in a provision for the compensation here to be reduced by any amount awarded in the related proceedings.  The Tribunal likewise provided no explanation of its reference to an "unequivocal position" from Claimant in this respect.  At best, the Award cites an assertion by Claimant that it would amend its claim in this proceeding if it were awarded in the related CRCICA arbitration "damages […] that overlap with damages sought but not yet determined in this [ICSID] arbitration."  Claimant's Rejoinder Memorial on Jurisdiction and Admissibility, ¶ 205 (cited in Award (Exhibit RA-02), ¶ 11.25).  Claimant cannot now amend its claim in this proceeding, so that position is moot.  Elsewhere, the majority cites an argument by Claimant that EGAS (not Respondent) "may seek an offset" in the CRCICA arbitration to account for an award in this ICSID arbitration.  Award (Exhibit RA-02), ¶ 10.13.  Claimant may well oppose any such request for an offset, and indeed Claimant has not amended its claims in the CRCICA arbitration to account for the majority's compensation award here.  In any event, it is apparent that the Award contains no "steps" to avoid double recovery, in contradiction with the Tribunal's own stated reasoning.

[212]   Award (Exhibit RA-02), ¶¶ 10.75-10.77.

[213]   *See supra*, Section III.A.2.

111.    First, the majority stated that if Claimant had timely invoked its rights under *force majeure* provisions of downstream contracts in light of the grave situation in Egypt, this "*would have effectively closed down most, if not all, of the Claimant's business.*"[214]   The majority cites no evidence or even representations from Claimant for this proposition.   The evidence in the record demonstrated the opposite, as shown by Egypt and observed in the Dissenting Opinion,[215] and the majority offered no reasoning to reconcile its conclusions with the evidence.   Related to this, Egypt showed that, far from being on the verge of shutting down, Claimant continued to earn profits and never engaged in loss-making transactions.   Although the majority noted this argument in its summary of Respondent's positions,[216] the majority wholly failed to address it and provided no reasons for why it was wrong or how the majority's conclusions are consistent with those facts.

112.    Second, the majority wholly ignored Egypt's demonstration that Claimant had an ample supply of lower-cost gas that it could have used to mitigate its damages but voluntarily chose not to use.   Rather than using comparatively <u>in</u>expensive gas that it already had to meet the downstream obligations that were the alleged cause of its damages, Claimant chose to buy on the comparatively expensive international spot market, thereby driving its damages up.[217]   The majority failed to address this entire argument and evidence in any detail, even though the Dissenting Opinion correctly observed that "[b]*y the uncontested calculation by Respondent's expert, this would have reduced* [Claimant's] *damages to at most US$ 241 million*."[218]   There can be no justification for the majority's ignoring an argument that would have reduced compensation by close to 90%.

113.    Finally, the majority brushed aside a number of further arguments by Egypt that showed that Claimant had not taken reasonable steps to mitigate its purported injury.   Among these were arguments that UFG did not take any affirmative steps to reduce downstream obligations but rather that the general downward trend in the Spanish gas market had led to reduced demand[219] and that in fact UFG did not turn away a single customer by way of "mitigation."[220]

---

214   Award (<u>Exhibit RA-02</u>), ¶ 10.127.

215   Dissenting Opinion (<u>Exhibit RA-02</u>), ¶ 56.

216   Award (<u>Exhibit RA-02</u>), ¶ 10.81.

217   Tr. Day 2, 347:22-349:14.

218   Dissenting Opinion (<u>Exhibit RA-03</u>), ¶ 58.

219   Tr. Day 2, 346:17-347:1.

220   Tr. Day 2, 347:8-21.

Instead of contending with these arguments and explaining any reason against them, the majority offered the hollow mantra that "[t]*he Tribunal has considered the other matters raised by the Respondent*" and "*rejects them all.*"[221]   That mantra is insufficient to state reasons as required by Article 52(1)(e) of the Convention.

114.    In sum, the majority's treatment of the compensation analysis in the Award is riddled with holes and contradictions that require annulment.  The amount awarded by the majority to Claimant is the largest ever awarded in an ICSID arbitration, and the majority's numerous, egregious failures to address Egypt's arguments, to explain its reasoning, to maintain consistency, and to consider all of the evidence cannot be allowed to stand.

## C.    The Tribunal Manifestly Exceeded Its Powers

115.   *Ad hoc* committees have held that an excess of powers exists where "*a tribunal: (i) went beyond the scope of the parties' arbitration agreement; (ii) decided points that had not been submitted to it; or (iii) failed to apply the law agreed by the parties.*"[222]   An excess of powers is manifest where it is "*both obvious and serious.*"[223]   As the *Malicorp v. Egypt ad hoc* Committee explained, "*these two terms are* [not] *inconsistent to the extent that what has serious and substantial implications is also clear and obvious.*"[224]

116.   Here, the majority manifestly exceeded its powers when it (i) assumed jurisdiction over UFG's claims although its investment was procured through corrupt or other unlawful means, (ii) failed to apply Article 8 of the ILC Articles on State Responsibility in its attribution analysis, and (iii) failed to apply the law on damages by reading out the cap on damages included in the SPA.

---

[221]   Award (Exhibit RA-02), ¶ 10.132.

[222]   *See*, *e.g.*, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited (TANESCO)*, ICSID Case No. ARB/10/20, Decision on the Application for Annulment (Aug. 22, 2018) (Exhibit RLA-02), ¶ 184; *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment (Dec. 30, 2015) (Exhibit RLA-13), ¶ 55.

[223]   *See*, *e.g.*, *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited (July 3, 2013) (Exhibit RLA-07), ¶ 56; *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr Soufraki (June 5, 2007) (Exhibit RLA-19), ¶ 40.

[224]   *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on the Application for Annulment of Malicorp Limited (July 3, 2013) (Exhibit RLA-07), ¶ 56.

1.   The Tribunal Assumed Jurisdiction Over UFG's Claims Despite The
     Investment Having Been Obtained By Corrupt Or Other Unlawful Means

117.  As the *Caratube v. Kazakhstan ad hoc* Committee explained, "*the power of any arbitral tribunal derives from the authority vested upon it through the consent of the parties; if arbitrators address disputes not included in the powers granted, or decide issues not subject to their jurisdiction or not capable of being solved by arbitration, their decision cannot stand and must be set aside.*"[225]  The *ad hoc* Committee in *Venezuela Holdings v. Venezuela*, in turn, accepted that "*matters of jurisdiction may call for a more rigorous approach than other grounds for annulment, simply because a tribunal ought not to be allowed to exercise a judicial power it does not have (or vice versa).*"[226]

118.  As set forth above in Section III.A.1, the SPA was obtained through corrupt or other unlawful means, in violation of international public policy and the legality requirement of the Spain-Egypt BIT.  Article 1(2) of the Spain-Egypt BIT defines an "*investment*" as "*any kind of assets* […] *acquired under the law of the host country of the investment and in particular, although not exclusively* […] *rights to engage in economic and commercial activities authorized by law or by virtue of a contract, particularly those rights to search for, cultivate, extract or exploit natural resources, in accordance with existing laws and regulations.*"[227]  Article 3(1) of the Spain-Egypt BIT further provides that "[e]*ach Party shall protect in its territory the investments made in accordance with its laws and regulations.*"[228]

119.  A tribunal constituted under the Spain-Egypt BIT therefore lacks jurisdiction over claims based on an investment made in violation of Egyptian law, including an investment procured through corrupt or other unlawful means.  The majority itself recognized that "*an investment made corruptly by a Spanish investor under the laws of Egypt does not qualify for protection under the Treaty,*"[229] and that "*a party's corrupt acts in procuring a contract in Egypt, such as*

---

[225]  *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP (Feb. 21, 2014) (Exhibit RLA-16), ¶ 74.  *See also Ioan Micula, Viorel Micula and Others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment (Feb. 26, 2016) (Exhibit RLA-20), ¶ 126;  *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment (Nov. 2, 2015) (Exhibit RLA-15), ¶ 50;  *Sociedad Anónima Eduardo Vieira v. Republic of Chile*, ICSID Case No. ARB/04/7, Decision of the *ad hoc* Committee on the Application for Annulment of Sociedad Anónima Eduardo Vieira (Dec. 10, 2010) (Exhibit RLA-21), ¶ 252.

[226]  *Venezuela Holdings, B.V., et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment (Mar. 9, 2017) (Exhibit RLA-18), ¶ 110.

[227]  Spain-Egypt BIT (1992) (Exhibit C-0001), Art. 1(2) [emphases added].

[228]  Spain-Egypt BIT (1992) (Exhibit C-0001) [emphasis added].

[229]  Award (Exhibit RA-02), ¶ 7.46.

*the SPA with EGPC, are criminal offences under Egyptian law.*"[230]   The majority then concluded that "*proven corruption by the Claimant in procuring the SPA would be fatal to the Claimant's claims derived from the SPA in this arbitration, as regards jurisdiction, admissibility and the merits.*"[231]

120.   The majority's excess of power was also manifest, that is readily apparent and serious, through the majority's egregious disregard of the red flags tainting the investment with corruption and Claimant's failure to provide a plausible explanation of the red flags.[232]

121.   Corruption is widely recognized as being contrary to international public policy.[233] Recognizing the difficulty of proving corruption allegations, arbitral tribunals have held that "*red flags can play an important supporting role in the assessment of guilt,*" and that "*red flags* [are] *useful in triggering an awareness that a transaction does not conform with the characteristics usually found in comparable transactions.*"[234]   The *Metal-Tech v. Uzbekistan* tribunal, which declined jurisdiction based on corruption, relied on the following red flags:

- "[T]he total payments made by the [investor] to the Consultants exceeded its initial cash contribution to the venture and amounted to nearly 20% of the entire project cost.   The proportion – or rather the disproportion – is striking."[235]

- "The appearance created by the high level of the payments is not dispelled by the reasons which the Claimant puts forward to explain these amounts."[236]

- "The Claimant's explanation that the Consultants were lobbyists and lobbyists do not work for Uzbek minimum wage is unhelpful.   It was not disputed that Uzbek law does not recognize the concept of a lobbyist.   More

---

[230]   Award (Exhibit RA-02), ¶ 7.47.

[231]   Award (Exhibit RA-02), ¶ 7.48.

[232]   *See supra*, Section III.B.I.

[233]   *Niko Resources (Bangladesh) Ltd. v. People's Republic of Bangladesh et al.*, ICSID Case No. ARB/10/11 and ICSID Case No. ARB/10/18, Decision on Jurisdiction (Aug. 19, 2013) (Exhibit CL-0128), ¶ 434; *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and ICSID Case No. ARB/12/40, Award (Dec. 6, 2016) (Exhibit RLA-22), ¶ 493; *World Duty Free Company Limited v. The Republic of Kenya*, ICSID Case No. ARB/00/7, Award (Oct 4, 2006) (Exhibit RL-0020), ¶ 157.

[234]   *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction (Mar. 8, 2017) (Exhibit RLA-23), ¶¶ 548-549; *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (Oct. 4, 2013) (Exhibit RL-0002), ¶ 293.

[235]   *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (Oct. 4, 2013) (Exhibit RL-0002), ¶ 199.

[236]   *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (Oct. 4, 2013) (Exhibit RL-0002), ¶ 201.

important, none of the Consultants was qualified to render lobbying services."[237]

- "[I]f the Consultants had engaged in lawful lobbying, they would have rendered their services in a transparent manner – not under consulting contracts shrouded in secrecy."[238]

- "While the Consultants lacked obvious qualifications to advise the Claimant about the molybdenum industry, two of them had significant connections with Uzbek Government officials responsible for the approval, establishment and operation of the Claimant's investment."[239]

122. In the present case, the majority found the following red flags:

- "From the evidence before this Tribunal, it does not appear that Mr El Komy provided any funding net of what he received, or was due to receive, from the Claimant under the JVA and its related agreements. The U\$ 10 million success fee alone dwarfed the U\$ 2.87 million he paid in as capital (quite apart from the U\$ 4.01 million loaned by the Claimant for this purpose)."[240] The majority thus concluded that "the Claimant's choice of Mr El Komy as a local partner for the Damietta Project cannot be explained on the basis that Mr El Komy (with EATCO) was a net source of capital for the project."[241]

- "As to the expertise of Mr El Komy and EATCO, neither appear to have brought any particular specialist expertise to the project. Mr El Komy was trained as a geological engineer; but it is undisputed that he had no personal expertise or experience in the LNG industry. It is also far from clear that he had had any extensive business experience in the petroleum industry more widely in regard to major projects."[242]

- "Mr El Komy's relevant experience was limited and recent. […] The Tribunal concludes the [sic] Mr El Komy's professional expertise (with EATCO) cannot explain the Claimant's choice of Mr El Komy as a local partner for the Damietta project."[243]

- "The Tribunal infers that the Project was conceived by Unión Fenosa in 1999, before Mr El Komy became involved with the Claimant in early 2000. He did not bring the project to the Claimant. The Tribunal also infers that the

---

[237] *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (Oct. 4, 2013) (Exhibit RL-0002), ¶ 201.

[238] *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (Oct. 4, 2013) (Exhibit RL-0002), ¶ 202.

[239] *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (Oct. 4, 2013) (Exhibit RL-0002), ¶ 225.

[240] Award (Exhibit RA-02), ¶ 7.93 [emphasis added].

[241] Award (Exhibit RA-02), ¶ 7.94.

[242] Award (Exhibit RA-02), ¶ 7.95 [emphasis added].

[243] Award (Exhibit RA-02), ¶¶ 7.99, 7.100 [emphasis added].

project had been the subject of previous development on the Claimant's behalf by other, qualified persons."[244]

- "[T]he Tribunal does not accept that there was no 'influence.'  It concludes that there was influence exercised by Mr El Komy over senior decision-makers at the Ministry of Petroleum and EGPC over the SPA."[245]

123.  Despite such clear red flags and despite Claimant's inability to provide a plausible explanation of why it allegedly chose Mr. El Komy and paid him an inordinate compensation, the majority in manifest excess of its powers assumed jurisdiction over the dispute, in violation of international public policy and of the terms of the Spain-Egypt BIT.  In fact, rather than decline jurisdiction, the majority upheld jurisdiction on a theory that Mr. El Komy was a highly paid lobbyist notwithstanding that Egyptian law criminalizes paid lobbyist services, as set forth at paragraphs 55 and 71 above.

124.  The majority's patent disregard of the evidence put forward to corroborate the nature of Mr. El Komy's involvement in the Damietta Plant Project, its failure to draw the appropriate conclusions from the existence of several red flags, and its manifest disregard of Egyptian law constitute egregious errors of fact or law that give rise to a ground for annulment of the Award under Article 52(1)(b) of the Convention.[246]

125.  By assuming jurisdiction over the Claimant's blatantly illegal investment, the majority manifestly exceeded its powers and the award must consequently be annulled pursuant to Article 52(1)(b) of the Convention.

## 2.    The Tribunal Failed To Apply The Proper Law In Its Attribution Analysis

126.  *Ad hoc* committees have consistently held that a tribunal's failure to apply the proper law constitutes a manifest excess of powers.  The *Soufraki v. United Arab Emirates ad hoc* Committee, for example, confirmed that "[i]*t is widely recognized in ICSID jurisprudence that failure to apply the applicable law constitutes an excess of power.  The relevant provisions of the applicable law are constitutive elements of the Parties' agreement to arbitrate and constitute part of the definition of the tribunal's mandate*."[247]

---

[244]   Award (Exhibit RA-02), ¶ 7.107 [emphases added].

[245]   Award (Exhibit RA-02), ¶ 7.109 [emphasis added].

[246]   *See Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP (Feb. 21, 2014) (Exhibit RLA-16), ¶ 72.

[247]   *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr Soufraki (June 5, 2007) (Exhibit RLA-19), ¶ 45.

127. The *Tidewater v. Venezuela ad hoc* Committee further "*subscribe*[d] *to what it recognizes as* jurisprudence constante*, namely that both the non-application of the proper law and the application of a law that is not proper must be considered as such excess of powers*."[248] It is indeed well-established that "[m]*isinterpretation or misapplication of the proper law may, in particular cases, be so gross or egregious as substantially to amount to failure to apply the proper law.*"[249]

128. The majority manifestly exceeded its powers when it egregiously misapplied international law in its attribution analysis. Article 42(1) of the Convention requires an ICSID tribunal to "*decide a dispute in accordance with such rules of law as may be agreed by the parties.*" Article 11(3) of the Spain-Egypt BIT requires an ICSID tribunal constituted under the BIT to apply, *inter alia*, "*the rules and the universally accepted principles of international law.*"[250]

129. Therefore, the customary international law rules codified in the ILC Articles on State Responsibility constitute the proper law agreed by the parties when it comes to attribution. As the majority stated, the ILC Articles on State Responsibility "*are generally accepted as authoritatively reflecting the principles of customary international law as they relate to attribution.*"[251]

130. The majority's egregious misapplication of the customary international law rules reflected in the ILC Articles on State Responsibility constitutes a serious departure from the proper law agreed by the parties, and entails a manifest excess of power under Article 52(1)(b) of the Convention, which warrants the annulment of the relevant portion of the Award.

---

*See also Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (Dec. 27, 2016) (Exhibit RLA-09), ¶ 126; *Ioan Micula, Viorel Micula and Others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment (Feb. 26, 2016) (Exhibit RLA-20), ¶ 127.

[248] *Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (Dec. 27, 2016) (Exhibit RLA-09), ¶ 126.

[249] *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr Soufraki (June 5, 2007) (Exhibit RLA-15), ¶ 86. *See also Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP (Feb. 21, 2014) (Exhibit RLA-16), ¶ 81; *Mr. Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment (Feb. 12, 2015) (Exhibit RLA-24), ¶ 162; *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment (Jan. 15, 2016) (Exhibit RLA-25), ¶ 108.

[250] Spain-Egypt BIT (Exhibit C-0001), Art. 11(3).

[251] Award (Exhibit RA-02), ¶ 9.90.

131.  As set forth at paragraph 29 above, the majority concluded that EGAS acted on the instructions of and under the control and direction of Egypt, within the meaning of Article  8 of the ILC Articles.[252]

132.  Pursuant to Article 8 of the ILC Articles on State Responsibility, the conduct of a person shall be considered an act of the State under international law when the person is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the unlawful conduct.  The ILC's Commentary emphasizes that "[s]u*ch conduct will be attributable to the State only if it directed or controlled the specific operation and the conduct complained of was an integral part of that operation*."[253]

133.  Arbitral tribunals have confirmed that in order to establish that the conduct of an entity with legal personality separate from the State is attributable to the State pursuant to Article 8 of the ILC Articles, a party must satisfy a very demanding test.  As the *Jan de Nul v. Egypt* tribunal confirms, "[i]*nternational jurisprudence is very demanding in order to attribute the act of a person or entity to a State, as it requires both a general control of the State over the person or entity and a specific control of the State over the act the attribution of which is at stake; this is known as the 'effective control' test*."[254]

134.  The Tribunal egregiously misapplied this two-prong test and instead, as explained above, justified its conclusion that EGAS's failure to supply gas was to be attributed to Egypt principally because "*the Respondent's decisions to cut and curtail gas supply to the Damietta Plant was, by its nature and purpose,  a sovereign act by the Respondent under international law*."[255]  However, that Egypt's purported decision to cut and curtail gas supply to the Damietta Plant was a sovereign act in no way establishes that Egypt specifically directed or instructed EGAS to curtail gas supplies to the Damietta Plant.  As the *Hamester v. Ghana* tribunal explains:

> "[F]or all the acts complained of, in case they are not attributable to the State under Article 5, the Tribunal must also determine whether they are attributable under Article 8,

---

[252]   Award (Exhibit RA-02), ¶ 9.118.

[253]   *Draft Articles on Responsibility of States for Internationally, Wrongful Acts, with Commentaries,* Yearbook of the International Law Commission (2001), Vol. II, Part 2, p. 47 (Exhibit CL-0064) Art. 8, Comment  3[emphasis added].

[254]   *Jan de Nul N.V., Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award (Nov. 6, 2008) (Exhibit CL-0022), ¶ 173.

[255]   Award (Exhibit RA-02), ¶ 9.138.

the attribution or non-attribution under Article 8 being independent of the status of Cocobod [the Ghana Cocoa Board], and dependent only on whether the acts were performed 'on the instructions of, or under the direction or control' of that State.  Such acts could therefore be attributable not because they are the result of the use of governmental power, but because they are under the direct command or effective control of the State."[256]

135.  As set forth at paragraph 89 above, the majority itself recognized that "*a situation falling within Article 5 'is to be distinguished from situations where an entity acts under the direction or control of the State, which [i]* [sic] *covered by Article 8.* "[257]  A "*sovereign*" or "*political*" decision by Egypt to cut and curtail gas to the Damietta Plant is no substitute to a showing of specific instructions from a State organ to EGAS to curtail and stop gas deliveries to the Damietta Plant.

136.  The majority's egregious misapplication of Article 8 of the ILC Articles on State Responsibility is compounded by the majority's reference to irrelevant evidence.[258]  As is clear from paragraphs 9.132 to 9.137 of the Award, none of the evidence referred to by the Tribunal is on its face relied on to show an instruction or direction by Egypt to EGAS to specifically curtail or stop gas deliveries as of February 2013.  The evidence is, rather, put forward to support the Tribunal's conclusion that Egypt's purported decision to cut and curtail gas supply to the Damietta Plant was "*by its nature and purpose, a sovereign act by the Respondent under international law.*"[259]

137.  In sum, the majority's blatant and egregious misapplication of the rules of attribution reflected in the ILC Articles on State Responsibility, the proper law agreed by the parties, constitutes a manifest excess of power, that was determinative for the majority's finding that Egypt breached Article 4(1) of the Spain-Egypt BIT, at a minimum for the period following

---

[256]   *Gustav F W Hamester GmbH & Co. KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award (June 18, 2010) (Exhibit RL-0009), ¶ 198 [emphasis added].

[257]   Award (Exhibit RA-02), ¶ 9.114.

[258]   Award (Exhibit RA-02), ¶¶ 9.132-9.136.

[259]   Award (Exhibit RA-02), ¶ 9.138. *See, e.g.*, *Petroleum minister: Gas exports to Jordan, Spain halted*, Al-Masry Al-Youm (Oct. 15, 2012) (Exhibit C-0286) (unverified press report post-dating the beginning of the gas shortages cited for the proposition that Egypt "has stopped exporting gas to Jordan and Spain because of increasing gas consumption on the domestic market.").

EGAS's notice of *force majeure* on February 24, 2013.[260]  Such manifest excess of powers justifies the annulment of the Award in relevant part under Article 52(1)(b) of the Convention.

### 3.   The Tribunal Read Out The Cap On Damages Agreed In The SPA

138.   The majority recognized that the Spain-Egypt BIT "*does not set out a standard of compensation to be applied in the case of any violations of the Treaty, save as regards expropriation under Article 6 of the Treaty.*"[261]  No expropriation is alleged to have occurred in this case.  Consequently, the majority held that "*any compensation to be awarded by this Tribunal is to be decided by applying principles of customary international law, namely 'full reparation' to wipe out, as far as possible, the consequences of the Respondent's international wrongs.*"[262]

139.   The majority found that Egypt's violation of the Spain-Egypt BIT derives solely from the undertaking that the majority found the State made in regard to EGAS's obligations under the SPA.[263]   The majority therefore determined that "*compensation for the Respondent's international wrong under the Treaty cannot exceed the Seller's obligations under the SPA,*"[264] correctly reflecting the fact that the principles laid down in the SPA constitute an integral part of the proper law applicable to the calculation of any potential compensation.  Specifically, and as set forth above in Section III.B.3, Section 8.1 of the SPA provides:

> "**Section 8.1. Failure to supply NG.** […] Seller's liability vis-à-vis Buyer as a result of this Section 8.1 shall not exceed an amount equivalent to ninety per cent (90%) of the Price applicable to the NG not delivered by Seller."[265]

140.   Yet, having acknowledged this important limitation, the majority failed to apply it, in manifest excess of its power.  As set forth in Section III.C.2. above, *ad hoc* committees have repeatedly held that a failure to apply the proper law constitutes a manifest excess of power, and this ground for annulment is all the more apt whenever a tribunal disregards the applicable law,[266] as the majority did, when it stated with no explanation that "[t]*he cap on damages as to*

---

[260]   Award (Exhibit RA-02), ¶ 9.131.

[261]   Award (Exhibit RA-02), ¶ 10.95.

[262]   Award (Exhibit RA-02), ¶ 10.96.

[263]   Award (Exhibit RA-02), ¶ 10.105.

[264]   Award (Exhibit RA-02), ¶ 10.107 [emphasis added].

[265]   Natural Gas Sale and Purchase Agreement (Aug. 1, 2000) (Exhibit C-0002), Section 8.1. [emphasis added].

[266]   *See supra*, ¶¶ 126-127.

*90% of undelivered gas provided by Article 8.1[2] of the SPA is not relevant to the Claimant's claims made by reference to Article 8.1[1].*"[267]

141.    In *Venezuela Holdings v. Venezuela*, the tribunal addressed similar arguments regarding the nature and amount of the compensation due for Venezuela's expropriation of the Cerro Negro Project.   Specifically, Venezuela argued that compensation was to be limited by a contractual clause that established a cap pursuant to which "*under certain conditions, 'compensation would not be granted for any fiscal year if the price of the benchmark crude oil (Brent) has exceeded US$ 27 per barrel in 1996 dollars.*'"[268]   The tribunal disregarded the cap, explaining:

> "In the present case, Clause 15(1) of the Association Agreement makes a clear distinction between the action that the Foreign Party may initiate against Lagoven CN on the one hand, and the action that it may initiate against the Government on the other. The price cap contained in Clause 15(2)(a) is applicable only to the compensation payable by Lagoven CN.   Since the Respondent in this proceeding is the Bolivarian Republic of Venezuela, not Lagoven CN, <u>the Tribunal concludes that it may not oppose this price cap to the Claimants</u>."[269]

142.    However, upon Venezuela's application for annulment, the *ad hoc* Committee held that this amounted to a manifest excess of the tribunal's powers, pursuant to Article 52(1)(b) of the Convention, because it was a failure to give effect to a legal provision applicable to the project. Consequently, the *ad hoc* Committee partially annulled the award, holding:

> "The Tribunal exceeded its powers by failing to apply the proper law, and the 'manifest' nature of this failure is shown by the <u>inadequacies in the Tribunal's reasoning for the choice of applicable law</u>, in both its positive (the law chosen) and negative (the law rejected) aspects.   Conversely, the failure to state adequate and non-contradictory reasons is of central significance inasmuch as it had decisive effect on the choice and application of applicable law and thus on the Tribunal's decision on the principal point at issue (the assessment of the compensation due)."[270]

---

[267]   Award (<u>Exhibit RA-02</u>), ¶ 10.109.

[268]   *Venezuela Holdings, B. V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award (Oct. 9, 2014) (<u>Exhibit RLA-26</u>), ¶ 369.

[269]   *Venezuela Holdings, B. V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award (Oct. 9, 2014) (<u>Exhibit RLA-26</u>), ¶ 373 [emphasis added].

[270]   *Venezuela Holdings, B. V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment (Mar. 9, 2017) (<u>Exhibit RLA-18</u>), ¶ 189 [emphasis added].

143.    In the present case, the majority did correctly identify the proper law on damages when it recognized the relevance of the price cap provided for in the SPA.  Yet, the majority failed to give effect to the price cap in its determination of compensation, and likewise failed to give adequate and non-contradictory reasons (or, indeed, any reason)[271] for doing so.  This renders the majority's excess of powers all the more manifest, because it knowingly and blatantly disregarded the proper law on damages.

144.    Through its egregious disregard of its own determination of the law that should have been applied to compensation, and by nevertheless reading out the SPA's cap on liability, the majority manifestly exceeded its powers.  Thus, the portion of the Award relating to the amount of compensation due to Claimant must be annulled, in application of Article 52(1)(b) of the Convention.

## IV.    REQUEST FOR A STAY OF ENFORCEMENT OF THE AWARD

145.    Pursuant to Article 52(5) of the Convention, Egypt requests that enforcement of the Award be stayed pending a decision on the Application for Annulment.

146.    Article 52(5) provides that "[i]*f the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.*"  Accordingly, Egypt respectfully requests that the Secretary-General of the Centre notify the parties of the provisional stay of enforcement.  Egypt will request a continuance of the provisional stay promptly upon constitution of the *ad hoc* Committee.

147.    Egypt is entitled to a stay of enforcement based on the following circumstances:

- For the reasons set forth above, there are compelling grounds for the annulment of the Award.  Given the size of the compensation awarded, which is unprecedented in an ICSID arbitration, and the matters of international public policy at issue, it is essential that the *status quo* be maintained until a decision on the Application for Annulment is rendered.

- Enforcement of the Award pending the *ad hoc* Committee's decision on annulment would severely impact the Egyptian economy.  In the last decade, Egypt has suffered from the devastating effects of the Global Financial Crisis as well as the political chaos ensuing from two uprisings that ended with the removal of two presidents.  Egypt had

---

[271]    *See supra*, ¶ 102.

to obtain a three-year US$ 12 billion IMF loan in November 2016, forcing it to comply with a severe austerity program.[272]  The number of Egyptians living below the poverty line has increased from 26.3% in 2012 to an estimated 35% in 2017.[273]  Egypt's political situation remains tense, with experts reporting a "*significant increase in potential instability and unrest.*"[274]

- In the absence of a stay of enforcement, Egypt would face a significant risk of not being able to recover any funds paid to UFG before a decision on annulment.  UFG asserted during the arbitration that "[i]*t's in the process right now of working with its banks to try to restructure its payment obligations* […] *to continue to survive.*"[275]  There is thus a genuine risk that UFG would distribute any funds obtained from Egypt or otherwise place them beyond Egypt's reach.  The risk is particularly aggravated given the very substantial amount awarded to UFG by the majority.

- Immediate enforcement of the Award would also expose Egypt to the risk that UFG would receive double recovery because UFG is seeking US$ 2.8 billion for the same gas delivery shortfalls in the pending CRCICA Arbitration No. 899/2013.[276]

## V.   **REQUEST FOR RELIEF**

148.  For the foregoing reasons, the Arab Republic of Egypt respectfully requests that:

(a)   the Award be annulled in its entirety, or in the alternative, in relevant part;

(b)   enforcement of the Award be stayed pending a decision on Egypt's application for annulment; and

(c)   Egypt be reimbursed for all costs and expenses associated with the annulment proceedings, including professional fees and disbursements.

---

[272]   *Egypt wins approval for $12bn loan from the IMF*, BBC News (Nov. 12, 2016) (Exhibit RA-06).  IMF, Press Release: *IMF Executive Board Approved US$12 billion Extended Arrangement Under the Extended Fund Facility for Egypt* (Nov. 11, 2016) (Exhibit RA-07).

[273]   The World Bank, Arab Republic of Egypt poverty headcount ratio (2000-2014) (Exhibit RA-08); *Egypt's poverty line to increase to LE 800 monthly per person*, Egypt Today (July 23, 2017) (Exhibit RA-09).

[274]   *Warning signs of instability in Egypt*, Global Risk Insights (Feb. 19, 2018) (Exhibit RA-10).

[275]   Tr. Day 6, 1574:3-8.

[276]   *See supra*, ¶ 21, note 211.

149. As set forth at paragraph 146 above, the Arab Republic of Egypt also respectfully requests that the provisional stay of enforcement of the Award be notified to the Parties by the Secretary-General.

150. The Arab Republic of Egypt reserves its right to amend and/or supplement this application for Annulment.


Dated:  December 21, 2018

Respectfully submitted,



Claudia Annacker
CLEARY GOTTLIEB STEEN & HAMILTON LLP
12, rue de Tilsitt
75008 Paris
France
Telephone: +33 1 40 74 68 00

H.E. Counsellor Hussein Khalil Hamza
President of the Egyptian State Lawsuits Authority
Egyptian State Lawsuits Authority
42, Gameat El Dowal El Arabiya St., Mohandesseen,
Giza, P.O. Box: 12311
Egypt
Telephone: +202-376271357