# EXHIBIT 3

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**Unión Fenosa Gas S.A.**

**v.**

**Arab Republic of Egypt**

**(ICSID Case No. ARB/14/4)
Annulment Proceeding**

---

## DECISION ON THE APPLICANT'S REQUEST FOR A CONTINUED STAY OF ENFORCEMENT OF THE AWARD

*Members of the ad hoc Committee*
Mr. Andrés Jana Linetzky, President
Dr. Inka Hanefeld, Member
Judge Bernardo Sepúlveda Amor, Member

*Secretary of the ad hoc Committee*
Ms. Milanka Kostadinova

---

October 18, 2019

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY .............................................................................................. 1

II.    THE PARTIES' POSITIONS ...................................................................................... 5

    A.    The Applicant's position ..................................................................................... 5

    B.    The Respondent's position .................................................................................. 9

III.    THE *AD HOC* COMMITTEE'S ANALYSIS ................................................................ 12

    A.    The applicable legal standard ............................................................................ 13

    B.    Are there circumstances that require the continuation of the stay of enforcement? .... 17

V.    DECISION .................................................................................................................. 29

*Unión Fenosa Gas S.A. v. Arab Republic of Egypt*
*(ICSID Case No. ARB/14/4) – Annulment Proceeding*

## I.     PROCEDURAL HISTORY

1.      On December 21, 2018, the Arab Republic of Egypt ("**Egypt**" or the "**Applicant**") filed with the Secretary-General of the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") an application (the "**Application**") requesting the annulment of the award rendered on August 31, 2018 in ICSID Case No. ARB/14/4 (the "**Award**") in a dispute between Unión Fenosa Gas S.A. ("**UFG**" or the "**Respondent**") and Egypt. The Application was brought pursuant to Article 52 of the Convention on the Settlement of Investment Disputes between States and Nationals of other States dated March 18, 1965 (the "**ICSID Convention**").

2.      The ICSID Secretary-General registered the Application on January 8, 2019 and transmitted a Notice of Registration to the Parties on the same date.  In that Notice, the Secretary-General noted that the Application contained a request for a stay of enforcement of the Award in accordance with Rule 54(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Rules**").  The Secretary-General notified the Parties that, pursuant to Rule 54(2), the enforcement of the Award was provisionally stayed.

3.      The *ad hoc* Committee (the "**Committee**") was constituted on April 22, 2019, in accordance with ICSID Convention Article 52(3), comprising Mr. Andrés Jana Linetzky (Chile) as President, and Dr. Inka Hanefeld (Germany) and Judge Bernardo Sepúlveda Amor (Mexico) as members.  Ms. Milanka Kostadinova, ICSID Senior Legal Adviser, was appointed as Secretary of the Committee (the "**Secretary**").

4.      On April 24, 2019, the Applicant filed a communication requesting the continuing stay of enforcement of the Award.

5.      On May 2, 2019, the Secretary wrote to the Parties on behalf of the Committee, conveying the Committee's proposal that the first session be held either by telephone conference or in-person, preferably in Europe, on July 1 or 2, 2019.  In order to give the

Parties an opportunity to fully present their observations on the issue of the continuation of the stay, the Committee fixed the following briefing schedule:

- May 17, 2019: Applicant's observations with respect to the circumstances that require the continuation of the stay of enforcement;
- May 31, 2019: Respondent's response observations;
- June 10, 2019: Applicant's reply;
- June 20, 2019: Respondent's rejoinder.

6. By letter of May 9, 2019, the Respondent requested an extension until June 11, 2019 of the time for filing of its response observations and proposed that the second round of briefings be eliminated from the schedule.

7. As directed by the Committee, by letter of May 13, 2019, the Applicant provided its observations on UFG's position concerning the extension of the time and the elimination of the second round of written submissions on the continuation of the stay of enforcement.

8. On May 16, 2019, the Secretary informed the Parties of the Committee's decision to hold the first session in person, and to maintain the schedule fixed on May 2, 2019. The Parties were also informed of the Committee's decision that, pursuant to Article 52(5) of the ICSID Convention, the provisional stay of enforcement would continue until the Committee had heard the Parties and reached a decision on the Applicant's request for continuation of the stay.

9. On May 17, 2019, the Applicant filed its Observations in Support of its Request for the Continuation of the Stay of Enforcement of the Award, together with Exhibits RA-11 through RA-23, and Legal Authorities RLA-27 through RLA-42 (the "**Observations**").

10. On May 31, 2019, the Respondent filed its Opposition to Egypt's Request for Continuation of the Stay of Enforcement of the Award, together with the Witness

Statement of Mr. Javier Sáez Ramírez dated May 31, 2019, Exhibits CA-1 through CA-15, and Legal Authorities CLA-1 through CLA-26 (the "**Opposition**").

11.   By letter of June 3, 2019, the Applicant requested an adjustment of the filing schedule of briefings on the continuation of the stay of enforcement. UFG was invited to provide comments.

12.   By letter of June 5, 2019, UFG presented its observations on the Applicant's request of June 3, 2019.

13.   By email of June 6, 2019, Egypt provided its comments on UFG's communication of June 5, 2019.

14.   On June 6, 2019, the Committee decided to revise the schedule for written pleadings on the continuation of the stay set out on May 2, 2019, as follows:

–   June 17, 2019 – Applicant's reply; and

–   July 5, 2019 – Respondent's rejoinder.

15.   Both Parties complied with these deadlines.  On June 17, 2019, the Applicant filed its Reply Observations in Support of its Request for the Continuation of the Stay of Enforcement of the Award with the Witness Statement of Dr. Magdy Mohammed Galal, Exhibits RA-24 through RA-59, and Legal Authorities RLA-43 through RLA-61 (the "**Reply**").

16.   On July 5, 2019, the Respondent filed its Rejoinder to Egypt's Request for Continuation of the stay of Enforcement of the Award, together with a second Witness Statement of Mr. Javier Sáez Ramírez dated July 5, 2019, Exhibits CA-16 through CA-59, and Legal Authorities CLA-27 through CLA-54 (the "**Rejoinder**").

17.   On July 22, 2019, the Committee held its first session at the World Bank's offices in Paris, France.   The first session was immediately followed by a hearing on the

Applicant's Request for the Continuation of the Stay of Enforcement of the Award (the "**Hearing**").

18.    In addition to the Members of the Committee and the Secretary, the following individuals participated in the Hearing:

Representing the Applicant:

Counsellor Mohamed Khalaf, The Egyptian State Lawsuits Authority
Counsellor Yousria El Gamal, The Egyptian State Lawsuits Authority
Counsellor Nada Elzahar, The Egyptian State Lawsuits Authority
and
Dr. Claudia Annacker, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Ms. Ariella Rosenberg, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Ms. Laurie Achtouk-Spivak, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Mr. Larry C. Work-Dembowski, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Mr. Pablo Mateos Rodríguez, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Ms. Zeïneb Bouraoui, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Ms. Anastasia Poorhassan, Cleary Gottlieb Steen & Hamilton LLP (Paris)
Mr. Robert Garden, Cleary Gottlieb Steen & Hamilton LLP (Paris)

Representing the Respondent:

Mr. R. Doak Bishop, King & Spalding LLP (Houston)
Mr. James Castelo, King & Spalding LLP (Paris)
Ms. Sara S. Burns, King & Spalding LLP (Atlanta)
Mr. Aloysius Llamzon, King & Spalding LLP (Washington, D.C. and New York)
Mr. Rami Chahine, King & Spalding International LLP (Paris)
and
Mr. Mr Cesar Olano, Unión Fenosa Gas S.A.
Mr. Ignacio de la Peña, Unión Fenosa Gas S.A.
Mr. José de Lara, Unión Fenosa Gas S.A.

19.    At the July 22, 2019 Hearing, the Parties presented oral arguments on the continuation of the stay of enforcement.

20.    Having duly deliberated among its members, the Committee now issues this Decision on Applicant's request for a continued stay of enforcement of the Award.

## II.    THE PARTIES' POSITIONS

### A.    THE APPLICANT'S POSITION

21.    The Applicant argues that the Committee should continue the stay of enforcement for the following reasons: (i) there are no exceptional circumstances that justify departing from the general practice of *ad hoc* committees to continue a stay of enforcement when so requested. In particular, (ii) Egypt's request for continuation of the stay of enforcement is not dilatory; (iii) there is no reason to doubt that Egypt will comply with the Award if its request for annulment is rejected, and (iv) lifting the stay would cause undue hardship to Egypt, in light of the large amount of the Award, the risk of double recovery by UFG and the fragility of the political and economic situation in Egypt, whereas continuation of the stay would not prejudice UFG.[1]

22.    Based on ICSID statistics, the Applicant affirms that the prevailing practice of *ad hoc* committees is to grant a stay of enforcement, and that denying a continued stay of enforcement is the exception.[2] Relying on decisions by the committees in *Enron v. Argentina* and *Pey Casado v. Chile*, the Applicant states that a request for continuation of a stay should be granted in the absence of "very exceptional circumstances".[3] The party requesting continuation of the stay need not demonstrate that "termination of the stay would lead to severe consequences";[4] it suffices to show that no exceptional circumstances exist that justify departure from the general practice in favor of continuing the stay.[5]

23.    The Applicant recognizes that a *prima facie* dilatory application could qualify as an exceptional circumstance. However, to be dilatory, the application would have to have a

---

[1] Egypt's Observations, para. 2.
[2] Egypt's Observations, para. 5.
[3] Egypt's Observations, para. 3.
[4] Egypt's Reply, para. 11.
[5] Egypt's Reply, para. 11.

"manifestly abusive character" (*Mitchell v. Congo*)[6] or be brought "without any basis under the [ICSID] Convention" (*MTD v. Chile*).[7] Egypt affirms its good faith in seeking annulment of the Award, and good grounds for doing so, as evidenced by terms contained in a Dissenting Opinion to the Award.[8] Moreover, Egypt states that *ad hoc* committees have consistently declined to determine a stay of enforcement on the basis of a preliminary assessment of the merits and prospects of the annulment request.[9]

24.    The prospect of prompt compliance with the Award is another factor that must be taken into consideration, and which the Applicant claims weighs in its favor.[10] Egypt says it has taken "appropriate steps" to give effect to Article 54 of the Convention in its domestic arrangements,[11] and that is has consistently honored its international payment obligations, whether by amicably settling disputes or through voluntary compliance with awards rendered against it.[12] According to the Applicant, this includes post-award settlements reached by consent.[13] Whether or not Egypt paid ICSID fees and expenses during the proceedings before the Tribunal is irrelevant to Egypt's record of compliance.[14] Egypt also contests that any weight should be given to the witness statement of UFG's Chairman Mr. Javier Sáez Ramírez, in particular that unidentified Egyptian high officials told him that Egypt would not voluntarily pay the Award.[15]

25.    The relative hardship to the Parties that would result from lifting or continuing the stay must also be considered and, according to the Applicant, weighs in favor of continuing

---

[6] Egypt's Observations, para. 9.

[7] Egypt's Observations, para. 9.

[8] Egypt's Observations, para. 10.

[9] Egypt's Reply, para. 92.

[10] Egypt's Observations, para. 12.

[11] Egypt's Observations, para.16.

[12] Egypt's Observations, para. 18.

[13] Egypt's Reply, para. 21.

[14] Egypt's Reply, para. 29.

[15] Egypt's Reply, para. 31.

the stay of enforcement of the Award.[16] The Applicant points out the negative impact on Egypt's fragile political, social and economic situation of enforcing one of the largest awards in ICSID history whose quantum analysis, according to Egypt, is heavily flawed.[17] Contrary to what UFG suggests, Egypt's economy is far from flourishing and is still recovering from the 2008 financial crisis and 2011 revolution.[18] Moreover, Egypt sees a serious risk of double recovery by UFG in the parallel CRCICA Arbitration No. 899/2013 ("**CRCICA Arbitration**"), where UFG seeks to recover US$ 2.8 billion for the same losses and on the same facts.[19] The Applicant is not satisfied with UFG's assurances that it will not double collect.[20]

26.     On the other side of the equation, continuation of the stay would not impose hardship on UFG because the accrual of interest on the Award compensates UFG for the passage of time.[21] Egypt does not consider credible UFG's allegation that it is on the brink of insolvency, in particular based on UFG's own financial statements for 2017, which report positive operating profits since 2013.[22] UFG also did not report any risk of insolvency as a result of its subsidiary SEGAS' financial needs (SEGAS being the owner and operator of the Damietta plant in Egypt).[23] Based on UFG's own declarations, Egypt finds that SEGAS will not be in jeopardy of default before 2021, and that SEGAS' situation may well improve in the meantime.[24]

27.     To the extent that the financial situation of SEGAS has any relevance, Egypt finds that it weighs against UFG, because UFG would immediately redistribute any funds obtained

---

[16] Egypt's Observations, para. 21.

[17] Egypt's Observations, paras. 22-23.

[18] Egypt's Reply, paras. 57ss.

[19] Egypt's Reply, para. 78.

[20] Egypt's Reply, paras. 83-84.

[21] Egypt's Observations, paras. 25-26.

[22] Egypt's Reply, para. 41.

[23] Egypt's Reply, para. 45.

[24] Egypt's Reply, paras. 53-54.

through enforcement of the Award and place these outside Egypt's reach should the Award later be annulled.[25]

28.    Egypt does not deny that the Committee may condition a continued stay of enforcement; however, it finds that posting of security is not the default rule.[26] A party requesting annulment should not be punished for exercising its rights under the ICSID Convention.[27] If security were to be common practice, this may result in deterring developing countries from exercising their right to seek annulment pursuant to Article 52(5) of the Convention.[28] In the present case, an irrevocable bank guarantee as requested by UFG, equivalent to the full amount of the Award, would cause Egypt hardship and place UFG in a more favorable position than if the annulment proceedings had not been brought.[29] Egypt also objects to UFG's alternative request for placement of post-award interest in an escrow account, arguing that postponement of payment of an award due to a stay of enforcement cannot constitute prejudice (*Enron v. Argentina*) and can be remedied by the payment of post-award interest (*MTD v. Chile*).[30]

29.    Egypt therefore requests the Committee to order the continuation of the stay of enforcement, dismiss all of UFG's requests for relief in its Opposition, and order UFG to pay all of Egypt's costs, including attorney's fees, incurred in connection with the request for a continued stay of enforcement of the Award.[31]

---

[25] Egypt's Reply, para. 56.
[26] Egypt's Reply, para. 125.
[27] Egypt's Reply, para. 129.
[28] Egypt's Reply, para. 130.
[29] Egypt's Reply, para. 133.
[30] Egypt's Reply, para. 139.
[31] Egypt's Reply, para. 141.

*Unión Fenosa Gas S.A. v. Arab Republic of Egypt*
*(ICSID Case No. ARB/14/4) – Annulment Proceeding*

## B.   THE RESPONDENT'S POSITION

30.   According to the Respondent, Egypt has mischaracterized the legal standard for granting a continued stay of enforcement.[32] Under Article 52(5) of the ICSID Convention, a stay of enforcement can only be granted if the circumstances so require.[33] There is no presumption in favor of a stay and the party requesting the continued stay of enforcement has the burden of demonstrating that the circumstances require a stay.[34]

31.   The relevant factors to be taken into consideration are the following: (i) the likelihood of compliance with the award should the request for annulment be unsuccessful; (ii) the comparative hardship borne by each party in case the award is immediately complied with (or not); (iii) whether the request for annulment is dilatory, and (iv) the possibility of recouping payments by the applicant should the applicant later win on annulment.[35]

32.   UFG questions Egypt's record of compliance with ICSID awards, finding that pre- or post-award settlements, often at discounts, cannot properly be considered voluntary compliance.[36]  UFG finds that the specific circumstances of the present case further put into doubt Egypt's future compliance with the Award, including the size of the Award.[37] UFG also refers as relevant factors to Egypt's failure to contribute equally to the cost of the underlying ICSID proceeding,[38] and statements by top Egyptian officials to UFG Chairman Mr. Javier Sáez that Egypt would not voluntarily pay unless UFG settled on Egypt's terms.[39]

---

[32] UFG's Opposition, para. 9.

[33] UFG's Rejoinder, para. 21.

[34] UFG's Rejoinder, para. 24.

[35] UFG's Opposition, para. 12.

[36] UFG's Opposition, paras. 15-17.

[37] UFG's Opposition, para. 18. On the other hand, UFG states that the size of an award cannot be a controlling factor in any decision on stay, see UFG's Rejoinder, para. 78.

[38] UFG's Opposition, para. 20.

[39] UFG's Opposition, para. 21 and UFG's Rejoinder, para. 48.

33.     On the balance of hardship, UFG says that its financial circumstances are so dire that it may not survive until an annulment decision is reached.[40] UFG's 80% shareholding in SEGAS, the company that operates the Damietta plant, is pledged as security for SEGAS' loans, and may be lost if SEGAS cannot make its next payment, which it says is due in March 2021.[41]

34.     In contrast, Egypt has not demonstrated that denying a stay would result in "catastrophic immediate and irreversible consequences", which is the standard that must be met.[42] UFG relies on economic indicators and statements by high officials of the International Monetary Fund, the World Bank and Egypt itself, to show that Egypt's economy is flourishing and not nearly as fragile as Egypt makes it appear.[43] UFG also pledges that it will not double recover in the event that the pending CRCICA Arbitration is decided in its favor, as is feared by Egypt.[44]

35.     According to UFG, Egypt's arguments for annulment are facially deficient, revealing the annulment request's dilatory motive.[45] UFG discusses in some detail Egypt's arguments for annulment of the Award[46], and finds that they reflect Egypt's disagreement with the Award but do not identify annullable faults.[47]

36.     UFG states that, contrary to what Egypt sustains, *ad hoc* committees commonly employ their discretion to require security as a means of balancing opposing interests of the parties: on the one hand, the award debtor's risk in not being able to recoup paid funds should the award be annulled, and on the other hand, the award creditor's risk of not

---

[40] UFG's Opposition, para. 25.
[41] UFG's Opposition, paras. 27-28.
[42] UFG's Rejoinder, para. 51.
[43] UFG's Opposition, paras. 32-36.
[44] UFG's Opposition, para. 39.
[45] UFG's Opposition, para. 42.
[46] UFG's Opposition, paras. 43-68 and UFG's Rejoinder, paras. 106-127.
[47] UFG's Opposition, para. 42.

being paid the award should the request for annulment be dismissed.[48] Conditioning a stay is not a punishment, as Egypt would have it, but only a balancing of interests.[49]

37.    UFG finds that Egypt's annulment risk is minimal. It denies any risk of double recovery and refers to its undertakings both before the ICSID Tribunal and the CRCICA Tribunal not to double collect.[50] It also finds the argument premature, in the absence of a favorable decision in the CRCICA Arbitration and before the collection stage.[51] UFG is willing to undertake a guarantee that it will promptly return any payments received, should the Award be annulled.[52] If that is not sufficient, Egypt may seize the LNG Plant on Egyptian territory in which UFG holds an 80% shareholding.[53] By contrast, UFG finds that its enforcement risks are considerable, because Egypt may not be willing or able to pay the Award,[54] and because Egypt uses the annulment procedure as a negotiating tool.[55]

38.    Should the Committee grant Egypt's request for continuation of the stay of enforcement, UFG asks it to condition that stay on the posting of security for the full amount of the Award or, in the alternative and at a minimum, to (1) order Egypt to place the interest that the Award will generate during the annulment proceedings into an escrow account and (2) provide an unequivocal and unambiguous statement that it will promptly pay the principal of the Award if it is not annulled.[56]

39.    According to UFG, posting of security for the full amount does not place UFG in a more favorable position since, in any event, Article 53 of the ICSID Convention imposes on

---

[48] UFG's Rejoinder, para. 129.
[49] UFG's Rejoinder, para. 144.
[50] UFG's Opposition, para. 38.
[51] Hearing Transcript, pp. 125ss.
[52] UFG's Rejoinder, para. 132.
[53] UFG's Rejoinder, para. 132.
[54] UFG's Rejoinder, paras. 136-139.
[55] UFG's Rejoinder, para. 140.
[56] UFG's Opposition, para. 73.

Egypt the obligation to comply with the Award.[57] And even if it did place UFG in a better position, this is warranted to counter-balance the negative effect of the continuation of the stay (*Mitchell v. Congo*).[58]

40.  In the alternative, the posting of post-Award interest in an escrow account is fully warranted as an appropriate counter-balancing measure for the suspension of UFG's recognition proceedings of the Award during the annulment procedure.[59] In addition, Egypt should be willing to issue an unequivocal written guarantee that it will voluntarily comply with the Award should it not be successful in the annulment procedure, similar to the written undertaking required by the committee in the *Compañía de Aguas del Aconquija* case.[60]

41.  Thus, UFG asks the Committee to dismiss Egypt's Application for a stay of enforcement of the Award and lift the current stay of enforcement. In the event that Egypt's Application for a continuation of the stay is granted, UFG requests the Committee to require Egypt to provide security for the full amount of the Award or, in the alternative, (1) to order Egypt to pay interest on the Award during the course of the stay of enforcement into an escrow account and (2) require that Egypt provide an unequivocal and unambiguous written statement guaranteeing prompt payment of the Award's principal should the request for annulment be rejected.[61]

## THE *AD HOC* COMMITTEE'S ANALYSIS

42.  The Committee will address first the legal standard applicable to the stay of enforcement; then whether there are circumstances in this particular case that require the continuation

---

[57] UFG's Rejoinder, para. 148.
[58] UFG's Rejoinder, para. 155.
[59] UFG's Rejoinder, para. 163.
[60] UFG's Rejoinder, paras. 164-165.
[61] UFG's Rejoinder, para. 167.

of the stay of enforcement; and if the stay of enforcement is continued, whether it should be subject to conditions.

## A.   THE APPLICABLE LEGAL STANDARD

43.   Article 52(5) of the ICSID Convention establishes the faculty of the Committee to decide on Egypt's request for the continued stay of enforcement of the Award:

> *The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.*

Rule 54 of the Arbitration Rules specifies the procedure as follows:

> *(1) The party applying for the interpretation, revision or annulment of an award may in its application, and either party may at any time before the final disposition of the application, request a stay in the enforcement of part or all of the award to which the application relates. The Tribunal or Committee shall give priority to the consideration of such a request.*

> *(2) If an application for the revision or annulment of an award contains a request for a stay of its enforcement, the Secretary-General shall, together with the notice of registration, inform both parties of the provisional stay of the award. As soon as the Tribunal or Committee is constituted it shall, if either party requests, rule within 30 days on whether such stay should be continued; unless it decides to continue the stay, it shall automatically be terminated.*

> *(3) If a stay of enforcement has been granted pursuant to paragraph (1) or continued pursuant to paragraph (2), the Tribunal or Committee may at any time modify or terminate the stay at the request of either party. All stays shall automatically terminate on the date on which a final decision is rendered on*

the application, except that a Committee granting the partial annulment of an award may order the temporary stay of enforcement of the unannulled portion in order to give either party an opportunity to request any new Tribunal constituted pursuant to Article 52(6) of the Convention to grant a stay pursuant to Rule 55(3).

*(4) A request pursuant to paragraph (1), (2) (second sentence) or (3)* [for a stay or its modification or termination] *shall specify the circumstances that require the stay or its modification or termination. A request shall only be granted after the Tribunal or Committee has given each party an opportunity of presenting its observations.*

*(5) The Secretary-General shall promptly notify both parties of the stay of enforcement of any award and of the modification or termination of such a stay, which shall become effective on the date on which he dispatches such notification.*

44.     It is clear from Article 52(5) of the Convention that the Committee's decision on the continuation of a stay is discretionary ("the Committee *may…*"). It is also clear that the Committee's discretionary decision must be based on its appreciation of the specific circumstances of each case ("…if it considers that the circumstances so require…"). Which circumstances are relevant is left unspecified under Article 52(5), a further indication of the ample discretion of the Committee in this respect.[62] As is reflected by their presentations during the Hearing, both Parties are in agreement with this standard, accepting that granting of the stay lies within the discretion of the Committee and is circumstance based.[63]

---

[62] See in this same sense, *Burlington Resources, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Stay of Enforcement of the Award, August 31, 2007 (CLA-06) ("*Burlington v. Ecuador*"), para. 70.
[63] See Hearing Transcript, pp. 30-31 for Egypt's position and pp. 90-91 for UFG's position.

45.     Article 53(1) of the Convention establishes that an award is binding and immediately enforceable, "except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention". Thus, the Convention attempts to strike a balance between, on the one hand, the binding nature and enforceability of ICSID awards and, on the other hand, the procedural right of the parties to request an annulment in accordance with Article 52, including the right to request a stay of enforcement of the award. As stated by the committee in *Standard Chartered Bank v. TANESCO*, "the obligation that each State assumed on ratification of the Convention, under Article 53, to comply with awards against it is particularly important. This obligation is as important as the right to pursue annulment under Article 52 of the ICSID Convention. These two articles are linked together."[64]

46.     It is now well accepted that the continuation of a stay is not automatic and that there exists no presumption in favor of a stay of enforcement.[65] In view of the presumed validity of ICSID awards, several committees have confirmed the exceptional nature of a continued stay.[66] This Committee finds that a continued stay remains the exception to the immediate enforceability of ICSID awards and that its decision must depend on the specific circumstances of the case.

---

[64] *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited*, ICSID Case No. ARB/10/20, Decision on Applicant's Request for a Continued Stay of Enforcement of the Award, April 12, 2017 (CLA-35) ("*Standard Chartered Bank v. TANESCO*"), para. 84.

[65] *Sempra Energy International v. The Argentine Republic Argentina*, ICSID Case No. ARB/02/16, Decision on The Argentine Republic's Request for a Continued Stay of Enforcement of the Award (Rule 54 of the ICSID Arbitration Rules), March 5, 2015 (RLA-38), para. 27. Both Parties concur in their oral presentations during the Hearing that the continuation of the stay is not automatic, see Hearing Transcript, pp. 30-31 and 90-91.

[66] *Flughafen Zürich A.G. y Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Decision on the Termination of the Stay of Enforcement of the Award, March 11, 2016 (CLA-07) ("*Flughafen Zürich v. Venezuela*"), para. 57; *Ioannis Kardassopoulos and Ron Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Decision of the *ad hoc* Committee on the Stay of Enforcement of the Award, November 12, 2010 (RLA-58) ("*Kardassopoulos v. Georgia*"), para. 26; *Burlington v. Ecuador*, para. 73; *Churchill Mining Plc and Planet Mining pty Ltd v. Republic of Indonesia*, ICSID Case Nos. ARB/12/14 and 12/40, Decision on the Request for Continued Stay of Enforcement of Award, June 27, 2017 (CLA-08) ("*Churchill v. Indonesia*"), para. 34.

47.     A majority of *ad hoc* committees have interpreted Article 52(5) to mean that the burden
        of proof that there are circumstances that require the stay of enforcement is for the party
        seeking the continuation of the stay.[67] Some committees have found that it is part of the
        committee's discretion to establish the existence of such circumstances.[68]

48.     In this respect, the Committee recalls that Rule 54(4) of the ICSID Arbitration Rules
        instructs the party that makes a request "pursuant to paragraphs (1), (2) (second sentence)
        or (3)", to "specify the circumstances that require the stay…". The Committee finds that
        Rule 54(4) reflects the general principle that each party must prove its claims and justify
        its allegations. According to the Committee in *Carnegie*, "…a request to stay
        enforcement is like any other request before it. A party making the request must bear the
        burden of establishing the basis for the request".[69] Whether the circumstances are met to
        accept the request for the continuation of the stay must ultimately be established by the
        Committee within its discretionary powers as provided under Article 52(5) of the ICSID
        Convention, on the basis of all relevant circumstances and after having heard the
        observations of the Parties.[70]

---

[67] *Burlington v. Ecuador*, para. 75; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Stay of Enforcement, April 4, 2016 (CLA-10) ("*OI European Group v. Venezuela*"), para. 94.

[68] *Standard Chartered Bank v. TANESCO*, para. 53.

[69] *Carnegie Minerals (Gambia) Limited v. Republic of The Gambia*, ICSID Case No. ARB/09/19, Decision on The Gambia's Request for a Continued Stay of Enforcement of the Award, October 18, 2018 (RLA-37) ("*Carnegie v. The Gambia*"), para 42. In the same line, *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/11, Decision on the Stay of Enforcement of the Award, February 22, 2018 (CLA-27) ("*Karkey v. Indonesia*"), para. 103.

[70] *Elsamex, S.A. v. Republic of Honduras*, ICSID Case No. ARB/09/4, Decision on the Republic of Honduras' Request for a Continued Stay of Enforcement of the Award, January 7, 2014 (RLA-33) ("*Elsamex v. Honduras*"), para. 91; *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Decision on Applicant's Request for a Continued Stay of Enforcement of the Award, May 7, 2012 (RLA-36), para. 43.

**B.**  **ARE THERE CIRCUMSTANCES THAT REQUIRE THE CONTINUATION OF THE STAY OF ENFORCEMENT?**

49.  The Parties are in agreement that *ad hoc* committees must consider various factors in order to determine whether a continuation of the stay of enforcement should be granted.[71] They are also in agreement that, in this case, the Committee shall include in its analysis the following circumstances: (i) whether Egypt's annulment application is dilatory; (ii) Egypt's likelihood to comply with the Award if its annulment application is not granted, and (iii) the comparative hardship to the Parties of granting or not granting the stay of enforcement of the Award.[72]

### (i)  The dilatory nature of the Application

50.  Previous committees have largely agreed that the merits of the annulment application are not relevant for the purpose of the decision on whether or not to grant the continuation of a stay,[73] and that it is not for the committee to assess as a preliminary matter whether or not the annulment is likely to succeed.[74] The Committee agrees and considers that it is not appropriate for it to assess at this stage of the proceedings the extensive discussion

---

[71] See for Egypt's position, Egypt's Observations, para. 6 and Egypt's Reply para. 16; see for UFG's position, UFG's Opposition, para. 12 and UFG's Rejoinder, para. 26.

[72] Ibid. The Parties also mentioned as a relevant factor, the possibility of recoupment of payments made by Egypt should the Committee later decide in favor of the annulment, but this matter received less attention from both Parties in their written exchanges and in particular during the Hearing.

[73] *Mr. Patrick Mitchell v. Democratic Republic of the Congo*, ICSID Case No. ARB/99/7, Decision on the Stay of Enforcement of the Award, November 30, 2004 (RLA-29) ("*Patrick Mitchell v. Congo*"), para. 26; *Standard Chartered Bank v. TANESCO*, para. 60; *OI European Group v. Venezuela*, para. 115; See *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on Stay of Enforcement of the Award (CLA-32), paras. 57-58, for further references.

[74] *CMS Gas Transmission Company v. Argentine Republic*, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award (Rule 54 of the ICSID Arbitration Rules), September 1, 2006 (RLA-40), para. 37; *MTD Equity Sdn Bhd. & MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on the Respondent's Request for a Continued Stay of Execution (Rule 54 of the ICSID Arbitration Rules), June 1, 2005 (RLA-31) ("*MTD v. Chile*"), para. 28.

between the Parties[75] with respect to the merits of the grounds for annulment presented by Egypt in its Application.

51.    The Committee also concurs with previous committees that it would be appropriate to determine whether an application is manifestly dilatory.[76] However, for an application to be manifestly dilatory, a high threshold must be met, such as that the application for annulment has a manifestly abusive character or was brought without any basis under the Convention.[77]

52.    The Committee has not found any indication that Egypt's Application is manifestly abusive, without any basis in the Convention, or otherwise manifestly dilatory. In reaching that conclusion, the Committee considers that, by requesting the annulment of the Award and the continuation of the stay of enforcement, Egypt is exercising its procedural rights granted by the Convention, and should be presumed to act seriously and in good faith.[78]

53.    On the other hand, as the committee in *OI European Group* stated, "the mere fact that the application is not dilatory is not sufficient to grant the extension of the stay".[79] This factor is therefore not by itself dispositive either way for the decision of the Committee.

**(ii)    Egypt's likelihood to comply with the Award**

54.    The Parties disagree on the likelihood that Egypt will comply with the Award should its request for annulment be rejected. Egypt has stated in its Observations that "[t]he prospect of a state's prompt compliance with an award for which annulment does not

---

[75] For Egypt's position, see Egypt's Observations, para. 10 and Egypt's Reply, paras. 95-123. For UFG's position, see UFG's Opposition, paras. 43-68 and UFG's Rejoinder, paras. 106-127.

[76] *OI European Group v. Venezuela*, para. 115; *Elsamex v. Honduras*, paras. 96-97.

[77] *Patrick Mitchell v. Congo*, para. 26; *MTD v. Chile*, para. 28.

[78] Egypt has referred to the dissenting opinion of Mark Clodfelter as a demonstration of Egypt's good faith in seeking the annulment, see Egypt's Observations, para. 10. The Committee notes that in its opinion the existence of a dissenting opinion is not evidence nor weights in favor or against the seriousness or good faith of the application for annulment.

[79] *OI European Group v. Venezuela*, para. 115.

*Unión Fenosa Gas S.A. v. Arab Republic of Egypt*
*(ICSID Case No. ARB/14/4) – Annulment Proceeding*

succeed is an important factor in assessing whether to continue a stay of enforcement".[80] In support of its position Egypt has referred to the compliance of its domestic legislation with Article 54 of the Convention as well as its record of voluntary compliance with previous awards rendered against it by ICSID Tribunals, stating that "there is no reason for the Committee to doubt Egypt's compliance with the Award in the event that it is not annulled".[81] UFG strongly disagrees with Egypt's understanding of voluntary compliance and refers to further circumstances that would render unlikely Egypt's voluntary compliance with the Award if it is upheld.[82]

55.   As was stated by the *Enron* committee, "the relevant inquiry is whether in all the circumstances it may be said that there is sufficient doubt as to whether there will be compliance with ICSID Convention obligations on a final award in the event it is not annulled".[83]

56.   One of the circumstances committees have considered in this regard is the compliance by State parties to the Convention with their obligation to give effect to Article 54 in their internal law.[84] The Committee is satisfied that Egypt's domestic legislation complies with its obligation to give effect to Article 54. Nonetheless, the Committee is inclined to agree with UFG that this consideration has more negative than positive weight, i.e. when a State has not adopted laws to implement Article 54,[85] which is not the issue here. This is

---

[80] Egypt's Observations, para. 12.

[81] Ibid.

[82] UFG's Opposition, paras. 13ss.

[83] *Enron Corporation and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, October 7, 2008 (RLA-30) ("*Enron v. Argentina*"), para 49. See also *Standard Chartered Bank v. TANESCO*, para 62: "The key test is whether there is sufficient doubt that the applicant on annulment will comply with the award, if upheld".

[84] *Enron v. Argentina*, para. 79; *Elsamex v. Honduras*, para. 107.

[85] UFG's Opposition, para. 23.

also reflected in the *Elsamex v. Honduras* decision on stay,[86] and various decisions rendered by committees in cases against Argentina.[87]

57. The Parties' main disagreement concerns Egypt's record of compliance with the ICSID awards rendered against it. In particular, on whether settlement agreements can be considered or not as (a form of) voluntary compliance.

58. Egypt maintains that out of the 24 ICSID cases against it, it has prevailed in nine cases, and has reached pre- and post-award settlements in at least 11 cases. With respect to the remaining four cases, it states to have complied with two awards (*Wena Hotels* and *Middle East Cement*) whereas two additional cases were discontinued pursuant to ICSID Arbitration Rule 44 (*Hussein Sajwani, et al.* and *Utsch M.O.V.E.R.S. International GmbH et al.*).[88] Thus, it denies to have ever defaulted on an ICSID award.[89]

59. UFG's position is that Egypt has never voluntarily complied in full with an award against it and that a pre- or post-award settlement is not evidence of voluntary compliance.[90]

60. The Committee agrees in principle with the *Burlington* committee that "[w]hile it is up to [the] parties to negotiate a settlement if they find it convenient, it is not what compliance means under the ICSID Convention".[91] At the same time, the Committee finds that the fact that Egypt has settled 11 out of 24 cases filed against it with a discount of the amount claimed (pre-award settlement) or the amount of the award (post-award settlement) is not a circumstance that, in the words of the *Enron* decision cited above, creates "sufficient doubt" as to Egypt's likelihood of compliance with the Award.

---

[86] *Elsamex v. Honduras*, para. 107.

[87] See *Enron v. Argentina*, para. 79; *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award (Rule 54 of the ICSID Arbitration Rules), December 28, 2007 (RLA-32), para. 39.

[88] Egypt's Reply, para. 23. See also Egypt's oral arguments, at Hearing Transcript, pp. 58 and 160.

[89] Egypt's Reply, para. 22.

[90] UFG's Opposition, para. 16.

[91] *Burlington v. Ecuador*, para 84.

61.   In order to present specific evidence of Egypt's unwillingness to comply with the Award, UFG has introduced two witness statements by Mr. Javier Sáez Ramírez, Chairman of UFG, stating that he has been told by representatives of Egypt in the course of settlement negotiations that Egypt will not voluntarily pay this ICSID Award and that UFG must settle if it wants to recover any money.[92] Egypt in turn has filed a witness statement by Dr. Magdy Mohammed Galal, EGAS Vice Chairman for Operations and the National Gas Grid, who refutes Mr. Sáez's statements.[93]

62.   The Committee does not find the witness statement of Mr. Sáez to comprise sufficient evidence of Egypt's unlikely future compliance with the Award. Mr. Sáez's statement has been directly controverted by Dr. Magdy's witness statement. More importantly, the testimony of Mr. Sáez refers to statements made during settlement discussions between the Parties, i.e. within a context that makes it difficult to grant them conclusive value as demonstrations of Egypt's decision not to comply with the Award. Indeed, the Committee does not find it helpful to rely on confidential conversations for its decision on the continued stay of enforcement, even more so when, as the Parties mentioned during the Hearing, their settlement negotiations are still ongoing.[94]

63.   UFG has also referred to Egypt's default on advance payments required under Rule 14 of the Administrative and Financial Regulations during the arbitral proceedings as a factor indicating Egypt's lack of commitment to voluntary compliance with the Award. The Committee does not ignore that each party shall in principle contribute half of the arbitration costs during the tribunal proceedings, and that a party's failure to do so may have some effect in considering that party's future conduct. However, for the Committee, that circumstance alone does not create sufficient doubts as to Egypt's future compliance with the Award. The correct inquiry is whether such lack of payment of ICSID fees and

---

[92] First Witness Statement of Javier Sáez Ramirez, para. 2; Second Witness Statement of Javier Sáez Ramirez, para. 7.

[93] Witness Statement of Dr. Magdy Mohammed Galas, paras. 6-7.

[94] Hearing Transcript, pp. 185-186.

expenses allows the Committee to doubt that Egypt will comply with the Award, an inference that the Committee is not in a position to make.

64.    Finally, and importantly, the Committee notes that Egypt has offered during the Hearing to provide a statement that it will comply with the Award in case its annulment application is not granted,[95] which the Committee will take into consideration as a relevant circumstance in its decision on the request for continuation of the stay.

### (iii)    <u>The balance of hardship to the Parties if the stay of enforcement is or is not granted</u>

65.    Both Parties have presented detailed arguments, both in their written presentations and during the Hearing, on the relative hardship that each will suffer, if the stay of enforcement is continued or not. In this context, they have discussed the proper legal standard for the assessment of the circumstances that may create hardship for the Parties.

66.    UFG maintains that Egypt must demonstrate "catastrophic, immediate and irreversible consequences" if the Award is immediately enforced, which is the standard set by the committee in *MINE v. Guinea*.[96] Egypt's position is that the Committee should engage in a balancing or comparative hardship test, as have done other committees that found hardship without necessarily applying the high threshold of *MINE v. Guinea*.[97] UFG agrees that a committee would also look at a balancing of hardship between the parties.[98] The Committee considers that when both parties, as in this case, allege that the continuation of the stay will cause prejudice to them, the analysis of hardship is a balancing exercise, for the Committee to undertake within its discretion.

---

[95] Hearing Transcript, pp. 84-85.

[96] *Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4, Interim Order No. 1, Guinea's Application for Stay of Enforcement of the Award, August 12, 1988 (RLA-27), para. 27. This standard has been accepted by further committees, such as *Standard Charter Bank v. TANESCO*, para. 69; *Enron v. Argentina*, para. 51 and *Border Timbers Limited and others v. Republic of Zimbabwe*, Decision on Stay of Enforcement of the Award, April 24, 2017 (CLA-36), para. 84.

[97] Hearing Transcript, p. 150, lines 11ss.

[98] Hearing Transcript, p. 168, lines 9ss.

67.   With respect to the analysis of comparative hardship, Egypt has emphasized the large amount of the Award, whose immediate enforcement would affect its fragile political, social and economic situation. Egypt refers to the 2009 Global Financial Crisis and the 2011 revolution as the main causes for its economic vulnerability. It also mentions its continuous struggle against poverty and persistent uncertainty as to its future economic development. For its part, UFG claims running the risk of insolvency before being able to collect on the Award and losing its 80% shareholding in the Damietta Plant in Egypt.

68.   A separate but related issue of disagreement concerns the risk of double recovery, claimed by Egypt as a relevant factor in the balance of hardship. The Committee tends to agree with UFG that the matter is not related to the question of hardship and in any case is premature since no award has been rendered in the CRCICA Arbitration between UFG and EGAS.[99] In any event, the Committee is satisfied by UFG's repeated assurances, both before the ICSID Tribunal and the Committee itself that UFG will not attempt to double collect any overlapping damages obtained in the two parallel arbitrations.

69.   In the opinion of the Committee, the evidence before it is not conclusive in order to establish that the stay of enforcement or its lifting would cause either Party a concrete prejudice such that the balance of hardship should weigh in favor of either of them.

70.   More specifically, the Committee agrees with the line of reasoning developed by the committees in *Burlington v. Ecuador* and *Karkey v. Pakistan*, that a State seeking the continuation of a stay needs to show concrete evidence of a particular harm that goes beyond the budgetary impact that the payment of the award may have on the public finances of the State.[100] Following the committee in *Carnegie v. The Gambia*, if the Award is not annulled, Egypt will be faced precisely with the economic challenge of complying with the Award that it would face today if the stay were not lifted. [101]

---

[99] Hearing Transcript, pp. 125ss.

[100] *Burlington v. Ecuador*, para. 83; *Karkey v. Indonesia*, para. 112.

[101] *Carnegie v. The Gambia*, para. 45.

Accordingly, it is effectively asking for a postponement of having to face those economic consequences.[102]

71.    That said, the Committee agrees with Egypt that the size of the Award in this particular case does matter and should be taken into account as a relevant circumstance by the Committee.[103] In this regard, the Committee cannot but recognize the financial difficulties and impact that the enforcement of an award of such magnitude may represent for Egypt, when there still exists a possibility that such payment may not be required if the Application to annul the Award is successful. The Committee also recognizes the potential impact on UFG's current financial situation and cash flow, it having to wait for the decision on annulment before collecting on the Award; a risk that is not completely mitigated by the post-award interest granted in the Award. In this sense, the size of the Award is a factor that affects both Parties.

72.    Under such circumstances, the Committee is in favor of granting the request for continuation of the stay of enforcement, but subject to the conditions that are expressed below.[104]

73.    The Committee agrees with the committee in *Flughafen Zürich v. Venezuela* that the grant of a stay of enforcement on adequate security may strike a reasonable balance between the Parties' competing rights and interests.[105]

74.    The Committee notes that neither Party has questioned the Committee's powers to condition a stay, even if Egypt has expressed its concern that developing countries may

---

[102] Ibid.

[103] Hearing Transcript, p. 152.

[104] In the light of its decision to continue the stay of enforcement on condition, the Committee need not address the issue of recoupment of payments by Egypt should the award ultimately be annulled. That said, the Committee has no reason to doubt UFG's assurances that it would repay any money collected on the Award should the application for annulment be successful, see Hearing Transcript, p. 171, lines 14ss.

[105] *Flughafen Zürich v. Venezuela*, para. 69.

be deterred from presenting a request for annulment if security were common practice.[106] While not necessarily sharing Egypt's concern as a general matter, the Committee agrees that in this particular case the security for the entire amount of the Award may be too onerous for the Applicant in annulment.[107] Egypt also questioned that a stay conditioned on financial security may place the award creditor in a position more favorable than it otherwise would have been had the annulment not been requested.[108] The Committee agrees with the committee in *Patrick Mitchell v. Congo* that the posting of a guarantee, even if it actually improves the position of the award creditor, is "the counterbalance to the negative effect of the stay on the beneficiary, i.e. the counterbalance to the delay in his satisfaction through payment of the amount of the award, which in principle should be immediate".[109]

75.   UFG has requested security in the form of an irrevocable bank guarantee from a reputable international bank for the total amount of the Award. In the alternative, UFG has requested security in the form of quarterly payments of interest on the Award into an escrow account, maintained at a reputable international bank outside of Egypt and an unequivocal and unambiguous written statement guaranteeing prompt payment of the Award should the request for annulment be rejected.

76.   At its turn, during the Hearing, Egypt stated that, should the Committee decide that the circumstances warrant the provision of a formal assurance in order to continue the stay of enforcement, Egypt was prepared to provide, in place of a bank guarantee or other type of financial security, an unequivocal and unambiguous written undertaking guaranteeing that it will comply without delay with its international obligations under Article 54 of the

---

[106] Egypt's Reply, para. 130.

[107] See in this respect, *Churchill Mining v. Indonesia*, para. 39.

[108] Egypt's Reply, paras. 133-137.

[109] *Patrick Mitchell v. Congo*, para. 33. See also *Standard Chartered Bank v. TANESCO*, para. 87.

ICSID Convention in the event that the Award is not annulled and becomes enforceable.[110]

77.   Given the large amount of the Award and the as yet unknown decision the Committee may reach on the annulment request, the Committee finds that the posting of security for the entire amount of the Award would impose unnecessary financial stress on Egypt, at the risk of making the condition for the stay very difficult to fulfill.

78.   The Committee finds that a written undertaking by Egypt of prompt compliance of the Award in accordance with its obligations under the Convention provides UFG with reasonable assurances of post-annulment compliance, should the application for annulment be rejected. The Committee notes that Egypt referred during the Hearing to an undertaking of compliance of its obligations under Article 54 of the Convention,[111] while UFG referred to a specific commitment for prompt payment of the pecuniary obligations imposed by the Award.[112] In the Committee's view, the purpose of the undertaking is to provide specific binding assurances by Egypt to UFG that if the Committee decides against the Request for Annulment, it will promptly comply with the Award, thereby complying with its obligations under the Convention. Therefore, the language of the undertaking must satisfy such purpose, indicating unequivocally that Egypt will comply without delay with the terms of the Award in the event that the Award is not annulled and becomes enforceable. With respect to which authority shall issue such undertaking, during the Hearing, there was agreement between the Parties that this undertaking should be issued by any high official who can bind the Government of Egypt under international

---

[110] Hearing Transcript, pp. 84-85.

[111] Egypt mentioned that it would be prepared to accept the wording from the decision in the *Elsamex v. Honduras* case. Hearing Transcript, p. 162.

[112] As to the precise wording for the written undertaking by Egypt, UFG referred to the language approved by the committee in *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic* (Hearing Transcript, p. 144).

law, as for instance, and as suggested by Egypt, the Minister of Finance or the Minister of Petroleum.[113]

79.    In addition, and given the specific circumstances of this case, the Committee finds that the proper balance of the position and interests of the Parties requires the posting of security for the amount of post-Award interest that the Award will generate during the course of the annulment proceedings, to be released or payable to UFG upon the issuance of a final decision of the Committee rejecting the annulment.  On the one hand, it allows Egypt to receive the benefit of the stay of the enforcement of the Award without imposing an unreasonable burden on it.  At the same time, it allows UFG to immediately collect accumulated post-Award interest, should the Award be confirmed, and to promptly comply with its financial obligations.[114]

80.    At the end of the Hearing, the Committee asked the Parties, in case the Committee should decide to condition the stay on UFG's alternative submission, whether the interest payment amounts should be placed in an escrow account or secured with an irrevocable bank guarantee.[115] UFG considered both options acceptable, expressing some preference for a bank guarantee.[116] Egypt did not express any preference as it opposes any condition on the stay that implies financial expenditures pending the annulment procedure.[117] The Committee further notes that the Parties are in disagreement as to the correct calculation of the post-Award interest.[118]

---

[113] Hearing Transcript, pp. 179-180.

[114] Cf. *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award rendered on August 20, 2007 (Rule 54 of ICSID Arbitration Rules), November 4, 2008 (RLA-42), para. 42.

[115] Hearing Transcript, p. 177.

[116] Hearing Transcript, p. 181.

[117] Hearing Transcript, pp. 181-182.

[118] See for UFG's estimated Post-Award Interest until May 31, 2020, UFG's Opposition, Appendix A, updated in UFG's Rejoinder, Appendix A. See for the Parties' discussion of the correctness of UFG's calculation, Egypt's Reply, p. 49, footnote 274 and UFG's Rejoinder, p. 74, footnote 331.

81.     The Committee invites the Parties to liaise and agree on the modality and exact terms of the security thus established by the Committee, either in the form of an escrow account, held by a reputable international bank outside Egypt, established by Egypt in favor of UFG or by written bank guarantee issued by a reputable international bank, at Egypt's election. Within 15 calendar days following the notification by the ICSID Secretariat of this Decision, the Parties shall inform the Committee on the progress of their discussions and, if no agreement can be reached on the exact terms of the security, shall request further instructions from the Committee. The Applicant shall issue the financial security and provide a copy of the instrument to the Committee no later than 60 calendar days following the notification of this Decision.

82.     In addition, Egypt shall provide a written undertaking by the appropriate Egyptian authority, in the form referred to in paragraph 78, stating as follows: "The Arab Republic of Egypt commits itself unconditionally to comply without delay with its pecuniary obligations imposed by the Award, to the extent that the Award is not annulled and becomes enforceable, pursuant to the provisions established in Articles 53 and 54 of the ICSID Convention."

83.     The written undertaking shall be provided to the Committee together with the copy of the financial security issued by the Applicant, in accordance with the time schedule established above.

*Unión Fenosa Gas S.A. v. Arab Republic of Egypt*
*(ICSID Case No. ARB/14/4) – Annulment Proceeding*

## V.    DECISION

84.    For the reasons set forth above, in the use of its discretionary powers and having considered all relevant circumstances, the Committee unanimously decides as follows:

(1) To continue the stay of enforcement of the Award of August 31, 2018, in ICSID Case No. ARB/14/4 pending a decision on the Application and subject to the conditions established in this Decision;

(2) Within the period of 60 calendar days, the Applicant shall issue a financial security and provide a written undertaking in the terms established by the Committee in paragraphs 79 to 82 of this Decision, and submit a copy of both instruments to the Committee;

(3) The decision on costs in relation to the Request for the Continuation of the Stay of Enforcement of the Award is reserved until the conclusion of the annulment proceeding.

On behalf of the *ad hoc* Committee

_____
Mr. Andrés Jana Linetzky
President of the *ad hoc* Committee
Date: October 18, 2019