# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNION FENOSA GAS, S.A.<br><br>*Plaintiff*,<br><br>v.<br><br>ARAB REPUBLIC OF EGYPT<br><br>*Defendant*. | No. 1:18-cv-02395-JEB |

# DEFENDANT ARAB REPUBLIC OF EGYPT'S
# REPLY IN SUPPORT OF ITS MOTION TO SET ASIDE DEFAULT AND TO STAY
# FURTHER PROCEEDINGS
# <u>(ORAL ARGUMENT REQUESTED)</u>

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Matthew D. Slater
Larry C. Work-Dembowski
2112 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20037

*Counsel for the Arab Republic of Egypt*

The Arab Republic of Egypt ("Egypt") submits this reply in support of its Motion to Set Aside Default and to Stay Further Proceedings filed on March 6, 2020.  ECF No. 18.

## PRELIMINARY STATEMENT

The Clerk's default is not sustainable, and plaintiff Unión Fenosa Gas, S.A. ("UFG") does not seriously contend that it is.  In its opposition to Egypt's motion to vacate the Clerk's default, UFG stated that it "would not object to vacatur of the Clerk's entry of default." ECF No. 21 at 2; *see also id.* at 8.  And in abandoning its motion for default judgment, ECF No. 24, UFG accepts the logical and legal consequence of vacating the Clerk's default.  Without a Clerk's default, there is no basis for granting a default judgment.  *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 66 n.1 (D.D.C. 2011) ("Rule 55 specifies a two-step process for a party seeking to obtain a default judgment.  First, the plaintiff must request that the Clerk of the Court enter a default . . . .  Second, . . . the party must apply to the court for an entry of default judgment."); 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2683 (4th ed.), Westlaw (database updated April 2020) ("Prior to obtaining a default judgment . . . there must be an entry of default as provided by Rule 55(a)"); *see also* ECF No. 23 (Opposition to Motion for Default Judgment).  Thus, the only truly live issue is Egypt's request for a stay.

As to the stay, UFG complains that it is being "punished" for accepting the reality that it is not entitled to a default judgment and insists that Egypt and the Court must accommodate UFG's insistence that this case proceed immediately, ECF No. 24 at 1-2, notwithstanding the considerable reasons, grounded in judicial economy, international comity, the avoidance of inconsistent rulings, and the hardships Egypt faces, that counsel for a stay.  Staying further proceedings in this action is appropriate in light of the pending annulment proceedings that have continued and may soon moot this case or, in any event, potentially simplify the issues the Court

must resolve. Forcing Egypt to defend against recognition and potential enforcement of the award before those proceedings are concluded would impose undue hardship and prejudice on Egypt, hardships that have been magnified by the COVID-19 pandemic. Accordingly, Egypt respectfully requests that the Court vacate the Clerk's default and stay the case pending conclusion of the ICSID annulment proceedings.

## I. THE CLERK'S DEFAULT SHOULD BE VACATED BOTH BECAUSE UFG DOES NOT OPPOSE EGYPT'S MOTION AND BECAUSE VACATUR IS APPROPRIATE UNDER THE CIRCUMSTANCES.

Because UFG does not seriously oppose Egypt's motion to set aside the Clerk's default, the Court should grant the motion. *See, e.g. Martinez v. China Boy, Inc.*, No. 16-cv-496, 2017 WL 9989877, at *1 (D.D.C. Nov. 21, 2017) (granting a motion to vacate a default judgment where it was not opposed by the plaintiff). Recognizing, however, that vacating the default is not the same mechanical process at the hands of the Clerk that its entry was, Egypt responds to UFG's arguments and demonstrates that vacating the default is proper because (1) Egypt's default was not willful, (2) Egypt has meritorious defenses to UFG's complaint, and (3) UFG has not been and will not be prejudiced. *Enka Insaat Ve Sanayi A.S. v. Gabonese Republic*, 406 F. Supp. 3d 84, 87 (D.D.C. 2019).

### A. There Has Been No Willful Default.

The purported technical default by Egypt in this case was not willful. UFG asserts that Egypt was required to enter an appearance in this action notwithstanding the ICSID Annulment Committee's provisional stay of enforcement, ECF No. 21 at 6–7, and, based on specious reasoning, that Egypt's appearance was untimely even if that were not the case. Even if either argument were credited, which they should not be, neither demonstrates that Egypt made a willful default.

First, UFG misstates the date on which the provisional stay became effective. As UFG acknowledges, Egypt filed its annulment petition with ICSID on December 21, 2018. ECF No. 6 at ¶ 6. While the ICSID Secretary General did not transmit its registration of that petition and its recognition of the provisional stay until after the holiday season on January 8, 2019, the stay nonetheless automatically became effective when Egypt filed its application on December 21. Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, art. 52(5), Oct. 14, 1966, 17 U.S.T. 1270, 575 U.N.T.S. 159 (hereinafter "ICSID Convention") ("If the applicant requests a stay of enforcement of the award in his application, enforcement *shall be stayed* provisionally until the Committee rules on such request." (emphasis added)). The Secretariat's administrative notification does not and cannot change the automatic operation of the treaty. Thus enforcement was stayed 34 days after UFG purports to have effected service on November 17, 2018, ECF No. 8 at ¶ 3, as UFG later notes, ECF No. 21 at 7.

UFG cites no authority for its assertion that Egypt was required to appear notwithstanding that the treaty-based stay of enforcement precluded UFG from summoning Egypt in this enforcement action. UFG's argument is both cynical and inconsistent with UFG's own litigation position until recently. UFG itself relied upon the existence of the provisional stay in explaining why this Court should not dismiss its complaint for want of prosecution. ECF No. 6 at ¶ 6 ("[T]he ICSID Secretary General transmitted a notice of registration of Egypt's annulment application to UFG and Egypt, and simultaneously issued a <u>provisional</u> stay of enforcement of the ICSID award. Given the temporary nature of the stay issued by the ICSID Secretary General, UFG shall continue diligently working to effect service so that *once the ICSID stay is dissolved*, the instant action may proceed without delay." (second emphasis added)). And in subsequent status reports, UFG consistently referenced the stay as a reason why this action was not proceeding. *See*

ECF No. 8 at ¶ 4 ("The provisional stay of enforcement issued by ICSID on January 8, 2019, remains in effect at present."); ECF No. 9 at ¶ 2 ("The provisional stay presently remains in effect."); ECF No. 11 at ¶ 9 ("[B]ecause of the provisional stay granted by the Annulment Committee, Egypt still has not appeared in this action."); ECF No. 12 (continuing to note the presence of the provisional stay).

In none of these reports did UFG suggest that UFG, or Egypt, could defy the stay of enforcement proceedings by prosecuting, or defending against, UFG's complaint here. Nor did UFG make such a claim in its conversations with Egypt's counsel prior to the filing of Egypt's annulment petition. Indeed, UFG's response to the Court's order to show cause why the case should not be dismissed for want of prosecution stated that the case could proceed only "*once the ICSID stay is dissolved*." ECF No. 6 at ¶ 6 (emphasis added). And for good reason: Considerations of comity support giving effect to ICSID's stay of enforcement actions concerning its own arbitral award. *See Novenergia II-Energy & Environment v. Kingdom of Spain*, No.18-cv-01148, 2020 WL 417794, at *3–4 (D.D.C. Jan. 27, 2020) (citing a Swedish arbitral panel's decision to stay enforcement of its arbitral award as a reason to stay U.S. proceedings).

Indeed, UFG's final status report on January 27, 2020 (filed the first business day after the provisional stay was lifted) made no mention of any intent to seek a default. ECF No. 13. Far from suggesting Egypt was in default, UFG requested that the Court set a briefing schedule "requiring Egypt's prompt response to UFG's Complaint," *id.* at ¶ 5.[1] UFG's subsequent embrace

---

[1] In an ironic twist, UFG implies that Egypt moved *too quickly* to set aside the Clerk's default and should instead have waited longer for UFG to state its position. *See* ECF No. 21-1, ¶ 8. But even after Egypt filed its motion, UFG did not come back with its position until it informed the Court that it does not object to vacating the Clerk's default. ECF No. 21 at 2. Its proviso regarding the timing for Egypt to respond to the Complaint, *id.*, is a scheduling matter that relates to Egypt's motion for a stay, but is not a principled reason to leave the default in place.

of the Court's later invitation to file an affidavit of default, ECF No. 14, cannot erase the long record of UFG's representations to the Court that the case was stayed for all parties. Nor can it transform Egypt's conduct, which was entirely in line with UFG's own consistent position, into a willful default. *See Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc.*, 275 F.R.D. 20, 26 (D.D.C. 2011) ("Showing a willful disregard of court filing requirements would plainly be difficult to make . . . where, as here . . . [the] defendant relied on opposing counsel's representation[s]."). That Egypt had not filed an answer or motion to dismiss by February 19, 2020, when UFG contends (without citation) that Egypt's statutory 60 days to respond had expired. ECF NO. 21 at 9–10, is a moot point, because well before then the Clerk had already issued the default in question, ECF No. 15. It was more than reasonable for Egypt to focus its attentions on setting aside that default and seeking a stay under the circumstances.[2]

In short, UFG's purported evidence of bad faith by Egypt does not hold water, and there was no willful default.

### B.    Egypt Has Meritorious Defenses to UFG's Complaint.

As Egypt explained in its motion, it has substantial and meritorious defenses to UFG's attempts to enforce the Award, namely: (1) that the ICSID tribunal violated Egypt's due process rights by rejecting Egypt's corruption defense on a theory incompatible with either party's submissions and to which Egypt was not afforded the opportunity to respond; and (2) that the ICSID tribunal lacked jurisdiction over the dispute. Either argument would justify not recognizing

---

[2]    Considering that UFG moved for a briefing schedule on the first business day after the ICSID stay was lifted, ECF No. 13, and the Clerk's default was filed little more than a week later, ECF No. 15, it cannot be said that Egypt was negligent, much less willful, in not responding to the complaint between the termination of the stay and entry of the Clerk's default. *Cincinnati Ins. Co. v. All Plumbing Inc. Serv., Parts, Installation*, 292 F.R.D. 3, 6 (D.D.C. 2013) (explaining that "a negligent filing error" is "normally considered an excusable failure to respond" rather than a willful one).

the Award under the applicable full faith and credit standard.  These arguments are thus more than enough to meet the low bar for a "meritorious" defense in the context of a motion to set aside a default.  *Enka*, 406 F. Supp. 3d at 89–90 ("Meritorious in this context does not mean 'likelihood of success,' but rather, defenses are meritorious for the purpose of setting aside a default if they contain even a hint of a suggestion which, if proven at trial, would constitute a complete defense." (internal quotation marks and citations omitted).

UFG seeks to gloss over these defenses with the conclusory assertion that "Egypt is not entitled to raise any merits defenses."  ECF No. 21 at 8.  But that argument ignores the plain language of the statute, which unequivocally contemplates a role for the Court beyond rubber-stamping any award an ICSID tribunal issues.

Section 1650a provides that ICSID awards shall be given only "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  22 U.S.C. § 1650a(a).  The judgment of a state court can be denied full faith and credit where the issuing tribunal deprived the defendant of due process, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980) ("A judgment rendered in violation of due process is void in the rendering State and is not entitled to full faith and credit elsewhere."), or where the issuing tribunal lacked subject-matter jurisdiction, *Underwriters Nat'l. Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n.*, 455 U.S. 691, 704 (1982).  Thus, the same must be true of ICSID awards.  UFG's position would mean that U.S. courts are compelled to recognize an ICSID award merely because it had been issued — even if it was issued in absentia, without notice, and against a country that was not a signatory to the ICSID Convention.[3]  That is not what the statute says, and the Court should not accept UFG's fanciful gloss on that language.

---

[3] Apropos of Egypt's due process defense, in a decision announced just as this brief was to be filed, the Supreme Court reprimanded and reversed the Ninth Circuit for staging a

### C.     UFG Will Not Be Prejudiced By Setting Aside the Default.

Finally, UFG has not shown that it would be prejudiced by setting aside the Clerk's default.  For most of the time since UFG filed its complaint, UFG was prevented from enforcing its award by the ICSID stay, not because Egypt had not yet appeared in these proceedings.  In the meantime, both Egypt and UFG have been vigorously litigating Egypt's annulment petition and engaging in settlement negotiations.  There has been no delay in the ICSID proceedings, and Egypt has not engaged in dilatory conduct.  Egypt is entitled to challenge the Award under the terms of the ICSID Convention, and the dissenting arbitrator's opinion demonstrates that Egypt has a solid basis for doing so.  The annulment hearing is scheduled for July 2020, and it is manifestly not the case that no progress towards a final resolution has been made.

Moreover, the only possible consequence to UFG of setting aside the Clerk's default is that UFG would have to prove its case for recognition and refute Egypt's defenses.  Having to prove one's case is not legal prejudice, and UFG's desire to avoid doing so is not a sufficient reason to grant it a default judgment.  Vacating the Clerk's default in fact places UFG in precisely the position it requested.  ECF No. 13 at ¶¶ 4–5.

## II.     THIS COURT SHOULD STAY FURTHER PROCEEDINGS IN THIS CASE PENDING THE RESOLTION OF THE ICSID ANNULMENT PROCEEDINGS.

Proceeding to brief and decide the merits of this case before the conclusion of the ICSID annulment proceeding would needlessly expend judicial resources, ensnare the Court

---

"takeover of [appellant's] appeal" by inviting briefing from three amici and then deciding a case on grounds that were not presented by either party and, in fact, were "contrary [to the] theory of the case" that the appellant had presented at trial. *United States v. Sineneng-Smith*, ___ S. Ct. ___, 2020 WL 2200834, at *5 (2020).  Indeed, the ICSID tribunal's violation of the adversary presentation principle in this instance was even more egregious than the Ninth Circuit's error, as the Ninth Circuit at least gave the parties the chance to respond to its novel theories of the case. *Id.*

(perhaps unnecessarily) in complex questions of domestic and international law, and force the parties to bear the burden and expense of litigating similar issues in two distinct forums. UFG's attempt to rebut these arguments in favor of a stay is unavailing.

### A. The Interests of Judicial Economy Weigh In Favor of a Stay.

In this context as well, UFG insists that Egypt has no right to raise defenses to UFG's attempt to gain recognition of the Award, ECF No. 21 at 10–11, but as Egypt explained above, that is incorrect, *supra* at 6–7.

As UFG itself acknowledges, Egypt's defenses in these proceedings are substantially similar to its arguments before the Annulment Committee. ECF No. 21 at 8. That fact alone strongly favors staying these proceedings. *Novenergia II*, 2020 WL 417794, at *3 ("Here, the court's interest in judicial economy favors a stay. 'Litigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interest.'" (quoting *Naegele v. Albers*, 355 F. Supp. 2d 129, 141 (D.D.C. 2005)). "A hasty resolution [of substantially the same issues being litigated in the arbitral forum] resulting in [potentially] inconsistent rulings is not in the interest of judicial economy. Consequently, despite the delay, a stay pending the outcome of the [annulment] proceedings will conserve judicial resources." *Id.*

At the very least, the Annulment Committee's analysis of these issues will prove useful to this Court as it considers them here, should UFG prevail over Egypt's annulment application.

Indeed, this case is almost precisely analogous to *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 39–40 (D.D.C. 2019), where the Court cited complex issues of international law, the burden of dual forum litigation, the risk of conflicting

9

decisions, and the potential of the annulment decision to be helpful to the Court as reasons to grant a stay. UFG attempts to distinguish *Masdar* with self-serving arguments that the issues here are not complex and that there is no dispute here about arbitrability, but those arguments stem from UFG's misapprehension of Egypt's defenses under Section 1650a. In fact, Egypt's defenses — including that there was no agreement to arbitrate because UFG's corrupt practices took the underlying contract outside the scope of the bilateral investment treaty — raise issues at least as complex as the issues of treaty interpretation and EU case law at issue in *Masdar*.

### B. Interests of Comity Do Not Weigh Against a Stay.

In its opposition, UFG seeks to give almost dispositive weight to the Annulment Committee's conditioning the extension of the provisional stay on Egypt posting security, which Egypt was unable to do. ECF No. 21 at 8–12. Its argument that international comity demands that this Court deny Egypt's motion for a stay misunderstands the nature of international comity. In dissolving the provisional stay of enforcement, the Annulment Committee did not rule that enforcement actions *must* or *should* proceed while the annulment proceedings continue: it only ruled that they *can* proceed if the courts of the signatory states allow them to. UFG can point to no order from the Annulment Committee requiring that this case proceed. There is thus no order which this Court would countermand by staying its own proceedings; rather, UFG essentially asks this Court to defer, in the name of supposed comity, to an order that does not exist. The federal courts do not typically afford comity to the absence of a decision from a foreign tribunal. *U.S. v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 9 (D.D.C. 2013) ("If anything is clear, however, it is that the doctrine of international comity will not impede a judicial proceeding when no foreign judgment exists.").

UFG's complaint that the Court should not stay this case when the Annulment Committee required security for its stay extension, ECF No. 21 at 8–9, misapprehends the difference between the two proceedings. Any stay issued by this Court would apply only to this case, whereas the ICSID stay barred enforcement efforts anywhere in the world. Correspondingly, a stay by this Court would serve the Court's interests in regulating its own proceedings in the interests of judicial economy, comity, the avoidance of conflicting rulings, and justice. And when granting stays in similar circumstances, this Court has generally declined to require sovereign states to post security. *Novenergia II*, 2020 WL 417794, at * 6 ("[C]ourts in this Circuit generally have not required foreign sovereigns to post security because they are 'presumably . . . solvent and will comply with legitimate orders issued by courts in this country . . . .'" (quoting *DRC, Inc. v. Republic of Honduras*, 774 F. Supp. 2d 66, 76 (D.D.C. 2011)). These differences do not render a stay in one jurisdiction an end run around the other, and all of this Court's well-established reasons for declining security requirements against a sovereign apply here.

Last, UFG's citation to this Court's decision in *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94 (D.D.C. 2019), is inapposite. In *TECO*, the annulment committee had already partially annulled the underlying award, *id.* at 99, and the Court therefore was not confronted with a potential stay pending an annulment decision. By contrast, in this case, the annulment application has yet to be decided, with a hearing scheduled for this July. The conclusion in *TECO* thus has no bearing here.

C.      **The Balance of Hardships Favors Egypt.**

Next, the balance of hardships in this case favors Egypt. As discussed in Egypt's initial motion, allowing this action to proceed forces Egypt to bear the burden of attacking the Award in two forums, and the potential that it may ultimately have to recover assets from UFG.

11

ECF No. 18 at 15; *Masdar*, 397 F. Supp. 3d at 40; accord. *Novenergia II*, 2020 WL 417794, at * 4.  This concern is aggravated because the $2.2 billion award is one of "the largest [awards] ever rendered by an ICSID tribunal," as UFG's counsel has trumpeted. Ex. A (*King & Spalding Secures Landmark US $2.2 Billion ICSID Award for Spanish Client,* King & Spalding (Sept. 9, 2018))[4].  Forcing Egypt to pay on that award now, before its ultimate validity is decided by the Annulment Committee, will place a massive financial strain on Egypt's finances, perhaps for no reason and with no guarantee of recompense if the Award is then annulled.

UFG must acknowledge that the Annulment Committee recognized the financial challenges Egypt faces.  Egypt has been facing a severe economic crisis since 2009 – aggravated by the 2011 revolution – from which it is still recovering.  UFG makes no mention of this. To avoid the acute foreign exchange shortage that had been crippling the country's economy, Egypt had no alternative but to obtain a US$ 12 billion loan from the IMF just a few years ago.  Ex. B (*Egypt wins approval for $12bn loan from the IMF*, BBC News (Nov. 12, 2016)); Ex. C (Press Release, IMF, IMF Executive Board Approved US$12 billion Extended Arrangement Under the Extended Fund Facility for Egypt (Nov. 11, 2016)).  That IMF loan has required Egypt to adopt a severe austerity program, which has strained ordinary Egyptians.  *See* Ex. D (*Egypt to raise electricity prices in latest set of austerity measure*, Middle East Eye (May 21, 2019)); *see also* Ex. E (Yasser El-Shimy & Anthony Dworkin, *Egypt on the Edge: How Europe Can Avoid Another Crisis in Egypt*, European Council on Foreign Relations (June 2017)); Ex. F (Nadine Awadalla, *Forking out: Egyptians angered by new austerity after Eid feast*, Reuters (June 19, 2018)).  Tens of millions of Egyptians live under the poverty line.  *See* Ex. G (Press Release, The World Bank,

---

[4]  Citations to Exhibits A through N in this reply are references to the exhibits attached to the accompanying Declaration of Matthew D. Slater.

World Bank Group to Extend Current Strategy in Egypt to Maintain Momentum on Reforms (Apr. 30, 2019)); Ex. H (*World Bank: 60% of Egyptians poor, middle class suffers from "reforms"*, Middle East Monitor (May 3, 2019)).  Indeed, the national poverty rate for fiscal year 2018-2019 was close to 30%, Ex. I (Press Release, The World Bank, Egypt's Economic Update – April 2020 (Apr. 16, 2020)), and the World Bank revealed in April 2019 that nearly 60% of Egyptians are either poor or belong to the poorest groups, Ex. H, *supra*, a situation about which international organizations have expressed serious concerns, *see*, *e.g.*, Ex. J (*Understanding Child Multidimensional Poverty in Egypt*, UNICEF (December 2017));  Ex. E, *supra*, at 2, 6-8.

    The Egyptian economy remains vulnerable.  Ex. E, *supra*, Ex. H, *supra*.  In a recent analysis of Egypt's economic outlook in April 2019, the Economist noted that "[d]espite the positive indicators, few Egyptians feel progress" and that "sluggish investment also reflects the weakness of Egypt's domestic market." Ex. K (*Running to Stand Still: Egypt's economy thrills investors, but locals are struggling*, The Economist (Apr. 25, 2019)).

    The Egyptian economy was thus at a delicate inflection point before the present COVID-19 crisis, and it was far from certain whether Egypt would be able to ensure long-term growth and avoid slipping back into recession even at that point.  But recent economic analysis suggests that Egypt's GDP could fall by 2.1 to 4.8 percent in 2020 based on declining tourism, Suez Canal revenues, and remittances alone if the COVID-19 crisis lasts 3-6 months, an immense shock to an already fragile economy.  Ex. L (Clemens Breisinger et al., *COVID-19 and the Egyptian Economy: Estimating the Impacts of Expected Reductions in Tourism, Suez Canal Revenues, and Remittances*, Int'l. Food Policy Research Inst., at 1 (March 2020)).  So while the IMF's intervention and the hard work of the Egyptian people were slowly lifting the country's economy before the global COVID-19 crisis, and while Egypt's recovery efforts received praise

13

in the past, the Egyptian economy remains particularly susceptible to threats, including the present global health emergency.

Egypt's eventual economic health depends on when the country can reestablish enduring political and social stability. As discussed above, the severe austerity program imposed on Egypt has significantly deteriorated the living conditions of ordinary Egyptians and increased poverty, leading experts to identify "inherent risks of instability" throughout the country. El-Shimy & Dworkin, *supra* at 11. Political and social instability place economic recovery at risk.

In these circumstances, extracting over two billion dollars from the government's coffers – a full sixth of the US$ 12 billion IMF package – before the annulment procedure can run its course is likely to have serious consequences for Egyptian society. Where millions of citizens are slipping ever deeper into poverty, imposing the payment of billions of dollars before all available procedures have run their course would constitute serious hardship.

There can also be no comfort in the contention that UFG might repay to Egypt any amount that UFG recovers before the Award is annulled. UFG is a joint venture entity and offers no security against distributing to its shareholders or creditors any money it collects in enforcing the Award, and the record demonstrates that UFG's shareholders are able to decide to dispense with UFG's assets and, indeed, its very existence, when they choose. *See* Ex. M (Stephen Jewkes & Isla Binnie*, Eni, Naturgy clinch deal that will reopen Egypt's Damietta LNG Plant by June*, Reuters (Feb. 27, 2020) (noting that UFG was to be dissolved as part of the settlement agreement between the parties)). There is no need to expose Egypt to the potential that it will be unable to recover from UFG when the Award is annulled, especially at a time when governmental funds are desperately needed to confront the current crisis.

By contrast, in describing the burden that would result from a stay, UFG manages only passing references to supposed financial hardship, ECF No. 21 at 9, 11, with no quantification or detail. At best, UFG argues that a delay *per se* amounts to an undue hardship. But that is wrong. A delay – especially a brief one – is not a dispositive hardship, and UFG has not established what, if any, actual harm it could suffer from a stay. *See Novenergia II*, 2020 WL 417794, at *4 ("[W]hile a stay may well delay the resolution of the dispute, in the long run, a stay will still likely be shorter than the possible delay that would occur if this Court were to confirm the award and the [reviewing tribunal were to] then set it aside." (internal quotation marks omitted)). The relatively minor burden of a delay in this proceeding cannot compare to the burdens the Egyptian economy and citizens would be forced to shoulder if a stay were not granted.

### D. The Parties' Settlement Negotiations Support A Stay.

A stay is especially appropriate in this case given that the parties had reached a settlement agreement, which would have obviated the need for the Court to take further action in the case. While this settlement agreement has apparently fallen through in recent weeks, as UFG indicated, public sources suggest that the parties continue to negotiate. Ex. N. (Stuart Elliot & Gianluca Baratti, *Deal to Restart Egypt's Damietta LNG Plant Falls Through*, S&P Global (Apr. 24, 2020)). A settlement would render this litigation moot. While the existence of settlement negotiations alone would not ordinarily justify a stay, it should weigh in favor of one here given the other strong reasons supporting a stay.

## CONCLUSION

For all the foregoing reasons, Egypt respectfully requests that this Court vacate the Clerk's entry of default and stay further proceedings in this matter pending the conclusion of

annulment proceedings, or, in the alternative if the Court denies the request for a stay, set a briefing schedule permitting Egypt to respond to UFG's complaint within 45 days of the Court's decision.

Dated: May 7, 2020
Washington, DC

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Matthew D. Slater*
Matthew D. Slater (D.C. Bar No. 386986)
Larry C. Work-Dembowski (D.C. Bar No. 486331)
2112 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20037
202-974-1930
mslater@cgsh.com
lwork-dembowski@cgsh.com

*Counsel for Arab Republic of Egypt*