UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNIÓN FENOSA GAS, S.A., <br><br> Plaintiff, <br><br> v. <br><br> ARAB REPUBLIC OF EGYPT, <br><br> Defendant. | Civil Action No. 18-2395 (JEB) |

**MEMORANDUM OPINION**

To stay or not to stay; that is the question. Plaintiff Unión Fenosa Gas, S.A. claims that Defendant Arab Republic of Egypt reneged on its obligation to provide natural gas to UFG's liquefaction plant in that country, forcing the plant to close down entirely. An arbitral tribunal assembled under the auspices of the International Centre for the Settlement of Investment Disputes concluded that Egypt's actions had indeed violated various treaty obligations, and it awarded Plaintiff over $2 billion for the losses it had incurred, one of the largest awards in ICSID's history.

UFG has shifted forums and now seeks this Court's recognition and enforcement of the award. Egypt offers a procedural counter, asking the Court to stay the case until the ICSID rules on its annulment petition there. While the Court is sympathetic to Plaintiff's interest in finally concluding this multi-year dispute, it ultimately finds that the unique considerations of this case warrant imposing a stay here. The Court will therefore grant Egypt's Motion to Stay and deny UFG's Motion for Entry of Default Judgment.

1

I.      **Factual and Procedural Background**

Plaintiff is a specialized natural-gas corporation organized under the laws of Spain. See ECF No. 1 (Complaint), ¶ 2. In 2000, its predecessor-in-interest entered into a Sale and Purchase Agreement with the national oil company of Egypt (formerly the Egyptian General Petroleum Corporation and now the Egyptian Natural Gas Holding Company). Id., ¶¶ 9,10. Under the SPA, the state-owned oil corporation agreed to supply a certain amount of natural gas to UFG for at least 25 years. Id., ¶ 10. This energy supply would be critical to the economic viability of UFG's proposed natural-gas liquefaction plant to be located in Damietta, a Mediterranean port city in northeast Egypt. Id., ¶¶ 7, 10.

Following the execution of the SPA, UFG built the Damietta Plant — then the largest single-train liquefaction plant in the world — at a cost of approximately $1.3 billion. Id., ¶ 14. Almost since the plant's inception, however, Plaintiff has faced difficulties in procuring the guaranteed supply of natural gas from Defendant. From 2006 through 2012, Egypt systematically undersupplied UFG while continuing to raise gas prices. Id., ¶ 16. By 2013, the supply had been reduced to such unsustainably low volumes that UFG was forced to shut down the Plant. Id., ¶¶ 19–20.

Egypt's alleged violation of the SPA implicated a series of interlocking treaties. First, in 1994, Spain and Egypt entered into a bilateral investment treaty pursuant to which each nation, among other things, "guarantee[d] in its territory fair and equitable treatment for the investments made by investors of the other Party." Id., ¶¶ 21–24; see also Compl., Exh.C (Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt), ¶ 9. Article 11 of the Treaty additionally provides that unresolved disputes among the parties shall be submitted "at the choice of the investor" (in this case, UFG)

to one of several potential arbitration bodies, including the ICSID. See Compl., ¶ 27. The ICSID was established via the "ICSID Convention," a multilateral agreement signed by over 160 states — including Spain, Egypt, and the United States — to "facilitat[e] private foreign investment in developing countries." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 100, n.1 (2d Cir. 2017). The ICSID provides a "legal framework to resolve disputes between private investors and governments," including the convening of "arbitration panels to adjudicate disputes between international investors and host governments in 'Contracting States.'" TECO Guatemala Holdings, LLC v. Republic of Guatemala, No. 17-102, 2018 WL 4705794, at *1 (D.D.C. Sept. 30, 2018) (alterations and quotation marks omitted).

With its plant closed as a result of Egypt's alleged machinations, UFG filed a request for arbitration with the ICSID in 2014. See Compl., ¶ 31. An ICSID tribunal ultimately conducted a hearing and issued an award on August 31, 2018. Id., ¶¶ 34–35. The tribunal found that: (1) it had jurisdiction over the dispute; and (2) on the merits, Egypt's conduct had, among other things, violated its obligation to provide "fair and equitable treatment" to Spanish investors under the BIT. See id., ¶¶ 36–37; see also Compl., Exh. A (ICSID Award). The Tribunal awarded Plaintiff over $2 billion in damages and $10 million in legal costs, along with both pre- and post-award interest, the latter of which has continued to accrue since the date of the award. See Compl., ¶ 38.

One member of the three-person panel — who formerly served as the State Department's Assistant Legal Adviser for International Claims and Investment Disputes — dissented. See ICSID Award at ECF p. 333. He concluded that the tribunal lacked jurisdiction because UFG had secured the SPA by corrupt means, specifically by bribing someone with influence over the Egyptian government. Id. at 333–37. He also determined that even if the ICSID tribunal

3

retained jurisdiction, UFG's claims failed on the merits, id. at 337–44, and that, in any event, the tribunal had "greatly overstated" the damages amount.  Id. at 345.

On October 17, 2018, UFG initiated the present action, seeking recognition of the award and an entry of judgment against Egypt.  See ECF No. 16 (Pl. Motion for Default Judgment), Exh. 2 (Declaration of Charlene C. Sun), ¶ 5.  Plaintiff successfully served Defendant on November 17, 2018.  Id., ¶ 7.  The following month, Egypt submitted an application to annul the award in the ICSID, and that same day, the Secretary of the ICSID issued a preliminary stay of enforcement.  Id.  A duly constituted annulment committee granted Egypt's request for a stay pending the decision on its petition, but the committee made the stay subject to certain conditions, such as Egypt's posting of a security.  Id.  Defendant failed to comply with the conditions of the stay, and the committee thus terminated it on January 24, 2020.  Id.  The parties have completed briefing on Egypt's application before the annulment committee, and a final hearing is scheduled for next month.  See ECF No. 18 (Def. Motion to Set Aside Entry of Judgment and to Stay), Exh. 6 (Procedural Order) at 17.

Meanwhile in this Court, because Egypt had failed to file an answer or otherwise respond to UFG's Complaint within sixty days of service, the Clerk of Court entered default against Defendant.  See ECF No. 15.  Plaintiff next moved for default judgment as required by Federal Rule of Civil Procedure 55.  Egypt responded with a Motion to Set Aside the Clerk's Default, along with a Motion to Stay this proceeding pending the outcome of its annulment petition.  Mercifully streamlining matters, UFG has not opposed the Clerk's vacating of the entry of default and now only contests Defendant's Motion to Stay.  See ECF No. 21 (Pl. Opp.) at 2 ("[N]ow that Egypt has appeared in this action, UFG would not object to vacatur of the Clerk's

entry of default provided that the action move forward expeditiously and without any further unjustified delay by Egypt."). This is wise given that a default judgment was quite unlikely here.

## II.     Jurisdiction

The ICSID Convention requires the United States to "'recognize an award' and 'enforce the pecuniary obligations imposed by that award.'" Teco Guatemala Holdings, LLC, 2018 WL 4705794, at *4 (quoting ICSID Convention art. 54). Accordingly, 22 U.S.C. § 1650(a) – the enabling statue for United States participation in the ICSID Convention – provides:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.

Subsection (b) of § 1650 further grants the federal district courts "exclusive jurisdiction over actions and proceedings under subsection (a) . . . regardless of the amount in controversy."

## III.    Analysis

As explained above, the only currently contested issue is whether to stay enforcement of the ICSID award pending the decision of the annulment committee. Having already waited years to recover damages for the Damietta Plant fiasco, UFG understandably wants to keep these proceedings moving. Egypt, for its part, seeks to forestall remitting over $2 billion from its coffers.

First up: the ground rules guiding the Court's decision on Defendant's request for a stay. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). In deciding whether to grant a stay, courts generally "'weigh competing interests and maintain an even balance' between the

court's interests in judicial economy and any possible hardship to the parties." Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (quoting Landis, 299 U.S. at 254–55). District courts "may not 'order a stay of indefinite duration in the absence of a pressing need.'" Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain, No. 18-cv-1148, 2020 WL 417794, at *2 (D.D.C. Jan. 27, 2020) (alteration omitted) (quoting Belize, 668 F.3d at 731–32).

UFG's Complaint implicates unique concerns because Plaintiff seeks enforcement of an award imposed by an international arbitral body and currently on appeal. Courts "have broad discretion in deciding whether to stay proceedings pending the resolution of independent legal proceedings." Id. (citing Landis, 299 U.S. at 254). Adjournment of proceedings to enforce foreign arbitral awards, however, may "impede[] the goals of arbitration – the expeditious resolution of disputes and the avoidance of protracted and expensive litigation." Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 317 (2d Cir. 1998). Such adjournments also implicate "federal courts' obligations under international treaties to promptly recognize these awards." Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain, 397 F. Supp. 3d 34, 39 (D.D.C. 2019). "'On the other hand,' premature enforcement risks 'conflicting results and a consequent offense to international comity.'" Id. (alterations omitted) (quoting Europcar, 156 F.3d at 317).

In deciding the question of whether to stay arbitral enforcement proceedings, courts in this district have sometimes employed the six-factor test developed by the Second Circuit in Europcar, 156 F.3d at 317–18. See, e.g., Hardy Exploration & Production Inc. v. Gov't of India, 314 F. Supp. 3d 95, 105 (D.D.C. 2018). Here, the Court's analysis under this Circuit's more generally applicable stay framework leads it through the most relevant factors identified by Europcar. See 156 F.3d at 317–18 (courts should consider, *inter alia*, balance of hardships to the

parties, status of foreign proceedings, and "any other [relevant] circumstances"). Additionally, the Second Circuit's test is not binding, and the parties did not brief it. The Court thus sees no reason to apply the full Europcar list *seriatim*.

Turning to the merits, as a threshold matter, considerations of judicial economy favor a stay. The ICSID Convention affords the Court "little discretion in refusing or deferring enforcement of foreign arbitral awards," but it "expressly contemplate[s] refusal for awards that have been set aside." Hulley Enterprises Ltd. v. Russian Fed'n, 211 F. Supp. 3d 269, 283 (D.D.C. 2016) (quotation marks omitted) (granting stay pending conclusion of foreign proceeding relevant to case). Here, "a parallel proceeding is ongoing[,] . . . and there is a possibility that the award will be set aside." Higgins v. SPX Corp., 2006 WL 1008677, at *4 (W.D. Mich. Apr. 18, 2006) (quoting Europcar, 156 F.3d at 317). "Although a stay would immediately delay the resolution of the parties' dispute, it would still likely be shorter than the possible delay that would occur if this Court were to confirm the award and the ICSID were to then set it aside." Masdar, 397 F. Supp. 3d at 39 (alteration omitted) (quoting Matter of Arbitration of Certain Controversies Between Getma Int'l & Republic of Guinea, 142 F. Supp. 3d 110, 114 (D.D.C. 2015)); see also Telcordia Technologies, Inc. v. Telkom SA, Ltd., 95 F. App'x 361, 362–63 (D.C. Cir. 2004) (affirming district court's decision to "adjourn" enforcement of arbitral award pending appeal of decision in High Court of South Africa); CPConstruction Pioneers Baugesellschaft Anstalt (Liechtenstein) v. Republic of Ghana, Ministry of Roads & Transp., 578 F. Supp. 2d 50, 54 (D.D.C. 2008) ("Far from being at odds with the nature of arbitration confirmation proceedings, adjournments pending the completion of set-aside proceedings are an integral part of such proceedings.").

The Court finds it significant that the possibility of the award being set aside, or at least modified, is not merely wishful thinking on the part of Egypt. The award was not only one of the largest secured in the ICSID's history, but it also garnered a dissent, a relatively rare outcome in such cases. See Anton Strezhnev, You Only Dissent Once: Re-Appointment and Legal Practices in Investment Arbitration 2 (Nov. 8, 2015), http://scholar.harvard.edu/files/astrezhnev/files/dissent_draft_1.pdf (describing "dissent aversion" in international investment arbitration and noting that from January 1972 through April 2015, roughly 80% of ICSID final awards were unanimous and fewer than 15% included a dissent). Additionally, the dissent found fault with all aspects of the majority's award: its jurisdictional holding, merits conclusion, and calculation of damages. See ICSID Award at ECF pp. 333–47.

Even if UFG prevails before the annulment committee, moreover, there is merit in pausing to permit consideration of the grounds for that committee's decision. Egypt explains that some of the arguments raised in its annulment petition are identical to those that it will offer to this Court in defending against UFG's Complaint, including that the ICSID tribunal lacked jurisdiction over the dispute. See Def. Mot. to Stay at 14–15. While Plaintiff casts doubt on these arguments' likelihoods of success, "'[l]itigating essentially the same issues in two separate forums is not in the interest of judicial economy or in the parties' best interest.'" Novenergia II, 2020 WL 417794, at *3 (quoting Naegele v. Albers, 355 F. Supp. 2d 129, 141 (D.D.C. 2005)). And given the nature of Egypt's overlapping arguments, "at a minimum" the annulment proceedings "may affect this Court's determinations . . . by virtue of the[ir] persuasive value." Masdar, 397 F. Supp. 3d at 40 (quoting Hulley Enterprises Ltd., 211 F. Supp. 3d at 284); see also Novernergia II, 2020 WL 417994, at *3 (finding that consistent argument in both forums regarding arbitration panel's jurisdiction weighed in favor of stay).

Second, the balance of hardships also favors Egypt. Whenever a contested award is on appeal, one party — in this case, Defendant — "will undeniably be burdened by having to attack the validity of the arbitral award in two forums, and perhaps in ultimately having to recover assets seized during this action should the annulment proceeding go its way." Masdar, 397 F. Supp. 3d at 40. While that concern is not dispositive, it is heightened here by the enormity of this award. See ECF No. 25 (Def. Reply), Exh. A (King & Spalding Secures Landmark US $2.2 Billion ICSID Award for Spanish Client, King & Spalding (Sept. 9, 2018)). Egypt explains, quite candidly, that it currently faces a massive fiscal crisis exacerbated by the ongoing global COVID-19 pandemic. See Def. Reply at 12–13 (Egypt's "already fragile economy," with state $12 billion in debt to the International Monetary Fund, faces "immense shock" if COVID-19 crisis lasts even 3-6 months). The Court is loath to plunge so deeply into a sovereign's treasury during a period of immense uncertainty if there is a chance that the award might be set aside or mitigated to some extent.

To be sure, UFG faces hardships of its own in withstanding more delay in this case, and the Court does not take that privation lightly. See Pl. Opp. at 7 (noting that it "took UFG over four years in arbitration to obtain the ICSID Award"). Yet many of UFG's complaints about delay would be better aimed at the ICSID itself, which has generated no dearth of criticism in recent years for its "drawn-out" arbitrations. See Adam Raviv, A Few Steps to a Faster ICSID, 8 Global Arb. Rev. 23 (Nov. 13, 2013). At this stage, the parties are, in fact, quite near the finish line. As mentioned above, a final hearing on Egypt's annulment petition will take place in July, and therefore a decision should be rendered about seven months from now. Id. at 26 (explaining that annulment committee deliberations from 2007 through 2012 took average of six months). While this might seem a long time to wait, it is short relative to the length of the entire arbitration

process. Indeed, courts in this district have granted a stay to enforce arbitration awards in the face of far greater expected delays. See, e.g., Hulley Enterprises Ltd., 211 F. Supp. 3d at 288 (granting stay where set-aside proceedings were expected to conclude "within two and a half years"); Novenergia II, 2020 WL 417794, at *3 (permitting stay where delay expected to be between one and two years). A delay of months, rather than years, thus mitigates UFG's hardship somewhat, and in the meantime, Plaintiff "will be compensated for any delay because the award includes interest." Id., at *4.

UFG counters that a stay is not warranted because the ICSID lifted its own stay of enforcement following Egypt's failure to post the required security. See Pl. Opp. at 11. The conditions predicate for a stay in the ICSID, however, are not synonymous with those pertinent here. For one, "courts in this Circuit generally have not required foreign sovereigns to post security" in order to secure a stay. Id. at *6. Ultimately, the ICSID's lifting of the stay merely permits but does not require a signatory state to enforce the award, and, for the reasons articulated, the Court finds a stay to be the appropriate course. "Many courts have reached the same conclusion in similar circumstances." Masdar, 397 F. Supp. 3d at 40 (granting stay pending decision of ICSID annulment committee and collecting numerous other cases). Finally, while UFG relies on a decision in this district where a court refused to stay enforcement of an ICSID award because the ICSID itself had not stayed enforcement, that conclusion was reached after the ICSID annulment committee had released its decision, meaning there were no further proceedings to await. TECO Guatemala Holdings, 414 F. Supp. 3d 94, 99, 108 (D.D.C. 2019).

In sum, the Court finds that a stay pending the decision of the ICSID annulment committee is proper here. This decision does not suggest that a stay is always or even often warranted whenever a losing party petitions to annul an ICSID award. Rather, this case involves

several unique circumstances that, taken in conjunction, counsel in favor of a stay — namely, the size of the award, the nature of the divided panel opinion, the duplicative arguments in play both here and before the ICSID, and uncertainties regarding an unprecedented global pandemic. Finally, the Court will not passively await further proceedings. The circumstances justifying this stay will be reviewed with regularity, and the Court will promptly turn to the merits of UFG's Complaint upon the conclusion of the ICSID proceedings.

### IV.   Conclusion

For the foregoing reasons, the Court grants Defendant's Motion to Stay and to Set Aside the Entry of Default and it denies Plaintiff's Motion for Default Judgment. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 4, 2020